IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------:
IN RE:                                                            :
                                                                       :          **Chapter 11**
**USG CORPORATION, *et al.*,**                          :
                                                                       :          **Case Nos. 01-2094 (JKF)**
                                                                       :          **(Jointly Administered)**
                    **Debtors.**                            :
---------------------------------------------------------:
**USG CORPORATION, *et al.*,**                          :
                                                                       :
                    **Movant**                             :
                                                                       :
                    **v.**                                     :          **C.A. No. 04-1560 (JFC)**
                                                                       :
**OFFICIAL COMMITTEE OF**                          :
**ASBESTOS PERSONAL INJURY**                     :
**CLAIMANTS, OFFICAL COMMITTEE:**
**OF UNSECURED CREDITORS,**                       :
**OFFICIAL COMMITTEE OF**                          :
**ASBESTOS PROPOERTY DAMAGE**               :
**CLAIMANTS AND LEGAL**                            :
**REPRESENTATIVE FOR FUTURE**                  :
**CLAIMANTS,**                                             :
                                                                       :
                    **Respondents.**                       :


**JOINT STATEMENT OF THE ASBESTOS PERSONAL INJURY CREDITORS
COMMITTEE AND THE LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS
CLAIMANTS REGARDING DISCOVERY IN ADVANCE OF HEARING ON
METHODOLOGY FOR ASBESTOS PERSONAL INJURY ESTIMATION**

Marla Rosoff Eskin (DE No. 2989)
Kathleen Campbell (DE No. 4229)
CAMPBELL & LEVINE, LLC
800 N. King Street
Suite 300
Wilmington, DE 19801
Tel: (302) 426–1900
Fax: (302) 426-9947

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
399 Park Avenue
New York, NY  10022–4614
Tel: (212) 319–7125
Fax: (212) 644-6755

Peter Van N. Lockwood
Nathan D. Finch
Walter B. Slocombe
Kimberly N. Brown
One Thomas Circle, N.W.
Washington, D.C.  20005
Tel: (202) 862–5000
Fax: (202) 429-3301

Counsel to the Asbestos Personal Injury
Creditors Committee


YOUNG CONAWAY STARGATT
& TAYLOR, LLP
James L. Patton (DE No. 2202)
Sharon Zieg (DE No. 4196)
Sean Greecher (DE No. 4484)
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
(302) 571-6600

Local Counsel for the Futures
Representative

KAYE SCHOLER LLP
Michael J. Crames
Jane W. Parver
Andrew A. Kress
Edmund M. Emrich
Benjamin Mintz
Michael Lynn
425 Park Avenue
New York, New York  10022
(212) 836-8000

National Counsel for the Futures
Representative

## **INTRODUCTION**

The Asbestos Personal Injury Creditors Committee ("ACC") and Dean Trafelet, the Legal Representative for Future Asbestos Claimants ("FCR"), jointly submit this brief regarding the need for and the proper scope of discovery in advance of the hearing regarding the selection of the appropriate methodology to be used to estimate the Debtors' asbestos-related liabilities.  Point I of the brief summarizes the pertinent bankruptcy law principles governing estimation.  Point II explains our understanding of Debtors' proposal for substantive estimation methodology and why that methodology conspicuously violates basic bankruptcy law.  Point III describes the discovery the ACC and FCR propose to take prior to the methodology hearing, and explains why such discovery is necessary and appropriate.

Briefly, the ACC and FCR request discovery regarding two issues prior to a decision on estimation methodology.  First, discovery is needed because Debtors argue that the Court should employ a "substantive" estimation methodology in place of the well-established *Eagle-Picher/Owens Corning* method for estimating asbestos related claims.  The basis for their argument is factual: that Debtors' 20 years of experience resolving asbestos personal injury cases in the tort system is — so Debtors claim — worthless for purposes of estimating their future asbestos liability because they paid tens of thousands of asbestos claims for reasons having nothing to do with the merits of those claims.  To rebut this assertion and to establish that Debtors' history of paying claims in the tort system is in fact (as well as in law) the best reflection of their liability under state law, discovery concerning Debtors' litigation history is necessary in advance of the hearing.

Second, despite their prolific filings to date, Debtors have deliberately explained their "substantive estimation" theory in only the most general of terms.  The feasibility and propriety of Debtors' proposal hinge on the proposition that this Court can determine the so-called "characteristics of a valid claim" by deciding five fact-specific questions: (1) Do "unimpaired"

claimants have a compensable injury?  (2) What level of exposure must a claimant demonstrate to establish that Debtors' products were a "substantial factor" in causing injury?  (3) Does chrysotile asbestos cause mesothelioma?  (4) Can lung cancer without asbestosis be asbestos-related?  And finally: (5) Does asbestos cause "other cancers"?

Debtors would have the Court conduct a hearing to universally resolve these five questions. At that hearing, Debtors propose that "claimants and Debtors would present their expert evidence about the diseases that asbestos causes and the amount of exposure necessary to cause those diseases."  Debtors' Case Management Statement Re: Asbestos Personal Injury Estimation ("Debtors' Statement") 7.  But it is entirely unclear what kind of "expert evidence" Debtors have in mind.  What "expert," for example, can opine on whether the tens of thousands of individual claimants were or were not as a matter of law exposed to sufficient quantities of asbestos dust at the thousands of work sites where claimants allege exposure to USG asbestos?  On whether tens of thousands of individual claimants are or are not as a matter of law medically impaired?  On whether tens of thousands of individual claimants as a matter of law possess viable claims under whichever laws of the fifty states, with all their complexities, apply?

