# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| USG CORPORATION, | : | |
| a Delaware corporation, et al., | : | Jointly Administered |
| | : | Case No. 01-2094 (JKF) |
| Debtors. | : | |
| | : | |
| _____ | : | |
| USG CORPORATION, et al., | : | |
| | : | |
| Movant | : | |
| | : | |
| v. | : | |
| | : | |
| OFFICIAL COMMITTEE OF ASBESTOS | : | Civil Action No. 04-1559 (JFC) |
| PERSONAL INJURY CLAIMANTS, | : | Civil Action No. 04-1560 (JFC) |
| OFFICIAL COMMITTEE OF | : | |
| UNSECURED CREDITORS, OFFICIAL | : | |
| COMMITTEE OF ASBESTOS | : | |
| PROPERTY DAMAGE CLAIMANTS AND | : | |
| LEGAL REPRESENTATIVE FOR | : | |
| FUTURE CLAIMANTS, | : | |
| | : | |
| Respondents. | : | |

**DEBTORS' RESPONSE TO THE JOINT STATEMENT OF THE ASBESTOS PERSONAL INJURY CREDITORS COMMITTEE AND THE LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS CLAIMANTS REGARDING DISCOVERY IN ADVANCE OF HEARING ON METHODOLOGY FOR ASBESTOS PERSONAL INJURY ESTIMATION**

COOLEY GODWARD LLP
Stephen C. Neal (CA 170085)
Scott D. Devereaux (CA 146050)
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306
Tel: (650) 843-5000

RICHARDS, LAYTON, & FINGER, P.A.
Daniel J. DeFranceschi (DE No. 2732)
Paul N. Heath (DE No. 3704)
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Tel: (302) 651-7700

JONES DAY
David G. Heiman (OH 0038271)
Brad B. Erens (IL 6206864)
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Tel: (216) 586-3939

*Counsel for Debtors*

# TABLE OF CONTENTS

PAGE

I.  INTRODUCTION ........................................................................................... 1

II.  DISCUSSION ................................................................................................. 3

    A.  The Court Should Hear All the Relevant Evidence in Estimation............ 3

        1.  Debtors' right to test the merits of the claims prior to any deprivation of property is firmly established in the law ............... 3

        2.  Numerous courts have held that the merits of claims must be considered in mass-tort bankruptcies ...................................... 7

        3.  The ACC cites no authority where a court, over the debtor's objection, refused to consider the merits of claims in estimation.................................................................................. 10

    B.  Debtors' Estimation Plan Will Permit the Court to Consider the Merits of Claims in an Efficient and Fair Manner................................... 11

        1.  Initial claimant and expert discovery........................................... 12

        2.  Hearing to define the characteristics of valid claims.................. 13

        3.  Further discovery and a hearing to estimate the number and value of valid asbestos personal injury claims............................ 14

    C.  The ACC's Criticisms of Debtors' Estimation Proposal are Unfounded................................................................................................ 14

        1.  Debtors do not ask the Court to "make universal substantive rulings as matters of federal law." ........................... 15

        2.  Debtors' proposal for considering the merits of claims is efficient and feasible................................................................... 16

            a.  The Committee's specific criticisms of Debtors' plan are groundless ........................................................ 16

            b.  The ACC's approach provides no significant time savings...................................................................................... 18

        3.  Debtors are not seeking to exclude claims settlement history evidence from the estimation and have no obligation to show that such evidence is "worthless.".................. 20

        4.  The alleged existence of evidence contrary to Debtors' defenses has no bearing on whether those defenses must be heard............................................................................................. 23

    D.  No Discovery is Needed Before Briefing and a Hearing on Estimation Methodology........................................................................ 25

        1.  Discovery concerning Debtors' tort system experience is not relevant at this stage........................................................... 25

**TABLE OF CONTENTS**
(CONTINUED)

2.  The ACC's so-called contention interrogatories on Debtors' defenses have been answered in past filings and communications ........................................................................ 26

    a.  Claimants have the burden to prove that the chrysotile asbestos in U.S. Gypsum's products causes mesothelioma ........................................................... 27

    b.  Claimants must have admissible evidence of impairment to establish a valid claim ............................. 28

    c.  Claimants cannot recover absent legally adequate exposure to U.S. Gypsum's products .............................. 29

III.  CONCLUSION ................................................................................... 30

TABLE OF AUTHORITIES

PAGE

**CASES**

*Bittner v. Borne Chem. Co.*
   691 F.2d 134 (3d Cir. 1982)...........................................................4, 5, 6, 14, 24

*In re A.H. Robins Co., Inc. v. Mabey*
   880 F.2d 694 (4th Cir. 1989) ............................................................................9

*In re A.H. Robins Company, Inc.*
   88 B.R. 742 (E.D. Va. 1988)..............................................................................9

*In re Amatex Corp.*
   110 B.R. 168 (E.D. Pa 1990) ............................................................................6

*In re Armstrong World Industries, Inc.*
   285 B.R. 864 (Bankr. D. Del. 2002) .................................................................8

*In re Arriola Energy Corp.*
   74 B.R. 784 (Bankr. S.D. Tex. 1987) ...............................................................4

*In re Eagle-Picher Industries Inc.*
   189 B.R. 681 (Bankr. S.D. Ohio 1995)...........................................................10

*In re G.I. Indus., Inc.*
   204 F.3d 1276 (9th Cir. 2000) ..........................................................................5

*In re G-I Holdings, Inc.*
   Nos. 01-30135 (RG), 2005 WL 758193 (Bankr. D.N.J. February 1, 2005) ..........7, 17

*In re Kaplan*
   186 B.R. 871 (Bankr. D.N.J. 1995) ...............................................................5, 6

*In re Sikes*
   184 B.R. 742, n.4 (M.D. Tenn. 1995)...............................................................4

*In re Tyrone F. Conner Corp.*
   140 B.R. 771 (Bankr. E.D. Cal. 1992) .............................................................4

*In re USG Corp.*
   290 B.R. 223 (D. Del. 2003).............................................................................7

*In re Wilson*
   85 B.R. 722 (Bankr. E.D. Pa. 1988) ...............................................................15

*In the Matter of Baldwin-United Corp.*
   55 B.R. 885 (Bankr. S.D. Ohio 1985)...............................................................6

*In the Matter of Ford*
   967 F.2d 1047 (5th Cir. 1992) ..........................................................................6

*In the Matter of George W. Myers Co.*
   412 F.2d 785 (3d Cir. 1969)..............................................................................4

*Miller v. Air Line Pilots Assoc.*
   108 F.3d 1415 (D.C. Cir. 1997).......................................................................17

*National Union Fire Insurance Company of Pittsburgh, PA v. City
   Savings, F.S.B.*
   28 F.3d 376 (3d Cir. 1994.)..............................................................................4

TABLE OF AUTHORITIES
(CONTINUED)

PAGE

*Owens Corning v. Credit Suisse First Boston*
No. 04-00905, slip op. at 2 (D. Del. Apr. 13, 2005) .................................. 24

*Owens Corning, et al., v. Credit Suisse First Boston*
322 B.R. 719 (D. Del. 2005) .................................................. 10, 19

*Ram Constr. Co. v. Port Auth. of Allegheny County*
49 B.R. 363 (W.D. Pa. 1985) ..................................................... 16

STATUTES

11 U.S.C. § 502 (2005) ........................................................... 4

Fed. R. Bankr. P. 9014 (2005) .................................................. 15

Fed. R. Civ. P. 52 (2005) ....................................................... 15

Miss. Code Ann. § 11-11-3 (2005) .............................................. 23

Ohio Rev. Code Ann. § 2307.92(B) (2004) ...................................... 22

OTHER AUTHORITIES

H.B. 416 § 51-14-2(15) (Ga. 2005) ............................................. 22

H.B. 416 § 51-14-3 (Ga. 2005) ................................................. 22

H.B. 1019 § 4 (Fla. 2005) ...................................................... 22

S.B. 15 § 90.003 (Tex. 2005) .................................................. 22

Joseph N. Gitlin, et al.,
*Comparison of "B" Readers' Interpretations of Chest Radiographs for
Asbestos-Related Changes*,
11 Academic Radiology 843 (2004) ............................................. 21

*Manual for Complex Litigation, Third* (2003)
§ 21.422 ...................................................................... 17
§ 21.493 ...................................................................... 17

Mark Behrens & Monica Parham,
*Stewardship for the Sick: Preserving Assets for Asbestos Victims
Through Inactive Docket Programs*,
33 Tex. Tech. L. Rev. 1, 13-16 (2001) ........................................ 23

R.B. Reger, et al.,
*Cases of Alleged Asbestos-Related Disease: a Radiologic Re-
Evaluation*,
32 Journal of Occupational Medicine, 1088 (1990) ............................ 21

Victor E. Schwartz et al.,
*Addressing the "Elephantine Mass" of Asbestos Cases: Consolidation
Versus Inactive Dockets (Pleural Registries) and Case Management
Plans That Defer Claims Filed by the Non-Sick*,
31 Pepp. L. Rev. 271 (2003) .................................................. 23

## I.    INTRODUCTION

The question of whether the Court should consider the merits of claims in estimation is a legal question, and advance factual discovery is not needed to answer it. No discovery was requested or ordered before Judge Wolin concluded that the merits of claims must be considered in estimation, and none of the discovery the ACC claims to need now can possibly justify the result they seek -- namely, the exclusion of all evidence on the merits of claims from these proceedings.[1]  But, if any discovery is permitted at this time, it is more efficient and certainly more fair to allow all estimation discovery to go forward.   In that way, the Court will have the advantage of a complete record to decide, during the estimation proceedings, what evidence is relevant to determining U.S. Gypsum's liabilities.

Although the only issue presently before the Court is whether the ACC's requested discovery is warranted, the ACC's Discovery Brief focuses instead on the issue that the ACC said it was not ready to discuss -- whether the merits of claims should be considered in estimating U.S. Gypsum's asbestos personal injury liabilities.  By devoting their brief to arguing that merits evidence should be excluded, the ACC has confirmed that the Court can resolve this issue without discovery.

