22



31 PEPLR 271

31 Pepp. L. Rev. 271

(Cite as: 31 Pepp. L. Rev. 271)

Page 1

C

Pepperdine Law Review
2003

Asbestos Litigation & Tort Law: Trends, Ethics, & Solutions

*271 ADDRESSING THE "ELEPHANTINE MASS" OF ASBESTOS CASES: CONSOLIDATION VERSUS INACTIVE DOCKETS (PLEURAL REGISTRIES) AND CASE MANAGEMENT PLANS THAT DEFER CLAIMS FILED BY THE NON-SICK

Victor E. Schwartz [FNa1]
Mark A. Behrens [FNaa1]
Rochelle M. Tedesco [FNaaa1]

Copyright © 2003 Pepperdine University School of Law; Victor E. Schwartz;

Mark A. Behrens; Rochelle M. Tedesco

*272 Table of Contents

I. Introduction

II. The Roots of the Problem

  A. The Problem of the Unimpaireds

  B. Defendant Bankruptcies

  C. The Search for Peripheral Defendants

III. Consolidation: Trying to Solve the Symptoms of the Problem

  A. Historical Background of Consolidation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0331

31 PEPLR 271

31 Pepp. L. Rev. 271

(Cite as: 31 Pepp. L. Rev. 271)

B. Recent Asbestos Consolidations

C. Efficacy of Consolidation in Combating the Crisis

D. Due Process Issues Raised By Consolidation

E. Replacing Mass Consolidations with Mini-Consolidations

IV. Addressing the causes of the Problem--Inactive Dockets and Similar Case Management Plans

A. Inactive Dockets With a Proven Track Record of Long-Term Success

  1. Boston, Massachusetts

  2. Chicago, Illinois

  3. Baltimore, Maryland

B. State Courts That Have Recently Implemented Inactive Dockets

  1. City of New York

  2. Syracuse, New York

  3. Seattle, Washington

C. Recent Case Management Orders To Address Filings By the Non-Sick

  1. Greenville, South Carolina

  2. Portland, Oregon

  3. Cleveland, Ohio

D. Innovations Used By Federal Courts to Give Priority to the Truly Sick

  1. The Federal MDL Panel

  2. United States Bankruptcy Court for the District of Delaware

E. The American Bar Association Commission on Asbestos Litigation

V. Conclusion

*273 I. Introduction

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0332

31 PEPLR 271

31 Pepp. L. Rev. 271

(Cite as: 31 Pepp. L. Rev. 271)

Page 3

Courts and commentators have long recognized the extraordinary problems created by the "elephantine mass" [FN1] of asbestos cases in this country. [FN2] The Supreme Court of the United States has described the litigation as a "crisis." [FN3] Since the time of the Court's observation, the litigation has spread like a renewed wild fire, taking on even greater proportions. [FN4] Former United States Attorney General Griffin Bell has said "[t]he crisis is worsening at a much more rapid pace than even the most pessimistic projections." [FN5]

The statistics agree with General Bell. The number of asbestos cases pending nationwide doubled from 100,000 to more than 200,000 during the 1990s. [FN6] Ninety thousand new cases were filed in 2001 alone. [FN7] Most of these claimants are not sick and may never develop an asbestos-related disease. [FN8] The RAND Institute for Civil Justice ("RAND") predicts that the litigation will worsen and that the number of claims yet to be filed could range from 1 to 3 million. [FN9]

Already, at least 78 companies have been driven into bankruptcy, and almost one-half of these bankruptcies have occurred within the past two *274 years. [FN10] Plaintiffs' lawyers have responded by casting their litigation nets farther and wider. As a result, lawsuits are now piling up against companies with only a peripheral connection to the litigation, such as engineering and construction firms and plant owners. [FN11] There are now more than 8,400 asbestos defendants, [FN12] up from only 300 in 1982. [FN13]

The impact on the economy is staggering. A study released in December 2002 by Columbia Professor and Nobel-prize winning economist Joseph Stiglitz and two colleagues estimated that approximately 60,000 people (many of them union workers) have lost their jobs and roughly 25% of their pensions as a direct result of the litigation. [FN14] A study by NERA Economic Consulting estimates there will be as much as $2 billion in additional costs due to the indirect impacts of company closings. [FN15] Estimates of the total future cost of the litigation range from $200 to $275 billion. [FN16] To put these sums into perspective, General Bell has explained that they exceed current estimates of the cost of "all Superfund cleanup sites combined, Hurricane Andrew, or the September 11 terrorist attacks." [FN17]

Perhaps most disturbing, lawyers who represent asbestos cancer victims have said that current trends in the litigation threaten payments to the truly sick. [FN18] For example, Dallas lawyer Peter Kraus, who files asbestos suits only for cancer victims, condemns rivals who represent claimants who are not sick. He has said, "They're sucking the money away from the truly *275 injured." [FN19] Another plaintiffs' lawyer who represents sick and dying plaintiffs, Matthew Bergman of Seattle, Washington, has written:
   Victims of mesothelioma, the most deadly form of asbestos-related illness, suffer the most from the current system. As a result of these bankruptcies, the genuinely sick and dying are often deprived of adequate compensation as more and more funds are diverted into settlements of the non-impaired claims. . . . The solution is simple: defer the non-sick claims unless and until the claimants actually suffer an asbestos-related disease. [FN20] Even Mississippi tort king Richard Scruggs has said, "Flooding the courts with asbestos cases filed by people who are not sick against defendants who have not been shown to be at fault is not sound public policy." [FN21]

These facts reveal that the current asbestos litigation system is not working for anyone: neither the truly sick victims nor defendants, the judicial system, or the unemployed workers or retirees whose retirement savings have fallen precipitously as a result of the avalanche of claims against their former employers. Past methods to address the litigation clearly have failed, and federal legislation to solve the problem remains speculative. As a result, many courts are now reevaluating the way they handle asbestos claims. As the Supreme Court of West Virginia recently stated, the burden of asbestos litigation "has effectively forced the courts to adopt diverse, innovative, and often non-traditional judicial management techniques to reduce the burden of asbestos litigation that seem [sic] to be paralyzing their active dockets." [FN22] The choices that courts make will have a critical effect on the direction of the litigation. [FN23]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0333

31 PEPLR 271

31 Pepp. L. Rev. 271

**(Cite as: 31 Pepp. L. Rev. 271)**

Page 4

This article will examine the current trends in the litigation in greater detail, and show how these trends have combined to exacerbate the current "asbestos-litigation crisis." [FN24] Next, this article will examine the two *276 procedural approaches that are increasingly being used by courts to handle asbestos claims--trial consolidations versus inactive dockets (also called pleural registries or deferred dockets) and docket management plans that seek to give trial priority to the truly sick while deferring the claims of the unimpaired or very mildly impaired until they become sick. The article will then discuss aspects of the asbestos litigation problem each approach attempts to address, and explain the reasons why these options may appeal to courts that are at a crossroads of how to handle burgeoning asbestos dockets. The article concludes that courts should adopt inactive dockets or similar case management plans to give trial priority to the truly sick while preserving the claims of the non-sick until such time as they may develop an asbestos-related impairment.

II. The Roots of the Problem

Before turning to the ways in which courts have addressed asbestos litigation, it is helpful to understand the present trends in asbestos litigation that have set off a chain reaction, contributing significantly to the current crisis. [FN25] First, payments to individuals with little or no physical illness have encouraged more lawsuits. These filings have forced dozens of so-called "traditional" asbestos defendants into bankruptcy. Second, bankruptcy filings by these defendants are putting increased pressure on the remaining solvent defendants and speeding the bankruptcy process. Third, as the number of asbestos-related bankruptcies has grown, more defendants have been pulled into the litigation to provide claimants with new "deep pocket" sources of recoveries. [FN26] Some of the new attenuated class of defendants, the so-called "peripheral defendants," have themselves begun to collapse under the great weight of claims against them. [FN27] The downward spiral will continue to play out on a broad scale for many more years unless something is done.

A. The Problem of the Unimpaireds

In the past, most asbestos claims were filed by individuals with serious diseases, such as lung cancer or mesothelioma. [FN28] Today, however, *277 individuals who are not sick file the vast majority of new asbestos claims. [FN29] The United States Supreme Court has recognized that "up to one half of asbestos claims are now being filed by people who have little or no physical impairment." [FN30] Many of these claimants may never develop an asbestos-related disease.

The increase in filings by individuals with little or no impairment is largely responsible for the soaring number of asbestos claims. [FN31] In addition to creating a logjam in the courts, claims by unimpaired claimants divert resources needed to compensate the truly ill. [FN32] For example, Oakland, California, asbestos cancer victims' attorney Steve Kazan has expressed concern that recoveries by the unimpaired may so deplete available resources that his clients will be left without compensation. [FN33] His concern is illustrated by a highly publicized case from October of 2001 in which a Mississippi jury awarded $150 million to six plaintiffs "who are not sick from asbestos and may never become so." [FN34] One of the lawyers boasted that most of his clients had never missed a day of work. [FN35] In another trial that occurred in November of 2001, a Texas jury awarded $3 million to three plaintiffs who were exposed to asbestos at an aluminum plant. [FN36] "Their attorney said the verdict was reached even though two plaintiffs who do not have cancer were forbidden from testifying on their fear of developing the disease from past asbestos exposure." [FN37]

Why are unimpaired individuals filing so many claims? One reason may be concerns about statutes of limitations. [FN38] As one court has observed, *278 some unimpaired claimants may feel compelled to file claims "because they are aware of the latent and progressive nature of asbestos-related disease, and because they fear that their claims might be barred by the statute of limitations if they wait until such time, if ever, that their asbestos-related condition progresses to disability." [FN39]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0334

31 PEPLR 271

31 Pepp. L. Rev. 271

**(Cite as: 31 Pepp. L. Rev. 271)**

Another reason may be that plaintiffs' lawyers are aware that many traditional asbestos defendants are going bankrupt, and may seek compensation now out of fear that it will not be available later. [FN40] Some plaintiffs' lawyers also may be aware of the huge awards being given to unimpaired plaintiffs, and may think "why wait for an injury to manifest itself if I can receive compensation for my clients now?" [FN41]

