**23**

33 TXTLR 1                                                                    Page 2
(Cite as: 33 Tex. Tech L. Rev. 1)

Texas Tech Law Review
2001

**Articles**

**\*1 STEWARDSHIP FOR THE SICK: PRESERVING ASSETS FOR ASBESTOS VICTIMS THROUGH INACTIVE DOCKET PROGRAMS**

Mark A. Behrens [FNa1]
Monica G. Parham [FNa2]

Copyright © 2001 School of Law, Texas Tech University; Mark A. Behrens,

Monica G. Parham

I. Introduction

The bankruptcies in 2001 of Federal-Mogul Corp., USG Corp., W.R. Grace & Co., and G-I Holdings, Inc., formerly known as GAF Corp. ("GAF"), \*2 and the bankruptcies in 2000 of four otherwise solvent companies saddled with asbestos litigation-Babcock & Wilcox Co., Pittsburgh Corning Corp., Owens Corning, and Armstrong World Industries, Inc.-have once again highlighted the urgent need for creative and fair solutions to the national asbestos litigation problem. [FN1] Owens Corning, the company best known for its "Pink Panther" ads and Fiberglas insulation, went to great lengths to create an innovative National Settlement Program to address asbestos-related liability in an attempt to stay afloat. [FN2] The company threw in the towel, however, after plaintiffs' attorneys who did not enter into the settlement plan continued to bring suits and demand larger and larger payments. [FN3] "After settling about 240,000 claims for about $1.7 billion, [Owens Corning], seeing no relief coming, filed for bankruptcy." [FN4] Likewise, GAF believed its options were exhausted when "despite settling more than 500,000 claims to the tune of $1.5 billion, there was no ebb in the tide of personal-injury claims." [FN5] In fact, GAF's general counsel said there had been a "dramatic increase in the number of claims" against the company in 2000. [FN6]

It was the same story at W.R. Grace, which reported that the pace of asbestos claims being filed against the company had skyrocketed, "with 81% more claims filed in [2000] than in 1999." [FN7] In the fourth quarter of 2000, the number of claims filed against Grace "more than doubled over the year-earlier period, and the rate continued to accelerate in the first quarter" of 2001. [FN8] The chairman of Federal-Mogul, which manufactures engine bearings, pistons, gaskets, and seals for automobile makers and the spare-parts market, stated that "[t]he decision [to file for Chapter 11 protection] was based on the fact that asbestos liabilities were not going to diminish. In fact, they were going \*3 to grow." [FN9]

Other companies are likely to follow the lead of W.R. Grace, GAF, and Owens Corning, joining the over thirty employers "already in bankruptcy protection due to potential asbestos exposure." [FN10] Bankruptcy likely means the loss of management positions, as well as a possible stigma for the managers themselves. The employees of companies that go bankrupt also can pay a big price. Some employees will lose their jobs or have their salaries cut. Employees, including hundreds or thousands of hourly workers, can lose their investments in the company's stock. Other groups that have invested pension funds in the debtor's stock can lose. [FN11]

In addition, bankruptcies put "mounting and cumulative financial pressure on the remaining defendants [in asbestos

USG B 0358

cases], whose resources are limited." [FN12] They also jeopardize the ability of current and future claimants to obtain full and prompt compensation for their injuries. [FN13] As the United States Court of Appeals for the Third Circuit recently wrote: "The resources available to persons injured by asbestos are steadily being depleted. The continuing filings of bankruptcy by asbestos defendants disclose that the process is accelerating . . . . The continued hemorrhaging of available funds deprives current and future victims of rightful compensation." [FN14]

Serious concerns about the asbestos compensation system have existed for some time. [FN15] A decade ago, things had already reached such epidemic proportions that the Chief Justice of the United States Supreme Court appointed a special Ad Hoc Committee of the United States Judicial Conference to study the problem and recommend possible solutions. [FN16] The Ad Hoc Committee summarized the "most objectionable" aspects of the asbestos litigation environment as follows:
    Dockets in both Federal and State courts continue to grow; long delays are routine; trials are too long; the same issues are litigated over and over again; transaction costs exceed the victims' recovery by nearly two to one; *4 exhaustion of assets threatens and distorts the process; and future claimants may lose altogether. [FN17]

Unfortunately, in the years following the Ad Hoc Committee's report, "the already grim situation has deteriorated." [FN18] The number of asbestos- related matters filed in federal and state courts continues to spiral out of control. [FN19] The number of pending cases doubled in the six years from 1993 to 1999, from 100,000 cases to more than 200,000 cases throughout the country. [FN20]

The increasing caseload is not due to lack of trials and settlements; it is the result of a flood of new claims into the judicial system. [FN21] In the experience of just one company, Owens Corning had "been the target of 460,000 asbestos personal injury claims" from the beginning of the litigation to the time that the company filed for Chapter 11 protection in October of 2000. [FN22] From 1997 through 1999 new filings against some defendants ranged from 40,000 to over 60,000 per year. [FN23]

The substantial increase in the number of new asbestos claims does not correlate with either an increase in the number of individuals exposed to products containing asbestos, or with an increased prevalence in asbestos- related diseases. [FN24] Indeed, "[b]ecause of the increased awareness of dangers *5 and new government regulations, use of new asbestos essentially ceased in the United States in the early 1970's." [FN25] Yet, new asbestos filings "continue to skyrocket." [FN26]

The explosion is mostly due to new filings by unimpaired claimants [FN27]--"people who have been exposed to asbestos, and who (usually) have some marker of exposure such as changes in the pleural membrane covering the lungs, but who are not impaired by an asbestos-related disease and likely never will be." [FN28] Individuals who have little or no physical impairment now account for as much as eighty percent of all new asbestos-related filings. [FN29] Many of these claimants feel compelled to file lawsuits because of fears that state statutes of limitations will bar their claims if they do not file soon after the first markers of exposure become detectable. [FN30] As Dr. Louis Sullivan, *6 former Secretary of the Department of Health and Human Services, testified before Congress, there are "mass filings of cases on behalf of large groups of people who are not sick and may never become sick but who are compelled to file for remedial compensation simply because of state statutes of limitation." [FN31] As leading commentators have noted, however, "[w]hile there are understandable legal and emotional reasons why these premature suits are being filed in huge numbers, their presence on court dockets and in settlement negotiations inevitably diverts legal attention and economic resources away from the claimants with severe asbestos disabilities who need help right now." [FN32]

Mass filings by unimpaired claimants exacerbate the serious problems that plague the current asbestos compensation system. [FN33] These problems include the following: (1) the diversion of limited (and diminishing) resources away from claimants who are (or will be) sick to unimpaired, but earlier- filing, claimants; [FN34] (2) long delays caused by too many claims pouring into the tort system, and the desperate need for swift compensation for plaintiffs with substantial or even fatal impairments; [FN35] and (3) high transaction costs which waste resources that could be used to compensate sick claimants. [FN36] Inactive docket programs provide a solution to some of these problems. [FN37]

