IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | |
| | : | **Chapter 11** |
| **USG CORPORATION,** | : | |
| a Delaware corporation, et al., | : | **Jointly Administered** |
| | : | **Case No. 01-2094 (JKF)** |
| **Debtors.** | : | |
| | : | |
| _____ | : | |
| | : | |
| **USG CORPORATION, et al.,** | : | |
| | : | |
| **Movant** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **OFFICIAL COMMITTEE OF ASBESTOS** | : | **Civil Action No. 04-1559 (JFC)** |
| **PERSONAL INJURY CLAIMANTS,** | : | **Civil Action No. 04-1560 (JFC)** |
| **OFFICIAL COMMITTEE OF** | : | |
| **UNSECURED CREDITORS, OFFICIAL** | : | |
| **COMMITTEE OF ASBESTOS** | : | |
| **PROPERTY DAMAGE CLAIMANTS AND** | : | |
| **LEGAL REPRESENTATIVE FOR** | : | |
| **FUTURE CLAIMANTS,** | : | |
| | : | |
| **Respondents.** | : | |

**JOINT REPORT OF PARTIES ON PROPOSED DISCOVERY SCHEDULES AND
DEADLINES**

| | |
|---|---|
| COOLEY GODWARD LLP | RICHARDS, LAYTON, & FINGER, P.A. |
| Stephen C. Neal (CA 170085) | Daniel J. DeFranceschi (DE No. 2732) |
| Scott D. Devereaux (CA 146050) | Paul N. Heath (DE No. 3704) |
| Five Palo Alto Square | One Rodney Square |
| 3000 El Camino Real | P.O. Box 551 |
| Palo Alto, CA 94306 | Wilmington, Delaware 19899 |
| Tel: (650) 843-5000 | Tel: (302) 651-7700 |

JONES DAY
David G. Heiman (OH 0038271)
Brad B. Erens (IL 6206864)
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Tel: (216) 586-3939
_Counsel for Debtors_

The Debtors and the official committees exchanged initial disclosures, as ordered by the Court, on July 14, 2005. Since that time the parties have met and conferred regarding an appropriate schedule for conducting the discovery that the parties believe is necessary. The parties have been unable to reach agreement. Instead, two competing proposals have emerged. The first is a proposal by Debtors, the Equity Committee and the Unsecured Creditors Committee (referred to herein as "Debtors' Proposal"). The second proposal is by the Asbestos Claimants Committee ("ACC") and the Future Claimants Representative ("FCR") (referred to herein as "ACC/FCR Proposal").

Details of each proposal are presented below. While the parties jointly file this document, the parties do not agree with the positions set forth in the discussion of the competing proposals.

## I.    OVERALL DISCOVERY SCHEDULE

### A.    Debtor's Proposal

Debtors approach this process cognizant of the Court's admonition at the June 13, 2005 hearing that the whole discovery process should take no more than six months. (Transcript of June 13, 2005 hearing at 67-68.) To that end, Debtors propose an aggressive but realistic schedule designed to accommodate the needs of all parties. Pursuant to Debtors' Proposal, all fact and expert discovery will be complete on **April 28, 2006**. (A list of critical dates in Debtors' Proposal is submitted herewith as Exhibit 1). Pursuant to the ACC/FCR's Proposal, if no discovery is taken of personal injury claimants, discovery will be complete on **August 22, 2006**. If discovery of the personal injury claimants is permitted, as Debtors intend, then the ACC and FCR have no proposed schedule by which discovery would be complete. The failure to offer any date for the close of discovery if claimant discovery is permitted has effectively foreclosed a

-1-

reasonable meet and confer process in advance of the joint filing. Similarly, the other "conditional" negotiating positions of the ACC listed in section B below—i.e. the August 22, 2006 deadline is only proposed on the condition that Debtors concede a waiver of the attorney-client privilege and work product protection—made it impossible to meet the Court's directive that the parties agree on a joint schedule.

**B.    ACC/FCR's Proposal**

The most significant differences between the discovery plans proposed by the Debtors and the ACC/FCR relate to: (i) the relevance of discovery directed to individual claimants in the form of a claimant questionnaire requiring production of substantial documents, including physical exam results, pathology reports, diagnostic tests or reports, laboratory tests, letters or other written statements from a doctor or medical clinic, radiographic evaluations, PFT test reports, depositions of the claimant or co-workers, interrogatories or requests for admissions, and documents from other third parties such as health care providers (the "Questionnaire," attached as Exhibit 2) and the time necessary to accomplish that task; (ii) the fact that the ACC/FCR have had no significant discovery of the Debtors to date and that the Debtors are in possession of most of the relevant documents and witnesses; and (iii) the excessive number of expert witnesses proffered by the Debtors, the Debtors' plan to conduct multiple depositions of the same experts, and the Debtors' proposal to conduct these numerous depositions on multiple tracks, none of which is warranted and all of which is unduly burdensome, costly and unnecessary.

