# EXHIBIT 3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------- x
:
IN RE:                                        :   Chapter 11
                                              :
OWENS CORNING, et al.,                        :   Case No.: 00-3837 to 3854 (JKF)
                                              :   (Jointly Administered)
                    Debtors.                  :
                                              :   The Honorable John P. Fullam Has Withdrawn The
                                              :   Reference With Respect To This Matter [See Docket. No.
                                              :   12520]
                                              :
                                              :   Related to D.I. No. 12850
                                              :
---------------------------------------------- x

**BRIEF IN SUPPORT OF MOTION OF CSFB, AS AGENT, TO ESTABLISH
PROCEDURES TO OBTAIN A SAMPLE OF MEDICAL RECORDS, INCLUDING
X-RAYS, FROM ASBESTOS PERSONAL INJURY CLAIMANTS
ASSERTING NONMALIGNANT CLAIMS AGAINST THE DEBTORS
AND TO MODIFY THE COURT'S AUGUST 19, 2004 SCHEDULING ORDER**

| | |
|---|---|
| LANDIS RATH & COBB LLP<br>Richard S. Cobb (I.D. No. 3157)<br>Rebecca L. Butcher (I.D. No. 3816)<br>919 Market Street, Suite 600<br>Wilmington, DE 19810<br>-and-<br>WEIL, GOTSHAL & MANGES LLP<br>Martin J. Bienenstock<br>Richard A. Rothman<br>767 Fifth Avenue<br>New York, NY 10153<br>-and-<br>Ralph I. Miller<br>100 Crescent Court, Suite 1300<br>Dallas, TX  75201-6950<br>-and-<br>David A. Hickerson<br>Peter M. Friedman<br>1501 K Street, N.W., Suite 100<br>Washington, D.C.  20005<br>-and- | KRAMER LEVIN NAFTALIS &<br>FRANKEL LLP<br>Kenneth H. Eckstein<br>919 Third Avenue<br>New York, New York 10022<br><br>ATTORNEYS FOR CREDIT SUISSE<br>FIRST BOSTON, AS AGENT FOR<br>THE BANK GROUP |

Dated: October 4, 2004

# TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| I. | PRELIMINARY STATEMENT | | 1 |
| II. | STATEMENT OF FACTS | | 8 |
| | 1. | The Debtors Delayed Estimation Proceedings and Concealed Their Internal Valuation Reports Until Now | 8 |
| | 2. | The Vasquez and Mayer Reports | 10 |
| | 3. | The Friedman Report | 12 |
| | 4. | The Debtors' Concealed the Vasquez Report, the Mayer Report and the Friedman Report in Their Disclosure Statement | 17 |
| | 5. | The Johns Hopkins Study | 18 |
| | 6. | History Of Asbestos Litigation Relevant To This Motion | 20 |
| | 7. | The Debtors Are Aware that Owens Corning's Own Settlement History is Rife With Fraudulent Claims | 26 |
| | 8. | The Plan Proponents' Estimation Method Improperly Relies on the Debtors' Past Claims Payment History to Estimate Non-Malignant Claims | 27 |
| III. | ARGUMENT | | 29 |
| | A. | THE COURT SHOULD ESTABLISH PROCEDURES TO OBTAIN A RANDOM SAMPLE OF MEDICAL RECORDS, INCLUDING X-RAYS, SUFFICIENT TO CONDUCT A STUDY OF ASBESTOS PERSONAL INJURY CLAIMANTS FOR PURPOSES OF THIS ESTIMATION PROCEEDING | 29 |
| | B. | THE COURT SHOULD MODIFY ITS AUGUST 19 ORDER | 34 |
| IV. | CONCLUSION | | 36 |

# TABLE OF AUTHORITIES

Page

## CASES

*Allison v. McGhan Medical Corp.*, 184 F.3d 1311 (11th Cir. 1999).................................................33

*In re Asbestos Prod. Liab. Litig.* (No. VI), MDL 875, Admin. Order No. 8 (E.D. Pa. Jan. 14, 2002)..................22

