# EXHIBIT 7

FOR PUBLICATION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Bankruptcy No. 01-10578 (RTL) |
| | : | |
| FEDERAL-MOGUL GLOBAL INC., | : | |
| T&N LIMITED, *et al.*, | : | |
| | : | |
| Debtors. | : | |
| | : | |

| | | |
|---|---|---|
| THE OFFICIAL COMMITTEE OF | : | |
| ASBESTOS CLAIMANTS and | : | |
| ERIC D. GREEN, as the | : | |
| LEGAL REPRESENTATIVE FOR | : | |
| FUTURE ASBESTOS CLAIMANTS, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 05-59 (JHR) |
| | : | |
| ASBESTOS PROPERTY DAMAGE | : | |
| COMMITTEE, | : | |
| | : | **OPINION** |
| Defendant. | : | |

APPEARANCES:

Attorneys for The Official Committee of Asbestos Claimants

Marla R. Eskin, Esq.
Kathleen J. Campbell, Esq.
CAMPBELL & LEVINE, LLC
800 N. King Street Suite 300
Wilmington, DE 19801

-and-

Elihu Inselbuch, Esq.
Nathan D. Finch, Esq.
Danielle K. Graham, Esq.
CAPLIN & DRYSDALE, CHARTERED
399 Park Avenue
New York, NY 10022

Attorneys for Legal Representatives for Future Asbestos Claimants

Rolin P. Bissell, Esq.
Maribeth L. Minella, Esq.
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

Attorneys for The Official Committee of Asbestos Personal Property Claimants

Theodore J. Tacconelli, Esq.
FERRY, JOSEPH & PEARCE, P.A.
824 Market Street, suite 904
Wilmington, DE 19899

-and-

Michael P. Kessler, Esq.
Adam P. Strochak, Esq.
Peter M. Friedman, Esq.
Kristin King Brown, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153

TABLE OF CONTENTS

I. Introduction

II. Findings of Fact

        A. T&N's Liability in the United States
                1. Limpet
                2. Keasbey
                3. Raw Fiber
                4. United Kingdom Finished products
        B. T&N's Liability in the United Kingdom
        C. Medical Evidence on Asbestos Related Disease

D. T&N's Litigation Experience in the United States
   1. Pre-1985
   2. The Asbestos Claim Facility
   3. The Center for Claims Resolution
   4. Post-CCR
E. T&N's Litigation Experience in the United Kingdom
F. Estimations of Liability
   1. Pending United States Claims
   2. Settlement Averages and Dismissal Rates
   3. Future United States Claims
   4. Aggregate United Kingdom Liability
G. Plaintiffs' Criticisms of Dr. Cantor's Methodology
H. Defendant's Criticisms of Dr. Peterson's Methodology

III. Conclusions of Law

A. Procedural History and Jurisdiction
B. English Law Considerations
C. Estimation in Bankruptcy
   1. Purpose of an Estimation
   2. Method of the Estimation
D. T&N' Liability for Asbestos Personal Injury Claims
   1. Number of Pending and Future United States Claims
   2. Settlement Averages for United States Claims
   3. Aggregate Liability in the United Kingdom
   4. Interest and Inflation
   5. Conclusion

## I. INTRODUCTION

This case comes before the Court as a contested matter on the estimation of the

aggregate present value of pending and projected future asbestos personal injury and

wrongful death claims asserted against Turner & Newall Limited, a United Kingdom

company, and its non-United States subsidiary companies (collectively "T&N"). The

Court has reviewed the briefs and supporting materials filed by the Official Committee of

Asbestos Claimants ("ACC") and Eric D. Green, as the legal representative for the future

asbestos-related personal injury claimants (collectively the "Plaintiffs" or "Personal

Injury Claimants") and the Asbestos Property Damage Committee ("Defendant" or "PD

