Dr. Cantor also assumed an inflation figure for future claims at 2.2%, which is based upon the United States Congressional Budget Office's estimated long term inflation rate in the Consumer Price Index. (PD Exh. 2 at 37.) She used a 5.5% "risk-free" discount factor to compute T&N's present value of liabilities that is based on the 30-year treasury bond estimates published annually by the United States Office of Management and Budget. (Id. at 37-38.) Dr. Cantor, however, notes that economic theory would support an even larger discount rate to "reflect the risk of the future cash flows anticipated by claimants at the time they were injured." (Id. at 38.)

    4.    <u>Aggregate Liability in the United Kingdom</u>

Dr. Peterson was the only expert that forecasted the pending and future liability in the United Kingdom. Dr. Peterson testified that he employed the same methodology that was used in forecasting T&N's liability in the United States (Tr. at 558.) Because T&N was the dominant asbestos defendant in the United Kingdom, Dr. Peterson testified that he distinguished between claims where T&N had sole liability, and those where T&N had shared liability. (Tr. at 550-551, 553.) He considered the fact that T&N had far fewer claims than the United States, stable settlement values, and timing differences in epidemiology and asbestos exposure. (Tr. at 553-56.) Also, Dr. Peterson testified that the United Kingdom data did not support an increase in the propensity to sue. (Tr. at 557.)

Thus, Dr. Peterson considered that average settlement values for mesothelioma, other cancer, asbestosis, and pleural disease, both for cases where there was shared liability and sole liability, and computed average resolution values based upon historical

payment percentages during the 1998-2001 base period. (See Pl. Exh. 4 at 49.) He predicted that there would be 21,125 future claims against T&N in the United Kingdom (see Pl. Exh. 4 at slide 52), and forecasted the total liability for present and future claims in the United Kingdom at £229 million (approximately $400 million USD) (Tr. at 561.). The breakout by disease is depicted below in millions of £s.

| Claims | Meso | Othc | Asbestosis | Pleural D. | Total |
|---|---|---|---|---|---|
| Pending | £8 | £1 | £3 | £2 | £14 |
| Future | £121 | £8 | £52 | £34 | £215 |
| All Claims | £129 | £9 | £55 | £36 | £229 |

(See Pl. Exh. 4 at slide 54.)

### G. Plaintiffs' Criticisms of Dr. Cantor's Methodology

Plaintiffs take issue with several aspects of Dr. Cantor's methodology concerning future claims, which they argue make her estimates downwardly biased. It is argued that she mistakenly uses "death years" to count compensable claims filed during her four-year calibration period (1998-2001). Instead of counting the claims filed in a given year, and using that as a basis to project future compensable claims, Plaintiffs argue that Dr. Cantor erroneously imputed a death year to the claimants in her calibration period. She did this, in part, by using the claim payment date as a proxy for the date of death. Because the claim payment date is on average two years or more longer than the date of death, it is argued that Dr. Cantor's calibration period is flawed because it did not factor: (1) persons who made claims against T&N, but have not yet died, and (2) persons who have died

before the Petition Date, yet filed claims afterward. (Tr. at 1184-1190 (Peterson Rebuttal).) Thus, Plaintiffs argue that Dr. Cantor's death year methodology ignored over 30 percent of the cancer claims made during the calibration period. (Pl. FOF ¶95.) Also, Plaintiffs state that she excluded certain industries from her projection, even though T&N either directly, or through its subsidiary Keasbey, exposed persons in these industries to asbestos. (Tr. at 1101-1104.)

Plaintiffs state that the recent mesothelioma filings against T&N in 2001 and T&N's resolution history do not support Dr. Cantor's projections. Dr. Cantor testified that in 2001, 1,252 new mesothelioma claims were filed against T&N, which was up from the 900 new claims averages from 1998 and 1999. (Tr. at 1109-1110.) Plaintiffs contend that when you consider the 90% resolution rate, Dr. Cantor's 2002 projection of 660 compensable mesothelioma claims (a 40% drop from 2001) cannot be supported by either T&N's claims history, any epidemiological model, or events after the Petition Date. (Pl. FOF ¶ 96.) In addition, her future projections are contrary to the total number of filings against T&N before the Petition Date. Dr. Peterson testified that from a level of 18,000 new claims in 1995, the filings rose steadily to a annualized amount of approximately 60,000 new filings in 2001. (See Pl. Exh. 2 at 28.) Yet, Dr. Cantor projects only 23,706 compensable claims in 2002, a one-third drop from 2001 and a figure that is fewer than any year since 1997. (See PD Exh. 2 at 39.) Therefore, Plaintiffs argue that Dr. Cantor underestimates future filings.

