IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 01-2094 (JKF) |
| USG CORPORATION, *et al.*, | : | Jointly Administered |
| | : | |
| Debtors. | : | |
| | : | |
| USG CORPORATION, *et al.*, | : | |
| | : | |
| Movant, | : | |
| | : | |
| v. | : | |
| | : | |
| OFFICIAL COMMITTEE OF ASBESTOS | : | Civil Action No. 04-1559 (JFC) |
| PERSONAL INJURY CLAIMANTS, | : | Civil Action No. 04-1560 (JFC) |
| OFFICIAL COMMITTEE OF | : | |
| UNSECURED CREDITORS, OFFICIAL | : | |
| COMMITTEE OF ASBESTOS | : | |
| PROPERTY DAMAGE CLAIMANTS, | : | |
| LEGAL REPRESENTATIVE FOR | : | |
| FUTURE CLAIMANTS, AND | : | |
| STATUTORY COMMITTEE OF | : | |
| EQUITY SECURITY HOLDERS, | : | |
| | : | |
| Respondents. | : | |

### DECLARATION OF B. THOMAS FLORENCE

**I, B. Thomas Florence, declare under penalty of perjury that the foregoing is true and correct:**

    1.    I am the President of Analysis Research Planning Corporation ("ARPC"), the claims evaluation consultants retained by Dean M. Trafelet, the legal representative for future claimants (the "Futures Representative") in the above-captioned proceedings. I submit this

declaration in connection with the Futures Representative's opposition to the Motion for Approval of the Debtors' Sampling Plan and Claimant Questionnaire. As discussed below, the Debtors' sampling plan has numerous flaws.

**Qualifications**

2. I received a Ph.D. in research design and statistics from Michigan State University in 1981. I have taught courses and given lectures in the areas of research design, psychometrics, multi-variate statistical analysis, systems theory, and communication analysis. I have more than 25 years of experience in management consulting and research, including significant experience in litigation consulting, class action and mass tort case management.

3. Specifically, I have extensive experience in the area of valuing and estimating asbestos-related liabilities in connection with asbestos trusts and manufacturers. I have estimated current and future asbestos-related health claims relating to the A-Best Products Asbestos Settlement Trust, Amatex Asbestos Trust, DII Asbestos Trust, Keene Creditor Trust, JT Thorpe Successor Trust, Manville Personal Injury Settlement Trust, Pacor Trust, Fuller-Austin Asbestos Trust, UNR Asbestos Disease Claims Trust, Celotex Asbestos Settlement Trust, and the Eagle-Picher Personal Injury Settlement Trust. I have also estimated asbestos-related liabilities in connection with Babcock & Wilcox, 48-Insulations, Eagle-Picher Industries, A.P. Green, Armstrong World Industries, Federal Mogul, Flintkote Company, Halliburton, Kaiser, NARCO, Plibrico Company, Pittsburgh Corning, W.R. Grace, and Union Carbide. I have been qualified as an expert witness on issues regarding the estimation of the number and value of present and future asbestos claims in the Eagle-Picher, Fuller-Austin, Babcock & Wilcox, and Manville Trust cases.

4.  I also have considerable experience in the area of claims management, having been retained by the A-Best Products Asbestos Settlement Trust, Amatex Asbestos Trust, DII Silica Trust, Keene Creditor Trust, Manville Personal Injury Settlement Trust, Fuller-Austin Asbestos Trust, UNR Asbestos Disease Claims Trust, Celotex Asbestos Settlement Trust, Eagle-Picher Personal Injury Settlement Trust, Fibreboard Trust, Claims Resolution Facility, Dalkon Shield Trust, MDL-926 Claims Facility, Albuterol Claims Facility, FenPhen Diet Drug Trust, and the Dow Corning Settlement Trust to consult with them on issues of claims management. In that capacity, I have designed and implemented fully-integrated computerized management systems for processing more than 1,500,000 claims and billions of dollars in payments, and have provided claims valuation and liability assessment in numerous cases involving personal injury and property damage claims resulting from product and premises liability. In the course of this work, my colleagues and I at ARPC have reviewed thousands of asbestos claim files. My qualifications are set forth more fully on my *curriculum vitae*, attached as Exhibit 1.

