# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE

```
-------------------------------------------------x
In re:                           :
                                 :      Chapter 11
USG CORPORATION                  :
a Delaware corporation, et al.,  :
                                 :      Jointly Administered
            Debtors.             :      Case No. 01-2094(JKF)
-------------------------------------------------x
USG CORPORATION, et al.,         :
                                 :
            Movant               :
                                 :
      v.                         :
                                 :      Civil Action No. 04-1559 (JFC)
OFFICIAL COMMITTEE OF            :      Civil Action No. 04-1560 (JFC)
ASBESTOS PERSONAL INJURY         :
CLAIMANTS, et al.,               :
            Respondents.         :
-------------------------------------------------x
```

## RESPONSE OF THE STATUTORY COMMITTEE OF EQUITY SECURITY HOLDERS TO THE DEBTORS' MOTION FOR APPROVAL OF DEBTORS' SAMPLING PLAN AND CLAIMANT QUESTIONNAIRE

## WEIL, GOTSHAL AND MANGES LLP

| | | |
|---|---|---|
| Martin J. Bienenstock<br>Judy G.Z. Liu<br>767 Fifth Avenue<br>New York, NY 10153<br>Telephone: (212) 310-8000<br>Facsimile: (212) 310-8007 | David A. Hickerson<br>Peter M. Friedman<br>M. Jarrad Wright<br>1300 Eye Street, N.W.<br>Suite 900<br>Washington, D.C. 20005<br>Telephone: (202) 682-7000<br>Facsimile: (202) 857-0940 | Ralph I. Miller<br>200 Crescent Court,<br>Suite 300<br>Dallas, TX 75201<br>Telephone: (214) 756-7700<br>Facsimile: (214) 746-7777 |

## MORRIS, NICHOLS, ARSHT & TUNNELL

| | |
|---|---|
| Robert J. Dehney<br>Gregory W. Werkheiser<br>Daniel B. Butz<br>Curtis S. Miller | 1201 North Market Street,<br>18th Floor<br>P.O. Box 1347<br>Wilmington, DE 19899-1347<br>Telephone: (302) 658-9200<br>Facsimile: (302) 658-3989 |

Counsel for the Statutory Committee of Equity Security Holders

## TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ............................................................. 2

II.  THE DEBTORS' MOTION FOR DISCOVERY FROM A RANDOM
SAMPLE OF ASBESTOS PERSONAL INJURY CLAIMANTS IS
WELL WITHIN THE BROAD SCOPE OF PERMISSIBLE
DISCOVERY ............................................................................................. 5

    A.  Liberal Federal Discovery Rules Govern this Matter ............................... 6

    B.  The Court Has Inherent Power to Ensure that an Estimation Takes
into Account Only Legitimate Asbestos Claims ....................................... 8

        1.  Claimants Would Be Required to Produce in Response to a
Bar  Date the Very Information Sought By the Debtors'
Motion. .................................................................................................. 8

        2.  The Court Has Wide Latitude To Determine How To
Conduct The   Estimation Proceeding. ......................................... 10

III.  THE DISCOVERY SOUGHT BY DEBTORS' MOTION IS RELEVANT
TO THIS ESTIMATION PROCEEDING ............................................... 14

    A.  The Discovery is Relevant Because It Will Establish the Extent to
Which Pending Claimants Rely on Illegitimate and Fraudulent
Medical Evidence ................................................................................. 14

        1.  The Historical Process That Has Generated Nonmalignant
Asbestos Claims. .............................................................................. 15

        2.  The Johns Hopkins Study ............................................................. 17

        3.  The Silica MDL Proceedings ....................................................... 20

            a.  Judge Jack's ruling has already substantially
impacted  asbestos claiming ............................................ 24

    B.  The Proposed Claimant Discovery Will Differentiate Between
Impaired and Unimpaired Nonmalignant Claims. .................................. 27

        1.  The Asbestos MDL Treatment of Unimpaired
Nonmalignant  Claims. .................................................................. 28

        2.  Recent State Law Reform Measures and the Need to
Differentiate  Between Impaired and Unimpaired
Nonmalignant Claims. .................................................................. 29

    C.  Product Identification .......................................................................... 30

    D.  Discovery Is Needed to Identify Disease Category for Unknown
Claims. ............................................................................................... 33

i

**TABLE OF CONTENTS**
**(continued)**

                                                                                    **Page**

  E. Discovery Is Needed to Obtain More Information about Lung
    Cancer Claims. .................................................................................. 33

  F. Claimant Discovery is Needed to Determine Whether Pending
    Claims Are Similar to Closed Claims. ................................................... 34

IV. CONCLUSION ................................................................................................ 35

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re A.H. Robins Co.,*
  88 B.R. 742 (Bankr. E.D. Va. 1988), *aff'd*, 880 F.2d 694, 702 (4th Cir. 1989)......................11

*In re Allegheny Int'l, Inc.,*
  954 F.2d 167 (3d Cir. 1992)..................................................................................................9

*Bittner v. Borne Chem. Co.,*
  691 F.2d 134 (3d Cir. 1982)...........................................................................................10, 13

*In re Harrison,*
  987 F.2d 677 (10th Cir. 1993) ............................................................................................9

*Hickman v. Taylor,*
  329 U.S. 495 (1947)..............................................................................................................7

*Lundell v. Anchor Const. Specialists, Inc., (In re Lundell),*
  223 F.3d 1035 (9th Cir. 2000) .............................................................................................9

*In re Madden,*
  151 F.3d 125 (3d Cir. 1998)................................................................................................7

*Pacitti v. Macy's,*
  193 F.3d 766 (3d Cir. 1999)................................................................................................7

*Pepper v. Litton,*
  308 U.S. 295 (1939)..............................................................................................................8

*United States v. Procter & Gamble Co.,*
  356 U.S. 677 (1958)..............................................................................................................7

## STATE CASES

*In re Asbestos Prods. Liability Litig. (No. VI)*, 2002 WL 32151574 (E.D. Pa. Jan. 16,
  2002) ....................................................................................................................................17

*In re Eagle-Picher Industrial, Inc.,*
  189 B.R. 681 (Bankr. S.D. Ohio 1995)...............................................................................13

*Falkenberg Capital Corp. v. Dakota Cellular, Inc.,*
  1998 WL 552966 (D. Del. Aug. 4, 1998) ...........................................................................7

*Official Comm. of Asbestos Claimants v. Asbestos Property Damage Comm. (In re
  Federal Mogul Global Inc.)*, No. 05-59, 2005 W. 2013732 (D. Del. Aug. 19, 2005)............12

*Waters v. Genesis Health Ventures, Inc.,*
2004 WL 2700352 (E.D. Pa. Nov. 24, 2004) .......................................................... 7

## DOCKETED CASES

*In re Congoleum Corp.,*
No. 03-51524 (KCF) (Bankr. D. N.J. July 7, 2004) ............................................ 6

*In re Minn. Pers. Injury Asbestos Cases,*
No. C8-94-2875 (2d Dist. Ct. Minn. 2005) ...................................................... 30

*In re New York City Asbestos Litig.,*
No. 01-10657 (S.D.N.Y., Dec. 19, 2001) ........................................................ 32

*Official Comm. of Asbestos Claimants, et al. v. Asbestos Property Damage Comm. (In Re
Federal Mogul Global, Inc.),* No. 05-59, 2005 WL 2218360 (D. Del. Aug. 19, 2005) .......... 12

*In re Silica Prod. Liability Litig.,*
MDL Docket No. 1553 (S.D. Tex Jun. 30, 2005).......................................... *passim*

*In re USG Corp.,* No. 01-2094 (RJN) (Bankr. D. Del. Feb. 19, 2003) ........................... 8

## STATUTES, RULES AND LEGISLATIVE MATERIALS

28 U.S.C. § 1411 ............................................................................................... 9

28 U.S.C. § 157(b)(5) ..................................................................................... 9, 28

BANKRUPTCY RULE 3003(c)(3).......................................................................... 8

FED. R. BANKR. P. 2004 ...................................................................................... 6

FED. R. BANKR. P. 7026-45 .................................................................................. 6

FED. R. CIV. P. 26-45 .......................................................................................... 6

FED. R. CIV. P. 26(b)(1) ...................................................................................... 7

S. REP. NO. 108-118, at 84 (2003) ................................................................. 16, 17

## MISCELLANEOUS

Stephen J. Carroll, *et al.,* RAND INSTITUTE FOR CIVIL JUSTICE, *Asbestos Litigation Costs
and Compensation: An Interim Report* 40, 65 (2002) ........................................... 29

Eddie Curran, *Diagnosing for Dollars,* Mobile Register, Apr. 4, 2004......................... 25

Dr. Joseph Gitlin, *et al.*, *Comparison of "B" Readers Interpretations of Chest Radiographs for Asbestos Related Changes*, 11 J. Acad. Radiol. 843 n.8 (2004)..................18

Jonathan D. Glater, *Lawyers Challenged on Asbestos*, N.Y. TIMES, Jul. 20, 2005..................................................................................................................25

