1    asbestos liabilities, have you?

2        A    Other than the Fuller Austin insulation

3    company, no.

4        Q    Were you an executive of Fuller Austin, or

5    are you a trustee of a trust?

6        A    I'm on the board of directors, but I'm not

7    an officer other than that.  But that's -- I'm

8    mentioning it for completeness.  I don't think

9    that's what you were asking me about, but there is

10   that.

11       Q    Have you been on the board of directors of

12   any other companies besides Legal Analysis in the

13   last 20 years?

14       A    Trust Services, Inc., which is a

15   consortium -- it's a company owned by a consortium

16   of trusts to manage asbestos claims liquidation

17   proceedings.  Again, it's related to my service as a

18   trustee of Fuller Austin.  It's one of the trusts

19   that owns Trust Services.

20       Q    Are you on the board of Trust Services,

21   Inc.?

22       A    Yes.

23       Q    Do you have any other role at Trust

24   Services, Inc.?

25       A    I was chairman of the board at one point,

1    but other than that, no.

2    Q    Were you ever an employee of trust

3    services, Inc.?

4    A    Not an employee, no.

5    Q    Were you ever retained as a consultant,

6    apart from your role as a board member or chairman

7    of the board for trust services, Inc.?

8    A    I think some of the work I've done is a

9    consultant to Trust Services, but I'm not certain of

10   that.

11   Q    And which trusts does trust services

12   provide services to?

13   A    Well, it's owned jointly by the National

14   Gypsum trust, the Fuller Austin trust, and the DII

15   trust.  And it also performs services for three or

16   four other trusts, Swann, S-w-a-n-n.  I'm not going

17   to remember them all.  Eagle-Picher, Celotex.  There

18   are a couple other small trusts.

19   Q    Back to the estimates that you said you

20   had done on a confidential basis for some companies,

21   what was the context of those?

22   A    I was asked to do them.  The companies

23   wanted to get some statement of what their

24   liabilities were.  I assume they were related to

25   some transactions they may be doing, but I really

Page 92

1    didn't get into details with regard to why it is

2    they wanted the forecasts.

3        Q    Were any of them for potential acquirors

4    of companies where they were looking at other

5    companies and asking you to estimate the liability

6    of a potential acquisition target?

7        A    One was.

8        Q    Or any four companies where they were

9    targets of acquisitions where they were asking you

10   to provide some opinion that they could use in

11   talking to a potential purchaser?

12       A    Not to my knowledge.

13       Q    Can you describe the other two contexts in

14   some general way, if you can help us understand --

15   if you knew why those companies wanted an asbestos

16   estimate?

17       A    I don't know.  I mean, I know in one

18   instance I was asked to do an estimate of another

19   company because of an interest in either acquiring

20   it or some assets from that company.  In the others,

21   it was for the particular companies and how they

22   used it, I'm not sure.

23       Q    Were any of those during the context when

24   the Georgine settlement was pending, those estimates

25   for companies?

1    A    I think probably -- -- I'm not certain.

2    Q    Do you think some of them may have been?

3    A    Yes.

4    Q    And did they involve companies that were

5    participants in the Georgine settlement during the

6    CCR?

7    A    Not to my knowledge.

8    Q    Have you ever given any specific weight to

9    the Georgine settlement in any of the estimates

10    you've done of asbestos liabilities?

11    A    I don't understand your question.

12    Q    Have you ever used the Georgine settlement

13    terms to try to adjust your preferred estimate in

14    some way for asbestos liabilities in any context?

15    A    I've made estimates of liabilities under

16    Georgine for the National Gypsum trust, but I

17    believe I made alternative estimates -- I've made

18    both tort estimates and Georgine estimates for the

19    National Gypsum trust.  I don't think I've ever

20    tried to do some probabilistic weighting of them,

21    no.  I think that would have been an inappropriate

22    thing to do.

23    Q    Why would it be inappropriate?

24    A    Because their liability is one or the

25    other.  Either the Georgine class action is approved

Page 94

1    or not approved.  So you can give both estimates and

2    let the client determine what they do, but their

3    liability isn't some function of a probability of

4    the two of them.  It's one or the other.  One is a

5    contractual liability, and one is a tort liability.

6        Q    Have you formed any opinion on whether the

7    management of GAF in 1994 should or should not have

8    considered the Georgine settlement in making

9    management decisions?

10       A    I don't understand that question.

11       Q    Yes.  Let me try to ask it again.  Have

12   you formed any opinion in connection with your work

13   that you expect to express on whether the management

14   of GAF, in January of 1994, should or should not

15   have considered the Georgine settlement in its

16   analysis of its possible asbestos liabilities?

17       A    I've not been asked that question, and I

18   have not addressed that question.  I don't know if

19   I'll be asked that question at trial.

20       Q    At this time, you have not formed an

21   opinion on that one way or the other; right?

22       A    I think I have an opinion.

23       Q    What analysis have you done to reach that

24   opinion, or is that an opinion based on your

25   general knowledge of the situation in that time

1    context?

2       A    You've asked me an either/or, and I can't

3    answer it either/or.  It wasn't either of those.

4    The case was subadjudicate at the time of January

5    1994.  It wasn't the applicable law.  It wasn't the

6    final judgment.  It -- whatever interest the company

7    has in seeing what its liability might be under

8    Georgine was their business.  I can understand

9    that's something of concern to the company.

10         So for their own internal purposes, I

11    would expect they would want to do an analysis like

12    that, as to what would be the liability under

13    Georgine.  One could do an analysis like that, but

14    if you're interested in what is the likely

15    obligation to tort victims at that point in time,

16    that's established by the tort system.

17       Q    You don't believe the lawyers who

18    negotiated the class settlement for the class in

19    Georgine were acting in bad faith, do you?

20       A    No, I don't think so.

21       Q    You don't think they misrepresented their

22    views to the Court, do you?

23       A    I don't know what their views to the court

24    were.  I haven't read them.  They're honorable men.

25       Q    Have you read the fairness hearing

1    proceedings in Georgine?

2        A    No, I have not devoted that effort to it.

3        Q    Never?

4        A    It's very long.  I've seen excerpts and

5    statements from it, but I've not sat down and read

6    the fairness hearing from end to end, no, of course

7    not.

8        Q    Would you agree that the negotiation

9    between those plaintiffs' lawyers and the CCR

10    defendants was an arm's length negotiation?

