1    National Gypsum?  For your claims estimates?

2    A    My forecast -- both the values of the

3    pending claims and the forecasts for and values of

4    the future claims were based upon disaggregated

5    claims by disease and by occupation both.  So it's a

6    cross-tab.  So there were four occupational

7    categories times each of the disease categories.

8    Q    You didn't do that in your analysis

9    reflected in Exhibit 1; is that true?

10    A    That's not true.

11    Q    Okay.  You did a sensitivity analysis?

12    A    No.

13    Q    Okay.  What is true with regard to what

14    you did about aggregation or disaggregation by

15    occupation and disease type?

16    A    We disaggregated.  Look at page 12.  Look

17    at page 24.  It's a flawed method.  With what I know

18    now, I wouldn't use it if I put myself back there.

19    But we did it primarily because we had done it in

20    National Gypsum.

21    Q    The trend in that time period was that

22    insulators and shipyard workers were expected to be

23    going down in numbers; was that correct?

24    A    Are you looking at a particular page, or

25    are you just asking me?

1      Q    I'm asking you if you recall the trends,

2  but you can look at a page if you want to.

3      A    You're speaking of the epidemiology or the

4  claims filings?

5      Q    I'm talking about your projections.  I

6  believe it is based on epidemiology.

7      A    I don't have the annual numbers of filings

8  or the reforecast by disease -- by occupational

9  groups here with me.  I don't have the epidemiology

10  broken down.  But the incident of asbestos-related

11  cancers peaked earlier for shipyard workers than it

12  did for insulators, which in turn were earlier than

13  the other two categories.  So that would have had

14  the effect you were talking about.

15      Q    Construction workers were expected to have

16  more claims going forward in 1992; wasn't that true?

17  Claims were expected to go up for construction

18  workers?

19      A    You're talking about trends or absolute

20  numbers?  Because your question asked both.

21      Q    Well, I think I'm talking about as a

22  percentage of the claims as well as absolute

23  numbers, but if there's a difference, you can let me

24  know that.

25      A    Sitting here right now, I can't recall

1   what the relative absolute numbers of these claims

2   were.  Let me look at the forecast.  Just a second.

3   I don't think construction workers would have been

4   the largest in terms of absolute numbers.

5        Q    Ever?

6        A    I think not, but I can't answer that with

7   certainty.

8        Q    Do you know for GAF what occupations had

9   the greatest exposure to the products that generated

10  the most litigation?

11       A    Well, historically, most of their claims

12  came from this amorphous "other" category.  They

13  were neither shipyard insulators or construction

14  workers.  That's a category within the dynamic

15  category as it's called within the CCR database.

16  This is page 17 -- these are the pending claims, but

17  I think it reflects reasonably well the --

18       Q    Do you know which product by name of GAF

19  was the source of most of the claims as of 1994?

20       A    I have -- I provided a list of the

21  products here.  I can't tell you specifically which

22  product had the most claims, no.  I don't know that

23  that's -- one could ascertain that.

24       Q    How would you go about ascertaining that?

25       A    I don't think you could.

Page 180

1      Q    Shipyard workers were typically claimants

2  exposed during the earlier time periods than these

3  studies often during the 1940s; isn't that right?

4      A    Could you read the question?

5           MR. FINCH:  Object to form.

6           (The reporter read the record as

7  requested.)

8           THE WITNESS:  I don't understand that

9  question.

10          BY MR. MILLER:

11     Q    Shipyard workers were generally exposed

12 during the war years; isn't that true?

13     A    There were a lot of shipyard workers that

14 were exposed during the war years.  There were a lot

15 of shipyard workers that were exposed in subsequent

16 years.  The absolute number exposed in each -- there

17 was a higher concentration, I think, on an annual

18 basis of employment with exposures in the period

19 between 1941 and 1945.

