1  by deposition or in court, where you selected, as a

2  preferred model, one that had an increasing

3  propensity to sue with regard to asbestos

4  estimation?

5      A    I'm sorry.  Testimony -- what did I do

6  under what circumstances?

7      Q    When did you give either deposition

8  testimony or trial testimony in an asbestos

9  estimation context where your preferred estimate

10  relied upon an increasing propensity to sue, if you

11  know?

12      A    Sitting here, I can't speculate.

13      Q    When is the first you recall?

14      A    I'm quite sure I did it in Fuller Austin,

15  which is work I did in '97 and '98.  During that

16  period of time, I was working primarily on breast

17  implant litigation.  I wasn't doing much estimation

18  for asbestos cases.  I don't recall what I had done

19  for National Gypsum in that era.  It would have been

20  some time between 1995 and 1997 or so.  1998 at the

21  latest.

22      Q    Can you point to any contemporaneous

23  documents in 1993 or through the end of January 1994

24  in which responsible observers had suggested that

25  there should be an increasing propensity to sue in

1   asbestos estimations?

2       A    I'm not aware of anyone who forecasted in

3   that era having using increased propensities to sue,

4   and the data that were available in that period of

5   time were quite uncertain with regard to what the

6   trends were.  It probably wouldn't have -- it really

7   didn't give strong support for any trend, up, down,

8   unchanged.  There was uncertainty, and probably

9   most -- the strongest was an unchanged propensity to

10  sue.

11          Because more or less -- well, there's two

12  things.  There's the level of claims, and then

13  there's what was happening in the litigation.  The

14  level of claims were relatively stable in the early

15  to mid-'90s.

16      Q    Are you aware of any responsible experts

17  in asbestos estimation up through January of 1994,

18  other than yourself, who had given opinions that the

19  most probable trend was a decreasing propensity to

20  sue as of January 31, 1994?

21      A    I don't think so.  I can't think of anyone

22  who may have forecast that.

23      Q    Let me ask you to flip over to page 13 in

24  your report, and let's change subjects and talk a

25  little bit about your transition matrix.  First of

1    all, can you define for us and the jury what you

2    mean by the term "transition matrix" as you use it

3    in this report?

4         A    In the database of any asbestos defendant,

5    invariably, you see some cases where the database

6    does not identify the disease claim, the disease

7    process involved, but since the values of claims

8    vary, depending upon the disease process the

9    claimant alleges, and since our forecasts are based

10   upon disease, it's valuable to try and impute or

11   estimate what the distribution of diseases are among

12   claims that don't have a specified disease.  So the

13   transition matrix is essentially a set of numbers

14   that say among those claims that don't have an

15   identified disease, what percentage of them are

16   likely to be mesothelioma, what percent lung cancer,

17   and so on.

18        You can also use a transition matrix to go

19   from an alleged disease to a confirmed disease.

20   There are other uses of it, but in this context,

21   it's used to try to impute or estimate what are the

22   diseases, actual diseases among claims with an

23   unidentified disease, data that's unidentified in

24   the database.

25        Q    Go to page 13 you cite that the CCR -- if

1   you'll look at that last paragraph on page 13, I

2   think the third sentence, I'm going to read it.  You

3   say "CCR had done an empirical study which was

4   available to GAF in early 1994 using testimony and

5   evidence from the National Gypsum confirmation

6   hearing."

7           Do you see that?

8       A   Yes.

9       Q   You used that empirical study as a basis

10  for some of your calculations in this report; isn't

11  that true?

12      A   Yes.

13      Q   Do you have a copy of that empirical

14  study?

15      A   I don't have -- that which I got -- I

16  never got the full study.  What I got was

17  essentially just the distribution among the claims

18  that CCR looked at.  It's a study that they took at

19  my request, as I recall.

20      Q   Where is a copy of that distribution that

21  you got from them?

22      A   It's in the National Gypsum materials.  If

23  we didn't attach it here, I'll send it to you.  It's

24  been referenced in a number of my reports.

25      Q   Well, we requested it and didn't get it.

1    So we sure would like to have a copy.

2        A    I may have the distribution and some other

3    materials upstairs.  If you want me to take a break,

4    I can give it to you.  It's 1.4 percent for -- oh,

5    it's on page 14.

6        Q    I'm asking, I guess, for the reference

7    document, not a summary of it.  Did you get some

8    kind of document from them?

9        A    All I got was this set of numbers from CCR

10   in their verbal description to me of how they did

11   their study, which I testified about and I can

12   recount to you, if you want.

13       Q    I guess I'd like their copy of the set of

14   numbers.  What does that look like?  Is that on a

15   piece of paper somewhere, or has that been lost

16   along the way?

17       A    That's been done 13 years ago.  I don't

18   have a copy of it.

19       Q    So you don't have a copy of whatever they

20   sent you with the numbers on it?

21       A    That's right.

22       Q    And the verbal description, do you have a

23   memorandum or any notes on what they said when they

24   gave you that, or is that from recollection?

