1       Q    You're on the second page of exhibit 12,

2    sir.  There's the first page.

3       A    I beg your pardon.

4       Q    It's late, and I apologize.  That's one

5    reason I'm having trouble forming coherent

6    sentences.  I hope that's one reason.

7       A    You're forgiven, if I am.  I'm on the

8    first page of 12.

9       Q    The second entry there is "Adjustment to

10   Reflect Claims Pay Profile With Reasonable Economic

11   Basis," and it refers to footnotes 4 and 5.

12            Do you see that?

13       A    I do see the reference.

14       Q    Why don't we look at footnote 4 now,

15   please, sir?  That's kind of a long footnote, 4 is.

16   Why don't you read it quietly to yourself, and let

17   me know when you've done it.

18       A    Thank you.  I've read this.

19       Q    I assume, because you're not an economist

20   and you told me you don't think you know what the

21   question means, that you don't have an opinion on

22   whether the adjustments described in footnote 4 do

23   or do not have a reasonable economic basis; is that

24   correct?

25       A    I don't understand your question.

Page 242

1      Q    Do you believe that any of the adjustments

2    described in footnote 4 were reasonable analytic

3    steps to take?

4      A    I don't think I can answer this question

5    or, indeed, this line of questions because we were

6    not provided with the backup analyses of how these

7    assumptions were carried out in order to develop the

8    results in exhibit 12.  We provided our materials.

9         We have not gotten the steps that NERA

10   carried out in order to conduct this set of

11   analyses, and without that, I feel it's

12   inappropriate for me to try and discuss the

13   reasonableness of steps that I have not seen

14   substantiated.

15      Q    What backup materials do you think you

16   didn't get?

17      A    The actual tables that executed these

18   assumptions in order to generate these results.

19      Q    Do you know that there are tables as

20   opposed to simply doing multiplication?

21      A    Of course.  This was put on a computer.  A

22   computer ran this.  This was not done -- as smart as

23   Dr. Martin is, it wasn't done in her head.  You're

24   asking me to comment on an analysis that I have not

25   had a chance to review, and I can't do that.

Page 243

1      Q    Have you ever asked for this before?

2      A    We -- it's my understanding -- I don't

3   know whether or not it's been asked for.

4   Ordinarily, we provide our backup, our explanation.

5           We had exhibits that are attached to my

6   reports.  NERA routinely doesn't do that.  They

7   didn't provide it.  When we ask for things from near

8   arcs we get obfuscation.  So I don't know whether we

9   would have gotten it if we asked for it.  I do not

10  have it.  I cannot answer your question.  It was not

11  provided on a voluntary basis certainly.

12     Q    I move to strike the answer, except for

13  the statement "I cannot answer your question."

14          The next entry on the first page, it has

15  to do with an adjustment to settlement values.  Do

16  you see that?  It's the next to the last one, and it

17  refers to footnote 6 and 7.  My question is, you see

18  that entry, sir?

19     A    I'm sorry.  I see the third -- fourth row

20  of data on Exhibit 12.  I see the references to

21  footnote 6 and 7.  I started to read footnote 6.  Is

22  that what you want me to do?

23     Q    That's fine.  Why don't you now read

24  footnote 6.  I'm going to ask you about footnote 6

25  separately from footnote 7.

Page 244

1    A    I've read 6 and 7.

2    Q    Were you aware that GAF's share in the CCR

3    was in the process of being revised in 1994?

4    A    I know that -- it's my understanding it

5    was changed.  I'm not sure I know the precise date

6    when it was changed.

7    Q    Do you know whether, in January of 1994,

8    it was recognized that it was likely to be changed

9    to 20 percent?

10    A    I don't know how to answer that question.

11    I don't know by whom.

12    Q    Do you know what the share of payments

13    under Georgine allocated to GAF was?

14    A    I don't know that I recall that, no.

15    Q    Do you know if that was 20 percent or not?

16    A    At some point, I believe GAF's was reduced

17    to 20 percent.  When it was, whether it was in

18    Georgine -- my understanding it was generally, but I

19    don't know the date when that occurred, and I don't

20    know what was the understanding of the members of

21    CCR as of January 1994 about that issue with regard

22    to tort.  I don't know either way.

