Brickman - Direct / Recess / Brickman - Direct          25

1     COURT OFFICER:  All rise.

2                              (Recess)

3          THE COURT:  Be seated everybody.  Be seated .

4     Continue.

5          MR. HICKERSON:  Yes, Your Honor.  In light of your

6     comments we've pared down the rest of the direct.  I expect to

7     have about ten or 15 more minutes.

8     Q     Professor, can you tell me about any state legislative

9     reforms that impact on asbestos litigation?

10    A     Yes.  There have been some very significant legislative

11    reforms at the state level, in Texas, in Mississippi.   In

12    addition to what I've already indicated, Texas has included a

13    successor liability section which limits the liability of

14    parent companies which have acquired smaller companies which

15    came equipped with asbestos liability, to the gross asset value

16    of the acquired company.  This is a very significant

17    legislative event in addition to the legislation with regard to

18    venue.

19         In Mississippi there's been extensive legislative reform,

20    including a limitation on punitive damages going forward, which

21    of course is very relevant to the -- especially in light of the

22    testimony earlier about the Cosie case, which was a Mississippi

23    case in which the settlement was driven by punitive damage

24    considerations.

25         In Ohio there has been essentially a legislative enactment

1   that carries forward Judge Wiener's order in the MDL,

2   eliminating all of claims generated by screenings.  In the Ohio

3   legislation all of the screening claims, the non-malignant

4   claim, in any event, are precluded from being brought forward.

5   That's a shorthand way of putting that.  Ohio also included a

6   successor liability section similar to that in Texas.  There

7   was an Ohio case just a few days ago involving a lung cancer

8   which involved the interpretation of the new Ohio statute, and

9   it was an interpretation that limited the ultimate effect of

10  the statute.  Whether that applies to the non-malignants

11  remains to be seen.  I would expect that the -- before -- that

12  the ultimate decision will be made by the Ohio Supreme Court.

13  Q    So, the recent decision was a Trial Court decision?

14  A    It was a Trial Court decision.

15  Q    Professor, I'd like to ask you just a couple of questions

16  on the Manville trust.  I know the Court has heard a lot on

17  that already, so I just want to focus on some things which have

18  not been discussed.  Can you tell me whether, in the 1995 time

19  period, there were any significant events with respect to the

20  Manville trust?

21  A    Yes, there were.  When the Manville trust was

22  reconstituted by Judges Weinstein and Lifland and opened its

23  doors again, it was inundated with non-malignant claims.  That

24  is to say it received far more such claims than it had

25  anticipated, and in response the Manville trust undertook an

Brickman - Direct                                    27

1   audit of these claims and created an audit process that was

2   designed to confirm the readings of the asbestos lawyer B

3   Readers.  They found, however, a very high error rate on the

4   part of the B Readers by bringing in outside readers.  They

5   also found high accumulations or concentrations of B readings

6   by certain B Readers and they acted on the basis of that by

7   requiring x-rays in some cases, and subjecting those x-rays to

8   audits.

9   Q    And what happened next?

10  A    Well, the asbestos lawyers objected to that, and they sued

11  the Manville trust, and so there was a judicial proceeding that

12  ensued on the legitimacy, if you will, of adopting these

13  procedural devices and the Manville trust essentially conceded,

14  and discontinued use of this audit process.

15       THE COURT:  Was this all done in secret?  Or is it

16  part of an official Court record somewhere?  And if it's a

17  Court record why are we hearing testimony about it?  For

18  heaven's sake, will you please stop wasting time?

19       MR. HICKERSON:  Very well, Your Honor.

20  Q    We've heard testimony about the changes in the TDP in

21  2002.  Can you tel me what effect on the filing rates those

22  changes had?

23  A    Well, after the audit process did not prevail, there was a

24  huge spike up in claims in 2000, 2001, from 1999.  And Judge

25  Weinstein reconsidered the proceeding that he had presided



Brickman - Direct                              28

1  over, and sua sponte decided to hold another proceeding on the

2  question of amending the TDP.  And this resulted in a

3  negotiated settlement, and in 2002 he ratified that negotiated

4  settlement, which is now called the 2002 TDP, though noting in

5  his decision that it would not eliminate the opportunity for

6  fraudulent claiming, but that it would decrease the likelihood

7  of the success of such claiming.  So, in 2002, effective in

8  mid-2003, a new TDP came into existence.

9  Q    And since the new TDP, what is the claiming rate against

10 Manville?  How has that reacted?

11 A    The purpose of the new TDP was to decrease the number of

12 non-malignancy claims and to direct more of the money that was

13 being paid out by the trust to the malignancies.  And this, in

14 fact, was accomplished in 2003.  The number of claimants

15 submitting new claims to Manville was 101,400.  In 2004, the

16 number had declined to 14,752, which was an over 85 percent

17 decrease.  In 2003, the ratio of non-malignants to malignants

18 was nine to one.  In 2004, the ratio had declined to three to

19 one, so that the new TDP achieved a significant amount of

20 success.

