Peterson - Direct - Inselbuch

1  filing. And among the nonmalignant claims, I calculated an

2  annualized rate of 54,361 claims filed against Turner & Newall

3  in 2001 and in only two years, 2006 and 2007, do the

4  nonmalignant claims exceed that.  So this is not an aggressive

5  forecast.

6  Q.  Having forecast the number of claims, how did you go

7  about forecasting the value or the obligation to pay those

8  claims that Turner & Newall would have?

9  A.  Well, we used the same values that I used to estimate the

10  pending claim. I've estimated that the values that I forecast

11  that Turner & Newall would have paid in 2002, I forecast no

12  further increase in the values, the settlement values for

13  Turner & Newall after 2002 beyond the increase that I

14  presented earlier and used for the pending claims. I do

15  forecast that those payments will increase with monetary

16  inflation, which I've estimated at two and-a-half percent, but

17  the real value of those claims would be the same in 2010/2030

18  as they are in 2002. I've also -- and Slide 41 just notes this

19  assumption at two and-a-half percent interest rate.

20        I also assumed that future settlements would occur

21  two years after -- the case would be settled two years after

22  filing. And so when I discount -- so I essentially apply

23  inflation to two years past the year it's filed and I assumed

24  that's when the claim would be paid. I then present value

25  those claims back to the year 2001 using a 5.02 percent

*United States District Court*
*Camden, New Jersey*

———Peterson - Direct - Inselbuch———

1   discount rate, which is a risk free rate of return that was

2   provided to me by Tersigni and Associates, which is the

3   financial advisors to the Asbestos Claimants Committee.

4   Q.   Where did you get the 2.5 percent increase for inflation?

5   A.   It really has two sources. One, it's a number that's been

6   used by the Congressional Budget Office, although their most

7   recent forecast is about 2.1 or 2.2, but I've also looked at

8   what's been the recent inflation over the last ten, 15 years

9   and 2.5 is a better approximation of that.

10  Q.   If we turn back to Slide 24, you said you used the same

11  settlement and resolution values for the future claims as for

12  the present pending claims subject to inflation and

13  discounting. Are these the values at Slide 24 that you used?

14  A.   Yes, they are.

15  Q.   Using those slides, those values and your projections of

16  future claims that would be filed and the assumption you made

17  about timing, did you then forecast the indemnity for future

18  claims that would arise after October 1st for Turner & Newall?

19  A.   Well, we forecast that indemnity year by year, and for

20  the claims rising in each year and then summed it across all

21  those years. When we simply summed it across the years with

22  this two and-a-half percent inflation rate, the totals for

23  each disease summed across all years, these are the nominal

24  values, are shown on Slide 42.  So that the future payment for

25  mesothelioma claims for the increasing model would be

Peterson - Direct - Inselbuch

1   $9 billion, for nonmalignant claims it would also be

2   $9 billion, a total of just under 19 -- just under 20 billion

3   dollars.  For no increasing value, the total is $13.6 billion.

4   That's the nominal, that's what I would expect they would pay,

5   actually have to pay in each year, have they the assets to pay

6   the claims.

7   Q.   Now to get their total indemnity in nominal dollars at

8   all you have to then add the future indemnity to the present

9   indemnity?

10  A.   Yes.  This Slide 42 is only for the indemnity for future

11  claims, that's correct, so I need to add pending to get the

12  total, and that's shown on Slide 43.

13  Q.   And that shows the nominal values for both the increase

14  and the not increasing projections that you have made?

15  A.   Right.

16  Q.   Did you then calculate the present value of the future

17  indemnity?

18  A.   Actually, we calculated the present value for both the

19  future and the pending claims, because again we assumed that

20  the pending claims would be paid on average two years in the

21  future, so there was a slight discount of those, and that's

22  shown on Slide 44, where the present value of the future

23  claims is $1.35 billion, the nominal value is 1.455, as shown

24  on page 14.  So there is a slight reduction in the values of

25  pending claims for present valuation but it makes a large

─────Peterson - Direct - Inselbuch─────

1    affect upon future claims because.

2         THE COURT:  You said page 14?

3         THE WITNESS: I'm sorry, page 44, I beg your pardon.

4    BY THE WITNESS:

5    A.    And so here you'll notice, the Court will notice that the

6    present values of the pending claims are, of course, the same

7    for both models, the difference only is with regard to futures

8    with the total present value of liability for Turner & Newall,

9    assuming the increasing model is 11, a little over

10   $11 billion, the total present value for the no increasing

11   model is a little over 8.2 billion.

12   Q.    Did you prepare a graphic to show how the claims for

13   these various diseases are distributed?

14   A.    Yes. I prepared two of them, one for each model. Slide 45

15   shows -- it's essentially it's a pie chart that shows among

16   all of the liability across the various diseases what portion

17   will be for mesothelioma and each of the other diseases, and,

18   as we see, that there is a pretty similar amount of liability

19   for mesothelioma and nonmalignant claims. With cancers, more

20   than half of the liability would be owed to cancer victims not

21   to nonmalignant victims.

22         And that pattern is also similar on Slide 46, which

23   is a similar chart done for the no increase model where,

24   again, the mesothelioma/nonmalignant claimants would receive

25   about the same fraction of payments and the cancers together

Peterson - Direct - Inselbuch

1    would represent about 55 percent of the total claimants.

2    Q.   On summary then Slide 44 presents your estimation, either

3    under your increasing model or under your nonincreasing model,

4    of what you believe the pending and future liabilities for

5    U.S. claims for personal injury and death as a result of

6    asbestos exposure against T&N would be?

7    A.   That's correct.

8    Q.   Dr. Peterson, you testified in an estimation hearing in

9    Owens Corning, did you not?

10   A.   Yes, I did.

11   Q.   And that estimation hearing was before Judge Fullam in

12   Philadelphia, was it not?

13   A.   Yes.

14   Q.   And Judge Fullam, after hearing all of the evidence,

15   rendered an opinion, did he not?

16   A.   Yes.

17   Q.   Have you read that?

18   A.   Yes.

19   Q.   Do you recall that in that opinion he criticized your use

20   of an increasing propensity to sue?

21   A.   Yes, he did not accept that.

22   Q.   And do you recall what his reasons were for rejecting

23   that?

24   A.   He explained that he did that based upon.

25            MR. STROCHAK:   Objection, your Honor, Dr. Peterson is

Peterson - Direct - Inselbuch

1    going to explain to us Judge Fullum's reasoning?  I mean, his

2    reasoning --

3              MR. INSELBUCH: Or I'll read it.

4              MR. STROCHAK: -- in his opinion?  I think the opinion

5    would be the appropriate place to go.

6              MR. INSELBUCH: I think that's perfectly fair.

7    Let me read to the Court from Judge Fullum's opinion. This is

8    at page ten of his memorandum and order dated March 31st,

9    2005.

10             MR. STROCHAK:  Your Honor, it strikes me this would

11    be more appropriate for closing arguments, obviously at the

12    Court's discretion, but it sounds like argument to me.

13             MR. INSELBUCH: This is not argument, your Honor, I'm

14    going to ask Dr. Peterson to comment on Judge Fullum's

15    conclusions as to whether they have relevance in this

16    proceeding based on the facts here.

17             THE COURT:  I think that's an appropriate question.

18             MR. STROCHAK:  Thank you, your Honor.

19             THE COURT:  To the extent that it clarifies his

20    testimony here today in contrast to what would appear to be a

21    criticism by a judge in another opinion, I think it's

22    appropriate for him to respond.

23             MR. INSELBUCH: Thank you.

24    BY MR. INSELBUCH:

25    Q.   This is at page ten of Judge Fullum's memorandum and

*United States District Court*
*Camden, New Jersey*

526

Peterson - Direct - Inselbuch

1   order dated March 31, 2005.  Referring to Dr. Peterson. His

2   prediction that the number of claims will continue to increase

3   sharply for the next five years is based primarily upon the

4   upsurge in filings as a result of the NSP, an upsurge which

5   everyone else agrees was a temporary aberration, and in my

6   opinion, Dr. Peterson has failed adequately to take into

7   account the changes in the asbestos litigation landscape which

8   have already occurred and which will likely continue.

