Peterson - Direct - Inselbuch

1    results of each of these alternatives.

2    Q.    Do the slides that follow Slide 56 evidence some of the

3    sensitivity analyses that you've done?

4    A.    Yes, they demonstrate the alternative assumptions that

5    I've used in Slides 57 through --

6    Q.    Would you take the Court through them?

7    A.    Slide 57 shows alternatives I use of the dollar values

8    that -- current values of claims against Turner & Newall.  The

9    red line, row at the top is what I actually use in my forecast

10   and I described that yesterday, it's derivation.  The next two

11   differ from the forecast I use here because I don't reduce the

12   mesothelioma value, I use what I actually calculated was my

13   estimate of the current value of mesothelioma claims based

14   upon Turner & Newall's actual payments during 2000 and 2001

15   grossed up by its actual rate of increase in settlement values

16   from meso.  And that produced, as I described yesterday, an

17   estimate of $210,291.  I've used a more conservative estimate,

18   but that was the direct result of that calculation.  And then

19   I used Babcox and Wilcox, what was the ratio of payments for

20   each of the disease categories, and I showed that yesterday.

21   I used Babcox and Wilcox, the ratio of payments for each

22   disease to derive the values for lung cancer, other cancer,

23   and non-malignant on the second row.  And, alternatively, I

24   used the ratios of the disease values among diseases for Owens

25   Corning in the third line.  So these differ with regard to the

Peterson - Direct - Inselbuch

1  starting point they use, of less conservative starting point,

2  and they also use the actual experience of a couple of other

3  significant defendants with regard to the ratios of values for

4  different diseases.

5      The fourth row is Owens Corning's actual recent

6  settlements, and I present that because it's my expectation

7  that Turner & Newall's settlements in the future will eclipse

8  those, they would have eclipsed those paid by Owens Corning

9  because it is a more culpable defendant and it frankly has

10  liabilities that are more widespread than Owens Corning, too.

11  So it would be -- but with regard to values, it's that

12  enhanced culpability. So that's an alternative estimate, what

13  if Turner & Newall ended up paying as much as Owens Corning

14  has already paid prior to its bankruptcy.

15      The second to the bottom row is the average payments

16  made by Owens Corning in the years 2000 and 2001 for

17  mesothelioma, that's 98,000. As I showed yesterday, depending

18  on what assumptions we make about what's the settlement year

19  for claimants, Turner & Newall was actually paying $194,000

20  per claim in the year 2001, for claims that we certainly know

21  were 2001 settlements. So it's twice as much as what this

22  average is from this calculation. This calculation was based

23  on the assumption that the 2001, the appropriate 2001

24  settlement number for Turner & Newall was 138,000, which was

25  the number I reached when I not only included claims that were

Peterson - Direct - Inselbuch

1    identified by the database having settled in 2001, but added

2    to it the claims where I imputed 2001 settlement, that's the

3    138,000. When you average that with the year 2000

4    settlements, you get these values on the 1998 row. I'm sorry.

5    The second to the bottom row. But again that's considerably

6    less than Turner & Newall was actually paying no matter how

7    you measure it in 2001.

8         The last is essentially just a straight -- oh, it takes

9    those settlements in 2000, 2001 and applies the actual

10   increases that I observed in the database. So I looked at

11   what was the -- the 2000 and 2001 averaged payments for Turner

12   & Newall divided by, I think it was the '97 and '98 payments

13   averages, and I calculate that separately for each disease.

14   So the bottom row I'm not hanging the values off of meso, I'm

15   actually calculating separately for each disease as the same

16   with mesothelioma. Again, I think that's inappropriate for

17   the simple reason some of these values are unsustainable, as

18   Mr. Hanly said. And we know in particular the non-malignant

19   claims were not really representative in 2001, were not

20   representative of what Turner & Newall would have to pay in

21   future years because 12,000 of the 14,000 claims were these

22   very low Mississippi settlements.

23   Q. Do you show in Slide 62 in part on what the effect would

24   be of making these various assumptions?

25   A. Yes, I do.

Peterson - Direct - Inselbuch

1  Q.   And would you point the Court to where that is?

2  A.   Slide 62 shows all but one of the sensitivities I

3  reported on.   I omitted one just by error, which it actually

4  has a higher liability.   The first red line is the total

5  liability, that's my forecast, my base case forecast, the one

6  I prefer with an increases the propensity to sue produces

7  11.076 billion dollars total liability for present and future

8  value.   The next row is if I substitute the KPMG epidemiology

9  for Nicholson, it produces an estimated liability of roughly

10  10.5 billion dollars which is 94 percent of my --

11  Q.   Is that shown also in Slide 59, the calculation of the

12  KPMG versus Nicholson?

13  A.   Slide 59 shows the calculation of the future component of

14  it, so this is the difference between the two.   If you compare

15  the values in the Nicholson column in red to the KPMG in black

16  for each of these models increasing, no increasing.   You can

17  see for the increasing model use of the KPMG would reduce the

18  forecasted liability by roughly 600 million dollars or 6.3

19  percent.   For the no increasing model, it would reduce the

20  liability by about 5 billion dollars or 8.4 percent.   Actually

21  adds the pending claims value to it.

