600

— Peterson - Cross - Strochak —

1   both Mr. Hanly and I discussed in our direct exams.

2   Q.   Now, the way this works in your forecast is a, I think as

3   we've just discussed, beginning in the first period of your

4   forecast the fall of 2001, you had assigned a little bit north

5   of $6,600 in value to each non-malignant claim, correct?

6   A.   Well, the average of it.  Some would be more, some less,

7   of course, it's an average.  But on average that's the amount,

8   yes.

9   Q.   And your forecast is based on averages.  Of course you

10  don't value individual claims, you assign an average value,

11  right?

12  A.   I was just -- you were asking me if I assigned that to

13  every claim.  Of course I don't.  Some are worth less, some

14  are worth more, but the average is $6,600.

15  Q.   So a non-malignant claimant who settled prior to the

16  bankruptcy on average in 2001 would receive $1,296.  But for

17  purposes of your forecast, a non-malignant claimant that

18  hadn't settled in 2001 would be assigned $6,600 in value, is

19  that right?

20  A.   I wouldn't put it quite that way.  Among the claims the

21  peculiar claims that were settled in 2001 the average

22  settlement was 1,296 because 85 percent of them were

23  Mississippi claim that were settled for $300.  Your question

24  seems to imply generality, it's probably unfounded.

25  Q.   But nonetheless the average is 1,296, right?

*United States District Court*
*Camden, New Jersey*

601

Peterson - Cross - Strochak

1   A.  There's no doubt about that in my mind.

2   Q.  Let's just go back to Plaintiff's a, your report?

3   A.  I'm still there.

4   Q.  Good.  And again, looking at the non-malignant Table 1B,

5   even if we go back to the year 2000, the average T&N

6   settlement was a little bit north of 3,200, correct?

7   A.  That's right.

8   Q.  So your are still paying more than double.  If even if we

9   look at 2000 versus your forecast, you're still assigning more

10  than twice the value that a claimant would have received in

11  2000, on average again, is that right?

12  A.  Yes, twice the -- in 2000, that's correct.

13  Q.  Overall, your forecast allocates almost half of its value

14  to non-malignant claimants, right?  I believe that's Slide 45.

15  A.  Yes, I think that's correct.  There's like 45 or 47.2

16  percent.

17  Q.  Now, Dr. Peterson, you've told the Court that you derived

18  your forecast values from the scheduled values in the trust

19  distribution procedures that have been proposed in this case,

20  correct?

21  A.  I wouldn't put it that way.  I derived values that I

22  described in my testimony, I derived a range of values and

23  then I used the trust distribution values with an adjustment

24  for inflation as a conservative alternative of it.  But I have

25  a whole derivation of values in my report and selected to use

United States District Court
Camden, New Jersey

602

Peterson - Cross - Strochak

1    a number that was more conservative in derivation.

2    Q.    Let's skip to Slide 19 in your presentation, Plaintiff's

3    4?

4    A.    I have that.

5    Q.    This is step three of your calculation of T&N's

6    settlement averages.  And what it shows is that you have the

7    disease average reported here in the center column, correct?

8    Those are the numbers, those are the scheduled values from the

9    trust distribution procedures?

10   A.    Those are the scheduled values.  They're not the averaged

11   values but the scheduled values.

12   Q.    And then you have the numbers in red in the right-hand

13   column, which are -- that is the product of the disease

14   average column, that is the TDP scheduled values multiplied by

15   your percentage paid rate, correct?

16   A.    I'm sorry, Slide 19?  No, that's not correct.

17   Q.    How did you get from 200 to 189?

18   A.    These are both -- the red is an average settlement dollar

19   without, rather than the average resolution dollar, it does

20   not include the reduction for the percent of claims paid.  It

21   is the disease averages, as I testified, are on 2005 dollars

22   from the TDP and I took out four years of inflation to get to

23   2001 because that's the time at which I'm evaluating.  It's my

24   understanding the Court would want to value these in terms of

25   2001 dollar at the time of 2001 at the time of the bankruptcy.

Peterson - Cross - Strochak

1    Q.   Understood.  I apologize.  I missed that.

2         So the $189,036 for mesothelioma, to get your average

3    resolution cost in your forecast, you then multiplied that

4    number by your percentage paid, right?

5    A.   That's correct.

6    Q.   So these are -- the column 2001 dollars is your inflation

7    adjusted, you actually backed out the factor of inflation

8    average settlement value, right?

9    A.   Two responses to that if you don't mind.

10   Q.   Sure.

11   A.   One is the specific calculation is done in the manner in

12   which you said.  But what it really represents is a

13   conservative low estimate of what I believe to be the values

14   that Turner & Newall would have to pay at this point in time.

