<u>v. Coastal Corp.</u>, 503 U.S. 131 (1992).  These hearings spanned three days, from February 16, 2005 to February 18, 2005.

## II.  <u>Daubert</u> Hearings/Court Depositions

### A.    The Need for the Hearings

Prior to turning to the evidence adduced at the hearings, it is helpful first to summarize the facts that warranted them.  As the Plaintiffs' Fact Sheets came pouring into the document depository, something remarkable became apparent.  As required by this Court's orders, the Fact Sheets list <u>all</u> of the Plaintiffs' physicians--not just the physicians who diagnosed the Plaintiffs with silicosis.  In total, the more than 9,000 Plaintiffs who submitted Fact Sheets[23] listed the names of approximately 8,000 different doctors.  And yet, when it came to isolating the doctors who diagnosed Plaintiffs with silicosis, the same handful of names kept repeating.  All told, the over 9,000 Plaintiffs who submitted Fact Sheets were diagnosed with silicosis by only 12 doctors.[24]  In

---

[23]  Many of the Plaintiffs simply failed to obey the Court's repeated orders to submit Fact Sheets.  These Plaintiffs will be addressed, <u>infra</u>.

[24]  The twelve doctors are: Dr. Robert Altmeyer, Dr. James Ballard, Dr. Kevin Cooper, Dr. Todd Coulter, Dr. Andrew Harron, Dr. Ray Harron, Dr. Glynn Hilbun, Dr. Richard Levine, Dr. Barry Levy, Dr. George Martindale, Dr. W. Allen Oaks, and Dr. Jay Segarra.  The diagnoses and underlying methodology of Dr. Altmeyer and Dr. Levine are not discussed in this Order.  By agreement of the parties (because of the relatively small number of diagnoses Dr. Altmeyer and Dr. Levine issued), neither doctor testified at the <u>Daubert</u> hearings/Court depositions.
    Throughout this Order, the Court refers to these physicians as the "diagnosing doctors."  This is not meant to imply that any of the physicians are fact witnesses.  Plaintiffs have made no

-30-

virtually every case, these doctors were not the Plaintiffs' treating physicians,[25] did not work in the same city or even state as the Plaintiffs, and did not otherwise have any obvious connection to the Plaintiffs. Rather than being connected to the Plaintiffs, these doctors instead were affiliated with a handful of law firms and mobile x-ray screening companies.

Defendants sought discovery from nine of these diagnosing doctors, as well as three screening companies.[26] Two of the screening companies (N&M and RTS) fought the Defendants' document subpoenas in the United States District Court for the Southern District of Mississippi. In this Court, Plaintiffs filed motions to quash the document subpoenas issued to the other screening company and all nine doctors. With respect to each doctor, Plaintiffs asserted that they had standing to object to the discovery because each doctor "is a Plaintiffs' expert." (MDL 03-1553, Docket Entries 1077, 1079, 1081, 1083, 1084-87, 1188.)

---

such claim; instead, Plaintiffs have consistently maintained that the "diagnosing doctors" are "experts" (although, as discussed infra, they have intimated that some of the doctors may be non-testifying experts).

[25] Approximately 85 percent of the Plaintiffs who submitted Fact Sheets reported having a treating physician. (Feb. 18, 2005 Trans. at 243.) As a general matter, these Plaintiffs do not appear to be indigent individuals who do not otherwise have access to health care.

[26] The nine doctors are: Dr. Robert Altmeyer, Dr. James Ballard, Dr. Kevin Cooper, Dr. Todd Coulter, Dr. Glynn Hilbun, Dr. Richard Levine, Dr. Barry Levy, Dr. George Martindale and Dr. Jay Segarra. The three screening companies are: N&M Inc., RTS Inc., and Innervisions Inc.

Plaintiffs objected, among other reasons, on the grounds that asking the doctors to search their records and produce documents for 10,000 individuals would subject the doctors to an undue burden and expense. Nine of the ten motions to quash were filed on October 25, 2004. Four days later—and before the Defendants responded or the Court ruled—the Defendants deposed one of these diagnosing doctors.

### 1.    Dr. Martindale's Deposition

On October 29, 2004, Defendants deposed Dr. George H. Martindale, a radiologist in private practice in Mobile, Alabama. Contrary to Plaintiffs' assertion in their motion to quash the subpoena issued to Dr. Martindale (filed four days earlier), Dr. Martindale testified that he was not Plaintiffs' expert and had specifically refused Plaintiffs' lawyers' requests to serve as their expert. (Martindale Dep. at 13, 141, 152-53.)

Notwithstanding this, Dr. Martindale is listed on the Fact Sheets as diagnosing 3,617 Plaintiffs with silicosis. Each of Dr. Martindale's reports for each of these 3,617 Plaintiffs contain the following sentence:

> On the basis of the medical history review, which is inclusive of a significant occupational exposure to silica dust, physical exam and the chest radiograph, the diagnosis of silicosis is established within a reasonable degree of medical certainty.

-32-

(Martindale Dep. Ex. D-2.)  An example of one of these reports is attached as Exhibit 1.[27]

Despite this language in his reports, during his deposition Dr. Martindale admitted that he did <u>not</u> diagnose <u>any</u> Plaintiff with silicosis.  He admitted that he did not speak to a single Plaintiff; he only prepared "B-readings" of Plaintiffs' chest x-rays.[28]  (Martindale Dep. at 73.)  Indeed, he testified that he did not even know the criteria for making a diagnosis of silicosis. (Martindale Dep. at 70.)

Specifically, Dr. Martindale testified as follows:

> Q.   The impression states ... that on the basis of the medical history review, which is inclusive of a significant occupational exposure to silica dust, physical exam and the chest radiograph, the diagnosis of silicosis is established within a reasonable degree of medical certainty.   Now, Doctor, that's simply inaccurate, isn't it?

---

[27]  The Court selected this Plaintiff's report at random from a large number of similar choices.  The selection of this Plaintiff, or of any other Plaintiff specifically named in this Order or named in an exhibit attached to this Order, should not be interpreted as a finding that the named Plaintiff does not have silicosis or is a malingerer.

The social security number which originally appeared on Exhibit 1 has been redacted.  Likewise, all social security numbers on all other Exhibits attached to this Order have been redacted.