Debtors' substantive estimation plan is contrary to well-established estimation methodologies — indeed, no court has ever accepted the radical methodology that Debtors are proposing should be used here.  However, even assuming *arguendo* that there were some legal basis for the Court to even consider applying it, preliminary discovery is necessary to flesh out the particulars of the Debtors' incomplete proposal.  Thus, the ACC and FCR also seek discovery to clarify Debtors' contentions regarding the manner in which they would present their proposed five characteristics of a valid claim to the Court for decision, as well as what type of "epidemiological and economic expert testimony" Debtors anticipate for the second part of their substantive estimation scheme, including the manner in which these "experts" would use the "characteristics of

a valid claim" established in stage one to project the number of valid future claims, and how they

would assign values to the claims estimated.  Debtors' Statement 11.

Accordingly, for the reasons described more fully below, the ACC and the FCR respectfully

request that the Court grant them leave to conduct the discovery outlined in Section III.A and B

below.

**DISCUSSION**

I.    **GENERAL ESTIMATION PRINCIPLES — INCLUDING THE WELL-ESTABLISHED *EAGLE-PICHER* METHOD — MUST BE THE STARTING POINT FOR CHOOSING AN ESTIMATION METHOD**

A.    **Estimation Is Mandatory when Claim-by-Claim Allowance Is Impractical**

The Bankruptcy Code provides in pertinent part that

> There *shall* be estimated for purpose of allowance under this section — (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case.

11 U.S.C. § 502(c) (emphasis added).  Estimation enables the parties and the court to prepare and

evaluate a plan of reorganization without having to wait until each and every contingent or

unliquidated claim is litigated to judgment.  *See generally In re Johns-Manville Corp.*, 843 F.2d

636, 646-48 (2d Cir. 1988); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1013 (4th Cir. 1986); *In re*

*UNR Indus., Inc.*, 45 B.R. 322, 326 (N.D. Ill. 1984).  "The essence of section 502(c) [estimation] is

that 'all claims against the debtor be converted into dollar amounts.'"  4 COLLIER ON BANKRUPTCY

¶ 502.04[1] (15th ed. 1999) (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 354 (1977)).

Estimation is an alternative to individual claim-by-claim allowance otherwise afforded by

§ 502 of the Code, and should be structured in light of the basic principles underlying allowance.  If,

as in this case, a debtor's liability for unliquidated personal injury and wrongful death claims is

overwhelming — with claims numbering in the tens or hundreds of thousands — estimation is

mandatory because claim-by-claim adjudication would unduly delay administration of the estate. *See* 11 U.S.C. § 502(c).

Moreover, although the magnitude of these Debtors' liability for asbestos personal injury claims is enormous — with over 100,000 pre-petition claims pending — the fact that Debtors' asbestos-containing products sickened so many people does not justify nullifying protections for injured claimants that would apply if their claims were few in number, and thus adjudicated and ultimately liquidated individually.[1] *See In re UNR Indus., Inc.*, 45 B.R. at 325 (rejecting argument in bankruptcy case involving 17,000 asbestos claims that district courts can conduct "'summary hearing'" in lieu of full-blown trial, as debtor "points to no statute or rule that either authorizes this departure from normal practice or explains what procedures constitute a 'summary hearing'"). At a bare minimum, then, any estimation method this Court adopts must account for basic due process and bankruptcy principles for determining the amount and validity of claims.

### B.    State Law Determines the Validity and Value of Claims in Estimation

Debtors concede that the Court must conduct a § 502(c) estimation of the value of both pending and future asbestos personal injury claims. They also agree that estimation will entail statistical projections by experts. By definition, estimation is an approximation: it necessarily involves comparing a known or established quantum of data to the thing being estimated. Hence,

---

[1]    In addition to inherent due process requirements, bankruptcy law provides specific procedural protections to creditors when their claims are at issue. For example, a debtor cannot lodge a valid claim objection or create a "contested matter" without producing specific evidence to rebut a timely-filed proof of claim. *See Whitney v. Dresser*, 200 U.S. 532, 535 (1906); *In re Lundell*, 223 F.3d 1035, 1040-41 (9th Cir. 2000); *In re TransAmerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992). Further, Bankruptcy Rule 9014 mandates that "reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought," and that numerous provisions of the Bankruptcy Rules of Civil Procedure "shall apply," including *full discovery* under Rule 7026 (the equivalent of Fed. R. Civ. P. 26), and Rules 7028-7037 (the equivalent of Fed. R. Civ. P. 28-37). Finally, personal injury and wrongful death claims must "be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose." 28 U.S.C. § 157(b)(5); *see also id.* § 1411.

the fundamental task before this Court is to identify the data from which to estimate USG's liability to present and future claimants.

The ACC and the FCR maintain, but Debtors dispute, that these data are to be derived from Debtors' experience in the tort system. Accordingly, a central issue in establishing the estimation methodology to be applied here is the nature of Debtors' tort system experience.

That state law governs is incontestable. The Supreme Court has repeatedly held that the validity and amount of claims against a bankruptcy estate are determined by reference to the applicable non-bankruptcy law under which the claims arose. *See Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000); *see also Grogan v. Garner*, 498 U.S. 279, 283-84 & n.9 (1991); *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161 (1946). The principle that claims must be valued according to applicable non-bankruptcy state law applies in § 502(c) estimation cases, as has been repeatedly recognized by federal courts. *Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134, 135 (3d Cir. 1982); *In re Brints Cotton Mktg., Inc.*, 737 F.2d 1338, 1341 (5th Cir. 1984); *In re Farley, Inc.*, 146 B.R. 748, 752, 756 (Bankr. N.D. Ill. 1992); *In re Federal Press Co.*, 116 B.R. 650, 653 (Bankr. N.D. Ind. 1989).[2]

On March 31 of this year, U.S. District Judge Fullam cited this authority as the starting point for his estimation of the amount of contingent or unliquidated claims against Owens Corning:

> The claims being valued arise under state law, hence state law determines their validity and value. "The basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Raleigh*, 530 U.S. at 20 (*quoting Butner v. U.S.*, 440 U.S. 48, 54 (1979)). The same principle applies to estimation proceedings under § 502(c).