Indeed, this Court does not need advance discovery to conclude that merits evidence should be considered in estimation.  The ACC's argument that Debtors' merits-based proposal is extraordinary was rejected by Judge Wolin, who held that it is the

---

[1]    The terms "Debtors" and "the ACC" will have the meanings given them in Debtors' April 26 Brief Regarding Request for Discovery in Advance of Hearing on Issues to be Considered in Estimation, D.I. 10 ("Debtors' Discovery Brief").    The ACC's April 26 Joint Statement of the Asbestos Personal Injury Creditors Committee and The Legal Representatives for Future Asbestos Claimants Regarding Discovery in Advance of Hearing on Methodology for Asbestos Personal Injury Estimation, D.I. 11, is referred to herein as the "ACC's Discovery Brief."  The term "the Committee" will have the same meaning as "the ACC."

Court's duty to "reject unsubstantiated claims, bogus medical evidence and fanciful theories of causation [in estimation]." Judge Wolin's view recently was adopted by the Chief Judge of the Bankruptcy Court for the District of New Jersey in another asbestos-related bankruptcy. What is without precedent, however, is the ACC's plan to impose an estimation based solely on claims settlement history over Debtors' objections. The ACC provides no case support whatsoever for its proposal to affirmatively preclude merits evidence.

Discovery on the two topics requested by the ACC will not provide any basis for the exclusion of merits evidence from this estimation. With respect to the ACC's first request, even if the Committee can show that U.S. Gypsum's claims settlement history is relevant to estimation, this will not justify excluding, without any consideration whatsoever, other evidence relevant to estimation. Demonstrating that one source of potentially relevant information exists, does not justify excluding all other relevant information. In fact, Debtors do not contend that U.S. Gypsum's claims settlement history should be summarily excluded from consideration in estimation, but Debtors do contend that the actual merits of the claims at issue must be considered in estimation.

Discovery on the ACC's second proposed topic, precisely how merits evidence will be considered in estimation, also could not justify estimation based solely on claims settlement history. Although Debtors repeatedly have described their estimation proposal in detail and have answered the ACC's questions many times in the past, Debtors set forth their estimation proposal again in Section II(B) below. And, when Debtors file their motion for estimation before this Court, if the ACC believes that the estimation proposal

is unclear, the ACC is free to argue that the motion should be denied for lack of completeness.

Therefore, instead of proceeding with the one-sided, incomplete discovery sought by the ACC, the Court should order the parties to file motions for estimation in which the parties set forth their estimation proposals -- as they already have begun to do in their respective discovery briefs.  After briefing and argument, the Court can decide how it will conduct estimation and all parties can then pursue whatever discovery is appropriate to the estimation ordered by the Court.

II.     DISCUSSION

    A.     **The Court Should Hear All the Relevant Evidence in Estimation.**

The purpose of estimation is to make the best possible prediction of U.S. Gypsum's asbestos liabilities, giving all stakeholders a fair opportunity for recovery.  The parties agree that the Court should "us[e] the best evidence available" in estimating the pending and future asbestos personal injury claims.  (ACC Discovery Brief at 6.)  The parties disagree, however, about what evidence the Court should consider.  This is a dispute of enormous significance in this case.  The ACC's contention that the Court should exclude, without any consideration, all merits evidence from its estimation of U.S. Gypsum's liability is patently unfair and contrary to the law.

        1.     **Debtors' right to test the merits of the claims prior to any deprivation of property is firmly established in the law.**

The ACC's effort to block Debtors and other stakeholders from presenting any evidence on the merits of claims runs afoul of due process and the Bankruptcy Code.  A bankruptcy debtor's right to test the merit of claims made on its estate has been affirmed by the Third Circuit and throughout the country.  *See, e.g.*, *In the*

*Matter of George W. Myers Co.*, 412 F.2d 785, 786 (3d Cir. 1969) ("The alleged bankrupt was denied procedural due process by the Referee's refusal of its offer to present evidence."); *In re Sikes*, 184 B.R. 742, 746 & n.4 (M.D. Tenn. 1995) ("'The fundamental requisite of due process of law is the opportunity to be heard.' Toward that end, '[due] process requires that there be an opportunity to present every available defense.'") (citations omitted); *In re Tyrone F. Conner Corp.* 140 B.R. 771, 782 (Bankr. E.D. Cal. 1992) ("[n]ot allowing the debtor herein to present rebuttal evidence or cross-examine the witnesses making the factual contentions asserted . . . would be violative of the fundamental concept of procedural due process."); *In re Arriola Energy Corp.*, 74 B.R. 784, 790 (Bankr. S.D. Tex. 1987) ("The right to present a full defense on the issues is part of a litigant's rights of procedural due process.").

As the Third Circuit has explained:

> If parties were barred from presenting defenses and affirmative defenses to claims which have been filed against them, they would not only be unconstitutionally deprived of their opportunity to be heard, but they would invariably lose on the merits of the claims brought against them. Such a serious deprivation of property without due process of law cannot be countenanced in our constitutional system.

*National Union Fire Insurance Company of Pittsburgh, PA v. City Savings, F.S.B.*, 28 F.3d 376, 394 (3d Cir. 1994.)

The Debtors' right to test the merits of claims is buttressed by the Bankruptcy Code itself.  11 U.S.C. Section 502(a) gives a "party in interest," which includes the debtor, the right to object to claims.  11 U.S.C. § 502 (2005).  As the ACC admits, when a court estimates the value of claims to which a party has objected, "the validity and amount of claims . . . are determined by reference to the applicable non-bankruptcy law under which the claims arose."  (ACC's Discovery Brief at 5); *Bittner v. Borne Chem.*

*Co.*, 691 F.2d 134, 135, 137 (3d Cir. 1982); *see also In re G.I. Indus., Inc.*, 204 F.3d 1276, 1281 (9th Cir. 2000) ("'[A] claim cannot be allowed . . . if it is unenforceable under nonbankruptcy law'.").

After hearing evidence regarding the merits of claims under the applicable non-bankruptcy laws, a court may estimate highly dubious or baseless claims at far less than their alleged value or at zero dollars. In *Bittner v. Borne Chemical Company, Inc.*, a bankruptcy court, "[a]fter weighing the evidence," assigned a value of zero to a putative creditor's tortious interference claims against the estate. *Bittner*, 691 F.2d at 135. On appeal, the creditor argued that even if the bankruptcy court concluded that the claims were not supported by a preponderance of the evidence, the court had to assign them some value. *Id.* at 136. The creditor urged that if its current chance of prevailing was 40%, the Court had to multiply the alleged value of its claims by 0.4 and include that amount in the estimation. *Id.* The Third Circuit disagreed, expressly affirming the bankruptcy court's estimation of the contingent claims at zero dollars.

> Assuming . . . that the bankruptcy court did estimate [the creditor's] claims *according to their ultimate merits* rather than the present value of the probability that they would succeed in their state court action, we cannot find that such a valuation method is an abuse of the discretion conferred by <u>section 502(c)(1)</u> . . . [S]uch a valuation method is not inconsistent with the principles which imbue Chapter 11.

*Id.* at 136-37 (emphasis added).

The New Jersey Bankruptcy Court, in *In re Kaplan,* echoed *Bittner's* interpretation of the proper role of the court in estimation. As the *Kaplan* court explained:

> The court is of course bound by "the legal rules which may govern the ultimate value of the claim" and the court must determine the value of the claim according to its best estimate of the claimant's chances of ultimately succeeding in a state court action. *It is not inappropriate to value a*

> *party's claim at zero where the claim is contingent and where the bankruptcy court finds that the party probably would not succeed on the merits in a state court action.*

*In re Kaplan*, 186 B.R. 871, 874 (Bankr. D.N.J. 1995) (emphasis added) (citations omitted); *see also In re Amatex Corp.*, 110 B.R. 168, 170 (E.D. Pa 1990) ("We note that [contingent] claims are often fragile in the face of the estimation process and valued at zero."); *In the Matter of Baldwin-United Corp.*, 55 B.R. 885, 896-902 (Bankr. S.D. Ohio 1985) (disallowing contingent claims, but stating that if the claims had been estimated, they would have been estimated at zero). Thus, when a bankruptcy court concludes that a contingent claim is not supported by the evidence, it can estimate that claim at zero dollars, even if there is some probability that claim would succeed in state court.

Moreover, estimating claims with little merit at zero protects the interests of all other stakeholders in the bankruptcy. Indeed, one of the expressed reasons the *Bittner* court ruled as it did was to avoid giving dubious claimholders "a significant, if not controlling, voice in the reorganization proceedings." *Bittner*, 691 F.2d at 137; *see also In re Kaplan*, 186 B.R. at 874 ("As recognized by the Third Circuit in *Bittner,* the estimation process protects the interests of other creditors in not having their distributions diminished by allowing a claim whose contingency may never occur."); *In the Matter of Ford*, 967 F.2d 1047, 1053 (5th Cir. 1992) (noting Section 502(c)(1) "is designed to promote a fair distribution to creditors through a realistic assessment of uncertain claims.")

Because a court in estimation considers whether the claims against the estate have merit, the ACC's approach is flawed. The ACC does not propose that the Court measure the evidence supporting the claims and apply the applicable law. Instead, the ACC proposes to prohibit all such evidence and determine the value of the claims solely by

prior settlements of, what they contend are, similar claims. That is not how state court litigation is conducted, and it is not what the law requires or allows.

> **2.    Numerous courts have held that the merits of claims must be considered in mass-tort bankruptcies.**

When Judge Wolin was presented with this authority, he decided that evidence on the merits of claims must be heard. Indeed, he stated that the court's responsibility to "reject" baseless claims in estimation was "obvious."

> [I]f the debtor maintains that its creditors are not legitimate and that, properly analyzed, claims against it do not exceed its assets, the Court must assist . . . The statements in counsels' briefs compel the Court to state the obvious. In an asbestos bankruptcy, the Court will, within the constraints of the law, reject unsubstantiated claims, bogus medical evidence and fanciful theories of causation.