In addition, the increase in filings by unimpaired claims may result from mass screenings conducted by plaintiffs' law firms and their agents to identify and recruit potential clients. Such screenings are frequently conducted in areas with high concentrations of workers who may have worked in jobs where they were exposed to asbestos. [FN42] As Senior United States District Court Judge Jack Weinstein and Bankruptcy Court Judge Burton Lifland recently explained: "Claimants today are diagnosed largely through plaintiff-lawyer arranged mass screening programs targeting possibly asbestos-exposed workers and attraction of potential claimants through the mass media." [FN43]

Proponents argue that such measures help exposed individuals to learn whether they have an injury. [FN44] Others assert that the primary purpose of mass screenings is to build large "inventories" of cases for contingency fee personal injury lawyers. [FN45] Regardless of whether one agrees with mass *279 screenings, there seems to be a consensus that the practice fuels new asbestos filings. As the manager of the federal asbestos docket, Senior United States District Judge Charles Weiner of the Eastern District of Pennsylvania, has noted:

Oftentimes, these suits are brought on behalf of individuals who are asymptomatic as to an asbestos-related illness and may not suffer in the future. Filing fees are paid, service costs incurred, and defense files are opened and processed. Substantial transaction costs are expended and therefore unavailable for compensation to truly ascertained asbestos victims. [FN46]

B. Defendant Bankruptcies

As the number of claims resulting from exposure to asbestos has risen, an increasing number of defendant companies have been forced to seek the protection of the bankruptcy courts. As stated, at least 78 companies have been driven into bankruptcy. [FN47] Almost one-half of these bankruptcies occurred within the past two years. [FN48] The "process is accelerating" [FN49] due to the piling on nature of asbestos liabilities. [FN50] Each time a defendant declares bankruptcy, "mounting and cumulative" financial pressure is placed on the "remaining defendants, whose resources are limited." [FN51]

As more and more companies are forced into bankruptcy, payments to the truly sick are threatened. The widow of one man who died from mesothelioma has been told that she should expect to receive only 15% of the $1 million she might have received if her husband had filed suit before the companies he sued went bankrupt. [FN52] Similarly, the widow of a mechanic in Ohio will recover at most $150,000 of the $4.4 million dollar award that she received for her husband's death. [FN53]

*280 C. The Search for Peripheral Defendants

When "traditional" asbestos defendants are forced into bankruptcy, "experience shows that the asbestos personal injury bar will cast its litigation net wider and sue more defendants." [FN54] Now, more than 8,400 companies or individuals have been named as asbestos defendants. [FN55] Plaintiffs' attorney Richard Scruggs has called asbestos litigation the "endless search for a solvent bystander." [FN56]

According to RAND, asbestos litigation "has spread to touch firms in industries engaged in almost every form of economic activity that takes place in the American economy." [FN57] Companies that never manufactured or sold asbestos-containing products are being dragged into the litigation. [FN58] Well-known companies such as Gerber

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0335

31 PEPLR 271

31 Pepp. L. Rev. 271

(Cite as: 31 Pepp. L. Rev. 271)

Products Co., Ford Motor Co., Campbell Soup Co., AT&T Corp., and 3M Co., the maker of Scotch® tape and Post-it® notes, among others, have become defendants. [FN59] Some of these companies may have participated in the chain of distribution of the sale of an asbestos-containing product; others are premises liability defendants. [FN60] Involvement in asbestos litigation can have devastating consequences for these defendants. [FN61]

### III. Consolidation: Trying to Solve the Symptoms of the Problem

To some observers, the primary problem with asbestos litigation is the large number of asbestos claims. In an effort to address the overabundance of asbestos claims on their dockets, some courts have joined the asbestos claims for resolution at trial, either in mass consolidations or in clusters. The idea underlying case consolidation seems logical. If asbestos claims are crowding court dockets, then it would seem sensible to resolve the claims as efficiently as possible and to reduce the transaction costs in doing so. Unfortunately, as we explain, in lowering the barriers to litigation, courts *281 have unintentionally encouraged the filing of more claims. [FN62] Consolidated trials also raise serious due process issues.

### A. Historical Background of Consolidation

Consolidation of asbestos cases for trial has existed since the 1970s and 1980s, when judges began devising ways to manage growing asbestos dockets. At the time, some cases were being tried or settled, but for every claim that was resolved, two or three new claims were filed. [FN63] The advantages of consolidation were that several claims could be resolved at once, and the resolution of those claims provided reference points for the resolution of other claims as well. [FN64]

Notably, in the early consolidations "most judges limited the consolidations to a small number of cases (usually around five) with very similar liability issues and sought to conduct the proceedings with careful attention to the precise claims raised by each plaintiff against each defendant." [FN65] In the mid-1980s, as the number of asbestos filings continued to rise, trial judges began to use jumbo consolidations in which hundreds or thousands of cases were joined together for trial. [FN66] Unlike small consolidations, in which the claims were similar and individual issues were considered, jumbo consolidations are characterized by claims for different diseases resulting from exposures at multiple worksites for varying lengths of time; in addition, they are often marked by aggressive management of the docket by the trial judge, and pressure on the defendants to settle. [FN67]

### B. Recent Asbestos Consolidations

The most recent examples of mass asbestos trials occurred in West Virginia and Virginia in late 2002. On February 26, 2002, West Virginia Circuit Court Judge Martin Gaughan scheduled a mass trial to begin on September 23, 2002, to decide the liability of hundreds of defendants to approximately 8,000 plaintiffs. [FN68] As West Virginia Supreme Court of Appeals Justice Elliott Maynard explained:
  *282 [T]his litigation involves thousands of plaintiffs; twenty or more defendants; hundreds of different work sites located in a number of different states; dozens of different occupations and circumstances of exposure; dozens of different products with different formulations, applications, and warnings; several different diseases; numerous different claims at different stages of development; and at least nine different law firms, with differing interests, representing the various plaintiffs. Additionally, the challenged conduct spans the better part of six decades. [FN69]

The first phase of the West Virginia consolidation called for three trials to determine the alleged "fault" of three different groupings of defendants: premises owners, employers, and manufacturers. [FN70] The "fault" phase was to be followed by the determination of punitive damages issues--before any determination of causation or injury. [FN71] For any defendant whose conduct would give rise to punitive damages liability, the jury would be asked to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0336

31 PEPLR 271                                                                    Page 7

31 Pepp. L. Rev. 271

**(Cite as: 31 Pepp. L. Rev. 271)**

set a "punitive damages multiplier"--that is the number by which any subsequent award of compensatory damages would be multiplied to arrive at a punitive damages award. [FN72] Causation and compensatory damages would be decided only after the fault phase was completed. [FN73]

On its face, the mass trial plan "so depart[ed] from [the] accepted norm as to be presumptively violative of due process." [FN74] The plan also was in clear conflict with decisions by the United States Court of Appeals for the Second and Fifth Circuits. Those courts have held that due process does not permit the overbroad aggregation of widely disparate claims without any review for commonality or risk of prejudice to the litigants. [FN75] As the Second Circuit Court of Appeals stated in an asbestos case, "[t]he systemic urge to aggregate litigation must not be allowed to trump our dedication to individual justice, and we must take care that each individual plaintiff's--and defendant's--cause not be lost in the shadow of a towering mass litigation." [FN76]

It is apparent that the West Virginia plan assumed that the otherwise confusing trial process would be simplified, and that post-trial review would be precluded, by the forced settlement of large numbers of claims. The *283 threat of potentially massive punitive damages liability provides further evidence of the mass trial plan's coercive intent. [FN77] In that regard, the plan worked as the court seemed to intend. Within days after the United States Supreme Court declined to stay the trial or grant certiorari to review the plan, all but one of the original 259 defendants were forced to settle for reportedly huge sums of money. [FN78]

A smaller, yet no less troubling consolidation occurred later in 2002 in Virginia. There, a trial court judge ordered the consolidation of 1,300 asbestos claims, even though the same judge found "that consolidation of all of the cases would adversely affect the rights of the parties to a fair trial." [FN79]

C. Efficacy of Consolidation in Combating the Crisis

Despite the serious flaws in the procedures discussed above, we believe that the courts involved, as well as others that have joined asbestos claims, have done so with the best of intentions. Faced with overwhelming numbers of asbestos claims, they have worked to put money in the hands of the sick as quickly as possible, and to clear increasingly crowded dockets. Former Michigan Supreme Court Chief Justice Conrad L. Mallett, Jr. described the situation facing many judges with heavy asbestos caseloads in testimony before Congress. He observed that trial court judges inundated with asbestos claims might feel compelled to shortcut procedural rules:

Think about a county circuit judge who has dropped on her 5,000 cases all at the same time . . . . [I]f she scheduled all 5,000 cases for one week trials, she would not complete her task until the year 2095. The judge's first thought then is, "How do I handle these cases quickly and efficiently?" The judge does not purposely ignore fairness and truth, but the demands of the system require speed and dictate case consolidation even where the rules may not allow joinder. [FN80] *284 Justice Mallett's observation explains how courts, such as those in West Virginia, may view "mass joinder" and "jumbo" consolidations as a quick way to resolve the worsening asbestos litigation problem. In such proceedings, people with serious illnesses, such as mesothelioma or lung cancer, are often lumped together with claimants having different alleged harms or no illness at all-- apples are joined with oranges. [FN81] Work histories and exposure levels also may vary widely among plaintiffs. The goal of aggregated actions is to produce settlements with low transaction costs, even if it means trampling over the due process rights of defendants and the truly sick. Efficiency is promoted over fairness or reason. In cases that do not involve asbestos, judges would not consolidate or join dissimilar cases.