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

USG B 0359

Inactive docket programs, also known as deferral registries or pleural registries, are judicially-managed docketing systems that allow claims of impaired claimants to be heard more promptly by deferring the claims of *7 unimpaired claimants to an "inactive docket" until the individual develops an actual impairment. [FN38] These plans have obvious benefits for impaired claimants, who are able to move "to the front of the line" and not be forced to wait until earlier-filed unimpaired individuals are resolved. [FN39] Removing the long delays that are characteristic of many asbestos cases can be especially important to impaired claimants, [FN40] particularly if the individual has a fatal disease, such as mesothelioma, or is an older person, which is frequently the case. [FN41] Inactive docket programs also benefit unimpaired individuals by protecting their claims from being time-barred should an asbestos-related disease later develop. [FN42] This would address a primary engine driving the filing of many claims by unimpaired claimants. [FN43]

In addition, inactive docket programs conserve scarce financial resources that are needed to compensate sick claimants-resources that are now chewed up in discovery and in legal fees to litigate "claims that are premature (because there is not yet any impairment) or actually meritless (because there never will be)." [FN44] Plaintiffs and defendants would be relieved of such costs under an inactive docket plan because all discovery would be stayed until the claimant manifests impairment and his or her claim is removed from the inactive docket to the active trial docket. [FN45]

There are other benefits to inactive docket programs. By removing unimpaired claims from active dockets, these plans can reduce the specter of more employers being driven into bankruptcy, thereby helping to ensure that adequate resources remain for impaired claimants in the future. [FN46] Such docketing plans also may slow the increasing trend of "peripheral" defendants *8 being dragged into asbestos litigation. [FN47] These new defendants are diverse, ranging from oil companies to automobile manufacturers to small businesses; they have only attenuated connections to asbestos. [FN48] Courts, likewise relieved of having to address claims by the unimpaired, can dedicate greater resources to those most in need of judicial assistance-claimants truly impaired with asbestos-related diseases and other claimants in the tort system. [FN49] Unlike some reform proposals, under an inactive docket program, no plaintiff loses a cause of action; once someone becomes sick, his or her claim can proceed. [FN50]

This article provides an overview of inactive docket programs and summarizes the core components of such plans. [FN51] It also examines the experiences of the courts that have utilized inactive docket programs as a means of addressing the asbestos litigation crisis and proposes a model for wider application of these docketing systems. [FN52] This article concludes that properly managed inactive docket programs may provide an important partial solution to the ever-growing "elephantine mass of asbestos cases." [FN53]

## II. Key Components of Inactive Docket Programs

While details vary across jurisdictions, inactive docket programs generally contain the following elements: (1) a docketing procedure, wherein unimpaired claimants are put onto an inactive or deferred track, during which time applicable statutes of limitations are tolled and discovery is stayed; [FN54] (2) guidelines based on standard, objective medical criteria for assessing individual claimants to determine their medical status and providing for those claimants manifesting impairment to be removed from the inactive docket; [FN55] and (3) an ordering mechanism for cases removed from the inactive docket and placed on the active docket. [FN56]

### *9 A. Giving Priority to Impaired Claimants While Ensuring That Unimpaired Claimants Are Not Deprived of Their Right to Pursue Claims When They Get Sick

#### 1. Creating the Inactive Docket

The first step in establishing an inactive docket program is to determine which claims to initially place on the active and inactive dockets. [FN57] Perhaps because the majority of current filings involve unimpaired claimants, inactive docket plans generally start by placing all claimants on the inactive docket until impairment is established. [FN58] Another approach would be to allow claimants with mesothelioma to be placed directly on the active docket while

other claimants would be deferred until impairment is established. [FN59]

These approaches are preferable because they are the simplest and easiest to manage. This is important, since the goal of the inactive docket system is to minimize complexity and administrative costs. [FN60] However, one can imagine more complex systems that may involve multiple tracks. A more complex scheme might classify claims into the following four categories: (1) unimpairing conditions; (2) asbestosis and other non-malignant, impairing conditions; (3) mesothelioma; and (4) asbestos-related cancers. [FN61] These categories could be further refined by dividing some or all of them into several levels of impairment or defining them on the basis of multiple criteria. [FN62] The purposes of having an inactive docket plan militate against these complex approaches. [FN63]

### *10 2. Tolling Statutes of Limitations

As stated, many unimpaired claimants bring actions in order to prevent applicable statutes of limitation from running against their claims. [FN64] Given the latency period of many asbestos-related diseases, the applicable statute of limitation might well expire during the twenty to thirty-year period between exposure, the development of markers of exposure, and the onset of an asbestos-related disease. [FN65] Thus, the most important component of the inactive docket is the tolling of applicable statutes of limitations. [FN66]

### 3. Staying Discovery

Discovery should be held in abeyance while a claim remains on the inactive docket. [FN67] Precluding discovery serves the end of judicial efficiency by not clogging courts with the administrative minutiae of cases that may not be heard for years, decreases the financial impact on defendants of having to go through often repetitive rounds of discovery with unimpaired claimants, and allows unimpaired claimants to conserve their resources until such time as their condition has progressed to the level of impairment.

### B. Removal of Cases Based upon Objective Medical Finding of Impairment

A removal process, wherein cases may be moved to the active docket, should circumstances warrant such a move, is another key component of the inactive docket system. [FN68] The conditions under which removal is permitted should be clearly specified in any order creating an inactive docket. [FN69] Under the removal process, claimants should be permitted to move their cases from the inactive docket to the active docket only if they present credible medical evidence that their condition has progressed to the point of impairment according to objective medical criteria. [FN70] For the system to be successful, the *11 criteria must be enforced strictly. [FN71] If loopholes are permitted, the wall that is intended to exist between claims by impaired individuals on the active docket and claims of unimpaired individuals on the inactive docket will be little more than a cheesecloth that unimpaired claimants can pour through to become "activated." [FN72] Such a system would deplete assets needed to compensate sick claimants.