The Debtors contend that their proposed discovery schedule is consistent with the Court's suggestion at the June 13, 2005 hearing that discovery be completed within six months. However, as the transcript reflects, the Court's reference to six months was in

- 2 -

the context of the *Owens Corning* case. This case, as reflected in the Debtors' Initial Disclosures subsequently served July 14, 2005 (attached as Exhibit 3), now differs markedly from the *Owens Corning* case in that, among other things, the Debtors here seek to use the Questionnaire, have proffered excessive numbers of expert witnesses, and have not over the course of this Bankruptcy provided substantial documents and other discovery relating to their asbestos liability as Owens Coming did for several years prior to its January 2005 estimation hearing.

All of the dates in the ACC/FCR's discovery plan assume that the Debtors: (i) will not be permitted to submit the Questionnaire to claimants; (ii) will substantially complete document production by October 10, 2005; (iii) make their documents either available in hard copy in New York or provide scanned images of all documents to the parties; (iv) concede that they have waived the attorney-client privilege and the work product doctrine with respect to issues relating to their defense and settlement of personal injury asbestos-related claims; and (v) will not dispute the relevance or scope of the documents requested by the ACC/FCR.

## II.    DOCUMENT PRODUCTION

### A.    Debtors' Proposal

- **September 30, 2005.** Last date for service of requests for production of documents to parties and subpoenas to third parties.

- **October 31, 2005.** Last date for party and third party production of documents in response to requests and subpoenas.

With respect to Debtors' production of documents, Debtors presently are in the process of scanning for production all documents contained in USG Corporation's asbestos document repository. Documents in this production, which will be complete, or largely complete, by **August 31, 2005**, include documents pertaining to the composition,

identification and sales of asbestos-containing products of Debtors.[1]  Debtors believe that the documents to be produced before the end of August comprise the vast majority of documents that are potentially relevant, including the categories of documents referenced in the ACC's section herein that are unique to Debtors.  Debtors presently also are reviewing additional documents regarding Debtors' experience in the tort system for production.

Debtors have undertaken to make these productions while inviting the claimants to serve document requests.  The claimants served a document request pursuant to that invitation on August 9.  While overbroad in many respects, Debtors expect that all responsive and potentially relevant documents will be produced no later than **October 31, 2005.**  Debtors will meet and confer with the Committees with respect to their concerns noted in their section herein regarding claims of privilege and Debtors' objections to the breadth of the document demand.  To the extent that the parties are unable to reach resolution on any of the issues, Debtors' schedule providing more than five months between initial production of documents and close of fact discovery allows more than ample time for Court resolution of any document discovery dispute.  Debtors are amenable to shortened briefing schedules for resolution of any discovery issue.

With respect to the ACC's overall schedule, the ACC claims to need "at least 60 days" to review Debtors' documents.  Whether that is true or not, the schedule proposed by Debtors accommodates that request.  The vast majority of Debtors' documents will be available by August 31.  Most of the remaining documents will be made available in

---

[1] Debtors produced these documents in hard copy at their offices in Chicago beginning August 8. Rather than review them at that time, the ACC and FCR asked that the documents be copied or scanned for their review in New York, requiring the delay until the end of August.

September and the final group in October. Thus, beginning at the end of August through the end of October will give the ACC and FCR more than the 60 days they need for document review. Even as of the end of October, of course, the ACC and FCR would still have three and one-half months before fact discovery closes to further review and evaluate documentary evidence.