*In re Baldwin-United Corp.*, 55 B.R. 885 (Bankr. S.D. Ohio 1985)................................................7

*In re Certain Asbestos Cases*, 112 F.R.D. 427 (N.D.Tex. 1986)...................................................33

*In re Dow Corning Corp.*, 211 B.R. 545, 596-598 (Bankr. E.D. Mich 1997)........................................7

*In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702 (Bankr. S.D.N.Y. 1991)..................................33

*In re Enron Corp.*, 281 B.R. 836 (Bankr. S.D.N.Y. 2002)........................................................33

*Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387 (9th Cir. 2000).............................................33

*In re Joint E. & S. Districts Asbestos Litigation*, 982 F.2d 721 (2d Cir. 1992)................................33

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982)..............................................................7

*Pepper v. Litton*, 308 U.S. 295 (1939).......................................................................7, 32

*In re Valley Forge Plaza Associate*, 109 B.R. 669 (Bankr. E.D.Pa. 1990).........................................32

## STATUTES AND RULES

*11 U.S.C. § 524(g)* ............................................................................................29

*Health Insurance Portability and Accountability Act of 1996 (HIPAA)* 42 U.S.C. §§1320d-1329d-8....................30

*Fed. R. Civ. P. 26* ............................................................................................32

*Fed. R. Evid. 706* .............................................................................................33

## LEGISLATIVE HISTORY AND HEARINGS

*S. Rep. No. 108-118 at 79, 84 (2003)* ..........................................................................21

# TABLE OF AUTHORITIES
(continued)

Page

*Asbestos Litigation Crisis: Hearing on S. Hrg. 108-141 Before the Senate Comm. on the Judiciary.* 108th Cong. 96 (2003) ..................25

## TREATISES

6-26 MOORE'S FEDERAL PRACTICE CIVIL § 26.06 ..................32

## SECONDARY AUTHORITY

American Bar Ass'n Commission on Asbestos Litig. (Feb. 2003) ..................20-21

Bell, Griffin B., *Asbestos Litigation and Judicial Leadership: The Courts' Duty to Help Solve the Asbestos Litigation Crisis*, NLCPI, Vol. 6 (June 2002) ..................25

Bell, Griffin B., *Asbestos Litigation & Tort Law: Trends, Ethics & Solutions: Asbestos & the Sleeping Constitution*, 31 Pepp. L. Rev. 1 (2003) ..................21

Biggs, Jennifer et al., *Overview of Asbestos Issues and Trends* 3 (Dec. 2001) (http://www.actuary.org/mono.htm) ..................21

Brehm, Alison J., David N. Copas, Jr., and Colleen Kotyk Vossler, *To Be, or Not to Be: The Undiscovered Country of Claims Estimation in Bankruptcy*, 8 J. Bankr. L. & Prac. 197, 255 (1999) ..................32

Carroll, Stephen J., et al., Rand Institute for Civil Justice, *Asbestos Litigation Costs and Compensation: An Interim Report* 40 (2002) ..................21

Curran, Eddie, *Diagnosing for Dollars*, Mobile Register, Apr. 4, 2004 ..................24

Egilman, David, *Asbestos Screenings*, 42 Am. J. Indus. Med. 163 (2002) ..................24

Gitlin, Joseph N., M.D., et al., *Comparison of "B" Readers Interpretations of Chest Radiographs For Asbestos Related Changes*, 11 J. Acad. Radiol. 843 n.8 (2004) ..................18

Janower, Murray L. and Berlin, Leonard, *"B" Readers' Radiographic Interpretations in Asbestos Litigation: Is Something Rotten in the Courtroom?*, 11 J. Acad. Radiol. 841 n.8 (2004) ..................19, 20

Kazan, Steven, Testimony before the U. S. Sen. Comm. on the Judiciary (Mar. 2, 2003) (avail.at:http://judiciary.senate.gov/testimony.cfm?id=617&wit_id=1678) ..................22