Committee")[1], has considered the arguments of all interested parties, and has heard and

weighed the testimony of fact and expert witnesses who testified during the five (5) day

trial beginning on June 14, 2005, as well as the evidence admitted at the Estimation

Hearing.[2]

On June 30, 2005 the parties filed proposed Findings of Fact and Conclusions of

Law. On July 14, 2005, the Court heard and considered closing arguments and

questioned the parties on their respective arguments and evidence. In addition, the Court

received Response Briefs from each party that sought to dispute aspects of their

adversary's Findings of Fact and Conclusions of Law. Furthermore, the estimation was a

contested matter under Fed. R. Bankr. P. 9014. As such the Court takes judicial notice of

the entire docket in the bankruptcy cases. See In re Indian Palms Assocs., Ltd., 61 F.3d

197 (3d Cir. 1995). Therefore, in accordance with Fed. R. Civ. P. 52, the following

represents the Court's Findings of Fact and Conclusions of Law.

---

[1] The PD Committee consists of five members: Anderson Memorial Hospital, Jacksonville College, Moxie Real Estate, Richard Blyth, and the Hill School. The PD Committee represents the interests of approximately 3,200 municipalities, school districts, hospitals, businesses, and individuals who own and operate buildings where T&N manufactured asbestos products were installed, and have filled proofs of claim for damages.

[2] Neither the Debtors, nor any of the Official Committees in the Chapter 11 proceeding, the administrators appointed in the Debtors' United Kingdom insolvency proceedings (the "U.K. Administrators"), the trustees for the T&N Retirement Benefits Scheme (1989) (the "T&N Pension Trustees"), or any other U.S. or U.K. creditors made an appearance at the Estimation Hearing.

## II.    FINDINGS OF FACT

T&N is a wholly-owed subsidiary of Federal-Mogul Global, Inc. ("Federal

Mogul"), which was acquired by Federal-Mogul in March 1988 in a stock purchase.  (PD

Exh. 34 at 30.)  The Turner and Newall families formed T&N in England in 1920, and

according to T&N's National Trial and Coordinating Counsel for the United States, Paul

Hanly, Esq. ("Hanly"), it first discovered the dangers of asbestos as early as 1921.  (Tr. at

86-87.)[3]  Between 1976 and 2001, T&N resolved approximately 245,000 asbestos

personal injury cases (PD Exh. 2 at 9) and has paid out nearly $835 million (present

value) to resolve these claims.  (Tr. at 27 (Hanly).)  On October 1, 2001 (the "Petition

Date"), Federal-Mogul filed for relief under Chapter 11 of the Bankruptcy Code in

response to the mounting liabilities from asbestos litigation.

This estimation has created a conflict between members of the Plan Proponents

and the PD Committee.  The contested issue relates to the underlying Third Amended

Plan of Reorganization (the "Plan"), which the PD Committee argues unfairly allocates

value among the creditor constituencies.  The PD Committee was not involved in the

formulation in what it calls the "Central Deal," an agreement forged between the ACC

and other creditors committees.  (PD FOF at 14.)  As it now stands, the Central Deal

allocates 50.1% of the Reorganized Federal-Mogul equity (no cash) to the proposed

asbestos personal trust and 49.9% of the equity to the Federal-Mogul note holders (the

---

[3]  Cites to the Estimation Hearing transcript will be Tr. at _____ .  Where necessary, the
testifying witness will be put in parentheses.

"Banks"). (See PD Ex. 34 at 6.) The 50.1% of the equity of the Reorganized Federal-Mogul will establish a trust in accordance with section 524(g) in the Bankruptcy Code and the Trust Distribution Procedures ("TDPs") in the Plan. Other unsecured claims, including the claims of the PD Committee, are to be decided under one of three distribution ratios of the plan, which is dependant on aggregate estimated value of asbestos personal injury claims against T&N. (PD FOF ¶ 19.) Essentially, the higher the estimate of the aggregate liability, the higher the denominator will be, thereby lowering the ratio and lowering the percentage of recovery for other, non-asbestos personal injury unsecured claims against T&N. (Id.) The asbestos personal injury claims, however, will receive the aggregate number in the numerator under any of the distribution ratios.