Dr. Cantor's classifications of the disease for future claims is also questioned. Plaintiffs argue that Dr. Cantor failed to use transition data–that is, allocating a disease to a unspecified disease in the T&N database based on historical ratios– to estimate her future claims. Dr. Cantor testified that the use of untransitioned data shows that there is no increase, or even a decrease, in malignant claims over T&N's claims history. (Tr. at 1093 (Cantor).) Instead, Plaintiffs posit that Dr. Peterson's method, use of transitioned data is more reflective of T&N's litigation experience, which according to Hanly shows a marked increase in malignant claims. (Tr. at 79-82.)

Plaintiffs also dispute the settlement averages that Dr. Cantor used for each disease. For example, she calculated a settlement average of $102,000 for mesothelioma in 2001, yet uses a $68,886 base line to compensate all pending mesothelioma claims. (Tr. at 1117-1118.) Plaintiffs rely on Hanly's testimony that T&N experienced a 75% increase in settlement values for mesothelioma claims between 2000 and 2001, and that T&N was settling claims in 2001 for over $130,000 (see Tr. at 81-82 (Hanly)) to demonstrate that Dr. Cantor's assertion, that T&N would be able to resolve claims cheaper out of the CCR than in the CCR, is inaccurate.

Further, Plaintiffs contend that of the other asbestos defendants Dr. Cantor considered in her side-by side comparisons, she failed to fully appreciate the Union Carbide experience, which more closely resembled T&N's experience as it left the CCR at the same time as T&N. (See Tr. at 1170 (Cantor).) Yet, Dr. Cantor admitted that the number of claims filed against Union Carbide, and the costs to resolve those claims,

-35-

"skyrocketed" from 2001 to 2003. (Tr. at 1172.) On cross-examination, Dr. Cantor admitted that according to Union Carbide's Form 10-Ks, there were 73,806 claims filed in 2001 (when it left the CCR), 121,916 claims in 2002, and then 122,586 in 2003. (See Tr. at 1169.) Likewise, Dr. Cantor acknowledged that Union Carbide's indemnity costs went from $39 million in 2001, to $155 million in 2002, to $293 million in 2003, then to $300 million in 2004. (Tr. at 1168-70.) Hence, Plaintiffs insist that Dr. Cantor's argument that filings and costs were trending downward, when compared with a similarly situated post-CCR member, is inconsistent with the factual record.

### H. Defendant's Criticisms of Dr. Peterson's Estimate

The PD Committee questions Dr. Peterson's estimate on the grounds that his estimate of $11.1 billion is not on par with other estimates of T&N's total aggregate liability. Defendant observes that advisors to the United Kingdom pension trustee ("Tillinghast") have estimated T&N's aggregate liability at between $2.1-$5.1 billion. (See PD FOF ¶ 90.) The estimation consultants to the UK administrators ("EMB") calculated aggregate liability at $5.3 billion, and also characterized Dr. Peterson's claim values and propensity to sue numbers as "overstated." (See Pl. Exh. 16 at 4-5.) Also, the PD Committee points to Dr. Peterson's own shifting estimate of liability: first at $6.7 billion (see PD Exh. 14), then $5.6 billion (PD Exh. 14), and finally at $11.1 billion. Dr. Cantor also points out that an estimate provided by the National Economic Research Associates ("NERA") in 2001 and reported in Federal-Mogul's Form 10-K filed on December 31, 2000 (the last 10-K before the bankruptcy filing) estimated that the aggregate liability for all the Federal-Mogul entities at $1.8 billion. (PD. Exh. 2 at 6-7.)

Defendant attacks two central premises of Dr. Peterson's increasing estimate: (1) that there will be an increasing propensity to sue for cancers during the first five years of the forecast period, and (2) the ratio of claims for nonmalignant diseases to cancers will similarly increase. Thus, under the increasing model, Dr. Peterson estimates that there will be 1.1 million future claims, which Defendant states is nearly triple the 380,000 that have been filed against T&N in the 21 years before its bankruptcy. (See PD FOF ¶ 90.) The PD Committee reduces the nearly $9 billion dollar gulf between Dr. Cantor's and Dr. Peterson's estimate to two factors (1) higher settlement averages per disease and (2) the increasing claiming rates on which Dr. Peterson's increasing estimate is based.