**The Debtors' Proposed Sampling Plan**

5.  The validity of a sampling technique cannot properly be evaluated unless one knows the purpose for which the results will be used. The Debtors in their motion, however, are unclear as to the specific purposes for which the sample is being drawn. Until this is specified, I am not able to evaluate fully their proposed sampling methodology.[1]

6.  Debtors suggest that the sampling plan will "enable the court to draw conclusions regarding the proportions of valid and invalid asbestos personal injury claims at

---

[1] I do discuss in paragraph 17 below why the proposed sampling project will not answer the one specific purpose given by the Debtors, to calculate "what proportion of the claimants have exposures (to asbestos) above five fibers/cc-year." Motion at 5.

issue" Motion at 3. But, for the reasons stated below, the proposed sampling plan cannot do this with respect to either future or present claims.

**The Debtors' Proposed Sample Is Not Representative of Future or Present Claims**

7.  The Debtors seek to take discovery of a "statistically representative sample of 1,000 of the approximately 150,000 present claimants." Motion at 1. To the extent that the Debtors propose to use the results of this discovery to make "predictions" about "the proportions of valid and invalid asbestos personal injury claims" that can be applied to asbestos claims that will be filed against the Debtors in the future (*id.* at 3), the proposed sample is not representative of the future claims that will be asserted against the Debtors and therefore not a reliable basis for that purpose for several reasons.

**A.   The Proposed Sample Does Not Include Resolved Claims**

8.  It is fundamental that a sample is representative only of the population from which it is drawn. By definition, a database that contains only pending unresolved claims filed prior to the Debtors' filing of the Petition on June 25, 2001 (the "Petition Date") does not contain data about any claims that have been resolved through settlement, verdict or dismissal in the past. For example, if, hypothetically, 50,000 claims were filed between January 2000 and the Petition Date, and if 25,000 of those claims were resolved before the Petition Date, then a sample of only the 25,000 remaining unresolved claims would not be representative of the total 50,000 claims that were filed prior to the Petition Date.

9.  This is because the characteristics of the claims that were unresolved may be entirely different than the characteristics of the claims that were resolved. The Debtors chose which cases to resolve and which to leave open, presumably based on some differences in the characteristics between the two groups. For example, the unresolved claims may be claims filed

by specific law firms or filed in specific jurisdictions. Similarly, the resolved claims may be claims the Debtors chose to resolve because there was strong medical and/or product exposure evidence or conversely, according to Debtors, claims which had weaker medical and/or product exposure evidence, but could be resolved at values attractive to the Debtors. At most, the Debtors' proposed sample of claims is representative only of those claims that the Debtors chose not to resolve or could not resolve on satisfactory terms. Such a sample of unresolved claims is not a valid basis to draw conclusions about the characteristics of the claims that will be filed against the Debtors in the future, because those future claims will be reflective of the characteristics of all claims previously filed against the Debtors, including both resolved claims and claims that remain unresolved.

### B.   The Proposed Sample Contains Stale, Dated Claims

10.   Many of the present claims in the database provided to me by the Debtors have been pending for years. For example, more than 17% of the open claims (30,369 of the 178,307 in the database provided to ARPC by the Debtors) were submitted prior to 1998, more than three years before the Debtors filed for bankruptcy. *See* Exhibit B. The fact that more than 17% of these claims have been pending for years further indicates that the characteristics of these claims may be unrepresentative of the claims that would be asserted against the Debtors in the future.

11.   In general, unless there are significant changes in data trends, recently filed claims are likely to be the best estimate of the types and average resolution values of claims that an asbestos manufacturer would expect to see in the future, because they represent those claims closest in time and thus capture the Debtors' most recent experience in the tort system. But the Debtors' proposed sample will include claims that were filed more than three years before the

Petition Date. As such, the characteristics of those claims are unlikely to be representative of the claims to be filed against the Debtors in the future.