Jonathan D. Glater, *Asbestos Fund Bars 9 Doctors*, N.Y. TIMES, September 15, 2005........................................................................................................27

*Official Comm. of Asbestos Claimants, et al. v. Asbestos Property Damage Comm. (In re Federal Mogul Global, Inc.)*, No. 05-59 (D. Del. June 16, 2005) Hr'g tr. of Dr. Mark Peterson...............................................................................20

*Official Comm. of Asbestos Claimants, et al. v. Asbestos Property Damage Comm. (In Re Federal Mogul Global, Inc.)*, No. 05-59 (D. Del. June 1, 2005) Dep. tr. of William Hanlon..................................................................................31

*Official Comm. of Asbestos Claimants, et al. v. Asbestos Property Damage Comm. (In re Federal Mogul Global, Inc.)*, No. 05-59 (D. Del. June 14, 2005) Hr'g tr. of Paul Hanly, Jr., Esq..........................................................................31

*G-1 Holdings, Inc. v. Bennett (In re G-1 Holdings)*, No. 02-cv-030829 (S.D.N.J. Aug. 10, 2005) Dep. tr. of Dr. Mark Peterson..............................................................................13

*Owens Corning v. Credit Suisse First Boston (In re Owens Corning)*, No. 04-cv-905 (D. Del. Jan. 19, 2005) Hr'g tr. of Professor Lester Brickman....................................................................15

*In re Silica Prod. Liab. Litig.*, MDL Docket No. 1553 (S.D. Tex. Aug. 22, 2005) Hr'g tr..................................................................................................................22

*In re W.R. Grace & Co.*, No. 01-11039 (JKF) (Bankr. D. Del. Jan. 21, 2005) Hr'g tr....................................................................................................................6

Press Release, Claims Resolution Management Corporation, Suspension of Acceptance of Medical Reports (September 12, 2005)....................26

Victor E. Schwartz, *et al.*, *Addressing the "Elephantine Mass" of Asbestos Cases: Consolidation Versus Inactive Dockets (Pleural Registries) And Case Management Plans That Defer Claims Filed by the Non-Sick*, 31 Pepp. L. Rev. 271 (2003) ......................30

## I.    **PRELIMINARY STATEMENT**

The Statutory Committee of Equity Security Holders (the "Equity Committee") respectfully submits this response to the Debtors' motion filed on August 19, 2005 for approval of a sampling plan and claimant questionnaire to be used to take discovery from a random sample of asbestos personal injury claimants (the "Debtors' motion"). The Equity Committee supports the Debtors' motion because the discovery it seeks will provide critical information from a randomly selected, statistically representative number of persons who have asserted personal injury claims against the Debtors that is relevant and integral to the estimation of the Debtors' pending and future asbestos personal injury liability.

The discovery sought is well within the scope of the rules that govern discovery. Similar discovery has been recognized as necessary in other asbestos bankruptcies. Indeed, in the *W.R. Grace* proceedings pending before Bankruptcy Judge Fitzgerald, the court has permitted discovery of claimants like that sought here from *each of 118,000 claimants*, as compared to the narrow sample of only 1,000 claimants sought by the Debtors. Similarly, in the *Congoleum* bankruptcy the court allowed discovery from current claimants, including medical records and X-rays. Discovery from claimants has also been permitted in other mass tort estimation proceedings, such as the Dalkon Shield case.

Considering that the Debtors are seeking discovery from only a small sample of 1,000 out of a total of 150,000 asbestos claimants, the request can hardly be characterized as burdensome, given that hundreds of millions – if not billions – of dollars

are at stake in this case. Indeed, the Court could easily order discovery from all known claimants, as Judge Fitzgerald did in *W.R. Grace*. Instead of the proposed representative sample, the Court could – and should if requested – impose a claims bar date in this case, requiring *all 150,000* purported holders of pending asbestos claims to submit forms detailing their alleged diseases (including supporting medical records), work histories, asbestos exposure histories and the claims they have filed against other asbestos defendants. Instead, the Debtors propose to take discovery from only 1,000 asbestos claimants – less than one percent of the claimant pool. This proposal is statistically sound, and specifically designed to minimize the effect on the entire claimant body of obtaining claims data through a mandated bar date process.

The requested discovery is highly relevant and critically important to estimating the Debtors' asbestos liability. It is needed to identify the percentage of pending nonmalignant claims supported by bogus medical evidence.[1] Myriad recent studies and judicial pronouncements demonstrate that the medical data supporting a multitude of asbestos claims paid in years past is no longer valid. Very recently, a federal judge presiding over multi-district litigation proceedings related to purported exposure to silica noted that the doctors and medical screening companies involved in those cases –

---

[1] The predominant method of determining whether an individual has nonmalignant asbestosis is to review a chest radiograph (a term synonymous with "X-Ray"). The radiographs are reported using a classification system devised by the International Labor Office ("ILO"). The minimum reading necessary to sustain a finding of nonmalignant asbestosis is a "1/0" on the ILO scale. The radiographs are read by a so-called "B-reader" certified by the Public Health Service's National Institute for Occupational Safety and Health. As we discuss in more detail below, it is now well known that plaintiff-selected B-readers have engaged in practices involving the misdiagnoses of asbestosis that border on fraud, and would not constitute admissible evidence in federal court under the *Daubert* test.

including many of the same doctors who have provided diagnoses for scores of thousands of asbestos cases – were engaged in disgraceful practices focused more on generating money than providing accurate medical reports in support of legitimate claims. Through the discovery sought in the Debtors' motion, the Debtors and the Equity Committee will demonstrate how deeply this malfeasance has permeated asbestos litigation, and, correspondingly, the claims history upon which the representatives of the present and future asbestos personal injury claimants (the "Asbestos Claimants") will rely.

In order to hide the deficiencies in the claims history from the courts, the asbestos claimants committees routinely seek to prevent other parties from obtaining discovery of medical records and other information for pending claimants. They do this because rigorous examination of those claims will confirm what recent studies have exposed – that the "medical evidence" defendants were forced to accept in the past as their only mechanism for staving off an avalanche of hundreds of thousands of claims is the product of bogus methods and diagnoses orchestrated by plaintiffs' lawyers and complacent "B-readers" and non-diagnosing "doctors" that no longer constitute acceptable evidence.

Assuming that the Debtors' historical database of asbestos claims is relevant for estimation purposes, as the Asbestos Claimants will undoubtedly argue, the discovery sought in the Debtors' motion will also provide information that either cannot be found in the historical database or will supplement the data already included. For example, among the presumably small portion of claimants with nonmalignant diseases who rely on legitimate medical diagnoses, the discovery will show how many suffer from

an impairing disease, and how many do not[2]; what is the proper way to assign a disease category to "unknown" claims which are claims from the database missing disease information; how many claimants can actually establish that they were exposed to the Debtors' products; and how many simply named USG as a defendant as part of their lawyers' concerted effort to overwhelm the tort system with hundreds of thousands of baseless claims.[3]

The usefulness of discovery from present claimants is even more obvious considering that the Court must estimate *pending* and future claims not *settled* claims from the historical database that are not competing for distributions from the Debtors' estates. The Equity Committee should not be denied the opportunity to present, and the Court should not be denied the opportunity to hear, credible evidence derived from a statistical sample of pending claims as part of its evaluation and estimation of those claims.

## II.    THE DEBTORS' MOTION FOR DISCOVERY FROM A RANDOM SAMPLE OF ASBESTOS PERSONAL INJURY CLAIMANTS IS WELL WITHIN THE BROAD SCOPE OF PERMISSIBLE DISCOVERY

The Debtors and the Equity Committee are entitled to the discovery sought under the liberal rules governing discovery in civil litigation, as well as the rules and principles governing contested matters in bankruptcy cases.

---

[2] The bulk of nonmalignant asbestos claimants are "unimpaired" – that is they suffer from no measurable decrease in lung function as measured by pulmonary function tests (PFTs). Impaired nonmalignant claimants have PFT results which demonstrate loss of lung capacity. In addition to nonmalignant asbestosis, exposure to certain kinds of asbestos is known to cause mesothelioma and lung cancer. The relationship between asbestos exposure and other cancers is, at best, controversial.

[3] These facts are set forth in greater detail in the declaration of Dr. Denise Martin (the "Martin Decl."), the Equity Committee's estimation expert, attached as Exhibit A.