11        A    Well, they represented different

12    interests, and they were each trying to effectuate

13    the purposes which were different.  So I don't think

14    it was collusive.

15        Q    Well, is that different -- let me restart

16    the question.  Do you believe that each had

17    differing economic interests in that negotiation?

18        A    Well, of course, they had different

19    economic interests.  They had different interests,

20    and they had some common interests.

21        Q    What would be your definition of an arm's

22    length negotiation?

23        A    I don't know.  I didn't use the term.

24        Q    Do you ever used that term?

25        A    I probably have.

Page 97

1       Q     Would you agree that the plaintiffs'
2   lawyers who were representing the asbestos claimants
3   in the plaintiffs' class in Georgine were
4   sophisticated and experienced plaintiffs' lawyers?
5       A     Oh, undoubtedly.
6       Q     You don't think they were chumped by the
7   CCR?
8             MR. FINCH:  Object to form.
9             THE WITNESS:  Well, they may have at some
10  time in their lives.  I don't know.  They're bright
11  guys.
12            BY MR. MILLER:
13      Q     So would you agree that the value of the
14  Georgine settlement was an indicator of what the
15  Rice and Locks and other firms representing the
16  plaintiffs' class at that time felt was, all things
17  considered, in the best interest of their clients?
18      A     I have no idea what that question is or
19  how to answer it.
20      Q     What don't you understand about it?
21      A     What the value -- I just don't understand
22  your question.  It doesn't make sense to me.  I
23  don't know what you're asking me.  I can't answer
24  it.
25      Q     The plaintiffs' firms that were

1    representing the class were going to get fees as

2    class counsel as a part of the settlement; isn't

3    that true?

4         A    Yes.

5         Q    Do you have any reason to believe that the

6    plaintiffs' firms in that case were more interested

7    in their fees than they were in the interest of

8    their clients?

9         A    I have no reason to believe that, although

10   that is one of the criticisms of use of class

11   actions.  Class action is in a context like mass

12   torts, and there are instances where it can be

13   abused, but I don't have -- I'm not second-guessing

14   their motives with regard to that issue, no.

15        Q    In this particular settlement, the

16   Georgine settlement, you've never seen any

17   indication that the plaintiffs' lawyers were more

18   interested in their own fees than they were in the

19   clients to whom they owed fiduciary duties; isn't

20   that true?

21        A    One of the problems ultimately in the

22   resolution of the case was the conflicts in the

23   fiduciary duties that they owed to their present

24   claimants and their future claimants and the fees

25   that were generated by representing present

Page 99

1  claimants.  So it turned out to have been a

2  considerable concern to the courts, as I recall,

3  although I've not reread those decisions recently.

4  So I think it was an issue.  It became an issue.

5      Q     And did you feel it was personally an

6  issue at the time, or you're just saying that's what

7  the courts said?

8      A     I think these lawyers who who negotiated

9  the future class action on the part of -- for the

10  future plaintiffs thought they were doing the right

11  thing, and in some respects, maybe they were.

12  That's not the issue or the concern.  The issue is

13  is this -- it was ultimately -- it was a deal that

14  had real problems with it, and it was a deal that

15  was ultimately sunk by those problems.  Many or all

16  of those problems were known when they made the

17  deal.  It was a risk that people took at that time,

18  and these kinds of issues were among the problems

19  with the deal.

20      Q     You are aware there were what are called

21  future agreements between some of the defendants and

22  the Center for Claims Resolution and some of the

23  plaintiffs' law firms who entered into the Georgine

24  class action settlement?

25      A     There were terms as -- I think embedded in

Page 100

1    other agreements, there were terms of agreements

2    with regard to future claims between the lawyers and

3    CCR, yes.

4        Q    What was your understanding in the early

5    '90s of the purpose for which those futures

6    agreements were entered into?

7        A    I don't understand your question.

8        Q    Why do you understand that law firms were

9    willing to enter into some sort of agreement dealing

10   with their recommendations in the future in asbestos

11   cases as of the early 1990s?

12       A    Two answers to that.  One, they were a

13   part of an overall deal that got the present

14   claimants represented by those law firms paid

15   quickly in contrast to what likely otherwise would

16   have happened.  So it was a part of a deal.  It was

17   a term they agreed was a part of the deal.  Beyond

18   that, what were their purposes or objectives or

19   expectations about that?  I don't know.

20       Q    Do you know whether the AFL-CIO supported

21   the Georgine class action settlement?

22       A    As it was ultimately amended, my

23   understanding is that they did.

24       Q    Do you know why they did that?

25       A    I had no conversations with them.  I don't

1    know.

2         Q    Do you recall the statements they made at

3    the time about why they supported it?

4         A    I don't recall those, no.

5         Q    Do you know whether any financial

6    institutions factored Georgine into their analyst

7    reports in early 1994?

8         A    Other than the quotes that Dr. Martin

9    included in her report, I don't recall having seen

10   any, but I did read her rebuttal report and saw what

11   she quoted.

12        Q    Were you aware of that fact at the time

13   you prepared your exhibit 1?

14             MR. FINCH:  Aware of what fact?

15             BY MR. MILLER:

16        Q    Were you aware that some analysts, as

17   quoted in Dr. Martin's report, had referred to

18   Georgine in their analysis of asbestos liabilities

19   in early 1994?

20             THE WITNESS:  I certainly wasn't -- don't

21   recall the quotes that she had.  I don't know that I

22   really thought about it.  I'd have expectations

23   about what financial analysts might say, but I

24   didn't consider it, and I don't recall having looked

25   at it in particular.  I don't think it's relevant.

1          BY MR. MILLER:

2      Q     Don't you think it's relevant?

3      A     Particularly, the statements she has are

4  conditional.  It's something that's obvious.  If the

5  deal goes ahead and gets finalized, then it has

6  implications, and there's no doubt about that.  It

7  would have made more -- it would have had great

8  benefits for members of the Center for Claims

9  Resolution, including GAF.  That's why they

10 negotiated the deal.  So any financial analyst would

11 probably say if this happens, then it will have

12 implications for investment decisions regarding

13 these companies.  I would be surprised if they

14 wouldn't say something like that.

15     Q     What great benefits would Georgine have

16 had for GAF, as you understood it?

17     A     It would have been primarily a way to

18 control the timing of their payments.  They would

19 have had an orderly and agreed upon cash outflow for

20 these liabilities that would have helped them with

21 regard to financial planning.  It would have reduced

22 their liabilities.