20          But if you add all the persons who were

21 exposed to shipyards before and after 1945, I don't

22 know whether you'd find that to be the -- that most

23 of them were shipyard -- were war-year exposures.  I

24 haven't looked at that.  I'm not sure how that would

25 pan out.

1       Q   By 1993, the frequency of shipyard worker

2  claims had begun to go down some, hadn't it?

3       A   It may have.  Sitting here right now, I

4  don't have a definite answer to that.  Propensities

5  to sue were going up, but the incidents -- by 1993?

6  The incidents would have peaked earlier.  So it just

7  depends upon what those two -- was the increase in

8  the propensity to sue greater than the decline in

9  the incidents?  I just can't tell you.

10      Q   Do you recall dealing with the frequency

11  of shipyard worker claims in your testimony in

12  National Gypsum?

13      A   Yes.

14      Q   Do you recall what you said?

15      A   No.  I said a lot of things about

16  shipyard.  I certainly don't recall everything I

17  said.

18      Q   Do you recall whether you said, during

19  your National Gypsum testimony that the frequency of

20  shipyard worker claims had begun to go down some?

21      A   One, I don't recall that, and two, that

22  would be with regard to National Gypsum, I think,

23  unless I was making a general description.

24      Q   My question was --

25      A   But I don't know what I said.  So no, I

1    don't recall that.  No, I don't recall.

2        Q    My question is whether you recall saying,

3    with regard to National Gypsum, that the frequency

4    of the shipyard worker claims had begun to go down

5    some.

6        A    I don't recall that.

7        Q    Okay.  If it's all right with you, I

8    thought rather than mark these transcripts, we'll

9    give you a copy.  We can just look at them.

10   Otherwise, they'll just generate a forest worth of

11   extra paper.

12            MR. FINCH:  We don't need to mark them as

13   exhibits.

14            THE WITNESS:  Thank you.

15            BY MR. MILLER:

16       Q    I'm directing your attention to transcript

17   of proceedings.  These are kind of funny because

18   they're renumbered each day.  So you have to look at

19   the day.  This is volume 2 on January 21, 1993.

20   It's not actually necessarily volume 2 of your

21   testimony.

22            Let me direct your testimony to page 28.

23   Certainly, read as much as you want to, but what I

24   wanted to call your attention to to try to refresh

25   your recollection is a reference you're making to

Page 183

1  Exhibit AC40, and there is a question on line 5 that

2  has an answer that goes on for --

3      A    A while.

4      Q    -- a long time.  In the interest of

5  efficiency, I'm just going to direct your attention

6  to the first paragraph.  You can read as much of it

7  as you'd like to.  Please tell me when you've read

8  it, and then I'll ask you a question about it.

9      A    All right.  I've read this paragraph of my

10  answer beginning at line 7, page 28.

11      Q    In talking about a CCR data tape for June

12  of 1992; is that right?

13      A    That was the data we had.  It had data

14  running through 1991, yes.

15      Q    Do you still have a copy of that data

16  tape, by the way?

17      A    We may.  I don't know.

18      Q    Did you use it at all in your work in this

19  engagement reflected by Exhibit 1?

20      A    No.

21      Q    You say that that describes filings

22  against National Gypsum by occupation; is that

23  correct?

24      A    That's what I said, yes.

25      Q    And you say that there's somewhat

1  different trends by occupation in the data; is that

2  also correct?

3      A    Yes.  It's correct that that's what I

4  said, yes.  It's probably also correct.

5      Q    All right.  Well, line 11 through line 13

6  has a sentence that says "shipyard workers are

7  typically claimants who are exposed among the

8  earliest time period frequently in the '40s."

9          Do you see that sentence?

10     A    Yes.

11     Q    Do you believe that was a correct

12 reflection of what you were seeing in that data

13 tape?

14     A    I think that -- I don't think the data

15 tape would have answered that question.

16     Q    Was that your belief at the time as to

17 what you were seeing generally in the asbestos

18 litigation environment in 1993?