25       A    No.  I testified about that in the

1  National Gypsum case, but I read that section in

2  my -- you can either read it yourself, or I can tell

3  you what I said.

4      Q    So the most contemporaneous records you

5  have of what you recall they said was what you

6  testified to in National Gypsum; is that true?

7      A    Most certainly, yes, because it was done

8  in that case for me by CCR.  It became a standard

9  method that I've used and, I think, other people

10 have used since then to allocate diseases.  It was

11 updated -- CCR updated it in 1997 or '8 or some

12 time.

13     Q    Was this study published in some kind of

14 booklet form or report form or something?

15     A    No.

16     Q    How was it delivered to you?

17     A    Probably not e-mail in 1993.  I don't know

18 if they told me or sent me a piece of paper.

19 Essentially, they gave me this distribution -- I

20 asked them to do an analysis among claims that were

21 originally filed without a specified disease, what

22 did they determine the disease to be, and this was

23 the distribution that they sent me without any other

24 written description of what they had done.

25     Q    Did they send it to you by fax?  By

Page 207

1    courier?  By mail?

2        A    I don't recall.

3        Q    Was it on a single sheet of paper, or was

4    it --

5        A    It would have been on a single sheet of

6    paper, I think.  I don't think they just told me the

7    numbers over the phone.

8        Q    This was probably before you were using

9    e-mail extensively or not?

10        A    Oh, absolutely.  Well, we were actually

11    using the ARPA Net in 1985, but I don't think --

12    well, no, no, this was a period when I was using --

13        Q    1985?

14        A    Yeah, in 1985, not for this case.  We used

15    it in the Dog and Shield case.

16        Q    When was this study done?

17        A    I was just telling you when we used

18    computers.

19        Q    Right.

20        A    This study was done in 1992.

21        Q    And you believe it was done at your

22    request?

23        A    Yes.

24        Q    What is your basis, then, for your

25    sentence which says "which was available to GAF in

Page 208

1    early 1994"?

2         A    Well, it was in the materials, testimony,

3    and documents in the national Gypsum bankruptcy

4    case.

5         Q    You mean if they had read your testimony

6    in National Gypsum, they might have been able to

7    glean this from your testimony?  Is that what you're

8    saying?

9         A    I would be surprised if GAF wasn't

10   following the testimony in the course of the

11   National Gypsum bankruptcy.

12        Q    You're saying available to GAF means if

13   they read your testimony in National Gypsum, that's

14   the place it was available; right?

15        A    They might have gotten it from CCR.

16        Q    They might have, but you made the

17   statement "was available."

18        A    It certainly was available.  It was a

19   public number.  It was used, relied on.  It was a

20   basis of the court's findings in that case.

21        Q    You state at the bottom -- the sentence at

22   the bottom of page 13 to the top of page 14, "CCR

23   had used databases at different times to identify a

24   group of claims that had unknown diseases in an

25   earlier database and then had determined the

1   specific diseases which they had been assigned as

2   shown in table 5."

3           Did I read that sentence right?

4       A   Yes.

5       Q   And what were the two different times of

6   the databases that CCR used?

7       A   I don't recall.

8       Q   Did you ever know?

9       A   I don't know.  I may not have.  I just

10  asked them to undertake this, and they told me this

11  did they this for 12,000 cases.

12      Q   How many months or years and months apart

13  were these two different times?

14      A   Well, it would have varied, I think, when

15  they knew, it because they would learn this stuff

16  over time.  It may -- I subsequently learned that

17  there are -- that CCR database has two fields.  They

18  have a alleged disease and a confirmed disease.  It

19  may be that it was taken from the same database and

20  they just looked at a set of claims that had no

21  specific alleged disease and just saw what their

22  confirmed was.  It's possible that they did that.

23      Q   You don't know?

24      A   Sitting here right now, I don't.

25      Q   Did you ever know?

Page 210

```
 1       A    I think my inference at the time was that

 2   they had a database with two different data -- two

 3   different databases that they extracted at different

 4   points in time.

 5       Q    And when you say "databases," your

 6   impression is this is two databases and not three,

 7   four, five or some larger number of databases?

 8       A    No.  I'm sure if they had done that, it

 9   would have been extracted at two different points in

10   time.  It's really the same database, just extracted

11   at different points in time.

12            Let me say, GAF could have done this

13   themselves because they had access to the data.  So

14   if they wanted to know what were the diseases

15   within -- whether diseases were unknown, what was

16   their -- what was the experience of CCR in

17   determining the diseases, they could have done that

18   themselves.  The method was available to them, and

19   the exact same data were available.

20       Q    Do you know if, in the second database,

21   some diseases remained unknown?

22       A    I'm sure that that's likely to be true.

23   They resolved some claims without knowing the

24   disease.

25       Q    Is it your understanding that these
```

1    percentages are only for those claims in which they

2    did eventually get a disease?

3            A    I don't understand your question.

4            Q    It probably wasn't very good.  Let me try

5    it again.

6                 You stated that these are a group of

7    claims that had had unknown diseases in an earlier

8    database and then had determined the specific

9    diseases; correct?