23    Q    Footnote 6 has to do with applying a

24    particular share to mean resolution values in a

25    exhibit to the fairness hearing; is that correct?

Page 245

1      A     That's my --

2      Q     That's the subject?

3      A     That's my understanding of what footnote 6

4  is saying, yes.

5      Q     Okay.  You did not feel, based on your

6  prior testimony, that you wanted to use anything

7  from the Georgine fairness hearing in your analysis,

8  as I understand it; is that correct?

9      A     I don't think I testified to that.

10     Q     Well, maybe I should state this a little

11  more precisely and try to -- I was trying to save

12  some time.  I assume you don't believe that this

13  step is a reasonable analytic step to take based on

14  some of your prior testimony; is that correct or

15  incorrect?

16     A     You mean the 20 percent reduction step?

17  I'm not sure what "this" is.

18     Q     What's done in footnote 6.

19     A     I think there are a couple of things wrong

20  with it.  Tell you what they are?

21     Q     Why don't you tell me what you think is

22  wrong with it.

23     A     I don't think the dollar values -- this is

24  not the appropriate way to calculate what GAF's

25  payment history has been.  There's immediate data

Page 246

1   available that contradicts this.  That's what you'd

2   use.  You wouldn't use some exhibit that you can't

3   verify the accuracy of.  I don't know its base.  So

4   that's the first step, the use of that exhibit as

5   the basis for the calculation is wholly

6   inappropriate.

7       Q    What's wrong with using an exhibit that's

8   provided in court by the CCR?

9       A    Because you don't know the validity of the

10  numbers.  You don't know their derivation.  I don't

11  know their derivation.  Maybe Dr. Martin knows the

12  derivation and can spell that out with regard to the

13  data.

14          You have specific data about how much was

15  paid by this particular defendant in the database.

16  And so you have direct information why one would go

17  to this inferential step using questionable and,

18  really, unbacked-up data and make some adjustment to

19  it to get back down, and in any event, those

20  percentages differ from occupation to occupation.

21  So, you know, it doesn't reflect the actual

22  operation of CCR.  It's an improper step.  That's

23  one problem.

24          The other problem is the 20 percent

25  reduction isn't appropriate, because all the 20

Page 247

1    percent reduction is is an offset for the change

2    that had already occurred in CCR, switching from the

3    policy of namings where previously every member of

4    the CCR had contributed to every claim, whether or

5    not they had been named, but beginning at the end of

6    1991 and the beginning of 1992, all members of CCR

7    only paid on those claims where they were named, and

8    that changed -- the effect of that change was to

9    increase the amount of obligation for GAF compared

10   to what it had to pay historically.

11          By reducing its payment percentage, which

12   apparently was anticipated, from roughly 28 to 20

13   percent, you're basically offsetting the impact of

14   GAF -- what GAF would have to contribute to CCR as a

15   whole.  So if you want to take this 20 percent

16   reduction, you also need to model or take into

17   account the name/not name change.  It's a half a

18   loaf.

19      Q    Do you know whether this is a reasonable

20   analysis if you were asked to look at what would be

21   expected to happen if the Georgine settlement had

22   been approved?

23      A    I don't have an opinion about that.

24      Q    You notice that footnote 7 deals with age

25   multipliers?  Do you see that?

Page 248

1      A     Yes.

2      Q     If you were going to do an age adjustment,

3   recognizing that you've told us you don't think one

4   is appropriate here, would you agree or disagree

5   with this general approach?

6      A     I'm sorry. Isn't that a kind of would you

7   stop beating your wife question? I wouldn't make

8   the age adjustment. So I don't think that any step

9   is appropriate. I can't -- I have not thought about

10  how I would do something that's an inappropriate

11  step to do here when it's demonstratively and

12  empirically incorrect. And furthermore, with regard

13  to both of these footnotes in this entry, I don't

14  have the underlying data that executed the analysis

15  that Dr. Martin reports in the table in exhibit 12.