21        THE COURT:  They're still only getting five cents on

22 the dollar, as I understand it.

23        THE WITNESS:  Yes, but they are considering

24 increasing that right now because of the decline.  So, they've

25 already instituted the steps necessary to begin -- they've

Brickman - Direct                    29

1  already begun the process that could lead to a raise in the

2  percentage because of the decline in claiming.

3       THE COURT:  Do you think that the -- the relatively

4  small amount of money that could possibly be obtained might

5  have had some effect on causing fewer claims to be filed?

6       THE WITNESS:  Yes, Your Honor.  That was one of the

7  changes in the TDP.  The significant changes were, in fact, to

8  raise the occupational exposure requirement for level three to

9  significant, to remove a diffusion test that had been abused,

10  and to change the dollar amounts.  And so, yes, absolutely that

11  was part of the reason why there's been a decline in the non-

12  malignancy claims filed in '04, and further declines are

13  anticipated for '05.

14  Q    And in your view what's the reason for the declines?

15  A    In my view the dominant reason for the decline, but not

16  the sole reason, is the change -- is the 2002 TDP, the changes

17  effected by the 2002 TDP.  That was the purpose of the TDP, and

18  in my view it largely achieved that purpose.

19  Q    And what's the basis for your view on that?

20  A    I have a number of things I've taken into consideration in

21  reaching that opinion.  One was the -- were discussions that

22  took place in a Mealey's conference several months ago in which

23  I was a participant that was put together by Joe Rice and David

24  Austern, the president of the claims processing arm of the --

25  Q    Who is Joe Rice?

1  A    Joe Rice is one of the leading asbestos lawyers.  He's on

2  many ACC's.  And at that meeting on -- and the panel discussion

3  that I was participating in, Mr. Rice commented that with

4  regard to the decline that had been evident to that point, that

5  in his view that was not a transitory decline, it was a

6  permanent decline.  And he gave as reasons for that decline

7  that the Manville -- the change in the Manville TDP, and as

8  well the other TDPs that were then in formation involving the

9  other trusts that are now in formation because of the on-going

10  bankruptcies, and the fact that they too are limiting the

11  amounts of money available to the non-malignancies, and

12  favoring the malignancies in terms of the payment of trust

13  assets, and these were the two dominant reasons that he listed

14  for that decline.

15      In addition, I spoke extensively with David Austern, whom

16  I've already identified, on the question of what he ascribes

17  the decline to, and he also ascribes the decline primarily to

18  the TDP, and he notes that that decline is not simply limited

19  to Manville, but there are extensive, this other evidence with

20  regard to other trusts already, even though most of them won't

21  report until the end of February, that they've all had

22  significant declines in claiming in 2004.  David Austern

23  expects that this decline will continue into 2005.

24          MR. HICKERSON:  Pass the witness.

25          THE COURT:  So that for estimation purposes I should

Brickman - Direct                    31

1  simply transfer all future claims to the Manville trust?  Is

2  that right?

3         THE WITNESS:  Obviously not, Your Honor.  But

4  certainly there's an effect between the amounts -- the values

5  in a TDP certainly effect the quantum of claims.  It's a matter

6  of the profitability.

7         THE COURT:  Anybody have any questions?

8         MR. INSELBUCH:  Can we have a minute, Your Honor?

9         THE COURT:  You may have 30 seconds.

10        MR. INSELBUCH:  No questions.

11        THE COURT:  Okay.  Thank you very much, Professor.

12 You may step down.  Anything further?  Any further evidence

13 from anybody?  The hearing is over?  Apparently not.

14        MR. MILLER:  May it please the Court, Your Honor, my

15 name is Ralph Miller, again.  And we're gong to present Dr.

16 Dunbar. Perhaps while we set up, and we will try to move

17 quickly, I could go ahead and make a brief offer of proof with

18 regard to his qualifications, and we can go ahead and start

19 with exhibits.  Would that be all right, while the witness

20 comes in?

21        THE COURT:  Sure.

22        MR. MILLER:  Your Honor, the initial report of Dr.

23 Dunbar is CSFB Exhibit 157 dated October 15, which includes his

24 curriculum vitae.  And we'd like to offer that report as well

25 as CSFB Exhibits 158 and 159 --

Brickman - Direct                                    32

1      THE COURT:  Are they floating about here somewhere?

2      MR. MILLER:  Yes, Your Honor.  We have them in books.

3      UNIDENTIFIED ATTORNEY:  No objection, Your Honor.

4      UNIDENTIFIED ATTORNEY:  We need the books.

5      UNIDENTIFIED ATTORNEY:  We'd like to see the books

6  and the materials, please.

7      MR. MILLER:  And we will pass those up in a moment,

8  Your Honor.

9      MS. PARVER:  Could you just give us, Mr. Miller,

10  those exhibit numbers again so when we get them we can check?