9        Now, first on the subject of the increasing

10  propensity to sue. First, do you agree with Judge Fullum's

11  conclusion?

12  A.   With all due respect, I don't. There are other reasons

13  why the claims increased against National Gypsum in recent

14  years.

15  Q.   You said National Gypsum.

16  A.   Excuse me, Owens Corning.  And I don't believe that the

17  data that were presented to him were sufficient to examine

18  that issue and were distorted, but he did not have the

19  opportunity to know that because other witnesses that

20  presented this issue testified after me and I didn't have a

21  chance to respond to errors in their presentation, but I

22  disagree with his conclusion.

23  Q.   But apart from whether you agree with him or disagree

24  with him, his reason is stated that your conclusion or

25  estimate or preference for an increase was based primarily

Peterson - Direct - Inselbuch

1  upon the upsurge in filings as a result of the NSP, an upsurge

2  which everyone else agrees was a temporary aberration. Does

3  that set of fact, irrespective of whether Judge Fullam was

4  right or you're right, does that set of facts exist in this

5  case?

6  A.   No.

7  Q.   And why is that?

8  A.   I need to describe a bit what the NSP was and, indeed,

9  Mr. Hanly described the Owens Corning -- described both --

10  mentioned both the NSP and described it, and also described

11  Owens Corning's prior litigation strategy. The NSP is a

12  program that was similar to, to some degree, to the SSP

13  program that the Center for Claims Resolution had adopted

14  after the Georgine class action was overturned. There were

15  attempts to have large scale settlements with law firms for a

16  predetermined negotiated amounts for each claim based on

17  criteria that both sides agreed.  That's similar.

18       What's different about it is that prior to this point

19  in time, to the NSP, Owens Corning had been an aggressive

20  litigator, had been the most aggressive litigator and

21  defendant.  And it tried, and again Mr. Hanly discussed this

22  in his testimony, but it's widely known. And looking at their

23  data it also shows they received many adverse verdicts in 1995

24  and 1996.  It turned out to be a costly process that was

25  counter-effective for them.

*United States District Court*
*Camden, New Jersey*

Peterson - Direct - Inselbuch

1       But what the argument was that the NSP had an impact

2   is that other experts asserted that when the NSP program was

3   adopted that claimants who had not filed previously against

4   NSP now came in and filed in the late nineteen nineties to

5   take advantage of the NSP programs, and they referred to some

6   data they got from the Manville Trust that they argued

7   supported it. I take an issue with regard to what their data

8   is and how they used it, but I needn't get into that here.

9       But assuming that these data were correct and that

10  there is evidence that people who had not filed an early years

11  now filed in the late nineties to participate in the program

12  and that that produced the increases in claims for Owens

13  Corning, if that happened, it would have happened because in

14  the mid nineteen nineties claimants were facing an Owens

15  Corning that was a very aggressive litigator, and there were

16  claimants who did not want -- who had marginal claims and did

17  not want to face a litigation environment and policy where

18  Owens Corning essentially wouldn't pay claims unless they

19  litigated them, whereas, under the NSP it became a friendly

20  environment.  And that's the argument, the NSP became a

21  friendlier environment and made it easier for claimants.

22      So this argument about NSP essentially grows out of a

23  change in the strategy and tactics that Owens Corning used, a

24  tactic that discourage claim filings in earlier years and the

25  people who proposed this argument state encouraged claim

—————————Peterson - Direct - Inselbuch—————————

1    filings in late years.  So that produced distortions in timing

2    and claims that otherwise would have been filed in earlier

3    years were filed later and produced an artificial trend.

4         I don't believe that's true.  That's not consistent

5    with the claims patterns against other defendants who didn't

6    have an NSP, which were similar to what Owens Corning was

7    experiencing.  And companies that didn't have that NSP

8    environment, that change of strategies, also saw these kind of

9    increases.  And a the data, frankly if they had presented the

10   complete data, wouldn't have supported their argument. But,

11   that's the arguments and that's what Judge Fullam was

12   referring to.

13        Here, Turner & Newall and CCR never had an aggressive

14   litigation strategy, they always had, as Mr. Hanly testified,

15   a policy of trying to settle claims. And indeed, they settled

16   many claims prior to the settlement, <u>Georgine</u> settlement class

17   action being filed in 1993. During that period of time, there

18   were relatively few claims but we know when they were filed

19   against other defendants, so there wasn't this change in

20   regimen and strategy that would cause claimants to first

21   withhold claims from earlier years and file them later.

22   Because the policy also and strategies at CCR were continuous

23   and constant, so you don't have a tactical change that could

24   have led to some of the increases in the Owens Corning case.

25   And that's, that's essentially what the NSP argument was and

Peterson - Direct - Inselbuch

1  it just simply doesn't apply here.

2  Q.  In Owens Corning, in that hearing, did you also, as you

3  are here, present a nonincreasing model?

4  A.  Yes, I did.

5  Q.  And how did that model and its estimate compare with the

6  estimates that Judge Fullam credited?

7  A.  Judge Fullam credited the essentially two alternative

8  forecasts, one by Dr. Rabinovitz and one by Dr. Vaquez and

9  they found -- one was higher, one was lower than the

10  $7 billion that he ultimately estimated would be Owens

11  Corning's liability. Dr. Rabinovitz's forecast was

12  $8.1 billion and she assumed no increase in propensity to sue.

13  My no increase model is 8.4 billion dollars.  So essentially

14  my forecast was effectively almost identical to that one, and

15  I presented that to the Court, I just -- and frankly, I would

16  have been perfectly comfortable with the Court accepting that

17  forecast, although I don't think it was as good, either there

18  or here, as the increasing model, but -- he did not accept my

19  increasing propensity to sue model, but he didn't reject my

20  alternative no increasing model, which is indeed consistent

21  with both of those he accepted.

22  Q.  He went on to say, as read before, in my opinion Dr.

23  Peterson has failed adequately to take into account the

24  changes in the asbestos litigation landscape which have

25  already occurred and which will likely continue. And earlier

Peterson - Direct - Inselbuch

1   in his opinion beginning at page six, he lists a number of

2   factors occurring in the tort system which he questions

3   whether they would continue in the future. And I would like to

4   name these factors for you and ask you whether or not, in

5   fact, in this case you considered these events or these

6   factors and whether they apply to Federal-Mogul and how you

7   employed these issues in doing your estimation.

8          There were seven factors that he listed. The first

9   was so-called venue shopping. Are you familiar with the term?

10  A.   Yes.

11  Q.   Did you consider the concept of venue shopping in

12  Federal-Mogul and as it might or might not have affected the

13  values of claims against Turner & Newall and whether, if there

14  were to be a decline in the ability to do venue shopping,

15  whether that would have made any difference in your forecast?

16  A.   I did consider it. I don't -- it was not an issue that

17  was a significant for Turner & Newall as it might have been

18  for Owens Corning, and with the exception of one jurisdiction

19  it probably wasn't terribly important to Owens Corning.

20         Judge Fullam specifically identified three

21  jurisdictions, the State of Mississippi, the State of Texas,

22  and Southern Illinois being places where there had been --

23  there have been changes in the ability of plaintiffs who are

24  not residents or didn't work in those jurisdictions to file.

25  There have been changes in the venue rules of those three.

*United States District Court*
*Camden, New Jersey*

—————Peterson - Direct - Inselbuch—————

1          The change in Texas occurred five or six years ago,

2   it was about 1996 I believe, and so whatever impact that had

3   has already been reflected in the data for Owens Corning,

4   frankly, and also for Turner & Newall.  But I've looked at

5   that issue and the primary effect of the Texas venue statute

6   was to make it more difficult for claimants who did not --

7   probably impossible for claimants who did not either reside in

8   Texas or were not exposed in Texas to file lawsuits there. And

9   so it did move some claims.

10          Well, in talking with plaintiffs and defendants, what

11   we've seen is that claims that were otherwise filed in Texas

12   tend to be filed now in other states. It was -- the venue was

13   in part used to deal with problems of statutes of limitations

14   among Alabama and Georgia claims.  So the claims, it didn't

15   eliminate claims, it moved them.