22  Q.   And that is summarized now on Slide 62 across the line

23  where you see epidemiology?

24  A.   Yes.

25  Q.   All right.   Now, we were talking in Slide 57 about

Peterson - Direct - Inselbuch

1   alternative settlement averages.

2   A.    Yes.

3   Q.    Where do you find those on Slide 62?

4   A.    Well, on Slide 62 under the column type of variation

5   where it says values, those are alternative assumptions about

6   values and it describes, identifies each of the five

7   alternative for cases that I described before and the values

8   associated with them. So, depending upon which of these

9   alternatives we used it could increase the liability by as

10  much as 88 percent.  If I start off with $210 million as meso

11  value and use the ratios that BMW paid for different diseases,

12  that produces a forecast of $20.87 billion, which is

13  188 percent of my forecast.

14        The first three forecasts produced higher estimates

15  including simply the amount that Owens Corning was paying.  In

16  the two years prior to the bankruptcy, it would produce an

17  estimated liability that's 12 per cent greater than I forecast

18  here. All of these assume an increase in propensity to sue,

19  the only variations in these models has to do with values. If

20  I use the last two models, if I -- the separate trends where I

21  actually look at the 2000/2001 payments by Turner & Newall and

22  calculate trends vis-a-vis diseases, it produces a forecasted

23  liability for present and future claim of $7.5 billion, which

24  is 32 percent less than my preferred for cost.

25        If I use the value, actual values averaged across

*United States District Court*
*Camden, New Jersey*

Peterson - Direct - Inselbuch

1    2000/2001 that Turner & Newall was paying prior to its

2    bankruptcy, it produces a forecast liability of $4.9 billion,

3    which is 44 percent of what I think is a proper estimate. And

4    as I -- and I think my base case is preferable to any of these

5    five, but I particularly think that the bottom two don't

6    represent -- don't reflect what would have happened to Turner

7    & Newall after it left CCR after these other companies went

8    into bankruptcy for all of the other reasons I've described

9    before.

10   Q.   Would you turn to Slide 58. This was again one of the

11   alternatives that you described in Slide 56, and would you

12   describe to the Court what this is.  And then, if you would,

13   take the Court to Slide 62 and show where the calculation is

14   made of the effect.

15   A.   Slide 52 presents my -- the assumptions I used in my

16   basic analysis call for the increasing and no increasing

17   propensity to sue, of the percent of claims within each

18   disease that would be resolve with payment. I've two

19   alternatives.  One is if I had used the period 1998 to 2001

20   rather than 2000, 2001, it results in higher estimates of

21   payments of claims for mesothelioma and lung cancer and

22   effectively the same rates for other cancers and nonmalignant.

23        The third line is the assuming the arbitrary

24   assumption that Turner & Newall really got quite effective and

25   was able to get rid of 30 percent of each future claimants, an

————Peterson - Direct - Inselbuch————

1   unlikely calculation but one that I'm showing just so the

2   Court can see the calculation of what would be an extreme

3   assumption. Those are reflected -- the 70 percent paid

4   assumption is the very last entry on Table 68.

5   Q.   62.

6   A.   62, rather.  It shows that the total liability under that

7   assumption is $8.6 billion, which is 77 percent of my

8   preferred forecast.

9   Q.   '98 to --

10  A.   Yeah, '98 to 2000.

11  Q.   Isn't that the first miscellaneous --

12  A.   Yes, it's the top entry for the miscellaneous section,

13  98-01 percent paid, that increases my forecast by three

14  percent to 11.4 billion dollars.

15  Q.   You've already discussed Slide 59, that's the

16  KPMG/Nicholson comparison?

17  A.   Yes.

18  Q.   Would you look at Slide 60?

19  A.   Yes.

20  Q.   And what is that?

21  A.   Slide 60 is my effort to try and represent what would be

22  the effect if nationwide there were legislation like Ohio has

23  that would essentially eliminate or defer payments to

24  unimpaired nonmalignant claimants. I assume there would be two

25  changes from that effect. One is I assume it would eliminate

—Peterson - Direct - Inselbuch—

1   about 60 percent of the nonmalignant claims as being

2   unimpaired. That's based both upon looking again at the

3   distribution of what claims have pulmonary function tests that

4   are -- would qualify for payments under these provisions and

5   some assumption about how the kinds of things that come in

6   might change and how they'd be documented.

7        I also assume that of that 60 percent of claims that

8   are eliminated, it's the 60 percent that have the lowest

9   value. These are the least serious group of claims, so I've

10  eliminated the lowest 60 percent and recalculated what the

11  liability would be, whereas presently -- that would have the

12  effect of reducing the future liability for cancer claims by

13  about 14 average payment, of 14 percent, based upon -- from

14  the model that I'm using. That's the average resolution costs.