15   There's -- because of the matters that I discussed in my

16   direct examine, there's uncertainties about how much this

17   company would have to pay in the future.  You can't simply go

18   back and calculate what they just paid in the last year and

19   say, oh, they're going to pay that in the future because of

20   the matters that I discussed, the expectation, reasonable

21   expectation is they would pay more.  So we don't have a

22   precise calculous of that.  It could be a bit more, it could

23   be a bit less.  I think it's likely to be perhaps quite bit

24   more than I forecast here.  So any particular number I put in

25   here is really a precise number I use for my calculation of a

Peterson - Cross - Strochak

1  value that could fall within a fairly wide range, not much

2  lower than this but could be considerably higher.  In fact, I

3  don't think any lower than this.  So I picked the lowest

4  number within that reasonable range and that's what this

5  represents.

6  Q.  Now, you said that the number going forward, the average

7  resolution cost going forward generally should be higher than

8  that observed in the last actual year of data, is that what

9  you said?

10  A.  It's my expectation, although, in fact, the lung

11  cancer/Mesothelioma numbers are almost precise, the same that

12  Turner & Newall did actually pay in 2001 when we're certain

13  they really, I mean what they settled in 2001, when we know

14  that was the actual settlement date.  So again, on the basis

15  of conservatism, I think perhaps the numbers should be higher

16  than this but, in fact, it corresponds to the most recent

17  settlement for mesothelioma and lung cancer, the kinds of

18  cases that are being looked at most closely by Turner & Newall

19  in the period between leaving CCR and entering bankruptcy.

20  Q.  Now, that's a conclusion that you came to as a matter of

21  your own personal judgment, correct?

22  A.  I can only testify from my own expert judgment.

23  Q.  Right.  It's not a forecasting principle, that is, you

24  don't, as a matter of forecasting principles, you don't

25  automatically start with the last year and go up from there,

*United States District Court*
*Camden, New Jersey*

605

Peterson - Cross - Strochak

1   correct?

2   A.   There is no forecasting principle with regard to this.

3   What you do is you try -- and you have to use your expert

4   judgment and your knowledge about the litigation environment

5   in order to state what you think is the most likely payments

6   that someone would have to do, that's the forecasting

7   principle.  And one of the ways to test is that reasonable and

8   plausible is to see if your forecast payments in the future,

9   how they correspond what they're paying at the time of the

10   bankruptcy.  So that's a test of, its sensibility.  And so

11   those are both forecasting principles but the primary one is

12   you have to use your judgment and your knowledge about the

13   area.

14   Q.   Let's go back to the TDPs for a second.  And one of the

15   reason you chose to use TDP values to start with for the

16   derivation of your average settlement values for the forecast,

17   is that you believed that those were numbers that had been

18   established by the proponents of the bankruptcy plan, correct?

19   A.   I think I mentioned that in my report, but that's a

20   secondary consideration.

21   Q.   In fact, you testified on direct that in coming up with

22   your calculation of average settlement values for the

23   forecast, you spoke with various members of the asbestos

24   claimants committee in this case, is that right?

25   A.   I spoke with them.  And I also spoke with lawyers from

*United States District Court*
*Camden, New Jersey*

———————Peterson - Cross - Strochak———————

1    the Hanlon law firm.  Both, I spoke with both sides.  The

2    people that have the most intimate knowledge about the values

3    of claims are not people like me, they're the people that

4    actually have to settle them.  So as I -- when I have the

5    opportunity to do so, I speak with plaintiff and defense

6    lawyers about values and what they think about the reasonable

7    range of values are and I bounce numbers off of them.  So I

8    spoke with lawyers on both sides.

9    Q.  I believe what I heard you say yesterday was that you had

10   a discussion with members of the asbestos claimants committee

11   in this case where one or more of those members suggested to

12   you that an appropriate way to derive values for the trust

13   distribution procedures in this case would be to hang the

14   values of lung cancer claims, other cancer claims, and

15   non-malignant claims on the mesothelioma values, is that

16   right?

17   A.  I had conversations both with members of the committee

18   and with Mr. Inselbuch who represents the committee about

19   using that method and it's appropriateness, yes.

20   Q.  And, in fact, one of the committee members suggested to

21   you that that method be used, is that right?

22   A.  No, not -- it was the committee as a whole recommended

23   that.

24   Q.  Let me just get you to turn, if I could, to Property

25   Damage Exhibit 93 in your binder.

607

Peterson - Cross - Strochak

1   A.   I have it.

2   Q.   Do you recognize Exhibit 93 as the list of the members of

3   the asbestos claimants committee in these bankruptcy cases?

4   A.   I recognize the names of the counsel who represented the

5   members.  I don't know that I've ever met any of the

6   particular members.

7   Q.   It would be fair to say the members themselves don't

8   typically attend committee meetings, is that right?