[28]  A "B-reading" is a physician's report of findings from a patient's chest radiograph (i.e., an "x-ray").  This report is entered on a standardized form using a classification system devised by the International Labour Office ("ILO").   NIOSH issues "B-reader" certifications for physicians in the United States. There are approximately 500-700 certified B-readers currently practicing in the United States.  (Feb. 18, 2005 Trans. at 76-77.)

A.  I can't - yes, sir - I can't diagnose silicosis on the basis of the chest x-ray and ILO [i.e., International Labour Office B-read form], and I didn't intend to.... [N]otwithstanding whatever is said here, I did not intend to make a diagnosis of silicosis or asbestosis based on the ILO, chest x-ray that I had, and/or the information that I was sent.  I assumed that the physician who did the physical, did the history, took the occupational exposure would be making the diagnosis.

Q.  Okay, let's break this up into a couple of pieces. Would it be fair to say that in your opinion this impression that's listed on [Dr. Martindale's report] is an overstatement of what you did?

A.  I think - yes, I think it's an overstatement.

Q.  Would it be fair to say that this appears to state a clinical diagnosis of silicosis when, in fact, that's not what you did?

A.  Correct.

(Martindale Dep. at 101-03.)  Dr. Martindale further testified:

Q.  Doctor, as you sit here today, will you withdraw from all of your reports that have the [diagnosing] language under 'impression' ... as incorrect and overstated?

A.  I would say that if there wasn't an established - if another physician hadn't established a diagnosis of silicosis slash asbestosis, I would withdraw that.  I would - I would say that I am personally not making a diagnosis of asbestosis or silicosis on any report that - whose ILO I filled out and whose chest x-ray I looked at, that it was not my diagnosis of asbestosis or silicosis, notwithstanding how I worded that paragraph.

....

Q.  [W]e can pull out all thirty-five hundred of these if we need to, but it would be fair to say that the impression paragraph such as the one listed in [Dr. Martindale's report] - that anywhere that occurs in your thirty-five hundred diagnoses, that that's overstated?

A.  As far as I'm concerned, yes.... I'm not diagnosing silicosis myself, correct.

(Martindale Dep. at 120, 132.)

In early 2001, Dr. Martindale decided to get a B-reader certification in order to supplement his income.  (Martindale Dep.

at 51-52 ("I'd heard there was a physician here in Mobile named Jim Ballard who had read a number of B-read films and ... I thought that ... it would be something that could supplement my income.")) All of Dr. Martindale's reports and B-reads were works hired by N&M, Inc., the screening company that orchestrated the majority of silicosis diagnoses for Plaintiffs in this MDL. (Martindale Dep. at 52.)

Between March 2001 and June 2002, Dr. Martindale read approximately 4,000 B-reads for N&M, for both silicosis and asbestosis litigation. (Martindale Dep. at 16-17, 20, 113.) As noted above, 3,617 of these came to be labeled "diagnoses" by Dr. Martindale for Plaintiffs in this MDL. These 3,617 diagnoses were issued on only 48 days, at an average rate of 75 diagnoses per day.

According to his testimony, the reason Dr. Martindale moved so quickly is that he did not believe he was diagnosing silicosis; he believed he was simply providing a "second check" of another physician's thorough diagnosis:

> A.  [I]t was my understanding that another physician had done a physical and history -- occupational history, medical history -- had supervised some PFTs [i.e., pulmonary function tests] and had evaluated the chest x-rays, and only those patients that they had deemed had positive chest x-rays were sent to me to evaluate.
> ....
> Q.  And do you have an understanding of why N&M wanted you to do a second read of these x-rays?
> A.  The only explanation that I was given was that for case -- for settlement of cases, the second reading was being required.  I guess as a second check, you know.
> Q.  And who gave you that explanation?

> A.   Heath Mason, who I guess is one of the owners of N&M.

(Dr. Martindale Dep. at 21-24, 60.)[29]

The process operated as follows: for each person, N&M mailed Dr. Martindale a chest x-ray in a jacket, a single sheet of paper that contained an abbreviated history and physical, and an ILO form (i.e., a B-read form) with the person's and Dr. Martindale's identifying information already filled in.[30]  (Dr. Martindale Dep. at 19, 34-36, 91-92.)  Dr. Martindale was told by Heath Mason, co-owner of N&M, that the abbreviated history and physical had been performed by a radiologist named Dr. Ray Harron.  (Id. at 16, 36-37.)  Dr. Martindale testified that he did not rely on this form in any way in performing his B-read.  (Id. at 106.)  But in making his B-reads, Dr. Martindale was "influenced" by the B-read notation written on each x-ray jacket, which Dr. Martindale understood (based on what Mr. Mason told him) had been written by Dr. Harron. (Id. at 36-37, 45-46.)  Dr. Martindale was a novice--"I had read no

_____

[29]  See also Martindale Dep. at 65-66 ("[M]y interpretation of the whole process was that a physician was taking a good occupational history, a medical history, performing a physical exam, and either he or someone else was overseeing the pulmonary function tests, and there was an interpretation of the chest x-ray at the time all of this was done, and these patients were screened for people who appeared as if they had clinical diagnoses of asbestosis or silicosis and the chest x-ray supported that diagnosis."); 102 ("I assumed that the physician who did the physical, did the history, took the occupational exposure would be making the diagnosis.").

[30]  A copy of this abbreviated "physical and history" is attached as Exhibit 2.  A copy of a pre-printed ILO form is attached as Exhibit 3.

films other than my [B-reader certification] test"––and Dr.
Martindale "was under the impression ... Dr. Harron has read
thousands and thousands of films." (Id. at 46.)   Thus, Dr.
Martindale was "probably affected by [Dr. Harron's B-read notation]
to some extent." (Id. at 45.)   After noting Dr. Harron's B-read,
Dr. Martindale would look at the x-ray, complete the ILO form and
dictate a report for each file sent to him by N&M.   Dr. Martindale
completed as many as 159 B-reads a day, often in the evenings,
after returning home from a normal workday. (Id. at 126.)