---

[2] The appropriate date as of which claims should be valued is the petition date. *In re Brints Cotton Mktg.*, 737 F.2d at 1342; *In re Eagle-Picher Indus., Inc.*, 189 B.R. 681, 686 (Bankr. S.D. Ohio 1995) (present and future asbestos claims must be valued "as of the filing date of the petition").

> *Bittner*, 691 F.2d at 135.  And claims are to be valued as of the petition date.
> *In re Brinns* [*sic*] *Cotton Mktg.*, 737 F.2d 1338 (5th Cir. 1984).

>     This necessarily means that the claims are to be appraised on the basis
> of what would have been a fair resolution of the claims in the absence of
> bankruptcy.

*Owens Corning v. Credit Suisse First Boston*, 2005 WL 756747, at *2 (D.Del. Mar 31, 2005)

(Fullam, J.).  Later, in denying a motion for reconsideration of his $7 billion estimate of Owens-

Corning's liability for asbestos-related injury and death, Judge Fullam reiterated: "This Court does

not have the authority to change state law.  All cases which can survive summary judgment

disposition under state law have some potential value."  *Owens Corning v. Credit Suisse First*

*Boston*, No. 04-00905, slip op. at 2 (D.Del. April 13, 2005) (Fullam, J.) (attached hereto as **Exh. A**).

    Although courts may use "whatever [estimation] method is best suited to the particular

contingencies at issue," it is clear that under all circumstances they must apply pertinent state law

governing the ultimate value of the claim.  *Bittner*, 691 F.2d at 135.  Hence, in estimating personal

injury claims under § 502(c), courts have attempted to predict how the case would turn out if it were

litigated to conclusion in the forum in which it was pending prior to bankruptcy, using the best

evidence available.  In *In re Farley,* for example, the court estimated a group of personal injury

claims for purposes of voting on the plan and determining plan feasibility.  The court valued the

claims by multiplying the potential damages available in the state court action by the court's

estimation of the claimants' likelihood of success at trial — *i.e.,* by estimating the result experience

shows would be likely.  146 B.R. at 756.  In so holding, the court made the following observation,

which underscores the propriety of estimating claims based on the legal and practical realities of

litigating in the state tort system:

>     The Illinois Circuit Court has denied an earlier summary judgment motion
> filed by Farley, based on the same employment issue that it raised here.
> Barring settlement, the tort case will be going to trial before a state court jury.
> Therefore, the subject claims cannot and do not have a zero value in any legal
> or practical sense. Their more realistic value consists of the amount stipulated

as damages in [the] event Farley is found liable, discounted by the chance that
Farley will not be found liable.

146 B.R. at 753. Similarly, in *In re Federal Press*, 116 B.R. at 653-54, a court estimated for

purposes of plan voting the value of an unresolved personal injury claim pursuant to § 502(c) by

reference to the nationwide average of jury verdicts in similar cases.

Judge Fullam put it this way:

We are not, at this time, deciding how much each claimant will actually be
entitled to receive, but the total amount which the claimants, as a group, could
legitimately have claimed as compensation, as of the petition date. The values
of future claims should be estimated based on what the claims would have
been worth in the tort system as it existed on the petition date.

*Owens Corning*, 2005 WL 756747, at *2.

Accordingly, consistent with *Raleigh* and *Bittner*, numerous courts estimating mass tort and

asbestos claims have relied on estimates based on the debtor's pre-petition claims experience in the

state court system. *See, e.g.*, *In re Eagle-Picher Indus., Inc.*, 189 B.R. 681, 686 (Bankr. S.D. Ohio

1995) (estimating claims based upon the debtor's pre-petition claims history); *In re Babcock &

Wilcox Co.*, No. 00-10992, at 47-49 (E.D. La. Oct. 8, 2004) (relevant excerpt attached hereto as

**Exh. B**) (estimating claims based upon expert testimony predicated upon the debtor's claims

history); *In re A.H. Robins Co., Inc.*, 88 B.R. 742 (E.D. Va. 1988), *aff'd*, 880 F.2d 694, 702 (4th Cir.

1989) (Dalkon Shield case).[3] No court has held that asbestos claims may be estimated based on

claims qualification rules manufactured anew in bankruptcy, irrespective of the debtor's tort system

experience. *See Owens Corning,* 2005 WL 756747, at *5 (rejecting opinion of expert because it

"cannot be accepted without totally disregarding the historical experience in asbestos litigation").

---

[3]    Although not an asbestos case and not involving future claims of the type found here, *A.H.
Robins* is also instructive. There, the debtor was the manufacturer of the "Dalkon Shield," an
intrauterine birth control device which was alleged to have caused serious personal injuries. The
district court estimated the personal injury claims against the debtor based upon the debtor's pre-
petition claims history. 880 F.2d at 699-700.

In other words, statistical principles, basic common sense, and the seminal case law on this subject make clear that "[t]he estimate should be primarily based on the history of *this* company." *In re Eagle-Picher Indus.,* 189 B.R. at 690; *cf.* Frederick C. Dunbar, Denise Neumann Martin & Phoebus J. Dhrymes, Estimating Future Claims 81 (1996) ("Where data is available on the indemnity payments that historically have been made on similar claims, an average of these may serve to estimate the payment on pending or future claims."). The *Eagle-Picher* court outlined the core components of estimation in aggregate:

1. The estimate should be primarily based upon the claims history of the particular company whose liability is being estimated. This consideration does not, however, rule out the desirability of considering trends general to the industry, particularly regarding the rate of filing of claims.

2. The total number of claims to be expected should be estimated.

3. The estimation of claims should categorize them by disease and occupation, as well as other factors.

4. Valuation of claims should be based upon settlement values for claims close to the filing date of the bankruptcy case.