*In re USG Corp.*, 290 B.R. 223, 225 (D. Del. 2003).

Judge Wolin's ruling recently was followed by the Chief Judge of the Bankruptcy Court for the District of New Jersey, Rosemary Gambardella. *See In re G-I Holdings, Inc.*, Nos. 01-30135 (RG), 01-38790 (RG), 2005 WL 758193 (Bankr. D.N.J. Feb. 1, 2005) (Debtors' Appendix to this Brief ("Appx.") Vol. 1, Tab 1). Judge Gambardella, who is presiding over the asbestos bankruptcy of G-I Holdings, Inc., adopted Judge Wolin's conclusion that a court in estimation must reject "unsubstantiated claims, bogus medical evidence and fanciful theories of causation." (*Id.* at USG B 0027 (quoting Judge Wolin).) In describing how the estimation will move forward, the court held:

> G-I Holdings will be afforded the opportunity to object to claims . . .
>        . . . .
> will be permitted to present any relevant defenses and can attack any medical evidence submitted by the Committee . . . [and] will be permitted to move for summary judgment on certain issues on a claims-wide consolidated basis pursuant to Federal rule of Bankruptcy Procedure 7042.

(*Id.* at USG B 0028.)

Further, even before Judges Wolin and Gambardella ruled that a court estimating asbestos personal injury liabilities should weed out baseless claims, numerous other courts presiding over mass-tort bankruptcies had done precisely what the ACC seeks to prevent this Court from doing -- they allowed parties to pursue evidence regarding the merits of claims:

- In the asbestos bankruptcy of Armstrong World Industries, Inc., Armstrong argued that the claimants' method for determining whether asbestos from its floor tiles posed a hazard did not meet *Daubert*'s standards for admissibility. (Appx. Vol. 1, Tab 2 at USG B 0037 (*In re Armstrong World Indus., Inc.*, Debtors' Sept. 17, 2002 Brief).) The Bankruptcy Court for the District of Delaware held a two-day hearing, during which both sides presented detailed information concerning potential health risks from asbestos floor tiles. Armstrong's witness was an expert in epidemiology and the occupational diseases caused by asbestos. (Appx. Vol. 1, Tab 3 at USG B 0076-81, 0082 (*In re Armstrong World Indus., Inc.*, Sept. 26, 2002 Hearing Transcript).) The court ultimately granted Armstrong's motion to exclude the evidence, reasoning that the claimants proposed approach was "not a scientifically valid method of *quantifying* the level of asbestos contamination in a room or building." *In re Armstrong World Industries, Inc.,* 285 B.R. 864, 871 (Bankr. D. Del. 2002).

- In the asbestos bankruptcy of W.R. Grace, Judge Judith Fitzgerald has indicated her willingness to use a "questionnaire" for gathering information from the Grace asbestos personal injury claimants. (Appx. Vol. 1, Tab 4 at USG B 0085-86 (*In re W.R. Grace & Co.*, Jan. 21, 2005 Hearing Transcript).) The Court suggested the questionnaire would be treated as a "series of interrogatories," for the debtors' experts to decide what they "think[] is a proper valuation." (*Id.*) The Court also noted that the appropriate way to address the claimant information is through a "battle of experts." (*Id.*) The Court concluded that the claimant discovery was "calculated to lead [to] relevant admissible evidence." (*Id.* at USG B 0093.)

- Also in W.R. Grace, the debtors objected to various Zonolite Attic Insulation ("ZAI") claims. (Appx. Vol. 1, Tab 5 at USG B 0098, 0100 (*In re W.R. Grace & Co.*, Debtors' June 10, 2002 Objection).) Debtors argued, *inter alia*, that there was no scientifically reliable evidence that ZAI posed an unreasonable risk of harm to the occupants of homes or that the limited frequency or duration of potential disturbances of ZAI resulted in hazardous levels of airborne asbestos fibers. (*Id.* at USG B 0100-01.) The bankruptcy court ordered that the parties take discovery to explore "what science demonstrates with regard to whether ZAI creates an unreasonable risk of harm." (Appx. Vol. 1, Tab 6 at USG B 0105 (*In re W.R. Grace & Co.*, Oct. 21, 2002 Order); Appx. Vol. 1, Tab 7 at USG B 0107 (*In re W.R. Grace & Co.*, Nov. 25, 2002 Order).) As part of that effort, the court allowed the parties to file Rule 42 consolidation motions together with related

*Daubert*/summary judgment motions and oral argument was scheduled nearly eleven months after the original order. (Appx. Vol. 1, Tab 7 at USG B 0108 (*In re W.R. Grace & Co.*, Nov. 25, 2002 Order).)

- In *In re A.H. Robins Company, Inc.*, the personal injury claims arising out of Robins' Dalkon Shield were estimated after a detailed discovery process. *In re A.H. Robins Company, Inc.*, 88 B.R. 742, 746 (E.D. Va. 1988). The court directed the parties to develop a "reliable data base to aid in analyzing and determining the aggregate value of Dalkon Shield claims." *Id*. This data collection process lasted over a year and a half and included the results of more than 195,000 two-page claim forms, roughly 6,000 responses to a fifty-page questionnaire, and medical records from a random sample of 7,500 claimants. *In re A.H. Robins Co., Inc. v. Mabey*, 880 F.2d 694, 699 (4th Cir. 1989). The 50-page questionnaire sent to some of the potential claimants asked about the claimants' use of the Dalkon Shield and the nature of their injuries, including "verification by way of medical records where possible." *Id.* At the ultimate estimation hearing, the parties presented "extensive medical, statistical, epidemiological, and other expert testimony." *In re A.H. Robins Co., Inc.*, 88 B.R. at 746-47.[2]

- In the asbestos bankruptcy of The Babcock & Wilcox Co. ("B & W"), the court set a bar date and authorized the debtor to collect over 220,000 claim forms from the asbestos personal injury claimants. (Appx. Vol. 1, Tab 8 at USG B 0115-16 (*In re Babcock & Wilcox Co.*, Debtors' July 2, 2002 Motion).) The court-approved claim forms required claimants to submit extensive medical information (*e.g.*, diagnoses, lung function scores, International Labour Organization ratings) and exposure information (*e.g.*, exposure sites, industries and occupations, duration of exposure). (*See id.*; Appx. Vol. 1, Tab 9 at USG B 0174-78 (*In re Babcock & Wilcox Co.*, Debtors' Oct. 18, 2001 Report); Appx. Vol. 1, Tab 10 at USG B 0197-98 (*In re Babcock & Wilcox Co.*, Debtors' Oct. 18, 2001 Motion); Appx. Vol. 1, Tab 11 at USG B 0211-14 (*In re Babcock & Wilcox Co.*, Debtors' Feb. 5, 2001 Motion and Feb. 9, 2001 Order).)[3]

---

[2]    The ACC's Discovery Brief includes *A.H. Robins* among the bankruptcies that allegedly relied on claims settlement history to perform estimation. (*See* ACC Discovery Brief at 7.) But Debtors can find no indication that the ACC's claim is accurate from the decision it cites, namely, *In re A.H. Robins Company, Inc.*, 88 B.R. 742 (E.D. Va. 1988), *aff'd*, 880 F.2d 694 (4th Cir. 1989).

[3]    After collecting this merits information, the parties in B & W ultimately reached a consensual agreement. Only after this agreement was reached did the parties conduct for the Court a "settlement history" estimation. Nowhere did the B & W court reject the admissibility of the merits evidence that it had permitted the debtors to collect over the claimants' strenuous objection. Although the court refused to leave the reorganization pending for the length of time necessary to implement B & W's approach, B & W's proposal for adjudicating all 220,000 claims pending against it bears little resemblance to the streamlined process for estimation Debtors propose here.

**3.    The ACC cites no authority where a court, over the debtor's objection, refused to consider the merits of claims in estimation.**

The ACC has not identified a single case where a debtor that sought to challenge its asbestos-related claims was precluded from presenting evidence as to the merits of claims and had estimation by claims settlement history forced upon it.   In *Eagle-Picher* and *Owens Corning*, the cases on which the ACC relies, the debtors did not contest the estimation proceedings.

Specifically, in *Owens Corning, et al., v. Credit Suisse First Boston*, 322 B.R. 719 (D. Del. 2005), the debtor and the asbestos claimants' committee agreed on a plan of reorganization and the debtor did not offer any estimate of personal injury liability during estimation.   *Id.* at 721.   A group of bank creditors that contested the jointly submitted plan presented evidence, including medical evidence and testimony of experts, to be considered in estimation in conjunction with Owens Corning's claims payment history. In fact, some of the evidence the court recited as bearing on its ruling in *Owens Corning* is the same evidence the ACC seeks to exclude from presentation to the Court here. *Compare id.* at 723 (discussing evidence on mass screenings and the unreliability of certain pro-plaintiff B-Readers) *with* ACC's Discovery Brief at 20-21.

In *In re Eagle-Picher Industries Inc.,* 189 B.R. 681 (Bankr. S.D. Ohio 1995), prior to the hearing on estimation, the debtors, the asbestos claimants' committee, and the future claimants' representative reached an agreement in principal on the entire plan of reorganization and negotiated a specific value for the asbestos claims.   *Id.* at 682.   The court concluded, based on the recommendation of the plan proponents, that it should estimate the value of the asbestos claims for use in the plan despite the agreement among the plan proponents.   *Id.*   All parties' experts opined on the value of the present and

future asbestos claims using claims payment history. *Id*. at 686-87, 691-92. Although the Court resolved disagreements as to which claims payment history to utilize, it did not refuse to hear evidence regarding the merits of claims.