As it turns out, bending procedural rules to put pressure on defendants to settle brings no lasting efficiency gains. [FN82] Rather than making cases go away, it invites new ones. [FN83] As mass tort expert Francis McGovern of Duke University Law School has recognized:

Judges who move large numbers of highly elastic mass torts through their litigation process at low transaction

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0337

31 PEPLR 271                                                              Page 8

31 Pepp. L. Rev. 271

(Cite as: 31 Pepp. L. Rev. 271)

costs create the opportunity for new filings. They increase demand for new cases by their high resolution rates and low transaction costs. If you build a superhighway, there will be a traffic jam. [FN84] Indeed, RAND recently concluded that "it is highly likely that steps taken to streamline the litigation actually increased the total dollars spent on the litigation by increasing the numbers of claims filed and resolved." [FN85] One West Virginia trial judge involved in that state's asbestos litigation ruefully acknowledged this fact. He said:

I will admit that we thought that [an early mass trial] was probably going to put an end to asbestos, or at least knock a big hole in it. *285 What I didn't consider was that that was a form of advertising. That when we could whack that batch of cases down that well, it drew more cases. [FN86]

D. Due Process Issues Raised By Consolidation

Consolidations also raise serious due process issues because defendants are given virtually no opportunity to defend against an individual plaintiff's claims. In some cases, defendants are not even given the chance to conduct discovery with respect to many of the claims that are consolidated. Defendants are pressured to settle all of the consolidated claims because, as Sixth Circuit Court of Appeals Judge Richard Posner has explained in the class action context, mass aggregation of claims can produce coercive legal "blackmail settlements." [FN87] The 2002 West Virginia mass trial exemplifies the pressure that is exerted on defendants to settle consolidated claims and thereby waive their basic due process rights. [FN88]

Using such leverage to force large block settlements of cases is certainly a quick way to clear the lower court's docket, but the United States Constitution does not permit courts to trample over litigants' due process rights in this fashion. In our civil justice system, the ends do not justify the means. This basic fact was at the core of this United States Supreme Court's decisions in Amchem Prods. Inc. v. Windsor [FN89] and Ortiz v. Fibreboard Corp. [FN90]

E. Replacing Mass Consolidations with Mini-Consolidations

Some courts have attempted to avoid the various problems created by mass consolidations through "mini-consolidations" that join small clusters of *286 claims. Unfortunately, many of the problems that exist in mass joinders still exist in smaller consolidations. As United States District Court Judge Charles Butler found, confusion might result even when relatively small numbers of claims are aggregated. [FN91] Reviewing a verdict rendered by a jury in a case in which ten personal injury actions and three wrongful death actions were consolidated, Judge Butler stated: "It is evident (unfortunately, in hindsight) that despite all the precautionary measures taken by the courts (e.g., juror notebooks, cautionary instructions before, during and after the presentation of evidence, special interrogatory forms) that joint trial of such a large number of differing cases both confused and prejudiced the jury." [FN92]

Whether sold as mass trial or bouquets, consolidations simply focus on a symptom of the asbestos litigation problem (overcrowded dockets) without addressing the causes of the problem. Consolidating claims in order to clear court dockets is a bit like using a lawn mower to mow down weeds in a garden: it may provide a temporary respite from the problem, but ultimately it does not eliminate the cause of the problem, and the solution may create more problems than it solves.

IV. Addressing the causes of the Problem--Inactive Dockets and Similar Case
Management Plans

Other courts have chosen to manage their dockets by paying the sickest claimants first through inactive dockets or deferred claim docketing plans. [FN93] Both consolidations and innovative docket management plans are driven by a concern about overcrowded dockets. Yet, where consolidations seek to address the problem by processing all claims as quickly as possible, courts that have implemented inactive dockets seek to manage their cases by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0338

31 PEPLR 271

31 Pepp. L. Rev. 271

(Cite as: 31 Pepp. L. Rev. 271)

screening out the claims of the non-sick, while preserving the right of these claimants to sue if they should develop an asbestos-related disease in the future. [FN94]

A. Inactive Dockets With a Proven Track Record of Long-Term Success

Inactive docket programs, also known as deferred dockets or pleural registries, are judicially-managed docketing systems that allow claims of *287 impaired claimants to be heard more promptly by deferring the claims of unimpaired claimants to an "inactive docket" until the individual develops an actual impairment. [FN95] No plaintiff loses a cause of action; once someone becomes sick, his or her claim can proceed.

Docket management plans that give priority to the sick have obvious benefits for impaired claimants. Such individuals are able to move "to the front of the line" and not be forced to wait until earlier-filed claims by unimpaired individuals are resolved. Removing the long delays that are characteristic of many asbestos cases can be especially important to impaired claimants, particularly if the individual has a fatal disease, such as mesothelioma, or is an older person, which is frequently the case. [FN96] Inactive dockets also benefit unimpaired individuals by protecting their claims from being time-barred should an asbestos-related disease later develop. This would address a primary engine driving the filing of many claims by unimpaired claimants.

In addition, inactive docket programs conserve scarce financial resources that are needed to compensate sick claimants--resources that are now used up litigating "claims that are premature (because there is not yet any impairment) or actually meritless (because there never will be)." [FN97] Plaintiffs and defendants are relieved of such costs under inactive docket plans because all discovery is stayed until the claimant manifests impairment and his or her claim is placed on the active trial docket.

Inactive dockets can also reduce the specter of more employers being driven into bankruptcy, thereby helping to ensure that adequate resources remain for impaired claimants in the future. And, such dockets may slow the increasing trend of "peripheral" defendants being dragged into asbestos litigation. Courts, relieved of having to address claims by the non-sick, can dedicate greater resources to those most in need of judicial assistance-- claimants truly impaired with asbestos-related diseases and other claimants in the tort system.

Inactive dockets have existed for over a decade in several large cities-- Boston, Chicago and Baltimore. According to a recent article in HarrisMartin's Columns: Asbestos, judges in all three jurisdictions believe that the plans are working well for all parties involved. [FN98]

*288 1. Boston, Massachusetts

Judge Hiller Zobel adopted the Massachusetts Inactive Asbestos Docket in 1986 as an amendment to an order creating a statewide consolidated asbestos docket. [FN99] The docket was envisioned as a mechanism to give priority to the claims of the truly sick while tolling statutes of limitations for claims brought by the non-sick or their families. [FN100] While on the inactive docket, cases are exempt from discovery. [FN101]

The Massachusetts Inactive Docket does not specify criteria to be applied in determining whether a case should be moved from the Inactive to the Active Docket. [FN102] If, however, a claimant and counsel feel removal is warranted, they may file a complaint in the Consolidated Docket. [FN103] In cases where removal is not agreed to, the judge overseeing the Docket makes the final removal determination. [FN104] The judge tasked with overseeing the Inactive Docket has, however, made clear to all litigants that he expects pleural cases to be placed on the Inactive Docket in order to further the court's goal of reducing expenditures of court time and resources trying purely pleural actions. [FN105] Accordingly, there have been relatively few instances of contested

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0339

31 PEPLR 271                                                      Page 10

31 Pepp. L. Rev. 271

(Cite as: 31 Pepp. L. Rev. 271)

removals. Indeed, while placement of pleural cases on the Inactive Docket is not mandatory, most of the primary plaintiffs' counsel involved in Massachusetts state court litigation have opted to file substantially all of their pleural cases on the Inactive Docket. As a result, the number of cases on the Active Docket and the amount of money spent on settlements with unimpaired claimants have been significantly reduced. [FN106]

How do the judges feel about this plan? Judge Zobel was recently quoted as saying, "It's really a very good system that has worked out. . . ." [FN107] Jim Ryan, special master of the Massachusetts asbestos litigation, has described the inactive docket as "an extremely useful tool." [FN108] He added, "I don't see any downside for creating one anywhere else." [FN109]

*289 2. Chicago, Illinois

In 1991, Judge Dean Trafelet in Cook County (Chicago) Illinois, found that "[t]he volume of asbestos-related personal injury claims now pending in the Circuit Court of Cook County presents a serious threat of calendar congestion to the Court. A substantial number of cases filed in this Court involve plaintiffs who claim significant asbestos exposure, but who are not now physically ill." [FN110] Judge Trafelet stated that many defendants "have had their available resources severely strained and believe that their resources can be better expended if focused on those cases that involve claims of actual and current conditions of impairment." [FN111]

To address these problems, Judge Trafelet created an inactive docket for unimpaired asbestos claimants. Under the Cook County plan, all claimants are required to file an Asbestos Personal Injury Information Sheet. [FN112] Cases that allege asbestos-related cancer or mesothelioma proceed to the active trial docket. [FN113] All other claims are placed on the inactive asbestos docket. [FN114] If a claimant later develops an impairing condition, according to objective medical criteria defined by the court, then he or she may petition the court to have the case removed to the active docket for trial. [FN115] While on the inactive docket, claims are exempt from discovery, and "shall not 'age' for any purpose." [FN116]

3. Baltimore, Maryland

An inactive asbestos docket was introduced in Baltimore in December of 1992. [FN117] Under the Baltimore plan, plaintiffs' counsel are required to *290 attach an Inactive Docket Claimant Information Form to each complaint. [FN118] If the claim is immediately removable, or at the time when the claim becomes removable, claimant's counsel is required to file a Request for Removal and the documentation necessary to show that the claim meets the "minimum criteria for removal," as defined within the order. [FN119] In addition, claimants who remain on the inactive docket for more than twenty-four months, and do not meet the minimum criteria for removal from the inactive docket but believe they have compensable injuries, may file a Request for Removal setting forth the factual and medical bases for the assertion. [FN120] Defendants have fourteen days to file written objections to any such request. [FN121] If the court orders a case to be removed from the inactive docket, it is placed in the active civil trial docket. [FN122]

Circuit Court Judge Richard Rombro, who oversees the asbestos litigation in Baltimore, recently remarked on the success of the court's inactive docket plan. Since the docket's establishment in 1992, he said:
  [T]here have been 14,713 cases filed and placed on the inactive docket; in that same period 6,098 cases have been moved to the active docket, and 71 cases which were removed to the Federal Court. The number activated from the inactive docket is over 40 percent which would indicate to this court that the docket is working and that a substantial number of cases have been moved to the active docket while those without any impairment remain on the inactive docket. [FN123] Judge Rombro added: "With the number of defendant companies that have declared bankruptcy, it would seem that the resources should be conserved for those who are substantially and demonstrably

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0340

31 PEPLR 271

31 Pepp. L. Rev. 271

**(Cite as: 31 Pepp. L. Rev. 271)**

sick, or who are actually impaired, from exposure to asbestos." [FN124]

B. State Courts That Have Recently Implemented Inactive Dockets

More recently, courts as far apart as the East and West Coasts--New York City; Syracuse, New York; and Seattle, Washington--have joined the list of pioneering courts that have adopted inactive dockets to manage their growing asbestos caseloads.