### C. Assigning a Place for Impaired Claimants Removed to the Active Docket

Once a previously inactive claim is removed to the active docket, the docketing plan must address the position that case should occupy on the active docket. [FN73] This ordering mechanism could take one of a number of forms. One approach would be to place those individuals most severely afflicted with an asbestos-related disease first in line. [FN74] Thus, an impaired claimant with mesothelioma would be placed in front of an impaired claimant with asbestosis. [FN75] Another approach would be to place the claim at the position it would have held on the active track if it had been placed on the track on the day the suit was originally filed. [FN76] Another possibility is to treat the activated claim the same as any other claim filed for the first time, whether based on an asbestos-related impairment or any other injury. [FN77] The claim would assume a place on the active docket consistent with other product liability and civil actions filed with the court that same day. [FN78]

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

III. Special Issues: Fear of Injury and Medical Monitoring Claims

Fear of injury (or infliction of emotional distress) and medical monitoring claims, which seek recovery in the absence of a present physical injury, may pose the "most serious practical obstacle" to the smooth and effective running of a sound inactive docket plan. [FN79] These claims present difficult public policy issues for a number of reasons. [FN80] First, as a general matter, the legitimacy of such claims is questionable and open to serious *12 debate. [FN81] These claims also present their own public policy concerns. [FN82] Second, claims seeking recovery in the absence of physical impairment go right to the "nettle of the problem"-these claims present the very issues that inactive docket programs exist to remedy. [FN83] Regardless of how one feels about fear of injury or medical monitoring claims, the unavoidable fact is that there is a limited amount of money available to compensate those individuals injured by asbestos, and that pool of funds may be exhausted at some point. [FN84] A respected scholar put it this way:

As between the claims of the already impaired and the claims of those who are not now (and may never become) sick, but who genuinely fear becoming so, society should accord higher priority to the former. The issue here is not the validity of some cancerphobia claims, but their temporal priority in the sequencing of litigation and in the distribution of resources to those who are injured and need relief. [FN85]

The crisis in the current system will only be exacerbated if fear of injury and medical monitoring claims are permitted. [FN86] People who suffer actual asbestos-related injuries may be unable to obtain basic compensation for their injuries if funds are further depleted for individuals who have no present physical injury, and may never become sick. [FN87] The funds that exist should go to those who are sick. [FN88] As one federal judge has explained:

There is little doubt that millions of people have suffered exposure to hazardous substances. Obviously, allowing individuals who have not suffered any demonstrable injury from such exposure to recover the costs of future medical monitoring in a civil action could potentially devastate the court system as well as defendants . . . . Allowing today's generation of exposed but uninjured plaintiffs to recover may lead to tomorrow's *13 generation of exposed and injured plaintiff's [sic] being remediless. [FN89]

In light of these concerns, jurisdictions adopting an inactive docket for asbestos cases should not recognize fear of injury or medical monitoring claims in the absence of impairment.

IV. Inactive Dockets Have Been Successful

Fortunately, inactive docket programs do not have to be developed out of wholecloth. There are a number of jurisdictions where the device is currently utilized with success, as discussed below.

A. Massachusetts

The Massachusetts Inactive Asbestos Docket was created in September of 1986 through an amendment to an order creating a statewide consolidated asbestos docket. [FN90] The docket was envisioned as a mechanism by which plaintiffs who had been diagnosed with asbestos-related pleural diseases could toll all applicable statutes of limitations regarding their claims, or the related claims of their families or estates, until their pleural conditions developed into either asbestosis or some type of malignancy. [FN91] Furthermore, while on the inactive docket, cases are exempt from discovery. [FN92]

The Massachusetts Inactive Docket does not specify criteria to be applied in determining whether a case should be moved from the Inactive to the Active Docket. [FN93] If, however, a claimant and counsel feel removal is warranted, they may file a complaint in the Consolidated Docket. [FN94] In cases where removal is not agreed to, the judge overseeing the Docket makes the final removal determination. [FN95] The judge tasked with overseeing the Inactive Docket has, however, made clear to all litigants that he expects pleural cases to be placed on the Inactive

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Docket in order to further the Docket's goal of reducing expenditures of court time and resources trying purely pleural actions. [FN96] Accordingly, there have been relatively few instances of contested removals. Indeed, while placement of pleural cases on the Inactive Docket is *14 not mandatory, most of the primary plaintiffs' counsel involved in Massachusetts state court litigation have opted to file substantially all of their pleural cases on the Inactive Docket. As a result, the number of cases on the Active Docket has been significantly reduced, as has the amount of money spent on settlements with unimpaired claimants.

### B. Cook County (Chicago), Illinois

The Circuit Court for Cook County, Illinois, led by Judge Dean M. Trafelet, likewise instituted a pleural registry system in March 1991. [FN97] In so doing, the court recognized that the current system posed problems for all litigants. [FN98] Plaintiffs and their attorneys filed cases involving no present impairment out of fear that the statute of limitations would expire before the plaintiffs' diseases progressed to a stage that was medically recognized as impaired. Defendants expended substantial sums appearing in and defending against such claims. [FN99]

Under the Cook County Plan, each claimant must file an Asbestos Personal Injury Information Sheet. [FN100] All cases in which an asbestos-related cancer or mesothelioma are alleged may proceed directly with the filing of a complaint on the Active Docket. [FN101] All claims registered by persons who claim a history of asbestos exposure and demonstrate objective asbestos-related physical findings (such as pleural plaques), but who either do not meet the minimum criteria for impairment as defined in the Order, or who have not manifested an asbestos-related cancer as described in the Order, are placed on the registry. [FN102] These claimants remain on the registry until and unless removed in accordance with procedures specified in the Order. [FN103] While on the registry, claims are exempt from discovery, and "shall not 'age' for any purpose." [FN104]

### *15 C. Baltimore, Maryland

The Circuit Court for Baltimore City established an Inactive Docket in 1992. [FN105] Under the order, every claim is initially placed on the Inactive Docket, though certain claims are eligible for immediate removal. [FN106] For a claim alleged to be eligible for removal from the Inactive Docket, either immediately upon filing or subsequently due to changed circumstances, claimant's counsel is required to file a Request for Removal and the documentation necessary to show that the claim meets the "minimum criteria for removal," as defined within the order. [FN107] A defendant has fourteen days to object to the removal of any claim or claims from the Inactive Docket. [FN108] If the court orders the removal of a claim from the Inactive Docket, the clerk of the court is directed to place the court on the active civil docket for Baltimore City, or transfer the matter to the appropriate jurisdiction. [FN109] All claims that are not specifically removed remain on the Inactive Docket. A claimant whose case has been assigned to the Inactive Docket for at least twenty-four months and who does not meet the minimum criteria for removal, but contends that he or she has a compensable asbestos- related injury, may file a Petition for Removal with the administrative judge of the Circuit Court for Baltimore City. [FN110] Any defendants objecting to removal are thereafter given an opportunity to respond. [FN111] Within thirty days of the expiration for filing responses, the administrative judge must enter an order which may, in the court's discretion, establish a discovery schedule and set a hearing date. [FN112] After the hearing, an administrative judge may select up to ten cases, depending on the number of petitioners, and place those cases on the active civil docket to establish a test case to determine whether the plaintiffs' conditions have met the "minimum criteria for removal" and constitute compensable injuries. [FN113]