**B.    ACC/FCR's Proposal**

Although the Debtors have not yet produced documents, the ACC/FCR expects that document production by the Debtors will be voluminous. On August 9, 2005, the ACC/FCR served the Debtors with a set of document requests seeking documents relating to, among other topics, each of the numerous issues raised by the Debtors and the Equity Committee in their Initial Disclosures provided on July 14, 2005 (the Equity Committee's Initial Disclosures are attached as Exhibit 4) and including such issues as (i) the composition, usage, and sale of the Debtors' asbestos-containing products; (ii) the level of asbestos exposures experienced by those working with drywall joint compound as well as exposures experienced by any bystanders to drywall finishing; (iii) whether mesothelioma is caused by exposure to chrysotile fibers; and, (iv) the Debtors' knowledge of the potential dangers associated with the asbestos in the Debtors' products and the warnings provided with those products. In addition, with respect to issues relating to its defense strategy and the reasons for their settlement of personal injury asbestos-related claims, the ACC/FCR believe that the Debtors have waived the attorney-client privilege and work product protection for pre-June 2001 communications by placing at issue the reasons why they settled asbestos personal injury claims and by making the assertion that they settled and paid claims where there was no potential for liability.

The ACC/FCR propose that the Debtors substantially complete their document

- 5 -

production by October 10, 2005 (60 days from the date of the ACC/FCR's document request). The ACC/FCR presently anticipate that they will need at least 60 days to review the large volume of documents produced by the Debtors and identify potential witnesses to depose. If the Debtors produce the bulk of their responsive documents by October 10, 2005, then the ACC/FCR propose to complete their document review by December 9, 2005. Although the ACC/FCR have attempted to be as comprehensive as possible in their initial document requests, to the extent that document production indicates other relevant documents, the ACC/FCR must have the right to submit additional requests to the Debtors and subpoena third parties for relevant documents.

If the Debtors do not substantially complete document production by October 10, 2005, or if there is motion practice concerning issues of attorney-client privilege or the scope of discovery, or if the Debtors are permitted to serve their proposed Questionnaire and demand for all supporting documents and medical records, then the October 10, 2005 and December 9, 2005 dates will need to be extended.

III.    **QUESTIONNAIRE OF PRESENT PERSONAL INJURY CLAIMANTS**

A.    **Debtors' Proposal**

- **August 19, 2005.**  Last date for Debtors to file a motion seeking approval of sampling plan and questionnaire.

- **September 19, 2005.**  Last date for responses to Debtors' motion re sampling plan.

- **October 3, 2005.**  Last date for replies to responses to Debtors' motion re sampling plan.

- **November 4, 2005.**  Last date for service of questionnaire.

- **December 9, 2005.**  Last due date for completed responses to questionnaire from claimants.

- **January 6, 2006.** Last date for RUST Consulting to distribute database of results of questionnaire responses and documents produced by claimants.

- **February 15, 2006.** Last date for fact discovery closure.

Debtors have proposed to take discovery from less than 1% of the present personal injury claimants by way of a standardized questionnaire. Debtors propose selecting a random sample of 1,000 claimants for their discovery (See August 4, 2005 letter from Scott Devereaux to all parties re: Debtors' Sampling Plan, Questionnaire and Document Discovery, attached as Exhibit 2). Claimants have indicated they object to propounding a questionnaire on this sample of claimants. Consequently, no later than August 19, Debtors intend to file a motion with the Court seeking approval of their sampling plan and questionnaire. Debtors have asked the claimants to provide a reasonable time by which they can respond to the motion. The ACC and FCR have not responded to that request. The Debtors propose September 19 as the date for any party to oppose or respond to the motion and October 3 for any replies.

Assuming for scheduling purposes that the questionnaire is approved by the end of October, Debtors propose sending it to selected claimants no later than November 4. Responses would be due 35 days later – December 9, 2005. The responses to the claimant questionnaire will be provided to a data management firm, previously agreed upon by the parties, RUST Consulting ("RUST"). RUST will in turn distribute the questionnaire results in a searchable database by January 6, 2006. This will leave the bulk of January and February for analysis of the data and the preparation of expert reports relying upon that data.

In arguing the merits of the proposed questionnaire in this joint filing, the ACC/FCR maintains that Debtors' proposed questionnaire is improper and will not lead

- 7 -

to relevant evidence. This is not credible, and is not consistent with the Court's admonition at the June 13, 2005 hearing that the Court would be inclined to grant discovery with "any remote relevancy" and that the parties should work toward agreeing to discovery unless "[they]'re absolutely a hundred percent certain that there is no value whatsoever." (Transcript of June 13, 2005 hearing at 76-77.)

Appropriate claimant discovery is not only relevant to, but an indispensable component of any inquiry into the merits of the claims. The claimant discovery sought by the questionnaire may show, for example, that many claimants had *de minimis* (or zero) exposure to U.S. Gypsum's asbestos-containing products and cannot establish that those products were a legal cause of their injuries. Similarly, the discovery may show that many claimants have no reliable evidence that they sustained a compensable, asbestos-related injury. These questions simply cannot be addressed without gathering discovery from some sample of present claimants.