Kim, Quenna Sook, *Asbestos Trust Says Assets are Reduced as the Medically Unimpaired File Claims*, Wall St. J., Dec. 14, 2001, at B6 ..................22

TABLE OF AUTHORITIES
(continued)

Page

Reger, R.B. et al., *Cases of Alleged Asbestos-Related Disease: A Radiologic Re-Evaluation*, 32 J. Occup. Med. 1088 n.11 (1990) .......................................................... 18

Rubin, Hon. Carl B. and Laura Ringenbach, *The Use of Court Experts in Asbestos Litigation*, 137 F.R.D. 35, (1997) ................................................................................. 33

Setter, David et al., *Why We Have to Defend Against Screened Cases -- Now is the Time For A Change*, 18-20 Mealey's Litig. Rep.: Asbestos 23 at 2 (2003) ................... 15, 24

I. **PRELIMINARY STATEMENT**

CSFB, as Agent for the prepetition institution lenders to Owens Corning and certain of its affiliates (the "Banks") files this brief in support of its motion (the "Motion") seeking an expedited procedure to obtain a random sampling of already-existing Medical Records (as hereinafter defined), including X-rays, of asbestos personal injury Claimants who have asserted nonmalignant claims against Owens Corning.[1] As the Court knows, Owens Corning and certain of its subsidiaries as debtors and debtors-in-possession (collectively the "Debtors") have joined forces with the Official Committee of Asbestos Claimants (the "ACC") and the Legal Representative for Future Claimants (the "Futures Representative," and together with the Debtors and ACC, the "Plan Proponents") to propose a nonconsensual chapter 11 plan of reorganization (the "Plan") that is conditioned upon a finding that the Debtors' liability for asbestos-related claims be estimated at no less than $16 billion – including approximately $10.7 billion for Owens Corning alone. The Plan Proponents contend that the quantification of the Debtors' asbestos personal injury liability may be arrived at by extrapolating from the Debtors' prepetition claims settlement history.

In its August 19, 2004 Order, the Court indicated that it had preliminarily determined that "the data now available -- the Debtors' claims history, the experience in other cases, etc. -- viewed in light of the expert testimony at the scheduled hearing, should probably suffice for claims estimation purposes." (Order Upon Claims Estimation Issues, dated Aug. 19, 2004.) As the Banks previously have argued to the Court, however, the Debtors' settlement history cannot be relied upon for a number of reasons, but especially because so many individual claims lacked

---

[1] In this context, references to Owens Corning refer only to the parent company of all the Debtors, the only company which has asbestos liability other than Fibreboard.

medical validity.[2] The Banks' position in this regard has recently been vividly confirmed by the Debtors' own long-suppressed internal reports demonstrating rampant fraud in the Debtors' National Settlement Program ("NSP").[3] If the Debtors' settlement history is to be used in this estimation proceeding, it will be necessary to expeditiously conduct a scientific evaluation of that history to cleanse the data of improprieties; without such an evaluation there cannot be an accurate and legally supportable estimation of the Debtors' asbestos liabilities.

Had the Debtors fulfilled their fiduciary duties, they would have produced these internal reports more than two years ago when they were completed and then promptly commenced a proceeding to estimate the asbestos claims at levels consistent with the internal analyses. Instead, the Debtors proposed a plan completely at odds with their own internal analyses, resisted all attempts by the Banks and other commercial creditors to commence formal estimation proceedings (thereby manufacturing their present cries of urgency), and stonewalled and obstructed the Banks' attempt to obtain these internal analyses. In April of this year, months before these reports were produced to the Banks, the Debtors even represented to the Bankruptcy

---

[2] See Reply Memorandum of Law to Objections of Official Committee of Asbestos Claimants and Future Claims Representative and the Debtors' Joinder Thereto, to Joinder and Supplement of Credit Suisse First Boston, As Agent, To Motion of the Official Committee of Unsecured Creditors for An Order Establishing A Bar Date For Filing Proofs of Claim For Asbestos Claims and the Content Therefore Pursuant to Bankruptcy Rule 3003(c)(3) at 6, 16.