Therefore, the PD Committee asserts that a higher estimate of asbestos personal injury claims will suppress the amount of cash the Debtors will need to satisfy the claims of property damage claimants and other unsecured creditors of T&N, thus raising the value of the new equity securities that will be distributed to most creditor constituencies and freeing cash flow to pay interests on the new debt that will be issued to various banks. As such, the PD Committee proffers a lower estimate of aggregate liability, whereas the Personal Injury Claimants seek a larger amount. The Court's function here is not Plan confirmation; rather, the Court is charged with determining an estimation of liability for the creation of a personal injury trust, which is one of many aspects that will be considered by the Bankruptcy Court when it considers the confirmation of the Plan.

**A. T&N's liability in the United States**

T&N was named in its first asbestos personal injury case in the United States in August 1977. (PD Exh. 34 at 31.) By the Petition Date, approximately 114,000 lawsuits were pending in the United States (Id.) Hanly testified that T&N's liability in the United States arose out of four product lines. A brief discussion of these sources of liability is important in understanding the significant reach of T&N's asbestos containing products in the United States and the United Kingdom.

    1.    Limpet

The Limpet product was invented by T&N in 1931 and was distributed throughout the United States from 1934 to 1974. (Tr. at 56 (Hanly).) Limpet was a spray-on application that was used for fireproofing, insulation, condensation control, and decorative finishes. (Id.) Limpet was made of pure asbestos, either amosite or crocidolite, and had the greatest asbestos content of any product in the United States. (Id.) According to the Disclosure Statement Describing the Third Amended Plan of Reorganization (hereinafter the "Disclosure Statement" and submitted as PD Exh. 34.), the Limpet was not widely marketed or used in the United States due to its significant expense, its relatively slow spraying process and the U.S. licensees' lack of success in promoting it. (PD Exh. 34 at 32.) From 1957 to 1965, approximately half of all Limpet sold in the United States went into three high-profile projects: Chase Manhattan Plaza in New York City, the Prudential Center in Boston, and the Central Terminal Building at

-7-

LaGuardia International Airport. (Id. at 32-33.) Since the late 1970s, T&N was named in relatively few cases by plaintiffs alleging Limpet exposure. (Id.)

### 2.    Keasbey

In 1934, T&N purchased Keasbey & Mattison Co. ("Keasbey"), who until 1962, manufactured and sold every variety of asbestos-containing product, including Limpet, textiles, insulation, and building materials. (Tr. at 54-56 (Hanly).) Keasbey was often referred to as a "mini Johns-Manville." (Id. at 54.) In 1962, T&N sold Keasbey's assets.

In the late 1980s, asbestos plaintiffs discovered that T&N was the supplier of raw asbestos fiber to Keasbey, and began asserting claims against T&N on this supplier theory. Also, plaintiffs pursued claims on an alter ego theory, which proved largely unsuccessful in the courts (see PD Exh. 34 at 33) and few claims were settled based on the alter ego or similar theories of liability. Because of the breadth of the Keasbey product line, the resulting liability from Keasbey products could be substantial.

### 3.    Raw Fiber

T&N owned asbestos mines and mining interests in southern Africa and Canada. (Tr. at 53 (Hanly).) T&N sold raw fiber to asbestos companies in the United States, and used its mined fiber to manufacture its own products. (Id.) T&N was sued in the United States by plaintiffs alleging personal injury from asbestos exposure in the manufacturing or transportation process. (Id.) T&N was also sued by end-users of asbestos containing products on a supplier theory. T&N's Disclosure Statement states that it brokered a

-8-

"minuscule amount" of fiber to United States companies. (PD. Exh. 34 at 34.)