Defendant submits that Dr. Cantor's calculation of settlement averages based on historic settlements over her four-year calibration period is superior to the overstated Trust Distribution Procedures ("TDPs") that Dr. Peterson relies on. Dr. Peterson's settlement average per disease is significantly higher than they were in 2001. The settlement averages represent a 36% increase in mesothelioma claims, a 59% increase for lung cancer, a 204% increase for other cancers, and a 410% increase for nonmalignant diseases. (Tr. at 598-99, 608-610.)

The PD Committee also questions Dr. Peterson's claiming rates that are established in his Increasing model. While Dr. Cantor acknowledges that claims against T&N rose sharply from 1997 (22,000 claims) to the first nine months of 2001 (44,700 claims), she disagrees with Dr. Peterson's projection that T&N will face in excess of 40,000 claims through the year 2015. Moreover, Dr. Peterson puts the peak year for

cancer claims at 2006, which is 43% higher than what T&N actually experienced in 2001. (See Tr. at 781 (Peterson).) This increase, the PD Committee argues, is not attributable to any increase in malignant disease incidence because both the Nicholson model and the KPMG model (establishing peak mesothelioma incidence in 1997, and all cancers in 1990) do not show this continued increase. (See PD Exh. 2 at A-2; Tr. at 766-768.) Additionally, Defendant contends that the myriad of legal reforms now in effect, or being proposed, will also drive down the claiming rates of nonmaliganant claims.

### III. CONCLUSIONS OF LAW

#### A. Procedural History and Jurisdiction

On June 16, 2004, the Chief Judge of the United States Court of Appeals for the Third Circuit designated this Court to sit on the United States District Court for the District of Delaware in the Federal-Mogul bankruptcy case. On December 2, 2004, the Debtors filed a motion pursuant to 11 U.S.C. Section 105(a) for an Order (I) Clarifying District Court Judge Wolin's December 10, 2001 Order, and (II) Delineating the Respective Roles of the District Court and the Bankruptcy Court With Respect to Asbestos Estimation and Plan Confirmation Matters in these Cases, which sought withdrawal of the reference to this Court from the Bankruptcy Court of both the asbestos personal injury claims estimation and the Plan confirmation proceedings. (Docket No. 6517, Bankr. No 01-10578 (RTL).) On January 14, 2005, the PD Committee filed a statement in support of the Withdrawal Motion. (Docket No. 6830, Bankr. No 01-10578 (RTL).)

Following a hearing on January 25, 2005, this Court entered an Order that granted a withdrawal of the reference with respect to the estimation hearing pursuant to 28 U.S.C. § 157(d), but reserved decision on whether to withdraw the reference as to Plan confirmation. This Court has jurisdiction over the estimation of asbestos personal injury claims under 28 U.S.C. §§ 1334 and 157.

### B. English Law Considerations

In an attempt to efficiently and thoroughly resolve the liability concerns in the United States, Plaintiffs have also submitted evidence that it hopes will provide some persuasive reference to the concurrent administration (bankruptcy) proceedings in the United Kingdom. Recently, the English solicitors for the Administrators of the English companies in the Federal-Mogul Group (the "UK Debtors") applied to Justice David Richards of the English High Court of Justice ("Justice Richards") for directions that concerned various issues of conflicts of law pursuant to section 14(3) of the Insolvency Act 1986. On June 9-10, 2005, Justice Richards held a hearing, in which the High Court indicated that it could be assisted on the issues after this Court renders its estimation judgment.

To that end, Ms. Barbara Dohmann Q.C. ("Dohmann"), a barrister at the Bar of England and Wales and a member of the Blackstone Chambers, provided credible and well-reasoned expert testimony as to the choice of law for liability and damages that would apply if T&N's personal liability claims, based on events in the United States, were considered by an English court. Clearly, this Court's consideration of the question is for

-39-

the purposes of this hearing and the pending United States bankruptcy proceedings. The interpretation of United Kingdom law for purposes of the United Kingdom administration is a matter for the United Kingdom courts.