**There Is No Reliable Basis to Determine the Claimants' Occupations**

12. In addition to being unrepresentative of the claims to be filed against the Debtors in the future, the Debtors' proposed sample of present claims suffers from other defects. The Debtors' motion states (at 3-4) that "the 1000 claimants will be chosen from two 500-claimant sub groups: (1) claimants whose primary or secondary occupations were in the construction industry and (2) claimants whose primary or secondary occupations were not in construction." The Debtors propose to determine which claimants should be assigned to which group based on occupation and industry information contained "in the database of the records of the Center for Claims Resolution" ("CCR"). *Id.* at 4 n.2. There are several problems with this approach.

13. First, almost one-half of the open, pending claimants (86,362 of the 178,307 claimants in the database provided to ARPC) are categorized as having an "unknown" occupation. The Debtors' proposed sampling methodology does not state what they intend to do with the 48% of the pending claims as to which occupation is unknown. This raises a strong potential for bias which cannot be addressed until the Debtors state how they intend to treat these unknowns.

14. Second, even where the CCR database does contain the occupational history of certain claimants, it does not indicate what a particular claimant's "secondary" occupation was. The database indicates a primary occupation but provides no indication of secondary occupation. All other occupations are therefore merely assumed to be non-primary. Approximately 25% of the open claims have multiple occupations and all would need to be

analyzed to determine the relevant "secondary" or non-primary occupation. As a result, the decision of how to classify a claimant's secondary occupation would be a subjective determination made by the person involved in drawing the sample, which could further introduce bias into the sample.

### The Proposed Sample Sizes Are Too Small for Reliable Estimation

15.  The Debtors propose that the two 500-claimant sub-groups "will be further stratified according to the claimants' alleged injury, with 100 claimants randomly chosen from each of the following categories: mesothelioma, lung cancer, other cancers, non-malignant asbestos disease, and alleged injury unknown." Motion at 4. Thus, the sample will consist of ten groups of 100 claimants each. The Debtors assert that the information drawn from this sample will allow the asbestos exposure in the overall claimant population to be estimated to an accuracy of +/-7%. *Id.* at 5.

16.  While the margin of error for answering any single question about the overall claimant population based on information obtained from the proposed sample may be +/- 7%, answering any question about a characteristic of the claimants in relation to some other characteristic would produce a substantially larger margin of error. For example, if for each such compound question the answer would be true for 50 claimants in each sub-category and not true for the other 50, then if one wanted to know how many of the 100 non-malignant asbestos claims meet two specific criteria, the sample size is no longer 100 but 50 (with the accompanying inherent increase in the size of the error margin). It is likely that the Court and the parties would want to answer some questions of this type. For example, for claimants with non-malignant asbestos diseases, how many claimants had an ILO reading of 1/1 but have limited pulmonary function test results, or how many claimants have proof of exposure to USG asbestos-containing

products but were exposed for less than one year. Thus, the margin of error stated in the motion is correct only if the results of the sampling project will be used for the limited purpose of answering simple, non-conditional questions. Otherwise, a much larger sample would be required to obtain answers with a reasonable margin of error.

**The Proposed Sample Cannot Answer the One**
**Specific Purpose Given by the Debtors in their Motion**

17. The proposed sampling project will not answer the one specific purpose given by the Debtors, to calculate "what proportion of those claimants have exposures (to asbestos) above five fibers/cc-year." Motion at 5. That question cannot be answered by the results of the sampling project because, based on my experience, the claimants do not have that specific information. Thus, the Debtors' questionnaire and the records they seek cannot accomplish the stated purpose that Debtors provide.

**The Database and/or Information Used by the Debtors to Draw the Sample Appears**
**Different From the Databases Provided to the Futures Representative and to the ACC**

18. The Debtors appear to be working with different information concerning the number of unresolved present claims than are reflected in the database that ARPC was provided with by the Debtors in July 2002. As stated above, the Debtors' motion speaks of approximately 150,000 present claimants. However, the database provided to ARPC has 178,307 non-duplicative, open, pending, or Settled But Not Documented claims. These 178,307 claims exclude duplicative Georgine claims and 27,192 claims designated as "Common Claims."[2]

---

2   The Common Claims are claims filed during the approximate six month time period prior to the Petition Date. The Common Claims do not include information about whether the claims were settled, open and pending or dismissed. I have been told by PACE, the Debtors' agent, that the Debtors were not named as defendants by any of these claimants.