**A.**          **Liberal Federal Discovery Rules Govern this Matter.**

This estimation proceeding is a contested matter governed by Rule 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). Fed. R. Bankr. P. Rule 9014 incorporates as applicable rules 7026-45 which in turn incorporate Fed. R. Civ. P. 26-45 – the rules governing discovery in ordinary civil matters. These rules permit broad discovery so long as it is reasonably calculated to lead to relevant, admissible evidence. Indeed, in noting that the debtors in the *W.R. Grace* chapter 11 cases were entitled to take discovery from claimants, the bankruptcy court stated that "*what the debtor intends to do seems to me, in an estimation process, to be calculated to lead [to] . . . relevant admissible evidence. And for a discovery on an estimation process, that's all I need.*" (Hr'g tr., *In re W.R. Grace & Co.*, No. 01-11039 (JKF) (Bankr. D. Del. Jan. 21, 2005) at 140 (emphasis added).)[4] Additionally, in *In re Congoleum* – another asbestos bankruptcy – discovery from asbestos claimants was also ordered by the bankruptcy court. *In re Congoleum Corp.*, No. 03-51524 (KCF) (Bankr. D. N.J. July 7, 2004).[5] There, the Court permitted discovery of a wide array of claimant medical records, work histories, product exposure histories, and claims and recovery histories against other asbestos defendants from thousands of claimants to ensure that a chapter 11 plan was fair, equitable and proposed in good faith. *Id.* at 7-8.

---

[4] Relevant portions of this transcript are attached as Exhibit B.

[5] The order is attached as Exhibit C. The discovery in *Congoleum* was ordered pursuant to Bankruptcy 2004 rather than Rule 9014. The fundamental purpose of that discovery was to enable an interested party to obtain specific information about a random sample of claimants so that party could make reasonable extrapolations from the claimant pool as a whole in order to estimate the debtors' liability. While Rule 2004 is not applicable here, the Court can use other discovery rules incorporated in Rule 9014 to mandate the same kind of discovery – for the same purposes – in this proceeding.

The Bankruptcy Rules afford the same breadth of discovery as that afforded by Fed. R. Civ. P. 26, which provides:

> Parties may obtain discovery regarding *any matter*, not privileged, that is *relevant to the claim or defense of any party*, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

FED. R. CIV. P. 26(B)(1) (emphasis added). Indeed, discovery "is available in all types of cases at the behest of any party, individual or corporate, plaintiff or defendant." *Hickman* v. *Taylor*, 329 U.S. 495, 507 (1947).

The scope of discovery permitted under the federal rules is "broad and liberal." *Pacitti* v. *Macy's*, 193 F.3d 766, 777 (3d Cir. 1999); *see also In re Madden*, 151 F.3d 125, 128 (3d Cir. 1998) ("Pretrial discovery is therefore, 'accorded a broad and liberal treatment.'"); *Waters* v. *Genesis Health Ventures, Inc.*, No. 03-cv-2909, 2004 WL 2700352, at *1 (E.D. Pa. Nov. 24, 2004) ("It is well recognized that the federal rules of civil procedure allow broad and liberal discovery."); *Falkenberg Capital Corp.* v. *Dakota Cellular, Inc.*, No. 95-351 MMS, 1998 WL 552966, at *4 (D. Del. Aug. 4, 1998) ("It is axiomatic that the discovery rules are to be construed liberally in favor of the party seeking discovery.") "The liberal discovery permitted by the Federal Rules of Civil Procedure ensures that no relevant facts remain hidden." *Waters*, 2004 WL 2700352, at *1. Accordingly, discovery should be denied only when "strong public policies weigh against disclosure." *United States* v. *Procter & Gamble Co.*, 356 U.S. 677, 682 (1958). Here, the public policies weigh overwhelmingly in favor of disclosure, not against it.

**B.**    **The Court Has Inherent Power to Ensure that an Estimation Takes into Account Only Legitimate Asbestos Claims.**

In a bankruptcy proceeding this Court has "the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in the administration of the bankrupt estate." *Pepper v. Litton*, 308 U.S. 295, 308 (1939). Earlier in these cases, Judge Wolin noted that the Court had an obligation to "reject unsubstantiated claims, bogus medical evidence and fanciful theories of causation. The Court will protect those who have been truly harmed." *In re USG Corp.*, No. 01-2094 (RJN) (Bankr. D. Del. Feb. 19, 2003) (Order at 4). In addition to the liberal federal rules regarding discovery, various bankruptcy-specific federal rules provides the mechanism to carry out this mandate.

1.    Claimants Would Be Required to Produce in Response to a Bar Date the Very Information Sought By the Debtors' Motion.

The information the Debtors seek in their motion could also be obtained by imposing a "bar date" or deadline for filing asbestos personal injury claims. While the Debtors have not yet moved for the imposition of such a bar date, there is an absolute right to one pursuant to Fed. R. Bankr. P. 3003(c)(3).[6] Fed. R. Bankr. P. 3003(c)(3) further requires that all claimants with disputed claims file an official proof of claim form with sufficient supporting documentation to establish a *prima facie* claim and to be eligible to participate in distributions from a debtor's estate. Fed. R. Bankr. P. 3003(c)(2).

---

[6] Fed. R. Bank. P. 3003(c)(3) states that "the court *shall* fix and for cause shown may extend the time within which proofs of claim or interest may be filed" (emphasis added).

Pursuant to section 502(a) of the Bankruptcy Code, a proof of claim is *prima facie* evidence of the claim, and thus the claim is deemed allowed unless a party in interest objects. Although the ultimate burden of proof is upon the claimant, a debtor or other party in interest objecting to a claim must establish sufficient, credible facts to rebut the proof of claim. *Lundell v. Anchor Const. Specialists, Inc.*, (*In re Lundell*), 223 F.3d 1035 (9th Cir. 2000). Without access to relevant, permissible discovery, an objector would be unfairly hampered in prosecuting, let alone sustaining, its objection. Once a party in interest overcomes the *prima facie* effect initially given to a filed proof of claim, the claimant must prove the validity of the claim by a preponderance of the evidence. *In re Allegheny Int'l, Inc.*, 954 F.2d 167 (3d Cir. 1992); *In re Harrison*, 987 F.2d 677 (10th Cir. 1993).

It cannot be disputed that each person asserting asbestos personal injury claims here would be required to provide detailed supporting information to sustain their individual claims in the normal claims reconciliation process that occurs in bankruptcy cases – either in claims submitted to an asbestos trust, in proceedings to resolve contested claims, to survive a motion for summary judgment, or in a jury trial, to the extent a claimant even has such a right pursuant to 28 U.S.C. § 157(b)(5) and 28 U.S.C. § 1411. The Debtors' proposed sampling plan and questionnaire is a far less burdensome method of obtaining by representative sample the very information that the claimants themselves would otherwise have to produce on an individual basis to liquidate their claims.[7] The

---

[7] While noting these principles, the Equity Committee does not seek to liquidate any individual's claim in this estimation proceeding. Rather, the Court is estimating the aggregate liability the Debtors could have if *all* asbestos claims were liquidated. To do that, Debtors and other parties in interest must have fair access to information reasonably

greater power this Court has to order *all* pending personal injury claimants to file their claims pursuant to a bar date necessarily includes the lesser power to order the streamlined claimant discovery sought here, which is only a small fraction of the supporting documentation and other information that the Asbestos Claimants as a group would have to provide to sustain their claims.

     2.     The Court Has Wide Latitude To Determine How To Conduct The Estimation Proceeding.

Third Circuit precedent in *Bittner v. Borne Chem. Co.*, 691 F.2d 134 (3d Cir. 1982), empowers this Court to use whatever methods are best suited to estimating the Debtors' liability. In *Bittner*, the Third Circuit held that "we are persuaded that Congress intended the procedure [in conducting an estimation] to be undertaken initially by the bankruptcy judges, using whatever method is best suited to the contingencies at issue. The principal consideration must be an accommodation to the underlying purposes of the Code." *Id*. at 135. Here, the methodology "best suited" to the situation should take into account relevant medical, legal and historical information from a randomly selected, statistically representative sample of pending claims to establish an estimated aggregate value of pending and future claims. Simply relying on data from historical claims requires the extraordinary leap of faith – not supported by law or logic – that pending and future claims will be supported by similar medical evidence, will look like, and will be treated like, claims that were resolved in the past.

---

calculated to lead to relevant, admissible evidence to ensure that the Court's estimation of asbestos claims reflects the best possible estimate of the aggregate value of legitimate asbestos claims.

As noted above, discovery from asbestos claimants has been allowed in *W.R. Grace*. Claimant discovery and use of a random sample of discovery from claimants is also supported by *In re A.H. Robins Co.*, 88 B.R. 742 (Bankr. E.D. Va. 1988), *aff'd*, 880 F.2d 694, 702 (4th Cir. 1989) – the only appellate decision to address estimation in the mass tort context. In *A.H. Robins*, the district court established a bar date by which *all* Dalkon Shield claimants had to submit responses to a questionnaire. *In re A.H. Robins Co.*, 88 B.R. at 745; 880 F.2d at 699. The Fourth Circuit praised the estimation methodology of an expert who (1) used "a representative sample" of claimants, (2) examined questionnaires to determine whether claimants had valid product identification (the expert "weeded out those [claimants], for example with no medical proof of use of the Dalkon Shield"), (3) examined questionnaires to determine whether claimants were injured, and if so, what type of injury they suffered (the expert "classified the claims into those with and without complications and the nature of the injuries claimed"). *Id.* The proposed discovery here inquires into each of these three areas.