23          I think the certainty in the reduction to

24 exposure were -- it would have dampened the risks

25 they faced with regard to large trial judgments.  It

1    was a deal that was clearly favorable to -- had

2    benefits for CCR members.  That's why I, assume,

3    they agreed with that, or they wouldn't have

4    negotiated it.

5         Q    Do you think it would have reduced the

6    financial incentive for plaintiffs' law firms to

7    invest in asbestos litigation?

8         A    By itself, not necessarily.

9         Q    What do you mean "by itself"?

10        A    Well, if it became a model for Owens

11   Corning and W.R. Grace and Pittsburgh Corning and

12   other companies that were not members of the Center

13   for Claims Resolution.  Then ultimately the problem

14   would have had some impact, but it would have

15   affected one portion of the potential recoveries the

16   people had.  The possible spread of it would have

17   had more of an impact, if it spread.

18        Q    Did you read the District Court opinion in

19   the Georgine case?

20        A    I believe I did at the time.

21        Q    Do you recall that the District Court in

22   the fairness hearing found the terms of the

23   stipulation of settlement were fair to the class as

24   a whole?

25        A    It had to have.  Otherwise, it wouldn't

1    have approved the fairness of the deal.

2        Q    Do you recall that the District Court

3    found that they were -- the terms were reasonable,

4    adequate, and fully justified by the evidence of the

5    fairness hearing?

6        A    The same answer.

7        Q    They had to do that; right?

8        A    Yes.  It's a part of the decision for

9    remedy, I guess.

10        Q    Do you recall that there were some

11    exposure requirements in the Georgine settlement?

12        A    I do recall that there were exposure

13    requirements, yes.  Sitting here right now, I can't

14    tell you what they were.

15        Q    Do you recall that the District Court

16    found that Georgine's exposure requirements served

17    the purpose of compensating those who had actual

18    exposure to asbestos, while excluding those with

19    only trivial, i.e. not medically significant

20    exposure?

21        A    No.

22        Q    Would you agree that the concept of

23    compensating those who have actual exposure while

24    excluding those with only trivial was a reasonable

25    purpose for the plaintiffs' lawyers to try to pursue

1    on behalf of the plaintiffs' class?

2         A    Well, it's a rarity that if someone

3    doesn't have an exposure that's medically

4    significant, they don't have a cause of action.  So

5    I guess it would be hard for anyone to disagree with

6    that.

7         Q    Do you recall that the District Court

8    concluded the values and the compensation schedule

9    of the Georgine settlement were a reasonable

10   reflection of the CCR defendants' historical

11   settlement averages from the tort system?

12        A    I don't recall that.

13        Q    Would you have any reason to question

14   whether that was an appropriate finding?

15        A    Well, I don't know the record in the case.

16   I've not reviewed the transcript of the hearings.  I

17   don't know what evidence was provided to the Court

18   about that issue.  So I can't comment on it, on a

19   decision with an evidentiary basis that I'm

20   unfamiliar with.  In the context of the evidence

21   they had, it may have been an appropriate

22   conclusion.

23             (Exhibit 3 identified.)

24             BY MR. MILLER:

25        Q    I've handed you what's been marked as

1    Exhibit 3.  It's 157 FRD page 246.  It's, I believe,
2    actually a Lexis print.  And I'd like to ask you to
3    turn with me to finding of fact number 95, which I
4    believe is on -- it's on page 35 of this print, and
5    I believe if we can find the pagination, it's on 277
6    of 157 FRD.  Will you turn with me to page 35 of
7    this print?
8         A    I have that.
9         Q    I'm going to read it, the first sentence,
10   and ask you if I've read it right.  Paragraph 95
11   says "Having reviewed the underlying documents
12   provided to Class Counsel during the negotiations
13   and accepted into evidence at the fairness hearing,
14   and having found these documents to be accurate and
15   valid, this court finds that the values in the
16   Compensation Schedule are, indeed, a reasonable
17   reflection of the CCR defendants' historical
18   settlement averages from the tort system."
19              Did I read that correctly?
20        A    You read it correctly, yes.
21        Q    Have you ever don e any analysis of the
22   exhibits that are listed there to see whether you
23   believe they are or are not a reasonable reflection
24   of the CCR defendants' historical settlement
25   averages from the tort system?

1     A     I'm sorry.  Could you either restate,

2  re-ask the question or read it to me?

3     Q     Yeah, I'll try to restate it.  You were

4  doing various kinds of analyses in the early '90s up

5  through the present of asbestos liability --

6     A     Yes.

7     Q     -- for lots of different purposes; right?

8     A     Yes.

9     Q     In any of your analyses, have you ever

10  formed an opinion one way or another as to whether

11  the values in the compensation schedule in the

12  Georgine settlement which are referred to there are

13  indeed a reasonable reflection of the historical

14  settlement averages from the tort system of the CCR

15  defendants?

16     A     So you're asking me if I've drawn any

17  inferences about whether the compensation schedule

18  values were a reasonable reflection?

19     Q     Right.

20     A     I recall having looked at that issue in a

21  contemporaneous with this and having been concerned

22  that they didn't, but I don't recall the specific

23  analysis that I did.  It's just something I recall

24  having done and looked at in somewhat -- something I

25  was just interested in at the time.  I've looked at

Page 108

1  an exhibit that Dr. Martin attached to her report
2  that further troubles me, and when I look at the
3  historic averages of GAF, that it was paying prior
4  to and contemporaneous with the negotiation of the
5  Georgine class action, that they didn't seem
6  consistent to me to be -- they did not seem
7  consistent with the amounts that were in the deal,
8  though I don't think any of -- I have not set out to
9  make a definitive comparison of this.  I just have
10  concerns, although I do think that the document that
11  Dr. Martin attached supports that concern.
12     Q    Which document are you referring to in
13  Dr. Martin's report?
14     A    Well, I don't have her report, but she
15  did -- I can describe it.  There is a --
16     Q    I'll mark the report and let you find it.
17  Wouldn't that be easier for you?
18     A    Thank you.  It would be easier.
19          (Exhibit 4 identified.)
20          BY MR. MILLER:
21     Q    You've been handed Peterson Exhibit 4
22  entitled "rebuttal report of Denise Neumann Martin."
23  Is that the report you were referring to in your
24  previous answer?
25     A    Yes, and thank you for providing it to me.

1    Q    Would you turn to whatever the document is

2  that you're referring to and identify it for the

3  record?