19         MR. FINCH:  Object to form.

20         THE WITNESS:  Sorry.  Could you repeat the

21 question?

22         BY MR. MILLER:

23     Q    Yeah.  Is that a reflection of what you

24 were seeing generally in that time period in

25 asbestos claims patterns?

1     A     The this point in time, I wouldn't have

2  had many data sets.  So I wouldn't have had much

3  general experience.  I would have had this,

4  Eagle-Picher, maybe some from Manville.  I think

5  this is the first case I testified on an estimation.

6  With all due respect to myself, I think that's a

7  poorly articulated sentence.  I'm not sure quite

8  what I meant or that I was even quite sure what I

9  meant when I said it.

10     Q     Do you disagree with it now?

11     A     I don't understand it.

12     Q     Good.  I thought it was just my questions

13  that you were having trouble understanding.

14     A     No.  I find some of the most perplexing

15  things I read are things I've said.  The

16  epidemiology is based upon data that indicates that

17  the pattern of exposures among shipyard workers tend

18  to be earlier than the other occupational groups.

19  That's pretty unambiguous, and hopefully my

20  answer -- my statement was understandable in

21  contrast to this.

22          But that doesn't necessarily mean that the

23  claimants were concentrated in that period of time,

24  and I don't know what "typically claimants who were

25  exposed" means.  So I find it an inartful sentence,

1    and I'm sorry I said it.

2        Q    At the bottom of page 28 and the top of

3    page 29 -- and I realize that's beyond what I asked

4    you to read --

5        A    I'm flexible.

6        Q    -- it has a sentence that I'd like to

7    direct your attention to, that carryover sentence.

8    So why don't you read --

9        A    I'll read that whole paragraph.

10       Q    Why don't you read that whole paragraph,

11   and tell me when you've done that.

12       A    Thank you.

13            I've read that sentence -- that paragraph

14   rather.

15       Q    The sentence that carries over says "and

16   you can see there that where shipyard workers are

17   going down, construction workers are going up."

18            Did I read that right?

19       A    Yes.

20       Q    What do you think that meant?

21       A    I think that's number of filings.

22       Q    That's consistent with the epidemiology as

23   it was perceived in early 1993, isn't it?

24       A    That's my recollection, yes.

25       Q    And you noticed a trend over that previous

1  five to 10 years that construction claims had been

2  filed in increasing numbers; isn't that correct?

3      A    Without having the data in front of me, I

4  can't answer that question, but I have to -- I just

5  have to insert that I don't regard the -- these

6  occupational categories by -- collected by CCR as

7  being very reliable.

8      Q    Why is that?

9      A    Well, first of all, because they produce

10 some absurd propensities to sue for insulators, and

11 secondly, it's just in the nature of the kind of

12 information that collected.  How they get

13 categorized is -- I don't have confidence in the

14 quality of the data entry for this category.  It's

15 one of the reasons why I wouldn't use this kind of

16 analysis if I were writing on a clean slate today

17 and did in section 7.

18     Q    What are the absurd propensity to sue for

19 insulators that you're referring to in that answer?

20     A    Absurd is probably too strong a term, but

21 unlikely.  They produce propensities to sue that

22 exceed 100 percent across a series of years for

23 insulators.  Now -- I mean, that's possible -- for

24 meso.  That's not unexpected for other cancers or

25 lung cancers, but for mesos, you wouldn't expect it

Page 188

1    for an extended number of years, that more people

2    would be filing claims than presumably were getting

3    the disease.  And the reason that happens is because

4    how CCR enters the information describing the work

5    category of insulator is probably different from how

6    Nicholson and his colleagues use the term in their

7    epidemiology work.

8            Nickelson was sticking pretty closely to

9    people that were in the union; whereas, CCR appears

10   to be using -- categorizing someone as an insulator

11   even if they worked in a different union and a

12   different setting.  So there appears to be an

13   inconsistent use of the terms in the epidemiology

14   and in the claims database that makes a comparison

15   of the two troubling.