10           A    Yes.

11           Q    So these were, by definition, claims in

12   which a specific disease was eventually assigned;

13   correct?

14           A    Yes.

15           Q    And your unspecified category there is

16   0.0; right?

17           A    In the transition matrix, that's correct.

18           Q    You don't know how many claims were

19   unspecified in this first database and remained

20   unspecified after this passage of time in the second

21   database; correct?

22           A    That's correct.

23           Q    You would assume there are some?

24           A    Yes.

25           Q    What was the oldest claim in the GAF

1    database as of January 31, 1994, that still had an

2    unknown disease shown, if you know?

3        A    I have no idea.

4        Q    Do you know that some claims go for many,

5    many years and never get a disease specified?

6        A    Oh, yes, of course.

7        Q    Do you know if GAF -- let me strike that

8    and start over.

9            Do you know if the CCR had a procedure for

10   administratively closing claims after they got to be

11   old and simply nonresponsive?

12       A    That's not a basis for getting a dismissal

13   on the merits generally.  They could have closed it

14   on their books, I guess, and it's probably a good

15   practice from the standpoint of accounting for their

16   claims.  I guess I don't recall whether I knew that

17   or not.

18       Q    Did you make any assumptions in your study

19   about what would happen if a claim was pending for

20   10 years and the disease was never specified and the

21   court still never dismissed the claim?

22       A    Well, we assume that there's some portion

23   of the claims that will never have -- will never

24   have a specified disease and will be closed without

25   payment.  And historically, that's 4.3 percent among

Page 213

1    the GAF claims in this period of time.  And so we

2    assumed that on a going-forward basis, that among

3    the pending claims as well, 4.3 percent of them will

4    be closed without payment and without having

5    specified disease.

6        Q    What do you understand to be required

7    before a claim can be closed without payment?

8        A    I already answered that.  CCR can choose

9    to put whatever label it wants on its database at

10   any point in time that it wants.  If, as you say,

11   there are stale claims that they think have never

12   been -- the process is not going to be, they can

13   just change the status of them.  If you're asking

14   about legal determination, you have to go in and

15   move for a dismissal of the claim.

16            That's the way to get -- or ask the law

17   firm to agree to dismiss the claim, either on the

18   merits with or without prejudice.  So those are ways

19   to -- there are different kinds of closings that

20   have different implications.

21       Q    In the middle of your paragraph that's

22   under table 5 on page 14, you have a sentence that

23   says "through 1993, GAF had allocated 4.3 percent of

24   unknowns to unspecified disease."

25            What does that mean?

1      A     You have to read the sentence before.  Let

2    me start the paragraph.  "This transition matrix

3    could then be used to assign to all pending claims a

4    specific disease category.  To be conservative, I

5    assumed that a certain fraction of pending claims

6    would eventually close with the disease still

7    unspecified, and I used GAF's fraction of closed

8    unspecified disease claims to calibrate the

9    transition matrix.  Through 1993, GAF had allocated

10   4.3 percent of unknowns to unspecified disease.  I

11   reduced the CCR transition probability so that the

12   expected fraction of open claims with unspecified

13   diseases was 4.3 percent.  The resulting transition

14   probability is shown in table 6."

15     Q     How do you know what GAF had done as of

16   1993?

17     A     We know cases that they settled.  We know

18   cases that were filed.  We know cases that were

19   resolved with a resolution date.  Those are pieces

20   of information, if the dates -- the resolution

21   dates, the settlement dates that preceded January 1,

22   1994, were events that happened in 1993 or before.

23     Q     And what was the date of the data tape you

24   were working with with that information in it?

25     A     A 2002 data tape.

1      Q    Do you know what the percentage of claims

2  were that were in the unspecified category as of

3  some data tape in 1993 for GAF or that were still

4  unspecified in that 2002 data tape you were using?

5      A    Claims that were unspecified in 1993 and

6  unspecified in 2002?

7      Q    Do you know which ones were unspecified in

8  1993 and how many of those became specified between

9  then and 2002?

10     A    Well --

11     Q    Not closed claims, but claims that they

12 had a specification on.

13     A    Well, among the claims that had an

14 unspecified disease, there were 6334 that were

15 resolved prior to January 1, 1994, and had an

16 unspecified disease.  So presumably, those were and

17 remained unchanged as unspecified disease claims.

18 Essentially, they were done dealing with those

19 claims.

20          Of the remaining claims, there may have

21 been some additional ones.  We count 14,588 that

22 were open as of January 1 -- December 31st, 1993,

23 and had an unspecified disease in the database that

24 were used.  How many of the claims had the disease

25 added to them between January 1, '94, and the date

1    of our data tape, I can't tell you.  But whatever it

2    is, that's the best evidence of the disease

3    distribution for those claims.  It's the best way of

4    allocating those claims.  So thank God they did it.

5        Q    Well, let me ask you, though, the 14,000

6    claims that still had unspecified diseases had been

7    around for almost 10 years and still had unspecified

8    diseases; isn't that true?

9        A    They would have, by definition had to been

10   filed prior to January 1, 1994.  So they could have

11   been around eight years or more.