16         It's likely that I may find other problems

17  with regard to this -- these steps and how it's

18  executed. So I would say that I don't know that my

19  comments here are exhaustive with regard to what's

20  problematic about this.

21     Q     If you had the backup data, would you look

22  at that backup data and try to see if you had

23  additional problems with it?

24     A     Yes. I almost certainly would do so.

25     Q     Do you notice that -- going back to the

Page 249

1   first page --

2         MR. FINCH:  First page of what?  12?

3         MR. MILLER:  Of the exhibit 12.

4         THE WITNESS:  Yeah, the table, yes.

5         BY MR. MILLER:

6     Q    Yes, the table.  I didn't finish because

7   somebody handed me a note.  The last step

8   is "Adjustment to Reflect a 10-year Horizon."

9         Do you see that?

10    A    Yes.

11    Q    You recognize that the Georgine settlement

12  had a 10-year horizon in it?

13    A    No.

14    Q    You didn't know that?

15    A    I don't agree with the characterization.

16    Q    It had 10 years before there was a

17  renegotiation point?

18    A    It anticipated two 10-year periods with

19  some renegotiation.  I think it was applicable over

20  two 10-year periods.

21    Q    Have you looked at the CD-ROM that was

22  produced with Excel spreadsheets by the way as

23  backup to the NERA report?

24    A    I don't know that we've gotten that.

25    Q    Well, do you know whether you have or have

Page 250

1    not gotten it as you sit here?

2        A    I spoke with Dan Relles, who is the

3    statistician, and he said we have not gotten backup

4    material.  If we have gotten it, we'll look at it.

5    If we haven't gotten it, I'd appreciate getting it.

6        Q    As you sit here today, can you say under

7    oath that you did not receive a CD-ROM with Excel

8    spreadsheets that had the backup for exhibits on it?

9        A    I can say under oath that I made inquiry

10   with Dan Relles who told me that we did not have the

11   backup information.  Beyond that , I can't say.  I

12   can't swear under oath for what Dr. Relles knows or

13   doesn't know.  He's not under oath here.

14       Q    I understand that.  Did you ask Dr. Relles

15   about whether he had seen a CD-ROM that had Excel

16   spreadsheets on it?

17       A    I didn't ask that specific question.  I

18   asked him if he had the backup.

19       Q    Do you know whether he did or did not,

20   from something he said, look at Excel spreadsheets

21   that were produced by Dr. Martin with regard to her

22   report?

23       A    I didn't -- I don't believe we've gotten

24   anything like that.  I'm quite certain we haven't.

25   And if Dr. Relles had it, he would have looked at

Page 251

1     it.

2             MR. MILLER:  How much time have we used on

3     the tape so far, please?

4             MR. FINCH:  About 20 minutes, I think.

5             VIDEO OPERATOR:  Left on the tape?

6             MR. MILLER:  No, no, how much have we used

7     on the tape.  I've talking about how much we've used

8     since the break is really my question.

9             VIDEO OPERATOR:  Okay.

10            About 20 minutes we've used.

11            MR. FINCH:  We've used or we have

12    remaining.

13            VIDEO OPERATOR:  We have 40 minutes

14    remaining.

15            MR. MILLER:  Let's go off the record just

16    a moment.

17            VIDEO OPERATOR:  We're off the record.

18    The time is approximately 5:31 p.m.

19            (Recess.)

20            VIDEO OPERATOR:  We are back on the

21    record.  The time is approximately 5:38 p.m.

22            MR. MILLER:  While we were off the record,

23    Mr. Finch made a proposal.  Why don't you outline

24    that, sir.

25            MR. FINCH:  Mr. Miller and I discussed the

1   proposal, and it is as follows.  He will finish one

2   more topic here, and I will have a short redirect

3   based on the topics that have been covered today.

4          Then we will adjourn the deposition, which

5   can be reconvened, and Mr. Miller will have an hour

6   to question Dr. Peterson.  The only stipulation

7   about that is that the deposition can be conducted

8   via telephone or video conference so we don't have

9   to fly everybody back to Washington or Texas or

10  something like that.