11      MR. MILLER:  Sure.  They're 157, 158, and 159.  Your

12  Honor, very briefly, Dr. Dunbar is a senior vice president at

13  National Economic Research Associates, NERA, in New York.  It's

14  a group of consulting micro-economists, most of whom are former

15  academics.  It has 500 people in 16 offices.  He joined in

16  1979.  He received his undergraduate degree in mathematics and

17  economics in 1966 from Reed College.

18      THE COURT:  It's your theory I can't read, I take it.

19      MR. MILLER:  Pardon me?

20      THE COURT:  It's your theory I can't read.

21      MR. MILLER:  Well, no, Your Honor.  I think -- the

22  point we wanted to emphasize here is that Dr. Dunbar is, unlike

23  the other people who testified, an economist, and he has both a

24  master's and a Ph.D. in economics.  He's published a book we

25  want to call to the Court's attention, Estimating Future

33

1  <u>Claims, Case Studies for Mass Tort and Product Liability</u>.  And

2  to some extent, Your Honor, I'm killing time while we set up.

3                          (Laughter)

4          THE COURT:  Actually, that's not necessary.

5          MR. MILLER:  All right.

6          THE COURT:  Silence is golden.

7          MR. MILLER:  All right.  Thank you, Your Honor.  I

8  did want to present something that is not in the materials,

9  Your Honor.  There are a number of judicial opinions that quote

10  Dr. Dunbar, and perhaps -- that comment on Dr. Dunbar's

11  testimony.  And --

12          THE COURT:  Comment favorably or unfavorably?

13          MR. MILLER:  Well, the ones I have are all favorable,

14  Your Honor, and I believe those are the only ones I know about.

15  But perhaps, in the theory that people can read, do I have more

16  -- I'll see if I can get some copies of this and pass this up

17  in a moment.  Since Dr. Dunbar is here, maybe we can swear him

18  and begin, Your Honor.

19          THE COURT:  That's possible.

20          COURT OFFICER:  Please raise your right hand.

21          FREDERICK C. DUNBAR, CSFB WITNESS, AFFIRMED

22          COURT OFFICER:  Please state and spell your name for

23  the record.

24          MR. DUNBAR:  Frederick C. Dunbar.  F-r-e-d-e-r-i-c-k

25  C.  D-u-n-b-a-r.

Dunbar - Direct                                    34

1           MR. MILLER:  Your Honor, we tender Dr. Dunbar as an

2   expert in asbestos claims estimation.

3           THE COURT:  You may proceed on that assumption.

4                      DIRECT EXAMINATION

5   BY MR. MILLER:

6   Q   Dr. Dunbar, as you sit here today, what is your best

7   estimate based on the investigation you have done, your

8   training and experience, and reasonable economic probability

9   for the value of allowable claims for present and future

10  asbestos personal injuries against Owens Corning, the Delaware

11  parent corporation?

12  A   Two point oh --

13          MR. FINCH:  Objection, Your Honor.  What is

14  allowable?  No foundation.

15          THE COURT:  I'm sure that's a subject for cross

16  examination when the time comes.

17  Q   Yes, sir?

18  A   Two point oh four six billion.

19  Q   Does that --

20          THE COURT:  Two point oh four six?  Is that Owens

21  Corning, not including Fiberboard?

22          THE WITNESS:  That's correct.

23          THE COURT:  Thank you.

24  Q   Does that include or exclude the so-called contract claims

25  where settlement agreements have been submitted under the

Dunbar - Direct                              35

1  national settlement program, or other settlement agreements,

2  and payment has not yet been made?

3  A    That includes the contract claims.

4  Q    Just for the record, what amount do you compute for those

5  contract claims in that estimate?

6  A    On net, 439 million.

7  Q    And does that take into account the $110 million credit

8  which has been referred to, or not?

9  A    That is after subtracting the credit from the gross

10 amount.

11         THE COURT:  Did I understand that this covers all

12 pending claims and future claims?  Everything all together?

13         MR. MILLER:  Dr. Dunbar?

14         THE WITNESS:  Yes.  That's correct.

15         MS. PARVER:  Your Honor, could we just ask if this is

16 a nominal or present value number?

17         THE COURT:  You could ask.

18         MS. PARVER:  Thank you, Your Honor.

19 Q    Is this nominal or present value, Dr. Dunbar?

20 A    Discounted present value.

21         THE COURT:  Discounted at what rate?

22         THE WITNESS:  8.12 percent.

23 Q    And while we're there, your inflation rate is what, Dr.

24 Dunbar?

25 A    2.17 percent.  That's the inflation rate for the CPI.

Dunbar – Direct                              36

1    THE COURT:  Everybody else used 2.5 I think, didn't

2 they?

3    THE WITNESS:  Dr. Vasquez used 2.0.

4    MR. FINCH:  Objection, Your Honor.  That's not true.

5 Dr. Vasquez used 2.5 and then he adjusted it to 2.0 based on

6 other considerations.

7    THE COURT:  Okay.  Quibble, quibble.

8 Q    Have you prepared any summaries of the differences between

9 your estimate of other experts?