16          The second impact that it had --

17          MR. STROCHAK:  Your Honor, excuse me. I hate to

18   interrupt.  But again, this analysis is not contained in Dr.

19   Peterson's reports.  It strikes me that it's really more

20   appropriate for redirect examination, if I choose to cross-

21   examine him about it.  There is no analysis in his reports of

22   venue issues or anything else.

23          MR. INSELBUCH: Your Honor, an expert provides a

24   report stating his opinions and the reasons for those

25   opinions. In his testimony, he can answer questions.  He

─── Peterson - Direct - Inselbuch ───

1    certainly couldn't put in his report everything he thought

2    about in connection with formulating his opinion. It seems to

3    me fair to let the expert respond to questions that fairly

4    would support or would argue against the adequacy of his

5    opinion and the adequacy of his thinking process.

6         THE COURT:  Why don't we handle it this way. Let's

7    permit the questioning to take place, as long as it's

8    appropriate, and I think it is.  If someone states a

9    proposition that in direct that proposition be questioned,

10   even by direct examination, to see if it continues to support

11   the conclusion, which is important in the report, if the

12   conclusion isn't changed or affected, the justification for

13   the conclusion can be explored during the direct examination.

14        Now, whether or not it's anticipating a rebuttal, I

15   take the position in a non-jury case that rather than trying

16   to fragment whether that's direct, that's rebuttal, it will

17   come out on cross, if it's appropriate to be explored, let's

18   explore it at one time so that when we finish with the witness

19   and he leaves here, we don't have to worry about coming back

20   for a degree of rebuttal that can be anticipated, if in fact

21   it's now already a matter of record what that challenge is.

22   We'll let counsel explore it while he's on the stand.

23        So, we'll continue win the examination.  And to the

24   extent that the questions are directed to help support a

25   conclusion that's already contained in reports that you have,

Peterson - Direct - Inselbuch

1    I'll permit that series of questions.

2        MR. STROCHAK:  Thank you, your Honor.

3        THE COURT:  It's different if he's shifting

4    conclusions which you are not prepared to meet, but the

5    conclusion isn't changing, it's just additional support for

6    it. See the difference?

7        MR. STROCHAK:  I understand, your Honor.  I

8    respectfully disagree, but....

9        THE COURT:  Well, it's non-jury and I think we should

10   have as complete a record as we can.

11       MR. STROCHAK:  I understand.  My point is to the

12   extend he's testifying about an analysis he did on the affect

13   of a venue rules, it's very difficult for me to cross-examine

14   it having just hearing this announced for the first time, that

15   was my objection, your Honor.

16       THE COURT: Well the other way of handling it is to

17   say if it's not brought out this way, would you never have had

18   an intention to explore his conclusion by asking him about

19   those elements that were raised in Judge Fullum's report?

20   But, would you have directed to any of those conclusions in an

21   effort to weaken the opinion here?  If you don't feel that

22   they're relevant here, then you don't have to explore them,

23   but if it's a potential you are going to raise them, then we

24   might as well meet them.

25       MR. STROCHAK:  Thank you, your Honor.

Peterson - Direct - Inselbuch

1           MR. INSELBUCH: Judge Fullum's decision was

2    March 31st, the property damage lawyers had an opportunity to

3    take Dr. Peterson's testimony thereafter.  And they may or may

4    not have chosen not to ask these questions at deposition.

5    They may ask them here.

6           THE COURT:  All right.

7    BY MR. INSELBUCH:

8    Q.   Had you finished your discussion of venue shopping?

9    A.   No, unfortunately I had a couple more comments on it.

10          With regard to Texas, there was one other effect and

11   it was a perverse effect of the statute. Dr. Rabinovitz, who I

12   mentioned, in the Owens Corning case has done studies of what

13   the effects of statutes generally in this area and finds that

14   often they have effects that are unanticipated and contrary to

15   the persons who sponsor it.  And this is one case of that

16   because the Texas lawyers who were no longer representing --

17   I've learned this by again talking to plaintiffs' lawyers and

18   defense lawyers -- the Texas lawyers who now had fewer cases

19   from out-of-state come in to represent, began to go to other

20   parts of Texas where they had not very aggressively sought to

21   represent claims.  So they ended up bringing more claims into

22   the litigation and getting higher values because these were

23   now Texas victims in Texas. So the net effect of the Texas

24   statute with regard to venue is, one, it probably didn't have

25   much impact because cases that were in Texas got transferred

Peterson - Direct - Inselbuch

1    elsewhere. They may have gotten slightly lower values in other

2    states, it's hard to tell. The other impact is that it

3    increased the pressures within Texas by having more Texas

4    claimants in venues and jurisdictions that were more

5    threatened, and so probably it was either a wash or actually

6    increased the liability.

7         I did consider this issue.  The Texas venue statute

8    is something I've known about, thought about, considered in

9    all of my forecasts since we've had a chance to look at it's

10   affect.

11        The other two jurisdictions were Mississippi.

12   Mr. Hanly testified -- and Mississippi was not a significant

13   jurisdiction for Turner & Newall, as Mr. Hanly testified,

14   frequently Turner & Newall was able to get summary judgment to

15   dismiss Mississippi cases, he testified to that effect,

16   because the plaintiffs there weren't able to identify Turner &

17   Newall. Even when they settled claims in Mississippi, they

18   didn't do so for very large values. As I testified previously,

19   of the 14,000 nonmalignant claims that Turner & Newall settled

20   in 2001, 12,000 of them were from Mississippi for an average

21   value of $300. If some of those cases had venues -- were in

22   Mississippi because of venue provisions that are no longer

23   applicable, it didn't have much impact.  And indeed, those

24   cases could have been filed in their home jurisdiction and it

25   very well would likely have gotten more than the $300 average

1    they got in Mississippi, so Mississippi wasn't significant.

2         The other jurisdiction is Southern Illinois, it was a

3    euphemism for Madison County, a particular county in Illinois

4    that's infamous in asbestos litigation because of the large

5    size of the verdicts there. It's a significant jurisdiction

6    and venue issues there are significant as long as a defendant

7    is very actively participating in litigation.

8         But that wasn't Turner & Newall.  Turner & Newall to

9    my knowledge hadn't tried a case in Madison County, it was not

10   a litigating defendant.  Even in the future I think it will

11   not be a particular litigating defendant.  In my estimates of

12   the future liabilities against Turner & Newall, I did not make

13   any assumption that those payments would go up because they

14   were now going to be exposed to judgments in Madison County

15   that they hadn't been before. So, the summary of that is that

16   I did consider venue issues, I considered the specific issues

17   and jurisdictions that Judge Fullam mentioned and they might

18   -- they would have marginal effects at most.

19   Q.   The second factor that Judge Fullam listed again at page

20   six was mass screenings. Did you consider the fact of mass

21   screenings and apparently the thought that mass screenings

22   would be reduced in connection with your forecast for

23   Federal-Mogul's liabilities?

24   A.   I did. I have -- it's an issue that I think there is some

25   uncertainty about, what would be the entrepreneurial activity

—Peterson - Direct - Inselbuch—

1   of plaintiffs' lawyers using those methods.  I've talked to

2   some plaintiffs' lawyers who think there may a reduction in

3   that, some who think that this will continue. Judge Fullam

4   stated that he -- although he was critical of mass screenings,

5   I think his point here was that he thought they would become

6   economically unattractive to plaintiffs' lawyers to conduct in

7   the future because the assets available to pay claims were

8   declining.

9        I think that's probably not the case because with the

10  confirmation of all the pending bankruptcies setting up trust

11  distribution procedures, as well as the continuing litigation,

12  there still would be substantial amounts of money paid in

13  aggregate across all defendants to even unimpaired

14  nonmalignant claimants. It's probably less than it would be

15  before, so it may reduce the incentives some and so there

16  probably will be some law firms that no longer find it cost

17  effective to do the activities necessary to review claims.  On

18  the other hand, there are other law firms, there are always

19  bottom-feeding law firms, if they can assemble ten thousand

20  claims and receive $50,000 on average across all those claims,

21  or even $20,000 a claim on the average, which is something

22  that could be obtained with these trusts, that's a significant

23  amount of money, income to the law firm. So, it may be that on

24  a going-forward basis we will see some reduction in this kind

25  of entrepreneurial activity, but I would -- that's speculative

Peterson - Direct - Inselbuch

1    I think and uncertain and I've considered it in its -- you

2    know, it's one argument for concluding that perhaps the --

3    well, in fact, I've taken it into account because my forecasts

4    of the number of future nonmalignant claims under my

5    increasing model are essentially less than what they received

6    in the past, so I think it's probably reflected in the

7    calculations that I do, but it's an argument that I think has

8    some weight.