15       Oh, let me explain.  When I did this model on page

16  60, I had to -- I had to use a -- I couldn't base it on my

17  base case because the way I'm forecasting values of claims,

18  I'm assuming that things are increasing by roughly 200 percent

19  for mesothelioma, and then I calculated these others.  So I

20  actually don't have the historic distribution of claims that

21  are the same as what I'm forecasting.  So what I did is I ran

22  this calculation compared to the model that I described

23  earlier, which is shown on Figure 42, it's the no increase

24  value, so I started with the no increase value model, not my

25  preferred model.  Okay, what if we used the no increase value

—————Peterson - Direct - Inselbuch—————

1    model and then make these changes to the legislation?  I did

2    that because now I can identify what the lowest 60 percent of

3    nonmalignant claims is, I couldn't otherwise do that.  And so

4    I examined what was the percent change in the payments for

5    that model and just assumed they would have that same change

6    on my preferred model.

7         So these average resolution values here are based

8    upon the payments in 2000 and 2001 that Turner & Newall made

9    without any adjustments representing the new significant

10   changes in the litigation environment. And so I'm showing the

11   changes before and after that and it  shows that the overall

12   average across nonmalignant claimants, both those that get

13   paid and not paid, would fall by 14 percent, if you assumed

14   that the lowest value of 60 percent go away.  And it is so

15   slight because the lower value claims have lower values, so

16   we're getting rid of the poor ones.

17        The second assumption I made is since the law firms

18   would now be losing roughly 60 percent of claims they

19   represent, they'd have 60 percent or 50 percent, have

20   substantial less work, because those claims would no longer be

21   subject to litigation. And as a result, given the resources

22   that the law firms have, they would put more effort in and

23   raise their demand for the cancer claimants, so I assumed

24   there would be a ten percent increase in the resolution costs

25   of the cancer claims.

*United States District Court*
*Camden, New Jersey*

579

————Peterson - Direct - Inselbuch————

1       Now, that ten percent is obviously an arbitrary

2   figure, it could be they increase by five percent or

3   15 percent, it's just meant to represent the recognition that

4   by eliminating 60 percent of the claims roughly that the law

5   firms have and with their existing resources, they would be

6   more effective in representing and get larger settlement

7   values for the cancer claims.

8       So those are the assumptions built into my forecast

9   for the change in the legislation. So what it did, it assumes

10  that the nonmalignant would go down by 14 percent and each of

11  the cancer claims would go up, but the overall liability for

12  nonmalignant claims would go down like 14 percent, the overall

13  liable for the cancer would go up by ten percent.  The net

14  effect of that is pretty slight. It would reduce the liability

15  by only, I think, two or three percent, which is shown by the

16  fourth to the last row on Slide 62.

17      I did a similar analysis to this with the same

18  assumptions for the Owens Corning case where the distribution

19  of settlement values is slightly different, somewhat

20  different, and there it would have a bigger effect on Owens

21  Corning.  The reason it has a bigger effect on Owens Corning

22  is that the lower valued claims didn't have quite the same

23  relatively low values that Turner & Newall had. So two to

24  three percent is probably the minimum effect the legislation

25  would have.  It might have an effect of ten percent or more,

*United States District Court*
*Camden, New Jersey*

580

———Peterson - Direct - Inselbuch———

1  but it wouldn't have a great effect.  As big a change as

2  eliminating 60 percent of the nonmalignant claimants would

3  have a relatively modest impact on the liability of any

4  asbestos defendant, and this one relatively slight.

5  Q.  Focusing on Slide 62 now where you have listed the

6  various alternative sensitivity analyses you've done, do you

7  recall some of these alternative forecasts as more plausible

8  or less plausible among themselves and/or more or less

9  plausible with respect to your base case analysis?

10  A.  Yes. The plausibility of these alternatives varies

11  greatly when you consider what the circumstance of the

12  asbestos litigation is today and was at the point in time of

13  bankruptcy for Turner & Newall.  Some of them are quite

14  reasonable, some of them I think are highly improbable, and so

15  improbable as to not really be appropriate forecasts, but I

16  provided them to the Court because you may disagree with me

17  and you could see what are the consequences of any different

18  assumption you care to make.

19  Q.  Now during opening arguments counsel for the Property

20  Damage Committee made reference to the forecast alternative

21  here that arrives rat a total liability of $3.6 billion. Do

22  you see that?

23  A.  Yes, I recall that.

24  Q.  You were here when that -- during the opening, were you

25  not?

*United States District Court*
*Camden, New Jersey*

581

Peterson - Direct - Inselbuch

1   A.   Yes.

2   Q.   Now, would you tell the Court what the assumptions are

3   that would lead to that conclusion and give the Court your

4   views as to the plausibility of those assumptions?