9   A.   I don't -- I don't know.  I think I've maybe been to one,

10  at most two committee meetings in this case.  In other cases

11  sometimes the committee members -- the plaintiffs themselves

12  who are appointed as the committee members participate and

13  others they don't and I don't know the general practice here.

14  I think it's more likely than not that their representative

15  attend the meeting but I can't say for sure.

16  Q.   These individuals, they would generally participate

17  through their counsel, is that fair to say, in terms of any

18  action you have had with the committee?

19  A.   They rely on their counsel who know a lot more about

20  these issues typically.

21  Q.   Now, in this meeting that you were discussing where the

22  committee decided to hang the values for the other diseases on

23  the mesothelioma values, which representatives of members of

24  the committee participated, do you recall?

25  A.   I don't -- this happened mostly through correspondence.

*United States District Court*
*Camden, New Jersey*

Peterson - Cross - Strochak

1    I sent suggestions of values, I think I got some e-mails from

2    members, spoke on the phone to members.  I don't recall

3    whether or not I attended a meeting to discuss trust

4    distribution values in this case.  I go to a number of those

5    meetings, I may or may not have, so I can't recall that.  I

6    did discuss this issue, I believe, with some of the members

7    and then Mr. Inselbuch sent me a letter expressing the

8    specific request that the committee had asked him to make of

9    me.  That's kind of chronology of the events and what I can

10   recall about it.

11   Q.  Is it your understanding that often different members of

12   an asbestos claimants committee will represent or advocate the

13   interests of a particular category of asbestos claimants?

14   A.   They have different points of view.

15   Q.   That is, there are people who would advocate the

16   interests or try and advance the interests of mesothelioma

17   claimants, correct?

18   A.   I don't think I would say it that way.  If I did, I'd

19   probably get into trouble, because the plaintiffs' lawyers,

20   each of them represent a range of claimants, they have

21   mesothelioma claimants and they have other claimants and their

22   obligation is to represent the interests of all of their

23   claimants.  All I can say is the members have different points

24   of view for whatever reasons.

25   Q.   Let's just flip back to demonstrative No. 10 on the

Peterson - Cross - Strochak

1  screen again.

2  A.    You're back into my binder?

3  Q.    No, this will come up on the screen in just a second.

4      We talked about the nonmalignant on the right-hand

5  side.  Let's just move right to left.  Other cancer, the

6  average value as calculated for 2001 was $4,590, correct?

7  A.    That was the average settlement amount agreed to by

8  Turner & Newall, and I think it was a couple dozen other

9  cancer plaintiffs in 2001.  That's the number, yeah.

10 Q.    And then the average value that you used in your forecast

11 is $13,941, right?

12 A.    Correct.

13 Q.    204 percent increase right?

14 A.    I assume that that's correct.

15 Q.    And then lung cancers, again $18,956 is the actual

16 information and 30,246 is your forecast average value,

17 correct?

18 A.    Well, 18,956 is the number that I presented in my report,

19 I think it's probably not a correct number.  I would be more

20 inclined to accept the numbers that were discussed both in my

21 deposition materials I sent you and rebuttal report that

22 exclude, that include the pre-'92 settlements, which is in the

23 range of maybe 23,000 to 30,000, but that was in my report.

24 It's one way to calculate this certainly.

25 Q.    This is the number that actually came out of your report

*United States District Court*
*Camden, New Jersey*

610

Peterson - Cross - Strochak

1    right?

2    A.    The first report.  Subsequent reports, when I did further

3    analysis and looked more at these numbers thanks to the

4    questions you were asking me at the depositions and in

5    response to Dr. Cantor's work, I looked more closely at it and

6    I'm more comfortable with the latter numbers.  But this is a

7    number I used and presented my report and it's a sensible

8    calculation of the average certainly.

9    Q.    And then finally mesothelioma $138,939 actual as you

10   calculated it in your initial report.  At $189,036 as

11   calculated in your forecast, right?

12   A.    Yes.

13   Q.    Projected in your forecast?

14   A.    Yes, those numbers are the, I think, both the

15   mesothelioma and lung cancer numbers are reflected on Exhibits

16   20 and 21 where I show  my materials demonstrative where I

17   show the trends and the settlements and show the three

18   alternative ways of calculating it.  But those are one of the

19   numbers that's included in that graphic.

20   Q.    Turn, if you would, Dr. Peterson, to Slide 15 in your

21   presentation.  Exhibit 4, Plaintiff's 4?

22   A.    Yes, I have that.

23   Q.    Now, what you do here is you calculate an average

24   mesothelioma settlement $210,291, right?

25   A.    Yes.

*United States District Court*
*Camden, New Jersey*

611

Peterson - Cross - Strochak

1  Q.   That's not an actual number, that's again your adjusted

2  number, right?