    Dr. Martindale then mailed the completed ILO forms and
dictation tapes, along with everything he had received from N&M, to
a transcriptionist who had been referred to Dr. Martindale by N&M.
(Id. at 24-25, 29-31.)   The transcriptionist typed the written
reports which have been used in this litigation and which included
the "diagnosis of silicosis" language. (Martindale Dep. Ex. D-2;
see Exhibit 1, attached.)   Mr. Mason asked Dr. Martindale to allow
this language to be inserted in the reports, and, despite the fact
that Dr. Martindale knew the language to be false, Dr. Martindale
acquiesced. (Martindale Dep. at 31-32, 101-03.)   After the
transcriptionist typed the reports, she sent them to N&M, who
stamped them with Dr. Martindale's signature. (Id. at 24-25, 29-
30.)   Under this process, Dr. Martindale did not sign, review or
even see his reports after they were transcribed. (Id. at 29-31,
106.)   Indeed, Dr. Martindale was not even sure that he had ever

seen one of his diagnosing reports prior to the date of his

deposition. (Id. at 102.) Specifically, he testified:

> Q.  [Y]ou've never seen this form [i.e., Dr.
> Martindale's report with the "Impression" of a diagnosis
> of silicosis, see Exhibit 1] before today; right?
> A.  I haven't seen this form. I don't know whether I
> ever saw the impression -- I feel like I did probably see
> the impression and approved it probably or acquiesced to
> it, whatever, but I don't know exactly how -- when he
> [i.e., Mr. Mason] wanted to include 'within a reasonable
> degree of medical certainty,' I don't -- I don't remember
> the exact wording of what it said, whether it said it's
> -- you know the diagnosis is established within a
> reasonable degree of medical certainty or whether it said
> within a reasonable degree of medical certainty the
> patient has silicosis or asbestosis or -- but
> notwithstanding whatever is said here, I did not intend
> to make a diagnosis of silicosis or asbestosis based on
> the ILO, chest x-ray that I had, and/or the information
> that I was sent. I assumed that the physician who did
> the physical, did the history, took the occupational
> exposure would be making the diagnosis.
> ....
> Q.  And if you had it to do over again, you wouldn't
>     use that [diagnosing] language?
> A.  I wouldn't use that language, no, sir.

(Martindale Dep. at 101-02, 103-04.)

N&M paid Dr. Martindale $35 for each of his 3,617 reports

which purport to diagnose a Plaintiff with silicosis. (Id. at 20.)

### 2.  December Hearings

#### a.  December 2 Telephonic Hearing

On December 2, 2004, the Court conducted a telephonic hearing

on Plaintiffs' motions to quash the document subpoenas for their

diagnosing doctors. By this time, five of the doctors (including

Dr. Martindale) had indicated that they had no responsive

documents, making the motions moot as to them.  With respect to the
remainder of the doctors, the Court rejected Plaintiffs' argument
that discovery should be quashed because the doctors might be non-
testifying experts.[31] The Plaintiffs refused to affirmatively state
that any particular doctor was, in fact, a non-testifying expert
for any Plaintiff.[32]  Moreover, the Court ruled that "so long as
Plaintiffs  are  proffering  the  doctors  and  their  diagnoses  to
fulfill this Court's requirement under Order No. 6 that Plaintiffs
produce  diagnoses  of  silica-related  disease,  Plaintiffs  cannot
claim the doctors are non-testifying."  (Order No. 17 at 3.)

### b.    December 17 Status Conference

    At the next in-person status conference after Dr. Martindale's
deposition, on December 17, 2004, the Court expressed concern about
Dr.  Martindale's  withdrawal  of  his  diagnoses,  and  thereafter
proposed  Daubert  hearings/Court  depositions  for  all  of  the
remaining diagnosing doctors, as well as the screening companies
(such as N&M) that hired most of them.  (Dec. 17, 2004 Status Conf.

---

[31]  Most discovery against non-testifying experts is
prohibited by Federal Rule of Civil Procedure 26(b)(4)(B).

[32]  Instead of affirmatively stating that the doctors have
been retained as non-testifying experts, Plaintiffs only vaguely
asserted: "Plaintiffs ... object to the extent that Dr. Cooper is
a consulting-only expert for any of the 10,000 [Plaintiffs]."
(Mot. Quash Cooper Subpoena, MDL 03-1553 Docket Entry 1084, at 3
(emphasis added) (each of the motions to quash contained the same
language).)  But as set out above, Plaintiffs did affirmatively
state in each motion to quash that each doctor was a "Plaintiffs'
expert."  (See, e.g., Mot. Quash Cooper Subpoena, MDL 03-1553
Docket Entry 1084, at 1.)

Trans. at 17-18, 24.)   When the Court proposed these hearings, Plaintiffs' liaison counsel readily agreed.   Plaintiffs' liaison counsel emphasized that the Plaintiffs' lawyers were "caught ... by great surprise" by Dr. Martindale's testimony, and he indicated that the testimony of the other diagnosing doctors would be different.   For example, the following exchanges occurred at the December 17 status conference:

> COURT: I'm not blaming anybody about Martindale.... But Martindale, if he's a symptom of a bigger problem, I need to know about it now and everybody else does too.
> PLAINTIFFS' LIAISON COUNSEL:  I certainly agree with your Honor.... [W]ith respect to the Martindale issue, it came as a great surprise to the member of our team that used him....  It caught us by great surprise.  We don't think it is indicative of what you're going to see with respect to the other [diagnosing physicians]....  We are willing, ready, and able to bring the rest of these guys here to show -- to show their stripes.
> ....
> COURT: Now, we all know, ... that silicosis is a very bad disease, and you get it from a workplace in admitted instances.  It's very bad.  And you get it from certain products, from long-term exposure, and there are people that are very sick with that.  But what happens is, as we all know, is that sometimes the good is thrown in with the bad and it prevents people who really need to go forward with their case from being heard and getting their discovery.  And that's why something like this is so crucial ... to lay to rest.
> PLAINTIFFS' LIAISON COUNSEL: I'm not disagreeing with you....  [A]ll I am saying is ... that the Martindale deal caught everybody by surprise on our side.

(Dec. 17, 2004 Status Conf. Trans. at 18, 19, 21, 23-24, 35.) Plaintiffs' liaison counsel also spoke repeatedly of the Plaintiffs' lawyers' "grave concerns as to how [Dr. Martindale] got flipped."  (Id. at 45; see also id. at 18-20, 39.)   In light of

these concerns, Plaintiffs' liaison counsel asked for an order that defense counsel would not be allowed to contact any of Plaintiffs' experts without first obtaining permission of Plaintiffs' counsel. (Id. at 41, 45-46.)