*In re Eagle-Picher Indus.*, 189 B.R. at 690-91.

Thus, as *Eagle-Picher* recognizes, the lengthy history of asbestos litigation, along with Debtors' and numerous other asbestos defendants' well-established claims histories, provides a massive reservoir of information on which to draw for estimation purposes. This history informs us that asbestos-related claims generally fall into basic categories based on the disease alleged — mesothelioma, lung cancer, other cancer, asbestosis and pleural disease — and that the value of the cases is dependent on the severity of the disease, with the more serious diseases such as mesothelioma receiving higher settlements or jury awards than claims alleging pleural disease. *See* 189 B.R. at 684-86. To estimate the aggregate value of *pending* claims using these data, the expert takes the total number of pending claims for each category of disease, discounts that total by the debtor's historical experience in terms of the percentage of claims rejected based on the criteria

used by that debtor, and then multiplies the "likely to be settled" claims by the average settlement amount for each particular claim category.

To estimate a debtor's liability to *future* claimants, the expert calculates the product of (a) the incidence of asbestos-related disease in the population in a given time period, which is derived from well-known epidemiological models; and (b) the estimated percentage of those people who will file a claim against the debtor, which takes into account the debtor's claims history. This common-sense methodology of relating future claims to the incidence of disease and the number of victims who have previously filed claims against a particular debtor has been used in every asbestos-related bankruptcy since 1990.

## II.    DEBTORS' "SUBSTANTIVE ESTIMATION" PROPOSAL, BY CONTRAST, IS UNTESTED

### A.    Debtors' "Substantive Estimation" Proposal Is Flawed on Its Face

Debtors' so-called "substantive estimation" scheme, by contrast, has never been done before. In rejecting past history, Debtors seek to create a set of substantive federal common law rules of tort law to govern *en masse* disposition of asbestos personal injury claims in bankruptcy.

This approach is fundamentally flawed both legally and factually. Its central legal defect is that the Debtors' substantive estimation scheme calls for the Court to make universal substantive rulings as matters of federal law. Under *Raleigh*, the validity of claims against a bankruptcy estate must be determined by reference to the state law under which the claims arose. *See* 530 U.S. at 20. This principle is unassailable, and it applies in estimation. In keeping with this precedent, *every court* that has presided over an asbestos-related bankruptcy over the past 15 years has estimated liability using the debtors' historical information regarding the payment of claims in the tort system. *In re Eagle-Picher Indus.*, 189 B.R. at 690-91 — which memorialized this method a decade ago — remains the authoritative reference on estimation in the aggregate. Indeed, as recently as this March, a Federal District Court in this District applied this well-recognized approach of using a

debtor's claims history to estimate Owens Corning's aggregate asbestos liability for bankruptcy purposes. *See generally Owens Corning,* 2005 WL 756747.

Debtors would have this Court ignore these precedents and approve a hypothetical procedure that has never been used before. Quite apart from the myriad of legal defects in Debtors' approach, it is based solely on a false factual premise posited by Debtors' bankruptcy lawyers: that USG's pre-petition tort lawyers and corporate management routinely settled bogus claims for which USG in fact had zero potential liability. This proffered justification for rejecting *Eagle-Picher* and its progeny has no merit. As discussed further in Point III, below, before Debtors' "substantive estimation" proposal can even warrant serious consideration, the ACC and the FCR must be allowed to do the discovery necessary to challenge USG's assertion that its history of resolving over 300,000 cases is irrelevant to its "actual" liability.

> **B.     With at Least Seven Major Stages and Many Others Implied, Debtors' Proposal Is a Minefield of Complexity, and Would Invite Contentious Litigation Every Step of the Way**

Debtors' basic contention is that, instead of looking to USG's actual experience in the tort system as other courts have done in asbestos-related bankruptcies over the past 15 years, the Court should accept their invitation to invent an entirely new concept they call "substantive estimation" that has no basis in the Bankruptcy Code, Rules or established precedent.

As we understand it, Debtors' vision of "substantive estimation" would have — at a minimum — the following steps: First, the Court "would conduct a hearing to establish the [five] characteristics of valid claims against Debtors" and "determine what types of claims (in terms of levels of exposure and alleged injury) should be treated as payable for estimation purposes." Debtors' Statement 6.[4]  In other words, Debtors would have this Court make factual findings to

---

[4]     Specifically, the five questions Debtors would have the Court determine as a matter of law are the following claimant-specific questions:  (1) whether "unimpaired" claims are compensable

establish global federal rules governing tort claim validity that would operate to supplant the

individual laws of 50 states that otherwise govern claim liquidation, effectively setting up a federal

bankruptcy law of asbestos liability.  Second, the Court would draw a sample (Debtors suggest "a

sample size as small as approximately 1,100 claimants") of pending claims.  *Id.* 6 n.11.  Third, the

parties would "conduct discovery [of such claimants] to gather information necessary to determine

the number of individuals who have valid and payable claims."  *Id.* 6.  Fourth, the Court would hold

a hearing to determine — based on discovery and its prior rulings regarding the "characteristics" of

valid claims — the number of sample claims in each disease category that have the "characteristics"

of a valid claim.  *See* Debtors' Estimation Decisional Tree.  Fifth, the Court would estimate the total

number of valid present and future claims through "statistical extrapolation" by experts.  *Ibid.*

Sixth, the Court would determine "the aggregate present values of present and future claims based

upon meaningful historical settlement values for the various illnesses."  Debtors' Statement 11.