In short, while the ACC characterizes Debtors' approach to estimation as "radical" it is the ACC's attempt to prevent this Court from even hearing evidence as to the merits of the claims, in the face of a request to do so, that is truly unprecedented.[4]

**B.    Debtors' Estimation Plan Will Permit the Court to Consider the Merits of Claims in an Efficient and Fair Manner.**

Contrary to the ACC's claim that Debtors have "deliberately" explained their estimation proposal in "only the most general of terms," Debtors have laid out their plan repeatedly and in considerable detail. In addition to Debtors' Case Management Statement, Discovery Timeline, and Estimation Decisional Tree filed with this Court, in 2002 Debtors filed a 38-page motion for estimation, to which the ACC responded with a 42-page opposition. This briefing was followed by a two-hour oral argument before Judge Wolin, after which he ruled that the merits of claims had to be heard in estimation.[5] Additionally, Debtors have engaged in numerous meet and confer conferences with the ACC addressing Debtors' estimation proposal and provided the ACC with a confidential mediation statement describing that proposal at length. The ACC's claim that it does not understand Debtors' proposal is part of a broader effort to convince the Court that Debtors' proposal is "too complex" and should be abandoned. Neither is true. *Another* summary of Debtors' estimation proposal follows.

---

[4]    The ACC repeatedly implies that because Debtors use the term "substantive estimation" to describe their proposal, it must be a new and never-before-tried approach to estimation. Debtors only use that term to distinguish their approach from the ACC's claims-settlement-history-only approach, which is devoid of consideration of the substance or merits of claims. As shown above, considering the merits of claims in estimation is common and accepted.

[5]    Notably, at no time during this process did the ACC claim to need any advance discovery.

1.      **Initial claimant and expert discovery.**

As shown on Debtors' Estimation Timeline, estimation will begin with discovery of the parties' experts, including reports and depositions, and a sample of personal injury claimants.  The expert discovery will revolve around the five questions that the Court should consider in determining the characteristics of valid claims in estimation.  (*See* Part 1 of Debtors' Estimation Decisional Tree, D.I. 5.)  Debtors' experts will testify as to what diseases can be caused by the type of asbestos used in U.S. Gypsum's products (chrysotile asbestos), how much asbestos exposure is required to cause disease, and the occupational characteristics of those claimants who are likely to demonstrate exposure to U.S. Gypsum's products at levels sufficient to cause disease.

During this period of discovery, which Debtors estimate will take approximately four months, the ACC also may pursue other discovery that it believes necessary and appropriate, including, for example, the tort system history discovery that the ACC now requests.  Debtors also will take discovery of the ACC experts who will testify regarding the characteristics of valid claims.

Concurrent with this expert discovery, the parties will conduct discovery of a statistically significant number of pending claimants.  The discovery will cover the standard information these claimants typically provide in state court litigation, such as the claimant's medical history, claimed disease, occupational history, occupational and non-occupational asbestos exposure, and asbestos litigation history.  Many, if not most, of the claimants already will have collected this evidence and produced it to other defendants or

asbestos trusts.   From this discovery, the Court will be able to draw mathematically reliable conclusions as to the characteristics of all of Debtors' present claimants.[6]

To the extent necessary, at the end of this period, the parties will file any motions for summary resolution of undisputed issues or *Daubert* motions to exclude inadmissible expert testimony.[7]

### 2.    Hearing to define the characteristics of valid claims.

With discovery and pre-hearing motions completed, the Court will hold an evidentiary hearing to determine the characteristics of valid claims (Part 1 on Debtors' Estimation Decisional Tree, D.I. 5).   The Court will not decide the validity of any individual claim during the hearing, but instead determine the characteristics of claims (in terms of exposure and alleged injury) that should be treated as valid.

The resolution of the five basic claim validity issues will assist the Court in estimating the number of valid present and future claims.   For example, the Court will hear evidence from experts regarding the occupational characteristics of those claimants who likely had exposure to U.S. Gypsum products sufficient to cause disease.   Similarly, the Court will hear evidence from experts regarding the diagnosis of asbestos-related impairment for purposes of determining the number of claimants who likely will be able to demonstrate impairment sufficient to establish injury.   The Court also will hear from

---

[6]    Debtors' work with their expert statistician to date suggests that it is possible to attain a 95% confidence interval that a sample is accurate to within plus or minus 3% – clearly a "reasonable estimate" – using a sample size no larger than 1,000 claimants.   By limiting discovery to a much smaller, but still statistically representative, subset of claimants the Court can reduce the burden on parties and claimants alike, without sacrificing accuracy.

[7]    As Debtors' April 26 Discovery Brief explained, taking all this discovery at one time is both more efficient and more equitable than the ACC's discovery plan.   By collecting all discovery on merits issues in a single phase, the parties will avoid the inevitable redundancies that must result from subjecting Debtors (and others) to partial discovery now.   Likewise, conducting all discovery at once eliminates the risk that the Court will make any rulings based on incomplete evidence.   (*See* Debtors' Discovery Brief at 4-6.)

experts as to whether chrysotile asbestos (the type of fiber in U.S. Gypsum's products) causes mesothelioma at the level of exposure U.S. Gypsum claimants could have experienced.

Under *Bittner*, the Court should estimate at zero those claims where it is likely that there is not sufficient exposure or physical impairment to establish a valid claim. Conversely, the Court should estimate as payable those claims where there is likely sufficient exposure to a U.S. Gypsum product and reliable evidence of asbestos-related injury.  In this way, the Court will use the factual evidence to develop a set of criteria for claims predicted to be valid and payable.

>    **3.    Further discovery and a hearing to estimate the number and value of valid asbestos personal injury claims.**

With the characteristics of a valid claim established, the parties will then conduct discovery of their respective economic and statistical experts who will testify regarding the number of valid present (based on the Court's rulings in the first hearing and the claimant discovery); the number of valid future claims; the value the Court should assign to the estimated valid claims in each disease category; and the aggregate value of U.S. Gypsum's asbestos personal injury liability.  (*See* Parts 2 and 3 of Debtors' Decisional Tree, D.I. 5.)  These aggregate values will be used to determine the size of the Section 524(g) trust that Debtors will propose in their plan of reorganization. Again, the parties will have the opportunity to file any appropriate prehearing motions.

>    **C.    The ACC's Criticisms of Debtors' Estimation Proposal are Unfounded.**

The ACC's Discovery Brief levels a number of attacks at Debtors' estimation proposal.  While the estimation proposals are not the subject of this motion,

Debtors are compelled to answer some of the ACC's misstatements about Debtors' proposal.

### 1. Debtors do not ask the Court to "make universal substantive rulings as matters of federal law."

The ACC argues that Debtors' estimation protocol will force this Court to make universal rulings "as matters of federal law," when, in fact, state law controls the ultimate resolution of the claims. (*See, e.g.*, ACC Discovery Brief at 4-10.) The majority of the questions the Court will address in estimation are factual, not legal. Contested matters, such as estimation proceedings, are governed by Federal Rule of Bankruptcy Procedure 9014, which requires the Court to resolve disputed issues of fact based on an evidentiary hearing. *See* Fed. R. Bankr. P. 9014(d) (2005), advisory committee notes ("[I]f [a] motion cannot be decided without resolving a disputed material issue of fact, an evidentiary hearing must be held at which testimony of witnesses is taken in the same manner as testimony is taken in an adversary proceeding or at a trial in a district court civil case."); *see also* Fed. R. Civ. P. 52(a) (2005), made applicable to contested matters by Fed. R. Bankr. P. 9014. Whether chrysotile asbestos causes mesothelioma, is a matter of scientific evidence -- the answer to this questions does not depend on state substantive law. Whether lung cancer in the absence of asbestosis can be asbestos-related is a question of medical fact, regardless of the jurisdiction in which the question is asked.

To the extent these factual questions intersect at all with questions of law, federal courts presiding over bankruptcy actions are perfectly capable of interpreting and applying state substantive law, and do so routinely. *See, e.g., In re Wilson*, 85 B.R. 722, 727 (Bankr. E.D. Pa. 1988) ("Bankruptcy courts have traditionally and routinely

interpreted state law in order to resolve disputes in bankruptcy cases and administer the estate."); *Ram Constr. Co. v. Port Auth. of Allegheny County*, 49 B.R. 363, 367 (W.D. Pa. 1985). Moreover, the critical legal requirements for personal injury claims do not meaningfully vary among states. Debtors are cognizant that the estimation must be based on state substantive law and have not relied on unusual or ephemeral trends in the tort laws of certain states. Instead, Debtors rely on two bedrock principles of tort law, applicable in all jurisdictions -- claimants must establish that they are injured and that the defendant caused their injuries.

        **2.**    **Debtors' proposal for considering the merits of claims is efficient and feasible.**

        **a.**    **The Committee's specific criticisms of Debtors' plan are groundless.**

The ACC argues that Debtors' plan to test the merits of claims is a "minefield of complexity," and, thus, the Court is justified in excluding all merits evidence and refusing to consider Debtors' defenses. (ACC's Discovery Brief at 10.) In attempting to create confusion, the ACC misdescribes many concurrent phases of estimation as being sequential. (ACC Discovery Brief at 10-11). Debtors ask the Court to refer to Debtors' Estimation Timeline (D.I. 5) and Section II(B) above to understand the timing of the discovery and hearings Debtors anticipate will be necessary.

The ACC also argues that, under Debtors' plan, individual claimants must be permitted to participate in estimation. This argument ignores the difference between estimation and liquidation of claims. In estimation, a court predicts the aggregate liability of a debtor for purpose of establishing a plan. This Court will not make any rulings for *liquidation purposes* or decide the validity of any individual asbestos personal injury claim. For this reason, individual claimants have no right to appear. Their

interests are represented by the Committees.  Indeed, the very lawyers who assert that claimants' due process rights are implicated here argued in the *In re G-I Holdings Inc.* asbestos bankruptcy, "[An estimation] designed solely to test the Debtor's solvency, not to determine actual distributions to individual claimants, [does] not violate anyone's jury-trial or due-process rights."  *In re G-I Holdings Inc.*, 2005 WL 758193 (Appx. Vol. 1, Tab 1 at USG B 0026) (quoting the ACC's brief).

Moreover, Debtors and the ACC seek precisely the same outcome from estimation -- a dollar approximation of U.S. Gypsum's liability for the purposes of creating a 524(g) trust and confirming a plan of reorganization.  Therefore, if any claimant has the right to appear individually to contest a merits-based estimation, they also would have an equal right to appear to contest an estimation based on claims settlement history.  Claimants do not have a right to appear because estimation does not decide individual claims; but even if they did, that right would exist under any estimation protocol.