**\*291 1. City of New York**

In December of 2002, New York trial court Judge Helen Freedman observed that fewer than 10% of the 21,000 asbestos-related personal injury or wrongful death claims pending in New York City involve claimants with asbestos-related malignant diseases; a "small percentage" have sustained functionally impairing asbestosis. [FN125] "For the great majority of plaintiffs and decedents, however, the only clinical markers of asbestos exposure are pleural thickening or plaques that cause[] no discernable physical impairment." [FN126] Judge Freedman went on to summarize the public policy problems created by this situation:

The large number of claims made by or on behalf of the unimpaired or minimally impaired impedes the ability of the much smaller group of seriously ill plaintiffs and decedents to recover for their injuries. Recoveries by unimpaired or minimally impaired plaintiffs deplete the funds needed to compensate present and future claimants with serious illnesses, and resources are dwindling as the "elephantine mass of asbestos cases" nationwide drives large numbers of potentially culpable parties into bankruptcy. [FN127]

Judge Freedman, therefore, amended the existing New York City asbestos case management order to establish a "deferred docket" for claimants with little or no present physical impairment. [FN128] Under the court's order, future asbestos claims are deemed to be on the deferred docket unless the claimant alleges that he or she meets certain minimum medical criteria defined in the order and presents documentation to support his or her claim. [FN129] A claimant may be moved to the active docket if the plaintiff's counsel and the special liaison counsel for the defendants stipulate that the person satisfies the minimum criteria for the active docket, or the plaintiff presents information that he or she meets the minimum medical requirements defined in the order to be removed to the active trial docket. [FN130]

2. Syracuse, New York

Similar to Judge Freedman in New York City, Judge James McCarthy of New York's Fifth Judicial District, which includes Syracuse, recently **\*292** found that of the more than 200 asbestos-related personal injury cases pending before his court,

less than 5% of the claimants or decedents suffer or suffered from asbestos-related malignant diseases, and a small percentage of the remainder have sustained functionally impairing asbestosis. For the great majority of plaintiffs and decedents, however, the only clinical markers of asbestos exposure are pleural thickening or plaques that caused no discernible physical impairment. [FN131] Consequently, in January of 2003, Judge McCarthy amended his court's existing case management order to establish a deferred docket. [FN132] Under the order, all actions brought by claimants that do not meet the minimum medical criteria are stayed. [FN133] A claim may be moved to the active docket if the plaintiff's counsel and the special liaison counsel for the defendants stipulate that the claimant satisfies the minimum medical criteria for placement on the active docket, or the plaintiff presents such information to the court. [FN134]

3. Seattle, Washington

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0341

31 PEPLR 271

31 Pepp. L. Rev. 271

(Cite as: 31 Pepp. L. Rev. 271)

King County (Seattle) Superior Court Judge Sharon Armstrong concluded in December of 2002 that the "increasing volume of asbestos cases" had made it "necessary for the court to give priority to the cases of plaintiffs who are the most ill." [FN135] The court went on to hold that "plaintiffs who are asymptomatic, who suffer from only mild reduction in lung function, or whose reduced lung function is not attributed by competent medical opinion to asbestos-related disease" shall be "placed on an Inactive Status Calendar" until such time that the claimant's "symptoms or lung functions reaches [sic] the level of significant functional impairment." [FN136] The court did not specify the criteria that would be used to transfer the cases to active status, but is in the process of conferring with counsel to develop a fair and objective medical threshold. [FN137]

C. Recent Case Management Orders To Address Filings By the Non-Sick

A number of state courts have recently entered innovative case management orders that also seek to prioritize asbestos cases. These orders *293 accomplish the same public policy and legal objectives as a formal registry. [FN138]

1. Greenville, South Carolina

In April of 2002, Circuit Court Judge Larry Patterson of Greenville, South Carolina, was appointed by the Chief Justice of the South Carolina Supreme Court to coordinate and control all asbestos-related cases filed in the South Carolina Circuit Courts. [FN139] Pursuant to that authority, Judge Patterson issued a case management order in late 2002 governing all asbestos-related cases filed by the Wallace & Graham law firm based in Salisbury, North Carolina. [FN140] The order dismisses without prejudice all Wallace & Graham asbestos-related claims except those filed by persons who suffer from malignant diseases, have functionally impairing asbestosis, or have died as a result of an asbestos-related disease. [FN141] The statute of limitations for dismissed claims is tolled. [FN142] Claimants later meeting the minimum medical criteria set forth in the order are able to refile their claims at that time. [FN143]

2. Portland, Oregon

Finally, as this article went to print, Multnomah County (Portland), Oregon Circuit Court Judge John Wittmayer was circulating a draft order that would "abate" claims filed by unimpaired asbestos claimants "while *294 preserving for the litigants their positions on any statutes of limitations issues." [FN144]

The "findings" in Judge Wittmayer's draft order indicate that the annual number of Portland area asbestos filings has doubled since September of 1999. [FN145] Judge Wittmayer also found that a number of these cases "involve plaintiffs who neither exhibit any symptoms of any asbestos-related condition, have never been treated for any asbestos-related condition, have incurred no medical expenses as a result of an asbestos-related condition, and have not been diagnosed by a treating physician as having an asbestos-related disease." [FN146] He suggested that these cases might result from mass screenings that are "advertised in the newspaper" and "sponsored by attorneys and/or labor unions." [FN147] He also recognized that statutes of limitations concerns might drive some claimants to file premature claims. [FN148]

Judge Wittmayer's draft order seeks to address these issues by abating all cases filed by claimants who are not medically impaired, as defined in the order. [FN149] A motion to abate may be filed by a plaintiff, a defendant, or on the court's own motion. [FN150] If a plaintiff or defendant does not object to a motion within fifteen days of its filing, the party will be considered to consent to the motion. [FN151] If the court grants the motion, the case is in abatement for four years. [FN152] During that time, any party may file a motion to move the case to the active trial docket by showing that the claimant meets the minimum criteria set forth in the order. [FN153] The court will

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0342

31 PEPLR 271

31 Pepp. L. Rev. 271

(Cite as: 31 Pepp. L. Rev. 271)

dismiss the case if it is not activated within four years. [FN154]

3. Cleveland, Ohio

The Court of Common Pleas of Cuyahoga County, Ohio, has established a filtering mechanism to screen out claims by persons other than those who are truly sick. According to the court's case management order, all upcoming discovery and trial preparation in the Cleveland area asbestos litigation will focus on groups of plaintiffs whose claims seek redress for functional impairment due to asbestos exposure. [FN155] The court's order reflects the intent to allow the claims of plaintiffs who are functionally *295 impaired to be decided before the claims of the unimpaired, thus helping to preserve assets needed to compensate the truly sick. [FN156]

D. Innovations Used By Federal Courts to Give Priority to the Truly Sick

At the federal level, orders to prioritize the treatment of asbestos claims have been issued by the Judicial Panel on Multidistrict Litigation, MDL No. 875 (the federal "MDL panel"), managed by Senior United States District Judge Charles Weiner of the Eastern District of Pennsylvania, [FN157] and by United States District Court Judge Alfred Wolin, who oversees the USG Corporation (USG) bankruptcy proceeding in Delaware.

1. The Federal MDL Panel

In 1992, Judge Weiner adopted procedures, which although not technically an inactive docket, had the purpose of prioritizing "malignancy, death and total disability cases where the substantial contributing cause is an asbestos-related disease or injury." [FN158] Under the court's order, a select number of cases were identified and placed into one of four disease categories. [FN159] In each case, plaintiff's counsel was required to have a written medical opinion by a board-certified specialist indicating that exposure to either asbestos or products containing asbestos was a contributing cause to the claimant's condition. [FN160] Cases in which the claimant suffered from mesothelioma or lung cancer were thereafter given priority with respect to review, settlement, or further litigation. [FN161] Through utilization of the *296 ordering device, thousands of cases involving non-impaired claimants were dismissed without prejudice. [FN162]

Similarly, with respect to claims brought under the federal Jones Act for asbestos exposures during World War II and thereafter, by Memorandum and Order filed May 2, 1996, Judge Weiner administratively dismissed without prejudice approximately 20,000 cases filed by one law firm--the Jaques Admiralty Law Firm in Detroit, Michigan. [FN163] Those orders provided that reinstatement of the claims in the MDL would be warranted only if each plaintiff provided the court with, among other things, sufficient medical evidence of a present "manifest injury" (rather than asymptomatic conditions such as pleural thickening or scarring). [FN164] Significantly, in the seven years since Judge Weiner entered these orders, only a handful of these 20,000 maritime cases have been reinstated to active status.

More recently, in January of 2002, Judge Weiner found that "the filing of mass screening cases is tantamount to a race to the courthouse and has the effect of depleting funds, some already stretched to the limit, which would otherwise be available for compensation to deserving plaintiffs." [FN165] Accordingly, Judge Weiner acted to administratively dismiss without prejudice (and toll the applicable statutes of limitations) of all asbestos cases initiated through mass screenings. [FN166] Cases subject to administrative dismissal remain active for the purposes of settlement, and motions to amend pleadings. [FN167] Any party may request a case to be transferred to active status by filing a request for reinstatement and providing the court with an affidavit supporting the reasons for reinstatement. [FN168]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0343

31 PEPLR 271                                                                Page 14

31 Pepp. L. Rev. 271

(Cite as: 31 Pepp. L. Rev. 271)

2. United States Bankruptcy Court for the District of Delaware

USG and its major domestic subsidiaries filed petitions for reorganization under Chapter 11 of the U.S. Bankruptcy Code in July of 2001. [FN169] The case was assigned to United States District Judge Alfred *297 Wolin. [FN170] In response to USG's request to establish procedures to resolve the asbestos personal injury liability in its bankruptcy case, Judge Wolin has ordered that claimants with legitimate asbestos-related cancer claims shall be processed and compensated in the bankruptcy proceeding before other claimants. [FN171]

Importantly, Judge Wolin was careful to set standards to help ensure the reliability of claims submitted. Under his order, claimants are required to provide the court with "a medical report by a board-certified internist, pulmonary specialist, oncologist, or pathologist" demonstrating a diagnosis of "a primary cancer" that was "caused by asbestos exposure." [FN172] Each claimant must also provide additional information regarding his or her claim, including the claimant's occupational exposure to USG products and smoking history. [FN173] Upon the passing of the cancer-only bar date, or deadline, and processing of claims, the court will hold a hearing to estimate the liability of USG and its affiliates for these claims. [FN174]

E. The American Bar Association Commission on Asbestos Litigation

Finally, it is worth noting that in February of 2003, the American Bar Association's (ABA) House of Delegates passed a resolution calling for Congress to adopt legislation that would defer the claims of unimpaired plaintiffs and toll all applicable statutes of limitations until such claimants are able to satisfy medical criteria indicating the presence of an impairing condition. [FN175] Supporters of the plan included Chicago personal injury lawyer *298 Terrrence Lavin, who said: "Members of the asbestos bar have made a mockery of our civil justice system and have inflicted financial ruin on corporate America by representing people with nothing more than an arguable finding on an x-ray." [FN176] The ABA plan, he added, "is not tort reform. It's scandal reform." [FN177]

While the ABA resolution was directed primarily at encouraging federal legislative action, it is yet another voice providing support for efforts to prioritize the claims of the truly ill while preserving the legal rights of the non-sick.