### D. Federal Multidistrict Panel

Pursuant to the federal multidistrict litigation statute, the Judicial Panel on Multidistrict Litigation has transferred all asbestos personal injury *16 litigation in the federal courts to MDL No. 875 (the federal "MDL panel"). [FN114] The MDL panel is managed by Senior United States District Judge Charles R. Weiner of the Eastern District of Pennsylvania. [FN115]

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

While the MDL panel overseeing federal asbestos litigation did not establish an inactive docket per se, Judge Weiner did, through Administrative Order No. 3, implement a process prioritizing asbestos-related diseases for settlement purposes "to give a priority to malignancy, death and total disability cases where the substantial contributing cause is an asbestos- related disease or injury." [FN116] Under Administrative Order No. 3, a select number of cases were identified and placed into one of four disease categories. [FN117] In each case, plaintiff's counsel was required to have a written medical opinion by a board-certified specialist indicating that exposure to either asbestos or products containing asbestos was a contributing cause to the claimant's condition. [FN118] Cases in which the claimant suffered from mesothelioma or lung cancer were thereafter given priority with respect to review, settlement, or further litigation. [FN119] Through utilization of the ordering device, thousands of cases involving non-impaired claimants were dismissed without prejudice. [FN120] Accordingly, the plan that was established in Administrative Order No. 3 helped to meet the MDL court's goal of creating a device through which "broad based negotiations designed to reduce the docket backlog" could occur. [FN121]

## V. A Proposed Inactive Docket Plan for Courts or Legislatures

The attached proposed model inactive docket plan incorporates and expands upon many of the concepts embodied in inactive docket orders currently in place. [FN122] The plan would pass constitutional muster, [FN123] and could *17 be accomplished either by state trial courts (pursuant to their inherent authority to control their own dockets) [FN124] or through legislation at the federal or state levels.

Under the proposed model inactive docket plan, all asbestos claims would start on the inactive docket. [FN125] While on the inactive docket, the applicable statutes of limitations would be tolled, and discovery would be stayed. [FN126] This would address the current pressure on unimpaired claimants to bring early actions due to concerns about the running of state statutes of limitations. [FN127] It also would shorten delays for impaired claimants (as well as other claimants in the civil justice system), and reduce transaction costs in asbestos litigation. [FN128]

Through a petition and review process, all cases meeting objective medical criteria developed by the American Thoracic Society would be removed to the court's active docket. [FN129] This threshold assessment would ensure that all asbestos claims in the covered jurisdiction would be evaluated under the same medical standards, providing more accuracy and fairness for all involved. [FN130] Cases removed to the active docket would proceed as filed. [FN131]

## *18 VI. Conclusion

The recent bankruptcies of several large employers, and the fact that over thirty companies have declared bankruptcy due to asbestos liability costs, establishes that the current asbestos compensation system is broken and badly in need of an immediate fix. [FN132] The system is overburdened and continues to worsen as more claims pour in. [FN133] Current asbestos litigation is also too costly, and contains incentives that reflect unsound public policy. [FN134]

Unimpaired claimants feel compelled to file actions because of fears that statutes of limitations will bar their claims if they do not file soon after the first markers of exposure become detectable. [FN135] These claims exacerbate the serious problems that exist in the asbestos tort system. [FN136] As new claims flood into the courts, they cause further delays for persons with substantial or even fatal impairments that may have an urgent need for compensation. [FN137] Claims by the unimpaired also waste resources that should be used to compensate sick claimants. [FN138]

Inactive docket programs provide a fair and sound partial solution to some of the most serious problems in the current asbestos compensation system. [FN139] These dockets exist in a number of jurisdictions and have been successful. [FN140] Often, they have been developed in cooperation with both plaintiff and defense counsel. [FN141] We propose a model inactive docket program that draws strong support from these plans. [FN142] Our model plan permits courts to manage the increasing burden of asbestos litigation. [FN143] The plan could be

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

33 TXTLR 1
(Cite as: 33 Tex. Tech L. Rev. 1)

accomplished either by state trial courts utilizing their inherent authority to control their own dockets, or through federal or state legislation. [FN144]

The plan focuses judicial resources, as well as the resources of asbestos defendants, on matters involving individuals who are actually impaired due to asbestos exposure. [FN145] At the same time, the model plan protects unimpaired claimants by tolling the applicable statutes of limitation for any case placed on the inactive docket; this is to ensure that timely filed claims are not *19 barred. [FN146] Transaction costs would be reduced on premature or meritless claims because discovery would be stayed for all claims on the inactive docket. [FN147] Once impairment is established pursuant to fair and accurate scientifically accepted medical criteria, claimants would be able to remove their claims from the inactive docket to the active docket, where they would proceed as filed. [FN148]

*20 APPENDIX--MODEL INACTIVE DOCKET PROPOSAL
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

[FNa1]. Mark A. Behrens is a partner in the law firm of Shook, Hardy & Bacon L.L.P. in Washington, D.C., and an Adjunct Professorial Lecturer in Law at The American University, Washington College of Law. He received his B.A. in Economics in 1987 from the University of Wisconsin-Madison and his J.D. in 1990 from Vanderbilt University, where he served as Associate Articles Editor of the Vanderbilt Law Review.

[FNa2]. Monica G. Parham is Of Counsel at the law firm of Crowell & Moring LLP in Washington, D.C. She received her B.A. in Political Science with Honors and Distinction and Phi Beta Kappa from the University of North Carolina at Chapel Hill in 1990 and her J.D. in 1993 from Yale Law School, where she served as a Senior Editor of the Yale Law and Policy Review.

[FN1]. See Mark D. Plevin & Paul W. Kalish, What's Behind the Recent Wave of Asbestos Bankruptcies?, 16 Mealey's Litig. Rep.: Asbestos, No. 6., Apr. 20, 2001; Asbestos Liability System Needs Immediate Overhaul, Nat'l Underwriter, Apr. 9, 2001, at 18; Patricia Callahan, USG Files for Chapter 11 After Referring to Senate's Power Shift as Latest Setback, Wall St. J., June 26, 2001, at A4; Quenna Sook Kim, Firms Hit by Asbestos Litigation Take Bankruptcy Route, Wall St. J., Dec. 21, 2000, at B4; Quenna Sook Kim, G-I Holdings' Bankruptcy Filing Cites Exposure in Asbestos Cases, Wall St. J., Jan. 8, 2001, at B12; Mitchell Pacelle, Federal-Mogul Files in Bankruptcy Court After Estimate for Asbestos Liability Soars, Wall St. J., Oct. 2, 2001, at B11; Mark D. Plevin et al., Don't Bankrupt Asbestos, Legal Times, Mar. 19, 2001, at 68; Susan Warren, W.R. Grace Seeks Bankruptcy Protection In the Face of Asbestos- Related Litigation, Wall St. J., Apr. 3, 2001, at B8.