The ACC/FCR have also claimed that Debtors' questionnaire will impose undue burdens, arguing that completing it and supplying the requested records is in fact more burdensome than the discovery that would be allowed in jury trials of individual claims. This, at best, is wild exaggeration. The questionnaire asks the claimant to supply identifying information, claimed injury, occupational history, and medical history. Where appropriate, claimants are also asked to supply back-up documentation (such as medical records). This is information fundamental to any personal injury claim, and should be readily available to claimants and their counsel (indeed, much of it was presumably collected, reviewed and evaluated by claimants' counsel as a matter of course before filing suit). Rather than being unduly burdensome, Debtors ask here for such

- 8 -

information from only 1000 claimants. Judge Fitzgerald in the W.R. Grace bankruptcy recently approved a very similar questionnaire and document request for every one of the more than 100,000 present claimants in that bankruptcy. Counsel for Grace represented in argument that the same ACC lawyers involved here estimated that just four months were needed for compilation of the more than 100,000 questionnaires in that case.

The ACC/FCR also complains of the burden they contend will result from the need to spend "four person days" to review and code each of the 1000 claimant questionnaires once collected.    To the extent the ACC/FCR assume that the questionnaires will need to be coded by each party once collected, the ACC/FCR are incorrect.    The Debtors have already made arrangements for responses to the questionnaire to be provided to RUST, who will, in turn, code the results and distribute them in a searchable computer database to all parties approximately one month later. The ACC/FCR will not need to hire twenty people to analyze "medical and legal records" as they claim.

During the meet and confer process, the ACC/FCR have also continued to claim ignorance as to how claimant discovery will be used in the estimation.  This topic was discussed extensively in the parties' April and May briefs in this matter. (*See* Debtors' May 26, 2005 Response to the ACC/FCR's Joint Statement at 11-14, 26-30.) As Debtors explained then, their plan to use the claimant discovery in the estimation was set forth in the Debtors' December 2005 Case Management Statement, Discovery Timeline, and Estimation Decisional Tree filed with this Court, as well as in a 38-page motion for estimation Debtors filed in 2002, to which the ACC responded with a 42-page opposition. As part of the most recent negotiations, Debtors provided the ACC/FCR with another,

even more detailed summary of their sampling plan and with a revised version of their proposed claimant questionnaire (an original and substantially similar version having been exchanged in 2003). The ACC/FCR's claim that they still are not aware of how Debtors will use the claimant discovery in the estimation strains credulity.

Finally, the ACC/FCR's claim that they cannot determine the appropriateness of a sampling method until after the data has been collected from that sample makes no sense. The statistical reliability of a sample is calculable and known before a sample is taken. This attempt to "lie in wait" is gamesmanship.

### B.    ACC/FCR's Proposal

The Debtors have stated that they intend to file a motion seeking Court approval of their proposal that a Questionnaire (with a demand for all supporting records) be sent to a sample of 1,000 claimants. The ACC/FCR have indicated to the Debtors that they will need at least 30 days to respond to such a motion. The proposed Questionnaire, among other requests, asks for the following items: physical exam results, pathology reports, diagnostic tests or reports, laboratory tests, letters or other written statements from a doctor or medical clinic, radiographic evaluations, PFT test reports, depositions of the claimant or co-workers, interrogatories or requests for admissions answered by or on behalf of the claimant in an asbestos-related personal injury lawsuit brought against the Debtors, and the production of documents from other third parties such as health care providers. The proposed Questionnaire discovery is, in many respects, more burdensome than permissible discovery in the underlying individual asbestos cases, and the burdens—cost and time needed to complete the Debtors' proposed discovery—far outweigh any probative value such proposal may have.

- 10 -

The Debtors' proposed Questionnaire, with its demand for voluminous supporting records, will not lead to the discovery of information relevant to an estimation of the Debtors' asbestos liabilities. The proposed Questionnaire is, at best, relevant only to individualized claim litigation, and, in fact, much of the information sought would be objectionable even in the context of litigating individual claims. While some of the discovery contemplated by the proposed Questionnaire might be relevant if the parties were litigating the particular claim or claims at issue before a jury, that situation is not the task at issue here. For reasons which the ACC/FCR will explain more fully in their responding papers, the entire exercise should be prohibited (or at least significantly limited in its scope and required response). To cite but one example of the burden imposed, simply collecting and copying all the documents sought by the Questionnaire (such as all medical records relating to over 600 cancer claims, many of which are in the hands of third party health care providers) would be time consuming, burdensome, and enormously costly for the estate and the cancer victims themselves.