[3] The NSP was, for all intents and purposes, the Debtors' prepetition capitulation to asbestos plaintiffs' law firms. Starting in 1998, the Debtors ceased contesting asbestos liability and began paying out hundreds of millions of dollars to the most aggressive plaintiffs law firms to settle those firms' "inventory" of cases. A firms' inventory might consist of claims of varying severity, ranging from mesothelioma to unimpaired. The Debtors made these payments to individual firms, assigning a dollar value to each "disease," and the firms agreed to "recommend" to their clients that they accept the settlement payment. The required "proof" for an individual to establish a claim was gossamer thin, at best. Indeed, based upon the evidence the Banks have obtained so far, it appears that there was virtually no examination of the validity of any claim before it was paid.

Court that they had already provided any party that wanted to challenge the Debtors' projections "with all of the information . . . reasonably require[d] to prepare its own analysis of the Debtors' present and future asbestos liabilities."[4]

It is now known what the Debtors were hiding -- and why: These recently-disclosed reports reveal that by 2002, the Debtors' own experts, retained with the approval of the Bankruptcy Court, had determined that the vast majority of nonmalignant claims settled and paid by the Debtors never should have been paid. Moreover, these reports value the Debtors' asbestos liabilities at a fraction of what the Debtors propose in their Plan. These expert valuation reports are 1) Thomas E. Vasquez, Ph.D., *Forecast of Future Asbestos Claims and Indemnity: Owens Corning and Fibreboard* (the "Vasquez Report" attached hereto as Exhibits "A1-A4"); and 2) Mark W. Mayer, *Report on Owens Corning's Pre-Petition Asbestos Personal Injury and Wrongful Death Claims* (the "Mayer Report" attached hereto as Exhibit "B").

The Debtors also belatedly produced to the Banks on September 3, 2004 the report of Dr. Gary Friedman, a medical expert the Debtor also retained with the Bankruptcy Court's approval. Although concealed by the Debtors until now, Dr. Friedman conducted a study more than two years ago, in 2002, reviewing 1,691 randomly selected claims files submitted to Owens Corning under the NSP. He concluded that 87% of these claims did not satisfy the minimal medical criteria set forth in settlement agreements between the Debtors and certain asbestos plaintiffs law firms under the NSP. Dr. Friedman further concluded that he had substantial concerns that, even among the remaining 13%, there were additional claims that did not meet the medical criteria in

---

[4] Debtors' Objection to Application of the Official Committee of Unsecured Creditors to Compel Production of Documents at 5 (the "Objection to the Motion to Compel" attached hereto as Exhibit "I").

3

the NSP. As Dr. Friedman found, for example, a "substantial downward pressure" on the 13% of claims was that a single suspect B-reader accounted for 45.6% of the claims in his study, and five B-readers accounted for more than 80% of these claims.[5] While Dr. Friedman did not have access to claimants' actual X-rays in conducting his study, he noted that if he had, the 13% of the claimants who ostensibly satisfied the medical criteria eligibility would likely be even lower. Significantly, for purposes of the instant motion, Dr. Friedman stated that "**the single greatest factor which may determine the future number of unimpaired nonmalignant claims rests largely on the willingness of all parties to provide for ongoing review of the claims and the underlying data including X-rays and PFTs.**"[6] Gary K. Friedman, M.D., *"Owens Corning Impaired Nonmalignant Claim Submissions 1994-1999"* at 35 (the "Friedman Report," attached hereto as Exhibit "C1" and "C2"). (emphasis added).