Nevertheless, T&N did form a joint-venture with Johns-Manville, which still exists today,

and might be a potential source of liability for claimants injured by Johns-Manville

products. (Tr. at 58 (Hanly).)

    4.    United Kingdom Finished Products

    T&N had several United Kingdom subsidiaries that manufactured finished

products containing asbestos and marketed them in the United States. Based on the

agency relationship that existed between T&N and the United Kingdom subsidiaries,

Hanly testified that the parent was responsible for all claims against any of the two United

Kingdom subsidiaries. (Tr. 59-60 (Hanly).) Two of the subsidiaries were TBA Industrial

Products Ltd. and Ferodo U.K. (Tr. 60-61.) Hanly testified that TBA Industrial was

named in more than 75 percent of the claims against T&N in the United States; whereas,

Ferodo was only named in 1 to 5 percent. (Tr. at 61.)

    **B. T&N's Liability in the United Kingdom**

    T&N's United Kingdom asbestos claims administrator, Andrea Crichton

("Crichton") testified that T&N's liability in the United Kingdom differs from that in the

United States because the majority of asbestos personal injury claims in the United

Kingdom are based upon negligence and/or failure to provide a reasonably safe

workplace for T&N employees. (Tr. at 153 (Crichton).) Other claims are from family

members who lived with T&N employees, environmental exposure claims from persons

living in the vicinity of T&N factories, and some products liability claims. (Tr. at 153-

54.) The evidence submitted indicates that the United Kingdom's liability is substantially lower than that of the United States.

### C. Medical Evidence on Asbestos Related Disease

Each party put forward its respective expert to discuss the medical evidence regarding the incidence and trends of asbestos related diseases in the United States. Plaintiffs presented expert testimony from a medical doctor, Laura Welch, M.D. ("Welch"), a physician with board certifications in both occupational environmental medicine and internal medicine. (Tr. at 183 (Welch).) Dr. Welch has held faculty and medical staff positions at the Albert Einstein School of Medicine, Yale University School of Medicine, George Washington University School of Medicine, and the Washington Hospital Center. (Tr. at 189.) Dr. Welch has had over twenty-five years of experience in the diagnosis and treatment of asbestos-related diseases, and in the design of programs for that purpose. (Tr. at 186-87.)

The PD Committee submitted the testimony of Dr. Hans Weill, M.D., who is a board-certified pulmonologist, former President of the American Thoracic Society, and researcher with 35 years of experience in the study and treatment of asbestos exposure. (See Testimony of Hans Weill, M.D., in Owens Corning v. Credit Suisse First Boston, No. 04-CV-905 (D. Del.) 1/18/2005 at 45-48 (hereinafter "Weill Tr. at ___").)[4] Dr. Weill has been on the staff at Tulane Medical Center since 1976 and has personally evaluated over 1,000 individuals exposed to asbestos. (Id.)

---

[4] Dr. Weill's Owens Corning testimony was admitted to the record pursuant to an agreement among the parties. (See Tr. at 803-04.)

Even though the ravages of asbestos diseases are well documented, the experts

dispute the trends in the main categories of disease: mesothelioma, lung cancer, other

cancers, and nonmalignant diseases, such as asbestosis, pleural plaques, and thickening.

Both experts agree that the latency period for most asbestos related disease is 20 to 40

years. (Weill Tr. at 40; Tr. at 255 (Welch)). In essence, Dr. Weill asserts that because of

the dose response function for asbestos-related disease, and the fact that workplace

exposures have become increasingly less prevalent since 1972, the overall disease burden

in the United States is declining. (Weill Tr. at 71.) Dr. Weill believes, in part, that the

phenomenon of systematic over-reading of chest x-ray films by asbestos litigation

screening facilities, as reported in the Gitlin Study (see PD. Exh. 28), undermines the

evidence that the incidence of asbestos-related disease is increasing as against T&N. (PD

Exh. 59 at 6.) Based on his 2004 study "Changing Trends in Mesothelioma Incidence"