Regarding liability, Ms. Dohmann testified that the choice of law applicable to T&N's United States asbestos personal injury claims would be governed by either the Private International Law (Miscellaneous Provisions) Act 1995 (the "1995 Act") or common law. For personal injury claims in which both the exposure and the manifestation of disease took place after May 1, 1996, the 1995 Act determines the applicable choice of law; whereas, in claims arising before May 1, 1996, pursuant to Boys v. Chaplin, [1071] AC 356, the choice of law analysis is driven by the "double actionability" test. (Tr. at 339-342 (Dohmann).) Ms. Dohmann opined that under either scenario, a Court in the United Kingdom would apply the law of the relevant United States jurisdiction to determine T&N's liability for asbestos claims asserted against it based upon exposure and injury occurring in the United States. The Court accepts Ms. Dohmann's testimony as credible and persuasive.

The damages determination, however, has generally been considered a procedural matter that is governed by the law of the forum; that is, English domestic law. (Tr. at 343-344.) Ms. Dohmann testified that several developments have called into question this premise, and that she believes that the House of Lords will ultimately determine that a United Kingdom court will also apply United States law to the quantification of damages question. First, in 2004, the Court of Appeal decided Harding v. Welands

-40-

[2004] EWCA Civ 1735, and held that under the 1995 Act a statutory cap on damages under the foreign law governing the underlying tort was a substantive matter. Ms. Dohmann testified that <u>Harding</u> is set to be heard by the House of Lords in the later half of 2005, and that based upon the substantial criticism of the quantification of damages rule, it is likely that they would affirm the Court of Appeal's decision. (Tr. at 347-348.). She believes that the House of Lords has demonstrated a willingness to overturn antiquated or unjust procedural rules. (Pl. FOF ¶ 67.) For example, in <u>Miliangos v. George Frank Ltd.</u> [1976] AC 443, the House of Lords did away with the rule that English courts could only give judgments in pounds sterling because of the currency's exchange rate fluctuations, which could be a source of injustice in those cases arising in other countries.

Second, Ms. Dohmann spoke of two decisions rendered by Australia's highest court, <u>Régie Nationale des Usines Renault SA v. Zhang</u>, (2003) 210 CLR 491, <u>John Pfeiffer Pty. Ltd. v. Rogerson</u> (2000) 203 CLR 503, which as persuasive authority, held that quantification of damages should be governed by the same law that governs liability. (<u>See</u> Tr. at 352-53.) In addition, she observed that the Council of the European Union has issued a draft choice of law regulation that provides, that the law applicable to the tort or delict shall be the law of the country in which the damage occurs, and the nature and assessment of damages will also be based on the laws of the country where the damage occurs. (Tr. at 349-351.)

Admittedly, the laws governing quantification of damages is in a state of transition in the United Kingdom. The PD Committee correctly established during cross-examination that as of this moment the laws of the United Kingdom would control the quantification of damages issue. Nevertheless, the Court accepts the testimony of Ms. Dohmann, and concurs with her opinion that the House of Lords will ultimately decide that United States claims against T&N would be assessed and quantified, in an English administration, under the applicable law of a United States jurisdiction, regardless of whether the claims are considered under the 1995 Act or common law.

### C. Estimation in Bankruptcy

Estimation helps the court "avoid the need to await the resolution of outside lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcome of these actions." Matter of Ford, 967 F.2d 1047, 1053 (5th Cir. 1992). The Bankruptcy Code states that estimation is necessary when liquidation outside of bankruptcy would unduly delay the administration of the case. 11 U.S.C. 502(c). The object of such a proceeding is to establish the estimated value of a creditor's claim for purposes of formulating a reorganization plan. Kool, Mann, Coffey & Co. v. Coffey, 300 F.3d 340, 347 (3d Cir. 2002). Although courts have disagreed about whether estimation is mandatory or permissive, it is apparent that the Bankruptcy Code requires an estimation in order to prevent undue delay in the administration of the estate.[10]

---

[10] "Thus, relief for the debtor is incomplete, and those creditors are not given an opportunity to collect in the case on their claims. The proposed law [the current Bankruptcy

-42-

It is undisputed that the Personal Injury Claims are contingent and unliquidated, and that liquidation of each claim by a trial would unduly delay the administration of these cases. Moreover, the parties are attempting a plan for reorganization; thus, in accordance with the underlying principles in bankruptcy of promoting the quick and efficient administration of the estate, the estimation of the aggregate allowable amount on all United States and United Kingdom pending and future asbestos claims will be determined by this Court.