31148396.DOC                                            8

19. On September 14, 2005, Debtors' counsel provided ARPC with databases "as of January, 2002" and "as of May, 2002." The "as of January, 2002" and "as of May, 2002" databases contain information only regarding "bundled" claims, *i.e.*, claims that were filed and/or settled prior to the dissolution of the CCR, but do not contain information regarding "unbundled" claims, *i.e.*, claims that were filed against USG and/or settled after the demise of the CCR.

20. While Debtors' counsel has recently asserted that it has produced to the Futures Representative and the other parties all of the databases in the same configuration and with the detail it received from the CCR, the only complete database that ARPC has received from the Debtors is "as of March 2002" and, as described above, it contains higher numbers of present claims (178,307) then the approximately 150,000 present claims referred to by the Debtors in their Motion. Debtors have not explained why the database from which they intend to draw the sample has a substantially different number of present claims than the database they provided to ARPC. Thus, as of the date of this declaration, I still do not know what database the Debtors are relying upon. Nor am I able to determine whether the 150,000 present claims that the Debtors' motion refers to includes only open, pending claims or also includes Settled But Not Documented claims. Until I receive complete databases "as of January, 2002" and "as of May, 2002" and the database and/or the information that the Debtors are relying upon, I am not in a position to compare the databases in order to ascertain the differences among them and the reasons for such differences. It is important that the different databases be reconciled and that agreement be reached among the parties that a specific database is accurate before any sampling should be undertaken.

### Analysis of the Data Would Be Extremely Time-Consuming

21.     The Debtors' proposed sampling project would cause significant delay. First, there is the time needed to gather the information and supporting medical and legal records from 1,000 people along with any depositions previously taken of claimants that were provided in response to the request for records in the questionnaire, which I do not address in this declaration. Second, there is the time required to computerize and analyze the records and testimony elicited in response to the Debtors' questionnaire.

22.     In an effort to estimate the time required, I assumed that RUST Consulting, the data management firm retained by the Debtors, would tabulate the answers to the questionnaires but that the parties would be responsible for coding and computerizing all of the records and deposition testimony. We would then be presented with a computer file with the questionnaire responses and images or hard copies of the supporting materials. We would be responsible for extracting the relevant information from the accompanying records (medical records, interrogatories, depositions, Proofs of Claim, etc.), coding and computerizing the information for analysis, and combining the questionnaire data with the supporting data to construct a database that could be analyzed.

23.     Based on my twenty-five years of experience working with claim processing, the tasks required would include:

- Test, identify and resolve any inconsistencies in the RUST/questionnaire data.

- Re-code and clean the RUST data (e.g. open-ended questions, text fields).

- Match the RUST data with other data sources (e.g., the Manville Trust) to fill holes in the data.

- Design medical records coding (with physicians and records advisors).
- Design interrogatory, deposition and bankruptcy and Trust Proof of Claim coding (with attorneys).
- Draft written coding rules.
- Pre-test coding procedures.
- Finalize all coding rules.
- Code all medical records/reports/tests (test results, x-rays, office visits and diagnoses, surgery records, medications, medical histories, etc.).
- Code all interrogatories and depositions (injured parties and co-workers).
- Code all bankruptcy and Trust Proof of Claim filings.
- Computerize data coding.
- Quality control check (validation) of all coded data.
- Combine data sets into an analytic database for analysis.
- Prepare code-book and database structure documentation.

Assuming sampled claimants provide the requested information, I estimate that the time required to complete these activities would be more than 20 hours per claim.

24. As noted above, assuming all sampled claimants provided the requested information and that 20 people could be identified and sufficiently trained to perform these tasks, it would require more than six months from the time the sampled claimants provide the requested information to compile and code the data of all 1,000 claimant files into an analytic database. In addition, it may also be necessary to gather additional evidence relevant to the claimant files.