The Asbestos Claimants will undoubtedly cite *Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 722 (Bankr. D. Del. 2005) for the propositions that claimant discovery should be denied, and only historical data should be used to estimate the value of pending and future claims. But that case does not hold that claimant discovery is prohibited under the bankruptcy code or under the federal rules of discovery, and, in any event, is not binding on this Court.[8]

---

[8] The Owens Corning estimation case, including the discovery order in that case, is currently on appeal to the Third Circuit.

In *Owens Corning*, the historical claims and litigation history of the company was merely the starting point from which the district court ultimately made adjustments to correct for a number of factors that otherwise influenced the historical claims data. Accordingly, after discussing the litigation history, the court stated:

> It does not necessarily follow, however, that it is safe to assume that these historical results can properly be extrapolated into the future. As the Banks have convincingly demonstrated, some of the past results have been skewed by factors which can and should be avoided in the future. The question to be resolved is the extent to which adjustments should be made to historical values to account for these probable changes.

*Owens Corning*, 322 B.R. at 722-23. The court then listed a number of historical factors that were unlikely to be repeated in the future, and should be taken into account in the estimation, including for purposes here:

- Mass-screenings of asbestos related disease "triggering thousands of claims by persons who had never experienced adverse symptoms;"

- Erroneous X-ray interpretations by Suspect B-Readers;

- Over-payment to "Unimpaired" claimants.

*Id.* at 723. While the district court conceded that adjustments for these factors were required, discovery from claimants would have permitted a much more accurate evidentiary record for these purposes – indeed, the decision in *Owens Corning* does not make clear how the court took each of these factors into account.[9]

---

[9] The Asbestos Claimants may also point to the decision in *Official Comm. of Asbestos Claimants v. Asbestos Property Damage Comm.* (*In re Federal Mogul Global Inc.*), No. 05-59, 2005 WL 2218360 (D. Del. Aug. 19, 2005), a recent asbestos estimation case, to support their argument that the discovery sought here is neither needed nor permitted. However, that case is inapposite. In *Federal Mogul* the trial court estimated the pending and future liability of Turner & Newall Inc. based on estimates which were prepared relying solely on historical data. No party sought discovery from a random sample of pending claimants, and therefore the court did not even address whether the type of discovery proposed here would have been appropriate. Moreover, no party in *Federal*

As Dr. Martin's affidavit in this case makes clear, this Debtors' historical database does not contain all information necessary to ascertain the impact of the factors described in *Owens Corning*. The vast majority of the claims in the Debtors' database was generated while it was a member of the Center for Claims Resolution ("the CCR"),[10] from 1988 to early 2001, and it lacks certain types of specific information about claimants which could be easily obtained from a sample of pending claimants.

Notably, in a very recent deposition, the Asbestos Claimants Committee's own expert, Dr. Mark Peterson, testified that for some data categories (i) the CCR database is not "very reliable," (ii) he did not "have confidence in the quality of the data entry," (iii) he "question[ed] the integrity of the information" in it, and (iv) he "would not want to rely upon" that database "for purposes of making forecasts." Dep. tr. of Dr. Mark Peterson, *G-1 Holdings, Inc. v. Bennett (In re G-1 Holdings)*, No. 02-cv-030829

---

*Mogul* raised the issue of the critical information gaps in the historical database in contrast to the affidavit of Dr. Martin in this case, which includes a detailed explanation of why discovery from a random sample of claimants will provide relevant and necessary information.

Likewise, any reliance by the Asbestos Claimants on *In re Eagle-Picher Indus., Inc.*, 189 B.R. 681 (Bankr. S.D. Ohio 1995), in which a bankruptcy court's estimation of the Eagle-Picher company's asbestos liability was based on its pre-petition settlement history, is also misplaced. There, too, is no party sought discovery from a random sample of claimants in that case. Moreover, *Eagle-Picher* was decided years before the rampant wrongdoing and misconduct now known to permeate asbestos litigation was uncovered. *See* pages 14-27, *infra*. As the Third Circuit noted in *Bittner*, 691 F.2d at 134, estimation must be conducted in light of the "contingencies at issue" – whatever the contingencies at issue were in *Eagle-Picher*, the contingencies here involve revelations of fraud and wrongdoing, thus warranting claimant discovery from a small sample of individuals asserting claims against the Debtors to enable Debtors to expose any fraudulent claims asserted and value them accordingly.

[10] The CCR was an entity which provided a combination of joint defense, settlement and administrative services for roughly twenty major asbestos defendants companies.

(S.D.N.J. Aug. 10, 2005) at 187-189.[11]  Dr. Peterson's admissions in that deposition

reveal the flaws in the position the Asbestos Claimants have taken in this case, where

they seek to force all parties to estimate the asbestos liability here based exclusively on

evidence residing in the same database.

### III.   THE DISCOVERY SOUGHT BY DEBTORS' MOTION IS RELEVANT TO THIS ESTIMATION PROCEEDING

#### A.   The Discovery is Relevant Because It Will Establish the Extent to Which Pending Claimants Rely on Illegitimate and Fraudulent Medical Evidence.

The discovery sought by the Debtors will allow the Equity Committee to

demonstrate to the Court that a vast percentage of pending claimants rely on illegitimate

or fraudulent diagnoses made by doctors and medical companies who manufacture

medical evidence that abjectly fails the *Daubert* test for admissibility.  Specifically, the

proposed discovery seeks medical evidence and records from a sample of claimants

asserting nonmalignant asbestos related personal injuries.

There have long been suspicions that many nonmalignant asbestos claims

filed against asbestos defendants have been based on bogus medical evidence.  Very

recently, new evidence has surfaced which confirms these suspicions and exposes the

fraudulent practices used to generate asbestos claims.  Given that these startling

disclosures have occurred after the Debtors commenced their chapter 11 cases, it is

impossible for the historical database to identify the number of valid claims untainted by

this fraud.  And, of course, the historical database does not include X-rays, which must

---

[11] Relevant excerpts of this deposition are attached as Exhibit D.

also be examined.[12] Discovery from Claimants will provide statistically significant insights into the number of pending claimants who rely on the doctors and medical companies that generate bogus evidence. This information will provide a basis for drawing conclusions about the strength of pending and future claims. See Martin Decl. at ¶ 12-13. The Equity Committee respectfully submits that arriving at an estimate without discovery into these issues would require the Court to place its imprimatur on what the Equity Committee believes to be – and what another court in the Silica MDL has clearly found to be – an egregious abuse of the legal system.

Below, we have set forth evidence that has emerged since the Debtors commenced their chapter 11 cases which demonstrates why discovery from claimants is needed to establish the extent to which bogus nonmalignant asbestos claims have been asserted against these Debtors.

1.    The Historical Process That Has Generated Nonmalignant Asbestos Claims.

To understand the magnitude of these egregious abuses, it is first necessary to understand how the vast majority of nonmalignant asbestos claims are generated. An expert disclosed by the Debtors in this case, Professor Lester Brickman, will testify about the "entrepreneurial mode" of "mass asbestos screenings," which have generated (approximately) "well in excess of 90 percent of all nonmalignant claims."

---

[12] There is no doubt that the overwhelming majority of personal injury claimants rely on X-rays to support their asbestosis claims. The 2004 American Thoracic Society standards confirm that X-rays remain the best diagnostic tool for assessing the presence of nonmalignant disease, and specifically note that "[t]he abnormal PA chest film and its interpretation remain the most important factors in establishing the presence of pulmonary fibrosis." AMERICAN THORACIC SOCIETY, *Diagnosis and Initial Management of Nonmalignant Diseases Related to Asbestos,* Dec. 12, 2003 at 700.

Hr'g tr. of Pro. Lester Brickman, *Owens Corning v. Credit Suisse First Boston (In re Owens Corning)*, No. 04-cv-905 (D. Del. Jan. 19, 2005) at 17.[13]  These screenings are "all paid for by plaintiff lawyers who go out to various locations, local union halls, motel parking lots. There's a substantial amount of advertising that precedes" the screenings, and the screenings tout the potential financial benefits of having an asbestos claim. *Id.* These screenings take place in a mobile X-ray van "on an assembly line basis, one every five, six, seven, minutes, and they might screen, depending on the size of the truck . . . two, three hundred workers a day." *Id.*  These screenings "have no purported health benefit," the screening principals involved have "no doctor-patient relationship" with the claimants, and all information about the screening is transmitted to the attorneys who pay for the screenings, not the person screened. *Id.* at 18.

In a submission to another federal court, a plaintiffs' attorney noted that Manville Personal Injury Trust estimated in 2002 that "90% of the Trust's last 200,000 claims have come from attorney-sponsored X-ray screening programs . . . and 91% of all claims allege only nonmalignant asbestos 'disease,' and these cases receive 76% of all Trust funds." S. Rep. No. 108-118, at 84 (2003) (citing letter from Steven Kazan to the Hon. Jack B. Weinstein, dated July 23, 2002).