4    A    It's Exhibit 3 attached to the end of the

5  report.

6    Q    This is titled "Georgine class action

7  values were in line with historical averages as

8  reflected by contemporaneous CCR documents."

9         Did I read that correctly?

10   A    That's correct.

11   Q    Have you done any analysis to try to

12 evaluate this report that is in writing somewhere?

13   A    No.  I just looked at it and reached

14 conclusions based upon this exhibit but not reduced

15 into writing.

16   Q    Let me ask you, did we end up getting a

17 staple and get to some of those -- that exhibit that

18 we marked separately put together or not?

19        MR. FINCH:  I gave it to you, and you

20 marked it as Exhibit 2.  I didn't staple it.

21 There's probably a stapler behind Denise Martin in

22 the drawer there.

23        BY MR. MILLER:

24   Q    You still have in front of you Exhibit 2,

25 which is this collection of papers, Dr. Peterson?

1       A     It's getting buried, but yes, I have it.

2       Q     And yours is clipped; right?

3       A     Yes, mine is clipped, and each individual

4    analysis is further clipped.

5       Q     Does this analysis have anything to do

6    with the issue we are now discussing, which has to

7    do with the historical values of the CCR as compared

8    with the Georgine settlement?

9       A     Let me look at it for a moment.

10      Q     Yeah, please, do.

11      A     Yes, I believe it has relevance to this as

12   one of the matters that gave me concern.

13      Q     What part of this are you referring to?

14      A     It's the third of the three of these

15   subdocuments, but it's essentially the third page

16   from the end of the whole packet of materials.  It

17   has a horizontal line at the top.

18      Q     What is the purpose of this analysis that

19   we're looking at?  This is titled by the way so

20   we're clear, the first line of text is "settlements

21   when filing year greater than or equal to 80?

22      A     Yes.

23      Q     Please describe for us first what this

24   document is, if you would, please.

25      A     This document is the standard run we use

Page 111

1    just to -- we call it our AOUT file for some reason,

2    and it's simply a summary of the relevant statistics

3    with regard to claims filings and resolutions for

4    this defendant, GAF, but we've run similar analyses

5    for other defendants.  It's our background

6    information wanted so that's essentially -- it's

7    taken from the GAF database, and the particular page

8    that I made reference to, at the bottom of it

9    has "average settlements."  When the filing year is

10   greater to or equal to 1980, we excluded cases that

11   were filed prior to 1980.  I think there were just a

12   few.

13          There was some concern about garbage data

14   that had a filing date earlier than that.  Then it

15   reflects the average amount paid to claimants when

16   they received the money for each of the four disease

17   categories plus unknown disease claims by year and

18   then by -- the last row is the period of four years,

19   1990 to '93.  That's the page that I would refer you

20   to in the particular table.

21       Q    The left-hand column is titled "CO," and

22   it seems to have B-93 under it all the way down.

23       A    Yes, it's cohort.  It's the claims data

24   pertinent to claims through 1993.

25       Q    When was the CCR formed?

1       A     1988.

2       Q     And do you know when GAF joined the CCR?

3       A     I believe they joined them right way.

4    They were a latecomer to ACF, but my recollection is

5    they were one of the original members of CCR.

6       Q     That was my next question.  The ACF was

7    the asbestos claims facility; is that correct?

8       A     Yes.

9       Q     And it was another collective group that

10   dealt with asbestos claims on behalf of defendants;

11   is that true?

12      A     And insurance companies, yes.  It had

13   insurance company members.

14      Q     Do you know when GAF joined the ACF?

15      A     I believe they joined them in late '87 or

16   early '88.  It was -- it might have been '87.

17      Q     So some of the data here for filing year

18   greater than or equal to 80 would precede the entry

19   of GAF in either the ACF or the CCR; is that true?

20      A     Some of the claims -- well, if you turn

21   back to the first page of this section, it shows

22   filing years, and were claims filed prior to 1987

23   certainly.

24      Q     Back to the reason you identified this,

25   how does this document that we are looking at that

1    you've identified impact whatever analysis you might

2    have done with regard to Exhibit 3 to what's been

3    marked Peterson Exhibit 4?

4        A    I'll answer your question.  Let me kind of

5    just take issue with a word that you've been

6    using, "analysis."  These are more on the lines of

7    observations.  I did not sit down and set out to do

8    an analysis of the appropriateness of the class

9    action settlements in Georgine.  It wasn't something

10   that I felt was relevant or necessary for what I'm

11   doing, either now or in 1994.

12        But these are observations that I've made

13   just looking at these CCR blended averages were and

14   how they compared to other historic data about GAF

15   settlements.  And with regard to exhibit 3 that

16   Dr. Martin provided, that CCR's statements about

17   what its historic averages were.  So these are more

18   observations.  This is not something that's a part

19   of my report.

20        Q    Do you have any analysis that has allowed

21   you to quantify in anyway a conclusion about the

22   work done in Exhibit 3 to Peterson Exhibit 4?

23        A    Well, first of all, on its face, Exhibit 3

24   is not -- it's an apples and orange comparison.  The

25   class action blended averages are the amount that is

1    anticipated would be paid to claimants who receive

2    compensation.  The figures on the right, the CCR

3    historical averages, are cases that includes zeroes

4    in there.

5            So this is not a comparison with what

6    people received historically from CCR when they got

7    paid.  It's what happens when you include people

8    that don't get paid, too.  So it underestimates the

9    amount of money that was paid historically to

10   claimants and is not an appropriate comparison.  So

11   that's one concern.  I don't think -- if this is the

12   basis for the court's decision, it's an

13   inappropriate basis, and it's not a -- and the way

14   that Dr. Martin attempts to use this exhibit in her

15   report, it's not -- it doesn't carry her point.

16           But the other concern I have is that if

17   you look at what the historic averages that were

18   paid by GAF during the years prior to -- during the

19   period of years shown at the bottom of the table I

20   showed you, they're roughly in the order of 40 to 50

21   percent of the -- what is purported to be the

22   historic average payment by CCR, and that is

23   inconsistent with the representation that in this

24   period of time, GAF was paying either roughly 28

25   percent or 20 percent of the overall CCR liability.