16       Q    Do you know if CCR characterized them as

17   insulators on its own or if it relied upon what the

18   plaintiffs claimed their occupation was when they

19   filed the claim?

20       A    I believe it's a -- it would have been a

21   combination of both things.  There's a judgment --

22   there's entry of information by the on the complaint

23   or by the law firm, but there's also judgment on how

24   the data gets entered into the database invariably.

25       Q    Insulators received higher settlements

Page 189

1  than many other categories, didn't they?

2      A    From whom?

3      Q    From the CCR.

4      A    I haven't looked at that.

5      Q    If they did, which I believe is correct,

6  hypothetically, wouldn't that create some incentive

7  for plaintiffs to categorize themselves as

8  insulators if they had a choice?

9      A    If your premise is true, it certainly

10 would have created -- and the law firm knew it,

11 which it presumably would have, it would have

12 created an incentive to label workers as insulators,

13 particularly if in doubt, and that's another reason

14 to question the integrity of the information and not

15 cause -- cause me not to -- if that's true, cause me

16 not to want to rely upon the CCR categories for

17 purposes of making forecasts.

18          MR. MILLER:  How long have we been going?

19          VIDEO OPERATOR:  We've been on the record

20 for about an hour.

21          MR. MILLER:  Why don't we take a break.

22          VIDEO OPERATOR:  We're off the record.

23 The time is approximately 3:18 p.m.

24          (Recess.)

25          VIDEO OPERATOR:  We are back on the

Page 190

1    record.  The time is approximately 3:42 p.m.  This

2    is the beginning of tape number 4.

3              BY MR. MILLER:

4        Q    Let me ask you to turn, please, with me in

5    your report, Exhibit 1, if you have it.

6        A    I have it.

7        Q    To page 7.

8        A    I have that.

9        Q    I'd like to ask you to read the first full

10   paragraph to yourself under section 4, the one that

11   starts "this report forecasts."

12       A    Sure.

13            I've read that paragraph.

14       Q    You're explaining here what you've done in

15   the two different parts of your report, one through

16   section 6 and one beginning in section 7?

17       A    And one in section 8 as well.

18       Q    Beginning in section 7.  In the middle you

19   say that "the 1993 data showed trends of increasing

20   GAF cancer claim filings, nonmalignancy claim

21   filings and settlement filings some of which were

22   inconsistent with the in that era, and that required

23   further exploration."

24            That's a part of a sentence, but did I

25   read that correctly?

Page 191

1       A     Yes, you did.

2       Q     You then say "as of 1993, the meaning of

3   these trends was uncertain:  Did they represent the

4   beginnings of long-term trends that would increase

5   GAF's liability?  Or were they simply perturbations

6   that had no long-term significance?"

7             Did I read those sentences correctly?

8       A     Yes, did, and I love the emphasis you put

9   on it.

10      Q     What are perturbations?

11      A     Disturbances.

12      Q     From a data standpoint, what is the

13  significance of figuring out whether something is a

14  perturbation or a long-term trend?

15      A     Well, you would expect -- well, a

16  long-term trend is kind of self-explanatory, I

17  think.  Perturbations are just -- maybe, may or may

18  not be one-time events that have no bearing upon

19  what one would expect to happen over the long term.

20      Q     In your work in the asbestos estimation

21  area, have you seen some examples of perturbations

22  in the data before?

23      A     Yes.

24      Q     Can you give me some examples of what

25  turned out to be a perturbation, in your view?

1      A     The 1989 claim filings against the

2    Manville trust.  They got something like 100,000

3    claims in that year.  No one had gotten that level

4    of claims before.  It was another decade before that

5    level of claims were reached elsewhere.  That was a

6    perturbation.  The surge you asked me about earlier

7    for the Fibreboard cases would probably have been a

8    perturbation.