12       Q    Wouldn't you expect that the mesothelioma

13   claims, for example, would be given some priority by

14   plaintiffs' law firms because they were the

15   higher-value claims?

16       A    Not necessarily.

17       Q    You don't observe that in the data?

18       A    Well, I observe a couple things in the

19   data -- in data.  I can't observe specifically this

20   issue here, but I observe that even over the course

21   of eight, 10, 12 years, claims continue to be

22   resolved and have diseases added to them.  So simply

23   because a claim's been around a long time doesn't

24   mean that it's necessarily a claim that won't be

25   compensated or identified.

1          And I also understand that there are

2     reasons that law firms defer resolutions of claims

3     because of the issues of the way the legal rules

4     operate in some states is that every time you settle

5     a claim and then you later take -- if you're a law

6     firm and you have a claim to sue 10 people and you

7     take that case to trial, some -- in some

8     jurisdictions, every case that you've settled

9     reduces the amount of money that you can get, even

10    if you obtain a judgment against the people, you get

11    a verdict in the trial.  It's a set-off rule, and

12    those set-off rules affect how lawyers choose to

13    settle those claims.  So that's an act and

14    consideration by some law firms in some

15    jurisdictions.

16         Q    I'm sorry.  I'm confused.  I thought I

17    knew what a set-off rule was, but I don't

18    understand.  This reduces what?  The legal fees or

19    it reduces the collection of the claimants against

20    somebody?

21         A    The collection of the judgment.

22         Q    Why?

23         A    Well, always there's a set-off for

24    settling parties.  The question is, how do you

25    get -- if you get $1 million verdict against

Page 218

1    defendant A and you previously settle $500,000 with

2    other defendants for the same claim, typically,

3    whatever you can collect from A is reduced by what

4    you've already been paid by other people to avoid

5    double payment to the victim, to the plaintiff.

6              In some jurisdictions, it's not based upon

7    how much money you've received.  It's based upon a

8    pro rata share.  If this is one of six defendants,

9    they may -- you have 1/6 of your judgment against

10   defendant A reduced.  So there are different set-off

11   rules in different states.  Sometimes it's too

12   costly to settle a claim if you think you're going

13   to take the claim to trial.  That's particularly

14   relevant in meso cases.

15        Q    Do you think that -- so you're saying that

16   some of these might not be specified diseases

17   because they're being prepared for trial?  Is that

18   what you're saying?

19        A    Against other defendants.

20        Q    And you think --

21        A    Or tried.

22        Q    Did you make any effort to match the

23   Social Security numbers of these claims to find out

24   if they had diseases specified in any of the other

25   databases of any of the other defendants?

1      A    I don't know if we did that here or not.

2  I don't believe so.  I think we just took the -- we

3  took the methods -- certainly in this action we took

4  the methods of 1994.  We took one method.  The other

5  method was just assume that the distribution -- that

6  all of the unspecified disease claims get allocated

7  to specific disease categories in the same

8  proportion as you observe them among specific

9  claims.  That's another method.

10          It would have put many more claims into

11  the meso/lung cancer category than we actually did.

12  So we took the more conservative method here.

13      Q    I want to make sure that I and the jury

14  and the Court will understand what you were looking

15  at and what you were doing here.  First, you're

16  working in this part of the report with a data tape

17  that is as of 2002; right?

18      A    Yes.

19      Q    You're looking at a group of claims that

20  still had no disease specified in them as of 2002;

21  is that true?

22      A    Yes.

23      Q    Go ahead.  You're looking at claims that

24  had been around because they were filed prior to the

25  end of 1993; correct?

Page 220

1      A     Yes.

2      Q     During that time period, we all recognize

3  that claims were getting diseases assigned to them,

4  and that was being put into the database; correct?

5      A     Well, not completely.

6      Q     What's not correct about that?

7      A     In another case, the Federal Mogul case,

8  we have three different extracts of data from the

9  Center for Claims Resolution for three members --

10  three companies that were Federal Mogul companies

11  that were all CCR members.  And we find that, not

12  infrequently, the data tape we have, for example,

13  for Turner Newell have a claim that doesn't have a

14  specified disease on the Turner Newell extract but

15  will have one on the Ferodo, F-e-r-o-d-o, data from

16  CCR.  So CCR may know what the disease is for a

17  plaintiff and they have identified a new database.

18  Remember, CCR is settling these claims.

19      So the mere fact that this extract for GAF

20  or for Turner Newell doesn't reflect what the

21  disease is doesn't mean that CCR is ignorant of it

22  and hasn't determined what that disease is.  The

23  implication of your questions have been that there's

24  something odd about an eight-year passage of time

25  about having learned what the disease is.  It may be

1    that CCR actually does know that.

2        Q    Would you prepare for, the court reporter,

3    a separate index for me and provide it to me?  I

4    want to keep a little list here so that I can find

5    things.  Would you mark that filibuster 1 for me on

6    the index?  Thank you.