11         MR. MILLER:  And we'd like to note that

12  one of the reasons for this proposal is there was a

13  CD-ROM produced, and some tracing is going to be

14  done to find out what happened to that CD-ROM.

15         MR. FINCH:  Yes.  Caplin & Drysdale

16  received a CD-ROM.  We're tracing to figure out why

17  that was not sent to Dr. Peterson.  We'll send it to

18  Dr. Peterson.  I suggest we reconvene the next part

19  of the deposition a week or two hence after we can

20  get that to him.  But let's just work on the

21  schedule after we get off the record and finish

22  today.

23         MR. MILLER:  Also for the record, we

24  believe the Bates numbers on the CD-ROM are DMM

25  00014321.  So we believe it has 14,321 Bates

Page 253

bered pages on it.

MR. FINCH:  2000 of those pages are CCR

tlement agreements.

MR. MILLER:  Perhaps.

BY MR. MILLER:

Q    Dr. Peterson, I want to be sure the record

clear on one topic we talked about earlier today.

u have never had any financial interest in a

aintiffs' law firm that does asbestos work; is

at correct?

A    That's correct.

Q    And you have never had any financial

rticipation in any asbestos recoveries, obviously

etting aside hourly expert fees; is that true?

A    That's correct.

Q    Are you aware that the United States

attorney in Manhattan has subpoenaed some records

having to do with asbestos litigation?

A    No.

Q    Have you read the news reports on that?

A    I don't recall.

Q    Have you read news reports suggesting that

one of the things that the U.S. attorney is looking

into is expert witnesses in asbestos litigation who

may have had contingent fee arrangements that were

Page 253

1    numbered pages on it.

2          MR. FINCH:   2000 of those pages are CCR

3    settlement agreements.

4          MR. MILLER:   Perhaps.

5          BY MR. MILLER:

6      Q    Dr. Peterson, I want to be sure the record

7    is clear on one topic we talked about earlier today.

8    You have never had any financial interest in a

9    plaintiffs' law firm that does asbestos work; is

10   that correct?

11     A    That's correct.

12     Q    And you have never had any financial

13   participation in any asbestos recoveries, obviously

14   setting aside hourly expert fees; is that true?

15     A    That's correct.

16     Q    Are you aware that the United States

17   attorney in Manhattan has subpoenaed some records

18   having to do with asbestos litigation?

19     A    No.

20     Q    Have you read the news reports on that?

21     A    I don't recall.

22     Q    Have you read news reports suggesting that

23   one of the things that the U.S. attorney is looking

24   into is expert witnesses in asbestos litigation who

25   may have had contingent fee arrangements that were

Page 254

1   undisclosed?

2        A    No, I'm not aware of that.

3        Q    Just to be clear, on the record under

4   oath, you don't have any undisclosed contingency fee

5   arrangements related to asbestos matters; is that

6   true?

7        A    That's true, although I've had a hard time

8   collecting some of my fees, but none of them are

9   intended to be or are contingent.  They just turn

10  into bad debts sometimes.

11            MR. MILLER:  That's the topic I wanted to

12  cover.  Thank you.

13            THE WITNESS:  Thank you.

14            MR. FINCH:  I have a short redirect.

15                    EXAMINATION

16            BY MR. FINCH:

17        Q    Dr. Peterson, is it correct that none of

18  the fees you earn through your work as an expert or

19  consultant in asbestos litigation is contingent in

20  anyway upon the nature of your testimony or the

21  outcome of any particular case?

22        A    That's correct.

23        Q    Earlier today, you were asked some

24  questions by Mr. Miller about your testimony before

25  the Senate judiciary committee and your preparation

1  for same in connection with federal legislation that

2  would reform the way asbestos claims are processed

3  in the United States.  Do you recall that testimony?

4      A    Yes.

5      Q    Did that testimony and the work that led

6  up to it constitute lobbying activity on your part?

7      A    No.  I don't regard it as lobbying.  I was

8  doing technical analyses.