10 A    Yes, I have.

11    MR. MILLER:  Can I get those?  This is the collection

12 of -- Your Honor, we have a book on this testimony.  If I can

13 get those for you.

14    UNIDENTIFIED ATTORNEY:  Is this a book of your

15 demonstrative exhibits, Ralph?

16    MR. MILLER:  Yes.

17    UNIDENTIFIED ATTORNEY:  Can I have it too, please?

18    MR. MILLER:  Sure.

19    UNIDENTIFIED ATTORNEY:  And I'd like it too, please.

20    MR. MILLER:  Of course.

21    UNIDENTIFIED ATTORNEY: And this is which exhibit

22 number?

23    UNIDENTIFIED ATTORNEY:  This isn't the

24 demonstratives.

25    UNIDENTIFIED ATTORNEY:  There were separate exhibits.

Dunbar - Direct                                    37

1                    (Pause)

2          MR. MILLER:  Your Honor, I am advised that the book

3    titled "Fred Dunbar, Direct Exhibits" has already been passed

4    up to the Court and distributed to counsel, so that's where --

5          THE COURT:  We don't know what number you're

6    referring to.

7          MR. MILLER:  Yes, Your Honor.  I'll give you those

8    numbers right now.  I just want to make sure they are before

9    the Court.  Your Honor, we have moved in already the expert

10   reports which are at the front.  These are beginning at 289.

11   They include 290 --

12         THE COURT:  Well, do they begin at 289 or 290?

13   Which?

14         MR. MILLER:  No, Your Honor.  They begin at 289.  It

15   continues through 290.  And there is also a related exhibit at

16   294.  And we would move admission of those.

17         MS. PARVER:  Which ones are we moving?

18         MR. MILLER:  289, 290, and 294.

19         THE COURT:  They will be received.

20         MS. PARVER:  I object, Your Honor.

21         THE COURT:  I don't doubt it.  What is your basis?

22         MS. PARVER:  Your Honor, Court orders.  Some of these

23   exhibits are based on work that has not been disclosed to the

24   plan proponents in accordance with the Court-ordered

25   stipulation with respect to making things available before

Dunbar - Direct                                      38

1   deposition testimony.

2           MR. FINCH: Your Honor, if I could just put a finer

3   point on that. In particular, CSFB transcripts exhibits 290

4   and 294 have comparisons of the NERA forecast to the Dr.

5   Vasquez forecast.

6           THE COURT: Right.

7           MR. FINCH: Dr. Dunbar has not commented on in his

8   reports -- on -- at least hasn't done the work product to show

9   the reconciliation. This is new material that neither Ms.

10  Parver nor I have had a chance to depose them about. And I --

11          THE COURT: Well, you'll have chance to cross examine

12  him.

13          MR. FINCH: Thank you, Your Honor.

14          THE COURT: Objection is overruled. Go ahead.

15  Q   Dr. Dunbar, would you tell us briefly what 289 is?

16  A   Yes. 289 is a table that starts at the top with the NERA

17  forecast. And then, taking in order of the steps that are

18  typically used to make a claims forecast I point out how you

19  can build from the NERA forecast up to the Peterson forecast.

20  So, basically this tells you which analytic decisions that you

21  can switch on or off in order to get from our number up to Dr.

22  Peterson's number.

23          THE COURT: So I can assume that your number does not

24  accept any of those steps, one through seven? One through six,

25  I mean.

Dunbar - Direct                          39

1        THE WITNESS:  That's not necessarily a yes/no answer.

2   My preferred number is 2.046, but on Exhibit 294 I point out

3   some adjustments that I think that I believe reasonable people

4   could disagree on, and so you could make those adjustments in

5   order to come up to a higher number.

6        THE COURT:  So, your revised forecast is 3.151?

7        THE WITNESS:  Yes.

8        THE COURT:  Thank you.

9   Q    Did you do a separate reconciliation from your estimate to

10  the estimate of Dr. Francine Rabinovitz?

11  A    No.

12  Q    Why not?

13  A    Basically, except for -- her forecast is very similar to

14  the Peterson forecast.  Among the differences are the -- she

15  doesn't have the surge -- she has a surge adjustment which

16  reduces her forecast from Dr. Peterson's forecast, and so, with

17  that one change she comes very -- with that one change this

18  table can tell you pretty closely what her forecast is, and

19  then she also uses the KPMG curve for estimating her cancers.

20  And so, that -- you can see what the effect of that is on this

21  table.

22        THE COURT:  Well, could I ask you a question about

23  289?

24        THE WITNESS:  Sure.

25        THE COURT:  Do you complain that the Peterson

1 forecast does not take -- does not adjust for dismissal rates,

2 but if the dismissals are counted as zero recoveries, aren't

3 they calculated into the averaging of claims?

4          THE WITNESS:  The answer to that is yes, but that

5 doesn't mean that it zeros out.  And let me -- I can explain

6 that if you want.