9    Q.    The third topic or factor that Judge Fullam listed was

10   erroneous x-ray interpretations by suspect B readers. What, if

11   any, consideration did you give to that and the potential for

12   the distinction of so-called erroneous x-ray interpretations

13   or the continuing of those readings?

14   A.    A couple. I mean, I looked at that issue extensively in

15   Owens Corning but did not have the opportunity to testify

16   about it. I really have three things to say about that. Four

17   things to say about that.

18          One is despite raising this concern, Judge Fullam

19   went on to say that B readers have an opportunity to get to a

20   jury, so even though he may have been offended by them he

21   recognized that these -- this may not have had a terribly

22   great effect because those B readers can still get before

23   juries and testify.

24          The other response is that the -- I looked at the

25   particular doctors who -- about when concerns were raised in

—————Peterson - Direct - Inselbuch—————

1   regard to B readers, I looked at that in Owens Corning, I've

2   looked at it in Manville, I looked at it in the Center for

3   Claims Resolution, and the doctors that are concerned tended

4   to have filed claims in the mid nineteen nineties and they've

5   been filing relatively fewer claims, some not at all now

6   recently.  So, there is a reduction, those particular

7   individuals are less a feature of the litigation in recent

8   years. They've already been weeded out, they've already been

9   weeded out to some degree, and that's reflected in the recent

10  data of claims filings against Turner & Newall.

11          The other comment is that the as Mr. Hanly said, the

12  defendants know who those doctors are, and they know, if there

13  is a doctor upon whom they don't place much credence, they

14  will pay less money to a claim that has this documented by a B

15  read from one of these doctors. So, the system itself reflects

16  the knowledge of plaintiffs' and defense lawyers.  There are

17  no secrets in asbestos litigation, it's so big and people are

18  so experienced in it that the defendants know this and take

19  this into account.  That's one of the reasons why these

20  doctors are used less frequently now because a plaintiff's

21  lawyer getting a new case in is not going to send someone for

22  a B read to one of these suspect doctors because he won't get

23  as much money as if he gets a B read in a doctor who has more

24  credibility and will provide the opportunity of getting a

25  larger settlement.

───────── Peterson - Direct - Inselbuch ─────────

1      The last point is that it follows up on what is

2   related to what Judge Fullam said, it's that with regard to

3   trial presentation, which is what would be considered here,

4   plaintiffs' lawyers can always use a different B reader at

5   trial. They submit a file, they submit a claim to Owens

6   Corning, if they go to trial, and often some of them already

7   have had the x-rays read by different B readers in order to

8   have a stronger case, either at trial or because the Manville

9   Trust for example won't accept x-rays from Dr. Herron, one of

10  the doctors listed, and I think there is one or two others.

11  I'm a trustee of the Fuller Austin Trust.  At my urging, the

12  Fuller Austin Trust also refuses to accept medical reports

13  from Dr. Herron.  And CCR itself wouldn't accept in some of

14  its SSP agreements would not accept medical records supplied

15  by Dr. Herron.  So a lot of that is being weeded out.  And if

16  it's a decent claim, the plaintiffs' lawyers can go to another

17  doctor.

18      So for all those reasons, I think it's a problem,

19  it's a problem that bothers me as a trustee, it's a problem

20  that bothers me as an expert in this litigation.  I agree with

21  Judge Fullam that the litigation system isn't perfect, that

22  there are things that he doesn't like about it, things that I

23  don't like about it, but I'm forecasting how the system

24  operates, not how I think it should operate.

25  Q.   The next factor listed by Judge Fullam was overpayment to



Peterson - Direct - Inselbuch

1    "unimpaired" claimants.

2    A.    I think that's related to this B read issue. As long as

3    you can get to a jury with cases that may be questionable,

4    they present a litigation threat, so, you know, I don't --

5    overpayment is a difficult concept for me.   There is a market

6    for these claims and the defendants are sophisticated with

7    regard to the strength of evidence that is submitted and they

8    pay less to weaker claims, so I think that's reflected in

9    there.   I don't think that's an issue that can be addressed in

10   a forecast, either here or there, and I think in the end his

11   supplemental opinion tended to suggest that, his opinion for

12   reconsideration.

13   Q.    The next factor he listed were group lawsuits. What, if

14   any, role did group lawsuits play in your forecasting of

15   Turner & Newall's U. S. liabilities?

16   A.    Well, group lawsuits themselves don't have much

17   significance, it's really their relationship to global

18   settlements, which is another problem, and maybe I can address

19   them both and save some time.

20        The argument is that plaintiffs' law firms file on

21   one complaint a wide range of claims, mesothelioma claims and

22   unimpaired nonmalignant claims, and that then the defendant is

23   forced to settle or enters into settlements in which it

24   settles both nonmalignant and mesothelioma claims. The filing

25   of the complaint itself doesn't mean they'll be tried together

—Peterson - Direct - Inselbuch—

1   or they have to be settled together, it's a convenience and

2   efficiency with regard to being able to file.  It reduces the

3   operating cost of law firms a bit, that's about it's only

4   impact, but it's the grouping of claims for resolution at

5   trial that have an impact.

6           There, the lawyers representing Owens Corning as well

7   as Mr. Hanly in this case, thought that in both instances that

8   the group settlements, putting cases together, was

9   advantageous for defendants. Mr. Hanly testified to that here,

10  the lawyers who represent Owens Corning testified to that

11  there. It's advantageous to them because by putting a bunch of

12  cases together, they can settle the mesothelioma claims more

13  cheaply and they can settle the bulk of these claims, a group

14  of these claims more cheaply than if they had settled them

15  individually. They may pay somewhat more in settlements to the

16  nonmalignant claims, the unimpaired claims, but they get a

17  savings off of what the lung cancer or mesothelioma claims do.

18          I actually discussed this issue in one of my Rand, in

19  my Rand reports, and I called it the concept of borrowing

20  value, that weaker claims tend to borrow settlement dollars

21  from the stronger claims. And that's one of the consequences.

22  It may be offensive from my standpoint as to the equities of

23  it, who should get the most money, but from a standpoint of a

24  defendant, it is actually advantageous, as the lawyers say.

25          One other comment about that is that the State of New

—————Peterson - Direct - Inselbuch—————

1   York was -- or the City of New York, the judge that has the

2   asbestos litigation in the City of New York was concerned

3   about this and so she prevented the grouping of nonmalignant

4   claims and meso claims being filed together. And as a result

5   of it, the trial schedule in New York now is nothing but

6   mesothelioma claims.  And as the lawyers who represented Owens

7   Corning said, that's the worst thing that could have happened

8   because they're getting trial after trial after trial of the

9   worst cases.  They would much rather have trials and

10  settlements of a group of claims rather than just facing the

11  worst cases for them. So, again, there is a perverse effect of

12  some of these.

13          And so I think that the -- the final comment I'd say

14  is that Mr. Hanly testified that in the future Turner & Newall

15  would have continued to make group settlements, and I

16  testified to that in my deposition in this case, because it's

17  the only way to resolve these claims.  You've got to resolve

18  groups of claims, there are too many to do otherwise.  And as

19  Mr. Hanly says, it was advantageous to Turner & Newall to

20  continue to settle them in that manner, it reduced it's

21  overall liability. So, that happened in the past I think it

22  would happen in the future.  I don't think it's a reason to

23  expect any change in the liability either in Owens Corning or

24  here.