5   A.   That forecast assumes that the -- that after the time of

6   the bankruptcy, the rate of filings of claims against Turner &

7   Newall and propensities to sue would remain unchanged, and it

8   meant that -- and these are propensities to sue that are

9   calculated off 2000/2001. It would result in a drastic

10  reduction in claim filing. It's actually my low -- my no

11  increase model, which is a drastic reduction in the number of

12  nonmalignant claims that we were getting.  As I pointed out

13  earlier, even my increasing model forecasts that the number of

14  filings against Turner & Newall in future years would be less

15  than it was actually experiencing in 2001, with the exception

16  of one year in the future. But this goes further and says

17  rather than this pattern you saw of increasing claim filings

18  against Turner & Newall, and its suddenly just going down for

19  cancer and nonmalignant, there is no plausible reason to

20  expect that. Nothing happened in the asbestos litigation that

21  would suggest that something like that would happen. On the

22  contrary, everything that's happened in the asbestos

23  litigation suggests that the claims will be going up. The

24  termination of CCR, the concurrent bankruptcies of eight other

25  major asbestos defendants, the increasing advertising that was

United States District Court
Camden, New Jersey

Peterson - Direct - Inselbuch

1  occurring with regard to -- by plaintiffs' law firms,

2  increasing trends in filings for Turner & Newall itself, the

3  increasing filings against -- by all other asbestos

4  defendants, the fact the claims against other defendants have

5  continued to increase.  The most relevant defendant, Union

6  Carbide, has increased and increased dramatically after the

7  termination of CCR.  All of those suggest strongly that Turner

8  & Newall would have received more claims, not less.  There is

9  nothing to suggest they'd receive less, but that's the

10  assumption here, that Turner & Newall would -- each rate of

11  claiming would remain the same, its actual numbers of filings

12  would go down.

13        The second assumption is that despite all the factors

14  that I just mentioned, that Turner & Newall would pay no more

15  money in the future than it had to pay on average to resolve

16  claims in 2000 and 2001, but because -- and for mesothelioma

17  and lung cancer, that's an implausible forecast just on the

18  record of the experience of Turner & Newall because Turner &

19  Newall was paying something between 138 and $195,000 on

20  average to resolve mesothelioma claims in the year-ending with

21  its bankruptcy.

22        This assumption is that they would settle all future

23  claims for $98,000 it would essentially get a benefit of

24  50 percent, again there is no reason to expect that it would,

25  they would be able to settle claims in the future for less

United States District Court
Camden, New Jersey

————Peterson - Direct - Inselbuch————

1   than they had in the past. The testimony by Mr. Hanly is

2   supportive of my belief and opinion that Turner & Newall will

3   be paying more, not less. But this assumption assumes it was

4   paying less at the time of its bankruptcy for both lung cancer

5   and mesothelioma claims, and its basis for nonmalignant claims

6   is affected greatly again by these distorted, limited and

7   unrepresentative settlements of 2001 that Turner & Newall

8   made.  So you can only reach that assumption of 3.6 by

9   disregarding all of the events and circumstances that had

10  occurred in the year 2001 that would have caused Turner &

11  Newall to both get more claims and have to pay more, and there

12  is no -- I know of no fact, I've heard of no fact in this case

13  or any other case that suggests that Turner & Newall would

14  have such, such good luck in 2000 after each bankruptcy filing

15  in 2001 if it hadn't filed.  There is just no reason to expect

16  that. And so that's -- I regard that -- again, I've provided

17  it to the Court so the Court can know what would happen if

18  what I regard as an extraordinarily unlikely event happened,

19  but I believe it to be so extraordinary unlikely to be simply

20  an incredible forecast.

21  Q.   In your judgment as an expert, Dr. Peterson, do you

22  believe that the forecasts that you have presented to the

23  Court, and in particular your preferred forecast, is a

24  conservative one or an aggressive one?

25  A.   Oh, I think it's conservative in many ways. It's not

*United States District Court*
*Camden, New Jersey*

Peterson - Direct - Inselbuch

1    aggressive. Even the increasing model assumes that Turner &

2    Newall would receive fewer claims in all future years except

3    for one than it received in 2001 when you annualize the

4    claims.   It's based on dollar values that are the lowest

5    calculation that I could provide the Court based upon each

6    historic experience in looking at what would be each likely

7    future.   It's the lowest number I could -- it's a number

8    that's lower than what's typically being paid by other

9    asbestos defendants who, on an ongoing basis, would face the

10   lower exposure to damages than would Turner & Newall.   So for

11   both those reasons, even the increasing model, I believe, is a

12   conservative model.