3  A.   Forecasted number.  It's sort of based upon two

4  parameters in the Turner & Newall's settlement data, that's

5  the number that I calculated and estimate is an appropriate

6  forecasting number for what they have to pay in 2001 and 2002.

7  Q.   And the way you get that is you calculate an average for

8  '97, 98, right?

9  A.   I start with that, yes.

10  Q.   And you calculate an average for 2000 to 2001, right?

11  A.   Yes.

12  Q.   And then you determine that that's a 214 percent change,

13  is that right?

14  A.   Yes.  And divide the '98 by the 45 and you get 2.14.

15  Q.   That's right.  So you multiply 2.14 times your calculated

16  average for 2002, 2001 and that takes it up to 210,291?

17  A.   Right, that's the next step, the second bullet.

18  Q.   In arriving at your necessary average using your

19  forecast, you don't actually use the 210,291, do you?

20  A.   I use a more conservative number that we've already

21  discussed.

22  Q.   You refer to the TDP that was agreed by the numbers of

23  committee, right?

24  A.   No, I actually use a number lower than the TDP, it's

25  $189,000.

*United States District Court*
*Camden, New Jersey*

Peterson - Cross - Strochak

1  Q.   Because you back out inflation?

2  A.   That's the calculation.  But I use 189,000, yes.

3  Q.   Now, you've characterized the use of the 98,246 number as

4  conservative, is that right?

5  A.   98,267.

6  Q.   267, I'm sorry?

7  A.   I would say it's more than conservative, I think it's

8  inappropriate.  Conservative in this calculation, yes.  I'm

9  sorry.  It is a conserve number to use in these steps, that's

10  correct.  It's one of two types of conservatives in arriving

11  at the 210.

12  Q.   You suggested to the Court that it was conservative

13  because if you look only at the 2001 claims in the database

14  that have been designated in the database as settled in 2001,

15  you come up with an average of 194,000 plus a little bit,

16  right?

17  A.   Yes.  But also when you compare it with 138,000, which is

18  the average for all the claims, all the settlements that we

19  either know are actually or those I've imputed by either

20  terms.  The 98,000 is a conservative number.  It doesn't

21  represent where they actually ended up before they went into

22  bankruptcy.  And the 194 and the 138 are alternative estimates

23  of what would happen outside of CCR.  The 98,000 represents --

24  actually is -- it's more heavily weighted for settlements

25  within CCR.  So that's another reason why the 2001 number is a

*United States District Court*
*Camden, New Jersey*

613

Peterson - Cross - Strochak

1   more appropriate basis for forecasting the future liabilities.

2   Q.   Let's talk about 138,939 for a second.   That's the number

3   that was reported in your initial report as the calculated

4   average for 2001, right?

5   A.   Yes.

6   Q.   When I took your deposition back in December of last

7   year, I'm pretty certain I asked you how that number was

8   calculated and you told me that what you did was you took the

9   expense year.

10  A.   I'm sorry, when?

11  Q.   This would have been your deposition in December of last

12  year.

13  A.   I think that's correct.   I think you're correctly

14  recounting what the deposition was, but the answer was

15  incorrect and I apologize for that.

16  Q.   So at the time you gave your deposition in December of

17  last year, you were under the impression that the method for

18  determining the actual average settlement value for 2001 was

19  to look in the database and figure out which settlements had

20  been paid in 2001, is that right?

21  A.   That's what I answered.   I don't recall sitting here now

22  what my impression is, but that was my answer.   I don't know

23  that it -- I might have been ill-prepared to answer that

24  question.   There's lots of issue that go into the bankruptcy

25  and, frankly, I -- was, I don't believe I had -- I certainly

*United States District Court*
*Camden, New Jersey*

614

Peterson - Cross - Strochak

1   didn't understand it.  At the time I probably had not thought

2   much about that particular issue but I answered it

3   incorrectly.

4   Q.   Turn, if you would, to Property Damage Exhibit 92 in your

5   binder.

6   A.   I have to reorient myself a little bit.

7   Q.   Take your time.

8        You have a bigger desk than I do, you have an

9   advantage.

10  A.   The perks of being a witness.

11       I have it and I'm balancing it here.

12  Q.   I'll represent to you, Dr. Peterson, this is a document

13  that you produced to us after your more recent deposition when

14  we asked for some backup information about how you had

15  calculated your average, actual average settlement values.

16  A.   It certainly looks like that.  I accept your

17  representation.

18  Q.   This is not a document that was created contemporaneous

19  with your original report, was it?

20  A.   No.

21  Q.   It's got a date of June 6, '05 in the top left hand

22  corner, correct?

23  A.   Yeah, that it does.  That's when this was printed out.

24  Q.   What this document does is it explains the set of rules

25  that you used for figuring out which claims to put into your

————Peterson - Cross - Strochak————

1    calculation of average settlement values for 2001, right?