The Court's orders related to the Daubert hearings/Court depositions were memorialized in Order No. 19, the same order which established the final briefing schedule on the issue of subject-matter jurisdiction.  The Court ordered that on February 16-18, 2005, "[e]very physician who has diagnosed silicosis in any of the Plaintiffs, regardless of whether any Plaintiff relied on the diagnosis on a fact sheet, shall attend in person and testify." (Order No. 19 at 2.)  In addition, the Court ordered representatives of the two primary screening companies, RTS and N&M, to attend and testify.  (Id.)  The Court granted Plaintiffs' request to prohibit Defendants from having any further contact with Plaintiffs' diagnosing physicians, other than to conduct the previously-scheduled depositions of Dr. Glynn Hilbun (on December 20, 2004) and Dr. Kevin Cooper (on January 4, 2005).  (Id.)  The Court also ordered Defendants to pay the reasonable fees and travel expenses for the attendance of the Plaintiffs' diagnosing physicians.  (Id. at 3.)  Finally, the Court denied Defendants' motion for a stay of all discovery except discovery into Plaintiffs' doctors and screeners; instead, all discovery was allowed to continue.  (Id. at 5.)

-41-

It is worth remarking why the Court conceived of the--for lack of a better phrase--"Daubert hearings/Court depositions."[33] These were the most efficient and effective way to allow the Defendants to depose the doctors (as is their right under the Federal Rules of Civil Procedure), while providing direct Court supervision over the proceedings--which seemed advisable in light of the allegations (or at least, intimations) of misconduct made by both sides.[34] The Court's direct supervision also was advisable in light of a quartet of motions filed by Defendants in the wake of Dr. Martindale's deposition: Defendants' Motion to Exclude Plaintiffs' Experts (based upon Daubert considerations); Defendants' Motion to Appoint Independent Expert Medical Advisors/Technical Advisory Panel (pursuant to Federal Rule of Evidence 706);[35] Defendants' Motion for Physical Examinations; and Defendants' Motion for Partial Summary Judgment and/or Dismissal (regarding Cause Nos. 03-387 and 03-392, arguing that those Plaintiffs relying on Dr. Martindale for their

---

[33] For ease of reference, hereinafter the Court will refer to the "Daubert hearings/Court depositions" as simply, "Daubert hearings."

[34] Specifically, the Defendants had charged that all of Dr. Martindale's diagnoses were "fraudulent", while Plaintiffs intimated that the Defendants exerted some type of improper influence in order to "flip" Dr. Martindale.

[35] Rule 706 provides, in part:
The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations.  The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses of its own selection.
Fed. R. Evid. 706(a).

silicosis diagnoses no longer had competent diagnoses on which to base their claims, in violation of Mississippi law[36] and this Court's Order No. 6). The Court deferred ruling upon these motions until after the Daubert hearings. However, in Order No. 19, the Court did state, "[t]he parties are urged to agree on a panel of four experts for the purpose of excluding, if possible, any plaintiff that does not presently have silicosis or is not in fear

---

[36] In this motion, and at other times during the MDL proceedings, Defendants have argued that Mississippi law does not recognize a cause of action for fear of contracting a disease or illness in the future, no matter how reasonable the fear.

   However, it is worth noting that the pronouncements from the Mississippi Supreme Court have not been so clear. Most recently, the Court stated:

> We have before found that emotional distress inflicted either negligently or intentionally is compensable. However, emotional distress based on the fear of a future illness must await a manifestation of that illness or be supported by substantial exposure to the danger, and be supported by medical or scientific evidence so that there is a rational basis for the emotional fear. We do not harm and, in fact, preserve a recovery for emotional distress when the same is based on such a foundation.

S. Cent. Reg'l Med. Ctr. v. Pickering, 749 So.2d 95, 99 (Miss. 1999) (emphasis added) (quoting Leaf River Forest Prods., Inc. v. Ferguson, 662 So.2d 648, 650 (Miss. 1995)); see also Jackson v. Johns-Manville Sales Corp., 781 F.2d 394, 414 (5th Cir. 1986) ("Jackson's claim is not merely that he might get cancer, or that there is a remote possibility that he will. Jackson has established that there is a greater than fifty percent chance that he will get cancer. Who can gainsay that this knowledge causes him anguish, or that this anguish is reasonable? Certainly not this court and, in our view, not the Mississippi Supreme Court.") (emphasis in original) (citation omitted). Thus, it appears that a claim for fear of a future illness may be compensable in the absence of manifestation of that illness, so long as the claim is "supported by substantial exposure to the danger, and ... supported by medical or scientific evidence so that there is a rational basis for the emotional fear." S. Cent. Reg'l Med. Ctr., 749 So.2d at 99.

-43-

of future illness as related to silicosis, and to prioritize the degree of severity of silicosis in any other plaintiff." (Order No. 19 ¶ 5.)

Finally, it bears repeating that the Court conducted these hearings prior to deciding the issue of subject-matter jurisdiction for two reasons. First, the hearings were warranted by Defendants' motion for sanctions, which is a matter a court without subject-matter jurisdiction may consider, see Willy v. Coastal Corp., 503 U.S. 131 (1992). Second, the hearings were potentially relevant to the issue of the Court's subject-matter jurisdiction. As discussed below, one method of establishing subject-matter jurisdiction is through the doctrine of improper joinder, which can be shown with evidence of "actual fraud in the pleading of jurisdictional facts." Smallwood v. Ill. Cent. R.R. Co., 385 F.3d 568, 573 (5th Cir. 2004) (en banc), cert. denied, 125 S. Ct. 1825 (2005); see also Travis v. Irby, 326 F.3d 644, 646-47 (5th Cir. 2003). In light of Dr. Martindale's deposition, Defendants alleged actual fraud in the pleading of Plaintiffs' claims of silica-related injuries.[37]

Finally, as a more practical matter, the parties were in agreement as to the advisability of the hearings: the Defendants

---

[37] In addition, at least according to Defendant 3M, whether the Plaintiffs have sustained an injury is relevant to the issue of whether the jurisdictional amount-in-controversy requirement has been met. As alleged in the Complaint and the Fact Sheets, Plaintiffs' claims of injuries largely hinge on the experts' diagnoses of silica-related disease. In light of Dr. Martindale's deposition, the validity of at least 3,617 Plaintiffs' diagnoses was in question.

were eager to have this forum to depose the doctors, and the
Plaintiffs, in the words of Plaintiffs' liaison counsel, were
"willing, ready, and able to bring the rest of these [diagnosing
doctors] here ... to show their stripes." (Dec. 17, 2004 Status
Conf. Trans. at 23.)