Seventh, the Court would "estimate the total value of the asbestos personal injury claims * * * by

multiplying an average settlement value for each claim by the number of valid pending and

projected future claims," and thereby determine the size of a § 524(g) Trust.  *Ibid.*

     As our Decision Tree of Debtors' "Substantive Estimation" indicates, narrowing Debtors'

proposal even down to these seven steps is an optimistic proposition.  Many other steps are implicit

in Debtors' plan.  As a prerequisite to an evidentiary hearing on Debtors' proposed "characteristics

of a valid claim," for example, the parties would have to conduct discovery involving competing

experts in medicine, industrial hygiene, epidemiology and any other field that could conceivably

bear upon what would amount to rules of law that will determine claim validity for all purposes

---

(and, by implication, what medical evidence is necessary to establish a compensable injury), (2) the
minimum levels of exposure needed to constitute a "substantial factor" in causing asbestos-related
illnesses, (3) whether chrysotile asbestos cause mesothelioma, (4) whether lung cancer without
asbestosis is asbestos-related, and (5) whether asbestos can cause cancers other than mesothelioma
and lung cancer.

(and the question whether such rules can be universally applied to tens of thousands of claims in the first place). Assuming individual claimants are permitted to participate (which, we contend, they must be in keeping with due process and § 502), this discovery would be lengthy and complex.

As noted above, following discovery Debtors would seek decisions on the global "characteristics of a valid claim." Although Debtors say they envision "Daubert challenges" in connection with an evidentiary hearing on these "characteristics," it is clear that they seek not merely to determine whether there is qualified expert evidence to support plaintiffs' claims on the five questions. Debtors also would seek general rulings on the disputed factual issues presented, e.g., whether chrysotile asbestos can cause mesothelioma.[5] Debtors' Statement 7. Even if a few hundred individual claimants sought to file their own opposition papers (which is a conservative estimate, given that the outcome of the "characteristics of a valid claim" hearing would have an enormous impact on the viability of individual claims), this Court could end up reading and deciding motions for many months, if not years.

All this would be the prelude: (a) to the highly controversial issue of drawing samples adequate to ensure statistical validity across virtually innumerable combinations of disease categories, exposure characteristics, and the various laws of 50 states; (b) discovery of sampled claimants (including detailed work history and medical records); and (c) reciprocal discovery of Debtors on issues such as product identification. Debtors would also take depositions of a so-far

---

[5] In this connection, Debtors' prior filings intimate an intention to misuse *Daubert* as a vehicle for globally resolving the ultimate issues on the merits. *See*, *e.g.*, Debtors' Reply Brief in Support of Motion for Case Management Order 10 (Aug. 21, 2002) (positing that *Daubert* is not limited to the admissibility of testimony in a particular case, but may "appl[y] in hearings relating to general liability issues, and * * * must be applied here"). Thus, what Debtors mean by the seemingly innocuous phrase "Daubert challenges" is precisely the type of issue we seek to clarify through contention interrogatories in advance of the hearing on methodology, as explained further below.

unspecified "subset" of claimants, and the ACC, FCR and/or individual claimants would presumably notice depositions of USG employees or others with knowledge bearing on the issues.

Given personal injury claimants' right to jury trial under 11 U.S.C. § 1411 (*see supra* n.1), this Court would then have to answer a threshold question in advance of the hearing regarding Debtors' liability for the "sample" claims: whether it must be by jury trial.  Once the Court issued its findings regarding which sample claims survive the universal substantive liability rules previously created by the Court, yet another round of discovery and hearings would be necessary regarding how to value the surviving claims.  This is all before the Court even gets to the actual estimation.

The final step of Debtors' proposal would mirror the first and only step of the process we propose: an exchange of expert reports regarding the value of present and projected future claims, expert depositions, and an estimation hearing.

Given the enormity of this task and the many legal pitfalls it presents, the first question this Court must logically answer is whether the creation of this brand new legal concept called "substantive estimation" is justified or necessary at all — and on that issue, discovery is necessary because crucial factual points are involved.

III. **BEFORE THE COURT COULD BE POSITIONED TO SERIOUSLY CONTEMPLATE DEBTORS' NOVEL "SUBSTANTIVE ESTIMATION" PROPOSAL, IT NEEDS CERTAIN FACTS**

A. **The ACC and FCR Seek Discovery to Test Debtors' Assertion that USG's Lawyers Routinely Settled "Baseless, Sham Claims," Rendering Its Settlement History an Invalid Basis for Estimation**

Debtors' plea for the creation of a so-called "substantive estimation" method is premised on the factual contention — which we strenuously dispute — that USG's 20-year history of resolving asbestos personal injury cases in the tort system is worthless for purposes of estimating liability in bankruptcy.  Debtors concede that USG paid "tens of thousands of asbestos claims" while governed

by state law in the tort system, but assert that it did so "for reasons having nothing to do with the merits of those claims," which Debtors now dismiss as "baseless, sham claims." Debtors' Statement 14. Thus, Debtors submit that its lengthy history of paying claims should not preclude them "from fighting against them now" — now, that is, that Debtors are no longer in the state tort system. *Ibid.*

However, as explained above, the *state law rules* apply in bankruptcy that applied in the tort system. State law governs, and federal courts lack the authority to create "federal common law" to displace it. *See Raleigh*, 530 U.S. at 20. For this reason, the entire premise underlying Debtors' concept of "substantive" estimation is unfounded. Yet this rejected notion is precisely what Debtors are urging this Court to accept — a so-called "substantive estimation" of their "true" liability (whatever that means) that is wholly divorced from the realities of the tort system as manifested in USG's settlement and verdict history, and that has no grounding in any legal precedent whatsoever.

As we will show through discovery, Debtors' history of paying claims in the tort system is in fact (as well as under the law) the best reflection of their liability under state law. In the *Owens Corning* case, similar discovery was conducted regarding that debtor's litigation history. As Judge Fullam wrote, such discovery produced a wealth of information, including the following:

> (1) how juries evaluated various categories of asbestos claims; (2) the percentage of cases disposed of without payment; (3) how the various asbestos defendants viewed their comparative liability for the universe of asbestos claims throughout the nation * * * (4) what experienced asbestos litigators on both sides regarded as the appropriate settlement value of various types of asbestos-related claims; and (5) a rough approximation of the relationship between the number of persons affected by the asbestos-related diseases and the number of such persons who would make claims against Owens Corning (propensity to sue).