Finally, the ACC's argument that Debtors' plan to collect minimal discovery of sample claimants is "highly controversial" also is inaccurate.  (ACC Discovery Brief at 12.)  As explained in Debtors' Discovery Brief, sampling is a commonly-employed method for reliably and efficiently obtaining discovery on large bodies of data.  *See, e.g.*, *Manual for Complex Litigation, Third* §§ 21.4223, 21.493 (2003) (Appx. Vol. 1, Tabs 12 and 13 respectively); *Miller v. Air Line Pilots Assoc.*, 108 F.3d 1415, 1425 (D.C. Cir. 1997).  Indeed, the very counsel for the ACC in this matter stated to Judge Fitzgerald in *In re W.R. Grace* that, with respect to the number of claimants required for a statistically significant discovery sample, "[y]ou need whatever the experts would tell you would be a

sufficient sample to . . . have it be representative." (Appx. Vol. 1, Tab 4 at USG B 0086 (*In re W.R. Grace & Co.*, Jan. 21, 2005 Hearing Transcript.)  Notably, the sampling proposed by Debtors will be far more efficient for the parties and the Court than the procedures approved and undertaken in many previous mass-tort estimations.  (See the discussion of claimant discovery in *In re The Babcock and Wilcox Co.*, *In re A.H Robins*, and *In re W.R. Grace* in Section II(A)(2) above.)  If the ACC were genuinely concerned about whether and how sampling can work, they would have taken Debtors up on their numerous offers to provide discovery on this issue.[8]

>           **b.    The ACC's approach provides no significant time savings.**

Although the ACC criticizes Debtors' proposal as being too time consuming, the ACC's estimation protocol does not appear to be any more efficient, and at the same time it is unfair.  While Debtors have suggested an approximately one-year timeline to complete estimation, the ACC has requested four to six months of discovery before the parties even file briefs addressing what evidence will be considered in estimation.  (*See* ACC's Decisional Tree at 1, D.I. 6.)  After that time, even if the ACC were to prevail on all fronts, the parties and the Court must still address the issues of which claims settlement history is relevant to estimating Debtors' liability and why.  Addressing these issues will require further discovery.

Debtors' arguments showing that claims settlement history is not a good predictor of liability (some of which are briefly summarized below) will have to be considered in

---

[8]    During the meet and confer regarding the ACC's discovery requests, Debtors offered to engage in reciprocal discovery of their respective statisticians as to a proper sampling methodology.  The ACC refused this offer and apparently no longer seeks discovery regarding Debtors' sampling proposal, but, instead, simply elects to criticize it.

order for the Court to decide whether a modification to the claims history is required.  As the ACC's expert, Mark Peterson, has stated:

> The extrapolations [from claims resolution history] are problematic if the bases for settling claims have or will change.  The extrapolations would then provide little information about what defendants will actually pay, but would at most indicate what defendants' expected payments would have been if the past practices had continued into the future.

(Appx. Vol. 2, Tab 14 at USG B 0244 (*In re Johns-Mansville Corp.*, Peterson May 7, 1991 Expert Report).)

In an effort to persuade the Court to favor its estimation proposal, the ACC tries to present an "*Eagle-Picher / Owens Corning* method" of estimation solely by claims settlement history as monolithic and easily applied.  It is neither.  Rather than being a straightforward mathematical exercise, settlement history has been applied to different asbestos bankruptcies in significantly different ways for purposes of estimation.  For example, Peterson used very different historical "base periods" for determining an average historic settlement value in *Eagle-Picher*, *Babcock & Wilcox*, *W.R. Grace*, and *Owens Corning*.  Applying these differing approaches to U.S. Gypsum's settlement history could cause Peterson's estimate to vary by billions of dollars.  Likewise, in *Owens Corning*, the various parties' estimates of liability, all of which purported to use claims payment history, varied by a staggering nine billion dollars, and the Court concluded that Peterson had over-estimated Owens Corning's liability by over four billion dollars.  *See Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 721, 725 (D. Del. 2005).

The ACC glosses over the complexities in their own estimation approach, while exaggerating those in Debtors' in other ways also.  For instance, both plans call for the Court to project how many future claims will be filed and to decide what claims

settlement history to use in assigning values to valid claims.  Yet the ACC's Decisional Tree contains nine boxes (beginning in the middle of the third page with "Discovery regarding value of surviving claims") describing this seemingly burdensome process under Debtors' proposal, and it is not even mentioned in the ACC's over-simplified representation of its own proposal.

> **3.    Debtors are not seeking to exclude claims settlement history evidence from the estimation and have no obligation to show that such evidence is "worthless."**

Throughout their Discovery Brief, the ACC tries to promote the fallacy that unless Debtors can definitively prove that U.S. Gypsum's claims settlement history is "irrelevant" and "worthless," Debtors proposal to have the merits of claims considered "collapses."  (*See, e.g.*, ACC's Discovery Brief at 1, 10, 13 and 16.)  The ACC seems to believe that if claims settlement history can be shown to have any relevance in the estimation, the Court will automatically exclude all other evidence.  The availability of one source of allegedly relevant evidence does not justify excluding relevant evidence from all other sources.  Debtors believe that considering all of the relevant evidence will allow the Court to make the most accurate estimation.  Consequently, Debtors are not seeking to preemptively exclude claims settlement history.  Therefore, neither Debtors nor the ACC needs to address the value of claims settlement history before the Court decides whether to consider merits evidence in the estimation.

Although Debtors do not have to, and are not now attempting to, prove that claims settlement history is "worthless," Debtors feel compelled to address the ACC's assertions regarding the feasibility of using U.S. Gypsum's claims settlement history to accurately predict liability.

The ACC implies that there is a long history of trials testing Debtors' defenses to claims. To the contrary, more than 99% of U.S. Gypsum's claims history consists of settlements. The majority of settlements were for less than $1000 (after adjusting earlier settlement amounts upward for inflation). This is less than a single day of attorney time. Ninety-percent of U.S. Gypsum's settlements were for $5,000 or less. At these values, U.S. Gypsum was economically better off settling the most baseless claim rather than litigating the actual claim merits and value. This economic reality lead U.S. Gypsum to join, and remain for over a decade in, the Asbestos Claims Facility and the Center for Claims Resolution. These claim settlement "values" can provide no information as to claim validity.

In retrospect, the nations' asbestos defendants' practice of offering early settlements, absent meaningful evidence of exposure or harm, accelerated the filing of meritless claims. The rapid spread of mass screenings, for instance, created legions of allegedly injured plaintiffs. In recent years, two peer-reviewed studies reexamining the medical records of such plaintiffs found that 95% of the sample plaintiffs tested were misdiagnosed.[9] Indeed, a federal judge in Texas who recently heard evidence on a similar screening program used in Silicosis cases, declared that the testimony of one of the diagnosing doctors raised "great red flags of fraud." (Appx. Vol. 2, Tab 17 at USG B 0278 (*In re Silica Products Liability Litigation,* Feb. 17, 2005 Hearing Transcript).)

---

[9]     *See* Joseph N. Gitlin, *et al.*, *Comparison of "B" Readers' Interpretations of Chest Radiographs for Asbestos-Related Changes,* 11 Academic Radiology 843 (2004) (Appx. Vol. 2, Tab 15) (while plaintiffs' readers who found abnormalities in 95.9% of 492 radiographs, an independent panel of readers found abnormalities in only 4.5%); R.B. Reger, et al., *Cases of Alleged Asbestos-Related Disease: a Radiologic Re-Evaluation,* 32 Journal of Occupational Medicine, 1088 (1990) (Appx. Vol. 2, Tab 16) (compared to plaintiffs' readers who found evidence of asbestos exposure in 439 of between 700 and 750 tire workers screened by radiograph, 3 independent radiologists found at most 2.5% to 3.6% of 439 tire workers had evidence of exposure).

These doctors and screening companies were heavily involved in the asbestos mass screening program which ultimately overwhelmed Debtor U.S. Gypsum. Nonetheless, the ACC urges the Court to assume that such claimants have legitimate and compensable injuries in proportion to Debtors' history of settling such claims.

In addition to these facts, the landscape of the tort system has changed significantly since Debtors filed for reorganization. For example, recent legislation and judicial decisions should substantially decrease the number of nonmalignant asbestos claim filings. Florida, Georgia, Ohio, and Texas have enacted legislation providing that no one may bring or maintain an action for nonmalignant asbestos-related injury unless they establish a *prima facie* case of physical impairment. A *prima facie* case requires, among other things, proof that a doctor or competent medical authority took a detailed history from the exposed person and that the person has a permanent physical impairment which meets certain minimum objective medical criteria and for which exposure to asbestos was a substantial contributing factor. *See* H.B. 1019 § 4 (Fla. 2005) (Appx. Vol. 2, Tab 18); H.B. 416 §§ 51-14-2(15), 51-14-3 (Ga. 2005) (Appx. Vol. 2, Tab 19); Ohio Rev. Code Ann. § 2307.92(B) (2005) (Appx. Vol. 2, Tab 20); S.B. 15 § 90.003 (Tex. 2005) (Appx. Vol. 2, Tab 21). Moreover, many courts have effectively set minimum impairment criteria for nonmalignant asbestos claims by referring such claims to special dockets, called inactive or deferred dockets or pleural registries, which toll the applicable statute of limitations until such time, if ever, that an impairing asbestos-related injury becomes manifest. *See* Victor E. Schwartz *et al.*, *Addressing the "Elephantine Mass" of Asbestos Cases: Consolidation Versus Inactive Dockets (Pleural Registries) and Case Management Plans That Defer Claims Filed by the Non-Sick*, 31 Pepp. L. Rev. 271, 291-

96 (2003) (Appx. Vol. 2, Tab 22) (identifying courts that have adopted inactive dockets); Mark Behrens & Monica Parham, *Stewardship for the Sick: Preserving Assets for Asbestos Victims Through Inactive Docket Programs*, 33 Tex. Tech. L. Rev. 1, 13-16 (2001) (Appx. Vol. 2, Tab 23) (same).