V. Conclusion

Courts facing the "elephantine mass of asbestos cases" recognized by scholars, practitioners, and the Supreme Court of the United States, have approached the task of reducing this unprecedented surge of litigation in two very different ways. Some courts, such as those in West Virginia, have engaged in mass consolidation. Other courts have utilized "mini- consolidations." At least theoretically, such procedures expedite resolution of the litigation, but this expediency comes with the price of litigants' fundamental due process rights. The consolidated trial is a blunt instrument. It does not allow individual claimants to be treated individually; everyone is thrown into the "courtroom Cuisinart." From a practical perspective, consolidation also defeats the very goal it is intended to achieve. Consolidations ultimately invite a massive amount of new case filings because plaintiffs' attorneys know that they will not be subject to the normal rules of law, and that their cases will be "greased through" the process, with little check on the merits.

A growing number of courts have decided to take a different path, one that is more surgical in its approach to the asbestos litigation problems of today. These courts have focused on the "root cause" of the current crisis-- mass filings by the unimpaired or only mildly impaired. These filings are largely responsible for the exploding asbestos dockets that many courts are now experiencing. They are also a driving force behind mass trials.

So far, state courts in states as far apart as Washington State and Oregon in the West, to Illinois and Ohio in the Midwest, South Carolina in the South, to Maryland in the mid-Atlantic to New York and Massachusetts in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0344

31 PEPLR 271

31 Pepp. L. Rev. 271

**(Cite as: 31 Pepp. L. Rev. 271)**

Northeast--as well as the federal MDL Panel, a federal judge in a major bankruptcy proceeding, and the ABA--have worked to separate valid asbestos claims from those that are nascent at best, and have given trial priority to people who are sick. Asymptomatic plaintiffs have been treated fairly; their claims are simply deferred, so if a person who is not currently ill unfortunately becomes sick, his or her claim will be preserved. Statutes of limitations should not bar their claims.

**\*299** Courts in America have a clear choice as to how they can help end the asbestos litigation mess. They should choose wisely and adopt procedures that protect the truly sick while preserving the ability of the unimpaired to pursue claims in the unfortunate event that they develop an asbestos-related illness in the future. Case consolidation, like other misguided, errant paths the law has taken in the past, should be placed in the wastebasket of litigation history.

[FNa1]. B.A. (1962), summa cum laude, Boston University; J.D. (1965), magna cum laude, Columbia University. Mr. Schwartz is a senior partner and chairs the Public Policy Group in the Washington, D.C. office of Shook, Hardy & Bacon L.L.P. He is co-author of the most widely used torts casebook in the United States, Prosser, Wade and Schwartz's Torts (10th ed. 2000), and author of Comparative Negligence (4th ed. 2002). He served on the Advisory Committees to the Restatement of the Law Of Torts projects on Products Liability and Apportionment of Liability, and currently sits on the Advisory Committee to the Restatement of the Law Of Torts: General Principles.

[FNaa1]. B.A. (1987), University of Wisconsin-Madison; J.D. (1990), Vanderbilt University, Associate Articles Editor of the Vanderbilt Law Review. Mr. Behrens is a partner in the law firm of Shook, Hardy & Bacon L.L.P. in Washington, D.C. He practices in the firm's Public Policy Group.

[FNaaa1]. B.A. (1997), summa cum laude, Hope College; J.D. (2000), University of Michigan. Ms. Tedesco served on the Michigan Journal of International Law.

[FN1]. Norfolk & Western Ry. Co. v. Ayers, 123 S. Ct. 1210, 1228 (2003); Ortiz v. Fibreboard Corp., 527 U.S. 815, 821 (1999).

[FN2]. See, e.g., Judicial Conference Ad Hoc Committee on Asbestos Litigation, Report to the Chief Justice of the United States and Members of the Judicial Conference of the United States 5 (Mar. 1991) 6 No. 4 Mealey's Litig. Rep.: Asbestos (Mar. 15, 1991) [hereinafter Judicial Conf. Rep.].

[FN3]. Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 597 (1997).

[FN4]. See, e.g., Eric Roston, The Asbestos Pit, Time, Mar. 11, 2002, at Y9, available at 2002 WL 8385920; Susan Warren, Swamped Courts Practice Plaintiff Triage, Wall. St. J., Jan. 27, 2003, at B1, available at 2003 WL-WSJ 3957498; Michael Freedman, The Tort Mess, Forbes, May 13, 2002, at 95, available at 2002 WL 2214449; Lisa Girion, Firms Hit Hard as Asbestos Claims Rise, L.A. Times, Dec. 17, 2001, at A1, available at 2001 WL 28937452; Amity Shlaes, The Real-Life Tragedy of the Asbestos Theatre, Fin. Times, May 14, 2002, at 23, available at 2002 WL 20299748.

[FN5]. Hon. Griffin B. Bell, Asbestos Litigation and Judicial Leadership: The Courts' Duty to Help Solve The Asbestos Litigation Crisis, Briefly, Vol. 6, No. 6, June 2002, at 7 (Nat'l Legal Ctr. for the Pub. Interest monograph), available at http://www.nlcpi.org (last visited Apr. 18, 2003).

[FN6]. See The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283, Before the House Comm. on the Judiciary, 106th Cong. 4 (1999) (statement of Christopher Edley, Jr., Professor, Harvard Law

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0345

31 PEPLR 271

Page 16

31 Pepp. L. Rev. 271

**(Cite as: 31 Pepp. L. Rev. 271)**

School), available at 1999 WL458254.

[FN7]. Alex Berenson, A Surge in Asbestos Suits, Many by Healthy Plaintiffs, N.Y. Times, Apr. 10, 2002, at A1, abstract available at 2002 WL 18538000.

[FN8]. See Jennifer Biggs et al., Overview of Asbestos Issues and Trends 3 (Dec. 2001), available at http://www.actuary.org/mono.htm (last visited Apr. 18, 2003); Stephen J. Carroll et al., RAND Inst. for Civl Justice, Asbestos Litigation Costs and Compensation: An Interim Report (Sept. 2002) [hereinafter RAND Rep.], available at http://www.rand.org/publications/DB/DB397/DB397.pdf. See also James A. Henderson, Jr. & Aaron D. Twerski, Asbestos Litigation Gone Mad: Exposure-based Recovery for Increased Risk, Mental Distress, and Medical Monitoring, 53 S.C. L. Rev. 815, 817-18 (2002).

[FN9]. See RAND Rep., supra note 8, at 77.

[FN10]. Editorial, Asbestos Dreams, Wall St. J., Oct. 17, 2003, at A10, available at 2003 WL-WSJ 3982978. See also Mark A. Behrens & Rochelle M. Tedesco, Two Forks in the Road of Asbestos Litigation, 18 No. 3 Mealey's Litig. Rep.: Asbestos 21, Mar. 7, 2003, at 1.

[FN11]. See Richard B. Schmitt, Burning Issue: How Plaintiffs' Lawyers Have Turned Asbestos Into a Court Perennial, Wall St. J., Mar. 5, 2001, at A1, available at 2001 WL-WSJ 2856111.

[FN12]. See The Fairness in Asbestos Injury Resolution Act of 2003: Hearing on S. 1125 Before the Senate Comm. on the Judiciary, 108th Cong. 4 (2003) (statement of Laurence H. Tribe, Professor, Harvard Law School), available at http://judiciary.senate.gov/testimony.cfm?id=777&wit_id=73; see also Susan Warren, Plaintiffs Target Companies Whose Premises Contained Any Form of Deadly Material, Wall St. J., Jan. 27, 2003, at B1, available at 2003 WL-WSJ 3957497.

[FN13]. See RAND Rep., supra note 8, at 6.

[FN14]. See Joseph E. Stiglitz et al., The Impact of Asbestos Liabilities on Workers in Bankrupt Firms 10 (Sebago Assoc., Dec. 2002).

[FN15]. See Jesse David, The Secondary Impacts of Asbestos Liabilities (NERA Econ. Consulting, Jan. 23, 2003). See also The Fairness in Asbestos Injury Resolution Act of 2003: Hearing on S. 1125 Before the Sen. Comm. on the Judiciary, 108th Cong. (2003) (statement of Frederick C. Dunbar, Ph.D., Senior Vice President, National Economic Research Associates), available at http:// judiciary.senate.gov/testimony.cfm?id=777&witid=2188.

[FN16]. See RAND Rep., supra note 8, at vii; Biggs, supra note 8, at 4.

[FN17]. Bell, supra note 5, at 4.

[FN18]. See Pamela Sherrid, Looking for Some Million Dollar Lungs, U.S. News & World Rep., Dec. 17, 2001, at 36, available at 2001 WL 30366341 (quoting Oakland, California, plaintiffs' lawyer Steve Kazan as stating that weak asbestos cases result in recoveries that could go to mesothelioma victims); Trisha L. Howard, Plaintiff's Lawyers Seek Limit on Asbestos Lawsuits by People with Nonmalignant Illnesses, St. Louis Post-Dispatch, Dec. 11, 2001, at C4, available at 2001 WL 4499314 (explaining that lawyers representing plaintiffs with malignancies believe steps should be taken to "preserve the integrity of these companies and their assets for people who are truly sick").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**USG B 0346**

31 Pepp. L. Rev. 271

**(Cite as: 31 Pepp. L. Rev. 271)**

[FN19]. Susan Warren, Competing Claims: As Asbestos Mess Spreads, Sickest See Payouts Shrink, Wall St. J., Apr. 25, 2001, at A1, available at 2002 WL-WSJ 3392934; see also Quenna Sook Kim, Asbestos Trust Says Assets Are Reduced As the Medically Unimpaired File Claims, Wall St. J., Dec. 14, 2001, at B6, available at 2001 WL-WSJ 29680683 ("According to a letter Manville trustees sent to Judge Weinstein on Dec. 5 [2001], a 'disproportionate amount of Trust settlement dollars have gone to the least injured claimants--many with no discernible asbestos-related physical impairment whatsoever.'").