[FN2]. See Kim, Firms Hit by Asbestos Litigation Take Bankruptcy Route, supra note 1, at B4.

[FN3]. See Joseph B. White & Jim VandeHei, Owens Corning Files for Chapter 11, Citing Escalating Asbestos-Liability Claims, Wall St. J., Oct. 6, 2000, at A3.

[FN4]. Kim, Firms Hit by Asbestos Litigation Take Bankruptcy Route, supra note 1, at B4.

[FN5]. See Kim, G-I Holdings' Bankruptcy Filing Cites Exposure in Asbestos Cases, supra note 1, at B12.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

[FN6]. Id.

[FN7]. Warren, supra note 1, at B8; see also Susan Warren, Grace Considers Chapter 11 Filing Amid Rising Asbestos Litigation, Wall St. J., Jan. 30, 2001, at A4 (noting a substantial increase "in asbestos related injury claims in 2000 over 1999").

[FN8]. Warren, supra note 1, at B8.

[FN9]. Pacelle, supra note 1, at B11.

[FN10]. See Gregory Zuckerman, Specter of Costly Asbestos Litigation Haunts Companies, Wall St. J., Dec. 27, 2000, at C1; Federal-Mogul Corp. Declares Bankruptcy, Cites Asbestos Suits, 23 No. 2, Andrews Asbestos Litig. Rep. 3 (Oct. 11, 2001).

[FN11]. See Dunn v. Hovic, 1 F.3d 1371, 1403 (3d Cir.) (Weis, J., dissenting), modified in part, 13 F.3d 58 (3d Cir. 1993); Patrick J. Hagan et al., Totalling Up the Costs of Asbestos Litigation: Guess Who Will Pay the Price, 9 Temp. Envtl. L. & Tech. J. 1, 14 (1990).

[FN12]. Christopher F. Edley, Jr. & Paul C. Weiler, Asbestos: A Multi- Billion-Dollar Crisis, 30 Harv. J. on Legis. 383, 392 (1993).

[FN13]. Id. at 393.

[FN14]. In re Collins, 233 F.3d 809, 812 (3d Cir. 2000), cert. denied sub nom. Collins v. Mac-Millan Bloedel, Inc., 121 S. Ct. 2216 (2001).

[FN15]. See generally Judicial Conference Ad Hoc Committee on Asbestos Litigation, Report to the Chief Justice of the United States and Members of the Judicial Conference of the United States (Mar. 1991) [hereinafter "Judicial Conference Report"].

[FN16]. See id.

[FN17]. Id. at 2-3.

[FN18]. Fairness in Asbestos Compensation Act of 1999: Hearing on H.R. 1283 Before the House Comm. on the Judiciary, 106th Cong. 29 (July 1, 1999) (testimony of Christopher Edley, Jr., Professor, Harvard Law School) [hereinafter Prof. Edley Testimony]; see also id. at 79 (quoting Dean Paul R. Verkuil, Cardozo Law School: "The rate of new filings and the growing number of pending cases vividly demonstrate a basic fact-the asbestos litigation problem is not getting better, it is getting worse.") [hereinafter Verkuil Testimony].

[FN19]. See Patricia G. Houser & David T. Austern, Manville Personal Injury Settlement Trust, in Mealey's

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Asbestos Conference 416 (1999) (showing that 500,000 claims are estimated to be filed against the Manville Personal Injury Settlement Trust over the next 50 years).

[FN20]. Prof. Edley Testimony, supra note 18, at 4. This figure may be conservative. See H.R. Rep. No. 106-782, at 18 (2000) (citing SEC filings). In their Form 10Q filings "with the Securities and Exchange Commission for the third quarter of 1999, Armstrong World Industries reported 182,000 pending claims, GAF Corporation reported 114,000, USG Corporation reported 100,000, W.R. Grace & Co. reported 102,894, and Kaiser Aluminum reported 110,599." Id. at 18 n.7. During the first nine months of 2000, the Manville Trust- established as part of Johns Manville's bankruptcy reorganization plan after that company sought bankruptcy protection in the early 1980s-received 39,500 new claims, which was more than the total annual filings in 1999. See Manville Personal Injury Settlement Trust Report (Oct. 30, 2000), reprinted in 11 Andrews' Asbestos 4 (Nov. 9, 2000).

[FN21]. See H.R. Rep. No. 106-782, at 18 (2000) (stating that "the rate of settlements and trials was not keeping up with new filings"); see also Judicial Conference Report, supra note 15, at 8 (noting that in 1991, in the federal system, nearly two new asbestos actions were filed for every action terminated).

[FN22]. See White & VandeHei, supra note 3, at A3.

[FN23]. See H.R. Rep. No. 106-782, at 18 (2000). Armstrong World Industries reported receiving 40,200 new claims for the first three quarters of 1999 and 71,000 claims for all of 1998. Id. at 18-19 n.8. Kaiser Aluminum reported 29,700 new claims for the first three quarters of 1999 and 22,900 claims for 1998. Id. GAF Corporation reported 42,200 new claims during the first three quarters of 1999, and W.R. Grace & Co. reported 20,629 new claims during that same period. Id.

[FN24]. See In re Joint E. & S. Dist. Asbestos Litig., 129 B.R. 710, 737 (Bankr. E. & S.D.N.Y. 1991), vacated, 982 F.2d 721 (2d Cir. 1992), opinion modified on reh'g, 993 F.2d 7 (2d Cir. 1993).

[FN25]. See id. Almost immediately after its creation in 1970, the Occupational Safety and Health Administration (OSHA) promulgated an initial regulation limiting asbestos exposure. See 36 Fed. Regs. 10,466, 10,506 (table G-3) (May 29, 1971) (codified at 29 C.F.R. § 1910). Soon thereafter, OSHA revised its regulations to limit asbestos exposure even further and to require special handling of asbestos products. See 36 Fed. Reg. 23,207 (Dec. 7, 1971) (emergency temporary standard); 37 Fed. Reg. 11,318 (June 7, 1972) (final standard) (codified at 29 C.F.R. § 1910). OSHA's asbestos regulations became progressively more restrictive, effectively precluding the use of asbestos in most commercial applications. See also American College of Chest Physicians, Statement on the Principles of Asbestos Litigation, at http:// www.chestnet.org/public.affairs/asbestos.html (last visited Feb. 14, 2001) (stating that "presently, the risk of asbestos exposure is negligible").

[FN26]. See Prof. Edley Testimony, supra note 18, at 5.