In any event, if some form of Questionnaire is permitted, sufficient time must be built into the fact discovery portion of the schedule to allow time for: (i) the completion of the Questionnaire by the claimants and their law firms; (ii) review of the information and documents collected by the parties and their experts; and (iii) compilation of the relevant information into one or more databases which can be analyzed by other experts. If Debtors' proposed Questionnaire is allowed to proceed, the plaintiff law firms who receive Questionnaires for their clients (some of whom could have as many as 50 sampled claimants) will need at least 4 months to complete the Questionnaire and collect

the requested documents (which as noted above are often in the hands of third parties such as doctors and hospitals).

The Debtors have never explained how their experts propose to estimate the Debtors' future liability from the discovery obtained from their sample of claimants. Nevertheless, the Debtors presumably intend to argue that if a claimant's Questionnaire and supporting documentation do not contain certain information, then such claims and similar claims should be estimated at a zero value. Although the ACC/FCR believe that the Debtors' entire approach is irrelevant and improper, to fairly address the Debtors' experts' analysis, the ACC/FCR, with assistance from their experts, will have to identify and retain approximately twenty people who are experienced in reading medical and legal records contained in claim files. Based upon the limited amount of time that the experts have had to review the Questionnaire (first received on August 5, 2005), as well as their experience in mass tort litigation, they have estimated that it will take approximately four person days to review each claimant's file. Assuming that twenty people can be identified to perform such a task, it would require approximately 10 months to complete the review and data analysis of all 1000 claimant files. This estimate neither includes the actual time for review and analysis of the data after it has been coded nor the time to gather additional evidence relevant to the files.

In the *Owens Corning* case, when a group of bank creditors proposed a similar sampling process, the bank creditors themselves acknowledged in pleadings filed with the Court that the proposed approach would take at least six months to complete if there were no objections to sampling or to the production of supporting documents by claimants whereas the Debtor estimated that the proposed approach would take a year to complete.

Finally, if the Court permits a Questionnaire, no expert can determine the appropriateness of the actual sample selected and the sampling methodology in a vacuum. Such sample evaluation can only occur once the ACC/FCR and their experts are able to review how the Debtors' experts use the sample in their expert witness reports. Until such reports are produced, the ACC/FCR will not be able to comment on the representativeness and appropriateness of the sample selected or the methodology used.

## IV.    DATABASE DISCOVERY

### A.    Debtors' Proposal

As a member of the Center for Claims Resolution ("CCR") from 1988 to early 2001, a database of claims against Debtors was compiled and managed by the CCR and its consultants. In 2002, two versions of that database were produced to all parties involved in the case at that time. Recently, counsel for the ACC and FCR have asked counsel for Debtors to arrange a telephone conference with those consultants to better understand the data in their possession. As a result of that call, and subsequent discussions, the ACC and FCR have asked the CCR's data management consultants to provide two additional versions of the database: (1) data of the claims against Debtors as of January 2002; and (2) the same data as of May 2002. Debtors are facilitating that request. These databases will be provided by the CCR's data consultants no later than the end of August. The data will be in the format with which counsel for the ACC and FCR are readily familiar based on their respective involvement in other bankruptcies of CCR members. Debtors foresee no discovery issues related to this information gathering currently being undertaken.

Debtors are not aware of any "integrity" issues with the data that the ACC cryptically references. As the CCR's consultant explained previously to all parties, any

- 13 -

differences in details between different versions of the database are minor and simply the result of normal updating of the large dataset that has gone on over time. Nevertheless, if the ACC/FCR wish to depart from the informal exchange of information that the CCR's consultants voluntarily have engaged in and, instead, seek a deposition of the personnel of the CCR's consultants, they are free to do so. Such a deposition will have no impact on the overall discovery schedule.

      **B.**    **ACC/FCR's Proposal**

      The integrity of USG's historic database is still in question regarding personal injury claims asserted against the Debtors and such claims' resolution (during the time periods when the Debtors were and were not a member of the Center for Claims Resolution ("CCR")). The parties have "met and conferred" on a number of occasions and continue to do so in order to understand why there are such differences in the databases previously provided. If agreement cannot be reached concerning the appropriate database to be used for the Hearing, discovery will be needed, at a minimum, from Navigant Consulting (the entity which was hired and began to update all or part of the CCR database in late 2001 and which is also the identified claims estimation   expert for the Official Committee of Unsecured Creditors).