The Friedman Report is remarkably consistent with a peer-reviewed study published in August 2004 by researchers at the Johns Hopkins Medical Institution, attached hereto as Exhibit "D." The Johns Hopkins researchers had a panel of six B-readers re-read X-rays that had been read in the first instance by B-readers selected by plaintiffs' attorneys. Shockingly, while the plaintiffs' B-readers had represented that 96% of the X-rays showed impairment in a range deemed to show compensable asbestos related nonmalignant injury (a reading of 1/0 or higher,

---

[5] To explain briefly, one method of determining whether an individual has nonmalignant asbestosis is to review a chest radiograph (a term synonymous with "X-Ray"). The radiographs are reported using a classification system devised by the International Labor Office ("ILO"). The minimum reading necessary to sustain a finding of nonmalignant asbestosis is a "1/0" on the ILO scale. The radiographs are read by a so-called "B-reader" certified by the Public Health Service's National Institute for Occupational Safety and Health.

[6] The Pulmonary Function Tests ("PFT") is a test submitted in connection with nonmalignant asbestosis claims which measures lung capacity.

as described in footnote 5), the Johns Hopkins panel of B-readers found that only 4.5% of the X-rays in fact had 1/0 or higher readings. The Banks have recently been able to match the Johns Hopkins sample against the Owens Corning claims database, and have discovered that a very high percentage -- at least 306 of 478 claimants with readable X-rays, or about 64% of the claimants in the Johns Hopkins study -- are also claimants against Owens Corning. The Friedman and Johns Hopkins studies make clear that healthy people routinely have been getting paid at the expense of the claims of the truly sick.

As detailed below, the ACC has complained that the Johns Hopkins study does not meet its supposed standards for constituting a representative and statistically significant population of cases, and claimed that the study is "meaningless as a serious analysis." (Objection and Response of the Official Committee of Asbestos Claimants to the Motion of the Official Committee of Asbestos Property Damage Claimants at 15, *In re Federal-Mogul Global, Inc.*, Case No 01-10578 (RTL) (Bankr. D. Del. Sept. 21, 2004) (the "ACC Federal Mogul Brief," attached hereto as Exhibit "E")).[7] While the Banks strongly disagree with this attack on the Johns Hopkins study, in light of the ACC's objections, and in order to be assured they can present their case in a manner that will not be subject to such criticisms, it is critical to conduct a study of Owens Corning claims along the lines of the Johns Hopkins study using a larger, randomized sample of X-rays. If the Debtors and the ACC would stipulate to the results of the Johns Hopkins study as binding upon them for purposes of this estimation proceeding, this could

---

[7] The ACC will be unable to mount a similar attack on the Friedman study, given that the ACC cited Dr. Friedman as an authority and referred to him as a "well-known medical expert who testifies for both plaintiffs and defendants." (ACC Federal Mogul Brief at 13.)

5

be avoided. Unfortunately, however, given the ACC's recent attacks on the study, the Banks do not anticipate reaching any such agreement.

The Friedman and Johns Hopkins studies have profound implications for this estimation proceeding. They highlight why it would be impermissible to simply extrapolate from the Debtors' settlement history to project the Debtors' asbestos liability fifty years into the future as the Debtors and the ACC would have this Court do. Simply put, the Debtors and the ACC are asking this Court not only to ignore the widespread fraud that drove Owens Corning into bankruptcy in the first instance, but also to endorse and perpetuate the fraud when estimating future asbestos liability.

In this proceeding, the ACC's estimation expert, Dr. Mark Peterson, will likely extrapolate from the number of nonmalignant claims paid in the past by the Debtors to estimate the number of such nonmalignant claims that will be need to paid in the future. Dr. Peterson's method of estimation makes the assumption that, because the Debtors paid a very high percentage of all nonmalignant claims submitted in the past, such claims must have been valid and, accordingly, the Debtors will be required to pay the same percentage of claims submitted in the future.

What the Friedman and Hopkins reports reveal is that Dr. Peterson's assumption is patently false and unsupportable in an estimation context. The ACC's method of estimation would require this Court to set aside funds to pay nonmalignant claimants who cannot proffer evidence of any asbestos-related injury, at the expense of other creditors, including the truly sick asbestos claimants and the Banks. As a result, if the Debtors' settlement history is to be used as any guide to this estimation proceeding, it is critical that the Banks and the Court be permitted to scrutinize the reliability of the history of nonmalignant claims against these Debtors. To