(See PD Exh. 62), Dr. Weill concluded that the peak incidence of mesothelioma in the

United States occurred in 1994, and that the incidence has since decreased. (Weill Tr. at

59.) Because mesothelioma incidence is probably "the clearest measure of the extent of

asbestos related disease, these [declining] trends strongly indicate that the overall burden

of asbestos health effects in the USA is waning, a pattern that would be expected to

continue." (PD Exh. 62 at 441.) Dr. Weill criticizes the Nicholson Study[5] as being

---

[5] The"Nicholson Study" is the oft-cited report authored by William J. Nicholson, et al., entitled Occupational Exposure to Asbestos: Population at Risk and Projected Mortality-1980-2030, 3 American Journal of Industrial Medicine 259 (1982) (hereinafter the "Nicholson Study" and submitted as Pl. Exh. 5), which sought to predict the incidence of asbestos related cancers until the year 2030.

-11-

overstated because it does not accurately reflect recent reduced exposure conditions. (PD

Exh. 21 at 8.) Also, Dr. Weill disputes the assertion that other forms of cancer, such as

esophageal, colo-rectal or laryngeal cancer are causally related to asbestos exposure. (PD

Exh. 21 at8.)

Conversely, Dr. Welch aligns herself with the projections of the Nicholson Study

and the Surveillance, Epidemiology, and End Results ("SEER")[6] data, which indicate that

there are currently about 2,800 new mesothelioma cases in men each year, plus several

hundred cases in women. (See Tr. at 270 (Welch).) Dr. Welch states that the incidence

of mesothelioma in the United States has not yet reached its peak, but believes the rate is

slowing. (Tr. at 283.) Furthermore, the Health and Safety Executive of Great Britain

("HSE"), which is responsible for the regulation of health and safety risks in Great

Britain, published a report in 2003 that states the annual number of mesothelioma deaths.

(See Pl. Exh. 6.) This report indicates that the number of mesothelioma deaths in Great

Britain has risen fairly constantly over time, from 153 in 1968 to 1,848 in 2001, and is

expected to peak at 1,950 to 2,450 around 2011 to 2015. (Pl. Exh. at 6.)

Lung cancer has also been attributed to asbestos exposure, however, a diagnosis of

asbestosis is not necessary for the development of asbestos-related lung disease. (Tr. at

249 (Welch)). Yet, workers with asbestosis have a four-fold increased risk of developing

---

[6] SEER Incidence Age-Adjusted Rates, 9 Registries, 1973-2002," National Cancer Institute, Bethesda, Maryland, available at http://www.seer.cancer.gov/faststats/sites.php?site=Mesothelioma&stat=Incidence (last visited July 18, 2005).

lung cancer. (Tr. at 203 (Welch); Weill Tr. at 102.) Regarding nonmalignant diseases, such as pleural disease and asbestosis, it is possible that a diagnosis can be made without the patient demonstrating functional impairment. (Tr. at 197 (Welch); Weill Tr. at 61, 101). Moreover, the 2004 American Thoracic Society Statement (the "ATS Statement"), which provides guidelines for diagnosing nonmalignant asbestos-related disease, states that asbestos can cause injury without functional impairment. (Pl Exh. 25 at 691; Tr. at 199 (Welch). Diagnosis of asbestosis can also be complicated by the fact that asbestosis can exist when a person has a normal chest x-ray on an ILO scale.[7] (Tr. at 201-202 (Welch);Weill Tr. at 75, 101.) The 2004 ATS Statement supports the assertion that asbestosis can persist despite no radiographic evidence (x-ray) of asbestosis. (Pl. Exh 25 at 696, 705.) Like, mesothelioma, other nonmalignant diseases have prolonged latency periods. Based upon CDC/NIOSH data, Welch stated that over the decade of 1990-2000 asbestosis incidence continued to rise and peaked at 20,000 hospitalizations in 2000. (Tr. at 259 (Welch); Pl. Exh. 33 at 3-4.)