1. <u>Purpose of an Estimation</u>

As indicated above, the Bankruptcy Code is less than clear *when* a court should undertake an estimation process. The Code is equally vague about the purpose of estimation. Section 502(c) only speaks of estimating claims for the purpose of allowance. The language does not expressly state whether claims are estimated for voting only, for voting and confirmation only, or for all purposes including distribution into a personal injury trust.

Here, the focus is on T&N's aggregate personal injury liability for the creation of a trust, not the merits of individual or class of individuals claims. To do the latter, would require that each claimant be afforded the procedural protections of the due process clause of the Fifth Amendment, thereby requiring cases that presented disputed issues of

---

Code] will permit a complete settlement of the affairs of the bankrupt debtor, and a complete discharge and a fresh start." H.R. Rep. No. 95-595, at 180 (1978), 1978 U.S.C.C.A.N. 5963, 6141.

fact a trial by jury. Thus, the Court finds persuasive the recent <u>Owens Corning v. Credit Suisse First Boston, (In re Owens Corning)</u>, 322 B.R. 719 (D. Del. 2005) case, and likewise determines that an estimation of asbestos liability for the limited purposes of plan formulation is a fruitful endeavor because it promotes the speed and efficiency goals of the Bankruptcy Code, while not implicating the procedural rights of the individual claimants. Also similar to <u>Owens-Corning</u> is the fact that this estimation did not involve the discovery of individual claims, but rather an inquiry focused on T&N's historical claims-handling practices, and expert testimony on trends and developments in the asbestos tort system. To do otherwise would eviscerate the purposes of the estimation process and place additional financial burdens on the very trust which the Court is trying to create.

Finally, the existence of a "Central Deal" among the Plan Proponents, and the possibility that a committee, such as the PD Committee, would be allocated a less than ideal distribution once the Plan is confirmed, is wholly ancillary to the Court's function in this estimation. Such pacts among creditor constituencies are commonplace in bankruptcies, and it makes little difference that one exists here. Ironically, the fact that the PD Committee challenges the lone estimation proffered by the Personal Injury Claimants, as a result of not being party to the Central Deal, has enabled the Court to consider more than one estimate, and observe how each expert withstands the rigors of cross-examination. In a sense, the existence of a Central Deal has aided the Court's fact-finding function.

2.     Method of the Estimation

The Bankruptcy Code does not establish the manner in which contingent or unliquidated claims are to be estimated. Bittner v. Borne Chemical Co., 691 F.2d 134, 135 (3d Cir. 1982). The Third Circuit has stated that Congress intended the procedure to be undertaken initially by the bankruptcy judges, "using whatever method is best suited to the particular contingencies at issue." Id. The principal consideration must be an accommodation to the underlying purposes of the Code. Id. In accomplishing this task, the estimating court is bound by the legal rules which may govern the ultimate value of the claim. For example, when the claim is based on an alleged breach of contract, the court must estimate its worth in accordance with accepted contract law. Id. It is, after all, a general principle in bankruptcy law that, for bankruptcy purposes, state law governs the validity and amount of a claim. See Raleigh v. Ill. Dept. of Revenue, 530 U.S. 15, 20 (2000). See also Bitner, 691 F.2d at 135 (applying same principle to estimation proceedings under § 502(c)). In addition, all claims are to be valued at the petition date. In re Owens Corning, 322 B.R. at 721-722 (citing In re Brinns Cotton Mktg., 737 F.2d 1338 (5th Cir. 1984)).

Courts in the Third Circuit have recently grappled with the manner in which an estimation should be conducted in the asbestos-bankruptcy context. In the In re ArmstrongWorld Indus. estimation, it was stated that "estimating future claims is more an imprecise art than a science, and the best way anyone can do is try to find an estimate that is not unreasonable." In re Armstrong World Indus., Case No. 00-04471, slip. op. 48,

-45-

Docket No. 6255 (Bankr. D. Del. December 19, 2003). Indeed, an estimation by definition, is an approximation and necessarily involves comparing a known or established quantum of data to the thing being estimated.