25. As noted above, until the Debtors disclose the specific purposes for which they intend to use the sample, it is difficult to estimate how the long the analysis of the database

would take. However, based on my experience, if the Debtors are trying to use the data from the sample claimants to determine, among other things, (i) if lung cancer claimants have underlying asbestosis; (ii) if non-cancer claimants have x-ray readings of 1/1 or above; (iii) if claimants have been exposed to asbestos products of other manufacturers, and the percentage of that exposure; (iv) if claimants have received payments from other asbestos manufacturers or trusts, and (v) the length of exposure to USG products, then it would take an additional eight to ten weeks to review, analyze and summarize the data after it has been coded.



B. Thomas Florence

**EXHIBIT A**

# B. THOMAS FLORENCE

**KEY QUALIFICATIONS:**

B. Thomas Florence is the President of *Analysis.Research.Planning Corporation* (ARPC) in Washington, D.C. Dr. Florence has over 25 years of experience in management consulting and research. He has significant experience in litigation consulting, class action and mass tort case management, toxic tort evaluation, environmental risk assessment, forecasting, large-scale statistical modeling, and work flow design and computerization.

Dr. Florence has participated in the start-up and on-going operations of entities established to resolve personal injury claims. He has assisted in the formulation of policies and the structure of operations, including designing and implementing work flow procedures and methods for processing claims, from the receipt of the claim form to the payment of the claim.

Dr. Florence was retained by eight of the asbestos-related personal injury trusts to consult in the area of claims management, and in several instances to perform assessments of the liabilities facing these trusts. He has designed and implemented fully-integrated computerized management systems for processing more than 1,500,000 claims and billions of dollars in payments, and has provided claims valuation and liability assessment in numerous cases involving personal injury and property damage claims stemming from product and premise liability.

Dr. Florence has assisted in the development of reorganization plans of companies facing bankruptcy, and has been retained as an expert witness for the quantification of liability before the Bankruptcy Court.

Dr. Florence has taught courses and given lectures in the areas of research design, psychometrics, multi-variate statistical analysis, systems theory, and communication analysis, and has published in the areas of environmental auditing and environmental risk analysis.

Dr. Florence's consulting experience includes the following representative assignments.

- Estimation of claim values and management methods for the Breast Implant Claims Office.
- Development of claim payment and evaluation methods for class action settlement involving Albuterol.
- Estimation of current and future asbestos-related health claims filed against the A-Best Products Asbestos Settlement Trust, Amatex Asbestos Trust, DII Asbestos Trust, Keene Creditor Trust, JT Thorpe Successor Trust, Manville Personal Injury Settlement Trust, Pacor Trust, Fuller-Austin Asbestos Trust, UNR Asbestos Disease Claims Trust, National Gypsum Settlement Trust, Celotex Asbestos Settlement Trust, Eagle-Picher Personal Injury Settlement Trust, A-Best Products, Babcock & Wilcox, 48-Insulations, Eagle-Picher