It is particularly telling that the surge in unimpaired claims has occurred in the face of medical research describing asbestosis as a "disappearing disease," and a condition that is "exceedingly rare." *Id.* at 79 (citing Letter from Dr. James Crapo to Senator John Kyl, dated June 23, 2003).  As a leading medical expert in asbestos-related diseases has stated: claimants are being compensated "for illnesses that, according to the

---

[13] Relevant excerpts of the transcript are attached as Exhibit E.

clear weight of medical evidence, either are not caused by asbestos or do not result in a

significant impairment - i.e., are not generally regarded by the medical profession as an

illness." *Id.*

Lawyers who represent claimants with malignant conditions have also

expressed their concern that this flood of nonmalignant claims threatens payments to

those truly ill. A member of the asbestos plaintiffs' bar testified:

> The heart of the asbestos problem is that tens of thousands of
> questionable claims, many generated by mass, for-profit X-ray
> screenings, are filed every year. These are not diagnosed cases of
> asbestos disease in any real sense. The vast majority of the
> claimants today have no real illness and no real symptoms. All
> they have is an X-ray that shows marks that could have been
> caused by asbestos. In most cases, they have not even seen a
> doctor.
>
> In short, they aren't really sick. If they were your children, you
> would not even keep them home from school.

Testimony of Steven Kazan, United States Senate Committee on the Judiciary (Mar. 2,

2003).[14]

These troubling practices have led Federal District Court Judge Charles

Weiner, who oversees the federal multi-district litigation overseeing asbestos cases (the

"Asbestos MDL") to administratively dismiss all claims which are generated using mass

screened evidence. *In re Asbestos Prods. Liab. Litig. (No. VI)*, 2002 WL 32151574 at *1-

2 (E.D. Pa. Jan. 16, 2002) (Admin. Order No. 8) (the "Asbestos MDL Order 8"). Judge

Weiner took the step of administrative dismissal because "the filing of mass screening

cases is tantamount to a race to the courthouse and has the effect of depleting funds, some

---

[14] http://judiciary.senate.gov/testimony.cfm?id=617&wit_id=1678

already stretched to the limit, which would otherwise be available for compensation to deserving plaintiffs." Asbestos MDL Order 8 at 2.

      2.   <u>The Johns Hopkins Study.</u>

      That mass screenings generate bogus medical claims was demonstrated in a 2004 study conducted at Johns Hopkins Medical Institutions. In that independent, blinded, peer reviewed study by Dr. Joseph Gitlin, *et al.*, *Comparison of "B" Readers Interpretations of Chest Radiographs for Asbestos Related Changes*, 11 J. Acad. Radiol. 843 n.8 (2004) (the "Johns Hopkins Study"), the Johns Hopkins team, which consisted of X-ray readers who have worked for both defendants and plaintiffs, found significant overreading of nonmalignant asbestosis in a sample of X-rays that had previously been reviewed by doctors retained by plaintiffs' attorneys.[15] Significantly, the Johns Hopkins Study discovered that *only 4.5%* of the claims were positive for asbestos related disease, even though the doctors that plaintiffs' lawyers selected had interpreted *96%* of the cases as positive.

      The Equity Committee anticipates the Asbestos Claimants will attack the underlying statistical basis of the Gitlin Study. However, the doctors responsible for the bogus X-rays in that study account for a huge percentage of all asbestos claims filed against all asbestos defendants, including, as we believe the evidence will show, these Debtors. The Asbestos Claimants will also argue that the John Hopkins Study only proves that defense-oriented "B" Readers[16] view evidence one way, while plaintiff-

---

[15] The Johns Hopkins Study is attached as Exhibit F.

[16] "B-readers" are the doctors who read and "score" X-rays pursuant to the ILO scale described in footnote 2, *supra*.

oriented X-ray readers read the same evidence another way. In essence, they seek to minimize the stunning results of the Gitlin study by simply ascribing them to reasonable disagreements between medical professionals. There is no merit to these arguments.

First, as described below, a number of the same doctors whose X-rays were reviewed in the John Hopkins study were excoriated in the silica MDL by Judge Jack for disgraceful medical practices that diverged from standard medical practices. Second, even asbestos plaintiffs' lawyers have effectively acknowledged that some of the doctors whose X-rays were reviewed in the John Hopkins study had not provided legitimate medical diagnoses – in settlement agreements with various defendants in 1999 and 2000, the plaintiffs' bar agreed that diagnoses from these bad doctors would not be used to support future claims. *See, e.g.*, Owens Corning Settlement Agreement dated December 8, 1998 at 7-8 (Owens Corning not obliged to accept a diagnosis from Dr. Ray Harron for purposes of settling cases)[17]; *See also* CCR Settlement Agreement dated May 17, 2000 at Appendix I at 2-3 (the CCR shall not be obliged to accept a diagnosis from Dr. Ray Harron for purposes of settling cases).[18] Third, Dr. Mark Peterson, the Asbestos Claimants Committee's valuation expert, has previously testified that he urged the Fuller Austin Trust – another asbestos bankruptcy trust – to reject medical reports from Dr. Ray Harron, one of the doctors identified in both the John Hopkins study and the silica MDL as among the most egregious producers of fraudulent medical diagnoses. Hr'g tr. of Dr.

---

[17] This document is attached as Exhibit G. The document was entered into evidence in *Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 722 (Bankr. D. Del. 2005).

[18] This document is attached as Exhibit H. The document was entered into evidence in *Official Comm. of Asbestos Claimants, et al. v. Asbestos Property Damage Comm. (In re Federal Mogul Global, Inc.)*, No. 05-59 (D. Del. June 16, 2005)

Mark Peterson, *Official Comm. of Asbestos Claimants, et al. v. Asbestos Property Damage Comm. (In re Federal Mogul Global, Inc.)*, No. 05-59 (D. Del. June 16, 2005) at 541.[19]  The John Hopkins study demonstrates the extraordinary relevance here of the discovery sought by the Debtors' motion concerning the medical evidence – or lack there of – provided in support of pending asbestos claims.

        3.      The Silica MDL Proceedings.

        That widespread misconduct pervades mass-screening enterprises and certain doctors who are prolific "B-readers" engage in massive wrongdoing was confirmed by a lengthy, exhaustively detailed decision issued by the Honorable Janice Graham Jack of the United States District Court for the Southern District of Texas. *See* Order No. 29: Addressing Subject-Matter Jurisdiction, Expert Testimony and Sanctions, (*In re Silica Prod. Liab. Litig.*, MDL Docket No. 1553, slip op. at 1 (S.D. Tex.) (the "Silica MDL Order").[20]  Judge Jack's order exposes the rampant misconduct of mass-screening entities and doctors who have generated thousands upon thousands of silicosis *and* asbestosis claims.  It also lays out in terms directly applicable to asbestos litigation precisely why the silica bar has generated these claims:

> The clear motivation to manage the diagnostic process was to inflate the number of plaintiffs and claims in order to overwhelm the Defendants and the judicial system.  This is apparently done in hopes of extracting mass nuisance-value settlements because the Defendants and the judicial system are financially incapable of examining the merits of each individual claim in the usual manner.

Order No. 29 at 238-39.

---

[19] Relevant portions of this transcript are attached as Exhibit I.

[20] The Silica MDL Order is attached hereto as Exhibit J.

Judge Jack's opinion also demonstrates the interrelationship between the medical "evidence" underlying both silicosis and asbestosis claims.  After substantial discovery was taken of certain mass-screening enterprises and physicians who generated a high volume of cases, Judge Jack issued a 249 page ruling covering a number of issues, including "whether the doctors who diagnosed Plaintiffs with silicosis employed a sufficiently reliable methodology for their testimony to be admissible." *Id.* at 115.  In answering that question, the MDL Court examined many underlying factual issues related to mass-screening enterprises and certain physicians who are active in both silica and asbestos litigation, and concluded that claims generated by screening companies and affiliated physicians "def[ied] all medical knowledge and logic," *Id.* at 116, and that the claims were not about the "search for truth and the quest for justice," they "were manufactured for money" and " were about litigation rather than health care." *Id.* at 150.  The screening companies upon whom discovery was taken in that case were involved in both asbestos and silica litigation. *Id.* at 66.  Judge Jack's opinion lays out the connection between asbestosis and silicosis claims in a stark paragraph about one screening company, N&M Inc.:

> Overall, N&M . . . managed to generate the diagnoses for approximately 6,767 [Silica] MDL Plaintiffs . . ..  When comparing the names of the approximately 6,757-N&M generated MDL Plaintiffs with the names in the Manville Personal Injury Settlement Trust (a trust established for asbestos claims after the Johns-Manville Corporation bankruptcy), *at least 4,031 N&M-generated Plaintiffs have also made asbestos claims*.  The magnitude of this feat becomes evident when one considers that many pulmonologists, pathologists, and B-readers go their entire careers without encountering a single patient with both silicosis and asbestos. . . .  Stated differently, a golfer is more likely to hit a hole-in-one than an occupational medicine specialist is to

> find a single case of both silicosis and asbestosis.  N&M parked a
> van in some parking lots and found over 4,000 such cases.