1          If you use the 20 percent figure, that
2    means the amount paid by CCR would be 5 times the
3    amount overall -- or not in every case.  Maybe it
4    wouldn't be 5 times, but it would be a significant
5    multiple of the amounts that GAF paid.
6          So these two sets of data don't seem
7    consistent to me.  They're troublesome.  Now, that's
8    all I've done.  I haven't looked further at it.  But
9    it is of some concern.  That's the observations.
10   You have the extent of my observations.
11      Q    Trying to break that down for a moment,
12   first, you said that you believe this is an apples
13   and oranges comparison.  Do you recall that part of
14   your answer?
15      A    Exhibit 3 is, yes.
16      Q    Would you explain to us why you believe it
17   is inappropriate to include the zero dollar
18   dispositions in the averages?
19      A    It's an appropriate step for some
20   purposes, but not for the comparisons.  Because,
21   here, the title of this document, Exhibit 3,
22   represents comparison between what the Georgine
23   average settlements would be and what the historic
24   averages were.  The Georgine are truly averages.
25   They're averages that they expect would be paid to

Page 116

1   people who will receive money, qualifying claims.

2   The historic averages are averages of both people

3   who get money and people who don't get money.  And

4   there are some people that didn't get money.

5           So you're comparing here what's the

6   historic average to pay all claimants, whether or

7   not they get paid, in order to assess how much money

8   should be paid to people when they get paid.

9           (Exhibit 5 identified.)

10          MR. FINCH:  What is this?  Peterson 5?

11          MR. MILLER:  Yes, Peterson 5.

12          BY MR. MILLER:

13   Q       I've handed you what's been marked

14   Peterson Exhibit 5, and this was previously marked,

15   I will represent to you, in the fairness hearing as

16   SP601(C), one of the documents referred to in that

17   passage we were reading from the Court.

18           Have you seen this document before?

19   A       Yes.

20   Q       You will note that the class action

21   blended average column in this exhibit is identical

22   to the numbers listed on Exhibit 3 in Dr. Martin's

23   rebuttal report, marked Peterson Exhibit 4; correct?

24   A       It is identical, yes.

25   Q       Do you know how the CCR calculated these

1    numbers?  Do you recall that?

2        A    Which numbers?

3        Q    The class action of blended average

4    column.

5        A    It's explained -- Dr. Martin explains it

6    in her report.

7        Q    Have you seen that exhibit SP601(B)

8    before, or would you like to see a copy of it?

9        A    SP601(B)?

10       Q    Yes.  That's document referred to in

11    footnote 2 that explains how it was calculated.

12       A    Oh, I'm sorry.  No, I'll accept that

13    that's a correct representation.  I think I've seen

14    something like that elsewhere.  Actually, I would

15    like to see it if you have it.

16       Q    Yes.

17       A    Why not.

18            (Exhibit 6 identified.)

19            THE WITNESS:  Thank you.

20            BY MR. MILLER:

21       Q    Do you see that that was a blending of

22    averages related to so-called nonextraordinary and

23    extraordinary claims?

24       A    Yes.

25       Q    Do you recall what the extraordinary

1    claims category was that was being dealt with in the

2    fairness hearing?

3         A    As I recall -- I recall treatment of

4    extraordinary claims, that there was -- these are

5    the maximum number of claims that qualify for

6    extraordinary treatment.  I believe there was a

7    panel that would approve the claim being treated as

8    an extraordinary claim.  What the criteria were to

9    be applied for each of these diseases to determine

10   extraordinary is, I don't recall.

11        Q    You see the column labeled 4 is

12   entitled "mean excluding top 5 percent and bottom 5

13   percent"?

14        A    I'm sorry.  Now we're back where?

15        Q    Back on Exhibit 3.

16        A    Okay, yes.

17        Q    You will notice that that is also a column

18   taken straight from SP601(C).  Do you see that?

19        A    Yes.  Well, I mean, Exhibit 3 just

20   accurately reproduces what's now Exhibit 5 in this

21   deposition.

22        Q    Right.

23        A    I didn't -- I never doubted the accuracy

24   of Exhibit 3 with regard to representing what was in

25   the CCR document.

1      Q    Do you know whether excluding the bottom 5

2  percent would exclude all of the zero payments or

3  some of the zero payments or how that would work?

4      A    My understanding that that step excludes

5  people who -- among those who got paid, it's the

6  lowest 5 percent of the claims and the highest 5

7  percent of the claims.  That's my understanding.

8  It's inappropriate, but I understand it.

9      Q    Why is it inappropriate?

10     A    Well, because those represent liabilities,

11 and it biases the numbers downward, obviously.  One

12 of the -- these are skewed distributions, and so

13 there are a number of people who have quite large

14 historic resolution amounts, and if this is supposed

15 to be a representation of the overall liabilities,

16 you need to include those large settlements as well.

17     Q    You recall we looked at the District

18 Court's opinion?  Would you turn with me back -- and

19 this is Exhibit 3 -- back to finding of fact 95.

20     A    Just a moment, please.

21     Q    I believe we decided it was on page 35, if

22 I recall that correctly.

23     A    I'm on page 35, paragraph 95.

24     Q    You will notice that the middle of that

25 sentence we read, the Court states that having found

Page 120

1    these documents to be fair -- I'm sorry.  I

2    misspoke.  Finding of fact number 95 starts

3    with "Having reviewed the underlying documents

4    provided to Class Counsel during negotiations and

5    accepted into evidence at the fairness hearing, and

6    having found these documents to be accurate and

7    valid."

8              Do you see that part of the sentence?

9    A    Yes.

10   Q    You'll notice that one of the exhibits

11   cited thereafter is this SB601(B) document --

12   A    Yes.

13   Q    -- that we have.

14   A    Yes.

15   Q    Do you disagree with the Court's finding

16   that this SB601(B) is a accurate and valid document?

17   A    601(B)?  I have no reason --

18   Q    Yes.

19   A    I have no reason to believe that it's an

20   inaccurate document.

21   Q    And is the same true of 601(C), which is

22   also in this group, that you have no reason to

23   believe it's not accurate and valid?

24   A    I'm not sure it's an accurate document,

25   and I don't know what it means.  Actually, it does

Page 121

1    indicate period of time.  I have concerns about its

2    accuracy, but I haven't been able to investigate it.

3    I have not investigated it.  I chose not to

4    investigate it.  I just have concerns.

5        Q    And you don't have it on your assigned

6    list to investigate it further, do you?

7        A    I'm likely to look at it more after this

8    deposition, but it wasn't -- as I said before, this

9    is not a central issue with regard to any opinions I

10    expressed either in my report or expect would

11    express in the trial in this matter.