9      Q     Those being the maritime legal clinic

10   claims you're talking about or --

11     A     Plus, just kind of a filing of claims that

12   just didn't look very high quality in order to try

13   and get in on the money that was being generated by

14   the settlement with the insurance companies.  Those

15   are examples.

16     Q     As a forecaster, have you found that

17   sometimes passage of time helps clarify whether

18   something say trend or a perturbation?

19     A     Passage of time denotes that you have

20   information about trends.  So at time point 1,

21   you're not sure whether or not you've got a trend,

22   and you could look at it 10 years later.  You can

23   see if, you know, in fact it turned out to have been

24   a trend.

25             So clearly, since trends are timebound,

Page 193

1    they define the events that change over time.  Of

2    course, the more time you have, the better you can

3    understand it.  Things that seem to be one-time

4    events, if they recur, then it's probably not a

5    one-time event, or it's something that has a cause

6    that may be episodic as opposed to a one-time event.

7    So sure, more information always helps.

8         Q    Turn with me to page 8, and look at the

9    first full paragraph at the bottom.  I'm going to

10   read a sentence, and you can tell me if I read it

11   correctly, the one that starts with the

12   word "first."

13             Do you see that?

14        A    I see that.

15        Q    "First, the BMCA transactions occurred

16   first when the GAF's claims filings and settlement

17   values were increasing, but it was not possible at

18   that time to understand the significance of those

19   increases, because information about GAF that would

20   have clarified these trends was cut off by the

21   Georgine class action."

22             Did I read that correctly?

23        A    Yes.

24        Q    Could you explain how the Georgine class

25   action operated to cut off information that would

1   have clarified the trends?

2        A    I'm going to read the paragraph preceding

3   to myself.

4             First of all, there was a stay against

5   filing claims that was entered by the District

6   Court.  So that cut off the information about

7   continued filings, other than filing claims subject

8   to the Georgine class action.  The changes in tort

9   value of claims couldn't be examined either with the

10  stay, because they were no longer settling claims in

11  tort.

12            Anything that got resolved after that stay

13  was entered would have been claims that were

14  resolved subject to the terms of the Georgine

15  settlement.  So as we discussed many hours ago now,

16  those were in the nature of contract resolutions,

17  not tort claims.  So all of that ended when the

18  Court entered its stay.

19       Q    Was there any requirements that a

20  plaintiff holding back a claim because of the

21  injunction had to notify the potential defendants

22  that they would have filed a claim except for that

23  injunction?

24       A    I'm not aware of that.

25       Q    In other words, people didn't have to make

1    a reservation and say I would have filed a claim,

2    but I'm enjoined, so I'm not filing it now?

3        A    No, that's not my understanding.

4        Q    You're not aware of any database that had

5    been generated at that point in time of all the

6    claims that might be sitting in some plaintiffs' law

7    firm's files not yet worked up because of the

8    Georgine injunction, are you?

9        A    The Georgine injunction didn't have

10   anything to do with working claims.  It had to do

11   with filing claims and paying them in the tort

12   system.

13       Q    Maybe my question wasn't good.  Let me try

14   it again.  You're not wear of any database at the

15   time that would say what claims were waiting to be

16   filed as of January 1994 but for the Georgine

17   injunction?

18       A    You can't identify them, because it's the

19   filing of the claim that is the -- the event that's

20   being prevented by the operation of the court stay

21   is what would identify them.  You would look, I

22   guess, at claims filings against some of the other

23   defendants and make inferences about what fraction

24   of those claims might have been filed against GAF or

25   CCR members.  Claims continued to be filed against

Page 196

1    other defendants.

2              Other things were going on at the time.

3    Remember, the Manville trust wasn't paying any

4    money.  So you couldn't really look to the Manville

5    data to reflect kind of a parallel experience.  But

6    that's the best one could do, I think, looking to

7    other defendants.