7            Perhaps you didn't hear my question.  Let

8    me ask it again.  During the time period between

9    between the end of 1993 and the data tape in 2002,

10   some disease specifications were occurring and being

11   entered into the database, some; is that true?

12       A    What do you mean "the database"?

13       Q    The 2002 database you believe was being

14   updated between 1993 and 2002 as some claims came in

15   with more information; is that correct?

16       A    There were some claims that, during the

17   course of the period of time from January 1, 1994,

18   through 2002, where the disease was entered in the

19   CCR database.  Some of those were entered into an

20   extract of the GAF database, but probably not all of

21   the ones that CCR knew about were entered into the

22   GAF database, based upon my experience with multiple

23   CCR defendants.

24       Q    I think we've established before that the

25   date on which these disease updates occurred was not

1   one of the things that was captured in the database;

2   is that correct?

3        A    I'm sorry.  Could you repeat the question?

4   I was thinking of something else.

5        Q    Yes.  The date when the disease field was

6   updated is not one of the things that was captured

7   in the database as of 2002; is that correct?

8        A    I think that's correct.  It's not

9   routinely captured in these kinds of databases.

10       Q    So we might say that there was eight years

11  of seasoning on all of the unspecified claims as of

12  1994 between the end of 1993 and the database in

13  2002; isn't that true?

14       A    I don't understand your question, what you

15  mean by "seasoning."

16       Q    Those claims were sitting around getting

17  older, and whatever was happening to them in terms

18  of processing was happening; isn't that correct?

19       A    Well, it's likely that most of them were

20  resolved some time in that period of time.

21       Q    Right.  And presumably, some of the more

22  serious and more valuable claims would be likely to

23  be resolved; isn't that true?

24       A    Some of the claims were resolved.

25       Q    You don't think that there is an economic

1    incentive for plaintiffs' lawyers to resolve their

2    strongest and most valuable claims rather than put

3    time and effort into their weakest and least

4    valuable claims?

5        A    Well, there's a concomitant economic

6    incentive on the part of CCR and GAF not to settle

7    the most expensive claims, too.  They each have

8    imperatives they're operating under.  It takes two

9    to settle a claim.  So, you know, certainly some of

10   those claims were likely to have been serious claims

11   and some weren't.

12       Q    You have looked at processing times for

13   disease categories before in some of your work,

14   haven't you?

15       A    Yes.

16       Q    On average, the processing times of

17   mesothelioma claims are shorter than the processing

18   times for nonmalignant claims in virtually all of

19   these defendants' databases; isn't that true?

20       A    Usually the average resolution time for

21   meso is shorter, but there is a distribution of

22   times with some mesothelioma claims taking a long

23   time to be resolved.

24       Q    Do you know how frequently it occurs that

25   a mesothelioma claim remains for eight years as an

1    unspecified disease and then, after eight years, it

2    turns out that the disease specified as mesothelioma

3    that was diagnosed eight years ago?

4        A    I don't understand that question.

5        Q    Let me start over.  Do you know how often

6    it is that, after eight years in the database of

7    GAF, a claim was specified as mesothelioma and the

8    diagnosis date had been eight years before as

9    opposed to a claim that started as a nonmalignant

10   and the mesothelioma showed up subsequently?

11       A    Well, I don't know what and I can't tell

12   from the database and neither can you what CCR knew

13   about the diseases for these claims.  Presumably,

14   most of them were resolved in the eight-year period

15   of time, and they may or may not have learned what

16   the disease was at the time they resolved, it and

17   they may or may not have entered it into the

18   database.  I've been telling you that repeatedly.

19   Simply because the data were not entered into the

20   database doesn't mean that CCR was ignorant of the

21   disease.

22       Q    How often do you think diseases were

23   entered into the databases?

24       A    What percentage of cases or how frequently

25   they did it or what?

Page 225

1     Q   How often do you think the updates were

2  done?  Is that once a month?  Once a year?

3     A   It isn't done in that fashion.  You do it

4  when you get the information in or you don't.

5  There's not a screening of all cases to see do we

6  have all the disease input.  That's not efficient.

7  That's not the way these databases are maintained.

8     Q   Do you agree that there is no compensable

9  claim for an unknown disease claim?

10     A   I don't know how you're using the

11  term "unknown disease claim."

12     Q   Do you agree that the defendant will not

13  pay money unless you tell them what's wrong with

14  them?

15     A   That's not always true.

16     Q   So sometimes that defendants do pay money

17  when the claimants don't tell them what's wrong with

18  them?

19     A   In group settlements, there may have been

20  an agreement to pay claims.  Generally, they require

21  the plaintiffs' law firm to identify the disease.

22  Sometimes, they just buy a book of claims and

23  will -- a defendant is willing to pay $100,000 to

24  get rid of 1,000 claims at $100 a piece.  They

25  really at that point don't much care.  They can get

Page 226

1    a release for these 1,000 claimants, and that's

2    sufficient.

3         Q    Do you remember National Gypsum, that you

4    concluded that there shouldn't be a category carried

5    along for unknown diseases?

6         A    I remember testifying to that effect, yes.

7         Q    Did you do that for the simple reason that

8    there is no compensable claim that's an unknown

9    disease?