9      Q    At whose -- who were the members of the

10 Senate judiciary committee or their staffers who

11 would have requested that you provide information to

12 them or testify before them in connection with

13 asbestos reform legislation?

14     A    Both Democrats and Republicans asked me to

15 testify.  Most of my analytic work has been

16 undertaken at the request of several different

17 people, first Senator Nickles when he was chairman

18 of the finance committee and on the judiciary

19 committee and his staffers, more recently Senator

20 Cornyn and his staffers, who is also on the Senate

21 judiciary committee.

22          I think I've been asked to do some

23 analyses by staffers for Mr. Durbin, Senator Durbin

24 and Senator Lahey, and there may have been others.

25 I was also asked to provide analyses, do some

1   analyses and comments by the Congressional Budget

2   Office and by the GAO, I guess, and by the AFL-CIO.

3   All of them have asked me to either review analyses

4   or provided them with analyses dealing with the

5   kinds of matters I testified about.  That was the

6   subject of my testimony in all instances.

7           MR. FINCH:  That's all I have.

8           MR. MILLER:  I will do one quick follow-up

9   on that last redirect.

10                      EXAMINATION

11          BY MR. MILLER:

12      Q    Were you compensated for these analyses

13  and comments that you were asked to provide by the

14  GAO and the AFL-CIO?

15      A    No.

16      Q    They were on your own time?

17      A    I was not compensated by them.  The work

18  that I've done, as I've described earlier, it's

19  billed in the same manner.

20      Q    And it was billed to a combination of

21  asbestos trusts and asbestos claimants' committees;

22  is that my understanding?

23      A    Yes.

24          MR. MILLER:  Thank you.  We'll reserve,

25  just for the record, we made an arrangement, we're

Page 257

1   going to have another hour.  We'll do it by

2   telephone or by video.  We'll try to exchange

3   documents and make it productive.

4              MR. FINCH:  Okay.

5              VIDEO OPERATOR:  We're off the record.

6   The time is approximately 5:45 p.m.  This concludes

7   the deposition of Mr. Mark Peterson.

8              (Whereupon, at 5:45 p.m., the deposition

9   was adjourned, to be reconvened at a later date.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 258

1      I HEREBY CERTIFY that I have read this

2    transcript of my deposition and that this transcript

3    accurately states the testimony given by me, with

4    the changes or corrections, if any, as noted.

5

6

7                              X

8

9

10

11    Subscribed and sworn to before me this      day of

12                 , 20          .

13

14

15

16                              X

17                         Notary Public

18

19

20

21    My commission expires:                       .

22

23

24

25

Page 259

1                    C O N T E N T S

2

3    WITNESS                          EXAMINATION

4    MARK A. PETERSON

5       By Mr. Miller                    4, 256

6       By Mr. Finch                   254

7

8

9    MARKED QUESTION - Page 221, Line 6

10

11                   E X H I B I T S

12

13   EXHIBIT NUMBER                    IDENTIFIED

14

15   Exhibit 1                            3

16   Exhibit 2                           34

17   Exhibit 3                          105

18   Exhibit 4                          108

19   Exhibit 5                          116

20   Exhibit 6                          117

21

22

23

24

25

Page 260

1       CERTIFICATE OF NOTARY PUBLIC & REPORTER

2

3    I, SARA EDGINGTON, the officer before whom the

4    foregoing deposition was taken, do hereby certify

5    that the witness whose testimony appears in the

6    foregoing deposition was duly sworn; that the

7    testimony of said witness was taken in shorthand and

8    thereafter reduced to typewriting by me or under my

9    direction; that said deposition is a true record of

10    the testimony given by said witness; that I am

11    neither counsel for, related to, nor employed by any

12    of the parties to the action in which this

13    deposition was taken; and, further, that I am not a

14    relative or employee of any attorney or counsel

15    employed by the parties hereto, nor financially or

16    otherwise interested in the outcome of this action.

17

18

19             -------------------------

20             Notary Public in and for the

21             District of Columbia

22    My Commission Expires:  NOVEMBER 1, 2007

23

24

25