7          THE COURT:  If you can, I'd like to hear it.

8          THE WITNESS:  Okay.  In this step, 4.2, we make two

9 changes at once.  One change is that we reduced the dismissal

10 rate to zero, and then the next change is we apply the average

11 of values to -- that includes the zeros in the average values.

12 And those averages that we use are the averages that Dr.

13 Peterson would come up with before -- before adding back

14 punitive values and verdicts, and before adding in an age

15 adjustment.  There is a reason why our dismissal rate analysis

16 produces a different result than a one than if you just

17 averaged in the zeros and assumed -- zero pays and assumed no

18 dismissals.

19          THE COURT:  Well, this says that it has a 16.9

20 percent effect.

21          THE WITNESS:  That's right.  And I was going to get

22 to that reason.  When we estimate the dismissal rate, we

23 estimate a dismissal rate on the non-NSP claims.  And we do

24 that because the non-NSP claims are the ones that were

25 individually evaluated.  The dismissal rate on the NSP claims

1  is very close to zero.  But the dismissal rates on the NSP

2  claims are much higher, over 30 percent, typically.

3          THE COURT:  Wait a minute.  You said it the other way

4  around.

5          MR. MILLER:  I'm sorry.  The non-NSP claims, Dr.

6  Dunbar.

7          THE WITNESS:  I'm sorry.  The dismissal rate on the

8  non-NSP claims are over 30 percent.  So -- and that occurred

9  because there was individual evaluation, and sometimes

10 individual contesting of the non-NSP claims, whereas the

11 compliance effort during the NSP period was pretty much lacking

12 as had been testified before.  So, when we apply a dismissal

13 rate, we're using an average dismissal rate only from a

14 fraction of the claims, that is, the fraction that is non-NSP.

15 We then apply that dismissal rate to all claims, and that

16 includes the filings of the NSP claims, because we're presuming

17 that if there had been individual evaluation of the NSP claims,

18 they too would have had the same dismissal rate.  They too

19 would have had upwards of a 30 percent dismissal rate.  So,

20 those are the -- that is the number of claims that had been

21 filed that would have been compensated had there been the same

22 treatment accorded the NSP claims that had been accorded the

23 non-NSP claims.

24         THE COURT:  But they would have been compensated at

25 zero --

Dunbar - Direct                                    42

1          THE WITNESS:  That's right.

2          THE COURT:  -- if they were dismissed.

3          THE WITNESS:  That's right.  But those zeros are not

4   averaged in.  When you compute -- when Dr. Peterson computes

5   his average values, he doesn't give a zero to those NSP claims

6   that would have been dismissed.  He gives a value to those NSP

7   claims that were actually paid.  And what that means is that

8   the -- the claim --

9          THE COURT:  So --

10          THE WITNESS:  Yes.  sorry.

11          THE COURT:  -- in the NSP they were making payments

12  on claims that should have been dismissed?

13          THE WITNESS:  Yes.  That -- well, that's our

14  approach, yes.

15          THE COURT:  I see.  Thank you.

16  Q    Would you turn to Exhibit 303, Dr. Dunbar, while we're on

17  the subject?  Does this summarize the dismissal rates by

18  disease?

19  A    Yes, it does.

20          THE COURT:  Which exhibit is that?

21          MR. MILLER:  Exhibit 303, Your Honor.  I believe.

22  I'm sorry.  I mis -- no, that's correct.  Yes, Your Honor.

23          THE COURT:  Yes.  That's okay.

24  Q    And --

25          THE COURT:  They're all the same color, however.

Dunbar - Direct                                    43

1        MR. MILLER:  No, they're not, Your Honor.

2   Q    What is the very small blue line there that's barely

3   visible on mesothelioma, Dr. Dunbar?

4   A    That's the dismissal rate for -- for under the NSP

5   agreements for the mesothelioma claims.

6   Q    And where is the little blue line for lung cancer, other

7   cancer, and non-malignant cancer, if any?

8   A    Well, it's -- the fraction is so small that the graphic

9   doesn't really -- isn't refined enough to show it.  But it's

10  zero percent rounded for lung cancer, one-tenth of one percent

11  for other cancer, and one-tenth of one percent for non-

12  malignant claims.

13  Q    I think we've already previewed this a little bit by what

14  you just said, but could you summarize any difference in your

15  analysis of the claims history of the company from the analysis

16  by Dr. Peterson and Dr. Rabinovitz?

17  A    Yes.  In summary, in broad-brush outline, you can look at

18  the claims history in the 90s as having two different time

19  periods.  And I've already categorized those as pre-NSP or non-

20  NSP versus NSP.  In the pre-NSP period, as we have heard, Owens

21  Corning took the view that it would try to apply its defenses

22  to individual claims, by and large.  There were a couple of

23  group settlements, but for the most part they evaluated each

24  claim and if they felt that there was not proof of causation,

25  or if there was inadequate medical proof, then they would try

Dunbar - Direct                                          44

1   to extract a zero pay status for that particular claim.