25  Q.  The final factor that Judge Fullam listed was punitive

—————Peterson - Direct - Inselbuch—————

1    damages. Do you have a view, did you consider punitive damages

2    in your estimation of Turner & Newall's U. S. asbestos

3    liabilities and how, if at all, did you apply that factor in

4    your work?

5    A.    Well, punitive damages really weren't an issue for Turner

6    & Newall because it wasn't a litigating defendant. The only --

7    the Hanly firm and several members of his law firm with whom

8    I've discussed it could identify only one punitive damage

9    award entered against Turner & Newall despite it's -- I mean,

10   that shows how valuable the CCR was in protecting it, its had

11   a terrible corporate history and it only had one punitive

12   damage award, and that award was entered or verdict was

13   entered in March, Mr. Hanly testified, of 2001 and was

14   appealed. The judgment was bonded and was subsequently settled

15   in 2004, I believe he testified, after the database, but I --

16   I haven't used and all parties in this case hadn't used this

17   after that database was generated.  It was a Missouri case.

18   I've gone back and looked at all of the 2001 settlements and

19   payment and found none that are $7 million or $6 million, so

20   it's not in the database, so it didn't get counted or

21   calculated.  I didn't include it, so there is no -- I can't --

22   you know, I would have excluded it if it had been there

23   because I understand it is in bankruptcy, it's not likely to

24   be regarded as the same as a compensatory verdict.  But it

25   happened so late, it wouldn't have impacted subsequent

—————————— Peterson - Direct - Inselbuch ——————————

1   settlements.  As Mr. Hanly said, it just didn't have an impact

2   on any settlements that occurred before.

3        But interestingly in the end in this, there was a

4   motion for reconsideration filed by the banks in Owens Corning

5   and there was a second opinion which Judge Fullam issued and

6   he specifically stated in there that he accepted as plausible

7   the statements by -- plausible -- accepted the statements

8   by -- truth of the statements by the lawyers representing

9   Owens Corning that they did not consider and use the threat of

10  punitive damages in settling cases, and Mr. Hanly said the

11  same thing here.

12       I think, as an expert in this area, I've done

13  studies, I've done empirical studies of punitive damages and I

14  know that they are rare, they're unpredictable, so that they

15  have relatively little impact beyond the cases in which they

16  arise.  Where I think they do have an impact is if you are

17  taking a case to trial and the judge allows punitive damages

18  to get to a jury, then if I were a defendant, I think

19  reasonable defendants then consider that threat in a matter of

20  trying to settle that case during trial. But just because you

21  are taking a case to trial even in a jurisdiction that allows

22  punitive damages doesn't mean that you are going to be

23  subjected to punitive damages because in my experience many

24  trial judges just refuse to let the issue get to a jury. So I

25  think it's an unpredictable matter that has effect for a small

Peterson - Direct - Inselbuch

1  number of claims which aren't really relevant here because

2  this is not a litigating defendant and has, according to the

3  people that reached the settlements, both plaintiffs and

4  defense lawyers, had no impact on the settlement.  So, I

5  considered it.  In the end, I think that I don't disagree with

6  Judge Fullum's opinion, and it's certainly not a relevant

7  consideration here.

8          MR. INSELBUCH: Your Honor, that is the end of Dr.

9  Peterson's estimate of U. S. liabilities, we're about to turn

10 to his estimate of U. K. liabilities, and if your Honor --

11         THE COURT:  Perfect.

12         MR. INSELBUCH: -- thinks this is a good time for a

13 recess --

14         THE COURT:  Recess.

15         (Short recess).

16         DEPUTY CLERK:  All rise.

17         THE COURT:  You may be seated.

18         MR. INSELBUCH: May I proceed?

19         THE COURT:  Yes, you may.

20 BY MR. INSELBUCH:

21 Q.  Dr. Peterson, I would like to now call your attention to

22 your estimation of Turner & Newall United Kingdom liabilities

23 and ask you to describe to the Court, first, basically what

24 methodology you employed, and then to tell the Court

25 specifically how you went about doing that estimation and what

United States District Court
Camden, New Jersey

─── Peterson - Direct - Inselbuch ───

1    the estimation resulted in.

2         MR. INSELBUCH:  And I think we begin at Slide 47,

3    your Honor.

4         THE WITNESS:  Well, the approach was the same as in

5    the United States.  There were a couple of changes that had to

6    be made to reflect the different litigation circumstance in

7    the UK and also differences in the epidemiology between the

8    United States and the UK, but, otherwise, it was a similar

9    approach in which I took data from the database provided us by

10   Turner & Newall for UK claims, did similar analyses and

11   compared them with an epidemiological forecast of future

12   asbestos-related deaths and proceeded essentially similarly

13   with a couple of changes.

14   Q.   Did you make an effort to familiarize yourself with the

15   English litigation system and environment in which Turner &

16   Newall operated?

17   A.   Yes.

18   Q.   How did you do that?

19   A.   Well, I spoke with lawyers in the UK.  I made two trips

20   to the UK both to learn about it and to talk about this.  I

21   had some familiarity with it because I've, there's another

22   project that I was doing with regard to Turner & Newall.  My

23   company did a study of Turner & Newall's liabilities in yet

24   other countries, what Turner & Newall calls the rest of the

25   world, ROW.  And one of the consultants we retained to do that

—————Peterson - Direct - Inselbuch—————

1    is a woman who is in the UK and is an expert, she's not an

2    attorney but she is an expert on asbestos litigation there

3    with victims' groups and so on, and also knows people who are

4    in the law and social sciences area in Europe.  Also, another

5    person that collaborated on that study is a good friend of

6    mine who is actually on my doctoral committee, is a lawyer who

7    is well-known, used to be the head of the American Bar

8    Foundation and is a well-known international scholar of law

9    and society issues, he had actually written a long monograph

10   on asbestos litigation in the UK.  So I looked at, used all

11   those sources.  And then I spoke with people at Turner &

12   Newall about the litigation.  Also, the Tweedale book

13   described the UK litigation to some degree, it was another

14   useful tool in learning about it, about litigation in the UK.

15   Those are my primary sources.

16   Q.   You say you used the same basic methodology.  You looked

17   at the database first?

18   A.   Well, I looked at the database after having familiarized

19   myself with regard to the issues and then kind of together

20   tried to learn more about the database by talking with people.

21   But that's -- the quantitative analysis begins with the

22   database, yes.

23   Q.   And would you describe to the Court what Slide 47

24   reflects?

25   A.   This is a slide that's similar to one I presented for the

─────Peterson - Direct - Inselbuch─────

1   U.S. analysis, it just compares the number of claims that had

2   been filed and resolved and the number of claims that were

3   pending by asbestos-related diseases.

4        I need to make a couple of comments about differences

5   here.  I did my analysis, I made two different -- two

6   complimentary predictions in the UK.  I separated claims by

7   what I called shared liability and Turner & Newall liability.

8   One of the differences between the United States and the UK

9   asbestos litigation is that Turner & Newall is by far the

10  dominant manufacturer of asbestos products and dominant

11  asbestos defendant in the UK.  It's kind of like Manville plus

12  Owens Corning plus Turner & Newall in this country, it plays a

13  role that's not, there's no equivalent in the United States.

14       So there are lots of claims -- and also the liabilities

15  in the UK tend to arise from among employees.  They don't have

16  a worker's compensation system like we have here.  So in this

17  country if a claim -- a Turner & Newall employee was exposed

18  by asbestos, to asbestos by Turner & Newall, he or she would

19  look to worker's compensation for compensation from Turner &

20  Newall.  In the UK that's a litigation claim so -- and Ms.

21  Crichton talked about that earlier that most of the claims are

22  employee claims.  So that meant for both of those reasons

23  there were a relatively large number of claims in which Turner

24  & Newall was the only defendant on the database.

25       The UK database for Turner & Newall reflected that it

Peterson - Direct - Inselbuch

1   often had 90 percent or more of the liability, that's a field

2   that was always entered in these claims as to what share

3   Turner & Newall will have.  And those claims are different

4   than the claims that had less than 90 percent.  Most of the

5   claims were less than 90 percent liability congregated around

6   30 or 40 percent.  And the shared liability claims were more

7   often contributions claims, indemnity claims by insurance

8   companies, they involve smaller payments, were by people who

9   may have worked as an employee not for Turner & Newall but at

10  another company, they may have been environmental claimants

11  who had lawsuits, so they're a different ilk.  So for that and

12  some other reasons I did the analysis separately for the

13  Turner & Newall only claims, which is those with 90 percent or

14  more liability and historically got paid more money from

15  Turner & Newall as opposed to the rest of them.  And this

16  shows the counts claims in each of those categories by

17  disease.