13          And even though I'm forecasting increasing numbers of

14   nonmalignant claims, taking into account the kinds of things

15   that Judge Fullam talked about, taking into account what I

16   admitted was an argument with some plausibility that maybe we

17   won't see as many screenings, I'm certain we'll see screenings

18   in the future, but maybe there won't be as many.   Even with

19   this forecast because it assumes so many fewer nonmalignant

20   claimants in the future years, it is consistant with the

21   assumption that nonmalignant claims would tamp down.

22          So, I believe that that's a conservative estimate

23   that reflects not only the events that were happening but some

24   expectation about the future of the litigation maybe somewhat

25   less than what Turner & Newall was actually facing in 2001.

585

Peterson - Cross - Strochak

1   And also the numbers of claims I'm forecasting are

2   extraordinarily conservative when we look at what happened to

3   Union Carbide.

4         MR. INSELBUCH:  We offer Plaintiff's Exhibit 4 at

5   this time.

6         MR. STROCHAK:  No objection, your Honor.

7         THE COURT:  P-4 is in evidence.

8   (PLAINTIFF EXHIBIT P-4 WAS RECEIVED IN EVIDENCE)

9         MR. INSELBUCH: We pass the witness.

10        THE COURT:  I think we're at our lunch break. It's a

11  little after 12:30.  Why don't we come back at say 1:45.

12        (Luncheon recess).

13        DEPUTY CLERK:  All rise.

14        THE COURT:  You may be seated.

15        MR. INSELBUCH: We have no further questions of Dr.

16  Peterson.

17        THE COURT:  Thank you.

18      You may cross-examine.

19        MR. STROCHAK:  Thank you, your Honor.

20  (CROSS-EXAMINATION OF MARK J. PETERSON BY MR. STROCHAK:)

21  Q.  Good afternoon, Dr. Peterson.  Adam Strochak, Weil,

22  Gotshal & Manges, for the Property Damage Committee.

23      Dr. Peterson, you most often testify on asbestos

24  estimations on behalf of committees of asbestos claimants,

25  correct?

*United States District Court*
*Camden, New Jersey*

—————————Peterson - Cross - Strochak—————————

1   A.   That's fair, yes.

2   Q.   And you are the person who is retained most often, more

3   often than any other consultant by asbestos claimants

4   committee in major bankruptcy cases, correct?

5   A.   On matters of estimates, I think that's correct.

6   Q.   My recollection from some of your prior testimony is that

7   the last time you testified in opposition to an asbestos

8   claimants committee would have been the Ahearn case in 1994,

9   correct?

10  A.   I think that's right.

11  Q.   And would it be fair to say, sir, that the majority of

12  your practice, that is, the business of LAS, your consulting

13  company, is performing work on behalf of asbestos creditors

14  committees in bankruptcy cases, at least for the last several

15  years?

16  A.   It changes from time to time.  But I think since a lot of

17  bankruptcies in 2002 and -- 2000 and 2001, that's correct.

18  Q.   Let me just ask you a general question, if I could, about

19  your estimation model, which I believe you testified is based

20  on standard methodologies, is that right?

21  A.   Yes.

22  Q.   Basically, what you do is you figure out the number of

23  claims for each year of your forecast, correct?

24  A.   That's the product of the forecasting, yes.

25  Q.   You're determining the number of claims that will be paid

Peterson - Cross - Strochak

1  in each year for the future part of the forecast?

2  A.   Yes, I estimate the number that will be filed and then I

3  multiply it by the percent they got paid to reach that number,

4  that's correct.

5  Q.   Actually, you multiply your average settlement costs by

6  the percent paid, right?

7  A.   It's the same thing.

8  Q.   Same calculation, but technically that's the way you

9  expressed it in your report.

10  A.   In this report, yes.  Sometimes I do it as two steps,

11  sometimes I do it as one.

12  Q.   So you would calculate your average settlement value, as

13  you explained to the Court today and yesterday, correct?

14  A.   That's a step, yes.

15  Q.   And then you multiply that by the percent paid, which in

16  the T&N case was approximately 90 percent, correct?

17  A.   Yes, that produces what I call the resolution average.

18  Q.   And the percent paid calculation essentially is the, I'm

19  going to call it the inverse and see if that makes sense, the

20  inverse of the dismissal rate.  So, for example, if you have a

21  90 percent paid rate, you would have a 10 percent dismissal

22  rate.  Right?

23  A.   It's actually a compliment, but I understand what you

24  mean.

25  Q.   Thank you for the correction.  I appreciate it.

Peterson - Cross - Strochak

1        Now, you've made some assumptions about when claims

2   would settle for purposes of your forecast, correct?

3   A.   Yes.

4   Q.   And you've basically assumed that claims would settle two

5   years after they file, is that right?

6   A.   On average, yes.

7   Q.   So you make a projection of the number of claims that

8   will be filed and then you move them two years forward in

9   terms of attributing value in the forecast, right?

10  A.   Correct.

11  Q.   And just to illustrate with a hypothetical example, if

12  your forecast was that a certain claim would be filed in 2005,

13  the dollars for that claim would go in 2007, is that right?