2    A.   Yes. Actually, I mean, it sets the rules generally that

3    we used, but in all prior years, over 90 percent of the claims

4    had a settlement year attached to it.  So the issue is, is a

5    more important, and frankly more interesting, 2001, so that's

6    why we speak to 2001 because that's how the issue arose in the

7    deposition.

8    Q.   And there are variables in the databases field in the

9    database for settlement year, correct?

10   A.   That's right.

11   Q.   And as you've indicated, sometimes the settlement year is

12   not filled in, but you know from other data on the record that

13   the claim actually has been settled; is that right?

14   A.   Yes.

15   Q.   And the database also has a field for expense year,

16   right?

17   A.   Yes.

18   Q.   And expense year is generally an indication of when the

19   claim was actually paid, right?

20   A.   Yes.

21   Q.   And then obviously you have various data and fields

22   relating to file year indicating when the claim was filed or

23   received by either the debtors or CCR, right?

24   A.   Yes.  And we derived essentially a composite variable as

25   to filed year and received year and service year.

616

Peterson - Cross - Strochak

1    Q.    Let me turn you, if I could, to page 15 of 16 in that

2    document. Are you there?

3    A.    Yes.

4    Q.    Okay.  It's got four groupings of data on this page and

5    they're all for mesothelioma.  I take it that's what the

6    "meso" on the left hand side means?

7    A.    Yes.

8    Q.    And then it has in the "set year" column, which I assume

9    means settlement year; is that right?

10    A.    That's correct.  And the 100 is obviously 2000 and 2001.

11    Q.    Right.  The numbers 90 through 101 corresponds to 1990 to

12    2001, correct?

13    A.    That's right.

14    Q.    And then moving a column to the right, it's got number of

15    settlements, right?

16    A.    Yes.

17    Q.    And what does that represent?

18    A.    Well, those are the number -- that's our best estimate of

19    the number of mesothelioma settlements reached in 2001 --

20    well, there is a technical issue here, and you may be getting

21    to why is the 135 different from 138, I don't know.  I guess I

22    need to explain this technical issue.

23    Q.    Actually, I'm not getting there, so let me interrupt you

24    so we don't have to go off on a folic and detour.

25    A.    That actually isn't precisely the number of claims

*United States District Court*
*Camden, New Jersey*

Peterson - Cross - Strochak

1  settled, it's the number of records that have a settlement

2  year.  Now, it's possible that the same case may have two

3  entries of a 2001 settlement because for some members of --

4  for some plaintiffs, they receive two payments, they may have

5  received one in an earlier year and one in a later year.  I

6  don't know if there were any that received two payments in the

7  same year.  But it's -- it's uncommon, but it happens.

8        And in constructing our database that we used for the

9  primary analyses, if a claimant got two payments, we add them

10  together and treat it as one. Here the issue we were

11  addressing, the one that Mr. Strochak raised in deposing me,

12  was an inquiry a table in my rebuttal report where

13  we essentially had a matrix of claims by settlement year and

14  filing year.  That table, this table, are made without

15  aggregating the multiple payments because you can't do this

16  analysis if you've got a claim that, for example, was settled

17  in 2000 and had a payment in 2000 and 2001, you no longer can

18  construct a table because that case gets two payments, you

19  know, what year did it settle, what year did it get expensed.

20  So, we just treated each record without having aggregated it

21  and that's why there is slight -- another reason why there is

22  slight differences between this table and the numbers reported

23  in my first report.

24        It's an arcane issue necessary to do this

25  presentation, and the only reason I'm troubling the Court with

*United States District Court*
*Camden, New Jersey*

Peterson - Cross - Strochak

1    it now is in response to Mr. Strochak's question that number

2    settled really represents the number of records recording a

3    settlement, and it is possible that the number of plaintiffs

4    who settled in that year may be a bit less than that because

5    they may be represented a couple times in there. The net

6    effect of our not aggregating it is to produce lower averages

7    because there is one case in here, Mr. Henderson, that got --

8    he may be in the 2001 group who received three different

9    payments.  And I think he is in the 2001 settlement.  He

10   received a payment of 625 -- $650,000, $325,000, $325,000.

11          We treat that as three different settlements for

12   purposes of this table. In fact, he got one, what is it,

13   1.35 -- $1.3 million, just it was broken down into three

14   different payments.  So by disaggregating in this way we've

15   slightly understated the average, but that's why, I'm sorry to

16   go on this diversion, but you asked me what that number means

17   and it isn't quite what it seems, and I've tried now to

18   explain it.

19   Q.   It's actually the next column I was really interested in.

20   A.   I don't have another answer.

21   Q.   The end cause column, that's the number of records that

22   actually have a positive settlement value in that; isn't that

23   right?