### 3.   Dr. Hilbun's and Dr. Cooper's Depositions

As noted above, despite the impending February Daubert
hearings, the Court allowed Defendants to conduct their previously-
scheduled depositions of Dr. Hilbun and Dr. Cooper on December 20,
2004 and January 4, 2005, respectively.  Dr. Hilbun (a general
surgeon) and Dr. Cooper (a general practitioner) each performed
abbreviated physical examinations on individuals who attended
screening events held by N&M for the law firm of Campbell, Cherry,
Harrison, Davis & Dove ("Campbell Cherry"). (Hilbun Dep. at 28-29,
32-34, 38; Cooper Dep. at 22-23.)  Dr. Hilbun was paid $5,000 per
day for performing abbreviated exams for five days of screenings in
Columbus, Mississippi, on April 22-26, 2002. (Hilbun Dep. at 28-
29, 32-34, 38.)  Lured by what he considered to be "easy money,"
Dr. Cooper performed abbreviated exams in Pascagoula, Mississippi
on April 15-16 and May 15, 2002. (Cooper Dep. at 22-23, 83.)

The exams consisted of asking two questions (whether the
person has (1) shortness of breath and/or (2) connective tissue
disease), listening to each person's lungs, and checking them for
cyanosis, clubbing, and ankle edema.  Pursuant to N&M's
instructions, Dr. Hilbun or Dr. Cooper completed a simple, single-

page form for each of the Plaintiffs, signed the handwritten form, and left it in N&M's custody at the conclusion of the screening. (Hilbun Dep. at 34, 37-38, 53, 78; Cooper Dep. at 23-25, 28-31.) An example of this form, which was so simple, "any first grader could read [it]" (Hilbun Dep. at 34), is attached hereto as Exhibit 4. The shaded portion of the form was filled out by Dr. Hilbun or Dr. Cooper; the remainder of the form was completed by others. (Hilbun Dep. at 41-43.) N&M provided Dr. Hilbun and Dr. Cooper with this form—the doctors had no input in drafting it or the prepared questions they asked during the exams. (Hilbun Dep. at 35; Cooper Dep. at 23-25, 28-31.) Dr. Cooper testified that it was "easy work" because his role was exceedingly limited "compared to what I do in my normal practice." (Cooper Dep. at 83.) He stated: "not having to make a call about anything whatsoever, not having to make a diagnosis, write a prescription, do anything like that, that's easy work." (Cooper Dep. at 83.)

Both doctors emphasized that they did not diagnose any of the Plaintiffs with silicosis. (Hilbun Dep. at 19; Cooper Dep. at 20.) Indeed, both doctors testified that they had <u>never</u> diagnosed anyone with silicosis. (Hilbun Dep. at 19; Cooper Dep. at 114.)

Sometime after the screenings, N&M presented both doctors with typed forms for their signature. Both doctors testified that they believed these forms were typed versions of their physical examination reports. A sample of these N&M-prepared typed forms is

-46-

attached as Exhibit 5 (Dr. Hilbun) and Exhibit 6 (Dr. Cooper).  All
of the forms contained the following language:

> On the basis of this client's history of
> occupational exposure to silica and a B reading of the
> clients chest x-ray, then within a reasonable degree of
> medical certainty, [Plaintiff] has silicosis.
> Exposure to silica is associated with an increased
> incidence of lung cancer, connective tissue diseases and
> autoimmune diseases.  Therefore, this client should
> consult with his or her physician.

(Exs.  5  &  6.)   Both doctors testified that, contrary to the
language in the typed forms, they did not see any x-rays, x-ray
reports or pulmonary function tests, and they did not diagnose any
Plaintiff with silicosis.  (Hilbun Dep. at 19-22, 52, 56-62, 84,
89-90, 94; Cooper Dep. at 19-21, 40, 47-51.)   Despite the false
information on the forms, Dr. Cooper personally signed and dated
249 typed forms.  (Cooper Dep. at 60.)   Dr. Cooper testified that
he failed to read any of the forms as he signed them, because he
was "very, very busy."  (Cooper Dep. at 20, 60, 66.)   Dr. Hilbun
testified that he never reviewed the typed forms, but simply
instructed his assistant to stamp his name on the forms.  (Hilbun
Dep. at 22, 61-62.)   N&M then presented the signed forms to
Campbell Cherry, who placed them in the document depository
pursuant to this Court's Order No. 6.[38]

---

[38]  These reports are not mentioned on Plaintiffs' Fact
Sheets.  Instead, according to the Fact Sheets, all of the
Plaintiffs who were examined by Dr. Hilbun or Dr. Cooper were
diagnosed with silicosis by Dr. Martindale.

Despite Plaintiffs' assertions to the contrary in the motions to quash, Dr. Hilbun and Dr. Cooper each testified that they had not agreed to be a Plaintiffs' expert in this matter. (Hilbun Dep. at 23; Cooper Dep. at 15.)