*Owens Corning*, 2005 WL 756747, at *3. This is precisely the type of information we propose to discover in advance of this Court's ruling on the choice of estimation methodology to test Debtors' assertion that this Court should not rely upon USG's lengthy history of paying claims in the tort system.

Even if Debtors could rewrite the rules governing their own liability simply by filing a Chapter 11 petition, the notion underlying Debtors' plea for a new way of estimating claims — i.e., that USG's lawyers routinely settled "baseless, sham claims" irrespective of USG's actual liability in the tort system — is just wrong. Debtors possess a database of hundreds of thousands of claims settled or litigated to judgment by USG. This database must be the starting point for any estimation, but it is not the limit of what information is needed to test Debtors' contention that most of the claims paid were bogus. Debtors cannot plausibly deny — and in any event the asbestos claimants' representatives have every right to establish — that claimants against USG had to meet some reasonable evidentiary standard before USG, its insurers, or its agents would write a check, and that, before they recommended a settlement, USG's lawyers determined that these lawsuits represented genuine potential liabilities to individuals with asbestos-related disease, and that USG faced a serious risk of having these cases decided overwhelmingly against it.

For much of its relevant history, USG was a member of the Center for Claims Resolution ("CCR"), which operated from 1988 to January 2001. The CCR was a group of twenty asbestos defendants which sought, as a group, to simplify and address the liability sharing process in a manner that would lower the claims resolution costs for each of them, both on an individual case basis and in the aggregate. In discovery, the ACC and the FCR would depose USG's lawyers and claims administrators who resolved claims on its behalf both inside and outside the CCR in order to test Debtors' contention that their tort lawyers routinely settled "baseless, sham claims" for two decades notwithstanding an allegedly common belief that the clients' "true" liability was zero.

More specifically, we would seek access to records concerning USG management's choice of strategy for dealing with claims, the defenses USG raised in cases that went to trial (or were settled near trial), and the standards USG's lawyers and claims administrators applied in deciding what cases to settle. In addition to documents concerning the handling of claims, both by settlement and

trial, we would seek access to documents reflecting USG's participation in the CCR, including consideration of whether to join, whether to remain, and the establishment and review of USG's liability shares.  Similarly, we would take the depositions of the key people associated with USG's handling of asbestos claims in the years before its filing, including decision makers, claims administrators, financial and legal advisers, and individuals involved in managing USG's relations with the CCR.

If discovery reveals — as we are confident it will — that the settlements USG (and CCR on its behalf) reached with a view to avoiding trial risks represent rational judgments as to the economic value of the settled claims, Debtors' core argument that "due process obligates the Court to decline" to employ the well-established *Eagle-Picher* method for estimating claims collapses. Debtors' Statement 14.  With Debtors' justification for departing from the favored *Eagle-Picher/Owens Corning* method debunked, their "substantive estimation" invention will be fully revealed for what it is (a self-serving attempt to ratchet down liability) and for what it is not (a serious estimation methodology).  In that event, estimation will begin as it should — and as it has in every other asbestos-related bankruptcy since 1990 — with expert examination of Debtors' history of resolving claims in the tort system.

### B.    The ACC and the FCR Seek Discovery to Test the Feasibility of Global Rulings on Debtors' Would-Be "Characteristics of a Valid Claim"

While preliminary discovery is necessary to probe Debtors' assertion that the *Eagle-Picher* method *cannot* work, it is also necessary to test the assumption that Debtors' hypothetical "substantive estimation" scheme *can* work.  Before the Court can seriously contemplate proceeding down a path that would delay these bankruptcy proceedings indefinitely at enormous cost to the estate, some preliminary discovery aimed at fleshing out the particulars of Debtors' proposal is in order.  For this purpose, the ACC and FCR would seek a clarification and explanation of how "substantive estimation" would proceed.

Although this Court could — and we submit, should — reject Debtors' proposal as a matter of law without discovery, the converse is not the case. Before embracing a hypothetical process that Debtors have invented out of whole cloth, the Court (as well as the ACC and the FCR) should fully understand the process Debtors envision. The ACC and the FCR seek discovery to clarify Debtors' contentions regarding the manner in which Debtors would present their proposed five "characteristics of a valid claim" to the Court for decision and what is actually in dispute. By way of example, we discuss below the three defenses Debtors chose to highlight in their December 2004 "Case Management Statement Re: Asbestos Personal Injury Estimation."

We would also seek to clarify by way of interrogatories exactly what type of "epidemiological and economic expert testimony" Debtors anticipate for the second part of their substantive estimation scheme, including the manner in which these "experts" would use the "characteristics of a valid claim" established in stage one to project the number of valid future claims, and how they would assign values to the claims estimated. Debtors' Statement 11.

## 1. The "Chrysotile Defense"

Debtors would have this Court rule as a matter of universal principle that exposure to chrysotile asbestos never causes mesothelioma and that, accordingly, "Debtors will show that most, if not all, claims alleging mesothelioma must be estimated at zero dollars." Debtors' Statement 10-11. In the same breath, Debtors admit that there are "dissenting experts" on this subject, that only two of eleven experts purportedly convened by the EPA to analyze the epidemiological studies relating to the carcinogenicity of asbestos made "comment[s]" consistent with Debtors' position, and that the EPA Report merely noted that the experts agreed that the literature shows "that amphibole fibers have far greater mesothelioma potency than do chrysotile fibers" — not that chrysotile fibers have no mesothelioma potency at all. *Ibid.* (quotation omitted).