In addition, certain hotbeds of asbestos litigation are reforming state venue rules to slow the tide of asbestos plaintiffs seeking a favorable forum. In Mississippi, for example, suits may now only be filed in the county where "a substantial alleged act or omission occurred," "a substantial event [causing] the injury occurred," the plaintiff resides, or the defendant resides or has its principal place of business. Miss. Code Ann. § 11-11-3 (2005) (Appx. Vol. 2, Tab 24). For these reasons, when all the evidence is before the Court at the estimation hearing, Debtors believe it will be clear that claims settlement history is a poor proxy for U.S. Gypsum's liability and cannot, in any event, be the sole basis for estimation. But this question, however it will later be resolved, is not relevant to whether Debtors are entitled to have the merits of claims considered in estimation and need not be explored now.

4.    **The alleged existence of evidence contrary to Debtors' defenses has no bearing on whether those defenses must be heard.**

As Debtors' Discovery Brief noted, the ACC is also attempting to bar merits evidence by conflating Debtors' right to have their arguments *heard* and Debtors' right to have their arguments *accepted* and accounted for in the estimation. For instance, the ACC's Discovery Brief cites to two health organization publications allegedly stating that chrysotile asbestos can cause mesothelioma, and then argues that the chrysotile defense "is not an absolute defense on the merits or even grounds for summary judgment." (ACC Discovery Brief at 19.) Apparently, the ACC contends that

the existence of *any evidence* contrary to the chrysotile defense completely bars this Court from hearing that defense.

Debtors believe that the ACC cannot present credible evidence sufficient to meet their burden that chrysotile asbestos causes mesothelioma at levels at which U.S. Gypsum claimants could have been exposed. But even if the ACC were to present some credible evidence on this issue, that certainly would not prevent the Court from hearing the chrysotile defense. Under *Bittner* and its progeny, it is not only legally insufficient claims that are subject to estimation at zero dollars. Factually weak claims may likewise be estimated as valueless, whether or not some evidence could conceivably support them. *See* Section II(A)(1) above. At the estimation hearing, both sides can and will bring forward all the relevant evidence, and the ACC can argue about whose evidence is stronger. But, the possibility (at this point before discovery has even begun) that some of Debtors' defenses will not be *accepted*, has no bearing on whether they must be *heard*.

Moreover, even accepting *arguendo* the ACC's untenable claim that a single piece of conflicting evidence would defeat the chrysotile defense, the Court still could not exclude all evidence on that defense at this stage of the proceedings. Without the benefit of expert discovery, the Court will not be able to evaluate whether any of the ACC's evidence allegedly showing that chrysotile can cause mesothelioma is credible or junk science?[10]

---

[10]    To the extent that the ACC's entire argument rests on Judge Fullam's recent statement that all claims that can survive summary judgment "have some potential value," Debtors respectfully submit that Judge Fullam's position is fatally inconsistent with the Third Circuit's pronouncement in *Bittner*, and cannot be adopted. *Owens Corning v. Credit Suisse First Boston*, No. 04-00905, slip op. at 2 (D. Del. Apr. 13, 2005) (Fullam, J.) (attached to the ACC's Discovery Brief as Exh. A). Moreover, even if Judge Fullam's view were accepted, Debtors would still be entitled to develop and present evidence sufficient to show that some categories of personal injury claims would not even survive summary judgment.

**D.    No Discovery is Needed Before Briefing and a Hearing on Estimation Methodology.**

The ACC seeks discovery on two topics: (1) U.S. Gypsum's claims settlement history and (2) the details as to precisely how merits evidence will be accounted for in the estimation. This discovery is not necessary before briefing and decision on estimation methodology.

**1.    Discovery concerning Debtors' tort system experience is not relevant at this stage.**

The ACC claims that it must have discovery to disprove Debtors' assertion that U.S. Gypsum's claims settlement history is "worthless," before the Court can decide whether to consider the merits of claims. (ACC's Discovery Brief at 13-14.) But, even if the ACC can show that claims settlement history will have some relevance, this does not justify excluding all other relevant evidence. Debtors are not now seeking to exclude claims settlement history from the estimation, so the ACC has no present need to demonstrate its usefulness.

Further, if discovery of the factual bases underlying the parties' arguments in the ultimate estimation hearing is permitted now, then it is permitted for both parties. Debtors should be entitled to take discovery of, among other things, the evidence the ACC contends proves that chrysotile asbestos can cause mesothelioma. Debtors also would be allowed discovery of evidence showing that there is no safe level of exposure to asbestos and that *de minimis* exposures can cause disease. In short, Debtors would be entitled to pursue discovery on the merits of the claims so that they can show the Court that merits-based evidence should be considered in estimation because not all claims are supportable.

If the Court allows this type of discovery to go forward now, the parties' requests would logically snowball into *all the discovery either party requires for the estimation*. For this reason, Debtors have offered to the ACC, and urged in their Discovery Brief, that if any discovery as to the ultimate estimation issues is permitted now, all discovery must be allowed to go forward.

    **2.    The ACC's so-called contention interrogatories on Debtors' defenses have been answered in past filings and communications.**

The ACC's second claim for discovery is based on their alleged ignorance of how consideration of the merits of claims will work in estimation. According to the ACC, Debtors "deliberately explained their 'substantive estimation' theory in only the most general of terms" and, now, "discovery aimed at fleshing out the particulars of Debtors' proposal is in order." (ACC Discovery Brief at 1, 16.)

The ACC's alleged confusion about Debtors' proposal is not credible. In 2002, the parties extensively discussed, briefed, and had oral argument on Debtors' proposal. After that process, Judge Wolin, obviously, was satisfied that he understood Debtors' proposal well enough to rule that merits evidence had to be considered. At no time did the ACC seek any of the advance discovery that they now purport is so critical.

The ACC's plea for discovery is a tactic for blocking evidence regarding the merits of claims in estimation. Apparently, the ACC hopes that by prematurely probing every detail of Debtors' plan, it can bog down the proceedings and convince the Court to simply give up and disallow merits evidence. In fact, if the ACC were successful in forcing a six-month delay for unneeded discovery, Debtors anticipate they would next argue that, because the process is taking so long, there is no time to consider merits evidence.

Notwithstanding the tactical nature of the ACC's response, Debtors address the specific questions posed in the ACC's Discovery Brief.

> **a.   Claimants have the burden to prove that the chrysotile asbestos in U.S. Gypsum's products causes mesothelioma.**

In its Discovery Brief, the ACC asks whether (1) Debtors intend for the Court to hear conflicting evidence on whether chrysotile causes mesothelioma and reach a resolution and (2) whether Debtors will argue that there is no conflicting evidence regarding the chrysotile defense. (ACC Discovery Brief at 19.) The accurate initial question in estimation, however, is whether the ACC has some competent scientific evidence to meet their burden to support their claim that the chrysotile asbestos in U.S. Gypsum's products causes mesothelioma. The evidence Debtors will submit consists of published literature and expert opinion on the scientific consensus that the evidence does not prove that chrysotile asbestos causes mesothelioma, or that it may do so only at extremely high levels of exposure.[11] Debtors will challenge all evidence presented that chrysotile asbestos causes mesothelioma and, if appropriate, seek to exclude evidence without a proper foundation in science under *Daubert*. To the extent the ACC plans to argue that the mere existence of *conflicting evidence* legally precludes the Court from considering a defense in estimation, their view is insupportable. (*See* Sections II(A)(1) and II(C)(4) above.)

---

[11]   Debtors' Case Management Statement to this Court expressly stated that Part 1 of estimation would include "expert testimony" and "adversarial evidentiary hearings" on the merits of claims. (*See* Debtors' Dec. 2004 Case Management Statement at 7; Appx. Vol. 2, Tab 25 at USG B 0411-12 (*In re USG Corp.*, Debtors' June 21, 2002 Brief) Debtors also have provided examples of the scientific and medical evidence that shows that chrysotile asbestos does not cause mesothelioma. (*See, e.g.,* Debtors' Case Management Statement at 10-11 & n.22-23; Appx. Vol. 2, Tab 25 at USG B 0418-20 & n.59-62 (*In re USG Corp.*, Debtors' June 21, 2002 Brief).)

        **b.**      **Claimants must have admissible evidence of impairment to establish a valid claim.**

The ACC next claims to need discovery "to clarify how Debtors intend to present for decision their assertion that the claims of unimpaired claimants must . . . be estimated at zero dollars", and with respect to whether Debtors intend to present experts regarding "the system" for diagnosing illness and how such evidence translates into characteristics of a valid claim.  (ACC's Discovery Brief at 21 (internal quotation marks omitted).)

Again, the accurate initial question is what evidence will the claimants present to meet their burden to support their claim of actual harm.  As Debtors have discussed in past filings, the evidence that most unimpaired claimants rely on to establish their injuries -- chest x-ray readings -- have been shown to be pervasively unreliable.  Two recent, peer-reviewed scientific studies found that less than five percent of B-reader diagnoses (x-ray readings) of asbestos plaintiffs are accurate.  (*See* Debtors' Dec. 2004 Case Management Statement at 9-10.)  In short, the claimants x-ray evidence is not indicative of harm.

Debtors have urged the Court to reject the ACC's assumption that all claimants are injured and, instead, to "apply widely accepted medical criteria measuring a putative claimant's breathing capacity against normal predicted levels for a healthy individual." (Appx. Vol. 2, Tab 26 at USG B 0414 (*In re USG Corp.*, Debtors' June 21, 2002 Brief).) Debtors will submit evidence in estimation that this legitimate injury criteria is superior to "accepting the ACC's *ipse dixit* that a claim alone is sufficient to yield liability."  (*Id.* at USG B 0415.)