[FN20]. Matthew Bergman & Jackson Schmidt, Editorial, Change Rules on Asbestos Lawsuits, Seattle Post-Intelligencer, May 30, 2002, at B7, available at 2002 WL-STLPI 5934774.

[FN21]. 'Medical Monitoring and Asbestos Litigation'--A Discussion with Richard Scruggs and Victor Schwartz, 17 No. 3 Mealey's Litig. Rep.: Asbestos 19 (Mar. 1, 2002) (quoting Mr. Scruggs) [hereinafter Schwartz & Scruggs].

[FN22]. State ex rel. Appalachian Power Co. v. MacQueen, 479 S.E.2d 300, 304 (W. Va. 1996).

[FN23]. See Paul F. Rothstein, What Courts Can Do in the Face of the Never-Ending Asbestos Crisis, 71 Miss. L.J. 1 (2001).

[FN24]. Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 597 (1997).

[FN25]. See Teju Rau, The New Wave of Asbestos Litigation: Nonmalignant Claims Affect Case Consolidation, Bankruptcies, and Insurance, BNA Prod. Safety & Liab. Rptr., Jan. 20, 2003, at 1 ("Almost everything about the new wave of asbestos litigation is different from the cases filed twenty years ago.").

[FN26]. See Susan Warren, Asbestos Suits Target Makers of Wine, Cars, Soups, Soaps, Wall St. J., Apr. 12, 2000, at B1, available at 2000 WL-WSJ 3025073.

[FN27]. See Mark A. Behrens, Some Proposals for Courts Interested in Helping Sick Claimants and Solving Serious Problems in Asbestos Litigation, 54 Baylor L. Rev. 331, 333 (2002).

[FN28]. See Roger Parloff, The $200 Billion Miscarriage of Justice; Asbestos Lawyers are Pitting Plaintiffs Who Aren't Sick Against Companies that Never Made the Stuff and Extracting Billions for Themselves, Fortune, Mar. 4, 2002, at 158, available at 2002 WL 2190334 ("When the first asbestos suits were filed in the 1960s, the plaintiffs were usually asbestos workers suffering from grave and crippling maladies. The most common [was] mesothelioma.").

[FN29]. See RAND Rep., supra note 8, at 20; Biggs, supra note 8, at 3.

[FN30]. Amchem, 521 U.S. at 631 (Breyer, J., concurring).

[FN31]. See Lester Brickman, Lawyers' Ethics and Fiduciary Obligation in The Brave New World of Aggregative Litigation, 26 Wm. & Mary Envtl. L. & Pol'y Rev. 243, 273 (2001) (stating that without the claims of unimpaired claimants "the 'asbestos litigation crisis' would never have arisen and would not exist today").

[FN32]. See In re Patenaude, 210 F.3d 135, 139 (3d Cir. 2000) (stating that "the sick and dying, [and] their widows and survivors should have their claims addressed first") (internal citation omitted).

[FN33]. See Asbestos Litigation: Oversight Hearing Before the Sen. Comm. on the Judiciary, 108th Cong. (Mar. 5,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0347

31 PEPLR 271

31 Pepp. L. Rev. 271

(Cite as: 31 Pepp. L. Rev. 271)

2003) (statement of Steven Kazan, partner, Kazan, McClain, Edises, Abrams, Fernandez, Lyons & Farrise), available at http://judiciary.senate.gov/testimony.cfm?id=617&witid=1678.

[FN34]. Theresa Kiely, Asbestos Case Leads to $150 Million Jury Award, Miss. News, Oct. 28, 2001, available at http:// www.clarionledger.com/news/0110128/m07.html.

[FN35]. See Jury Awards $150 Million in Asbestos Case, Assoc. Press Newswires, Oct. 28, 2001.

[FN36]. See Texas Jury Awards $3 Million in Asbestos Exposure Case, 23 No. 24 Andrews Asbestos Litig. Rep. 4 (Dec. 6, 2001).

[FN37]. Id.

[FN38]. Dr. Louis Sullivan, the former Secretary of the U.S. Department of Health and Human Services, testified before Congress that there are "mass filings of cases on behalf of large groups of people who are not sick and may never become sick but who are compelled to file for remedial compensation simply because of state statutes of limitation." The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283 Before the House Comm. on the Judiciary, 106th Cong. 4 (1999) (statement of Dr. Louis Sullivan), available at 1999 WL 20009757.

[FN39]. In re Asbestos Cases, 586 N.E.2d 521, 523 (Ill. App. Ct. 1991).

[FN40]. At a recent conference, one trial court judge on an unofficial basis expressed concern that if changes are made to address the problem of payments to the unimpaired at this time, the resources may not exist to compensate those individuals if and when they develop an asbestos-related illness in the future. But, if changes are not made now to curb payments to the unimpaired, then it is virtually certain that the resources will not exist to compensate those individuals if they get sick in the future. Continued payments to the unimpaired will bring about the very situation judges understandably wish to avoid.

[FN41]. Victor Schwartz, Some Lawyers Ask, Why Wait for Injury? Sue Now!, USA Today, July 15, 1999, at A17.

[FN42]. See Eagle-Picher Indus., Inc. v. Am. Employers' Ins. Co., 718 F. Supp. 1053, 1057 (D. Mass. 1989) ("[M]any of these cases result from mass X-ray screenings at occupational locations conducted by unions and/or plaintiffs' attorneys, and many claimants are functionally asymptomatic when suit is filed."); see also Parloff, supra note 29, at 154 ("To unearth new clients for lawyers, screening firms advertise in towns with many aging industrial workers or park X-ray vans near union halls. To get a free X-ray, workers must often sign forms giving law firms 40 percent of any recovery. One solicitation reads: 'Find out if YOU have MILLION DOLLAR LUNGS!'").

[FN43]. In re Joint E. & S. Dists. Asbestos Litig., 237 F. Supp. 2d 297, 309 (E.D.N.Y. 2002).

[FN44]. See id. (quoting Fred Baron, a past president of the Association of Trial Lawyers of America as saying, in reference to mass screenings, "I think it's a wonderful thing."); Andrew Schneider, Asbestos Lawsuits Anger Critics, St. Louis Post-Dispatch, Feb. 9, 2003, at A1, available at 2003 WL 3554893 (quoting a partner in a law firm that ran screenings as saying "critics of screening say law firms do it just to bring in business, and, in reality, that may be correct, but people are often helped by the results of the screenings.").

[FN45]. See Brickman, supra note 31, at 298 (providing a detailed account of how the typical "exposure only" case arises and is litigated).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0348

31 PEPLR 271                                                                 Page 19

31 Pepp. L. Rev. 271

(Cite as: 31 Pepp. L. Rev. 271)


[FN46]. In re Asbestos Prod. Liab. Litig. (No. VI), No. 8 MDL 875, at 1- 2 (E.D. Pa. Jan. 14, 2002) (Admin. Order No. 8) [hereinafter MDL 875, Admin. Order No. 8].

[FN47]. See supra note 10 and accompanying text.

[FN48]. See Stephen Carroll & Deborah Hensler, Facts and Figures About Asbestos Litigation: Highlights from the New Rand Study (RAND Inst. for Civil Justice, Jan. 2003).

[FN49]. In re Collins, 233 F.3d 809, 812 (3d Cir. 2000).

[FN50]. See Mark D. Plevin & Paul W. Kalish, What's Behind the Recent Wave of Asbestos Bankruptcies?, 16 No. 6 Mealey's Litig. Rep.: Asbestos 20 (Apr. 20, 2001).

[FN51]. Christopher F. Edley, Jr. & Paul C. Weiler, Asbestos: A Multi-Billion-Dollar Crisis, 30 Harv. J. on Legis. 383, 392 (1993).

[FN52]. See Albert B. Crenshaw, For Asbestos Victims, Compensation Remains Elusive, Wash. Post., Sept. 25, 2002, at E1, available at 2002 WL 100084407.

[FN53]. See Stephen Hudak & John F. Hagan, Asbestos Litigation Overwhelms Courts, Cleveland Plain Dealer, Nov. 5, 2002, at A1, available at 2002 WL 6382801.

[FN54]. Mark A. Behrens, When the Walking Well Sue, Nat'l L.J., Apr. 29, 2002, at A12.

[FN55]. See The Fairness in Asbestos Injury Resolution Act of 2003: Hearing on S. 1125 Before the Senate Comm. on the Judiciary, 108th Cong. 3 (2003) (statement of Laurence H. Tribe, Professor, Harvard Law School).

[FN56]. Schwartz & Scruggs, supra note 21, at 5 (quoting Mr. Scruggs).

[FN57]. RAND Rep., supra note 8, at 50.

[FN58]. See In re Joint E. & S. Dists. Asbestos Litig., 129 B.R. 710, 747-48 (E. & S.D.N.Y. 1991) (stating that "[a] newer generation of peripheral defendants are becoming ensnarled in the litigation" as plaintiffs' lawyers seek "to expand the number of those with assets available to pay for asbestos injuries"--even though "[t]he extent of liability, possible defenses and value of the claims against these new defendants is unknown....").

[FN59]. See Warren, supra note 26, at B1.

[FN60]. See Editorial, Lawyers Torch the Economy, Wall St. J., Apr. 6, 2001, at A14, available at 2001 WL-WSJ 2859560 ("[T]he net has spread from the asbestos makers to companies far removed from the scene of any putative wrongdoing."); Editorial, The Job-Eating Asbestos Blob, Wall St. J., Jan. 23, 2002, at A22, available at 2002 WL-WSJ 3383766.

[FN61]. See Douglas McLeod, Asbestos Continues to Bite Industry, Bus. Ins., Jan. 8, 2001, at 1, available at 2001 WL 5100719.

[FN62]. See Victor E. Schwartz & Rochelle M. Tedesco, The Law of Unintended Consequences in Asbestos Litigation: How Efforts to Streamline The Litigation Have Fueled More Claims, 71 Miss. L.J. 531 (2001).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.


USG B 0349

31 PEPLR 271

31 Pepp. L. Rev. 271

**(Cite as: 31 Pepp. L. Rev. 271)**

[FN63]. See The Fairness in Asbestos Compensation Act of 1999: Hearing on H.R. 1283, Before the House Comm. on the Judiciary, 106th Cong. 186 (1999) (statement of William N. Eskridge Jr., Professor, Yale Law School) [hereinafter Eskridge Testimony].