[FN27]. See Joint E. & S. Dists. Asbestos Litig., 129 B.R. at 748 (working in conjunction with unions, plaintiffs' lawyers have "arranged through the use of medical trailers and the like to have x-rays taken of thousands of workers without manifestations of disease and then filed complaints for those that had any hint of pleural plaques"); Eagle-Picher Indus., Inc. v. Am. Employers' Ins. Co., 718 F. Supp. 1053, 1057 (D. Mass. 1989) ("[M]any of these cases result from mass x-ray screenings at occupational locations conducted by unions and/or plaintiffs' attorneys, and many claimants are functionally asymptomatic when suit is filed."); Asbestos Litigation Crisis in Federal and State Courts: Hearings Before the Subcomm. on Intellectual Property and Judicial Administration of the House Comm. on

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

USG B 0367

33 TXTLR 1
(Cite as: 33 Tex. Tech L. Rev. 1)

the Judiciary, 102d Cong., 1st & 2d Sess. 100 (Oct. 24, 1991) (testimony of Professor Brickman) ("The existence of tens of thousands of such claims is accounted for by mass screenings of industrial workers financed by plaintiffs' lawyers and usually done with the active assistance of local union officials. Often, mobile x-ray vans brought to plant sites are used for the screenings."). See also Patrick Lysaught, Forces Shaping Mass Tort Litigation: Strategies for Defense Counsel, 67 Def. Couns. J. 165, 165 (Apr. 2000) (noting the growing use of the Internet by plaintiffs' lawyers to recruit new asbestos claimants).

[FN28]. Prof. Edley Testimony, supra note 18, at 5; see also In re Hawaii Fed. Asbestos Cases, 734 F. Supp. 1563, 1567 (D. Haw. 1990) (finding that "[i]n virtually all pleural plaque and pleural thickening cases, plaintiffs continue to lead active, normal lives, with no pain or suffering, no loss of the use of an organ or disfigurement due to scarring"); Richard Doll & Julian Peto, Asbestos: Effects on Health of Exposure to Asbestos 2 (1985) (stating that, "[t]he benign conditions of the pleura that are produced by asbestos are seldom of any lasting importance").

[FN29]. See Kim, G-I Holdings' Bankruptcy Filing Cites Exposure in Asbestos Cases, supra note 1, at B12 (reporting that "as many as 80% of [G-I Holdings'] asbestos settlements are paid to unimpaired people"); see also Eagle-Picher Indus., 718 F. Supp. at 1057 (stating that "many claimants are functionally asymptomatic when suit is filed"); Lester Brickman, The Asbestos Litigation Crisis: Is There a Need for an Administrative Alternative?, 13 Cardozo L. Rev. 1819, 1853 (1992) (stating that claims by the unimpaired "account[ed] for 60-70% of new asbestos claims filed").

[FN30]. See James S. Kakalik et al., Variation in Asbestos Litigation Compensation and Expenses 5 (Rand Inst. for Civil Justice ed., 1984). The period of time between the appearance of the first markers of asbestos exposure and the onset of asbestos-related impairments is often lengthy. See id. "Generally, 15 to 40 years elapse between asbestos exposure and disease manifestation." Id.

[FN31]. Fairness in Asbestos Compensation Act of 1999: Hearing on H.R. 1283 Before the House Comm. on the Judiciary, 106th Cong. 43 (July 1, 1999) (statement of Louis Sullivan, M.D., Immediate Past Secretary, Department of Health and Human Services) [hereinafter "Sullivan Testimony"]; see also John A. Siliciano, Mass Torts and the Rhetoric of Crisis, 80 Cornell L. Rev. 990, 1011 (1985) ("[P]erhaps anticipating the impact of statutes of limitation and the single judgment rule on [asbestos] claims should harm materialize [in plaintiffs] in the future, or perhaps bewitched by the idea of recovery for the mere fear of future illness, courts left the gate open and the caseloads surged.").

[FN32]. Edley & Weiler, supra note 12, at 393; see also In re Asbestos Prod. Liab. Litig. (No. VI), 1996 WL 539589, at *1 (E.D. Pa. Sept. 16, 1996) (stating that "[o]nly a small percentage of the cases filed have serious asbestos-related afflictions" and, as a result, they "are prone to be lost in the shuffle with pleural and other non-malignancy cases").

[FN33]. See Asbestos Prod. Liab. Litig. (No. VI), 1996 WL 539589, at *1.

[FN34]. See Edley & Weiler, supra note 12, at 393 (stating that "up to one half of asbestos claims are now being filed by people who have little or no physical impairment and that many of these claims produce substantial payments (and substantial costs) even though the individual litigants will never become impaired"); see also In re Joint E. & S. Dist. Asbestos Litig., 129 B.R. 710, 935 (Bankr. E. & S.D.N.Y. 1991) (indicating pleural claims accounted for 54.4% of all claims involving the Manville Trust).

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

33 TXTLR 1
(Cite as: 33 Tex. Tech L. Rev. 1)

[FN35]. See H.R. Rep. No. 106-782, at 10 (2000).

[FN36]. See Joint E. & S. Dist. Asbestos Litig., 129 B.R. at 749 (estimating that, by 1991, transaction costs will represent 70% of all funds expended in asbestos litigation while only 30% of the funds will be used to compensate victims).

[FN37]. See Peter H. Schuck, The Worst Should Go First: Deferral Registries in Asbestos Litigation, 15 Harv. J.L. & Pub. Pol'y 541, 542 (1992).

[FN38]. Id.

[FN39]. See In re Patenaude, 210 F.3d 135, 139 (3d Cir. 2000), cert. denied, 531 U.S. 1011 (2000) (stating that "the sick and dying, [and] their widows and survivors should have their claims addressed first") (citation omitted).

[FN40]. See Judicial Conference Report, supra note 15, at 11 (stating that the average duration of asbestos cases exceeds other types of cases).

[FN41]. See Kakalik, supra note 30 (noting that the average asbestos claimant surveyed was 57 years old).

[FN42]. See supra notes 38-39 and accompanying text.

[FN43]. See In re Asbestos Cases, 586 N.E.2d 521, 523 (Ill. App. 1991) (acknowledging that many currently unimpaired claimants nonetheless bring asbestos-related claims "because they are aware of the latent and progressive nature of asbestos-related disease, and because they fear that their claims might be barred by the statute of limitations if they wait until such time, if ever, that their asbestos-related condition progresses to disability").

[FN44]. Schuck, supra note 37, at 555; see also Ortiz v. Fibreboard Corp., 527 U.S. 815, 821 n.1 (1999) (stating that "transaction costs exceed the victims' recovery by nearly two to one"); id. at 867 (Breyer, J., dissenting) (repeating the fact that "of each dollar that asbestos defendants pay, those costs consume an estimated 61 cents, with only 39 cents going to victims"); Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 632 (1997) (Breyer, J., concurring in part and dissenting in part) (noting the disparity in costs expended compared to payments made to victims).

[FN45]. See Schuck, supra note 37, at 555.