**V.**    **INTERROGATORIES AND REQUESTS FOR ADMISSION**

      **A.**    **Debtors' Proposal**

-     **January 13, 2006.**  Last date for service of written interrogatories and requests for admissions.

-     **February 15, 2006.**  Last date for fact discovery closure.

      Pursuant to Debtors' Proposal, the Federal Rules of Civil Procedure will govern written interrogatories and requests for admissions. Any party would be free to

serve written interrogatories and requests for admission up until the last date which will allow adequate time for response prior to the date for close of discovery.

### B.    ACC/FCR's Proposal

Assuming that all of the dates and qualifications suggested above by the ACC/FCR are met, the ACC/FCR propose that interrogatories and requests for admissions be served by March 21, 2006 and completed by April 20, 2006.

## VI.    FACT WITNESS DEPOSITIONS

### A.    Debtors' Proposal

- **January 13, 2006:**    Last date to notice depositions of party witnesses.

- **February 15, 2006.**    Last date for fact discovery closure.  Third party depositions may be subpoenaed, subject to all limitations in the Federal Rules, up until the date allowing for adequate time for completion of the deposition prior to the close of discovery.

The ACC and the FCR have indicated that they intend to take depositions of current and former U.S. Gypsum employees about the company's asbestos containing products and tort system experience.  They also have indicated an intention to take the depositions of former lawyers involved in the tort system and potentially a former joint compound worker.  Debtors intend to take the depositions of certain doctors and employees involved in mass screenings of workers making claims of medical conditions "consistent with asbestosis."  Under Debtors' Proposal, these depositions would be completed between November 2005 and February 2006, with the close of such discovery on February 15, 2006.

An exchange of "witness lists" prior to depositions and the close of fact discovery, proposed herein by the ACC, is untenable.  Indeed, parties cannot ascertain who trial witnesses will be until depositions are taken.  As is standard practice in

- 15 -

litigation, the parties here should inquire through interrogatories as to what individuals have knowledge regarding any particular subject area. The parties will then work together to narrow the list of knowledgeable individuals to identify those witnesses who may, in fact, appear as a trial witness and, therefore, should be deposed. Debtors believe that process will work here, as in any complex litigation, while the ACC/FCR's Proposal of listing trial witnesses prior to discovery makes no sense.

### B.    ACC/FCR's Proposal

Assuming all of the document discovery dates suggested by the ACC/FCR are met, the ACC/FCR propose that on December 12, 2005 the parties exchange a list of fact witnesses whom they intend to call at the Estimation Hearing. Because, as shown below, there are expected to be numerous fact witnesses, the ACC/FCR propose that depositions of fact witnesses commence on December 13, 2005 and be completed by April 20, 2006.

In addition, the ACC/FCR propose that on February 13, 2006, the parties exchange a second list of rebuttal fact witnesses and any other witness for whom good cause is shown that the party was unable to identify on its initial list as a fact witness. The ACC/FCR propose that no fact witness may testify at trial unless he or she is identified on either the initial list or the rebuttal list.

This case will contain numerous fact depositions. The Debtors' initial disclosures indicate that they themselves will seek to depose at least ten fact witnesses including current or former employees of the Debtors, a certain number of sample claimants, and six depositions of witnesses relating to issues of x-ray readings in connection with the mass screening of individuals. In addition, the Equity Committee's initial disclosures state that the Equity Committee will seek depositions of the Debtors, the CCR,

- 16 -

defendants of asbestos personal injury claims (or insurers thereof), trusts established

pursuant to 11 U.S.C. § 524(g), asbestos claimants, medical experts retained in this case,

medical professionals and other individuals involved in diagnosing asbestos personal

injury claimants for litigation purposes, and plaintiff attorneys involved in asbestos cases.

The Equity Committee further states that "discovery into other sources may be required

as the discovery process proceeds." The ACC/FCR also anticipate that they will seek

several depositions of current or former employees of the Debtors, of the CCR, and of

individuals knowledgeable about the uses and application of the Debtors' asbestos-

containing products but cannot identify who or how many former/present employees of

the Debtors they need to depose until they review responsive documents.