### D. T&N's Litigation Experience in the United States

Plaintiffs presented Mr. Paul Hanly ("Hanly"), the primary outside defense counsel for T&N in the United States for the twenty years preceding its bankruptcy, to describe

---

[7] The term "ILO Scale'" means the system for the classification of chest x-rays set forth in the International Labour Office's Guidelines for the Use of ILO International Classification of Radiographs of Pneumoconioses (1980) as amended by the International Labour Office. The National Institute for Occupational Safety and Health's ("NIOSH") B Reader approval is granted to physicians who demonstrate proficiency in the classification of chest radiographs for the pneumoconioses using the ILO Classification System. See http://www.cdc.gov/niosh/topics/chestradiography/breader-info.html (last visited August 17, 2005).

T&N's litigation strategies in response to its mounting asbestos liability. The PD

Committee did not offer rebuttal testimony. Hanly's evidence was crucial because it shed

light on the task of placing the appropriate weight on T&N's historical settlements, and

provided insight into the perils that T&N faced in the months before filing bankruptcy.

The Court finds Hanly's testimony regarding the various strategies used by T&N is

credible and corroborated by the testimony of Mr. William Hanlon, the primary outside

counsel for the Center for Claims Resolution (the "CCR"), Mr. Michael Lynch, CFO for

T&N, and Dr. Mark Peterson ("Dr. Peterson"), the Plaintiffs estimation expert.

### 1.    Pre-1985

T&N's early strategy was to settle legitimate claims for the lowest amount possible

so that it could avoid the uncertainties and risks associated with litigation. (Tr. at 65

(Hanly).) Hanly explained that this response was borne out of necessity because in cases

involving mesothelioma and lung cancer the jury verdicts were usually high since it was

easy for plaintiffs to impute corporate knowledge to T&N based upon corporate

documents dating back to the 1930s. (Tr. at 85-87.) Therefore, establishing liability

against T&N for failure to warn was not difficult.


### 2.    The Asbestos Claim Facility

In June 1985, T&N joined the Asbestos Claim Facility ("ACF"), a consortium of

thirty-two asbestos producers and sixteen insurers, who sought to reduce the aggregate

settlement costs in asbestos litigation by streamlining administration costs and pooling

-14-

together legal experience. (Tr. at 49.) Among the original members were notable

asbestos-defendants Eagle-Picher, Pittsburgh Corning, Celotex Corp., Fibreboard Corp.,

and Owens-Corning Fiberglass Corp., U.S. Gypsum and National Gypsum, and insurers

such as Aetna Life and Casualty, Fireman's Fund, Cigna, the Hartford Insurance Group,

and Lloyds of London.[8]  After only a few years, internal disputes arose and the ACF was

dissolved in October 1988.  (Id.)

### 3.    The Center for Claims Resolution

The former members of the ACF, including T&N, joined the Center for Claims

Resolution ("CCR") in 1988.  (Tr. at 49-50 (Hanly).)  Like the ACF, the CCR had the

same goals of minimizing litigation expenses and increasing its members bargaining

power with personal injury claimants.  (Id.)  At first, the CCR was an "all pay" regime

whereby each member paid a portion of a claim that was either settled or went to verdict,

regardless of which party(s) were named on the complaint.  (Tr. at 68.)  In 1991, this

changed to a named-party only regime, which required only the parties named on the

caption to be liable.  The CCR developed intricate share allocations that apportioned

liability percentages to each claim based on the alleged occupational category or job site.

(Tr. at 73.)  The share allocations were based upon past settlement averages of each

member and production and sales history of each member as it relates to the type,

---

[8] Fitzpatrick, Lawrence, "The Center for Claims Resolution," 53 Law and Contemporary Problems 13-14 (1990). Notably, Johns-Manville was not included in the final ACF agreement because it was still under the jurisdiction of the bankruptcy courts. Id.