The In re Owens Corning estimation provides a useful analog to this estimation. That estimation hearing lasted six-days and had sixteen witnesses testify: four fact witnesses testified about the company's asbestos litigation experience, three medical experts testified about the standards for the diagnosis of asbestos related diseases and the effects of the diseases, four estimation experts valued Owens Corning's asbestos personal injury liabilities, two financial experts testified about the appropriate discount rate, an expert testified about the developments in asbestos litigation, and an expert opined on a study of B-reader x-rays. The range of competing estimates of Owens Corning's liability, as testified by the estimation witnesses: $2.08 billion (Dr. Dunbar), $6.5 billion to $6.8 billion (Dr. Vazquez), $8.15 billion (Dr. Rabinowitz), and $8.4 billion to $11.1 billion (Dr. Peterson). The court pegged Owens Corning's liability as "somewhere in between," and consequently, assessed its liability at $7 billion. In re Owens Corning, 322 B.R. at 725. This was in-line with other major asbestos bankruptcy estimations.[11]

The Memorandum and Order, however, does not give a roadmap to its $7 billion dollar figure; this, despite the enormous variations in the four estimates provided, $2-$11

---

[11] The estimate in the Babcox & Wilcox case was $7.1 billion to $9.0 billion, in Armstrong World Indus. it was $4.7 billion to $6.5 billion, in Raytech it was $7 billion, and in Eagle-Picher it was $2.5 billion.

billion dollars. This is not a criticism of that court, but rather, a recognition that each expert used a different set of assumptions and methods for determining historic levels of compensation, the values of that compensation, and how the universe of claims was evaluated.[12] Similarly, this Court is confronted with two estimates that are submitted by two well-respected experts, but are based upon radically different assumptions; indeed, like In re Owens-Corning, there is a $9 billion dollar gulf between the expert's estimates. The In re Owens-Corning court accurately reflected on how the estimating Court should approach an asbestos claim estimation

> In undertaking this comparative assessment, however, I prefer to avoid specific mathematical calculations: since mathematical precision cannot be achieved in the prediction being undertaken, it is important that we not pretend to have achieved mathematical accuracy.

In re Owens Corning, 322 B.R. at 725. The task, therefore, cannot be to simply determine which expert makes a more compelling argument as to a particular variable in their formula, insert the most credible figure, and then continue with the calculus. The task is made more difficult because the parties have spent considerable time criticizing the other expert's assumptions and the methodology used to compute each variable. After consideration of the expert reports in this matter, it is evident that the Court must make reasonable adjustments based on the record created at trial and embrace the methodology

---

[12] This is not uncommon. One commentator analysed the factual record in the A.H. Robbins estimation, and determined that Judge Merhige was left with nothing more than his own judgment in determining a proper estimation amount because of the diffrent assumptions employed by each estimation expert. See Alison J. Brehm, et al., To Be, or Not to Be: The Undiscovered Country of Claims Estimation in Bankruptcy, 8 J. Bankr. L. & Prac. 197 (1999).

it finds more reliable, while remaining vigilant to the potential bias that a party's expert may have on his or her estimation figures.[13]

To start, a workable framework was developed in In re Eagle Picher, 189 B.R. 681 (Bankr. S.D. Ohio 1995), wherein the court set out what an estimating court should consider in the asbestos estimation process. In consideration of all pre-petition, unpaid claims, the only sound approach is to begin with what is known; namely, the data in the T&N Database. Id. at 686. This Court did not conduct an independent analysis of the T&N Database; rather, it relied upon the testimony of the estimation experts. To attempt an estimation without utilizing information known about these debtors and their history in the handling of claims which have been asserted against them in the past, and their disposition, is to ignore a valuable resource. Id. From the database it is possible to associate with each claim characteristics such as occupation of the claimant, nature of the disease, the amount which was paid to the claimant, as well as a number of other factors. Id. Because much of the same information is known about the unpaid, pre-petition claims (pending claims), though, of course, not the settlement amount, it is possible to ascertain with some degree of accuracy what the settlement figures for those claims would be had they been resolved pre-petition. Id.

---

[13] Dr. Peterson presented the highest estimate in the Owens Corning Estimation, and unlike that estimation, Plaintiffs have decided not to present more than one estimation expert. Notably, the In re Owens-Corning court, however, found two other experts most credible and stated, "Dr. Vasquez and Dr. Rabinovitz are, in my view, about equally persuasive. Both have attempted, and largely succeeded, in adjusting historical figures to reflect changed circumstances." In re Owens Corning, 322 B.R. at 725.