**B. Thomas Florence**
Page 2

Industries, A.P. Green, Armstrong World Industries, Federal Mogul, Flintkote Company, Halliburton, Kaiser, NARCO, Plibrico Company, Pittsburgh Corning, US Gypsum, US Mineral, W.R. Grace, Union Carbide, and Fuller-Austin Co.
- Estimation of liabilities, claim values and claims processing methods for a bankruptcy case involving TCE contamination.
- Audit of claim processing procedures for the Settlement Facility – Dow Corning Trust, Celotex Trust, and the Fuller-Austin Trust.
- Estimation of the value and timing of personal injury claims resulting from the use of the Dalkon Shield IUD.
- Design and implementation of claim processing policies, procedures and systems for the Diet Drug Settlement Trust (Fen Phen).
- Estimation of the value of personal injury claims related to alleged exposure to toxic materials at the Love Canal; Times Beach, Missouri; and Three Mile Island.
- Development of a monetary allocation method for distributing settlement funds to over 10,000 DDT exposed claimants.
- Development and implementation of a system for processing 1,000,000 personal injury claims.
- Design and development of computer tracking and accounting systems for large-scale claims handling.
- Development of an expert system for valuing personal injury claims.
- Estimation of the financial impact on the electric utilities industry of proposed federal ban on polychlorinated biphenyls in electric equipment nationwide.
- National surveys and analyses of credit and financing practices in automotive sales, jewelry, consumer credit, residential mortgage, home furnishings, and home improvements industries.
- Financial analysis and budgeting of governmental fee revenues.
- Financial analysis of alternative organization structures for government agency.
- Analysis of the incidence and prevalence of PCB equipment in the electric utility industry.
- Time series analysis of toxicological research findings for a hazardous waste site.
- Development of strategic marketing plans for the telecommunications industry.
- Development of a model for assessing the effectiveness of hazardous waste cleanup activities.
- Design and analysis of the long-term behavior of hazardous waste spills in the environment.
- Design of environmental audit procedures for private industry.
- Design and implementation of a computerized system for administering and analyzing the effects of hazardous waste sites.
- Design and management of a toxicological review of hazardous industrial wastes.
- Design and implementation of an exhaust emissions test program.
- Analysis of maintenance and use patterns of automobile owners.
- Design and implementation of statewide management information system for state government.
- Design of minicomputer-based management information system for appellate courts.
- Construction of mathematical model to predict manpower needs for state agency.
- Design of 2,500 and 1,500 employee personnel classification and compensation systems.

B. Thomas Florence
Page 3

- Design of a structural reorganization plan for a state judicial system.
- Design of Affirmative Action Plan for state government.
- Analysis of discriminatory minority employment practices (private industry).
- Design of five-year system development plan for computer information system.
- Design of procedures for state Workmen's Compensation Appeals.
- Workload and procedural analysis of 2,500 employee government agency.
- Design of a national multimedia-training program for governmental planners.
- Management evaluation and audit of large metropolitan data processing department.
- Design of national training conference for governmental planners.
- Analysis of computerized and microfilm information retrieval systems.
- Analysis of technical goods and services in the optical industry.
- Consumer survey and analysis of marketing practices and policies in the vocational schools industry.
- Analysis of national marketing and pricing policies in the accounting industry.
- Analysis of psychological effects of broadcast media on information processing and decision making.

EDUCATION:

Ph.D., Michigan State University
MA, Michigan State University
B.B.A., University of Kentucky

AWARDS AND HONORS:

Summa Cum Laude, University of Kentucky
Beta Gamma Sigma Honor Society
Phi Kappa Phi Honor Society

PUBLICATIONS (does not include confidential, or non-public documents):

- "Mass Tort Claim Processing Facilities: Keys to Success," *Loyola of Los Angeles Law Review*, Volume 31, Number 2 (January 1998)
- "How Children Spend Their Time: A Sample Survey for Use in Exposure and Risk Assessment," with A. Silvers, D. Rourke and R. Lorimor. *Risk Assessment*, Volume 14, Number 6 (December 1994).
- "The Computerization of Mass Tort Settlement Facilities," with J. Gurney. *Law and Contemporary Problems*, Autumn 1991.
- The Environmental Audit Handbook. With T. Truitt, D. Berz, D. Weinberg, J. Molloy, G. Price, and L. Truitt, New York: Executive Enterprises Publications, Inc. Second Edition, 1983.