*Id.* at 79 (internal citations omitted) (emphasis added).  Judge Jack noted that the number

of silica MDL plaintiffs who had also made asbestosis claims was "staggering," *Id.* at

134, stunning, and not scientifically plausible.  *Id.* at 135.

   In additional proceedings in the same case, under questioning from Judge

Jack, counsel for one hundred of these implausible simultaneous silicosis/asbestosis

claimants opined that "I think the explanation on a lot of the cases is *the asbestosis*

*diagnosis was wrong.*" Hr'g tr. *In re Silica Prod. Liab. Litig.*, MDL Docket No. 1553

(S.D. Tex. Aug. 22, 2005) at 62-63 (emphasis added).[21]  Judge Jack hit the nail on the

head by responding "*Well, that would be a shame, wouldn't it, that your clients made*

*fraudulent claims in asbestosis and now those same people who made fraudulent claims*

*are trying to make another . . . claim here.*"  *Id.* at 63 (emphasis added).

   The discovery sought here will allow the Debtors and the Equity

Committee to establish how adversely the Debtors have been affected by similar wrong-

doing.  Judge Jack's opinion highlights the reasons why the Debtors and the Equity

Committee need to obtain claimant information about which doctors and screening

companies the pending claimants used.  Dr. Ray Harron, criticized extensively by Judge

Jack, was prolific among the doctors who reviewed X-rays of claimants against asbestos

defendants.  For example, the evidence from another proceeding demonstrates that Dr.

---

[21] The transcript is attached as Exhibit K.

Harron alone accounted for over 64,000 claims against that company.  *See* Analysis of claims against Owens Corning.[22]

Dr. Harron, whose practices Judge Jack described as "disgraceful," *Silica MDL Order* at 80, acknowledged that his diagnoses were for legal purposes, and not medical in nature.  *Id.*  He admitted that he did not rule out causes for radiographic changes other than silica exposure, that he relied on secretaries and typing companies to fill out diagnostic reports, and that he trusted clerical workers to interpret the B-reading forms he filled out and signed.  *Id.* at 84.  Dr. Harron failed to review a single report he submitted in the Silica MDL.  *Id.*  Dr. Harron also had a disturbing pattern of diagnosing claimants with both silicosis and asbestosis:

> When Dr. Harron first examined 1,807 Plaintiffs' X-rays for asbestos litigation (virtually all done prior to 2000, when mass silica litigation was just a gleam in a lawyer's eye), he found them all to be consistent only with asbestosis and not with silicosis.  But upon re-examining these 1,807 MDL Plaintiffs' X-rays for silica litigation, Dr. Harron found evidence of silicosis in every case.

*Id.* at 90.

Judge Jack found that another doctor, Dr. James Ballard, brazenly acknowledged that his diagnoses were impacted by whether a law firm was bringing an asbestosis or a silicosis claim: if a screening company or law firm told Dr. Ballard that a claimant had an exposure history consistent with asbestosis, that meant to him that the lawyers or screening company "want[ed] [him] to look for asbestosis," and that this "'could sway' his [X-]ray reading."  *Id.* at 94.  Judge Jack provided more than a dozen examples where Dr. Ballard, like Dr. Harron, made a "similar complete

---

[22] Attached hereto as Exhibit L.  The document was entered into evidence in *Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 722 (Bankr. D. Del. 2005).

asbestosis/silicosis reversal," or, in other words, diagnosed the same patient with asbestosis and silicosis at different times in order to support different claims. *Id.* Judge Jack noted that upon reviewing Ballard's B-reading patterns, his diagnoses "[were] remarkable," "stunning" and "defies all logic and all medical and scientific evidence of what happens to the lung when it's exposed to workplace dust." *Id.* at 95, 96, 136. Judge Jack made similar findings about two other doctors who are also prolific B-readers in asbestos cases. *The doctors identified in the silica opinion (Harron, Ballard, Oaks and Martindale) are among the most prolific B-readers in asbestos litigation. See* David Austern, 2004 Asbestos Claim Filing Trends at 8 ("2004 Trends").[23]

      With respect to screening companies, Judge Jack's opinion demonstrates that law firms, not physicians, were taking medical or occupational histories of claimants – a critical component in making a medical assessment of what kind of disease – if any – causes radiographic evidence of pneumoconiosis (*i.e.*, markings on an X-ray which could be read as consistent with a compensable disease). *Silica MDL Order* at 66-68. The court found "no evidence that anyone [taking medical histories] had any medical training or had been instructed by any medical professional what questions would be appropriate in taking an occupational history." *Id.* at 68. Judge Jack's order highlights in great detail the complete lack of evidence that certain high volume screening companies used proper X-ray technology or methodology, or that "any medical professional supervised the extent to which Plaintiffs were irradiated." *Id.* at 70. In sum, one principal in a screening company testified there was no regard for medical techniques or standards, but rather, "whatever the [law firm] asked us to do is what we did." *Id.* at 67 (alteration in original).

---

[23] Attached hereto as Exhibit M.

a.    *Judge Jack's ruling has already substantially impacted asbestos claiming*

The doctors who provided the bogus diagnoses at issue in the Silica MDL have been very active in asbestos litigation. These doctors provided B-reads for approximately 34,000 of the 119,500 claims processed by the Manville Trust between January 1, 2002 and June 30, 2004. *See* Austern, 2004 Trends at 8.[24] However, Judge Jack's compelling opinion is putting these doctors out of the claims manufacturing business. On September 12, 2005, the claims administrator for the Manville Trust (Claims Resolution Management Corporation "CRMC") announced that it would no longer pay claims which rely upon medical reports from these doctors or from suspect screening companies. CRMC stated:

> The reliability of reports prepared by the[se] doctors and screening facilities . . . has been challenged and is the subject of federal grand jury and congressional investigations into alleged fraud. Based upon evidence presented in the silica Multidistrict Litigation (MDL), the challenge is credible and compels suspension of acceptance of these reports. In the two months since Judge Janis Jack issued her June 30, 2005 Order in the silica MDL, CRMC has received no information or evidence to support continued acceptance of reports prepared by these doctors and facilities. Pending completion of the grand jury and congressional investigations and the litigation in which the reports were challenged, CRMC will no longer accept reports prepared by these doctors and facilities.

---

[24] One screener, who processed at least 14,000 people stated that he had classified every single person he had screened as having asbestosis. Eddie Curran, *Diagnosing for Dollars*, Mobile Register, Apr. 4, 2004, at A1.

Press Release, Claims Resolution Management Corporation, Suspension of Acceptance of Medical Reports (September 12, 2005).[25] Thus, as a direct result of the frauds unearthed in the silica MDL proceeding, the Manville Trust – by far the entity which resolves more asbestos claims than any other – is now refusing to settle claims based on medical evidence from the most prolific claims-generating doctors. This is a seismic shift in asbestos litigation, and the Equity Committee and the Debtors are entitled to know the impact it will have on the Debtors' asbestos liability. *See* Martin Decl. at ¶ 13. The requested discovery will assist in that process, in part, by revealing which claimants used which doctors.

 Moreover, as the CRMC press release notes, in August 2005, the United States House of Representatives Commerce Committee announced an investigation into the activities of the suspect silica doctors and screeners noting that "individuals entrusted with the health care of patients may have corrupted basic principles or medical standards in the service of litigation." *See* Letters from Hon. Joe Barton and Ed Whitfield, Aug. 2, 2005.[26] Furthermore, the United States Attorney for the Southern District of Manhattan has convened a grand jury to investigate these asbestos doctors and screeners and has even subpoenaed the Manville Trust's claims records. Jonathan D. Glater, *Asbestos Fund Bars 9 Doctors*, N.Y. TIMES, September 15, 2005, at C1; *see also* Jonathan D. Glater, *Lawyers Challenged on Asbestos*, N.Y. TIMES, Jul. 20, 2005, at C1.[27]

---

[25] This document is attached as Exhibit N.

[26] *http://energycommerce.house.gov/108/News/08022005_1618print.htm*, *http://energycommerce.house.gov/108/News/08022005_1619print.htm*. The letters are attached as Exhibit O.

[27] The articles are attached as Exhibit P.

The Asbestos Claimants will likely seek to diminish the impact of the findings by the Silica MDL court and the developments which have followed by arguing that asbestos defendants historically were aware of "bad doctors" and paid claims supported by those doctors anyway. This explanation misses the point that Judge Jack so forcefully made – that asbestos defendants and the judicial system were completely and unfairly overwhelmed by the sheer numbers of these bogus claims, and were forced to settle cases based on bogus evidence because of the shocking practices that had a virtual stranglehold on asbestos litigation in the late 1990s. Such practices can hardly serve as a continuing excuse that would purport to allow the Asbestos Claimants to avoid discovery and hide behind the bad doctors.