12        Q    It's not a central issue because you're

13    not using Georgine directly for any of your

14    calculations?

15        A    That's not necessarily -- I mean, it could

16    still have been important if it's a reason for

17    disregarding the use of Georgine.  I mean, this is

18    not a basis for having disregarded Georgine.  Its

19    relevance really is to the fact that -- this

20    document would suggest that there is not much

21    difference in what the CCR members would have to pay

22    overall under Georgine or without Georgine.  If

23    they're paying the same amount of money, then it

24    makes no difference to them other than they're able

25    to get rid of some nonmalignant claims.

1              Actually, that's another issue that I

2    should return to.  But clearly, Georgine was seen as

3    something that would save the CCR members money.  So

4    there's sort of a failure to track here.  So it's

5    relevant if I were asked to talk about -- if you

6    asked me on cross-examination how this benefited

7    claimants -- how the Georgine benefited CCR members

8    and I said earlier I believed it saved them money.

9    One of the reasons I believed it saved them money is

10   because I believe they were paying more money

11   historically to resolve claims than the scheduled

12   values here.  This seems to contradict what I'm

13   saying, but the evidence that I have, at least from

14   GAF, is not consistent with this table, but with

15   this document SP601(C).

16        Q    What is the evidence you have from GAF

17   that you think is not consistent with this document?

18        A    It's what the historic average resolutions

19   were for GAF for mesothelioma that I already pointed

20   you to.  It showed where you they were paying

21   somewhere on the order of 25 to $33,000 per claim on

22   average for mesothelioma.

23        Q    And is that back in your exhibit --

24        A    5, I think it's called.

25        Q    It was Exhibit 2, wasn't it, that we --

Page 123

1     A     I'm sorry, Exhibit 2.

2     Q     Your additional materials you provided

3  today?

4     A     I beg your pardon.  That's correct.  It's

5  Exhibit 2, yes.

6     Q     Is that only on that third page from the

7  back, the evidence that shows it's not consistent?

8     A     I'm sorry.  I don't understand your

9  question.

10    Q     Yeah.  Is there any place else in Exhibit

11  2 that you have evidence of these averages that you

12  think is not consistent with what's on Peterson

13  Exhibit 5?

14    A     That's the primary place.  That's where I

15  would look to.

16    Q     Is there someplace else that is not

17  primary that you can point to as you sit here?

18    A     In this document, I don't believe so.

19    Q     In any document that you've produced?

20    A     Again, there's the -- that I produced?

21  No, but I think it's inconsistent -- the additional

22  information comes from what Dr. Martin produced in

23  her rebuttal report.

24    Q     We're running out of tape, but instead of

25  just breaking for lunch, before we do, I'd like

Page 124

1　maybe a few minutes on the next tape to make sure I

2　know what the rest of these new documents are about

3　so we can talk about them at lunch, if that's all

4　right.  Let's go off the record.  But let's just do

5　a quick tape change, and then we'll break for lunch.

6　　　　　　VIDEO OPERATOR:  We're off the record.

7　The time is approximately 12:48.

8　　　　　　(Discussion off the record.)

9　　　　　　VIDEO OPERATOR:  We're back on the record.

10　The time is approximately 12:50 p.m.

11　　　　　　BY MR. MILLER:

12　　　　Q　　On your Exhibit 2, what data tape were you

13　working with?

14　　　　A　　It was the -- let's see.  The data tape

15　that was referenced in our report is the same data

16　tape.

17　　　　Q　　Is that 2002?  2004?  Or when was it

18　produced?

19　　　　A　　It was the September 30, 2002, data that's

20　referenced on page 9, section 5 of Peterson 1.

21　　　　Q　　How did you try to limit that to data

22　available in 1994?

23　　　　A　　We looked only to claims that were filed

24　before 19 -- January 1994.  Actually, it's through

25　1993, and settlements that were reported as having

1  been settled before December 31st -- on or before

2  December 31st, 1993.

3      Q    You didn't have dates when specific

4  disease categories were added to the database, did

5  you?

6      A    I don't think the database reflects that,

7  no.

8      Q    So you don't know, for example, as of 1994

9  which of the pending claims would have still been in

10  the category of unknown disease, do you?

11      A    On that date, no, we don't know.

12      Q    What is the reason that you did these

13  calculations in Exhibit 2 that we were just given

14  last night?

15      A    Just to provide data on issues that either

16  we had looked at and not provided in Peterson 1 or

17  issues that were raised by Dr. Martin in rebuttal

18  report.

19      Q    Let's take those two categories.  Which

20  issues did these provide data on that you had looked

21  at but not provided before?

22      A    Well, some of it had been provided, but

23  the last of these three documents, the one I drew

24  your attention to before that has the top row

25  filings and then below CO is the first column, that,

1    as I said, is the general form, and that just

2    provides the complete data with regard to the annual

3    filings of claims, the averages by year, the percent

4    of claims with each year that were resolved with

5    payment, and other matters.  So although we

6    discussed settlement values and provide in the

7    report the averages across the period '90 to '93,

8    this breaks it down on a year-by-year basis.  It's

9    essentially the first level of results and --

10        Q    Which of your issues did that provide

11   support for?

12        A    This is just a general document.  I don't

13   think it -- it isn't aimed at any particular point,

14   although obviously, I mean, the claim filings they

15   speak to the historic claims filings and

16   propensities to sue.  But it's essentially an

17   attempt to provide complete information about issues

18   that were in the report.  The average settlements

19   and the percent of claims paid and the average

20   dispositions were all discussed in the report, but

21   this provides more detail about that.  So it's

22   just -- it's an elaboration of data that were used

23   in the report.

24        Q    It was all data that was available to you

25   at the time you did the report; is that true?

1    A    Yeah, but that's not why they're provided.

2  It's the compilation of results, kind of a more

3  specific disaggregated and detailed results.  But it

4  is based on all the data that were available to us,

5  yes.

6    Q    And my question is, you didn't receive any

7  data after the date of the report that is being

8  included in this for the first time; is that

9  correct?

10    A    That's correct.

11    Q    And you say this is what you call the AOUT

12  print?

13    A    Yeah.  For some reason that's what this

14  form of report is called by Dan Relles.

15    Q    Do you normally provide this as support

16  for your reports?