8         Q    But you don't recall actually performing

9    that analysis yourself in 1994 to try to figure out

10   what claims might be accruing out there because of

11   Georgine, do you?

12        A    Actually, CCR did a survey of plaintiffs'

13   law firms and asked them what claims were being

14   withheld by them and they came to a number.  Now, I

15   don't know if they did that in 1994, but at some

16   point, they provided information like that to their

17   members.

18        Q    Do you know when they did that?  You say

19   you don't know for sure?

20        A    I don't know when they started doing it.

21        Q    Where would a copy of that be located, if

22   you were going to try to find it?

23        A    To the degree it was shared with members

24   of the CCR, GAF may have a copy of it.

25        Q    Do you have a copy of it?

Page 197

1      A    I don't have a copy of the document, but I

2   was told by Dee Hilton that -- of this project done

3   by the center of claims resolution and how their

4   estimation of how many claims might be accruing.

5      Q    When were you told by Dean Hilton?

6      A    Dee.

7      Q    Dee.

8      A    Dee, Dee, Dee.

9           I don't recall the date I was told.

10     Q    Do you know when the injunction was lifted

11   in Georgine?

12     A    It was shortly after the Supreme Court's

13   decision which was, I think, at the end of June

14   1997.  It was some time in the next month or two.

15     Q    I think you say on the top of page 9 that

16   by December of 1998 -- this is the first full

17   sentence at page 9.  "By December 31, 1998, most

18   claims and settlements that are accrued until the

19   period of the injunction had been filed."

20          Did I read that correctly?

21     A    Yes.

22     Q    So what you did, it's my understanding, in

23   the second part of the report, beginning with

24   section 7, was to look at the data you could get

25   after that date to try to figure out -- or as of

Page 199

1    understand the significance of those increases;

2    right?

3        A    I don't think you could fully understand

4    is probably a better word.  They're ambiguous.

5    They're ambiguous, uncertain.

6        Q    In the National Gypsum case, you used a

7    most probable analysis based on a decreasing

8    propensity to sue; isn't that correct?

9        A    Well, I had, as I said earlier, a range of

10   estimates, 16 or so which I provided the Court, and

11   it ultimately got me to agree that I provided all of

12   these in order to let the Court or anybody who

13   wanted to make whatever combinations of assumptions

14   they wanted to make with regard to those that I

15   presented.  But I think I testified that it was my

16   opinion that for National Gypsum, in January 1993,

17   that there was more likely to be a decrease in the

18   propensity to sue, yes, based on the data that I

19   have available to me, which was data through 1991.

20       Q    Your Fibreboard testimony was late in

21   1994; isn't that true?

22       A    It was some time during 1994.  I don't

23   recall the date.

24       Q    Do you recall what your most probable

25   scenario was on propensity to sue in terms of

Page 200

1   increasing, decreasing, or flat for your Fibreboard

2   preferred analysis?

3       A    I had combinations of -- the Fibreboard

4   analysis is very complicated.  It had two different

5   periods of time that I used as the base period for

6   forecasting propensities to sue, and it had -- I

7   don't think there was an increasing propensity to

8   sue in that case.  I think there was a decrease --

9   decreasing propensity to sue and a flat propensity

10  to sue.  There were a complex set of assumptions

11  about nonmalignant claims.

12          I think a declining multiplier but then

13  adding in claims that were going to be a part of

14  what I called a temporary surge -- temporary surge

15  or acceleration, I guess it was, and a permanent

16  acceleration, which had the effect of essentially

17  adding to or increasing the numbers of nonmalignant

18  claims over the next five or six years.  So it was

19  really a complicated set of forecasts, and I don't

20  recall which of those that I said was --

21      Q    As you say, in Fibreboard, you did not use

22  an increasing propensity to sue model as a preferred

23  model; is that true?

24      A    I think that's correct, yes.

25      Q    When did you first give testimony, either