10        A    That's not a -- that was what I said at

11   the time.  I disagree with that whole issue now.

12        Q    And you would disagree with your testimony

13   there because of the answer you just gave me, that

14   there's sometimes group settlements where some

15   unknown disease claims are picked up?

16        A    I don't necessarily disagree with that

17   testimony.  The issue of compensable is different

18   than compensated.  They mean different things.

19   There are cases that a defendant will -- this is one

20   of the complaints of defendants, that there are

21   cases that money is paid on when they think that

22   they may not have to pay that but they're just doing

23   it out of nuisance.  That certainly happens.  I was

24   testifying about compensable claims there, but I

25   disagree with that practice.  It turned out to have

1    been a faulty and problematic practice that I

2    testified to there.

3        Q    Looking at table 7, top of page 15, is

4    that the allocation that you have done?

5        A    That's the result of the allocation.

6        Q    How can we find out how many numbers came

7    in through the allocation?

8        A    Compare table 7 to table 3 on page 13.

9        Q    So one of the results of the allocation

10   was, in the mesothelioma category, the number of

11   pending claims went from 1602 to 1774; is that

12   right?

13       A    Yes.

14       Q    So it is inherent in that analysis that

15   there were 172, if I did my subtraction right,

16   mesothelioma claims that sat around for eight years,

17   and they were not entered as mesothelioma claims in

18   the CCR database?

19            MR. FINCH:  Object to form.

20            BY MR. MILLER:

21       Q    Is that correct?

22            MR. FINCH:  Object to form.

23   Mischaracterizes prior testimony.

24            THE WITNESS:  I don't know what -- this

25   data extract had them as unspecified diseases.  Some

Page 228

1   fraction of them were certainly mesos, and whether

2   or not they were identified as mesos in a CCR

3   database in the 2002 extract, they did not have any

4   identification of meso or any other disease.

5          BY MR. MILLER:

6       Q    So my question again is, your transition

7   matrix takes 172 unspecified claims and

8   recategorizes them eight years after they were filed

9   as mesothelioma claims; is that correct?

10      A    Could you read the question?

11          (The reporter read the record as

12  requested.)

13          THE WITNESS:  Yes, actually.

14          BY MR. MILLER:

15      Q    And your transition matrix takes the

16  difference between 284 lung cancer claims and 392

17  lung cancer claims and makes that recategorization;

18  is that correct?

19          MR. FINCH:  Object to form.  It's not

20  correct.  The numbers are 2834 and 3392.

21          MR. MILLER:  30 -- what?  3292?

22          MR. FINCH:  2834 and 3392.

23          BY MR. MILLER:

24      Q    Let me read them again.  I must have

25  misread them.  I'm sorry.  It takes 2834 lung cancer

1  claims, and it reclassifies the difference between

2  that number and 3392 as lung cancer claims; is that

3  correct?

4      A    It takes 14 -- your question is

5  unintelligible as state.  It takes 14,588

6  unspecified claims and takes a number of claims that

7  were pending on December 31st, 1993, that may or may

8  not have settled since then.  Of that 14,588, it

9  moves about 580 of them and assumes that they are

10  lung cancer claims -- 560.

11      Q    So those are 560 claims that had been on

12  the database for eight years, but the lung cancer

13  disease category had not been assigned to them; is

14  that correct?

15      A    The lung cancer had not been assigned to

16  them in a GAF database.  It may have been assigned

17  in another CCR database, and it may have been

18  learned by CCR without having been changed on any

19  database.  All of those things happen.

20      Q    But you haven't done any checking to see,

21  in fact, what -- whether any of those claims were

22  specified with any disease in some other database;

23  is that correct?

24      A    Well, I have not looked at that issue with

25  regard to this database, because I don't have a

1    contemporaneous database from other defendants.

2            But I've looked generally at -- I've

3    looked at other CCR databases, and I can say with

4    certainty that, among that 14,588 claims that have

5    an unspecified disease data in the GAF database,

6    some of them will have diseases specified in a CCR

7    database.  I know that for a certainty, because

8    that's the experience I've seen with regard to CCR

9    databases.  Why that should be the case, I don't

10   know.  You need to ask Peterson Consulting.

11       Q    The mesothelioma and the lung cancer

12   claims were recognized by the CCR to be the more

13   extensive claims in general to settle than the

14   nonmalignant claims; is that true?

15       A    CCR paid, on average, more money to

16   resolve mesothelioma and lung cancer claims than on

17   average for the diseases, yes.

18       Q    And plaintiffs' lawyers knew that as of

19   1994; correct?

20       A    Yes.

21       Q    If a plaintiffs' lawyer had a mesothelioma

22   claim, isn't it likely that the plaintiffs' lawyer

23   would try to notify the CCR that this is a

24   mesothelioma claim as opposed to a less valuable

25   claim?

1       A    I would think that's likely.

2       Q    Isn't it also likely that the CCR, knowing

3  that its most serious category of claims, would have

4  an incentive to make sure that got written down

5  correctly?