2        During the NSP period things changed a lot.  They made

3   large group settlements.  These large group settlements were,

4   in Judge Weinstein's words, a highway for claims, and they

5   allowed the plaintiff's bar to settle large inventories of

6   claims which were then not individually evaluated by Owens

7   Corning.  Now, to be fair to Owens Corning, I believe that in

8   the future they felt that there was going to be individual

9   evaluation of the future claims under the NSP, but they hadn't

10  quite got their, according to the testimony here, they hadn't

11  quite got their compliance effort together in evaluating those

12  claims in such years as '99.

13       MR. PODESTA:  Your Honor, I must object to the

14  characterization of other witnesses.

15       THE COURT:  You don't have to.  Pardon?

16       MR. PODESTA:  I said I must object to the

17  characterization of other witnesses' testimony.

18       THE COURT:  I don't know that he did, but the

19  objection is noted.

20  Q    Could you tell us what your allowable claims standard is

21  that you're using?

22  A    The allowable claims standard that was used for this

23  report has a -- basically a medical component, as well as a

24  dismissal rate component.  We presume that when a claim is

25  dismissed it is not an allowable claim, so extrapolate non-

Dunbar - Direct                                    45

1    dismissed claims --

2             THE COURT:  He wants your definition of an allowable

3    claim.

4             THE WITNESS:  Right.  And then, we apply one more

5    screen, which is a medical screen, to the claims.  And if a

6    claim is -- has a force of idle capacity less than 80, then we

7    treat that as a -- as what is called an unimpaired non-

8    malignant, and we don't give that -- in the numbers that I just

9    gave you we don't give that any -- that claim any payment.

10            THE COURT:  You're talking about pulmonary function?

11            THE WITNESS:  Yes.

12   Q    Did you assume that federal or state law would govern this

13   process?

14   A    I assumed that there would be state substantive law and

15   federal procedural law, and that in the -- the Court would use

16   such procedures as have been proven effective in the future to

17   evaluate individual claims that would be submitted.

18   Q    Do you make any specific adjustment for tactical issues

19   that there's been testimony on such as combinations of a few

20   mesothelioma claims with a large number of non-malignant claims

21   for Trial and State Courts?

22   A    No specific adjustments.  Any effects of those impacts are

23   in the average dollars that I use.

24            MR. MILLER:  May I move around a little bit, Your

25   Honor?  I'll try to speak loudly and move quickly.

Dunbar - Direct                                    46

1  Q    This flow chart was used in the opening.  Who designed it?

2           MS. PARVER:  Could you just give us the exhibit

3  numbers?

4           MR. MILLER:  Yes, I'll be happy to do that.  That is

5  Exhibit -- I'll be happy to do that.

6           UNIDENTIFIED ATTORNEY: It is 298.

7           MR. MILLER:  298.  Thank you.

8  Q    It was designed by whom, Dr. Dunbar?

9  A    That was designed by myself and one of my staff members,

10 Paul Hinton.

11          THE COURT:  Who did the artwork?

12          THE WITNESS:  Paul did the original artwork using

13 clip art on a computer.

14 Q    Would you take just less than 30 seconds and tell the

15 Court who were the primary staff members who assisted you on

16 this, and basically what their background is?

17 A    I mentioned Paul.  He has a degree in quantitative science

18 from Oxford, and he's a master of public administration from

19 the Kennedy School, Faten Sabry, who has a Ph.D. in economics

20 from Stanford, and Ron Miller, who has a Ph.D. in economics

21 from Princeton, and taught econometrics at Columbia for seven

22 years -- five years.  I'm sorry.

23 Q    Would you just very quickly go to the first point in the

24 flow chart where there is a major disagreement between your

25 analysis and that of Drs. Peterson or Rabinovitz?

Dunbar - Direct                                    47

1   A    Well, that would be exposed population.

2   Q    And that comes in that very first box?  Is that right?

3   A    Yes.

4   Q    Could we have demo 30A, please?  Do you recall this --

5   well, I don't want to ask you a do you recall question.  I've

6   learned about that, Your Honor.  What is the green line on this

7   chart that was shown by Dr. Peterson in his direct testimony?

8   A    That's the Sear data on mesothelioma deaths for the

9   population, age adjusted, and it includes males and females.

10  Q    And that was used to show that it tracks the red line for

11  Nicholson closer than the blue line for KPMG?  Is that right?

12  A    Yes.

13  Q    Could we have Demo 51, please?  What is that green line?

14  A    That green line is the Sear data, age adjusted, for males

15  only, and that was actually data that was reported in Dr.

16  Peterson's back-up.

17  Q    What statistical conclusions can you draw by comparing the

18  male only line with the KPMG and the Nicholson curves?