18      One other thing I should mention, is that other

19  cancers, as Ms. Crichton side, were almost always lung cancer,

20  they didn't separate, they called it other cancer, other than

21  meso, but they didn't separate meso from yet other cancers.  I

22  mean, excuse me, they didn't separate lung cancers from

23  gastrointestinal cancers, those are mostly lung cancer.

24  Q.  What is then reflected on Slide 47?

25  A.  It's the count of the number of resolved claims and the

552

—————— Peterson - Direct - Inselbuch ——————

1  number of pending claims for each of these diseases.  Another

2  noteworthy matter is that mesothelioma claims represent a

3  substantially greater share of the overall number of claims

4  filed in the UK and in the United States, although the UK does

5  get asbestosis and pleural claims just like in the UK.

6  Q.    Having --

7  A.    Let me add one other thing.  The unspecified disease

8  claims is a less significant issue in the UK, there are very

9  few of them.  As a result, we did a different process.

10  Whereas in the U.S. we had the several step process of

11  assigning unspecified disease claims -- first, looking to

12  Manville to fill it in and then assigning the remainder

13  imputing it and leaving some still in the unspecified claim.

14  Here we just imputed diseases for all of the unspecified

15  claims and we didn't have the transition matrix in the UK like

16  we had here.  We used the matrix that had been derived by the

17  Center for Claims Resolution for some of its claims which put,

18  for example, 1.4 percent of the unspecified disease claims in

19  the meso category.  It's a standard method for doing

20  imputation of unspecified diseases and it was a simpler

21  process than we did here.

22  Q.    And what does Slide 48 show?

23  A.    This is the distribution of diseases.  Once we have

24  imputed diseases for the unknown claims.  I stand corrected on

25  my own slide.  We continued to -- I'm sorry.  48 is simply the

*United States District Court*
*Camden, New Jersey*

553

Peterson - Direct - Inselbuch

1   percentages from the prior table and it shows that the

2   mesothelioma claims are between 20 and 30 percent of all

3   claims in the UK compared to maybe 2 to 3 percent in the

4   United States, and the relatively small number of unspecified

5   resolved claims.

6   Q.   As with the U.S. claims, did you then try to determine

7   what the average resolution values were of these cases?

8   A.   Yes, we calculated average settlements, on Slide 49,

9   where the average settlements are averaged across claimants

10  who received payment.  The percentage payment reflects among

11  all resolved claims what percentage received something.  And

12  when you multiply the two together, you get the average

13  resolution costs.  And here it shows that there is a

14  substantial difference in the amount Turner & Newall paid

15  between the shared liability and T&N only liability, which is

16  one of the reasons we separated them.

17  Q.   Are these --

18  A.   Let me make one other comment.  The period across which I

19  calculated these averages in the UK 1998 to 2000, it's a

20  longer period than I used in the United States, which was 2000

21  and 2001.  The reason I did that is, one, there's much less

22  data, so we tend to want more than less data.  The other

23  reason why it in contrast to the United States, which had this

24  rather substantial increasing trends in the average payments

25  between '98 and 2001, the payments were relatively flat across

*United States District Court*
*Camden, New Jersey*

Peterson - Direct - Inselbuch

1  time, quite stable in the UK.  So averaging them together over

2  that period of time just didn't distort the averages and

3  allowed me to have more data.  If I'd used the longer period

4  in the United States, I would have come up with an estimate of

5  the current average of Turner & Newall was far less than they

6  were actually paying in 2000 or even 2001.  I would be

7  averaging old settlement values of a now remote period in

8  time.  So that's an inappropriate step to do for the United

9  States, here it didn't make any difference because the

10  settlements were pretty stable.

11  Q.  And are these amounts stated in pound Sterling?

12  A.  Yes, they are.

13  Q.  Is that because that's how the records were kept?

14  A.  Yes.  And that's what they're interested in.

15  Q.  Did you then project a forecast for the indemnity for

16  pending claims?

17  A.  Yes, I did, using the same approach that I did in the

18  U.S., that's Slide 50, again, separately for the shared

19  liability claims and the Turner & Newall only claims.  It

20  shows the number of claims in each disease category after I

21  allocated or imputed the unspecified diseases.  The averages

22  in pound Sterlings I've already presented.  And the total

23  indemnity amount that we calculate by doing the

24  multiplication.

25  Q.  And these are, again, stated in the year 2000 pound

*United States District Court*
*Camden, New Jersey*

555

Peterson - Direct - Inselbuch

1   Sterling?

2   A.   2001.

3   Q.   I'm sorry.  The year 2001 pound Sterling?

4   A.   That's correct.

5   Q.   Did you then proceed to project the future claims that

6   would arise in the United Kingdom against Turner & Newall?

7   A.   Yes.

8   Q.   How did you do that?

9   A.   We followed the same general method as shown on slide 51,

10  I looked at the number of claims filed by disease in each

11  year.

12  Q.   And this was, again, done in the two different

13  categories?

14  A.   Yeah, separately for the shared liability and Turner &

15  Newall liability.  And again, there is -- there is an increase

16  you'll see in the cancer filings in recent years against

17  Turner & Newall but that has a different source than the

18  United States.  And I need to describe the different

19  epidemiology and exposures in the two countries.

20       The exposures that occurred in the UK and Europe for

21  asbestos tended to occur later.  In the United States, there

22  was heavy exposure during the 1940's during World War II when

23  people were working shipyards here, not an issue in the UK for

24  obvious reasons.  And, in general, asbestos products, their

25  use, their consumption in the UK lagged the United States by

Peterson - Direct - Inselbuch

1    about ten years or so.  So I did not -- and there is no

2    epidemiological model in the United Kingdom that is similar to

3    the Nicholson model in the United States.

4         So I addressed this by using -- there was a recent

5    model done in December of last year or 2003, I believe, by a

6    health agency in the UK that forecast future instances of

7    mesothelioma but only mesothelioma, there are none for lung

8    cancer or other cancers, and it uses a less sophisticated

9    method, less data intensive methods.  All they did, they

10   looked at what their equivalent of the SEER count was,

11   observed a pattern of the curve in it and just extend whether

12   that curve out.  And that's somewhat of a problematic methods

13   to use, because if you remember back to the Nicholson, the

14   comparison of the SEER data to Nicholson, I pointed out in the

15   late '80's there was a decline in the number of mesothelioma,

16   SEER incidents of mesothelioma.  If you forecasted a curve

17   based on that, you're going to get a much different curve than

18   actually eventually resulted, whereas Nicholson was a

19   theoretical base and rich empirical base was a much better

20   source of prediction than just extending a line.

21        So I used Nicholson instead of the mesothelioma model

22   from the UK, although when I compared them, and I lagged

23   Nicholson, so when Nicholson said there was going to be X

24   number of deaths in 2005, I treated that as the same number of

25   deaths in 2015, I just slid it ten years into the future.

*United States District Court*
*Camden, New Jersey*

———————————Peterson - Direct - Inselbuch———————————

1  When I did that, it was very similar to the UK forecast.  So

2  based on that confirmation and the superiority of the

3  Nicholson method, even though it was for U.S. exposures, not

4  UK, I used the Nicholson epidemiology.  And that method was

5  also accepted by the experts who were working for the UK

6  parties of interest, they accepted that as an appropriate

7  approach and used that in their own work.

8      But what that means is now you -- it's as if the United

9  States is ten years ago with regard to the incidents of

10  asbestos diseases.  That was a period of substantial growth,

11  still annual increases in the incidents of mesothelioma

12  disease and even lung cancer, which has peaked between those

13  two points in time.  So what we see here, this growth

14  increasing numbers of claims against Turner & Newall in the U.