14  A.   Well, it would be paid in 2007 with two years of

15  additional inflation and then I present value it back from

16  2007 to 2001 so it's two extra years of discounting, yes.

17  Q.   So the ultimate goal of your forecast is to figure out

18  for each year of the forecast, which is through 2039, correct?

19  Your forecast goes through 2039?

20  A.   Filings through 2039, yes.

21  Q.   So in terms of the actual dollars, you would go then to

22  2041, is that right?

23  A.   The actual dollars are as 2001 is the present value, but

24  the payments run through 2041, yes.

25  Q.   So conceptually you have boxes, a box for each year going

589

Peterson - Cross - Strochak

1   out from the beginning of your forecast, which is 2001,

2   correct?  You have the forecast the last three months of 2001?

3   A.   Yes.

4   Q.   Is that right?

5   A.   Yes.

6   Q.   So you have a box with a value in it for each year from

7   2001 through 2041?

8   A.   Well, the forecast actually begins with payments in 2003,

9   first full year 2004 through 2041, that's when the payments to

10  future claimants run.   The present claimants are assumed to

11  get paid in 2003.

12  Q.   And you built in a lag time to account for the fact that

13  there would be some start up time for a trust or something

14  like that?

15  A.   No, it's just the -- you're asking me a series of

16  questions about adding two years.   So claims start getting

17  filed in the fall of 2001 but those claims don't get paid

18  until 2003.

19  Q.   Understood.   Okay.   So in terms of describing your

20  forecast, would it be accurate to say that it is a discounted

21  cash flow forecast, that is, you are forecasting the cash flow

22  necessary to pay these claims as if they arose in the tort

23  system absent a bankruptcy for the period of your forecast?

24  A.   I think your description is correct.   I wouldn't label it

25  that, to me cash flow is a different thing.

United States District Court
Camden, New Jersey

590

Peterson - Cross - Strochak

1   Q.   But the description is fundamentally correct?

2   A.   I believe so.

3   Q.   You're putting dollar value in each year from 2003

4   through 2041, right?

5   A.   The nominal dollars in each year, that's correct, and

6   they're all present valued back.

7   Q.   Present valued back.  All right.

8        And the ultimate model is one that is designed to

9   predict what T&N would have paid in each year, 2003 through

10  2041, on account of its asbestos liabilities in the tort

11  system, right?

12  A.   Yes.  For present and future claims, yes.

13  Q.   On your direct testimony, sir, I believe you said that

14  you had done some after the fact reassessment of prior

15  estimates to determine how accurately they forecasted

16  liabilities, is that right?

17  A.   I don't understand your characterization of it.  I have

18  done forecasts that I'm able to test against empirical data

19  about the actual number of claims or the liabilities against

20  companies and compare the actual liabilities, the actual

21  claims to my forecast.  Is that what you're describing?

22  Q.   Yes.  I'm asking you -- believe on your direct testimony

23  you said you had done -- on some occasions you had done after

24  the fact assessments of your forecast to determine how

25  accurately they predicted the number of claims.

591

Peterson - Cross - Strochak

1   A.   When I can, yes.

2   Q.   In fact, you told the Court that you had done that,

3   right?

4   A.   Yes.

5   Q.   And you implied that your forecasts, in fact, were

6   relatively accurate, correct?

7   A.   Well, no.  Actually I claimed they're inaccurate,

8   generally they under forecast.  But for those cases I had data

9   to test against, yes.

10  Q.   Now, you've prepared three expert reports in this matter,

11  correct?

12  A.   Yes.

13  Q.   Your November 2004 report, correct?  Which I believe is

14  in evidence as Plaintiff's Exhibit 2.

15  A.   I have a November 2004 report, I don't recall what its

16  exhibit number is, that's correct.

17  Q.   And then your supplemental report also in evidence,

18  correct?

19  A.   Yes.

20  Q.   And then, finally, a rebuttal report to Dr. Cantor's

21  analysis, right?

22  A.   Yes.  I don't think that's in evidence but, yes, I did

23  prepare a third report.

24  Q.   Now, in none of those three reports is there any

25  statistical data or analysis demonstrating the accuracy of

*United States District Court*
*Camden, New Jersey*

Peterson - Cross - Strochak

1  your prior forecasts in any way, is there?

2  A.    There may be -- there are no quantitative calculations.

3  I think there's some discussion about forecasting and actually

4  forecasting in the beginning of the 2004 report, but I don't

5  recall all the language in that section.

6  Q.    So the answer would be, no, there's nothing in your three

7  prior reports providing any statistical or quantitative

8  analysis of the accuracy of your prior forecasts?

9          MR. INSELBUCH: Objection, your Honor.  Misstates the

10  witness' answer.