24   A.   It's it is same issue. This may be slightly more than the

25   number of individuals who had a settlement, this is the number

United States District Court
Camden, New Jersey

619

Peterson - Cross - Strochak

1   of records that were there.

2   Q.   So you've got four different sets of rules here on this

3   column, correct?  And I think you told me in your deposition

4   that the first rule you went on, that is after we corrected

5   the problem about expense year, the first rule was to just

6   look and see if this there was a settlement date in the

7   database, correct?

8   A.   Yes, that's the first of three rules actually, but yes.

9   Q.   That's right. So in the block there that has the meso

10  settlement year label on it, what we show in the number of

11  positives column is 65 positive settlement value records in

12  the database that actually had a settlement year of 2001,

13  correct?

14  A.   Yes.

15  Q.   And then the next block down is the expense year column,

16  and I believe you told me that if there was no settlement year

17  in the database, you reverted to expense year, correct?

18  A.   That was the -- yes, we used expense year if we didn't

19  have settlement year.

20  Q.   And then moving down the page, mesothelioma file year,

21  you have a third rule where you impute a year, correct?

22  A.   Yes.

23  Q.   And your --

24  A.   Well, expense years is also an imputed year.

25  Q.   Why is expense years imputed?  I mean, wouldn't the

*United States District Court*
*Camden, New Jersey*

Peterson - Cross - Strochak

1  record actually reflect an expense year of 2001?

2  A.  Yes, but it's for cases when there is no settlement year,

3  so we're imputing that the settlement year is the same as the

4  expense year.  The imputation is using a different variable to

5  provide an expense year number when it's missing.

6  Q.  So you've assumed that for the 119 records with positive

7  settlement values and no settlement year where they reflected

8  an expense year of 2001 that's what you've put into your

9  calculation, right?

10  A.  I'm sorry, could you repeat the question?

11  Q.  Yeah, it wasn't a particular good one.  I apologize.

12  A.  I was actually looking at a table, so.....

13  Q.  Your second rule says that if you have an expense date of

14  2001 and a blank in the field for settlement date, you put

15  that claim in 2001 for purposes of calculating your settlement

16  averages?

17  A.  Yes, that's explained on the first page of Exhibit 92.

18  Q.  So, totaling this up, so far we've got 65 records with an

19  actual settlement year of 2001 reflected in the database,

20  we've got another 119 records for which you've imputed a

21  2001-year based on the fact that they had an expense year of

22  2001?

23  A.  Yes.

24  Q.  Okay. Now you've got a file year calculation also, right?

25  A.  Yes.

*United States District Court*
*Camden, New Jersey*

621

Peterson - Cross - Strochak

1  Q.   And the filed year calculation basically says if I don't

2  have either settlement year or expense year data, you look to

3  your file year, right?

4  A.   Yes.

5  Q.   And if your file year plus two is greater than or equal

6  to 2001, you put that in 2001 for calculating your settlement

7  averages?

8  A.   I think we also took if it was a 2000 or 2001 settlement,

9  we also put them -- excuse me, let me start again. If it was

10  filed in 2000 or 2001 and it settled, obviously it had to

11  be -- if it were filed -- let's start again, yet.  If this was

12  filed in 2001 and it was a settled claim without a settlement

13  year or an expense year, it had to have been a 2001 settlement

14  because you know there is no settlements after 2001. If it was

15  filed in 2000 and didn't have an expense year or settlement

16  year, we also assumed that they were settled in 2001 as well

17  as the cases filed in 1999. So, there is a -- today generally

18  it's a two-year rule, but, you know, we came up against a

19  deadline, there were no claims settled after 2001, so anything

20  that was filed from '99 to 2001 I believe is treated as a 2001

21  settlement.

22  Q.   And then let's go up to the first block, the "meso any"

23  block, that represents a total of 225 records, right, with a

24  positive value?

25  A.   We're on page 15. 225, yes.

United States District Court
Camden, New Jersey

622

Peterson - Cross - Strochak

1    Q.    So that's all your claims, that's the universe, right?

2    A.    That should be.

3    Q.    So of the 225 records with positive value that could go

4    into 2001, under your rules only 65 of them have an actual

5    settlement year filled in the database of 2001; is that

6    right?

7    A.    If that was -- yes, that's correct.

8    Q.    Now in imputing your -- in figuring how to impute a year

9    into which to put your claims, you believe that it's a general

10   principle of forecasting that you would do such an exercise,

11   correct, that you have to put your claim somewhere, so you

12   have to use an imputation process, right?

13   A.    You could choose to ignore those claims. It's an

14   alternative way to do it. I don't regard this as a general

15   principle of forecasting, it's the steps that we did here.