Also, Dr. Hilbun testified that he first learned of the diagnosis language in his reports in December 2004. (Hilbun Dep. at 85-88.) He testified that he informed Billy Davis, an attorney with Campbell Cherry, of the false language five days prior to the December 17, 2004 status conference (and eight days prior to Dr. Hilbun's December 20 deposition). (Hilbun Dep. at 85, 88; see also Feb. 17, 2005 Trans. at 204.) Thus, Mr. Davis knew that Dr. Hilbun's diagnosing reports were false--but apparently did not know Dr. Cooper's diagnoses were false--when he argued before the Court that Dr. Hilbun and Dr. Cooper should not be required to testify because they did not diagnose any Plaintiffs with silicosis. Specifically, the following exchange occurred:

> DAVIS: A couple of doctors that [Defendants] mentioned are doctors that have not been identified on fact sheets as diagnosing physicians; they have not been relied upon as diagnosing physicians...
> COURT: Who are those?
> DAVIS: Dr. Kevin Cooper and Dr. Glen Hilbun. They performed physical exams on approximately 600 of our clients.
> COURT: Did they diagnose them?
> DAVIS: They are -- they --
> COURT: Are they diagnosing physicians?
> DAVIS: No, sir, we have not identified them as diagnosing physicians.
> COURT: Well, who made the diagnosis on those 600?
> DAVIS: Dr. Martindale. They are part of the Dr. Martindale group. We have relied on those doctors'

-48-

reports as it relates to taking a physical exam and a
medical history.
COURT: Were you going to -- who are you going to now want
to substitute in for Martindale for those 600?
...
DAVIS: Your Honor, we have ... gotten substitute
diagnoses on a large number of those --
COURT: By whom?
DAVIS: By Dr. Harron....
COURT: I want every single doctor who has diagnosed
silicosis in any of the ... Plaintiffs to show up for
that [Daubert hearings/Court] deposition.
....
DAVIS: If it's a diagnosis that we have relied on, your
Honor, or that we've submitted under our fact sheet.
COURT: No, anybody that's diagnosed silicosis in any of
these people needs to show up.  You're supposed to have
disclosed those names.  It doesn't matter what you're
relying on.  That was not what was back in the affidavit
months ago.  You were suppose to have disclosed the
diagnosing physician.  If you've got them and you haven't
disclosed them, ... there are going to be sanctions. ...
This is not a hide the ball with the silicosis.  These
are people who need --
DAVIS: Your Honor, we're not trying to hide the ball.

(Dec. 17, 2004 Status Conf. Trans. at 41-44.)  It was then that

Plaintiffs' liaison counsel interjected, for the third time, his

"grave concerns as to how [Dr. Martindale] got flipped."  (Id. at

45.)

**B.    Medically-Accepted Method for Diagnosing Silicosis**

At this point, it would be helpful to summarize the generally-

accepted standards in the medical community for diagnosing

silicosis.  As the Plaintiffs wrote in a brief filed prior to the

Daubert hearings:

The basic mechanism for diagnosing silicosis is not
controversial.  A diagnosis requires a history of

-49-

exposure to silica dust, radiographic evidence of
silicosis, and 'the absence of any good reason to believe
that the radiographic findings are the result of some
other condition.' It is also important that the time
between exposure and the onset of disease is consistent
with the latency period typical of silicosis.

(Pls.' Informational Br. Regarding Diagnosis Silicosis at 2 (citing

Hans Weill, et al., Silicosis and Related Diseases, in OCCUPATIONAL

LUNG DISORDERS 286 (3rd ed. 1994); Daniel E. Banks, Silicosis, in

TEXTBOOK OF OCCUPATIONAL AND ENVIRONMENTAL MEDICINE 380-81 (2nd ed.

2005).) The testimony of the diagnosing doctors was in accord with

the above summary. For instance, one of the Plaintiffs' diagnosing

doctors, Dr. Jay Segarra, a pulmonologist and NIOSH-certified B-

reader practicing in Biloxi, Mississippi, elaborated as follows

about the generally-accepted methodology for diagnosing silicosis:

[T]he diagnosis of [silicosis] rests on, basically,
three factors. One is an appropriate chest X-ray and
I'll tell you what that means in a minute. An adequate
exposure history which I'll explain in a minute. And
finally, the absence of any other disease that would be
more likely to explain the radiographic findings or
clinical symptoms or whatever than Silicosis.
An appropriate chest X-ray for a B-reader means, at
least, primarily small, rounded opacities. They don't
all have to be rounded but they should, at least, be
primarily rounded. And involving, at least, one of the
upper lung zones of an alveoli profusion of 1/0 or
greater. This is in the absence of some superior medical
data that you generally don't have such as a high
resolution chest CT scan or a tissue sample where you can
look under the microscope. Most of the time, you don't
have that available. So, that's the chest X-ray.
What an adequate exposure history means is that the
physician or an agent of the physician has just got taken
from the patient a history of exposure to potentially
toxic, environmental substances including organic dust
and inorganic dust. And determine that the level of
exposure -- the intensity and duration was sufficient to

-50-

> explain the abnormalities on the chest X-ray, or at least
> potentially.
>     And then ruling out the other diseases that can often
> be done by [past medical] history.  The physical exam
> plays usually a small role in that regard.  The history
> is more important.

(Feb. 16, 2005 Trans. at 353-54; see also Feb. 16, 2005 Trans. at

22 (Dr. Levy); Feb. 17, 2005 Trans. at 42 (Dr. Coulter); Feb. 18,

2005 Trans. at 146 (Dr. Andrew Harron); Feb. 18, 2005 Trans. at 107

(Dr. Parker).)[39]  Dr. Segarra further testified that generally it

is not appropriate for anyone other than the physician or an agent

of the physician to take the exposure and past medical history.

The exception to this would be if the patient is unavailable, in

which case a doctor could rely on "an extensive medical

questionnaire" for the medical history, or, in the case of a work

history, if the doctor has "not just a couple of words or a couple

of sentences but [the doctor] ha[s] the entire deposition of the

---

[39]  Dr. Levy stated that a physical examination is not
necessary to diagnose silicosis.  (Feb. 16, 2005 Trans. at 23.)
However, Dr. Levy has previously testified in another silicosis
case that the taking of a physical, as well as a history, are
"standard methodologies" in diagnosing silicosis.  Specifically,
he testified:
> The methodologies I've used [in diagnosing plaintiff
> with silicosis], including differential diagnosis,
> including reviewing the soundness of the X-rays and the
> literature, as well as the body of the literature as a
> whole, including use of Bradford Hill principles, all
> of those methodologies, the methodologies I've used in
> reviewing his past medical history, taking a history
> from him, performing a physical examination, all of
> those are standard methodologies used by physicians and
> by epidemiologists.
(Feb. 16, 2005 Trans. at 155.)

patient who explained what he did for work." (Feb. 16, 2005 Trans. at 355.)

Dr. Segarra testified that he will also have Pulmonary Function Tests ("PFTs") performed on the patient, in order to further aid in the diagnosis.[40] (Feb. 16, 2005 Trans. at 361.) And with respect to reading the chest x-ray, Dr. Segarra testified that "99.9 percent of the time," he does the B-reading himself, rather than relying on another doctor's B-read.[41] (Feb. 16, 2005 Trans. at 360.)