Apparently, Debtors expect to prove that the "conflicting" experts' view that exposure to Debtors products was capable of causing mesothelioma "is not supported by the scientific evidence." Memorandum of Points and Authorities in Support of Debtors' Motion for Case Management Order for Substantive Estimation Hearings 33 (June 22, 2002). As noted above (*supra* note 5), it appears that Debtors hope to use *Daubert* for this purpose, *i.e.,* to have this Court rule as a matter of law that no expert could conceivably testify that chrysotile is capable of causing mesothelioma in any person. Debtors signaled in prior papers that, in the alternative, they would argue that even if chrysotile is capable of causing mesothelioma, "a mesothelioma claimant must be able to show an exposure to Debtors' products far higher than most occupational exposures" in order to recover. *Ibid.* How Debtors would prove this fallback position as a matter of law and apply it to thousands of claimants *en masse* is a mystery. The most that can be gleaned from Debtors' vague assertions thus far is that they hope to convince this Court to stretch *Daubert* far beyond its clear and conventional meaning and seek a "one-size-fits-all" ruling *on the factual merits* of the dispute about the carcinogenicity of chrysotile asbestos. There is no legal basis for the sort of blanket factual ruling on a disputed medical point that USG is apparently proposing the Court be asked to make.

Certainly, *Daubert* does not provide any such authority. *Daubert* does not authorize courts to make general pronouncements on disputed medical contentions, only to determine whether there is reliable scientific opinion to support them. As Debtors grudgingly concede, there is authoritative medical opinion, including the opinions of government and public health agencies such as OSHA and the World Health Organization — i.e., work that easily satisfies *Daubert* — that chrysotile can in fact cause mesothelioma and that there is no such thing as "safe" asbestos fibers. *See* OSHA Occupational Exposure to Asbestos Rule, 29 C.F.R. §§ 1910, et al. (1994); *Report Presented by the International Programme on Chemical Safety on Environmental Health Criteria for Chrysotile*

*Asbestos* at 7, 168, WHO (1998).  Thus, even assuming arguendo it were the case that, as Debtors

contend, the "prevailing" medical view is that chrysotile does not cause mesothelioma, *Daubert*

does not create grounds for embracing one view as a matter of law, dismissing for all purposes

contrary expert opinion, and valuing all mesothelioma claims at zero as a matter of law.  At most,

the "chrysotile defense" affords a defendant no more than the opportunity to present conflicting —

but admissible — expert opinion on the subject, to be resolved by the trier of fact in each case.  It is

not an absolute defense on the merits or even grounds for summary judgment.

     In discovery, we would serve interrogatories aimed at clarifying precisely what Debtors

believe is factually in dispute and what kind of evidence Debtors intend to present to prove their

claim that all mesothelioma claims should be valued at zero.  For example: Do Debtors intend this

Court to hear conflicting experts on the subject and choose which opinion is the "correct" opinion

for all purposes?  Or do Debtors intend somehow to make a case that there is no conflicting expert

opinion?  If the latter is so, how would Debtors do this (with what kind of evidence)?[6]  The

resulting clarification of how the proposed "substantive estimation" is supposed to work is crucial

for the ACC and the FCR to be able to meaningfully address the legal issues the proposal presents.

### 2.    "Unimpaired" Claimants

     Debtors also seek a global ruling that, as a matter of federal law, so-called "unimpaired"

claimants do not have valid claims.  Debtors' Statement 8.  Once again, this Court could rely on

legal argument alone to reject the notion that tens or hundreds of thousands of claims could be

labeled "unimpaired" and valued at zero as a matter of federal law.  As Debtors admit, "[t]he

articulation of this standard differs somewhat from state to state."  *Id.* 8 n.13.  In fact, the vast

---

[6]    It appears that Debtors envision the same sort of process for establishing universal claim validity rules for whether lung cancer without asbestosis can be asbestos-related, and whether asbestos causes cancers other than mesothelioma and lung cancer — which, in turn, raises the same set of questions for discovery.

majority of jurisdictions do *not* limit the type of asbestos-related personal injury claims on which plaintiffs can recover. *See, e.g., Mauro v. Owens-Corning Fiberglas Corp.*, 542 A.2d 16, 23 (N.J. Super. Ct. App. Div. 1988) (holding that plaintiff suffering from pleural thickening as result of long-term exposure to defendants' asbestos was entitled to present claim to jury); *Bowerman v. United Illuminating*, 1998 WL 910271, at *5 (Conn. Super. Ct. Dec. 15, 1998) (opining that jury must decide whether lung scarring and implantation of asbestos fibers in lungs is compensable); *Owens Corning*, 2005 WL 756747, at *4 ([W]ith the possible exception of Ohio, no state has amended its tort law to specify a [pulmonary function test] threshold for compensability of a claim."). Federal Courts sitting in bankruptcy have recognized as much. *See, e.g., In re National Gypsum Co.*, 257 B.R. 184, 201 (Bankr. N.D. Tex. 2000) (opining that "claimants in these [pleural and asbestosis] categories *have received recoveries in the tort system*" and, additionally, many of them "*will incur actual damages* for medical tests and diagnostic treatment") (emphasis added).

Moreover, the whole notion of a global ruling on this issue conflicts with state law, which governs here. In *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297 (5th Cir. 1998), the Fifth Circuit held that "under [State] substantive law causation of plaintiffs injury by defendant's product and plaintiff's resultant damages must be determined *as to 'individuals, not groups,'*" and that "we are aware of no appellate decision approving such a group, rather than individual, determination of cause in a damage suit for personal injuries to individuals at widely different times and places." *Id.* at 313, 316 (quoting *In re Fibreboard,* 893 F.2d 706, 712 (5th Cir. 1990) (emphasis added)).