### c.    Claimants cannot recover absent legally adequate exposure to U.S. Gypsum's products.

Finally, the ACC purports to need discovery regarding how Debtors will demonstrate that many claimants had insufficient exposure to establish that U.S. Gypsum's products were a substantial factor in causing their injuries. Again, it is claimants' burden to establish that exposure to U.S. Gypsum's products caused their injuries. In light of the fact that U.S. Gypsum only manufactures products used in the construction industry, meeting this burden of proof will be difficult for the more than 80% of U.S. Gypsum claimants who did not work in construction as a primary or secondary occupation. (*See* Debtors' Dec. 2004 Case Management Statement at 8.)

As for claimants with construction occupation exposure, Debtors' experts have analyzed the considerable library of existing literature on the levels of asbestos exposure that various products cause. This research allows experts to reliably gauge the level of exposure those working with, or near to, U.S. Gypsum's asbestos-containing products would have experienced in different standard occupations over time. Claimant discovery will provide information on the nature and duration of exposure to U.S. Gypsum's products for a statistically representative sample of claimants. From this information, the total amount of a claimant's past exposures can be estimated reliably by multiplying the intensity of exposure (associated with the asbestos-containing product) by the duration of exposure, and adjusting, where necessary, for the fact that the claimant was not directly exposed, but was a bystander. The Court, with the assistance of expert testimony, can then estimate the number of present and future claimants who likely had sufficient exposure to U.S. Gypsum's products to cause disease. Conversely, claimants with

medically insignificant exposures, by this calculation, will not be able to establish that U.S. Gypsum's products were a substantial factor in causing their alleged injuries.

Finally, to the extent the ACC is asking for more information on the details of Debtors' exposure analysis than provided in this and previous briefs, their request is premature. Debtors will produce reports from their experts at the appropriate time. The reports will provide all the relevant detail of Debtors' exposure analysis, and the ACC will have a full opportunity to depose Debtors' experts on the bases of that analysis. Debtors certainly cannot be required today to describe every nuance of the testimony of multiple experts that will not be presented for the Court's consideration until some time in the future. That is the function of expert reports and testimony itself.

III.   CONCLUSION

For these reasons, the ACC's discovery requests should be denied, and the Court should set a briefing and hearing schedule to address the issues the Court will consider in estimation. Alternatively, the Court should order that all the discovery needed for conducting estimation should commence now and establish a schedule for that process. The issue of admissibility of evidence during estimation, now raised by the ACC, can be taken up after discovery is complete.

Dated:  May 26, 2005

RICHARDS, LAYTON, & FINGER, P.A.


COOLEY GODWARD LLP
Stephen C. Neal (CA 170085)
Scott D. Devereaux (CA 146050)
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306
Tel: (650) 843-5000

*/s/ Karen M. McKinley*
Daniel J. DeFranceschi (DE No. 2732)
Paul N. Heath (DE No. 3704)
Karen M. McKinley (DE No. 4372)
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Tel: (302) 651-7700

JONES DAY
David G. Heiman (OH 0038271)
Brad B. Erens (IL 6206864)
North Point - 901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Tel: (216) 586-3939

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I hereby certify that on May 26, 2005, I electronically filed ***Debtors' Response to***
***the Joint Statement of the Asbestos Personal Injury Creditors Committee and the Legal***
***Representative for Future Asbestos Claimants Regarding Discovery in Advance of Hearing on***
***Methodology for Asbestos Personal Injury Estimation*** with the Clerk of Court using CM/ECF
which will send notifications of such filing to the following:

| | |
|---|---|
| **Steven T. Davis** | **Michael R. Lastowski** |
| steven.davis@obermayer.com | mlastowski@duanemorris.com |
| | |
| **Marla Rosoff Eskin** | **Christopher D. Loizides** |
| meskin@camlev.com | loizides@loizides.com |
| | |
| **Brett D. Fallon** | **Christopher A. Ward** |
| bfallon@morrisjames.com | bankserve@bayardfirm.com |
| | cward@bayardfirm.com |
| **Paul N. Heath** | |
| heath@rlf.com; rbgroup@rlf.com | |

I hereby certify that on May 26, 2005, I caused a copy of the ***Debtors' Response***
***to the Joint Statement of the Asbestos Personal Injury Creditors Committee and the Legal***
***Representative for Future Asbestos Claimants Regarding Discovery in Advance of Hearing on***

*Methodology for Asbestos Personal Injury Estimation* to be served via e-mail upon the attached

*Service List*[1].

>     /s/ *Karen M. McKinley*
> Karen M. McKinley (No. 4372)
> Richards, Layton & Finger, P.A.
> One Rodney Square, P. O. Box 551
> Wilmington, Delaware 19899-0551
> Phone:  302-651-7700
> Fax:  302-651-7701
> E-mail:  mckinley@rlf.com

---

[1] As defined in and in accordance with *Order Establishing Case Management and Scheduling Procedures for All Matters in the Above-Captioned Bankruptcy Cases Which the Reference has been Withdrawn from the United States Bankruptcy Court for the District of Delaware to the United States District Court for the District of Delaware* [Docket No. 8 in Case #04-1560; Docket No. 6 in Case #04-1559 – entered March 23, 2005]

*In re:  USG Corporation*
*Service List as of May 26, 2005*

*Via E-mail*

*Representing Statutory Committee of Equity Security Holders*
Robert J. Dehney
Daniel B. Butz
Curtis S. Miller
Morris Nichols Arsht & Tunnell
P.O. Box 1347
1201 N. Market Street
Wilmington, DE 19899

*Representing Marathon Ashland Petroleum and Coral Energy Canada*
John D. Demmy
Stevens & Lee, P.C.
1105 North Market Street, 7th Floor
Wilmington, DE 19801

*Representing Official Committee of Asbestos Personal Injury Claimants*
Marla R. Eskin
Kathleen J. Campbell
Campbell & Levine, LLC
800 King Street, Suite 300
Wilmington, DE 19801

*Representing Edward Wally*
Robert Jacobs
Jacobs & Crumplar, P.A.
P.O. Box 1271
2 East 7th Street
Wilmington, DE 19899

*Representing US Trustee*
David Klauder
Office of the United States Trustee
J. Caleb Boggs Federal Building, 844 King Street, Room 2313 Lockbox 35
Wilmington, DE 19801-3519

*Representing Official Committee of Unsecured Creditors*
Michael R. Lastowski
Duane Morris, LLP
P.O. Box 195
1100 North Market Street, Suite 1200
Wilmington, DE 19899-1246

*Representing Airgas, Inc.*
Kathleen M. Miller
Smith Katzenstein & Furlow, LLP
P.O. Box 410
800 Delaware Avenue, 7th Floor
Wilmington, DE 19899

*Representing Dean M. Trafelet, Futures Representative*
James L. Patton
Sharon Zieg
Young Conaway Stargatt & Taylor, LLP
P.O. Box 391
1000 West Street, 17th Floor
Wilmington, DE 19899

*Representing Official Committee of Asbestos Property Damage Claimants*
Steven M. Yoder
Neal B. Glassman
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

*Representing Atlas Roofing Corporation*
Jennifer M. Zelvin
McCarter & English, LLP
P.O. Box 111
919 N. Market Street, Suite 950
Wilmington, DE 19899

*Representing Ancel Abadie and additional claimants*
Julie A. Ardoin
Stephen B. Murray
The Murray Law Firm
909 Poydras Street, Suite 2550
New Orleans, LA 70112-4000

*Representing Asbestos Property Damage Committee*
Scott L. Baena
Jay Sakalo
Annie Martinez
Allyn Danzeisen
Bilzin Sumberg Baena Price & Axelrod LLP
2500 First Union Financial Center, 200
South Biscayne Blvd.
Miami, FL 33131-2336

Gary L. Barnhart
Missouri Dept. of Revenue
P.O. Box 475
301 West High Street, Room 670
Jefferson City, MO 65105-0475

*Representing Statutory Committee of Equity Security Holders*
Martin J. Bienenstock
Judy G. Z. Liu
John J. Rapisardi
Robert J. Lemons
Weil Gotshal & Manges
767 Fifth Avenue
New York, NY 10153

Robert W. Bollar
Southern Counties Oil Co.
P.O. Box 4159
1800 West Katella Avenue, Suite 400
Orange, CA 92863-4159

*Representing Airgas, Inc.*
David Boyle
Airgas, Inc.
P.O. Box 6675
259 Radnor-Chester Road, Suite 100
Radnor, PA 19087

*Representing West Coast Estates*
Thomas J. Brandi
Terrence Edwards
Law Offices of Thomas J. Brandi
44 Montgomery Street, #1050
San Fancisco, CA 94104

*Representing Various Asbestos Claimants*
Alan R Brayton
Brayton & Purcell
222 Rush Landing Road
Novato, CA 94945

*Representing Various Asbestos Claimants*
Russell Budd
Alan B. Rich
Baron & Budd, P.C
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219

ReGen Capital I, Inc.
P.O. Box 626
Planetarium Station
New York, NY 10024-0540

Peter A. Chapman
572 Fernwood Lane
Fairless Hills, PA 19030

*Representing Central States, Southeast and Southwest Areas Pension Fund*
Rathna Chikkalingaiah
Central States, Southeast and Southwest Areas Pension Fund
Legal Department 9377 West Higgins Road
Rosemont, IL 60018-4938

*Representing Oracle Corporation and*
*Oracle Credit Corporation*
Shawn M. Christianson
Buchalter, Nemer, Fields & Younger
333 Market Street, 25th Floor
San Francisco, CA 94105-2130

*Representing Various Asbestos Claimants*
Rhonda S. Cleaves
Waters & Kraus, LLP
3219 McKinney Avenue, Suite 3000
Dallas, TX 75204

*Representing Tennessee Dept. of Treasury -*
*Unclaimed Property*
Marvin E. Clements, Jr.
C/O TN Attorney General's Office, Bankr.
Unit
P.O. Box 20207
Nashville, TN 37202-0207

*Representing Barbara G. Billet, Esq.,*
*Deputy Commissioner and Counsel*
Elaine Z. Cole
New York State Department of Taxation and
Finance
340 E. Main St.
Rochester, NY 14604

*Representing Committee Member*
Newberry College
c/o Edward J. Westbrook, Esquire
Richardson Patrick Westbrook & Brickman
LLC
P.O. Box 1007
1037 Chuck Dawley Blvd, Building A
Mount Pleasant, SC 29465