[FN64]. See id. at 187.

[FN65]. Id. at 188.

[FN66]. See id. at 190.

[FN67]. See id. at 190-91.

[FN68]. Mobil Corp. v. Gaughan, 563 S.E.2d 419, 421 (W. Va. 2002).

[FN69]. Id. (Maynard, J., concurring).

[FN70]. Id. at 421-422.

[FN71]. Id.

[FN72]. See Transcript of Hearing Before Judges Arthur, Recht, Booker, Stephens, and Alan Moats, In re Asbestos Litig., Civ. Action No. 02-C-9004 (Cir. Ct. Kanawha County, W. Va. Aug. 12, 2002).

[FN73]. Gaughan, 563 S.E.2d at 422.

[FN74]. TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 457 (1993).

[FN75]. See, e.g., Garber v. Randell, 477 F.2d 711, 716 (2d Cir. 1973); In re Chevron U.S.A., Inc., 109 F.3d 1016, 1020 (5th Cir. 1997); see also Todd-Stenberg v. Dalkon Shield Claimants Trust, 56 Cal. Rptr. 2d 16, 18 (Cal. Ct. App. 1996); Union Pac. Res. Group, Inc. v. Hawkins, 51 S.W.3d 741, 745 (Tex. App. 2001).

[FN76]. In re Brooklyn Navy Yard Asbestos Litig., 971 F.2d 831, 853 (2d Cir. 1992); see also Malcolm v. Nat'l Gypsum Co., 995 F.2d 346, 350 (2d Cir. 1993) ("The benefits of efficiency can never be purchased at the cost of fairness.").

[FN77]. Imposition of punitive damages in today's asbestos litigation environment is especially irresponsible. Punitive damage awards help speed asbestos defendants down the path to bankruptcy and threaten the availability of funds needed to compensate sick claimants. See Dunn v. Hovic, 1 F.3d 1371, 1399 (3d Cir.) (Weis, J., dissenting), modified in part, 13 F.3d 58 (1993); Judicial Conf. Rep., supra note 2, at 32; see also Mark A. Behrens & Barry M. Parsons, Responsible Public Policy Demands an End to the Hemorrhaging Effect of Punitive Damages in Asbestos Cases, 6 Tex. Rev. L. & Pol. 137 (2001).

[FN78]. See Mobil Settles, Leaving Carbide As Lone Asbestos Defendant, Assoc. Press Newswire, Oct. 10, 2002.

[FN79]. In re Hopeman Bros., Inc., 569 S.E.2d 409, 425 (Va. 2002).

[FN80]. The Fairness in Asbestos Compensation Act of 1999: Hearings on H.R. 1283 Before the House Comm. on the Judiciary, 106th Cong. 320 (1999) (statement of the Hon. Conrad L. Mallett, Jr.).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0350

31 PEPLR 271

31 Pepp. L. Rev. 271

(Cite as: 31 Pepp. L. Rev. 271)

Page 21

[FN81]. Senior United States District Court Judge Charles Weiner has explained that "[o]nly a very small percentage of the cases filed have serious asbestos-related afflictions, but they are prone to be lost in the shuffle with pleural and other non-malignancy cases." In re Asbestos Prods. Liab. Litig. (No. VI), No. Civ. A. MDL 875, 1996 WL 539589, at *1 (E.D. Pa. Sept. 16, 1996).

[FN82]. See Eskridge Testimony, supra note 63, at 201-02.

[FN83]. See Victor E. Schwartz & Leah Lorber, A Letter to the Nation's Trial Judges: How the Focus on Efficiency Is Hurting You and Innocent Victims in Asbestos Liability Cases, 24 Am. J. Trial Advoc. 247, 256-57 (2000). See also Glenn W. Bailey, Litigation is Destroying American Companies, USA Today, Jan. 1, 1994, at 76, available at 1994 WL 13637753 ("Judges' efforts to resolve [asbestos] cases all too often have resulted in a perverse incentive-- causing more cases and more backlog.") (Mr. Bailey was the CEO of Keene Corp. which filed for Chapter 11 protection in 1993 as a result of asbestos liability it acquired primarily from its 1968 purchase of a small manufacturer of acoustical ceilings, ventilation systems, and thermal insulation products.).

[FN84]. Francis E. McGovern, The Defensive Use of Federal Class Actions in Mass Torts, 39 Ariz. L. Rev. 595, 606 (1997).

[FN85]. RAND Rep., supra note 8, at 26. See also Michelle J. White, Explaining the Flood of Asbestos Litigation: Consolidation, Bifurcation, and Bouquet Trials, Working Paper No. 9362, at 24 (Nat'l Bureau of Econ. Res. Dec. 2002) ("Thus the procedural innovations substantially increase plaintiffs' lawyers incentives to file additional asbestos claims."), available at http:// papers.nber.org/papers/w9362 (last visited Apr. 18, 2003).

[FN86]. In re Asbestos Litig., Civ. Action No. 00-Misc.-222 (Cir. Ct. Kanawha County, W. Va. Nov. 8, 2000) (statement of West Virginia Judge Andrew MacQueen in hearing before Judge John Hutchison); see also Hon. Helen E. Freedman, Product Liability Issues in Mass Torts--View from the Bench, 15 Touro L. Rev. 685, 688 (1999) (judge overseeing New York City asbestos litigation stating that "[i]ncreased efficiency may encourage additional filings and provide an overly hospitable environment for weak cases").

[FN87]. In re Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1298 (7th Cir. 1995) (Posner, J.); see also Castano v. Am. Tobacco Co., 84 F.3d 734, 746 (5th Cir. 1996) (referring to class actions as "judicial blackmail"); In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 784-85 (3d Cir. 1995) (calling class actions "legalized blackmail").

[FN88]. See Dave Lenckus, Asbestos Liability Reform Efforts Continue: Push To Prioritize Claimants Draws Support From Some Plaintiffs' Attorneys, Bus. Ins., Sept. 30, 2002, at 2, available at 2002 WL 9518313.

[FN89]. 521 U.S. 591, 597 (1997) (invalidating proposed class action settlement of thousands of asbestos claims because the settlement failed to satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure).

[FN90]. 527 U.S. 815, 816-18 (1999) (relying on constitutional concerns as well as Rule 23 to invalidate proposed settlement).

[FN91]. Cain v. Armstrong World Indus., 785 F. Supp. 1448, 1455 (S.D. Ala. 1992).

[FN92]. Id.

[FN93]. See Mark A. Behrens & Monica G. Parham, Stewardship for the Sick: Preserving Assets For Asbestos

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0351

31 PEPLR 271

31 Pepp. L. Rev. 271

**(Cite as: 31 Pepp. L. Rev. 271)**

Page 22

Victims Through Inactive Docket Programs, 33 Tex. Tech. L. Rev. 1, 6 (2001).

[FN94]. For a helpful primer on the basic medical issues involved in utilizing objective medical criteria to prioritize the treatment of asbestos claims, see Dr. John E. Parker, Understanding Asbestos-Related Medical Criteria, 18 No. 10, Mealey's Litig. Rep.: Asbestos 25, June 18, 2003, at 45. See also The Fairness in Asbestos Injury Resolution Act of 2003: Hearing on S. 1125 Before the Sen. Comm. on the Judiciary, 108th Cong. (June 4, 2003) (statements of Dr. John E. Parker, Professor and Chief of Pulmonary and Critical Care Medicine; Robert C. Byrd, Health Sciences Center of West Virginia University; and Dr. James D. Crapo, Professor of Medicine at the National Jewish Center and University of Colorado Health Sciences Center, former President of the American Thoracic Society, and President-elect of the Fleischner Society).

[FN95]. See Peter H. Schuck, The Worst Should Go First: Deferral Registries in Asbestos Litigation, 15 Harv. J.L. & Pub. Pol'y 541 (1992).

[FN96]. See Judicial Conf. Rep., supra note 2, at 11 (stating that the average duration of asbestos cases exceeds other types of cases).

[FN97]. Schuck, supra note 95, at 555; see also Ortiz, 527 U.S. at 821 n.1 (stating that "transaction costs exceed the victims' recovery by nearly two to one"); id. at 867 (Breyer, J., dissenting) (repeating the fact that "of each dollar that asbestos defendants pay, those costs consume an estimated 61 cents, with only 39 cents going to victims"); Amchem, 521 U.S. at 632 (Breyer, J., concurring in part and dissenting in part) (noting the disparity in costs expended compared to payments made to victims).

[FN98]. See Inactive Asbestos Dockets: Are They Easing the Flow of Litigation?, HarrisMartin's Columns: Asbestos, Feb. 2002, at 2 [hereinafter Columns: Asbestos]; see also In re USG Corp., No. 01-2094, 8 n.3 (Bankr. Del. Feb. 19, 2003) (Memo. Op. & Order) ("The practical benefits of dealing with the sickest claimants first have been apparent to the courts for many years and have led to the adoption of deferred claims registries in various jurisdictions.").

[FN99]. In re Massachusetts Asbestos Litig. (Mass. Super. Ct. Sept. 12, 1986) (Mass. State Ct. Asbestos Pers. Injury Litig. Order).

[FN100]. See id.

[FN101]. See id. Similarly, pleural cases originally filed on the consolidated docket may be transferred to the inactive docket on plaintiff's motion and thereafter become subject to all of the same provisions and requirements as cases originally filed on the inactive docket. See id.

[FN102]. See id.

[FN103]. See id.

[FN104]. See id.

[FN105]. See id.

[FN106]. See Behrens & Parham, supra note 93, at 14.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0352

31 PEPLR 271

31 Pepp. L. Rev. 271

(Cite as: 31 Pepp. L. Rev. 271)

Page 23

[FN107]. Columns: Asbestos, supra note 98, at 3.

[FN108]. Id.

[FN109]. Id. at 70.

[FN110]. In re Asbestos Cases, 2 (Cir. Ct., Cook County, Ill. Mar. 26, 1991) (Order to Establish Registry for Certain Asbestos Matters).

[FN111]. Id. at 2-3.

[FN112]. See id. at 9. All claims must be filed individually. See id. at 15. The Order prohibits claims on behalf of groups of classes of claimants. See id.

[FN113]. See id. at 7.

[FN114]. See id. at 8.