[FN46]. See supra note 1 and accompanying text.

[FN47]. See Susan Warren, Asbestos Suits Target Makers of Wine, Cars, Soups, Soaps, Wall St. J., Apr. 12, 2000, at B1; The Asbestos Blob, Wall St. J., July 2, 2001, at A14.

[FN48]. See Warren, supra note 47, at B1; see also Richard B. Schmitt, How Plaintiffs' Lawyers Have Turned Asbestos Into a Court Perennial, Wall St. J., Mar. 5, 2001, at A1 (discussing how many "household names" have

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

USG B 0369

33 TXTLR 1
(Cite as: 33 Tex. Tech L. Rev. 1)

become defendants in asbestos litigation); Lawyers Torch the Economy, Wall St. J., Mar. 6, 2001, at A14 (stating that "the net has spread from the asbestos makers to companies far removed from the scene of any putative wrongdoing").

[FN49]. See discussion infra Part II.

[FN50]. See discussion infra Part II.A.2.

[FN51]. See discussion infra Part II.

[FN52]. See discussion infra Parts IV, V.

[FN53]. See Ortiz v. Fibreboard Corp., 527 U.S. 815, 821 (1999); see also infra Part V, VI (providing a proposed model inactive docket plan as a problem-solving device).

[FN54]. See discussion infra Part II.A.

[FN55]. See discussion infra Part II.B.

[FN56]. See discussion infra Part II.C.

[FN57]. See Schuck, supra note 37, at 571.

[FN58]. See id.

[FN59]. See Fairness in Asbestos Compensation Act of 1999: Hearing on H.R. 1283 Before the House Comm. on the Judiciary, 106th Cong. 44 (1999) (written statement of Alex G. Little, M.D., past president, American College of Chest Physicians, in support of H.R. 1283). Mesothelioma "is usually associated with a history of asbestos exposure"; whereas "[l]ung cancer has several known causes" and "[c]onsiderable evidence exists to suggest that such 'other' cancers in fact are not caused by asbestos." Id.

[FN60]. See Schuck, supra note 37, at 572.

[FN61]. See H.R. 1283, 106th Cong. (1999). Similar criteria were incorporated into legislation that came out of the United States House Committee on the Judiciary in 1999. See H.R. Rep. No. 106-782, at 7-8 (2000). However, the proposed legislation did not place unimpaired claimants into a separate category. See id. Rather, it placed claimants into one of four categories with varying levels of compensation due to each, namely the following: (1) non-malignant conditions, principally asbestosis; (2) mesothelioma; (3) lung cancer; and (4) certain other cancers, such as colorectal cancer. Id. at 11-12. A claimant who did not meet these standards by default fell outside of the legislation's compensation scheme, and was thus, for purposes of the legislation, unimpaired. See id. Within these broader categories, specific medical standards would be required, such as decreases in respiratory capacity as a result of

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

asbestos exposure, clinical evidence of disease through utilization of chest x-rays and similar devices, pathological examination of lung or other relevant tissue, and in some instances, statements by qualified physicians that asbestos-related changes were a substantial contributing factor in causing pulmonary function abnormalities. See id.

[FN62]. See Schuck, supra note 37, at 570-71.

[FN63]. See id. at 572.

[FN64]. See supra note 43.

[FN65]. See supra note 30 and accompanying text.

[FN66]. See Sullivan Testimony, supra note 31, at 43 (stating that waiver of statutes of limitation, "is one of the most important policy aspects to ensure that individuals suffering from asbestos-related illnesses receive fair and adequate compensation").

[FN67]. See Schuck, supra note 37, at 571 n.116.

[FN68]. See id. at 572.

[FN69]. See, e.g., app. infra pp. 20-25.

[FN70]. See American College of Chest Physicians, Statement, supra note 25 (stating that uniform criteria is needed to distinguish, "insofar as is scientifically and medically feasible, those individuals suffering from present asbestos-related impairment from those individuals who, although they have been exposed to asbestos, do not now suffer from asbestos-related impairment"). Organizations such as the American College of Chest Physicians, one of the largest organizations of chest physicians in the world with over 15,000 members specializing in cardiopulmonary health, have supported the utilization of uniform medical criteria to ensure equitable treatment of individuals exposed to asbestos. See id.

[FN71]. See id.

[FN72]. See id.

[FN73]. See app. infra pp. 20-25.

[FN74]. See, e.g., In re Asbestos Prod. Liab. Litig. (No. VI), MDL 875, Administrative Order No. 3 (E.D. Pa.) (Sept. 8, 1992) (Weiner, J.) [hereinafter Admin. Order No. 3].

[FN75]. See id.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

USG B 0371

[FN76]. See, e.g., Schuck, supra note 37, at 572.

[FN77]. See id.

[FN78]. See id.

[FN79]. Id. at 575.

[FN80]. See, e.g., Temple-Inland Prods. Corp. v. Carter, 993 S.W.2d 88 (Tex. 1999).

[FN81]. See Metro-North Commuter R.R. v. Buckley, 521 U.S. 424, 444 (1997) (holding in part, that under the Federal Employers' Liability Act, a railroad worker who had been exposed to asbestos, but had no present physical disease, could not recover medical monitoring costs as a separate injury); id. at 430 (rejecting "fear of disease" claim brought by a person who was exposed to asbestos, but had no physical injury); Mark A. Behrens & Phillip R. Anderson, State Supreme Courts Retreat from Medical Monitoring Causes of Action, L.J. Newsletters Prod. Liab. L. & Strategy, Vol. XX, No. 5, Nov. 2001, at 1.

[FN82]. See, e.g., Terry C. Gay & Paige F. Rosato, Combating Fear of Future Injury and Medical Monitoring Claims, 61 Def. Couns. J. 554, 562 (1994); George W. C. McCarter, Medical Sue-Veillance: A History and Critique of the Medical Monitoring Remedy in Toxic Tort Litigation, 45 Rutgers L. Rev. 227, 283 (1993); Victor E. Schwartz et al., Medical Monitoring-Should Tort Law Say Yes?, 34 Wake Forest L. Rev. 1057 (1999).

[FN83]. See Schuck, supra note 37, at 575.

[FN84]. See id.

[FN85]. Id. at 575-76.

[FN86]. See id.

[FN87]. See id.

[FN88]. See id.

[FN89]. Ball v. Joy Mfg. Co., 755 F. Supp. 1344, 1372 (S.D. W. Va. 1990), aff'd, 958 F.2d 36 (4th Cir. 1991).

[FN90]. See Commonwealth of Mass., Middlesex Superior Court, "Massachusetts State Court Asbestos Personal Injury Litigation Order," Sept. 1986 (on file with the authors).

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

USG B 0372

[FN91]. See id.