## VII.    EXPERT DISCOVERY

### A.    Debtors' Proposal

#### 1.    Expert Reports

- **February 24, 2006**.   Last due date for expert reports regarding case-in-chief.

- **April 3, 2006**.   Last due date for responsive expert reports.

Debtors specifically disclosed their experts, absent potential changes, in

their Initial Disclosure on July 12, 2005.   (See Exhibit 3).   The Equity Committee and

Unsecured Creditors Committee have agreed to avoid duplication of experts and will rely

on Debtors' experts as to all issues with the exception of economic issues, on which those

Committees will present separate experts.   Debtors propose that expert reports on issues

for which the party would normally bear the burden of proof as part of its case-in-chief be

exchanged by the parties on February 24, 2006.

Debtors propose that expert reports responsive to the initial reports be exchanged

38 days later, on April 3, 2006. Debtors believe that given the early disclosures made by Debtors in July, 2005, that the ACC and FCR can and should be in the process of identifying experts they believe are responsive to Debtors' experts and who are not part of the claimants' case-in-chief. For these reasons, Debtors believe 38 days to produce responsive expert reports is more than sufficient time.

The ACC/FCR complain that this timing is inadequate and list at length the subject matters on which Debtors disclosed experts in July. Each of these areas is relevant to a proper estimation, however, and such a "laundry list" argument based on fulsome and good faith disclosures by Debtors is cynical, at best. Debtors could just as easily point to the absence of detail in the ACC/FCR's disclosures to argue that discovery should take little time given the bare disclosures contained in that document. (A copy of the ACC/FCR Initial Disclosure—titled "ACC's and FCR's Proposed List of Witnesses To Be Called at the Estimation Hearing in Their Case-In-Chief Pursuant to Fed.R.Civ.P.26(a)(1)(A) and the Court's Directives at the June 13 Hearing"—is submitted herewith as Exhibit 5).

### 2.    Expert Depositions

- **March 24, 2006.** Last date for completion of case-in-chief expert depositions.

- **April 28, 2006.** Last date for completion of responsive expert depositions.

Debtors propose that depositions of experts following the initial expert reports begin ten days after the production of those reports—March 6, 2006. The depositions of all experts would take place over the following three week period, up to and including March 24, 2006. This schedule would result in expert depositions being completed ten days before responsive expert reports are due for exchange on April 3.

With these ten days, the parties would have the opportunity to understand the opposing experts' opinions in sufficient time to prepare a responsive report.

Because of the number of depositions to be completed in this three week time period, the depositions would take place on multiple tracks. Essentially, there would be three tracks: (1) Industrial Hygiene, Mineralogy and Construction Experts; (2) Medical/Scientific Experts; and (3) Economics Experts. This type of division is how lawyers, in fact, typically organize legal teams in large litigation involving areas of substantive expertise. The multiple tracking in light of the large law firms involved in the matter pose no substantial burden, in Debtors' view.

Debtors propose depositions of experts submitting responsive expert reports to begin seven days after the production of those reports—April 10, 2006. Those depositions would again go forward on multiple tracks for three weeks, up to and including April 28, 2006.

The ACC/FCR's Proposal with respect to expert depositions is deficient in that it does not provide for depositions of case-in-chief experts in advance of submission of rebuttal reports. This oddity invites numerous disputes at the estimation about the scope of disclosed opinions and propriety of responsive opinions. Additionally, a four-month period for depositions of experts, which the ACC/FCR schedule contemplates, is patently unreasonable, even assuming 20 to 25 experts. There is no reason why expert depositions cannot be concluded in the two month period proposed by Debtors.

**B.    ACC/FCR's Proposal**

The Debtors and other parties aligned with the Debtors have already identified more than ten experts (not including claims estimation experts) whom they anticipate will testify on their case-in-chief at the Estimation Hearing concerning such

subjects as general construction and building practices, construction drywall finishing, asbestos exposures experienced by those working with drywall joint compound as well as exposures experienced by any bystanders to drywall finishing, the role of epidemiology in identifying causes of disease and the scientific evidence (or lack thereof), the diagnosis of asbestos-related disease, the chemical nature and properties of different types of asbestos fibers, the interpretation of radiographs in diagnosing asbestos-related lung diseases, the recent trend of tort reform targeted at asbestos litigation, and the state of the art with respect to the dangers of asbestos and historical regulations pertaining to asbestos usage and exposures. In addition, the Debtors, Equity Committee and Property Damage Committee have each identified separate claims estimation experts whom they anticipate will testify at the Estimation Hearing. The ACC/FCR believe that the number and subject matter of expert witnesses should be limited. In this regard, the ACC/FCR will ask the Court to consider whether the Debtors should be permitted to elicit expert testimony on certain issues.