**B. Thomas Florence**
Page 4

- Report of the Study of PCBs in Equipment Owned by the Electric Utility Industry. Published by the Edison Electric Institute, February 1982.
- Analysis of PCB Capacitor Disposal Capacity. Report prepared for the Edison Electric Institute, November 1982.
- Judicial Staffing. Report published by the Wisconsin Supreme Court, 1980.
- Wisconsin Case Processing. Report published by the Wisconsin Judicial Planning Committee, Summer 1978.
- Maryland Court Personnel: District Court Staffing. Report published by the Administrative Office of the Maryland Courts, Summer 1987.
- Profile of the Tennessee Courts. Report published by the Tennessee Supreme Court, Fall 1977.
- Tennessee Court Reorganization Plan. Report published by the Tennessee Supreme Court, Fall 1977.
- "An Empirical Test of the Relationship of Evidence to Belief Systems and Attitude Change." Human Communication Research, Winter 1975.
- "An Assessment of Videotape in Criminal Courts," with E. Short and M. Marsh. Brigham Young University Law Review, Volume 1975, No. 2.
- A Two-Way Interactive Video/Audio Arraignment System for Suffolk County, New York: Implementation Issues and Costs. Report prepared for the American University, November 1975.
- "The Effects of Videotape Testimony in Jury Trials: Studies on Juror Decision Making, Information Retention, and Emotional Arousal," with G. Miller, D. Bender, F. Boster, N. Fontes, J. Hocking, and H. Nicholson. Brigham Young University Law Review, Volume 1975, No. 2.
- An Evaluation of the District of Columbia Model Court. Report prepared for the National Clearinghouse of Criminal Justice Planning and Architecture, January 1976.
- Videotape Recording in the California Criminal Justice System. Report published by the California Office of Criminal Justice Planning, March 1975.
- "The Development of Interpersonal Communication Theory," with D. Cushman. Today's Speech, Winter 1974.
- "Real vs. Reel: What's the Verdict?" with G. Miller, D. Bender, and H. Nicholson. Journal of Communication, Summer 1974.
- "The Application of Cybernetics to Human Communication Theory." Meeting of International Communication Association, 1972.
- "Effects of Videotaped Testimony on Information Processing and Decision-Making in Jury Trials," with G. Miller, F. Siebert, D. Bender, and H Nicholson. Legal Communication Workshop, 1974.
- "Videotape Recording in the California Criminal Justice System: Impacts and Cost," with E. Short and M. Marsh. California Public Defenders Association, 1975.

**EXHIBIT B**

## USG Pending Claims by Disease
(includes SBND [Settled But Not Documented] claims)

| Year Received | Mesothelioma | Lung Cancer | Other Cancer | Non-malignant | Unknown | Total |
|---|---|---|---|---|---|---|
| 1969 | | | 1 | | | 1 |
| 1978 | | | 1 | | | 1 |
| 1982 | | | | 2 | | 2 |
| 1983 | | 1 | | 3 | | 4 |
| 1984 | 2 | 2 | | 10 | | 14 |
| 1985 | | 3 | 1 | 34 | 15 | 53 |
| 1986 | 1 | 2 | 3 | 36 | 59 | 101 |
| 1987 | 4 | 7 | 5 | 38 | 201 | 255 |
| 1988 | 3 | 6 | 6 | 82 | 42 | 139 |
| 1989 | 29 | 44 | 8 | 263 | 157 | 501 |
| 1990 | 34 | 38 | 19 | 527 | 325 | 943 |
| 1991 | 36 | 49 | 49 | 462 | 492 | 1,088 |
| 1992 | 27 | 50 | 15 | 397 | 929 | 1,418 |
| 1993 | 39 | 75 | 20 | 541 | 741 | 1,416 |
| 1994 | 69 | 102 | 38 | 1,118 | 654 | 1,981 |
| 1995 | 94 | 114 | 48 | 1,321 | 945 | 2,522 |
| 1996 | 81 | 243 | 140 | 4,532 | 4,103 | 9,099 |
| 1997 | 127 | 323 | 81 | 3,847 | 6,453 | 10,831 |
| 1998 | 318 | 817 | 254 | 16,067 | 11,013 | 28,469 |
| 1999 | 414 | 985 | 224 | 17,797 | 10,120 | 29,540 |
| 2000 | 1083 | 1,195 | 351 | 19,921 | 24,849 | 47,399 |
| 2001 | 617 | 802 | 154 | 11,324 | 29,495 | 42,392 |
| (missing) | 4 | 2 | 4 | 49 | 79 | 138 |
| Total | 2,982 | 4,860 | 1,422 | 78,371 | 90,672 | 178,307 |

*Does not include any Georgine claims or 27,192 Unbundled claims designated as "Common Claims" that were missing status information.