**B.**    **The Proposed Claimant Discovery Will Differentiate Between Impaired and Unimpaired Nonmalignant Claims.**

The discovery is also relevant because it will allow experts to ascertain what portion of nonmalignant claimants are functionally impaired, and what portion are unimpaired. Recent state law reforms, as well as orders issued in the federal asbestos MDL proceeding, have established a trend either to bar unimpaired claimants by statute from recoveries on such claims, or alternatively, through the use of judicial dockets, to prevent unimpaired claimants from prosecuting their causes of action unless and until they develop some physical impairment. These judicial innovations are referred to as "pleural registries" or "inactive dockets." The Debtors' database lacks pertinent information on the number of claimants who have physical impairment, and those who do not. Thus, the database does not enable experts to determine what percent of claimants actually have impairment versus those that remain unimpaired. *See* Martin Decl. at ¶ 14.

The discovery sought will remedy this defect by requiring claimants to produce medical records, including objective medical tests which measure the existence of impairment.

    1.    The Asbestos MDL Treatment of Unimpaired Nonmalignant Claims.

In the Asbestos MDL, Judge Weiner has imposed an inactive docket for nonmalignant unimpaired cases.[28] This inactive docket differs from Judge Weiner's administrative dismissal of claims generated by mass screened evidence, discussed above. The inactive docket pertains to claimants relying on ostensibly legitimate evidence and not evidence from the mass-screening claims manufacturing mills. Under this inactive docket, the Asbestos MDL court does not remand unimpaired claims back to trial courts, but rather tolls the limitations period, ensuring that if that person does subsequently develop an impairment he/she has preserved a right to sue. Unimpaired claims are not litigated; a case only becomes "active" if the claimant later becomes impaired. *In re Asbestos Prods. Liab. Litig. (No. VI)*, 2002 WL 32151574 at *1-2 (E.D. Pa. Jan. 16, 2002), (Admin. Order No. 3). Thus, in the federal MDL, unimpaired nonmalignant claimants cannot recover anything on their claims absent a settlement offer from a defendant, and, as noted above, even claimants alleging impairment who attempt

---

[28] Federal treatment of asbestos claims is highly relevant here. An estimate is an evaluation of the aggregate value of all claims as if they were actually liquidated, either through settlement or litigation. The Equity Committee's position is that all pending and future asbestos personal injury claims against the Debtors must be prosecuted in federal court pursuant to 28 U.S.C. 157(b)(5), which provides that a district court *shall* order that personal injury and wrongful death claims against a debtor shall be tried in a federal district court. Although these claims would be based on state substantive law theories, they would be subject to federal rules of civil procedure, federal rules of evidence, and most importantly, could be transferred to the federal asbestos MDL, where claims founded on mass screening would be administratively dismissed and claims not alleging impairment would be placed on an inactive docket.

to use mass screened evidence must submit more reliable evidence before being permitted to prosecute their cases.

2.    Recent State Law Reform Measures and the Need to Differentiate Between Impaired and Unimpaired Nonmalignant Claims.

Claimant discovery is also necessary because the Equity Committee will demonstrate that recent state law reforms will significantly curtail the past practices of the asbestos bar of filing huge numbers of claims where the claimants have no evidence of any physical impairment. Studies have shown that the vast majority of nonmalignant claimants – up to 90% – have no physical impairment whatsoever. Stephen J. Carroll, *et al.*, RAND INSTITUTE FOR CIVIL JUSTICE, *Asbestos Litigation Costs and Compensation: An Interim Report* 40, 65 (2002). Unfortunately, for a multitude of claims, the USG claims database does not distinguish between impaired and unimpaired claimants. Accordingly, absent a stipulation from the Asbestos Claimants that some 90% of nonmalignant claimants have no physical impairment, discovery from a sample of claimants is necessary in order to demonstrate to the Court the enormous impact these state law reforms will have on nonmalignant claims.[29]

---

[29] As the Equity Committee noted in a prior filing, Georgia Pacific Corporation reported a substantial decline in asbestos claims filed against it in the first quarter of 2005 due to state tort reforms. Response of the Statutory Committee of Equity Security Holders to the Joint Statement of the Asbestos Personal Creditors Committee and the Legal Representative for Future Asbestos Claimants Regarding Discovery in Advance of Hearing at 15. That trend continued in the second quarter of 2005. Georgia-Pacific Corporation 10-Q for the Quarterly Period ended on July 2, 2005 at 19. (available at http://www.shareholder.com/Common/Edgar/41077/1193125-05-151340/05-00.pdf A recent release by EnPro Industries states that "new filings of asbestos claims continued at a lower rate," and noted the "increased dismissals of claims as the result of state reforms." EnPro Industries Reports Record Earnings as Industrial Markets Remains Strong, Aug. 2, 2005 (available at http://phx.corporate-ir.net/phoenix.zhtml?c=131738&p=irol-irhome).

As the Equity Committee noted in its previous filing in this case, Texas, Ohio, Florida and Georgia – leading forums for asbestos claims – have passed legislation effectively barring mass screened evidence and denying unimpaired claimants compensation. *See* Response of the Statutory Committee of Equity Security Holders to the Joint Statement of the Asbestos Personal Creditors Committee and the Legal Representative for Future Asbestos Claimants Regarding Discovery in Advance of Hearing at 15-17. Additionally, many state courts have adopted the inactive docket procedures used by Judge Weiner, including courts in California, Georgia, Illinois, Maryland, Massachusetts, New York, Pennsylvania, South Carolina, Wisconsin and, most recently, in Minnesota. *See* Victor E. Schwartz, *et al.*, *Addressing the "Elephantine Mass" of Asbestos Cases: Consolidation Versus Inactive Dockets (Pleural Registries) And Case Management Plans That Defer Claims Filed by the Non-Sick*, 31 Pepp. L. Rev. 271 (2003) (cataloging numerous jurisdictions which have "inactive dockets" and pleural registries); *see also In re Minn. Pers. Injury Asbestos Cases*, No. C8-94-2875 (2d Dist. Ct. Minn. 2005).[30]

Here, the proposed discovery can facilitate the determination of what percentage of claimants against USG are unimpaired – a critical element of any valid estimation of the value of future claims.

**C.     Product Identification.**

Discovery is also needed to establish how many pending claimants can demonstrate that they were exposed to the Debtors' products. The database available to experts in this case has limited information about whether claimants in settled cases were

---

[30] Attached as Exhibit Q.

actually exposed to the Debtors' products. The questionnaire designed by the Debtors will provide evidence on this point. The cause of this missing, but critical, information stems from the Debtors' participation in the CCR. USG was one of approximately twenty members of the CCR. Under CCR protocols, a member of the CCR was allocated a certain share of liability in a settlement any time it was named as a defendant by a plaintiff. Dep. tr. of William R. Hanlon, *Official Comm. of Asbestos Claimants, et al. v. Asbestos Property Damage Comm. (In Re Federal Mogul Global, Inc.),* No. 05-59 (D. Del. June 1, 2005) at 95-97, 115, 121 (hereinafter "Hanlon Dep. tr. at __").[31] The CCR settled claims with a plaintiff who submitted evidence of exposure to the products of any single CCR member. *Id.* at 108. Importantly, the plaintiff was not required to demonstrate exposure to the products of every CCR member that the plaintiff named as a defendant in the case. *Id.* at 148. As counsel for another member of the CCR explained, when a plaintiff presented evidence of exposure to any single CCR members' products, "the other members who had been named in that plaintiff's complaint had to contribute to the settlement notwithstanding that the plaintiff had not proffered any evidence of exposure to the products of those other defendants." Hr'g tr. of Paul Hanly, Jr., Esq., *Official Comm. of Asbestos Claimants, et al. v. Asbestos Property Damage Comm. (In re Federal Mogul Global, Inc.),* No. 05-59 (D. Del. June 14, 2005) at 68-69.[32] Thus, if USG was named as a defendant by a claimant with whom the CCR subsequently reached a settlement, that claim will appear in the Debtors' database as a resolved claim irrespective of whether the claimant was exposed to the Debtors' products.

---

[31] Relevant excerpts are attached as Exhibit R.

[32] Relevant excerpts are attached as Exhibit S.

Compounding the lack of accurate information in the database is the fact that asbestos plaintiffs' firms named defendants indiscriminately and without regard to whether or not a plaintiff was actually exposed to a defendant's products. For example, a brief filed by Weitz & Luxenberg – a major asbestos plaintiffs' law firm – explained that that firm routinely named a prepackaged inventory of defendants in asbestos cases and only later determined whether the plaintiff was exposed to the product of each defendant:

> It has been this firm's practice over . . . many years . . . involv[ing] thousands of asbestos personal injury suits, to file a Standard Asbestos Complaint against a general list of numerous (approximately 100) defendants, which have been identified as making, selling, using, incorporating, installing or providing premises with asbestos or asbestos products. The causes of action in the complaint are stated generally and jointly against all defendants: '[d]uring the course of [plaintiff's] employment, plaintiff was exposed to the defendants' asbestos and asbestos containing materials to which exposure directly and proximately caused him to develop an asbestos related disease. . .'