17    A    Typically not, but there was -- the

18  report, for example, didn't include a year by year

19  statement of what the settlement averages were.  We

20  just provided the settlement averages for a group of

21  years.  I thought there may be at some point an

22  issue with regard to the year-by-year settlement

23  averages.  I wanted to provide this in case either

24  during the deposition or the trial that matter came

25  up, you'd have what we understand that to be.

Page 128

1      Q    What issues raised by Dr. Martin did you,

2  in her rebuttal report, I think you said, did you

3  want to deal with in the materials that are now

4  Peterson Exhibit 2?

5      A    Issues of what she calls acceleration,

6  issues of the effects of age, both filings and

7  settlement averages, I guess the issue of the --

8  that Dr. Martin raised about the correspondence and

9  value of the Georgine values to what was paid

10  historically that we've been discussing the matter

11  is also addressed in the settlement materials.

12      Q    First of all, let's take the last one.

13  This issue of correspondence to the value of

14  Georgine and what was paid historically, is that

15  anything different than this third page from the

16  back that we've looked at?

17      A    No.

18      Q    Acceleration, what part of these documents

19  in exhibit 2 have to do with acceleration?

20      A    It's the first two pages, the page that

21  has g3 at the top left.

22      Q    Okay.  What conclusions or opinions do you

23  draw from those first two pages?

24      A    That there is no evidence of acceleration

25  as Dr. Martin discusses in her report, either among

1   nonmalignant or cancer claims.

2       Q    What do you look at in these two pages

3   that lets you reach that conclusion?

4       A    These tables are cross-tabs between the --

5   shows for each filing year, which are represented on

6   the columns, the number of claims that were

7   diagnosed in that same year, which is the zero

8   column, the number that were diagnosed in the

9   previous year, which is 1, 2 years ago, 2 and so

10  forth.  So it's a correspondence of diagnosis and

11  year of filing.  The second page is the same as the

12  first, but it's in terms of percentages rather than

13  numbers, where the percentages are calculated for

14  each filing year across the row.  That's the data

15  that are shown here.  And it's disaggregated for the

16  nonmalignant and cancer claims.  Did I answer your

17  question?  I'm not sure.

18      Q    Well, how do you -- what do you look at in

19  here to try to support the conclusion that there is

20  no acceleration?

21      A    Well, Dr. Martin essentially -- if you

22  look on the second of these two pages in the

23  nonmalignant group, Dr. Martin provided some results

24  and discussed a pattern essentially shown in the

25  column -- zero column for the nonmalignants, which

1   for 1993, it shows that 42.2 percent of the claims

2   that were filed in '93 were also diagnosed in '93.

3   For 1992, 46.3 percent of the claims that were filed

4   in 1992 were diagnosed in 1992.

5          Those are higher than the preceding four

6   years, five years really, where the percentages were

7   between essentially 24 percent and 34 percent of the

8   claims filed in those years were diagnosed in the

9   same year.  From this, she inferred that people are

10  accelerating the time for filing of nonmalignant

11  claims.

12         There was evidence that in 1991 and 1992,

13  claimants were filing more quickly in order, I

14  guess, to escape the Georgine class action.  It's an

15  issue that I also discussed in my report.  So that's

16  the data she uses to draw -- it's the empirical

17  basis for her conclusion.  But if you look at it,

18  the abhorrent years are not 1992 and 1993.  The

19  abhorrent years are the four preceding years, and

20  indeed, in most years, most nonmalignant claimants

21  are filed in the year they're diagnosed.

22         So this doesn't demonstrate anything

23  unusual about 1992 and 1993.  Instead, it reflects

24  that during the prior four years, there were a lower

25  percentage of claims filed in those years that were

1    actually diagnosed in that year.  And there are

2    reasons for that reduction based upon what was

3    happening concurrently in asbestos litigation.  So

4    essentially, she's selected partial results to

5    support her conclusion that are misleading and that

6    are not consistent with the whole record, and that's

7    why I produced this.

8         Q    What were the reasons for that reduction,

9    in your view, in the prior four years?

10        A    Well, I have to make a general comment,

11   that the asbestos litigation is in some sense a

12   system.  No single asbestos defendant operates

13   independently with what's going on with regard to

14   other defendants.

15             So I've discussed this before.  The fact

16   that huge settlement class action -- that huge

17   consolidations are settled in one state, for example

18   Baltimore, means that defendants don't have much

19   money to settle claims in other states.  So patterns

20   like that, how particular defendants or particular

21   plaintiffs are affected themselves depends upon what

22   happens elsewhere in asbestos litigation.  During

23   1980 -- that was the prefatory comment.

24             Let me give you the specifics.  During

25   1988 and 1989, Manville trust had come out of

1   bankruptcy, finally after 5 years.  The current

2   bankruptcy is a short time, but at that point in

3   time, people regarded it as an endless bankruptcy,

4   and it had a deadline.  Claimants had to file claims

5   by 1989.  It was essentially a bar date.

6         So the plaintiffs' law firms were

7   concentrating their filings on Manville, to get them

8   in, both because they were finally getting some

9   money on Manville, 100 cents on the dollar, and

10   indeed, the forward-looking claimants' lawyers

11   wanted to get those claims filed as quickly as

12   possible because of Manville's queue and because of

13   the likelihood that Manville would run out of money,

14   Manville trust.

15         So for all those reasons, there was a

16   concentration among the plaintiffs' bar filing in

17   1988 and '89.  So other defendants like CCR members

18   and GAF, in particular, would have had a reduction

19   of claims.  Of those diagnosed in that year, they

20   would tend to be filed in later years because the

21   plaintiffs' lawyers were concentrating on getting

22   Manville claims filings.

23         In 1990 and '91, you had bankruptcy

24   petitions by four other major asbestos defendants in

25   those years, and in particular, you had a lot of

1   action going on with regard to Eagle-Picher in 1990.

2   So lawyers again, fearing getting caught up in

3   another long morass of bankruptcy litigation like

4   they just experienced for Manville, tried to get

5   their claims filed and resolved by those defendants

6   before the bankruptcies occurred.

7           So there was a concentration on these

8   other defendants.  And it's likely that other

9   matters intruded, but at a minimum, those things

10  were going on, which were directing attentions and

11  activities of plaintiffs' lawyers away from GAF,

12  which is probably the reason why you get a lower

13  percentage -- you get the pattern of results you see

14  here.  So it's something peculiar about those years

15  that can explain this, not necessarily the inference

16  that Dr. Martin proposed.

17      Q    Any other part of this document that has

18  to do with acceleration?