6       A    Not necessarily.

7       Q    Why not?

8       A    Sometimes, there are errors.  Sometimes

9  they settle claims and they don't put it down.

10 Sometimes it's obviously entered in one of the CCR

11 databases but not in another.  The fact that data

12 are missing from a database could have many sources.

13      Q    You don't think the notion is that if

14 you've got a mesothelioma claim, it will probably be

15 written down as a mesothelioma claim in the

16 database?

17      A    Probably, but not certainly.

18      Q    Don't you think it's more likely to be

19 written down if it's a mesothelioma claim than a

20 nonmalignant claim?

21      A    Yes.  And that's why the transition matrix

22 only assigns 1.4 percent of the unknown diseases to

23 mesothelioma as opposed to 60-some percent to

24 nonmalignants.  Or if you did a pro rata

25 distribution, you assign fewer claims to

Page 232

1    mesothelioma than the pro rata distribution would

2    give you for precisely that reason.  But empirically

3    and demonstratively, it's the case that some of

4    these turn out to be mesothelioma.

5        Q    Where do we go to find that empirical,

6    demonstrative evidence you refer to?

7        A    The best source to go is the testimony and

8    the exhibits in the National Gypsum case.

9        Q    Which testimony shows that it's

10   empirically and demonstrative the case that claims

11   that are eight years old, some of them are going to

12   be classified as mesothelioma claims?

13       A    That isn't what I said.

14       Q    Well, you said it's empirically and

15   demonstratively the case that some of these turn out

16   to be mesothelioma.  So what did you mean by "some

17   of these" in that analysis?

18       A    Claims that don't have a specified disease

19   in a CCR database.

20       Q    Over what period of time, sir?

21       A    I don't have -- I'm not bounding it or

22   constraining it by time.

23       Q    And again, you don't know for this matrix

24   study that you're relying upon what the interval was

25   between the first database that you say CCR looked

Page 233

1  at and the second database; right?

2      A    It had to have been no more than four

3  years.

4      Q    Four years or less?

5      A    That's what I said.

6      Q    It could not have been eight years;

7  correct?

8      A    CCR wasn't in existence for eight years in

9  1992.

10     Q    Do you know if it inherited any databases

11 from the asbestos claims facility?

12     A    Ah, thank you.  Yes, it did.  It took

13 the -- well, actually, it took the databases from

14 its individual members and created the ACF database,

15 and then it took the ACF database then was

16 transported to the CCR database.  So I will -- thank

17 you.  I'll correct my statement.  Some of them could

18 have been eight years.

19     Q    So again, you don't know what the time

20 frame was between the first database that they used

21 and the second database in that study?

22     A    It wasn't a study constrained by time.

23     Q    It had to have some time interval between

24 the first database and the second database; right?

25     A    It was less than 100 years.

1      Q    Let's change subjects on that note.  Would

2  you find Dr. Martin's report, please?

3           MR. MILLER:  Could I get a time estimate,

4  please?

5           VIDEO OPERATOR:  On this tape, we've gone

6  an hour and 8 minutes.

7           MR. MILLER:  What's our total so far?

8           VIDEO OPERATOR:  5 hours and 59 minutes.

9           THE WITNESS:  I'm going to take a

10  two-minute break.

11           MR. MILLER:  Let's take a break.  Let's

12  recompute.

13           VIDEO OPERATOR:  We're going off the

14  record.  The time is approximately 4:51 p.m.

15           (Recess.)

16           VIDEO OPERATOR:  We're back on the record.

17  The time is approximately 5:02 p.m.

18           BY MR. MILLER:

19      Q    Would you find Peterson Exhibit 4, the

20  rebuttal report of Dr. Denise Martin, please?

21      A    I have that.

22      Q    Would you turn with me, please, to Exhibit

23  12?  Have you looked at this exhibit, "Substituting

24  Assumptions With a Reasonable Economic Basis Reduces

25  Dr. Peterson's Estimate of GAF's Future Liability

Page 235

1    Significantly"?  That's the title of it.

2          A    Briefly.

3          Q    The first adjustment is

4    titled "Adjustments to Reflect Propensity to Sue

5    With Reasonable Economic Basis," and it refers to

6    footnotes 2 and 3.  Do you see that?

7          A    Yes.

8          Q    And have you previously read footnotes 2

9    and 3?

10         A    I'm not sure whether or not I did.

11         Q    Would you turn with me --

12         A    I am reading it now actually in Exhibit

13   12.

14         Q    Would you, please, read footnotes 2 and 3

15   to yourself and tell me when you've done that, sir?

16   Sorry, are you looking up something else, sir?

17         A    There's a reference at footnote 3 to table

18   38 in my report.  So I'm looking at that, too.

19              All right.  I've read footnotes 2 and 3

20   which are on exhibit 12, and I've also looked at my

21   table 38 on page 49 to my report.

22         Q    Footnote 2 says that one of the

23   adjustments illustrated on this exhibit is using the

24   1991 period to calibrate the nonmalignant

25   multiplier.  Do you see that?