19  A    There's a way you can determine whether the green line

20  fits better the blue line, or fits better the red line.  What

21  you assume is that points on the green line, to the extent that

22  they don't really lie, say, on the blue line, that that

23  distance is an error, and so you try to determine what the

24  error is relative to the blue line versus the error relative to

25  the red line.  And the analysis that is performed shows that

Dunbar - Direct                                    48

1   the error relative to the red line is 50 percent greater than

2   relative to the blue line.  So, that means that the green line

3   fits the KPMG curve better than it fits the Nicholson curve.

4           THE COURT:  But for males only?

5           THE WITNESS:  For males only.  Yes, that's correct.

6   Q    Is it your opinion that the males only is a better fit for

7   the Owens Corning population or is the males and females a

8   better fit for the exposed population in the Owens Corning

9   claims history?

10  A    Neither is arguably perfect, but on the basis of

11  Nicholson's own research and on recent research on mesothelioma

12  incidents relative to asbestos exposure, the science would say

13  that it's more appropriate to use the male curve in order to

14  determine what to use for forecasting.

15  Q    Did you use the KPMG or the Nicholson approach?

16  A    We use an approach that is the -- virtually identical to

17  the way KPMG does its analysis.  We have one major difference,

18  though, and that is we made an adjustment to the exposed

19  population to account for the products that Owens Corning made.

20  This particular curve is for the entire exposed population to

21  asbestos, which I believe prior testimony said was around 29

22  million workers.  Whenever we do a forecast we try to tailor

23  the exposed population to the products of the defendant,

24  because many defendants, in fact, almost all defendants make

25  products that don't expose everybody.  They may expose just a

Dunbar - Direct                                    49

1  fraction of the population because they didn't make a product

2  for some -- that affected other workers.

3      In this particular case, Owens Corning did not make

4  friction products.  The primary exposure for automobile

5  mechanics was, in fact, friction products that are used in

6  things like brake linings.  So, we took out of the population

7  the auto mechanics, so our population is somewhat smaller than

8  what is shown there on the KPMG curve, not much smaller, but a

9  little bit smaller.

10      THE COURT:  Did you assume that Owens Cornings'

11  products were not in the workplace where these brake lining

12  people were working?

13      THE WITNESS:  We assumed that the primary exposure of

14  the automobile mechanics was to friction products.  Now, there

15  could be bystander exposure, but that's not going to create

16  really any material error in the forecast, because that type of

17  exposure by mechanics is -- can be the same as any other

18  individual who is also not included in the occupational exposed

19  population.

20  Q    How much difference does it make which curve is used?

21  A    Well, that -- it has a seven percent effect, according to

22  our calculation with regard to mesothelioma alone, and then it

23  has about a 13 percent effect if you substitute -- if you were

24  to substitute all of the KPMG cancer incidents for the

25  incidents that Dr. Peterson used.  And --

Dunbar - Direct                                50

1  Q    All right.

2         MS. PARVER:  Your Honor, I move to strike the

3  testimony of Dr. Dunbar insofar as he said it relates to Dr.

4  Rabinovitz, since as even Dr. Dunbar said a few minutes before

5  he began the testimony, Dr. Rabinovitz uses the KPMG

6  adjustment, not the Nicholson.  And to the extent he's now

7  testifying on the difference between the Nicholson and KPMG, it

8  is not relevant.

9         THE COURT:  Your argument that it should not be

10 persuasive is well founded.

11 Q    Well, let's try to clarify that.  What is the comparison

12 to Dr. Rabinovitz?

13 A    There is none.  I mean, this -- I'm just talking about the

14 comparison to the Peterson forecast.  The --

15        MR. MILLER:  All right.  That may have been my

16 question, Your Honor --

17        THE COURT:  That's what I thought.

18        MR. MILLER:  -- that created the confusion.

19        THE COURT:  I don't recall hearing the word

20 "Rabinovitz," but maybe it just floated in the air.

21        MR. MILLER:  Let's just make sure the record is

22 clear.  This --

23        THE COURT:  He's only talking about Peterson?

24        MR. MILLER:  Yes.

25        THE COURT:  Okay.

Dunbar - Direct                                    51

1    Q    Let's look at Exhibit 289 again, which we've talked about.

2    Could we get 289 on the screen, too, please?  What are steps

3    1.1 and 1.2 in relationship to what you just explained?

4    A    This is a build-up substituting if you were to go from our

5    KPMG style, cancer incidents, to the Nicholson incidents that

6    Dr. Peterson used, and you do that in steps, first

7    mesothelioma, then for all other cancers.  You see that it adds

8    first seven percent and then six percent to the -- if you go --

9            THE COURT:  Where do you see that?

10           THE WITNESS:  Okay.  Step --

11           THE COURT:  Oh, I see.  I see.  1.1?

12           THE WITNESS:  I'm at step one.

13           THE COURT:  1.1.  Okay.

14           THE WITNESS:  Right.

15   Q    What's the next point in the analysis where you had a

16   disagreement between your methodology and Dr. Peterson?