15  K. result from the fact that the incidence was growing, not

16  because the propensities to sue were growing.  So when I

17  forecast in the U. K., I used Nicholson lagged by ten years, I

18  observed the propensities to sue were quite stable and I used

19  those -- I assumed that there would be no increase in the

20  propensities to sue in the United Kingdom both because the

21  data were consistent with no increase and also, because of my

22  discussions with people in the U. K., there did not seem to be

23  an expectation or bases for seeing the kind of continuing

24  growth and claims in the U. K. that we've observed here.

25  Q.  Would you turn in your book to Plaintiff's Exhibit 6, the

Peterson - Direct - Inselbuch

1  exhibit book.

2  A.    That's in Volume II?

3           MR. FINCH:  Yes, it is.

4           THE WITNESS:  Yes, I have this.

5  BY MR. INSELBUCH:

6  Q.    Is that the report from the British government, the

7  health and safety executive that you made reference to in your

8  testimony?

9  A.    Yes, it is.

10          MR. INSELBUCH: We offer that, your Honor.

11          MR. STROCHAK: No objection, your Honor.

12          THE COURT:  P-6 is in evidence.

13     (PLAINTIFF EXHIBIT P-6 WAS RECEIVED IN EVIDENCE.)

14  BY MR. INSELBUCH:

15  Q.   With all of that by way of the theoretical underpinnings,

16  what did you do mechanically then to project the U. K. filings

17  against Turner & Newall for the future?

18  A.   I did precisely the same kind of calculation I did for

19  the United States.  I used the Nicholson epidemiology lagged

20  by ten years and the numbers of claims filed against Turner &

21  Newall, I believe, over the last five years to calculate

22  propensities to sue for each, for the two cancer groups, here

23  it's lung cancer, other cancers, and mesothelioma, where other

24  cancer is really lung cancer.  I calculated propensities to

25  sue and then I forecast the future claims by just using those

*United States District Court*
*Camden, New Jersey*

Peterson - Direct - Inselbuch

1  same propensities to sue multiplying them by the

2  epidemiological forecasts of cancer deaths in future years in

3  order to derive estimates of how many people would file claims

4  in the U. K. against Turner & Newall for mesothelioma and lung

5  cancer.  And for the non-malignant diseases, I again used this

6  multiple of the number of non-malignant claims to the cancer

7  claims historically, I used the same non-malignant multiplier.

8  In the UK I did that, I did that separately for asbestosis and

9  pleural disease and the results of that are shown on Figure

10 52.

11 Q.  On what number?

12 A.   Figure 52.  And I did this calculation separately for the

13 shared liability claims and the Turner & Newall liability

14 claims and then summed them up in order to get the total

15 number of claims I forecast.  So I assumed that the claim

16 filing pattern may be different among shared liability and

17 Turner & Newall only, that's why I did the forecasts

18 separately.

19 Q.  Did you then calculate the indemnity for future claims

20 and, if so, how did you do that?

21 A.   Well, I calculated the values of claims based off the

22 last five years in the U. K., same values I used for the

23 pending claims, same percent of claims that would be closed

24 with payment, and I multiplied the numbers of claims in each

25 year that I'm forecasting for each disease for the shared

*United States District Court*
*Camden, New Jersey*

──────── Peterson - Direct - Inselbuch ────────

1   liability and then for the Turner & Newall liability, I

2   multiplied them by the respective historic averages that I had

3   used for each disease, for each of these subsets of shared and

4   Turner & Newall only claims and then multiplied them again

5   times the percent of claims they can get paid and that

6   resulted in the amounts that are shown in 53.  Again, this is

7   the same approach that I used in the United States, taking

8   into account factual differences in the nature of the

9   litigation thereby disaggregating the claims between the

10  shared liability and Turner & Newall only.

11  Q.   And you made the same assumptions?

12  A.   Yes, I did.  Well, I did not have an increase in

13  propensity to sue.

14  Q.   You made the same assumptions with respect to when the

15  claims would settle?

16  A.   Yes.  I'm sorry.

17  Q.   And that what the inflation adjustment would be?

18  A.   Yes, those are in the footnote at figure 53.

19  Q.   Did you then calculate the present value of both the

20  pending and future U. K. claims against Turner & Newall?

21  A.   Yes, I did.  I increased them at an inflation of 2.5

22  percent.  That's a statistic I got from Eurostat, it's an

23  outfit that collects financial statistical information for

24  European entities, and they had it at predicted inflation rate

25  for the U. K. of 2.5 percent, which is the same as the United

——Peterson - Direct - Inselbuch——

1 States.  And I used the same discount rate 5.02 percent

2 because presumably the earnings that the risk free rate of

3 returns that Turner & Newall had would be the same in either

4 country.

5 Q.  And did you then come up with a value for pending and

6 future U. K. claims against Turner & Newall?

7 A.  I did it for each of the subgroups and added them

8 together, which was 229 million pounds as reflected on Figure

9 54.

10 Q.  And again, Dr. Peterson, did you prepare a pie chart to

11 show how the claims would break up percentage wise against

12 Turner & Newall by disease?

13 A.  Yes.  I present that at Slide 55.  And it shows that a

14 relative, somewhat larger fraction of the claims in the U. K.,

15 the payments would go to mesothelioma claims and smaller,

16 which I think is like 45 percent in the United States, it's 56

17 percent for meso in the U. K..  so it's a bit different,

18 basically similar.

19 Q.  Am I correct then to summarize that your Slide 54

20 represents your forecast of the indemnity that Turner & Newall

21 will face for present and future United Kingdom claims for

22 personal injury and death resulting from asbestosis, from

23 asbestos exposure?

24 A.  Yes, present value to the year 2001.

25 Q.  Okay.  Did you become aware in the course of your

─Peterson - Direct - Inselbuch─

1    representation of the committee or work for the committee of

2    criticisms in reports that had been prepared in England by

3    constituencies there of your work?

4    A.    Well, there were two expert reports prepared by some of

5    the interest groups in U. K., one by EMB Consulting Group and

6    another one by Tillinghost, which is actually an American

7    group, and they commented on my report as of February 2004,

8    which we discussed yesterday.  So it didn't represent my

9    current forecast, but it was that analysis and representation,

10   that's all they had available at the time.  I had not yet

11   prepared my report.  And they criticized some issues,

12   commented on others, agreed with the general principles that I

13   had.  Both of them stated they agreed with the expectation --

14   and they're both from the United States.  Actually EMB

15   discussed the U. K. -- they agreed -- EMB did a forecast for

16   the United Kingdom that was virtually identical with mine and

17   they used the same assumptions about the Nicholson

18   epidemiology lagged ten years.

19        For the United States, both EMB and Tillinghost

20   recognized and agreed with me that in the future the numbers

21   of claims that would be filed against Turner & Newall would

22   increase, the propensities to sue would increase.  They agreed

23   with me that the circumstances in changed litigation would

24   increase the settlement values against Turner & Newall in the

25   United States.  They then made their own forecasts.  And the

────────────── Peterson - Direct - Inselbuch ──────────────

1   forecast by Tillinghost is kind of, they don't provide much

2   detail about it, they made 27 different forecasts without a

3   lot of detail about it.  But neither Tillinghost nor EMB, they

4   both had models that were their own representation of the

5   rates of increase of future claims, so they both incorporated

6   increasing propensities to sue in their models.  For EMB it

7   was their only model.  For Tillinghost it was the model that

8   they prefer.  Neither one increased the dollar values, which

9   was consistent with the report that I prepared in February

10  2004, which wasn't really a forecast, it was the calculations

11  I've described before.  And both agreed with my repeated

12  statements in the February 2004 that the expectations that

13  values would increase, so they kind of replicated that but

14  neither one incorporated an increase in dollar values.

15       I then did some recalculations of the EMB forecast,

16  because there were some technical errors with regard to how

17  they did their forecast that are described in my supplemental

18  report.  And when I reran their report, it was very similar to

19  some of my forecasts here, my lower forecasts here that used

20  similar assumptions that they do, they did.  So I've read it.

21  I've commented on it.  They agree in principle with the

22  dynamics that were going on.  The reports don't, aren't

23  completely consistent with what their expectations are because

24  they didn't have much of a lead to follow at that point.