11          THE COURT:  Can you clarify the question?

12          THE WITNESS:  Yeah.  What I said is I believe there's

13  some discussion of it in the November 2004 report that is

14  based upon, it's not a statistical analysis, it's just

15  comparison of forecasts and actual results.  But the actual

16  numbers are not, certainly are not in the three reports, but

17  the inferences I draw from having made the comparisons and I

18  believe some discussions of it is in there.  But I have to go

19  back and review the report to know, to recall specifically

20  what's in there, but certainly there are no numbers in there

21  with regard to that issue.

22  BY MR. STROCHAK:

23  Q.    Let's turn to claim values a little bit.  And let me

24  start you -- I've given you and the Court, as well as counsel,

25  an exhibit binder for the cross-examination.  I've also given

United States District Court
Camden, New Jersey

593

Peterson - Cross - Strochak

1    you binders with a copy of your, copies of your depositions

2    from the T&N case and a copy of your trial transcript, trial

3    testimony from the Owens Corning case which we'll get to

4    later.

5         And if you pick up the exhibit binder you should find a

6    tab marked Plaintiff's Exhibits.  And if you turn to Tab 2,

7    you should come to your report in this matter.

8         If I could ask you to turn to Page --

9    A.   Wait a second, I'm not there yet.

10   Q.   Oh, sure.

11   A.   It's at least a test of my dexterity.  All right.  I have

12   Exhibit 2, Plaintiff's Exhibit 2, yes.

13   Q.   If I could just get to you turn to Page 10, which is Page

14   10 in our trial director system.

15   A.   Numbered Page 10 in the report?

16   Q.   That's correct.

17   A.   I have that.

18   Q.   These are your tables showing settlement averages for T&N

19   and four other companies, is that correct?

20   A.   That's correct.

21   Q.   And I believe, just to make sure we're all on the same

22   page, on Page 10, the first Table 1A, top on the left-hand

23   column of that table the bottom row is 2001, and those

24   represent your calculated averages, calculated settlement

25   averages for that year, correct?

United States District Court
Camden, New Jersey

594

——————Peterson - Cross - Strochak——————

1    A.    Yes.

2    Q.    So for mesothelioma in 2001, you've calculated an average

3    of $138,939?

4    A.    It's one of several that I've calculated.  As I describe

5    in my direct, that's the calculation when I -- both of the

6    claims were identified by the databases having settled in 2001

7    and the claims I'm imputing to have settled in 2001.  But

8    that's what that number represents, yes.

9    Q.    And lung cancer, again you've calculated for T&N $18,956

10   in 2001, right?

11   A.    For this particular calculation, that's correct.

12   Q.    This is the one you put in your report in this case,

13   right?

14   A.    Well, actually there are several different calculations

15   for both the mesothelioma and the lung cancer and they differ

16   with regard to this issue of certainty with regard to the 2000

17   -- with regard to the settlement dates having occurred in

18   2001.  And, in addition, for this table, but for some others

19   it isn't the case, but for this table we've excluded claims

20   that were filed in 1991 or earlier from the calculation.  It

21   creates some little difference actually for lung cancer, not

22   little difference, so that's why I said for this particular

23   analysis.

24   Q.    Right.  And this is the one that you chose to present in

25   your initial report in this case, correct?

*United States District Court*
*Camden, New Jersey*

595

—Peterson - Cross - Strochak—

1    A.    That's the one I was using in the initial report, that's

2    certainly right.

3    Q.    Dropping down to Table 1B 2001, other cancer claims,

4    T&N's settlement average is $4,590, correct?

5    A.    Yes.

6    Q.    And then, finally, the non-malignant, T&N again, $1,296?

7    A.    That's correct.

8    Q.    Okay.  Now, I don't think there's any dispute that the

9    mesothelioma values show an increase in trend in the years

10   preceding the bankruptcy, correct?

11   A.    I think that's correct.

12   Q.    Now, with respect to the lung cancer claims, is it your

13   testimony, sir, that there is an increasing trend in lung

14   cancer values for T&N during the period 1997 through 2001?

15   A.    Yes.

16   Q.    And with respect to other cancer claims, is it your

17   testimony that there is an increasing trend from 1997 to 2001?

18   A.    There really isn't much of a trend at all for other

19   cancers, I think that's probably isn't much there.

20   Q.    With respect to the non-malignant claims, is it your

21   testimony that there is an increase in trend from 1997 through

22   2001?

23   A.    No, it's not my testimony.

24   Q.    What about -- let's go back to the lung cancer for a

25   second.  What about those data suggests to you that there is

United States District Court
Camden, New Jersey

596

1   an increasing trend?

2   A.   Well, the values in 2001 are appreciably higher than they

3   were in any prior year.  The values, with exception of 1997,

4   in the period of reference, values in all subsequent years are

5   higher than that.  It's not a monotonic, a statistical term,

6   it's not a steady increase, but it's an overall increase.

7   Q.   So we have '97, we have 14,000, a little bit north of

8   14,000.  '98 we have 12,425.  '99 we have 12,179.  2000 we

9   have 14,350.  Correct?  Those are the right numbers?