16   Typically, there is a lot of imputation in forecasting.

17   Q.    Like imputing death year, for example, that's another

18   example of an imputation that you might do similar to this

19   exercise, correct?

20   A.    You can, you can make steps of imputation for whatever

21   variable you need depending on what you need it for and how

22   sensible your imputation was, but sure, that's another

23   possibility.

24   Q.    Now, you indicated before that the observed data for '97

25   through 2001 showed no increase for nonmalignant claims,

United States District Court
Camden, New Jersey

Peterson - Cross - Strochak

1    right?

2    A.   It didn't show much of a trend of any sort, no, that's

3    correct, I agree with that.

4    Q.   And you indicated the same was true for the other cancer

5    claims, right?

6    A.   I think that's -- I'd have to go back and look at it, but

7    I think that's all right.

8    Q.   And on the lung cancer you saw no -- let me take that

9    back.  Lung cancer, you pointed to the last two years of data

10   suggesting some type of increase, right?

11   A.   Well, it was a pattern over the last four years, but yes.

12   Q.   Let's done to Slide 16 in your book.

13   A.   Let me put this away for a moment.

14   Q.   Sure. It's heavy.

15   A.   It's awkward. I have 16, yes.

16   Q.   This is a process, step two in your settlement average

17   calculation, this is the process where you hung the value for

18   the three other disease categories on the mesothelioma

19   averages, correct?

20   A.   What's specifically on 16 is some data that supports the

21   reasonableness of that step, it isn't the actual calculation.

22   Q.   That's right, the actual calculation doesn't matter

23   because at the end of the day you disregard it and revert to

24   the scheduled TDP values, right?

25   A.   Oh, I disagree entirely with that statement.

624

Peterson - Cross - Strochak

1   Q.   Isn't that where the actual numbers come from?

2   A.   The calculation is important in deriving a value, it's a

3   critical step, it's a central step for deriving the values of

4   the diseases, which I then compare with the TDP values which

5   were derived using precisely the same method, using the ratios

6   of mesothelioma, lung cancer, other cancer nonmalignant

7   settlement values based on Turner & Newall actual data, but

8   it's precisely the same steps in both cases, it's just that

9   for the TDP I started with a $200,000 value for mesothelioma

10  and here I started with a $210,000 value.  In both, in both

11  estimates, both of which I did, the calculation of the ratios

12  and the use of ratios is an important central step and it

13  needs to have a rational basis for it, which I've demonstrated

14  with this table.

15  Q.   But the ratios aren't the numbers that you actually used

16  to derive your forecast average settlement values correct?

17  A.   That's wrong.

18  Q.   You don't plug those numbers into any formula to come up

19  with your average settlement value, do you?

20  A.   That's wrong.

21  Q.   Okay, let's go through it. Let's turn to Slide 18, if we

22  could. Slide 18 is taken from the proposed trust distribution

23  procedures, correct?

24  A.   These are the scheduled values for the TDP for Turner &

25  Newall and the proposed plan, yes.

*United States District Court*
*Camden, New Jersey*

Peterson - Cross - Strochak

1  Q.   Lung cancer, is 42,500?

2  A.   One of two lung cancers is 42,500.

3  Q.   That's right, the other one is 12,000?

4  A.   That's correct.

5  Q.   And a what you do is you put in on the next page, Page

6  19, 32,000, correct?

7  A.   32,000 is the average for the two lung cancer categories

8  and it is the number that I derived using this hanging process

9  I describe. You are reversing the order.  The 32 is the

10  derived number using the same methods for the TDP process as I

11  used here for this first step in the forecasting process.

12  Having gotten 32, then I made a judgement about what's an

13  appropriate ratio for the two lung cancer categories looking

14  to the other TDPs that had been constructed in other asbestos

15  bankruptcies.  That's the steps of the process, but it is

16  based upon starting with the $200,000 for meso and looking at

17  what was the historic ratio between meso and lung cancer

18  claimants for Turner & Newall.

19  Q.   I understand, Dr. Peterson, that you looked at the data

20  on pages 16 and 17 of your slides in reaching your

21  conclusions, what I'm focus dollars on is the actual

22  calculation, that is, the equation of how we get from point A

23  to point B.  And my point, sir, is getting to the numbers on

24  page 19 of your slides, the calculated information about other

25  defendants on pages 16 and 17 is not part of the equation that

1  you use to derive those values; is that right?

2  A.   This specific calculation on 19 does not use any of the

3  numbers from what, Exhibit 16 you're talking about?   That's

4  correct.

5  Q.   And for the other cancer, if we look at page 18, other

6  cancer from the TDP scheduled values is 14750 and that's

7  exactly the number on page 19, right?

8  A.   That's right.

9  Q.   And you deflate the 2001 dollars and you come up with

10  13941, right?