In evaluating pneumoconioses,[42] including silicosis, chest x-rays are normally interpreted using the ILO radiograph classification system. An example of the ILO's standardized form, on which B-readers record the results of their reads, is attached as Exhibit 7. For the purpose of the following discussion, box "2B. Small Opacities" is of primary concern.

---

[40] PFTs, which will be discussed _infra_, are a broad range of physiological tests that measure how well the lungs take in and exhale air and how efficiently they transfer oxygen into the blood.

[41] Moreover, Dr. Segarra testified that on the rare times he has relied upon another doctor's B-read, he refuses to make a final diagnosis until he sees the patient's x-ray himself. (Feb. 16, 2005 Trans. at 360-61.) And on one of those occasions, when he looked at the film, he changed his diagnosis. (_Id._)

[42] "Pneumoconiosis" is the general term for a disease of the lungs, such as asbestosis or silicosis, caused by long-continued inhalation of dusts or fibers or other extrinsic materials.

-52-

The ILO system standardizes the interpretation of chest x-rays using descriptions of the size, shape, and profusion (i.e., degree or severity) of radiographic abnormalities (i.e., visible lung markings or scarring).[43]  The system is used to describe shape (either regular/rounded or irregular/linear) and size (regular/rounded: "P", "Q", "R"; irregular/linear: "S", "T", "U") characteristics of radiographic abnormalities.[44]  See ILO Form, attached as Exhibit 7, at box "2B a."  The extent of radiographic abnormalities (i.e., "profusion", located on the ILO form at box "2B c.") is characterized by a number between 0 and 3, and a second number, separated from the first by "/".  The first number, preceding the "/", is the final score assigned to that film by the reader.  The second number, following the "/", is a qualifier.  The numbers 0, 1, 2, and 3 are the main categories, ranging from normal (or 0) to increasingly abnormal (1, 2, and 3).  An x-ray read as a category 1 film might be described as 1/0, 1/1, or 1/2.  When the reader uses the descriptor "1/1", she is rating the film as a "1",

_____

[43]  The discussion of the ILO classification system contained herein, see infra, is based on the ILO Guidelines (1980 and 2000 Editions), from testimony during the Daubert hearing, see Feb. 16, 2005 Trans. at 333, 340 & Feb. 18, 2005 Trans. at 44, and from the testimony of Dr. Laura Welch and Dr. David Weill before the Senate Judiciary Committee on February 2-3, 2005, see 2005 WLNR 2777131.

[44]  "P", "Q" and "R" mean that rounded opacities are present, with "P" representing diameters up to 1.5 mm, "Q" diameters from 1.5 mm to 3 mm, and "R" diameters from 3 mm to 10 mm.  (Opacities over 10 mm are described as large opacities in box "2C." of the ILO form.)  Small irregular/linear opacities in the same size ranges are classified as "S", "T" and "U".

and only considered it as a "1" film.  If she uses "1/0", she is saying she rated the film as a "1", but considered calling it a "0" (or normal) film before deciding it was category 1.  Finally, when the reader uses "1/2", she is saying she is rating the film as a "1", but considered calling it a "2" film.

The ILO classification scheme also addresses which of the six lung zones are involved (upper, middle, and lower, in either the right or left lung), located on the ILO form at "2B b."

The ILO guidelines direct the reader to include all the abnormalities that exist.[45]

Chronic or classic silicosis (i.e. the type of silicosis at issue in virtually all of the MDL cases) is characterized by tiny round nodules, primarily in the upper lobes of both lungs.  On an x-ray, these round nodules show up as small, rounded opacities, which would be rated on the ILO form as "P", "Q", or "R".  A diagram of these opacities, which are consistent with silicosis, is attached as Exhibit 8.  By way of contrast, asbestosis, which is caused by inhaling asbestos, is characterized by linear scarring, which shows up on an x-ray as small irregular opacities ("S", "T", or "U"), primarily in the lower lobes of both lungs.  A diagram of these opacities, which are consistent with asbestosis, is attached as Exhibit 9.

_____

[45]  See International Labour Office, Guidelines for the Use of the ILO International Classification of Radiographs of Pneumoconioses at 2 (2000).

If a reader were to read 1,000 x-rays, and then read the same x-rays a year later, there can be expected to be some variation in the findings. (Feb. 18, 2005 Trans. at 21-22.) This phenomenon of the same reader classifying a radiograph differently on different occasions is known as "intra-reader variability." If two different readers read the same x-rays and disagree amongst themselves on a classification, this is known as "inter-reader variability."[46] Concern over reader variability prompted the ILO to develop its classification scheme for the pneumoconioses. Obviously, the goal should be for variability to be as close to zero as possible. Dr. John Parker, who formerly administered NIOSH's B-reader program, testified: "[T]he statistical strength of the ILO classification system is in numbers. And if there are multiple examples of [variability], then it begins to exceed what is plausible an experienced reader might do." (Feb. 18, 2005 Trans. at 141.)

Returning to the process of diagnosing silicosis, the final criterion for a diagnosis is ruling out the other potential causes of the radiographic findings. Radiographic findings consistent with silicosis may be caused by a host of other diseases, including: other pneumoconioses, such as coal worker's pneumoconiosis, berylliosis and byssinosis; infectious diseases, such as tuberculosis; collagen vascular diseases, such as rheumatoid arthritis and lupus; fungal diseases, such as

---

[46] Reader variability is most likely to occur on profusions (i.e., "1/0" versus "0/1") rather than in zones or opacity sizes and shapes. (Feb. 18, 2005 Trans. at 137-38.)