Debtors contend, however, that "[e]xperts estimate that 88% of an estimated 1.1 million total claims filed or estimated to be filed in this country are expected to be non-malignant — the vast majority of which will be unimpaired claims." Debtors' Statement 9. Do Debtors intend to present "experts" in a substantive estimation proceeding to opine as to estimates of the number of "unimpaired" claims that will be filed against the Debtors (whatever that means)? Debtors add that

"recent medical research indicates that the system by which most of these claimants were diagnosed with pleural changes is irredeemably flawed." *Ibid.* Do Debtors intend to present medical or other experts regarding "the system" for diagnosing asbestos-related illness? How could such evidence possibly translate into a "characteristic of a valid claim"? As with Debtors' other defenses, the ACC and the FCR need discovery to clarify how Debtors intend to present for decision their assertion that "[t]he claims of unimpaired claimants must * * * be estimated at zero dollars" so as to be able to accurately present legal and factual arguments against going down the path Debtors propose. *Id.* 10.

### 3.    "Substantial Factor"

Since the seminal decision of *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1094 (5th Cir. 1973), it has been the prevailing law that claimants need only show that exposure to a defendant's asbestos was a substantial contributing factor to their disease. However, "[n]o safe level of exposure or 'threshold' level [of asbestos] has ever been established." *Orleans Parish School Bd. v. Asbestos Corp., Ltd.* 114 F.3d 66, 69 (5th Cir. 1997). "Where there is competent evidence that one or a *de minimis* number of asbestos fibers can cause injury, a jury may conclude the fibers were a substantial factor in causing a plaintiff's injury." *Wehmeier v. UNR Indus., Inc.*, 572 N.E.2d 320, 337 (Ill. App. Ct. 1991). In most cases, "[w]hether the defendant's conduct was a substantial factor is a question for the jury." *Borel*, 493 F.2d at 1094. "It is sufficient if it is shown that [a defendant's] products contributed to the injury. The degree of contribution is left for apportionment of damages." *Verbyke v. Owens-Corning Fiberglas Corp.*, 616 N.E.2d 1162, 1168 n.5 (Ohio Ct. App. 1992).

Notwithstanding this legal backdrop, Debtors propose to "use medical, industrial hygiene, and construction experts to assist in determining the occupational characteristics of claimants who could have been exposed to airborne fibers from U.S. Gypsum's products at a level sufficient to be a substantial factor in causing disease." Debtors' Statement 8. Hence, Debtors would apparently have

this Court do what no medical authorities have done: establish some threshold level of asbestos exposure that is necessary to satisfy state laws' various "substantial factor" tests as a matter of universal federal law.  Next, Debtors would have this Court determine — based on the testimony of medical experts, industrial hygiene experts, and "construction workers" — what occupations or "occupational characteristics" could as a matter of law have exposed claimants to the minimum level of asbestos that the Court has determined is necessary to cause disease.  But beyond this, the unanswered questions and logical disconnects inherent in Debtors' plan are mind-boggling.  What kind of "expert" can opine as to what occurred on a day-to-day basis, with respect to upwards of 100,000 individuals — each of whose claim is fact-specific — across myriad job sites and occupations decades ago?  How would Debtors' proposal account for a mesothelioma victim whose exposure occurred unconventionally (and thus might not be captured by Debtors' "occupational characteristics"), but occurred nonetheless?

*   *   *

In our view, contention interrogatories like those listed above are crucial to clarify precisely how Debtors intend to tee up a ruling on "the characteristics of claimants with medically insignificant, or zero, exposure to U.S. Gypsum's products," and to identify fully the legal defects and practical problems with Debtors' proposal.  Debtors' Statement 8.  If the realities of what Debtors propose turn out to be different from what can be intuited from their papers thus far, clarification of their "substantive estimation" plan will have served the additional purpose of conserving estate resources and this Court's valuable time.

## CONCLUSION

For the foregoing reasons, the ACC and the FCR jointly request that the Court authorize the discovery set forth herein in advance of its hearing on the competing estimation methodologies.

Date: April 26, 2005                     Respectfully submitted,

                                         CAMPBELL & LEVINE, LLC

                                         /S/ Marla Rosoff Eskin
                                         Marla Rosoff Eskin (DE No. 2989)
                                         Kathleen Campbell (DE No. 4229)
                                         800 N. King Street
                                         Suite 300
                                         Wilmington, DE 19801
                                         Tel: (302) 426–1900
                                         Fax: (302) 426-9947

                                         CAPLIN & DRYSDALE, CHARTERED
                                         Elihu Inselbuch
                                         399 Park Avenue
                                         New York, NY  10022–4614
                                         Tel: (212) 319–7125
                                         Fax: (212) 644-6755

                                         Peter Van N. Lockwood
                                         Nathan D. Finch
                                         Walter B. Slocombe
                                         Kimberly N. Brown
                                         One Thomas Circle, N.W.
                                         Washington, D.C.  20005
                                         Tel: (202) 862–5000
                                         Fax: (202) 429-3301

                                         Counsel to the Asbestos Personal Injury
                                         Creditors Committee


                                         YOUNG CONAWAY STARGATT
                                         & TAYLOR, LLP

                                         /S/ Sean Greecher
                                         James L. Patton (DE No. 2202)
                                         Sharon Zieg (DE No. 4196)
                                         Sean Greecher (DE No. 4484)
                                         1000 West Street, 17th Floor
                                         P.O. Box 391
                                         Wilmington, Delaware  19899-0391
                                         (302) 571-6600

                                         Local Counsel for the Futures
                                         Representative

KAYE SCHOLER LLP
Michael J. Crames
Jane W. Parver
Andrew A. Kress
Edmund M. Emrich
Benjamin Mintz
Michael Lynn
425 Park Avenue
New York, New York  10022
(212) 836-8000

National Counsel for the Futures
Representative