*Representing Dean M. Trafelet, Futures*
*Representative*
Nicholas J. Cremona
Andress A. Kress
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022

*Representing Ker McGee*
Myron K. Cunningham
Kerr McGee Center
P.O. Box 25861
Oklahoma City, OK 73125

*Representing Catholic Archdiocese of New*
*Orleans*
Martin Dies
1009 Green Avenue
Orange, TX 77630

*Representing Port St. Helens, Oregon*
Charles R. Ekberg
Lane Powell Sears Lubersky LLP
1420 Fifth Avenue, Suite 4100
Seattle, WA 98101-2338

*Representing Debtors*
Brad B. Erens
Robert Krebs
Scott A. Huff
Jones Day
77 West Wacker Drive, Suite 3500
Chicago, IL 60601-1692

*Representing Hayward Industrial Park*
*Associates, a CA general partnership*
Gregg M. Ficks
Coblentz, Patch, Duffy & Bass, LLP
One Ferry Building, Suite 200
San Francisco, CA 94111

*Representing Federal Express Corp.*
Charles J. Filardi, Jr.
Pepe & Hazard LLP
30 Jelliff Lane
Southport, CT 06890-1436

Ryan A. Foster
The Foster Law Firm, PLLC
440 Louisiana, Suite 2100
Houston, TX 77002

Charles O. Freedgood
JP Morgan Chase
270 Park Avenue Floor 12
New York, NY 10017-2036

*Representing Innovative Gas Services, Inc.*
Craig E. Freeman
Thelen, Reid & Priest LLP
875 Third Avenue
New York, NY 10022

*Representing Statutory Committee of Equity
Security Holders*
Julie T. Friedman
Victoria Vron
Robert Gee
Weil Gotshal & Manges
767 Fifth Avenue
New York, NY 10153

*Representing Environmental Protection
Agency*
Henry S. Friedman
John C. Cruden
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044

*Representing The Valleycrest Landfill Site
Group*
Neal A. Frink
Dinsmore & Shohl
1900 Chemed Center 255 East Fifth Street
Cincinnati, OH 45202

*Representing Bear, Stearns & Co. Inc.*
James G. Gereghty, Jr.
Bear, Stearns & Co. Inc.
383 Madison Avenue
New York, NY 10179

*Representing Certain Plaintiffs & Claimants*
Charles E. Gibson, III
620 North Street, Suite 100
Jackson, MS 39202

*Representing California Union Insurance
Company*
Leonard P. Goldberger
White and Williams LLP
1800 One Liberty Place
Philadelphia, PA 19103-7395

Terry A. Graffis
National City Bank
1900 East Ninth Street, Locator 01-2136
Cleveland, OH 44114

*Representing Creditor*
Tyler Greif
Peter Faulkner
1313 Avenue of the Americas
New York, NY 10019

*Representing Fox Valley Steel and Wire
Company*
Daniel J. Habeck
Cramer, Multhauf & Hammes, LLP
P.O. Box 558
Suite 200, 1601 East Racine Avenue
Waukesha, WI 53187

*Representing Debtor*
Paul Harner
Jones Day
77 West Wacker Drive, Suite 3500
Chicago, Il 60601-1692

*Representing Debtors*
David Heiman
Jones Day
North Point, 901 Lakeside Avenue
Cleveland, OH 44114

*Representing New Jersey Resources*
Robert L. Heugle, Jr.
Lomurro, Davison, Eastman & Munoz, P.A.
Monmouth Executive Center, 100
Willowbrook Road, Building 1
Freehold, NJ 07728-2879

Daniel K. Hogan
The Hogan Firm
1311 Delaware Avenue
Wilmington, DE 19806

*Representing OII Steering Committee*
Allan H. Ickowitz
Kathy K. Emanuel
Nossaman, Guthner, Knox & Elliott, LLP
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071

*Representing Official Committee of Asbestos
Personal Injury Claimants*
Elihu Inselbuch
Caplin & Drysdale, Chartered
399 Park Ave.
New York, NY 10022-4614

Thomas L. Jacob
Air Products and Chemicals, Inc.
7201 Hamilton BLVD.
Alentown, PA 18195-1501

William S. Katchen
Duane Morris, LLP
744 Broad Street, Suite 1200
Newark, NJ 07102

*Representing Various Asbestos Claimants*
Michael V. Kelley
Thomas M. Wilson
Kelley & Ferraro, L.L.P.
1901 Penton Media Building, 1300 East
Ninth Street
Cleveland, OH 44114

Allan Kellman
The Jaques Admiralty Law Firm
1370 Penobscot Building
Detroit, MI 48226

*Representing City and County of Denver*
Eugene J. Kottenstette
Assistant City Attorney
Land Use & Revenue Section
201 West Colfax Avenue, Dept 1207
Denver, CO 80202-3275

Roger Kral
Dietrich Industries
4200 St Rt 22 East #3
Blairsville, PA 15717

*Representing Trucklease Corporation d/b/a
AMI Leasing, sucessor in interest to Biddle
Co., Inc.*
Gary P. Lightman
Glenn A. Manochi
LIGHTMAN, MANOCHI &
CHRISTENSEN
1520 Locust Street, 12th Floor
Philadelphia, PA 19102

*Representing Official Committee of Asbestos
Personal Injury Claimants*
Peter Van N. Lockwood
Caplin & Drysdale, Chartered
One Thomas Circle, N.W.
Washington, DC 20005-5802

*Representing USG Corporation*
Mary A. Martin
USG Corporation
125 South Franklin Street
Chicago, IL 60606

*Representing Lexington Insurance Company*
Robert B. Millner
Sonnenschein, Nath & Rosenthal
8000 Sears Tower, 233 South Wacker Drive
Chicago, IL 60606

*Representing Commonwealth of
Pennsylvania, Pennsylvania Department of
Revenue*
Christopher R. Momjian
Office of the  Attorney General
21 S. 12th Street, 3rd Floor
Philadelphia, PA 19107-3603

*Representing Office of the Attorney General
- Washington*
Zachary Mosner
Office of the Attorney General - Bankruptcy
& Collections Unit
900 Fourth Avenue, Suite 2000
Seattle, WA 98164-1012

Lisa B. Neimark
E&Y Capital Advisors LLC
233 S. Wacker Drive
Chicago, IL 60606

*Representing The State of Louisiana*
L. Scott Patton
Walter C. Dunn
The Boles Law Firm
P.O. Box 2065
1818 Avenue of America
Monroe, LA 71207-2065

*Representing Center for Claims Resolution*
Michael P. Richman
Jean Marie L. Atamian
Anthony J. Diana
Leslie Chebli
Mayer, Brown, Rowe & Maw LLP
1675 Broadway
New York, NY 10019

Barry Ridings
Lazard Freres & Co. LLC
30 Rockefeller Plaza, 60th Floor
New York, NY 10020

*Representing Commonweath of PA*
Sharon L. Royer
Harrisburg Bankruptcy and Compliance
1171 South Cameron Street, Room 312
Harrisburg, PA 17104-2513

*Representing Parkway, Ltd.*
Howard C. Rubin
Kessler & Collins
5950 Sherry Lane, Suite 222
Dallas, TX 75225

*Representing Doris Saiger, as Personal
Representative of the Estate of William
Saiger, and Dawn Saiger*
Peter D. Russin
L. Tannenbaum
Meland Russin Hellinger & Budwick, P.A.
3000 Wachovia Financial Center 200 S.
Biscayne Boulevard
Miami, FL 33131

*Representing Associates Leasing, Inc.*
Sergio I. Scuteri
Farr Burke Gambacorta & Wright, P.C.
P.O. Box 788
Suite 201, Eastern International Executive
Office Center, 211 Benigno Boulevard
Bellmawr, NJ 08099-9811

*Representing IBM Corporation*
Beverly H. Shideler
IBM Corporation
2 Lincoln Center #200
Oakbrook Terrace, IL 60181-4837

*Representing Fee Auditor*
Warren H. Smith
Warren H. Smith & Associates, P.C.
Republic Center, 325 N. Saint Paul, Suite
1275
Dallas, TX 75201

*Representing Anderson Memorial Hospital*
Daniel A. Speights
Speights & Runyan
P.O. Box 685
200 Jackson Avenue East
Hampton, SC 29924

Adam M. Spence
The Law Offices of Adam M. Spence, P.C.
105 W. Chesapeake Avenue, Suite 400
Towson, MD 21204

*Representing Archiped Classics, Inc.*
Stephen C. Stapleton
Cowles & Thompson
901 Main Street, Suite 4000
Dallas, TX 75202

J.W. Taylor c/o Paul Matthews, Paralegal
Coastal Transport, Inc.
P.O. Drawer 67
Auburndale, FL 33823

*Representing USG Corporation*
Suzanne K. Torrey
USG Corporation
125 S. Franklin Street
Chicago, IL 60606

*Representing Future Claimants*
Dean M. Trafelet
P.O. Box 518
9130 Wild Lane
Baileys Harbor, WI 54202

*Representing New Jersey Self-Insurers
Guaranty Association*
Michael S. Waters
Jeffrey Bernstein, Esquire
Carpenter Bennett & Morrissey
Three Gateway Center 100 Mulberry St.
Newark, NJ 07102

*Representing Blue Cross & Blue Shield of
Florida, Inc.*
Richard Blackstone Webber II
Richard Blackstone Webber II, PA
320 Maitland Avenue
Altamonte Springs, FL 32701

*Representing Nick Ferrante*
Perry Weitz
C. Sanders McNew
Weitz & Luxenborg
180 Maiden Lane
New York, NY 10038-4925

*Representing Asbestos Creditors*
Scott W. Wert
Foster & Sear, L.L.P.
524 E. Lamar Blvd., Suite 200
Arlington, TX 76011

*Representing Official Committee of
Unsecured Creditors*
Denise K. Wildes
Stroock & Stroock & Lavan, LLP
180 Maiden Lane
New York, NY 10038-4982