[FN115]. See id. at 10. Cases are removed in two ways. The first essentially permits dismissal of an action, and the second is designed to encompass a change in the claimant's medical condition. See id. "A claimant may be voluntarily removed from the Registry" upon filing a certificate by counsel stating that the claimant is withdrawing his or her claims. See id. Thereafter, the tolling of pertinent timeliness provisions ceases. See id. A case may also be removed pursuant to the filing of a Request for Removal, along with accompanying documents and medical certifications establishing impairment. See id. Defendants have the opportunity to object to removal; however, the court makes the ultimate removal determination. See id. at 12. Once removal has been approved, the claimant proceeds to file a complaint on the Active Docket. See id.

[FN116]. Id. at 14-15.

[FN117]. See In re Asbestos Pers. Injury and Wrongful Death Asbestos Cases, No. 92344501 (Cir. Ct. Baltimore City, Md. Dec. 9, 1992) (Order Establishing an Inactive Docket for Asbestos Personal Injury Cases).

[FN118]. See id. at 7.

[FN119]. Id. at 8.

[FN120]. See id. at 10.

[FN121]. See id. at 8.

[FN122]. See id. at 11.

[FN123]. In re Pers. Injury and Wrongful Death Asbestos Cases, No 24-X-92-344501, at 5 (Cir. Ct. Baltimore City, Md. Aug. 15, 2002) (Mem. Op. and Order Denying Modification to Inactive Docket Medical Removal Criteria).

[FN124]. Id. at 5-6.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0353

31 PEPLR 271

31 Pepp. L. Rev. 271

**(Cite as: 31 Pepp. L. Rev. 271)**

[FN125]. In re New York City Asbestos Litig., 1 (Sup. Ct. N.Y. Dec. 19, 2002) (Order Amending Prior Case Mgmt. Orders).

[FN126]. Id.

[FN127]. Id. at 1-2 (internal citations omitted).

[FN128]. See id. at 2.

[FN129]. See id. at 7.

[FN130]. See id.

[FN131]. In re Fifth Jud. Dist. Asbestos Litig., 1 (Sup. Ct. N.Y. Jan. 31, 2003) (Amendment to Am. Case Mgmt. Order No. 1).

[FN132]. See id. at 2.

[FN133]. See id. at 5.

[FN134]. See id. at 6-7.

[FN135]. Letter from Judge Sharon S. Armstrong, King County, Wash., to Counsel of Record, Moving and Responding Parties, at 1 (Dec. 3, 2002) (on file with the author).

[FN136]. Id.

[FN137]. See id.

[FN138]. In addition, the Pennsylvania Supreme Court has held that asymptomatic pleural thickening, unaccompanied by physical impairment, is not a compensable injury that gives rise to a cause of action. See Simmons v. Pacor, Inc., 674 A.2d 232, 237 (Pa. 1996) (upholding Giffear v. Johns-Manville Corp., 632 A.2d 880 (Pa. Super. Ct. 1993)). Further, the court has held that the discovery of pleural plaques or a nonmalignant, asbestos-related lung pathology "does not trigger the statute of limitations with respect to an action for a later, separately diagnosed disease of lung cancer." Id. Furthermore, "because asymptomatic pleural thickening is not a sufficient physical injury, the resultant emotional distress damages are likewise not recoverable." Id. at 238. The court's decision relieves the pressure on individuals to file unripe claims simply to avoid statute of limitations issues later on. The court's ruling also helps preserve assets for the seriously ill by ensuring that they will not have to compete with the unimpaired to obtain compensation. For other cases holding that pleural thickening, unaccompanied by physical impairment, does not constitute a compensable injury, see Burns v. Jaquays Mining Corp., 752 P.2d 28, 31 (Ariz. 1987); Owens-Illinois v. Amstrong, 591 A.2d 544, 560-61 (Md. 1991), appealed on other grounds, 604 A.2d 47 (Md. 1992); In re Hawaii Federal Asbestos Cases, 734 F. Supp. 1563, 1567 (D. Haw. 1990) (applying Hawaii law).

[FN139]. See In re Wallace & Graham Asbestos-Related Cases, 1 (S.C. Cir. Ct. 2002) (Wallace & Graham Case Mgmt. Order).

[FN140]. See id. at 1.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0354

31 Pepp. L. Rev. 271

(Cite as: 31 Pepp. L. Rev. 271)


[FN141]. See id. at 4.

[FN142]. See id.

[FN143]. See id. at 5.

[FN144]. In re All Asbestos Exposure Cases Filed in Multnomah County, No. 0003-0000B, 5 (Or. Cir. Ct. 2002) (First Amended Draft Gen. Order Re: Asymptomatic, Untreated, or Inchoate Disease Cases).

[FN145]. See id. at 2.

[FN146]. Id. at 3-4.

[FN147]. Id. at 4.

[FN148]. See id. at 5.

[FN149]. See id. at 6-7.

[FN150]. See id. at 8-9.

[FN151]. See id. at 9.

[FN152]. See id. at 10.

[FN153]. See id.

[FN154]. See id.

[FN155]. In re Cuyahoga County Asbestos Cases (Ohio Ct. Com. Pl. Jan. 4, 2002) (Gen. Pers. Injury Asbestos Case Mgmt. Order No. 1).

[FN156]. Id. at 1.

[FN157]. In July of 1991, the Judicial Panel on Multidistrict Litigation ordered all federal asbestos personal injury and wrongful death actions to be centralized before Judge Weiner. See In re Asbestos Prod. Liab. Litig. (No. VI), MDL 875 (J.P.M.L. 1991). At the time of the transfer, inactive dockets existed in about a dozen federal district courts, including some districts with "very large asbestos caseloads." Schuck, supra note 95, at 568. These included a broad and diverse number of courts randing from the Northern District of California, the Northern District of Illinois, the Northern and Southern Districts of Mississippi, the Western District of New York, and Northern District of Ohio, to the Districts of Colorado, Connecticut, Hawaii, Maine, Maryland, Massachusetts, and New Hampshire. See id. at 568 n.109.

[FN158]. In re Asbestos Prod. Liab. Litig. (No. VI), MDL 875, at 1 (E.D. Pa. Sept. 8, 1992) (Admin. Order No. 3,) [hereinafter Admin. Order No. 3]. As the Third Circuit explained, Administrative Order No. 3 established that "in attempting to resolve cases through negotiation, cases of mesothelioma and lung cancer with asbestosis will be 'addressed ... on a priority basis.'" In re Patenaude, 210 F.3d 135, 140 (3d Cir. 2000). The order also reflected the court's ultimate goal of establishing an inactive docket covering cases that involved non-malignant conditions other

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0355

31 PEPLR 271

31 Pepp. L. Rev. 271

(Cite as: 31 Pepp. L. Rev. 271)

Page 26

than asbestosis.

[FN159]. Admin. Order No. 3, supra note 158, at 1. The disease categories were: (1) mesothelioma, living and deceased; (2) lung cancer, living and deceased; (3) other malignancies, living and deceased; and (4) asbestosis, total disability deceased or total disability living. See id.

[FN160]. See id.

[FN161]. See id.

[FN162]. See In re Asbestos Prod. Liab. Litig. (No. VI), MDL 875 (E.D. Pa. Oct. 16, 1997) (Order) (dismissing approximately 3,200 non-impairment claims without prejudice with all applicable statutes of limitation tolled).

[FN163]. See In re Asbestos Prod. Liab. Litig. (No. VI), No. 2 MDL 875 (Maritime Actions) (E.D. Pa. May 1, 1996) (Mem. Op. & Order).

[FN164]. See id. at 9. The court found that with respect to the maritime cases,
[O]nly a fraction of the recently diagnosed plaintiffs have an asbestos-related condition, and many of these may be open to question. Numerous cases have either no diagnosis of an asbestos-related condition, or there is scant credible medical evidence.... To file cases by the thousands and expect the Court to sort out the actionable claims is improper and a waste of the Court's time. Other victims suffer while the Court is clogged with such filings. Id. at 13.

[FN165]. MDL 875, Admin. Order No. 8, supra note 46.

[FN166]. See id. at *2.

[FN167]. See id.

[FN168]. See id.

[FN169]. See Case Update, at http://www.usg.com/special/caseupdate.asp (last visited Sept. 13, 2003).

[FN170]. Judge Wolin is a United States District Court Judge for the District of New Jersey in Newark. In November of 2001, the Third Circuit Court of Appeals appointed him to the United States Bankruptcy Court for the District of Delaware to oversee five asbestos-related bankruptcy cases, including the USG matter.

[FN171]. See In re USG Corp., No. 01-2094, (Bankr. Del. Feb. 19, 2003) (Memo. Op. & Order).

[FN172]. Id. at 10.

[FN173]. See id. at 11.

[FN174]. See id. at 9.

[FN175]. See Oversight Hearing on "Asbestos Litigation Crisis Continues," Before the Sen. Comm. on the Judiciary, 108th Cong. 2-3 (2003) (statement of Hon. Dennis Archer, President-elect, American Bar Ass'n), available at 2003 WL 11715910. The ABA Commission interviewed several nationally recognized pulmonologists

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0356

31 PEPLR 271                                                                 Page 27

31 Pepp. L. Rev. 271

(Cite as: 31 Pepp. L. Rev. 271)

and other medical specialists with extensive knowledge of asbestos-related non-malignant conditions to determine the objective medical criteria which would constitute the threshold level of asbestos-related injury that would permit a plaintiff's case to be placed on an active docket. See id. at 7. Based on those interviews, the ABA Commission promulgated a Standard for Non-Malignant Asbestos-Related Disease Claims (the "ABA Standard"). See id. at 3. The ABA Standard is also based both on guidelines for diagnosing asbestos-related conditions which have been published by the American Thoracic Society (a division of the American Lung Association) and on guidelines for the evaluation of impairment published by the American Medical Association. See id. at 8. See The Diagnosis of Nonmalignant Diseases Related to Asbestos, Am. Thoracic Soc'y Official Statement, 134 Am. Rev. Resp. Dis. 363-368 (Mar. 1986); Am. Thoracic Soc'y, Lung Function Testing: Selection of Reference Values and Interpretive Strategies, 144 Am. Rev. Resp. Dis. 1202- 1218 (1991); Am. Med. Ass'n, Guides to the Evaluation of Permanent Impairment (5th ed. 2001).

[FN176]. Editorial, ABA Backs Asbestos Reform, Wash. Times, Feb. 16, 2003, at B2, available at 2003 WL 7706224.

[FN177]. Id.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

USG B 0357