[FN92]. See id. Similarly, pleural cases originally filed on the consolidated docket may be transferred to the inactive docket on plaintiff's motion and thereafter become subject to all of the same provisions and requirements as cases originally filed on the inactive docket. See id.

[FN93]. See id.

[FN94]. Id.

[FN95]. Id.

[FN96]. Id.

[FN97]. See In re Asbestos Cases (Cir. Ct., Cook Cty., Ill. Mar. 26, 1991) (Order to Establish Registry for Certain Asbestos Matters) (on file with the authors).

[FN98]. Id. at 2-3.

[FN99]. Id.

[FN100]. Id. at 7. All claims must be filed individually, as the Order prohibits claims on behalf of groups of classes of claimants. Id. at 15.

[FN101]. Id. at 8.

[FN102]. Id.

[FN103]. Id. at 10. Cases are removed in two ways, the first essentially permits dismissal of an action, and the second is designed to encompass a change in the claimant's medical condition. Id. A claimant may be voluntarily removed from the registry upon filing a certificate by counsel stating that the claimant is withdrawing his or her claims. Id. Thereafter, the tolling of pertinent timeliness provisions ceases. Id. A case may also be removed pursuant to the filing of a Request for Removal, along with accompanying documents and medical certifications establishing impairment. Id. Defendants have the opportunity to  object to removal; however, the court makes the ultimate removal determination. Id. at 12. Once removal has been approved, the claimant proceeds to file a complaint on the Active Docket. Id.

[FN104]. Id. at 14-15.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

USG B 0373

[FN105]. See In re Asbestos Personal Injury and Wrongful Death Asbestos Cases, File No. 92344501 (Cir. Ct. Baltimore City, Md. Dec. 9, 1992) (Order Establishing an Inactive Docket for Asbestos Personal Injury Cases) (on file with the authors).

[FN106]. Id.

[FN107]. Id. at 8.

[FN108]. Id.

[FN109]. Id.

[FN110]. Id. at 10.

[FN111]. Id. at 10-11.

[FN112]. Id. at 9.

[FN113]. Id. at 10-11.

[FN114]. See 28 U.S.C. § 1407(a) (1993).

[FN115]. See Admin. Order No. 3, supra note 74.

[FN116]. Id. at 1. As the Third Circuit explained, Administrative Order No. 3 established that "in attempting to resolve cases through negotiation, cases of mesothelioma and lung cancer with asbestosis will be addressed. . . on a priority basis." In re Patenaude, 210 F.3d 135, 140 (3d Cir. 2000). The order also reflected the court's ultimate goal of establishing an inactive docket covering cases that involved non-malignant conditions other than asbestosis. Id.

[FN117]. Admin. Order No. 3, supra note 74, at 1. The disease categories were: (1) mesothelioma, living and deceased; (2) lung cancer, living and deceased; (3) other malignancies, living and deceased; and (4) asbestosis, total disability deceased or total disability living. Id.

[FN118]. Id.

[FN119]. See id.

[FN120]. See In re Asbestos Prod. Liab. Litig. (No. VI), MDL 875, Order of Oct. 16, 1997 (E.D. Pa.) (dismissing

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

approximately 3,200 non-impairment claims without prejudice with all applicable statutes of limitation tolled).

[FN121]. See Admin. Order No. 3, supra note 74.

[FN122]. See Appendix infra pp. 20-25.

[FN123]. The constitutional underpinnings of inactive dockets have been well-documented by one of the principal commentators in the area. See Schuck, supra note 37, at 587-93 (discussing how inactive docket plans comport with the right to a jury trial, full access to the courts, due process, takings issues, equal protection, and overall federalism concerns). See also Verkuil Testimony supra note 18, at 17-36 (discussing constitutional aspects of proposed federal asbestos litigation).

[FN124]. See Burns v. Celotex Corp., 587 N.E.2d 1092, 1094 (Ill. App. Ct. 1992) (holding that the order invoking provisions of Cook County's deferred docket order was "a traditional exercise of the court's authority to control its docket"). In re Asbestos Cases, 586 N.E.2d 521, 524 (Ill. App. Ct. 1991) (dismissing challenge to Cook County, Illinois' inactive docket and finding that "the registry is a tool whereby the court may prioritize the litigation of cases already filed and [is] an example of the court exercising its inherent authority to control its docket); see generally Landis v. N. Am. Co., 299 U.S. 248, 254-55 (1936) (discussing a court's inherent power to control its docket pursuant to its own judgment).

[FN125]. See Appendix infra p. 21.

[FN126]. See Appendix infra pp. 21, 23.

[FN127]. See Appendix infra p. 20.

[FN128]. See Appendix infra p. 20.

[FN129]. See Appendix infra p. 21.

[FN130]. See Admin. Order No. 3 supra note 74, at 1. Utilization of uniform, standard, generally accepted scientific and medical criteria also comports with the United States Supreme Court's admonition that courts act as "gatekeepers" against "junk" science. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 596-97 (1993); see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150-53 (1999) (holding that the Daubert factors do not apply just to scientists but also to engineers and other experts). The use of pseudo or "junk" science has been a particular problem in asbestos litigation. See In re Hawaii Fed. Asbestos Cases, 734 F. Supp. 1563, 1566 (D. Haw. 1990) (noting that asbestos-related cases were often diagnosed based on "subjective declarations of shortness of breath, tiredness and general lassitude" rather than objective clinical findings); Raymark Indus. Inc. v. Stemple, No. 88-1014-K, 1991 WL 100820 (D. Kan. May 6, 1991) (finding that medical screeners routinely disregarded standards set by the American Thoracic Society and reported asbestos-related injuries despite the fact that their screenings had no clinical significance).

[FN131]. See Appendix infra p. 21.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

[FN132]. See supra notes 1-10 and accompanying text.

[FN133]. See supra notes 12-23 and accompanying text.

[FN134]. See supra notes 12-17, 27-32 and accompanying text.

[FN135]. See supra notes 27-36 and accompanying text.

[FN136]. See supra notes 27-36 and accompanying text..

[FN137]. See supra note 38 and accompanying text.

[FN138]. See supra note 44 and accompanying text.

[FN139]. See supra notes 45-50 and accompanying text.

[FN140]. See discussion supra Part IV.A-D.

[FN141]. See supra text accompanying notes 94-95.

[FN142]. See discussion supra Part V.

[FN143]. See discussion supra Part V.

[FN144]. See supra note 124 and accompanying text.

[FN145]. See discussion supra Part II.A.1.

[FN146]. See discussion supra Part II.A.2.

[FN147]. See discussion supra Part II.A.3.

[FN148]. See discussion supra Part II.B.

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

USG B 0376

33 TXTLR 1
(Cite as: 33 Tex. Tech L. Rev. 1)

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

USG B 0377