The ACC/FCR's proposed schedule respecting expert depositions assumes that the Debtors will call all of the experts identified in their initial disclosures and that, unless the Court orders otherwise, there will be in total at least 25 testifying experts. The ACC/FCR's proposed schedule respecting expert depositions assumes that the Court will not permit the Questionnaire. Accordingly, the ACC/FCR propose that on April 21, 2006, the parties shall file with the Court and serve on opposing parties their Fed.R.Civ. P. 26(a)(2)(B) expert witness reports for any expert witness who will offer testimony at the hearing. Rebuttal expert witness reports shall be filed with the Court and served on or before May 22, 2006 except that in the case of claims estimation experts and other

- 20 -

experts who are required to test another expert's mathematical or epidemiological models or perform scientific testing of another expert's conclusions, such rebuttal reports shall be due on June 19, 2006. Expert witness depositions shall commence on May 23, 2006 and be completed by August 22, 2006.

The Debtors have proposed a schedule for expert depositions whereby at least 25 expert witnesses (many of whom will be submitting reports both for the case-in-chief and for rebuttal) may be deposed twice within two eighteen day periods (including weekends) on multiple tracks, with all expert depositions to be completed over an eight week period from start to finish. The Debtors' proposed schedule for expert discovery is unreasonable because: (i) it does not allow the experts sufficient time to analyze other expert reports and prepare rebuttal reports; (ii) it requires many of the experts to be deposed twice which is inefficient and wasteful and very burdensome for experts and the parties; and, (iii) it would tax the limited resources of the ACC's and FCR's counsel to prepare and conduct three to four tracks of depositions simultaneously.

The ACC/FCR's proposal, on the other hand, provides for all expert depositions to be completed within three months (as opposed to the two months proposed by the Debtors), which depositions would be conducted after all of the reports have been submitted and without at least triple tracks of depositions.

## VIII.  STIPULATIONS BY PARTIES re EXPERT DISCOVERY

The parties have reached the following two agreements regarding expert discovery:

1.    Simultaneous with the service of all expert reports, the parties shall produce all documents, data and written information that the expert relied upon or considered in forming his or her expert opinions in this matter. To the extent that the

- 21 -

disclosures include exhibits, information or data processed or modeled by computer at the direction of a disclosed expert in the course of forming the expert's opinions, machine readable copies of the data along with the appropriate computer programs and instructions shall be produced, provided that no party need produce computer programs that are readily commercially available.

      2.     The following categories of data, information or documents need not be disclosed by any party, and are outside the scope of permissible discovery (including deposition questions): (i) any notes or other writings taken or prepared by or for an expert witness in connection with this matter, including correspondence or memos to or from, and notes of conversations with, the expert's assistants and/or clerical or support staff, one or more other expert witnesses or non-testifying expert consultants, or one or more attorneys for the party offering the testimony of such expert witness, unless the expert witness is relying upon those notes or other writings in connection with the expert witness's opinions in this matter; (ii) draft reports, draft studies or draft work papers, preliminary or intermediate calculations, computations or data runs, or the other preliminary, intermediate or draft materials prepared by, for at the direction of the expert witness; (iii) any oral or written communication between an expert witness and the expert's assistant and/or clerical or support staff, one or more other expert witnesses or non-testifying expert consultants, or one or more attorneys for the party offering the testimony of such expert witness, unless the expert witness is relying upon the communication in connection with the expert witness's opinions in this matter. Finally, to the extent that the specific agreements herein waive disclosure requirements under Fed.R.Civ P. 26(a)(2)(B) or (C), the parties agree to such waiver.

Submitted on behalf of all parties.

Dated:  August 12, 2005

COOLEY GODWARD LLP
Stephen C. Neal (CA 170085)
Scott D. Devereaux (CA 146050)
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306
Tel: (650) 843-5000


RICHARDS, LAYTON, & FINGER, P.A.
Daniel J. DeFranceschi (DE No. 2732)
Paul N. Heath (DE No. 3704)
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
Tel: (302) 651-7700

JONES DAY
David G. Heiman (OH 0038271)
Brad B. Erens (IL 6206864)
North Point—901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Tel: (216) 586-3939

960161 v2/SF

- 23 -