Memorandum of Law Submitted by Weitz & Luxenberg at 3, *In re New York City Asbestos Litig.*, No. 01-10657 (S.D.N.Y., Dec. 19, 2001).[33] Thus, the mere fact that a claim is pending against the Debtors says little or nothing about whether any plaintiff can establish product identification.

In sum, the current state of information provides little useful information about the number of claimants – past or pending – who have allowable claims against the Debtors. This information is vital to projecting the number of legitimate pending claims against the Debtors and the number of future claims as well. The discovery sought by the Debtors will provide useful information and fill this critical information gap.

---

[33] Relevant excerpts are attached as Exhibit T.

**D.**     **Discovery Is Needed to Identify Disease Category for Unknown Claims.**

The discovery sought in the Debtors' motion is also relevant because it will provide critical information about pending claimants whose alleged disease is listed in the database as "unknown." A large percentage of pending claims reflected in the CCR database do not indicate what disease the claimant asserts to have. To estimate accurately the number of legitimate pending claims and the value of those claims (and to make reasonable projections about future claims ) these unknown claims must be assigned to a disease category (i.e., mesothelioma, lung cancer, other cancer or nonmalignant). See Martin Decl. at ¶ 11. Analysis of the proposed random sample of claim files from 200 claimants listed with "unknown" disease would allow the proportion of claimants against the Debtors who have malignant versus nonmalignant claims to be determined.

**E.**     **Discovery Is Needed to Obtain More Information about Lung Cancer Claims.**

The Debtors have previously set forth their position that as a medical matter, lung cancer is only caused by asbestos exposure where evidence of asbestosis is present in the cancer victim's lungs. The Equity Committee agrees with this position and will put forth testimony on this issue at trial. Based on the contents of the Debtors' database, there is currently no way to approximate the percentage of lung cancer claimants who have evidence of asbestosis. See Martin Decl. at ¶ 10. Discovery from the 200 lung cancer claimants sought by the Debtors will provide the evidence necessary to address this category of claims.

F.    **Claimant Discovery is Needed to Determine Whether Pending Claims Are Similar to Closed Claims.**

Finally, discovery is needed to weigh the relative strengths and/or weaknesses of pending claims as they relate to settled claims. As the ACC in the *Owens Corning* case noted, good reason exists to believe that claims pending as of the date of the Debtors' chapter 11 petition are weaker than settled claims. There, the ACC argued:

> like many defendants Owens Corning often chose to settle non-malignant claims more quickly when [they] regarded the evidence supporting such claims as being stronger and less subject to dispute …. and entered into global settlement agreements earlier with those law firms it regarded as representing a more dangerous mix of cases. Likewise, Owens Corning was less likely to settle quickly those pre-petition claims it regarded as representing *weaker* claims. The latter claims . . . remained unsettled when Owens Corning filed for bankruptcy.

Objection and Response of the Official Committee of Asbestos Claimants to the Motion of CSFB, as Agent, to Establish Procedures to Obtain a Sample of Medical Records, Including X-Rays, From Asbestos Personal Injury Claimants Asserting Nonmalignant Asbestos Personal Injury Claims Against the Debtors And to Modify the Court's August 19, 2004 Scheduling Order, *In re Owens Corning*, No. 00-3837 (JKF) (D. Del. Oct.18, 2004) at 8-9.[34] If the ACC's argument is correct that pending claims are weaker than settled claims, any blind extrapolation from settlement history to value pending claims (as contemplated by the Asbestos Claimants) would be fatally flawed. Without discovery, hundreds of millions of dollars may be allocated to pending claimants without any scrutiny of this critical issue.

---

[34]    Attached hereto as Exhibit U.

IV.    **CONCLUSION**

For the reasons set forth above, the discovery sought by the Debtors through the use of a sampling plan and claimant questionnaire is calculated to lead to relevant evidence for purposes of estimation.  Under the liberal rules governing discovery, that alone is sufficient to grant the Debtors' motion.  Moreover, the discovery sought and random sampling are accepted tools in estimation proceedings.  Accordingly, the Debtors' motion should be granted.

Date:  September 19, 2005                Respectfully submitted,

**MORRIS, NICHOLS, ARSHT & TUNNELL**

Robert J. Dehney (No. 3578)
Gregory W. Werkheiser (No. 3553)
Daniel B. Butz (No. 4227)
1201 North Market Street,
18th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

**WEIL, GOTSHAL & MANGES LLP**

Martin J. Bienenstock
Judy G.Z. Liu
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007

-and-

David A. Hickerson
Peter M. Friedman
M. Jarrad Wright
1300 Eye Street, N.W., Suite 900
Washington, D.C. 20005
Telephone: (202) 682-7000

Facsimile: (202) 857-0940

-and-

Ralph I. Miller
200 Crescent Court, Suite 300
Dallas, TX 75201
Telephone: (214) 756-7700
Facsimile: (214) 746-7777

Counsel for the Statutory Committee
of Equity Security Holders

# Index of Exhibits

Exhibit

Declaration of Dr. Denise Martin.................................................................A

Hr'g tr., *In re W.R. Grace & Co.,* No. 01-11039 (JKF)
    (Bankr. D. Del. Jan. 21, 2005)...............................................................B

Discovery Order in *In re Congoleum Corp.,* No. 03-51524 (KCF)
    (Bankr. D. N.J. July 7, 2004)........................ ...........................................C

Dep. tr. of Dr. Mark Peterson, *G-I Holdings, Inc. v. Bennett (In re G-I Holding),*
    No. 02-cv-030829 (S.D.N.J. Aug. 10, 2005).........................................D

Hr'g tr. of Professor Lester Brickman, *Owens Corning v. Credit Suisse First Boston*
    *(In re Owens Corning),* No. 04-CV-905 (D. Del. Jan. 19, 2005).........................E

Dr. Joseph Gitlin, et al., *Comparison of "B" Readers Interpretations of Chest*
    *Radiographs for Asbestos Related Changes,* 11 J. Acad. Radiol. 843
    n.8 (2004)................................................................................................F

Owens Corning Settlement Agreement dated December 8, 1998.......................................G

CCR Settlement Agreement dated May 17, 2000.............................................................H

Hr'g tr. of Dr. Mark Peterson, *Official Comm. of Asbestos Claimants, et al. v.*
    *Asbestos Property Damage Comm. (In Re Federal Mogul Global, Inc.),*
    No. 05-59 (D. Del. June 16, 2005)......................................................................I

Order No. 29: Addressing Subject-Matter Jurisdiction, Expert Testimony
    and Sanctions, *In re Silica Prod. Liab. Litig.,* MDL Docket No. 1553,
    *slip op.* at 1 (S.D. Tex) dated June 30, 2005.............................................J

Hr'g tr. *In re Silica Prod. Liab. Litig.,* MDL Docket No. 1553
    (S.D. Tex. Aug. 22, 2005)..................................................................K

Analysis of claims against Owens Corning.........................................................L

David Austern, 2004 Asbestos Claim Filing Trends.........................................M

Press Release, Claims Resolution Management Corporation,
    Suspension of Acceptance of Medical Reports (September 12, 2005)..................N

Letters from Hon. Joe Barton and Ed Whitfield, Aug. 2, 2005..........................................O

Jonathan D. Glater, *Asbestos Fund Bars 9 Doctors*, N.Y. TIMES,
    September 15, 2005 and Jonathan D. Glater, *Lawyers Challenged
    on Asbestos*, N.Y. TIMES, Jul. 20, 2005..................................................................P

*In re Minn. Personal Injury Asbestos Cases*, No. C8-94-2875 (Minn. 2005)...................Q

Dep. tr. of William R. Hanlon, *Official Comm. of Asbestos Claimants, et al. v.
    Asbestos Property Damage Comm. (In Re Federal Mogul Global, Inc.),*
    No. 05-59 (D. Del. June 1, 2005)...............................................…..................R

Hr'g tr. of Paul Hanly, Jr., Esq., *Official Comm. of Asbestos Claimants, et al. v.
    Asbestos Property Damage Comm. (In Re Federal Mogul Global, Inc.),*
    No. 05-59 (D. Del. June 14, 2005)...............................................…....…......S

Memorandum of Law Submitted by Weitz & Luxenberg,
    *In re New York City Asbestos Litig.*, No. 01-10657 (S.D.N.Y., Dec. 19, 2001).....T

Objection and Response of the Official Committee of Asbestos Claimants
    to the Motion of CSFB, as Agent, to Establish Procedures to Obtain a
    Sample of Medical Records, Including X-Rays, From Asbestos Personal
    Injury Claimants Asserting Nonmalignant Asbestos Personal Injury Claims
    Against the Debtors And to Modify the Court's August 19, 2004 Scheduling
    Order, *In re Owens Corning*, No. 00-3837 (JKF) (D. Del. October 18, 2004).......U