19      A    The only other is -- and it's not an issue

20  that Dr. Martin raised, I think appropriately, that

21  there isn't much indication even in these data of

22  acceleration of cancer claims.  Cancer claims can

23  not to be accelerated in situations where it's

24  occurs.  Non-malignant is more discretionary when

25  claims are filed.  That's the only observation I

1    make of this.

2       Q   What in this document had to do with

3    effects of age on both filings and averages?

4       A   It's the second set of materials, both

5    that are labeled as filings at the top, and the

6    first row is DSE, an abbreviation for disease, and

7    the first column is mesothelioma.  That's 14 pages

8    that have the same -- are structured in the same

9    way.

10       Q   Let's separate it with regard to

11    settlement averages first.  What do you look at here

12    in the way of analysis of the effects of age on

13    settlement averages?

14       A   Well, again, this is a cross-tabulation.

15    Actually, it's a three-way cross-tabulation within

16    each of the disease categories, mesothelioma, lung

17    cancer, other cancer, nonmalignants, plus a group of

18    cancers with aggregated data across the three

19    cancers, and then finally all claims, that they data

20    are aggregated in those ways, disaggregated.  Again,

21    the rows are the settlement year, and the columns

22    are now the ages of the claimants.  At the time of

23    filing where it's -- no, I think it's age of

24    settlement where the ages are broken out into four

25    categories, those who are less than 61 in the first

1   column, which is age 00-60, those who are in their

2   60s, 61 through 70, those who are 71 through 80, and

3   those who are 81 or older.

4           If you look on the second page, there's an

5   average settlement amount, and it shows within each

6   of these groups what is the average amount paid in

7   settlement for settlements reached in each of these

8   years among people in each of these various age

9   groups.  It shows a finding that Dr. Martin observed

10   in her -- a general finding that Dr. Martin observed

11   in her report, that in the period of 1988 through

12   1993, that people in the ages who were under 61

13   years old tended to get larger mesothelioma

14   settlements.

15           But it also shows other things.  It shows

16   that the settlement averages were increasing for all

17   categories, but particularly for the oldest people.

18   The oldest claimants have the greatest acceleration

19   and increase in the settlement values of

20   mesothelioma claims, which it is an indication --

21   actually, there's also -- it is an indication that

22   the differences in age groups were decreasing over

23   time, because the oldest people were getting

24   relatively less money.

25           If also showed that settlement values

1    tended to go up over time within each of these

2    groups with the greatest increase occurring among

3    the oldest people.  So it indicates to the degree

4    there are differences among mesothelioma claimants

5    and the average amount that they get, that decrease

6    is diminishing, and in any event, the oldest people

7    were getting paid more and more money all the time.

8         Q    Well, it still shows, if we look, for

9    example, for the '92 settlement year, that the

10   average for the under 60 group was $59,467; is that

11   right?

12        A    That's correct.

13        Q    But for 81 and over, it was $34,397;

14   right?

15        A    That's correct.

16        Q    So it's a difference of a little over

17   $25,000; right?

18        A    Yes, but it's less of a difference than in

19   1988 or 1989 when there was a four-fold differences

20   in the averages.  So the differences between these

21   groups are diminishing.  But that's -- that's the

22   only disease where this pattern occurs.  .

23             All of the diseases, the older people

24   either got more money or they got -- they've got

25   similar amounts of money during this period of

1  years, and that's shown for lung cancer, other

2  cancer, nonmalignants.  And across all claimants,

3  which is -- Dr. Martin took the one case where there

4  is some age effect and ignored the other diseases

5  where there wasn't an age effect and criticized me

6  for showing the data overall.

7          But it's the overall age that's important,

8  because the liability of this defendant is based

9  upon its liability across all claims, not just

10  mesothelioma.  When you look at all claims, which is

11  towards the end of this, in the second to last page,

12  you'll see that the oldest claimants, which is the

13  second from the right-most column, during the period

14  '80 eight to '89, the oldest --

15      Q    Can you help us find that?  Next to last

16  page of what?  Of this subset?

17      A    Of this section.  It has all in the first

18  column, and it's all in the first column and the

19  bottom is average settlement, the bottom table.  I'm

20  sorry.  These should have been numbered, but we just

21  kind of knocked these things out.

22      Q.   I'm sorry.  I'm still trying to find

23  these.  Let's do it from the back of the whole deal.

24      A    The back of the whole deal looks like

25  this, it has all average dispositions on a partial

Page 138

1    page.  I think you've gone too far.

2         Q    I think I've gone back to the prior

3    document.  Is this --

4         A    This is actually a relevant issue here.

5    No.  Do you want me to find it for you?

6         Q    I wonder if they're the same copies here.

7    Actually, I found it now.  Is this the right page

8    now?

9         A    Oh, yes, that's right.  Here is the number

10   of people that had resolutions, but this is the

11   average settlements amount, that page.  Let me

12   restate it.  If you --

13        Q    All right.  So what is the point you were

14   making about what that shows?

15        A    Across all diseases, across all

16   resolutions, all claims that were settled, the

17   average amounts paid to the oldest claimants were

18   more than the youngest claimants, and that's shown

19   in the age 81 and above where -- and I'll read

20   the -- in 1992 again, they received, on average,

21   $10,866.  People that were just younger, in their

22   70s basically, got 9,310.  People in their 60s got

23   7,481.  People that were under 60 got 6,877.

24        Q    That is reflecting, in part, the fact that

25   mesothelioma was much more likely to be present in

1    somebody who was 81 or older than under 60; isn't

2    that true?

3         A    No, it would be the converse actually.

4         Q    Mesothelioma was more likely 60 or

5    younger?

6         A    There were more mesothelioma settlements

7    among younger people than older people.  That's why

8    you observe this pattern.  In every age group, there

9    were more.  There may be a different distribution,

10   yes.  I think that's a fair statement.

11        Q    What's a fair statement?

12        A    That the distribution of settlements may

13   differ by age group.  Yes, that's a fair -- and

14   that's why I presented the information by each of

15   these diseases.

16             So for one of the diseases, meso, there

17   appears to be a diminishing age effect.  On the

18   other hand, the overall meso average is going up

19   over time, even though the age distribution is going

20   up over time.  So essentially, the empirical data

21   just don't support a conclusion that either within

22   this period of time or in the future, that

23   settlements will be going down because of the

24   population aging.  In fact, other than mesothelioma,

25   there's a reason to believe settlement amounts would