Page 236

1        A    Yes.

2        Q    You chose not to do that in your own

3   analysis; correct?

4        A    I didn't do it.

5        Q    Would you agree that there is a reasonable

6   economic basis for making that assumption and that

7   that is one reasonable way to compute the

8   nonmalignant calibration period?

9        A    Would you read that question, please?

10            (The reporter read the record as

11   requested.)

12            THE WITNESS:  I don't understand your

13   question.

14            BY MR. MILLER:

15       Q    Let me try it again.  Economists and other

16   experts who do asbestos estimation can sometimes

17   disagree on methodology; isn't that true?

18       A    Can and do.

19       Q    And sometimes, there are several

20   reasonable ways to do something; isn't that true?

21       A    Yes, sometimes for some things.

22       Q    All right.  This might be what some people

23   would say reasonable experts could disagree on.

24   That might be another way to talk about that

25   concept.  Is that the same concept that we're

1      talking about?

2          A    I don't understand that question.

3          Q    All right.  Let me ask it this way:  Do

4      you believe there is a reasonable economic basis or

5      there is not a reasonable economic basis for using

6      1990 through 1991 as the calibration period to

7      estimate the nonmalignant multiplier?

8          A    I don't understand what "reasonable

9      economic basis" is.  This is not economics.

10         Q    You don't think it's economics?

11         A    No.

12         Q    Why not?

13         A    Essentially, it's dealing with the

14     behavioral science of empirical analysis of legal

15     process.  So it's kind of a broader set of skills

16     than simply economics.

17         Q    So you don't have any opinion one way or

18     another as to whether an economist would find there

19     was a reasonable economic basis for this?

20         A    I think -- I don't want to be glib.  It's

21     a different issue about is it reasonable analytic

22     assumption and a reasonable -- I'm not an economist,

23     proudly not, and so you're asking me to put myself

24     in the shoes of what's reasonable for an economist

25     to do.  I have more difficulty in saying than

Page 238

1    someone who understands asbestos litigation and has

2    studied it for 25 years.  Do I think that this is a

3    reasonable analytic step to do?  That's a question I

4    can address more comfortably than asking me to put

5    myself in the skin of an economist.

6        Q    I will ask, then, the question that you

7    suggest you're more comfortable with.  Do you think

8    that this is a reasonable analytic step to do?

9        A    No.

10       Q    Why not?

11       A    While I think that there probably was some

12   acceleration of claim filing or generation of

13   additional claims because of the Georgine --

14   pendency of the Georgine class action, I think it's

15   inappropriate to assume that all of the differences

16   between the '92 and '93 nonmalignant claim filings

17   and 1990 and '91 is due to that acceleration,

18   particularly in the absence of any empirical

19   demonstration of an acceleration.  It's too

20   aggressive of an assumption.  I don't think it's

21   reasonable to think that's the only reason for

22   nonmalignant claim filings to have increased in '92

23   and '93.

24       Q    Footnote 3 refers to the use of the

25   decreasing propensity to sue model as set out in

Page 239

1    table 38 to forecast malignant claims.

2           Do you see that?

3       A   Yes.

4       Q   Again, I assume that since you're not an

5    economist, you don't have any opinion on whether

6    there is a reasonable economic basis for using that

7    approach; is that correct?

8       A   I don't even understand the nature of the

9    representation of "reasonable economic basis."

10      Q   Changing it to the question that you said

11   you feel more comfortable with, do you think this is

12   a reasonable analytic step?

13      A   I don't think, in light of the experience

14   of this defendant and what was happening at this

15   time, that it is a reasonable estimate.  It's

16   certainly not the best estimate.

17      Q   What is the experience of this defendant

18   that you're referring to in that answer?

19      A   Well, in asbestos litigation as a whole.

20   In 1992 and 1993, there were some dramatic changes

21   in asbestos litigation, in the latter part of 1992

22   and 1993 that made it unlikely that GAF would see a

23   decrease in the propensity to sue in future years.

24           Such things as the entry of the verdicts

25   in the Baltimore consolidated litigation, the

1  increased use of consolidations among various courts

2  across the country, the significant addition of

3  assets to asbestos litigation to compensate claims.

4  All of those were significant changes, among other

5  things, that made it unlikely that the propensity to

6  sue would decline.  Plus, GAF's own claims

7  experience were inconsistent with that.

8      Q    How was GAF's own claims experience

9  inconsistent?

10     A    For two of the three cancers, the

11 propensities to sue were increasing.  Its propensity

12 to sue for mesos had declined only because of the --

13 in the last year, but over the long term had been

14 increasing and the nonmalignant claims were up

15 sharply.

16     Q    If you go back to the first page, the

17 second entry is "adjustment to reflect claims pay

18 profile" --

19     A    I'm sorry.  Where are you?

20     Q    The first page of exhibit 12, the second

21 entry is titled "Adjustment to Reflect Claims Pay

22 Profile With Reasonable Economic Basis," referring

23 to footnotes 4 and 5.  Do you see that?

24     A    I'm sorry.  I'm lost.  You're on exhibit

25 12, first page?