17   A    As has been pointed out before, what Dr. Peterson does is

18   to estimate the non-malignancy claims as a fraction or a ratio

19   to the historic claims that have been made for cancers, and

20   this all cancers, including all other lung and mesothelioma.

21   For the last four years or so, NERA has been using a different

22   approach for its clients, and that approach was to estimate a

23   prevalence model based on the same data that Nicholson used for

24   his analysis, which is the Selikoff insulator data.  And that

25   -- we then estimate a propensity to claim on the basis of that

Dunbar - Direct                                           52

1   dose response model applied to the population that gives us

2   non-malignancy prevalence.  That propensity to sue is then

3   going to be extrapolated forward.  So, if instead we did not

4   use that particular model, but used the approach of Dr.

5   Peterson, which is to ratio the historic non-malignancy claims

6   to the historic cancer claims, that would add about one percent

7   to our forecast.

8   Q    Did you agree with the conclusion of Dr. Welsh that the

9   Selikoff data were not sufficient to develop a dose response

10  curve for non-malignant conditions caused by asbestos?

11  A    No.  Statistically that's --

12              MR. FINCH:  Objection.  Objection.  Lack of

13  foundation.  This man is not a medical expert, Your Honor.

14              THE COURT:  I know.  He's giving us his economic

15  viewpoint.

16              THE WITNESS:  Actually, I'm giving my statistical

17  viewpoint, Your Honor, with all --

18              THE COURT:  Well, economists and statisticians are

19  practically the same thing.

20              THE WITNESS:  Good for you.

21  Q    All right.  Briefly, Dr. Dunbar, why --

22              THE COURT:  I don't think he finished his answer.

23  Did you?

24              THE WITNESS:  No.

25              MR. MILLER:  Oh.

Dunbar - Direct                                    53

1  Q     Well, why?

2  A     Her point was that the average for the -- the average dose

3  for the Selikoff data is higher than it is for the exposed

4  population going forward.   Though her numbers were wrong

5  qualitatively she was right.   The average dose for the Selikoff

6  sample was -- is higher than for those people who were likely

7  to make a claim in the future.   But the average dose of those

8  who were likely to make a claim within the future was within

9  the sample that -- of the Selikoff data.   In other words, the

10 Selikoff data included enough people with the low doses, like

11 those who were going to be making claims in the future, to be

12 able to estimate a model.   So, we are not forecasting out of

13 sample.   We have a within sample forecast.   And for that reason

14 it is a valid approach.

15 Q     Did you validate the model on other data?

16 A     Yes, we did.

17 Q     Very briefly, how?

18 A     We validated the model on the Tulane study of progression

19 of asbestosis.

20 Q     How much difference would this make in comparison, the

21 latency issue with the Vasquez analysis?

22 A     It makes a somewhat bigger difference, which I can

23 explain.   That's on the next page, on Exhibit 290.   That's a

24 chart of reconciliation that is structured similarly to the

25 Peterson chart.   As you see, we build from our 2.046 billion up

Dunbar - Direct                                                              54

1   to the 4.624 billion, which is the Vasquez method to forecast.

2   Vasquez does one thing different from Peterson, and that is he

3   makes his non-mal forecast as a ratio to lung cancer claims

4   only, whereas Dr. Peterson uses a ratio to all cancer claims.

5   One other difference between Dr. Vasquez and Dr. Peterson, as I

6   mentioned, Dr. Vasquez actually developed the KPMG cancer

7   incidents.  His lung cancer incidents has one major difference

8   from the Nicholson incidents that Dr. Peterson used, and that

9   is the KPMG incidents is deaths of all people who were exposed

10  to asbestos, whereas the Nicholson incidents is only the

11  increase in cancer deaths that was caused by asbestos exposure.

12  So, like, if you have a population of 100 workers and we say

13  that maybe 20 of those workers are going to die of lung cancer,

14  even if they wouldn't have been exposed, but then maybe 30 die

15  because they were exposed, the Vasquez number for incidents is

16  30, whereas the Nicholson and Dr. Peterson incidents is ten.

17  So, there's a slightly different shape of the curve.  And in

18  fact, the Vasquez curve falls off more slowly in the future

19  than does the Nicholson incidents.  And for that reason there's

20  actually a bigger impact by switching to the Vasquez method for

21  estimating non-malignants.  You will have more non-malignants

22  in the future, everything else the same, using the Vasquez

23  method.

24  Q    Would you turn back to Exhibit 294, which is --

25          THE COURT:  I'm sorry, but we're going to have to

55

1  take a recess for lunch.

2          MR. MILLER:  All right.

3          THE COURT:  Recess until -- we'll try to get back at

4  1:45.  Okay?

5                      (Recess)

6                  * * * * *

7

## C E R T I F I C A T I O N

I, TAMMY DeRISI, court approved transcriber, certify

that the foregoing is a correct transcript from the official

electronic sound recording of the proceedings in the above-

entitled matter.

*Tammy De Risi*          Date:  January 20, 2005

TAMMY DeRISI

DIANA DOMAN TRANSCRIBING