25  Q.  Would you look in the book at Exhibit, Plaintiff's

564

Peterson - Direct - Inselbuch

1   Exhibit 16?

2   A.   Yes.

3   Q.   Is that the EMB report?

4   A.   Yes, it is.

5   Q.   Do you know on whose behalf that was prepared?

6   A.   It was done for the law firm Denton, Wilde & Papte, and

7   it was performed on behalf of the administrators of T&N

8   Limited.

9        MR. INSELBUCH:  We offer that exhibit, your Honor,

10  not for the truth of what it contains, but just to show that

11  Dr. Peterson considered it and reacted to the comments in

12  there.

13       MR. STROCHAK:  No objection, your Honor, we think it

14  should be in evidence.

15       THE COURT:  Okay.  16 is in evidence.

16   (PLAINTIFF EXHIBIT P-16 WAS RECEIVED IN EVIDENCE.)

17  BY MR. INSELBUCH:

18  Q.   Now, would you look at Plaintiff's Exhibit 17?

19  A.   Yes, I have that.

20  Q.   And what's that?

21  A.   This is the other report prepared by Tillinghost.

22  Q.   Do you know for whom that was prepared?

23  A.   Yes, on Page 1 of the report it states that it was

24  prepared for the law firm of Allen & Overy, who were counsel

25  to Alexander Forbes Trustee Services Limited and T&N Pensions

—Peterson - Direct - Inselbuch—

1    Trustee Limited.

2            MR. INSELBUCH:  On the same basis, your Honor, we

3    offer that, not for the truth of what it contains, just to

4    show that Dr. Peterson did consider it.

5            MR. STROCHAK: No objection, your Honor.

6            THE COURT:  P-17 is in evidence.

7        (PLAINTIFF EXHIBIT P-7 WERE RECEIVED EVIDENCE.)

8    BY MR. INSELBUCH:

9    Q.    Did you perform any sensitivity analyses with respect to

10   your estimation of the U.S. and/or U. K. estimations?

11   A.    I performed a number of -- close to 20 alternative

12   forecasts for the U.S. liabilities of Turner & Newall as

13   sensitivities to test how my forecast would change if I

14   altered one or sometimes two assumptions to me model.  This is

15   a standard method for trying to understand the uncertainties

16   in a forecast, it is the best way to do that.  And so I

17   present that -- some of these are plausible alternatives, some

18   of them I believe are not plausible, but I presented them all

19   in the reports and provided a table for the Court because

20   should the Court disagree with my assumptions and find some of

21   the others more persuasive, you would know what is my estimate

22   of the liability if you altered one, any of these assumptions.

23   Q.    On Slide 56, did you list what some of these alternative

24   approaches were?

25   A.    Yes.

566

Peterson - Direct - Inselbuch

1   Q.   Would you take us through those so that the Court can

2   understand what the choices were in connection with the

3   sensitivity analyses?

4   A.   Yes.  The first is to use -- I've made reference earlier

5   today to the KPMG's epidemiological projections, which were

6   essentially derived from Nicholson with some attempt to update

7   it.  I testified earlier that it doesn't -- it isn't -- it's I

8   believe that it is a reasonable forecast.  I've used it on

9   occasion when the SEER data was ambiguous as to which was

10  preferable, Nicholson or KPMG.  I've used it -- times, several

11  years ago, preferred it.  Now, with the more recent Nicholson,

12  SEER data, Nicholson is clearly the better model, but it's

13  reasonable.  And so I've done forecasts using the KPMG model

14  rather than the Nicholson model as a sensitivity.  And my

15  primary report from November 2004 shows the KPMG model and

16  provides data about it and discusses that.

17       The second is I've used different periods of propensity

18  to sue.  As I testified, I used 2000 and 2001 because it's the

19  most recent period, which is advantageous.  We're forecasting

20  the future and it's desirable to take the most recent period

21  of time because that's likely to be more like the future than

22  more remote periods of time.  As a sensitivity, I added 1999

23  to it, which is a bit more remote.  And it's a period -- it

24  has one more year within the CCR, which is somewhat less

25  appropriate.  It's also a period of lower claiming so it

────────Peterson - Direct - Inselbuch────────

1  doesn't fully reflect the recent high level of claims, but I

2  did include it as an alternative so the Court could see what

3  effect that would have.

4      Throughout my report and today, I've presented a

5  primary sensitivity, which is to compare my assumption that

6  propensity to sue will increase in the future compared to the

7  models with no increase, I provided details about that

8  throughout the report.  I've made alternative assumptions

9  about non-malignant multipliers using, adding 2001 to the

10  period, so that I used both 2000 and 2001 to calculate the

11  ratio of non-malignant to cancer claims, which produces more

12  future non-malignant claims because of that spike in filing in

13  2001.  I also did it across three years, 1999, 2000, and 2001.

14  I used several different alternative estimates of the

15  settlement values of claims that reflect some of the tables

16  that we discussed yesterday with different ways in which I

17  calculated what was the historic -- what was the current value

18  of Turner & Newall claims based on history.  I've included in

19  there as one assumption, I've examined the use of simply the

20  amount of money that Turner & Newall used to paid the

21  settlements in 2000, 2001 without any increase.  I think

22  that's a highly improbable and unreasonable assumption, it's

23  inconsistent with Mr. Hanly's forecast, but if the Court is

24  interested in knowing what the forecast would be if I used

25  those historic values, I provided that.

———Peterson - Direct - Inselbuch———

1    I've used different assumptions about the percentage of

2    claims that will be paid in the future.  I've based my

3    calculations of the percentage of claims to be paid on Turner

4    & Newall's experience in 2000 and 2001.  As I expected in

5    2001, Turner & Newall paid a somewhat smaller percent of

6    claims because when it left CCR, you would expect that there

7    were claims that probably CCR would have paid because of the

8    naming principals and the sharing of liability that Turner &

9    Newall was named in but now wouldn't pay and that's what I

10   observed in 2000.  So that 2000 and 2001 end up with a lower

11   percent of payment than if I simply used CCR years.

12       And another step -- this is one of two steps that I use

13   in my analysis to address the likelihood of somewhat lower

14   percent of claimants would like paid after 2001 when CCR left.

15   An alternative is to assume that simply 70 percent of the

16   claims would be paid for each disease.  As I showed yesterday,

17   90 percent or more, I think it's less, a bit under 90 percent

18   for mesothelioma are paid over 90 percent for all of the

19   diseases.  I've taken kind of a radical step and said what if

20   outside of CCR they only paid 70 percent.  It's an arbitrary

21   number that's meant to illustrate what if there was a big

22   change in the percent of claims paid and I present that.  I

23   think it's implausibly low.

24       Then I have an alternative calculation of the percent

25   of payments from 1998 through 2001, which is mostly in the CCR

—————— Peterson - Direct - Inselbuch ——————

1   and results in a higher percent of claims being paid.  I've

2   considered whether that's less plausible because I think being

3   outside of CCR would somewhat reduce the amount of claims to

4   be paid, but I present that as well.

5        I use alternative discount rates, what happens if I use

6   5.5 percent as discount rate rather than the 5.02 percent

7   provided to me by Tersigni and Company.

8        And, finally, I made an assumption about what would

9   happen if there were national legislation, not of the kind

10  that's being considered right now, but what's being advocated

11  by some senators, that would set up medical criteria that one

12  would need to qualify for payment as a non-malignant claimant.

13  And essentially such legislation would be intended and it's

14  being proposed to eliminate the unimpaired claims from

15  payment.  So I ran an analysis of what I believe would be the

16  impact.  And the State of Iowa is actually -- Ohio.  Excuse

17  me.  Ohio has actually enacted legislation that's like that.

18  And so I did a sensitivity analysis to see what would be the

19  effect on Turner & Newall's liability if such legislation were

20  to pass.  That's a way of kind of dealing with the state --

21  we're seeing what's called tort reform on a crazy quilt basis

22  around the country state by state basis.  This is analysis,

23  what if this one particular high visibility tort reform were

24  to be passed in every state by the Congress.

25        So I examined and present in my report and here the