10  A.   That's correct.  You read the numbers correctly.

11  Q.   And then we bump up just a little under $19,000 in 2001,

12  and it's that almost $19,000 number that suggests to you an

13  increasing trend?

14  A.   Well, that given the context what was happening in

15  litigation, yes.  But the numbers themselves -- well, they're

16  going up 1999, 2000, and 2001 they're going up.  I mean it

17  speaks for itself.

18  Q.   I'm sorry.  You said 1999 to 2000 is going up.  Is that

19  what you said?

20  A.   In successive years.  '98 and '99 are essentially the

21  same numbers.  '97 is the one anomaly in that period.

22  Q.   What statistical test did you do to determine whether

23  there was any significant increasing trend in the actual

24  numbers reported as apart from, separate and apart from your

25  opinion as to what was going on in the litigation system?

597

Peterson - Cross - Strochak

1   A.   Well, there really isn't a meaningful statistical test to

2   say do it for it.  I could have run a multiple progression

3   analysis but that not really meaningful, you have to look at

4   the trends with or without a multiple, excuse me, a

5   correlation.

6   Q.   Let's turn, if we could, to the averages that you

7   actually use in your forecast.  And do you still have your

8   binder of graphics, your trial graphics?

9   A.   Yes, I have that handy.

10  Q.   That's probably the most convenient source for this.  I

11  believe it's on Page 22, if we can go back to 22 on the

12  screen.  You have your copy in front of you?

13  A.   I have it.

14  Q.   So on Slide 22, this was your presentation of the, what

15  you called the adjusted T&N settlement averages, correct?

16  A.   It's the forecasted values that I'm using.  I don't know

17  if I characterize it the way you said, but it's the values

18  that I forecast Turner & Newall would have been paying in 2002

19  to settle these various categories of asbestos claims.

20  Q.   I'm sorry.  Now you got me confused.  2002?

21  A.   Yes, at the time of the bankruptcy, fall 2001, 2002 is

22  how much they would be paying.

23  Q.   2001.  Because your forecast is based on what was

24  happening in 2001, correct?

25  A.   I'm forecasting for essentially the period of time of

United States District Court
Camden, New Jersey

Peterson - Cross - Strochak

1   right after the bankruptcy, which is three months in 2001,

2   essentially the same value applies to 2002.  I tend to regard

3   it as 2002 because that's the first full year.

4   Q.  So these values in your forecast, your forecast fall 2001

5   through 2039, it is these values in red that apply throughout

6   the entire 40 plus years, excuse me, 38 plus years of your

7   forecast, right?

8   A.  Yeah.  Subject the monetary inflation, that's correct.

9   The real value amount is correct.

10  Q.  Now, when I asked you if these were your, what you

11  presented as your adjusted T&N settlement averages, it wasn't

12  a trick question, I was just reading off the caption.  These

13  are the adjusted T&N settlement averages, right?

14  A.  Yes, that's what it says.

15  Q.  And that's because you make adjustments to the historical

16  numbers that we reviewed in the last exhibit correct?

17  A.  Yes, they're quantitative adjustments to what the

18  historic, what the payments were by Turner & Newall before the

19  bankruptcy for the reasons that I describe at length in my

20  direct, yes.

21  Q.  Let's go to demonstrative No. 10, if we could.  This is

22  just a comparison of those data for comparison purposes?

23          MR. INSELBUCH: Where is this?

24          MR. STROCHAK: In your binder.

25          MR. INSELBUCH: This binder?

*United States District Court*
*Camden, New Jersey*

———Peterson - Cross - Strochak———

1      MR. STROCHAK: No, it should be in this binder,

2  hopefully.

3      THE WITNESS:  Is that in my binder?

4      MR. STROCHAK: I apologize, it appears to have been

5  left out of the binders.  I apologize for that.  But it's just

6  a simple repetition of the data we've just gone over the

7  screening, so everybody should be able to see it the computer

8  screens.

9  BY MR. STROCHAK:

10  Q.  So the top row of the chart is 2001 actual as calculated

11  in your report Plaintiffs's 2.  And the middle line, the

12  middle row of the chart is the adjusted T&N settlement

13  averages as reported in Slide 22 of Exhibit 4, correct?

14  A.  Yes, I think that's correct.  The percentage difference I

15  haven't calculated but they look, they don't look unreasonable

16  to me.

17  Q.  I won't hold you to calculations.

18  A.  Thank you.

19  Q.  Starting with the non-malignants on the right, you have,

20  again I won't hold you to calculations, but by our calculation

21  it's a 410 percent increase over the actual settlement

22  averages as you've calculated them, is that correct?

23  A.  I estimate that the real value of the non-malignant

24  claims at the time of the bankruptcy was $6,600.  The average

25  amount settlements was roughly $1,300, again for the reasons

*United States District Court*
*Camden, New Jersey*