11  A.   That's right.

12  Q.   And the nonmalignant number is, again turning to page 18,

13  the nonmalignant number is a composite of the last three lines

14  of the TDP schedule values?   Excuse me, the last four lines;

15  is that right?

16  A.   I'm sorry could you repeat that question?

17  Q.   Sure.   Let's look at page 18.

18  A.   I'm looking at it.

19  Q.   Categories 1, 2, 3 and 4 working up from the bottom.

20  A.   Yes.

21  Q.   Those are the nonmalignant disease categories, right?

22  A.   No.

23  Q.   How am I wrong?

24  A.   One also includes some cancers.   It's not -- I don't

25  regard it as a nonmalignant category, it's essentially for

———Peterson - Cross - Strochak———

1  people that have some minimal evidence of an asbestos-related

2  disease such that they would get past a summary judgment

3  motion, but it could be any disease other than mesothelioma.

4  That's what the trust distribution procedures describe it as

5  and that's how I regard it in doing forecasts of TDP values,

6  that's how I treat it.

7  Q.   Tell me how you get from those four values in the

8  schedule in the TDPs on page 18 to the $7,000 disease average

9  reported on page 19.

10 A.   There is two problems within the question. One is I don't

11 use the $400.  Like I just said, it's a different category.

12 Q.   Okay.

13 A.   The category 2, 3 and 4 related to the weighted average

14 7,000.  But what I did is I calculated a $7,000 value by

15 starting with $2,000 -- $200,000 for mesothelioma and looking

16 at Turner & Newall's own experience, what was the ratio of

17 mesothelioma values, settlements historically in 2000/2001 to

18 nonmalignant averages and it is essentially the nonmalignant

19 values are 3,5 percent of the mesothelioma values.  So that

20 gives me the $7,000. Now I've got the $7,000.

21       And then I go -- I suggest to the committee how to

22 divide up, how to calculate appropriate scheduled values for

23 each three of these categories of diseases that comes close to

24 the $7,000. You are reversing the order. The order of doing it

25 was doing the calculation -- the calculations on the first

*United States District Court*
*Camden, New Jersey*

—————Peterson - Cross - Strochak—————

1   column in black on Table 19 were done in exactly the same way

2   that I made the calculations in my report here, they're based

3   on starting with mesothelioma and looking at the historic

4   relationships for Turner & Newall.

5        Now, the Turner & Newall historic relationships are

6   not represented on page 16, I don't believe.  Maybe it's one

7   of the other defendants, I just don't recall.  But I used the

8   T&N historic averages to calculate the column on Table 19 that

9   you've drawn my attention to and I also used it to do the

10   calculation that are on Table 17 in the last row.  It's

11   precisely the same calculation.  With rounding, the numbers

12   show the same ratios, it's just one starts with -- when I

13   derived the TDP I used $200,000 average because the committee

14   wanted to be conservative with regard to the values to use for

15   mesothelioma.

16        In this report I used a $210,000 average because it

17   had the specific calculation, basis in calculation that I

18   described here. Frankly, it doesn't make much difference

19   whether you use the one or the other, but they're both done

20   the same way, and with the same intention, both done by me.

21   They were done at different times. And I used the $200,000 and

22   then reduced it even further because I wanted to be

23   conservative, I wanted -- I wanted -- did not want you to come

24   in here and you tell me:  Dr. Peterson, aren't you are taking

25   the highest value you could have calculated for mesothelioma?

629

Peterson - Cross - Strochak

1   And these are the cases, because I wanted to protect myself

2   from that kind of cross-examination and I wanted the court to

3   believe that I was doing reasonable forecasts.  And so I used

4   conservative forecasts that under, rather than overestimated,

5   consistent with all of my entire history of forecasting

6   asbestos liabilities.  I strive to underestimate rather than

7   overestimate, and that's the history of what my forecasts are.

8   Q.   Except in Judge Fullum's courtroom.

9   A.   We'll see what happens with Owens Corning's future

10  claims. The future may prove me right.

11  Q.   Let me just follow up on that while I have you. You said

12  several times before that you didn't have an opportunity to

13  present any rebuttal testimony in Owens Corning.  That's not

14  because Judge Fullam precluded it, is it?

15  A.   Oh, no, he didn't prevent my rebuttal. It wasn't my

16  decision, I'm just a witness.

17  Q.   Let's focus on two things you just said. The first you

18  said was that your discussion with the committee was an effort

19  in some way, I don't mean to mischaracterize your testimony in

20  any way, but in some way was an effort to divide up or

21  allocate the value; is that right?

22  A.   I don't understand your question. I don't think it

23  comports with what I testified.

24  Q.   Well, I heard you say something along those lines, and

25  perhaps you caught yourself before you got all the way out,