-55-

histoplasmosis and coccidioidomycosis; as well as sarcoidosis. (Feb. 16, 2005 Trans. at 101-05, 328; Feb. 18, 2005 Trans. at 91-93, 229.) Radiographic findings consistent with silicosis also may be caused by certain infections, drugs, pharmaceutical preparations, congestive heart failure, obesity, or simply inferior quality x-ray equipment or film. (Feb. 18, 2005 Trans. at 91-93, 229.)[47]

In order to rule out the multitude of other causes of the radiographic findings, it is vitally important for a physician to

---

[47]    Dr. Parker explained:
To reach a medical diagnosis certainly requires more than just shadows on a chest x-ray. Because those shadows can be caused by any number of disease processes. You would be quite interested whether the individual, if the shadows were consistent with silicosis, you would be quite interested in their workplace exposures over their lifetime. ... [In making t]he differential diagnosis, you're interested in their [occupational and exposure] history, their review of systems, their past medical history. There are drugs that can cause shadows on x-rays, or pharmaceutical preparations that can injure lung and cause shadows on the x-ray. There are organic dust exposures and inorganic dust exposures that can cause shadows on the x-ray. There are collagen vascular diseases such as rheumatoid arthritis, lupus, that can cause shadows on the x-ray. There's this unusual disorder, sarcoidosis, that can cause shadows on the x-ray, and congestive heart failure can cause shadows on the x-ray. Obese patients, as well as patients who take a shallow breath or other technical quality abnormalities with the film may lead to shadows on the x-ray that may be misleading and thought to be abnormal. But if the film is repeated with better technique, may appear more normal. (Feb. 18, 2005 Trans. at 91-93.) Similarly, Dr. Friedman testified about the "infections and [the] host of different diseases" that can look like silicosis on an x-ray, again highlighting the need for a differential diagnosis. (Feb. 18, 2005 Trans. at 229.)

take a thorough occupational/exposure history and medical history. (Feb. 16, 2005 Trans. at 101-06; Feb. 18, 2005 Trans. at 91-93, 229, 353-54.)  Indeed, even a travel history may be relevant: certain diseases which mimic silicosis on an x-ray are primarily found in particular geographic regions of the country or the world. (Feb. 16, 2005 Trans. at 101-06; Feb. 17, 2005 Trans. at 43-44.) If the patient has traveled to that region, then those diseases become more likely explanations for the radiographic abnormalities.[48] And, of course, given the wide variety of possible causes for x-ray findings consistent with silicosis, the occupational, medical and travel histories must be directed by someone with sufficient medical training and knowledge to guide the questioning through all of the areas necessary to exclude each of the other possible causes for the findings.[49]  This is why it is

------

[48]  For example, if the patient had traveled in, or previously lived in, certain areas of California and Arizona, then coccidioidomycosis would need to be ruled out as a cause of the x-ray findings prior to making a diagnosis of silicosis. (Feb. 16, 2005 Trans. at 101-02.)

[49]    As Dr. Todd Coulter, one of Plaintiffs' diagnosing physicians, testified:
> A:  [T]here's more to this than meets the eye.  The history has to be expansive but it also has to be guided, if you will, by what the patient tells you. ... We ask about social history.  We ask about family history.  I ask about smoking history.  Where I live on the Gulf Coast of Mississippi I want to know about their military history.  We've got a lot of people who have traveled all over the world.  I want to know about their -- their public health history, such as, inoculations and immunizations. ...
> Q:  So in reviewing the ... information that the patient has given you, you then sit down with a patient and flush that out for more information that you

-57-

imperative that the diagnosing physician take at least some portion
of the histories.  (Feb. 16, 2005 Trans. at 355, 366; Feb. 17, 2005
Trans. at 43-45; Feb. 18, 2005 Trans. at 92, 134, 244-45, 255.)

     Finally, at the conclusion of a patient's visit, Dr. Segarra
tells the patient "the results of all of what [he] did in trying to
come up with whether this person has silicosis or not." (Feb. 16,
2005 Trans. at 362.)   If Dr. Segarra diagnoses a patient with
silicosis, he will "sit down and explain the diagnosis to [the
patient].  And [he] recommend[s] to that patient or plaintiff that
he get a follow up examination with his treating doctors no later
than six months after [the] diagnosis." (Feb. 16, 2005 Trans. at
362-63.)   Dr. Segarra also tells the patient or plaintiff that
although the risk of getting lung cancer or other pulmonary
diseases is increased with silicosis, it is nonetheless unlikely
that they will contract those associated diseases:

> I want them to understand that they have a progressive
> disease.  But, that the other diseases for which they're
> at an increased risk, doesn't mean that they will get
> these other diseases.  And, in fact, they probably won't.
> It's simply that they're at greater risk than the average
> person.  And I try to quantify that risk and put that in
> perspective for them.

(Feb. 16, 2005 Trans. at 363.)

     After Dr. Segarra finishes discussing his findings with the
patient, he dictates his report, has it typed, reviews it, signs

---

consider important?
A:  History, history, history, yes, sir.
(Feb. 17, 2005 Trans. at 43-47.)

it, and then, in the litigation context, he sends it to the lawyer. (Feb. 16, 2005 Trans. at 362.)  Dr. Segarra does not use form letters or signature stamps in his practice. (Feb. 16, 2005 Trans. at 371.)  In addition to mailing the report to counsel, he will also either mail the report directly to the patient or insist that the plaintiff's counsel mail the report to the patient. (Feb. 16, 2005 Trans. at 362.)  The reason for this is that "[p]eople need reinforcement of what you tell them.  Studies have shown that you talk to patients and tell them something, but you really need to repeat it several times in different ways for it to sink in completely." (Feb. 16, 2005 Trans. at 362.)

According to Dr. Segarra, the entire process of determining whether an individual has silicosis takes between 60-90 minutes.[50] (Feb. 16, 2005 Trans. at 366.)  Thirty minutes of this time is devoted to taking the person's occupational, medical and smoking histories, and performing the physical examination. (Id.)

Although Dr. Segarra has diagnosed plaintiffs in a number of lawsuits, he has only diagnosed a single Plaintiff in this MDL, Roosevelt Sykes.[51] (Feb. 16, 2005 Trans. at 357-58.)  A copy of his

_____

[50] Similarly, Dr. Gary Friedman, whose testimony will be discussed infra, testified that he usually spends between an hour and an hour and a half with the patient. (Feb. 18, 2005 Trans. at 253.)  He continued: "And then after that, I read the x-rays, go over pulmonary function tests, review the medical records, frequently contact the treating doctor.  So the total time [to diagnose] is longer." (Feb. 18, 2005 Trans. at 253.)

[51] It is worth noting that because Dr. Segarra only diagnosed a single Plaintiff in this MDL, the Defendants