report for Mr. Sykes is attached as Exhibit 10.  Regardless of whether he sees the patient in a clinical setting or in a medical-legal setting, Dr. Segarra's methodology is the same.  (Feb. 16, 2005 Trans. at 371-72.)

Based upon the testimony presented at the <u>Daubert</u> hearings, as well as the medical literature and other materials submitted by the parties, the Court finds that the process described above is the standard medical practice for diagnosing silicosis, in both the clinical and the medical-legal context.  (<u>See, e.g.</u>, Feb. 16, 2005 Trans. at 367, 371-72.)

### C.   Comparison to Asbestosis

As will become apparent below, it is helpful to briefly contrast the method for diagnosing silicosis with the method for diagnosing asbestosis.[52]  Both diseases are chronic lung diseases caused by the inhalation of dusts found in a variety of workplaces. The diagnostic criteria for both diseases include the examination of chest x-rays.  As noted above, on a chest x-ray, silicosis presents with small, rounded opacities, in the upper or mid zones of the lungs.  <u>See</u> Exhibit 8.  By contrast, on a chest x-ray,

---

suggested that he not be required to testify at the hearing. However, the Plaintiffs insisted that Dr. Segarra be permitted to testify, and the Court granted Plaintiffs' request.  (Feb. 16, 2005 Trans. at 357-58.)  Defendants have not challenged Dr. Segarra's testimony under <u>Daubert</u>.

[52]  The information presented in this section comparing silicosis and asbestosis was derived from "Asbestosis and Silicosis," 349 The Lancet 1311, 1997 WL 9330702 (May 3, 1997).

asbestosis presents with irregular linear opacities, primarily at the bases and periphery of the lungs. See Exhibit 9. Also, unlike with silicosis, in cases of asbestosis, "pleural thickening" (denoted on boxes "3A" through "3D" on the ILO form) is common. (Feb. 18, 2005 Trans. at 45-46; compare Exhibit 9 with Exhibit 8.)

Because asbestosis and silicosis have such different appearances on an x-ray, in a clinical setting, "confusion between silicosis and asbestosis does not occur." Dr. David Weill, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 4 (Feb. 3, 2005). As Dr. Weill, a pulmonologist with the University of Colorado Respiratory Center, recently stated before the Senate Judiciary Committee:

> Distinguishing among diseases that fall into the same radiographic categories requires the clinician to consider other factors, most notably a careful history and pulmonary function test. There should not, however, be confusion between diseases that fall into different categories, such as asbestosis and silicosis.

Id. at 5; see also Dr. Paul Epstein, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 2 (Feb. 2, 2005) ("[T]he x-ray appearances of these two dust-related diseases [i.e., silicosis and asbestosis] are vastly different.").

While it is theoretically possible for one person to have both silicosis and asbestosis, it would be a clinical rarity. As Dr. Weill testified:

> Although asbestosis and silicosis are different diseases that look different on x-ray films, it is theoretically possible for one person to have both diseases. A person

-61-

> could be exposed to both silica and asbestos in
> sufficient quantities to cause either disease, but it
> would be extremely unusual for one person in a working
> lifetime to have sufficient exposure to both types of
> dust to cause both diseases.  In my clinical experience
> in the United States, I have never seen a case like this
> and colleagues who saw patients in periods where exposure
> levels were much higher have difficulty recalling an
> individual worker who had both asbestosis and silicosis.
> Even in China, where I saw workers with jobs involving
> high exposure to asbestos and silica (such as
> sandblasting off asbestos insulation), I did not see
> anyone or review chest radiographs of anyone who had both
> silicosis and asbestosis.

Dr. David Weill, Senate Judiciary Committee Testimony, Fed. Doc't
Clearinghouse at 4 (Feb. 3, 2005); see also Dr. Paul Epstein,
Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at
3 (Feb. 2, 2005) ("[I]t is my professional opinion that the dual
occurrence of asbestosis and silicosis is a clinical rarity."); Dr.
Theodore Rodman, Senate Judiciary Committee Testimony, Fed. Doc't
Clearinghouse at 2 (Feb. 2, 2005) ("Among the thousands of chest x-
rays which I reviewed in asbestos and silica exposed individuals,
I cannot remember a single chest x-ray which showed clear-cut
findings of both asbestos exposure and silica exposure.").
Likewise, Dr. John Parker, former administrator of NIOSH's B-reader
program and current revisor of the ILO guidelines, testified before
this Court that he has never seen a clinical case of asbestosis and
silicosis in the same individual.  (Feb. 18, 2005 Trans. at 89-
90.)[53]  Similarly, Dr. Samuel Hammar, a pathologist who has written

---

[53]  Dr. Parker did testify that he has seen pathologic
evidence (i.e., after an autopsy or biopsy) of both diseases
being present.  (Feb. 18, 2005 Trans. at 89.)  But he called such
pathologic findings "distinctly unusual."  (Feb. 18, 2005 Trans.

the leading pathology textbook on lung disease (and who is
frequently a plaintiff's expert in asbestosis cases), has written
the following:

> I have seen the diagnosis [of asbestosis and silicosis in
> the same patient] several times, and in the cases that
> I've had pathology to evaluate [i.e., where he has
> actually looked at the lung tissue], I have never seen
> cases in which there was both silicosis and asbestosis in
> the same patient. This does not necessarily mean that
> this couldn't happen, but in my experience, I have never
> seen it. Silicosis has a fairly distinct morphology, and
> at this point in time is a rare disease. I think I have
> seen about five cases over the last ten years that I
> thought pathologically represented silicosis.

(Feb. 18, 2005 Trans. at 263-64; Friedman Ex. 2.)

    **D.   Screening Companies**

    The majority of claims in this MDL rely upon diagnoses given
by doctors associated with screening companies. A representative
of two such screening companies, N&M and RTS, testified at the
Daubert hearings. N&M (short for "Netherland & Mason," the co-
owners of the company) helped generate approximately 6,757 claims
in this MDL, while RTS (short for "Respiratory Testing Services")
helped generate at least 1,444 claims. (Feb. 18, 2005 Trans. at
29-31, 177; Feb. 17, 2005 Trans. at 267; N&M Ex. 38.) Because N&M
produced such a large percentage of the claims in this MDL, the
Court will focus its discussion on N&M, with occasional references
to RTS when appropriate. Also, a third screening company,
Occupational Diagnostics, which generated 237 diagnoses, did not

_____

at 90.)

testify at the hearings. (Feb. 17, 2005 Trans. at 30, 53-54, 67-
68.) This third testing company, which, curiously, shares its
office and phone line with a Century 21 real estate business (Feb.
17, 2005 Trans. at 80-81), will be discussed _infra_, in conjunction
with the testimony of Dr. Todd Coulter.

In 1994, Heath Mason and Molly Netherland, the co-owners of
N&M, and Charles Foster, the owner of RTS, were all employees of
another Alabama screening company called "Pulmonary Testing
Service." Mr. Foster left Pulmonary Testing Service at that time
to form RTS, and Mr. Mason and Ms. Netherland formed their company
two years later, after Pulmonary Testing Service went out of
business. (Feb. 17, 2005 Trans. at 269; Feb. 18, 2005 Trans. at
169.)

At the time he formed N&M, Mr. Mason was 21 years old; he had
dropped out of junior college after only a year and had worked at
Pulmonary Testing Service for less than two years. (Feb. 17, 2005
Trans. at 268.) Neither Mr. Mason nor Ms. Netherland had (or
currently have) any medical training and N&M has never had a
medical director.[54] (Feb. 17, 2005 Trans. at 271-72, 276.) What
Mr. Mason did possess was contacts with paralegals at law firms.
(Feb. 17, 2005 Trans. at 274.) Ms. Netherland had the seed money

---

[54] Mr. Mason has attended a three-day course in
administering Pulmonary Function Tests. (Feb. 17, 2005 Trans. at
272, 300.)

for the business and access to x-ray equipment from her husband's chiropractic office. (Feb. 17, 2005 Trans. at 271, 275.)

At the outset, N&M simply provided x-rays to law firms. But the law firms quickly began asking N&M to also provide doctors to read the x-rays, perform physical examinations and provide finalized diagnostic reports, ready for litigation. (Feb. 17, 2005 Trans. at 272.) In late 1996 or early 1997, N&M hired Dr. Ray Harron, a radiologist and certified B-reader, to read chest x-rays as well as make diagnoses. (Feb. 17, 2005 Trans. at 270.) N&M paid Dr. Harron $125 per person for the process which included some combination of the following three steps: (1) reading the x-ray, (2) conducting an abbreviated physical exam, and (3) making a diagnosis.[55] (Feb. 17, 2005 Trans. at 280.) At first, Dr. Harron stipulated that he would receive a minimum payment of $10,000 per day, but Dr. Harron did not insist on this if less than 80 people attended a screening. (Feb. 17, 2005 Trans. at 280.) Over time, N&M sent x-rays to--in Mr. Mason's words--"multitudes of B-readers," including Dr. Harron, Dr. Andrew Harron (Dr. Harron's son),[56] Dr. James Ballard, and Dr. Allen Oaks, all of whom testified at the Daubert hearing. (Feb. 17, 2005 Trans. at 284.)

_____

[55] For instance, sometimes another B-reader would read the x-ray, while Dr. Harron would perform the physical examination and make the diagnosis. (Feb. 17, 2005 Trans. at 283.)

[56] Throughout this Order, Dr. Ray Harron will be referred to either as "Dr. Harron" or "Dr. Ray Harron," while his son will always be referred to as "Dr. Andrew Harron."

The screening companies were established initially to meet law firm demand for asbestos cases.  But sometime around 2001, law firms began asking the companies to screen people for silicosis. (Feb. 17, 2005 Trans. at 287.)  The initial lists of people to be screened were the law firms' "existing inventory" of asbestos plaintiffs.  (Feb. 17, 2005 Trans. at 281, 286.)  Law firms also placed advertisements in the media asking people to attend screenings.  One such law firm advertisement is attached as Exhibit 11.  Screening companies, in turn, advertised for law firm business, as well as for members of the public to attend the screenings.  An N&M marketing brochure is attached as Exhibit 12, and an RTS brochure is attached as Exhibit 13.  The public advertisements appealed to a broad range of individuals--for instance, one law firm advertisement begins:

> **Attention all contract, union, non-union, and retired** plant and factory workers, painters, sandblasters, glaziers/glassworkers, construction workers, quarrymen, boilermakers, bricklayers, plasterers, carpenters, welders, cement finishers, laborers, electricians, insulators, machinists, maintenance, operators, pipefitters, paperworkers, sheetmetal workers, steelworkers, sheetrock hangers, drywallers, and other trades: You may have been exposed to asbestos or silica sand for a period of time, and be eligble to be screened for **ASBESTOSIS, MESOTHELIOMA CANCER, LUNG CANCER, OR SILICOSIS.**

(Exhibit 11 (emphasis in original).)  The RTS brochure features an even longer list of trades, as well as details as minor as, "[t]he mobile units are not only functional but very appealing to the

eye."[57]  (Exhibit 13.)  N&M produced a television commercial listing
many job titles and inviting viewers to call a toll-free number to
make an appointment to be screened.  (Feb. 17, 2005 Trans. at 366-
67.)  When N&M received responses to its public advertising, N&M
then would solicit this client list to law firms.  (Feb. 17, 2005
Trans. at 367-68.)

Generally, the first stages of the screening process operated
as follows: (a) the law firm provided the screening company with a
list of people (for instance, existing asbestos plaintiffs or
workers at industrial sites); (b) either the law firm or the
screening company sent out a mass mailing asking the recipient to
call the screening company's toll-free phone number; (c) the staff
answering the phone would ask if the caller had been exposed to
silica; and, (d) for those who "showed some form of being exposed
to silica," the caller would be encouraged to attend a mass
screening.  (Feb. 17, 2005 Trans. at 281-82, 286, 289.)

The screening company would tailor this process to the wishes
of the law firm.  In the words of Mr. Mason, "basically, [the
screening company is] a service; whatever [the law firm] asked us
to do is what we did."  (Feb. 17, 2005 Trans. at 281.)  Some law
firms would simply ask the screening company to x-ray a group of
people and send the x-rays to the firm, who would then pass the x-
rays on to a B-reader hired directly by the firm.  (Feb. 17, 2005

---

[57]  A photo of a screening truck used by RTS is attached as
Exhibit 14.

Trans. at 283.) Then the law firm might ask the screening company to set up physical examinations and PFTs on those with positive B-reads. (Feb. 17, 2005 Trans. at 283.) Also, rather than using the screening company's receptionists, some law firms would hire a "temp service" to take "a brief work history" and decide if the person "had adequate exposure" to silica to justify the cost of the x-ray. (Feb. 17, 2005 Trans. at 284.)

In either case, there is no evidence that anyone answering the phones, whether employed by a screening company or a law firm, had any medical training or had been instructed by any medical professional what questions would be appropriate in taking an occupational history. (Feb. 17, 2005 Trans. at 293-94; Feb. 18, 2005 Trans. at 180.) Indeed, it is clear that the law firms, rather than any medical professionals, established the criteria for the screening company to use when taking the occupational history. (Feb. 18, 2005 Trans. at 194-95.) For example, Mr. Foster of RTS testified that the Barton & Williams law firm asked for a client to have at least five years exposure history to silica to qualify for a screening. (Feb. 18, 2005 Trans. at 195.) Mr. Foster said that other law firms required "a lot less" exposure. (Feb. 18, 2005 Trans. at 195.) Perhaps most telling was when the Court asked Mr. Foster, "What is your training on this, on [diagnosing] silicosis?", to which Mr. Foster replied: "Whatever the criteria the law firm sets." (Feb. 18, 2005 Trans. at 183.)

-68-

On the day of a screening, the screening company parked its van or truck (carrying a mobile x-ray machine) in the parking lot of a hotel or a retail establishment, such as a K-Mart or a Sizzler restaurant.[58] (Feb. 17, 2005 Trans. at 54.) As each client arrived in front of the van or trailer, a receptionist greeted the client, and using a standard form prepared by the screening company or law firm, verified that the client had an appointment and the information previously given by the client over the telephone.[59] (Feb. 17, 2005 Trans. at 306.) The client then underwent a chest x-ray. (Feb. 17, 2005 Trans. at 307.)

N&M's x-ray equipment was operated by a technician and was periodically inspected by the appropriate state certification board. Inspectors in both Mississippi and Texas have issued violations to N&M for failing to comply with state standards. (Feb. 17, 2005 Trans. at 308-09, 312, 316-17.) In addition, N&M did not have a policy of having a medical professional supervise the x-rays and the equipment during the screens. (Feb. 17, 2005 Trans. at 308-09.) Moreover, no medical professional actually ordered the x-rays; Mr. Foster testified that he viewed the client as "requesting" the x-ray for him- or herself. (Feb. 18, 2005

---

[58] A photo of a screening van used by N&M is attached as Exhibit 15, and a photo of a screening truck used by RTS is attached as Exhibit 14.

[59] An example of a form used in an N&M screening is attached as Exhibit 16. (Feb. 17, 2005 Trans. at 291-92, 306-07.) The client did not fill out the form between "Doctor Comments:" and "Pulmonary Function Test Results:".

Trans. at 42, 176; RTS Ex. 1.)  This is despite the fact that, according to Dr. Ballard (an RTS B-reader), in normal medical practice, a doctor orders an x-ray before it is performed on a patient.  (Feb. 18, 2005 Trans. at 42-43.)

At this point, it is worth noting that there is nothing inherently wrong about performing x-rays in a van or trailer.  For instance, NIOSH uses a mobile x-ray unit.  (Feb. 18, 2005 Trans. at 100.)  However, mobile units must have rigorous medical oversight, to ensure that proper safety standards are observed.  Moreover, mobile x-ray units often are not as heavy as ones in offices and do not always have a consistent power source, which can lead to inferior quality films.  (Feb. 18, 2005 Trans. at 292-93, 305-06.)  With respect to the units used by the screening companies at issue here, there is no evidence of medical oversight (rigorous or otherwise), sufficiently heavy x-ray units, or a consistent power source.  (See, e.g., Feb. 17, 2005 Trans. at 87-88.)  Indeed, there is no evidence any medical professional supervised the extent to which the Plaintiffs were irradiated.  (See, e.g., Feb. 17, 2005 Trans. at 88.)

Returning to the screening process in these cases, the Court will focus on, by way of example, the Campbell Cherry cases.[60]  In those cases, after the x-ray was taken, Dr. Harron (on behalf of

---

[60]  Campbell Cherry represents approximately 4,256 Plaintiffs in this MDL.

N&M) read the film using a view box, and decided whether the patient should have PFTs. (Feb. 17, 2005 Trans. at 317-21.)

As noted above, PFTs are a broad range of tests that measure how well the lungs take in and exhale air and how efficiently they transfer oxygen into the blood.[61]  While PFTs by themselves cannot determine the cause of any abnormality, they can be used in combination with a chest x-ray and other tests to help determine what type of lung disease a person has.  Mr. Mason, after attending a three-day training course, performed the most common PFT, spirometry.[62]  (Feb. 17, 2005 Trans. at 271-72.)  Despite the fact that he is not a respiratory therapist and, in his words, "I don't really have any medical qualifications" (Feb. 17, 2005 Trans. at 271-72), he moved beyond spirometry and performed other, more complicated types of PFTs.  (Feb. 17, 2005 Trans. at 278, 299-301; Feb. 18, 2005 Trans. at 269-70.)

An example of an N&M PFT report belonging to Plaintiff Robert Morgan is attached hereto as Exhibit 17.  Listed on pages 1, 4, 5

---

[61]  The most common PFTs are spirometry (often repeated after the administration of a bronchodilator such as albuterol), flow-volume loops, single breathing diffusing capacity (known as "DLCO"), helium dilution lung volumes, arterial blood gas analysis, pulse oximetry and sputum induction.  See generally http://www.hopkinsmedicine.org/pftlab/pftests.html.

[62]  Spirometry is a measurement of forced expiration.  The patient inhales maximally, filling his or her lungs to "Total Lung Capacity," and then exhales forcefully into a device called a spirometer.  The spirometer measures the volume and time of expiration, which allows the calculation of a number of parameters of lung functioning.  See http://www.hopkinsmedicine.org/pftlab/pftests.html.

and 6 of the PFT report are "Error Codes" for the equipment used to perform a particular PFT (page 1 is the spirometry report; page 4 is the single breath diffusing capacity report; page 5 is the flow volume loop report; page 6 is the lung volume report). These Error Codes, listed on the reports as "ECodes", contain between 3 and 6 different categories, each representing a performance requirement established by the American Thoracic Society. (Feb. 18, 2005 Trans. at 271.) If the equipment meets the American Thoracic Society requirement for each category, then each number will be "0". (Feb. 18, 2005 Trans. at 271.) But if the equipment fails a requirement, then the number for that category will be "1". (Feb. 18, 2005 Trans. at 271.) In reviewing "Ecodes" on pages 1, 4, 5 and 6 of Exhibit 17, it is clear that more often than not, the equipment failed to function according to American Thoracic Society requirements.

Dr. Friedman looked at page 1 of Mr. Morgan's PFT report and was immediately struck by the spirometry result which indicates that Mr. Morgan had a 43 percent ratio of the volume of air he could exhale in one second to the total volume of air he could exhale with a single breath. (Feb. 18, 2005 Trans. at 272; <u>see</u> Attached Exhibit 17 at 1 (listed as "FEV1/FVC%").) Given Mr. Morgan's age, the ratio should normally be approximately 75 percent. (Feb. 18, 2005 Trans. at 272.) According to Dr. Friedman,

-72-

> What that means is that if you have this [FEV1/FVC%]
> number reduced, that means there's airway obstruction,
> and you should use something like albuterol or nebulizer
> to see if this person has reversible airway disease like
> asthma. And you customarily would give the treatment,
> wait 15 minutes, and then repeat the study.

(Feb. 18, 2005 Trans. at 272.) However, as indicated by the

report, no such treatment was given to Mr. Morgan (i.e., there is

nothing listed under "Post Rx"), perhaps because N&M did not have

a doctor to prescribe the drug, or perhaps because N&M did not want

to slow the stream of clients in the screening process by waiting

15 minutes, or perhaps because the person administering the test

simply did not know the proper procedure. (Feb. 18, 2005 Trans. at

273.) In any event, according to Dr. Friedman, the "test [report]

doesn't tell us anything." (Feb. 18, 2005 Trans. at 273.)

    Returning to the screening process, after the PFTs were

performed, Dr. Harron performed an abbreviated physical examination

(taking about two minutes per client) and completed the ILO form

and an "A-sheet" in front of the patient.[63] (Feb. 17, 2005 Trans.

at 317-18, 321, 323.) During Dr. Harron's sole meeting with the

client, Dr. Harron did not ask the client about his or her work

---

[63] A copy of an ILO form is attached as Exhibit 18. A copy
of the "A-sheet" is attached as Exhibit 16. (Feb. 17, 2005
Trans. at 319.) As is apparent by the "Doctor Comments" section
of the A-sheet, the physical examination was very circumscribed
and very brief. (Feb. 17, 2005 Trans. at 323.) For instance,
the patient did not change into a gown or lie down. (Feb. 17,
2005 Trans. at 321-22.)
    The notation "e 1/0" at the bottom of Exhibit 16 indicates
Dr. Harron's profusion level reading. (Feb. 17, 2005 Trans. at
319-20.)

-73-

history; instead he simply relied upon the information gathered by the screening company, as written on the A-sheet. (Feb. 17, 2005 Trans. at 328.)    After completing the paperwork, Dr. Harron informed the client of his diagnosis. (Feb. 17, 2005 Trans. at 321.)    Later, Dr. Harron dictated a narrative from the ILO form, which sometimes would be typed immediately onsite and sometimes would be typed later offsite. (Feb. 17, 2005 Trans. at 318-19.)

At some point, Dr. Harron's relationship with N&M grew so close that N&M had a stack of blank ILO forms that had been signed by Dr. Harron. (Feb. 17, 2005 Trans. at 370-71.)    A copy of a pre-signed blank ILO form is attached as Exhibit 18.    Mr. Mason testified that while N&M would fill in the name and social security number of the patient and the date of the x-ray on the pre-signed ILO form, Dr. Harron himself completed the remainder of the form. (Feb. 17, 2005 Trans. at 371.)    He did not explain, however, why the forms were pre-signed if Dr. Harron himself later completed them.

In the case of the Campbell Cherry screens, if the patient received a diagnosis of silicosis, a receptionist informed the patient that they could choose any lawyer they wanted, but that a Campbell Cherry lawyer was waiting for them at a nearby offsite location. (Feb. 17, 2005 Trans. at 324-25.)

If the patient who was diagnosed with silicosis signed-up with Campbell Cherry to be a plaintiff, then Campbell Cherry paid N&M $750 for screening that patient. (Feb. 17, 2005 Trans. at 301-03,

-74-

325.)  If the patient was not diagnosed with silicosis or did not
sign-up with Campbell Cherry, N&M was paid nothing.  (Feb. 17, 2005
Trans. at 301-03, 325.)  Campbell Cherry represents approximately
4,256 Plaintiffs in this MDL, meaning N&M likely was paid
$3,192,000 for its Campbell Cherry work.  (Feb. 17, 2005 Trans. at
363.)  For each of the approximately 2,000 Plaintiffs represented
by O'Quinn, Laminack & Pirtle, N&M was paid $335 per positive
diagnosis.  (Feb. 17, 2005 Trans. at 363-64.)  Because of this fee
structure, Mr. Mason testified that the emphasis was on attracting
as many people as possible to the screenings and creating as many
positive diagnoses as possible; as he stated, "[F]rom a business
standpoint of mine, you had to do large numbers."  (Feb. 17, 2005
Trans. at 282.)

    Sometimes, law firms (especially Campbell Cherry) would ask
N&M to have another doctor do re-reads of the x-rays which had been
read as positive for silicosis.[64]  (Feb. 17, 2005 Trans. at 331-33,
342, N&M Ex. 17.)  And if the subsequent B-reader (often Dr.
Martindale) did not make a positive silicosis finding, then N&M
would send the x-ray to a third B-reader for yet another read.
(Feb. 17, 2005 Trans. at 335-37, 375-76, 405.)  Mr. Mason thought
it was even possible that if the third reader also did not make a
positive silicosis finding, then the x-ray would be sent to a

_____

    [64]  In some of these cases, the initial silicosis B-reader
also had read that Plaintiff's x-ray as consistent with
asbestosis for asbestos litigation.  (Feb. 17, 2005 Trans. at
331-33, N&M Ex. 17.)

-75-

fourth reader.  (Feb. 17, 2005 Trans. at 337-38.)  And while some
law firms did not want diagnoses made by Dr. Harron, other law
firms (for example, the law firm group of Barton & Williams) would
accept the initial Dr. Harron positive B-read even after two
subsequent B-readers had read the x-rays as negative for silicosis.
(Feb. 17, 2005 Trans. at 338-39, 407-09.)  As Mr. Mason stated:

> You would have different law firms that needed different
> bases at different times.  You may have in your inventory
> where Dr. Harron read them positive.  The people want a
> lawyer.  The people want to be represented.  So it's your
> job that if a [person] calls you and they have a B reader
> who has said they were positive, it's our job to help
> them find a lawyer.  That's what they want us to do.
> That's what we told them we were going to do.

(Feb. 17, 2005 Trans. at 339.)

Meanwhile, if a client was tested and told that he or she did
not have silicosis, the client was told to return for retesting at
a later date.  (Feb. 18, 2005 Trans. at 186-87, 201.)  However, Mr.
Foster testified that he did not keep track of how often a client
returned to be retested (Feb. 18, 2005 Trans. at 188, 201), meaning
clients, who sometimes were eager to be retested (Feb. 18, 2005
Trans. at 186), could be exposed to multiple chest x-rays in a
brief period of time.

Mr. Mason testified that in April 2002, the Campbell Cherry
firm asked N&M to find a doctor other than Dr. Harron to do the
physical examinations during the screenings.  (Feb. 17, 2005 Trans.
at 377-78.)  N&M recruited Dr. Hilbun and Dr. Cooper for this
purpose.  (Feb. 17, 2005 Trans. at 378.)  N&M passed on the extra

charges for these doctors to Campbell Cherry. (Feb. 17, 2005
Trans. at 380.) Mr. Mason testified that he believed the erroneous
diagnosing language in Dr. Hilbun's and Dr. Cooper's reports
(discussed supra) originated from Dr. Harron's office, where the
reports were transcribed. (Feb. 17, 2005 Trans. at 380-81, 391.)
In any event, Mr. Mason denied that N&M inserted the improper
diagnosing language into the reports. (Feb. 17, 2005 Trans. at
380-81.)

While Mr. Mason did not seem distressed about Dr. Hilbun's and
Dr. Cooper's false "diagnoses", he seemed quite distressed about
Dr. Martindale's retraction of all of his diagnoses. Mr. Mason
testified that "[Dr. Martindale] cashed every check that I ever
gave to him for this particular purpose [i.e., diagnosing
silicosis].... [H]e agreed to the [diagnosing] language...." (Feb.
17, 2005 Trans. at 382.) Mr. Mason explained:

> [T]he same [diagnosing] language is basically used on all
> the reports. I mean, Dr. Harron's reports are the same.
> At the time, Campbell Cherry ... faxed me this particular
> paragraph and I met with Dr. Martindale to discuss this
> paragraph. [Dr. Martindale] asked me what I thought it
> was about and I said, 'Basically all I know about it is,
> is that this is the same paragraph that we have on Ray
> Harron reports when he diagnoses people and they [i.e.
> Campbell Cherry] need a diagnosing paragraph.'
> And he said, 'Well, what do I have to have for that?'
> And I said, 'Well, you've got to have the stuff that I'm
> going to send to you,' which is their history, their
> latency, their time of exposure, which was all provided
> to him on the 'A' sheet.

(Feb. 17, 2005 Trans. at 383-84.) Mr. Mason, while looking at an
exhibit which is attached hereto as Exhibit 19, further explained:

A:    [W]hat [Campbell Cherry] wanted ... was that
      [diagnosing] language ... because ... [Dr.
      Martindale] was giving them a normal ILO form -- I
      mean, a normal X-ray narrative, basically without
      the [diagnosing] paragraph.

Q:    Yeah, which would have just been 'consistent with,'
      as opposed to this ... 'reasonable degree of
      medical certainty' language, right?

A:    Right.  And what I explained to [Campbell Cherry]
      when they showed it to me was, I said [Dr.
      Martindale] can't do that unless we provide to him
      their history, exposure, and all the things he
      needs to do a diagnosing paragraph, which we had
      not done in the past, but what we did do when we
      started to insert the paragraph.

Q:    So this 'reasonable degree of medical certainty'
      language is coming from the lawyers?

A:    This particular one, but I mean, I would say that
      it came from most likely Dr. Harron's report
      because it reads exactly the same.

(Feb. 17, 2005 Trans. at 384.)

    Indeed, in reviewing the reports of the diagnosing doctors who
participated in the mass screenings, the diagnosing language is
remarkably similar.  Not only was Dr. Hilbun's and Dr. Cooper's
diagnosing language identical to Dr. Ray Harron's, but Dr. Andrew
Harron's diagnosing language was likewise identical.  (Exhibit 19,
attached.)  When Dr. Oaks worked for N&M, his diagnosing language
was identical to the language in Dr. Martindale's reports.
(Exhibit 19, attached.)

    For example, Exhibit 20 (attached hereto) contains two reports
from Dr. Harron, wherein Dr. Harron diagnosed the same individual,
Clarence Odem, on one date with silicosis and on another date with
asbestosis (and neither report references the other).  On the
asbestosis report, Mr. Odem's work history states that he worked

-78-

for the U.S. Army as a laborer from 1957-1994, during which time he was exposed to asbestos; on the silicosis report, Mr. Odem's work history states only that he worked for Ingalls as a painter from 1965-1968 (i.e., during the same period he claimed to be working for the Army), during which time he was exposed to silica.[65] Most remarkable is that Dr. Harron based these two divergent diagnoses on the same chest x-ray--meaning the diagnoses and the inconsistent work histories originated from the same mass screening. Two additional examples of Dr. Harron making divergent diagnoses (one asbestosis and one silicosis) for the same individual arising out of the same mass screening are attached as Exhibit 21.[66]

Overall, N&M--a small Mississippi company operated without medical oversight--managed to generate the diagnoses for approximately 6,757 MDL Plaintiffs. To place this accomplishment in perspective, in just over two years, N&M found 400 times more silicosis cases than the Mayo Clinic (which sees 250,000 patients a year) treated during the same period. (Feb. 18, 2005 Trans. at 230.) Furthermore, when comparing the names of the approximately

---

[65] These reports were produced for the O'Quinn firm, which, in most instances, took the work histories of the clients. N&M, according to Mr. Mason, "would just verify that information with the client." (Feb. 17, 2005 Trans. at 400.)

[66] All of the silicosis reports were addressed to the O'Quinn firm at 440 Louisiana Ave. in Houston, while all of the asbestosis reports were addressed to Foster & Harssema, also at 440 Louisiana Ave. in Houston. Mr. Mason explained that the same law firm "had two sets of lawyers ... for this particular thing-- one to handle their silica exposure, one to handle their asbestos exposure." (Feb. 17, 2005 Trans. at 400.)

-79-

6,757 N&M-generated MDL Plaintiffs with the names in the Manville Personal Injury Settlement Trust (a trust established for asbestos claims after the Johns-Manville Corporation bankruptcy[67]), at least 4,031 N&M-generated Plaintiffs have also made asbestosis claims. (N&M Ex. 38.)  The magnitude of this feat becomes evident when one considers that many pulmonologists, pathologists and B-readers go their entire careers without encountering a single patient with both silicosis and asbestosis.  See Feb. 18, 2005 Trans. at 89-90, 263-64; Friedman Ex. 2; see also Dr. David Weill, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 4 (Feb. 3, 2005); Dr. Theodore Rodman, Senate Judiciary Committee Testimony, Fed. Doc't Clearinghouse at 2 (Feb. 2, 2005).  Stated differently, a golfer is more likely to hit a hole-in-one than an occupational medicine specialist is to find a single case of both silicosis and asbestosis.  N&M parked a van in some parking lots and found over 4,000 such cases.

**E.   Dr. Ray Harron**

In 1995, at the age of 63, Dr. Harron "kind of gave up real medicine and [he has] just been doing this pneumoconiosis work." (Feb. 16, 2005 Trans. at 259-60.)  From 1995 until the present, Dr. Harron has worked exclusively for plaintiffs' lawyers, reading x-rays and diagnosing asbestosis and silicosis for use in litigation. (Feb. 16, 2005 Trans. at 258-60.)  Specifically, all of Dr.

---

[67]   See generally http://www.mantrust.org.

Harron's "pneumoconiosis work" has been for N&M.  (Feb. 16, 2005
Trans. at 277.)  From 1995 through approximately 2000, Dr. Harron's
work for N&M focused on asbestosis cases.  (Feb. 16, 2005 Trans. at
279.)  Beginning in 2001, his focus shifted to silicosis cases.
(Feb. 16, 2005 Trans. at 279-80.)

    Dr. Harron testified as follows about his diagnosing process:

    [I]f there's a history of exposure with some latency and
    then I've got an x-ray, then I can tie it together and
    say 'within a reasonable degree of medical certainty'
    this individual has whatever pneumoconiosis I think it
    is.  And 'within a reasonable degree of medical
    certainty,' it is my understanding that all the lawyers
    on both sides of this room agree means better than a
    50 percent chance that this is what the diagnosis is.
    It's not a diagnosis the way a treating physician would
    have to make a diagnosis....

(Feb. 16, 2005 Trans. at 267-68.)  Dr. Harron explained that based
upon diagnoses "to a reasonable degree of medical certainty," he
would not "put [the clients] on drugs, do radiation therapy, put
radium in them, [or] refer them to a surgeon for some kind of
invasive work."  (Feb. 16, 2005 Trans. at 308.)  Stated
differently, Dr. Harron believes "it's a legal standard and not a
real diagnosis."[68]  (Feb. 16, 2005 Trans. at 268.)

_____

    [68]  Dr. Harron is correct that it is a legal standard.  The
Mississippi Supreme Court has stated that "[a] medical expert
need not testify with absolute certainty."  Stratton v. Webb, 513
So.2d 587, 590 (Miss. 1987).  In Stratton, the defendants argued
that the plaintiff had not provided the appropriate medical
expert testimony to satisfy causation requirements because the
medical expert had testified that he could not positively state
the cause of the plaintiff's medical condition.  See id. at 589.
However, the expert testified that the plaintiff had back
problems following her accident and felt the injury was related
to the accident.  See id. at 590.  In finding that there was

Dr. Harron testified that he did not agree with the language in his reports about him relying upon the results of a physical examination in making his diagnosis; but N&M asked him to place that language in his reports and he "capitulated". (Feb. 16, 2005 Trans. at 281-82.)

Dr. Harron also testified that, "I don't take the history; it's given to me...." (Feb. 16, 2005 Trans. at 267, 282.) Instead, Dr. Harron believed that the law firms or N&M took the client's history, or at least he understood that "a medical person is not taking the history." (Feb. 16, 2005 Trans. at 282, 295.) He testified that all he needs to make a diagnosis, in terms of exposure history, is a simple statement, such as, "I was exposed 20 years ago to silica." (Feb. 16, 2005 Trans. at 304-05.) However, he did testify that, "[i]f [the history is] not reliable ... then I have to retract the diagnosis." (Feb. 16, 2005 Trans. at 282-83.)

Dr. Harron also testified that he did not agree that one of the criteria for the diagnosis of silicosis is the absence of any good reason to believe that the positive radiographic findings are the result of some other condition. (Feb. 16, 2005 Trans. at 324-25.) This opinion is contradicted by all of the major textbooks in

---

sufficient causation evidence to sustain the verdict, the court stated that the expert's "testimony, taken as a whole, sufficiently established a reasonable medical certainty that the accident caused the injuries." Id.; see also Blake v. Clein, — So.2d ———, 2005 WL 774905, *17 (Miss., April 7, 2005) (same).

the field, as well as by the testimony of the other physicians at the hearing. (See, e.g., Hans Weill, et al., Silicosis and Related Diseases, in OCCUPATIONAL LUNG DISORDERS 286 (3rd ed. 1994); Daniel E. Banks, Silicosis, in TEXTBOOK OF OCCUPATIONAL AND ENVIRONMENTAL MEDICINE 380-81 (2nd ed. 2005); Feb. 16, 2005 Trans. at 353-54 (Dr. Segarra).) Indeed, even the Plaintiffs' briefing contradicts Dr. Harron's opinion. (Pls.' Informational Br. Regarding Diagnosis Silicosis at 2.)

The importance of excluding other conditions which might have caused the positive radiographic findings can be illustrated by the case of Plaintiff Donald Connell. Dr. Harron testified that based upon his ILO form for Mr. Connell, Mr. Connell displayed radiographic findings consistent with coal worker's pneumoconiosis, silicosis, asbestosis and/or berylliosis. (Feb. 16, 2005 Trans. at 328.) According to Dr. Harron's report which diagnosed silicosis, Mr. Connell worked at Peabody Coal Company. (Feb. 16, 2005 Trans. at 328.) Despite the fact that Mr. Connell presumably would have been exposed to coal while working at a coal company, thus making coal worker's pneumoconiosis an obvious explanation for the positive radiographic findings, Dr. Harron diagnosed only silicosis. Dr. Harron supposed this was because N&M had provided him with an A-sheet indicating exposure to silica. (Feb. 16, 2005 Trans. at 329-30.) However, the N&M A-sheet did not ask about exposure to coal, presumably because the sheet was produced only

for silicosis and asbestosis litigation. (Feb. 16, 2005 Trans. at 330.) An example of an A-sheet is attached as Exhibit 16.[69]

Dr. Harron testified that his only involvement in these cases was to complete the ILO forms. He trusted his secretaries, a typing company, N&M, and perhaps others, to "prepare [his] reports, stamp [his] name on them and send those reports out without [him] editing or reviewing them." (Feb. 16, 2005 Trans. at 285-87.) Dr. Harron also testified that he did not dictate his reports, but he instead trusted the secretaries/typists to know how to "translate [the ILO form] into English." (Feb. 16, 2005 Trans. at 289-90.) He did this despite the fact that none of them had any medical training, with the exception of one typist who had been an x-ray technician. (Feb. 16, 2005 Trans. at 290.) In other words, in every one of the approximately 6,350 reports (2,600 of which were diagnosing reports and the remainder were B-read reports) purportedly issued by Dr. Harron, Dr. Harron failed to write, read, or personally sign the actual report. (Feb. 16, 2005 Trans. at 285-90, 300, 317.)

Dr. Harron testified about the case of Plaintiff Barry Barrett. On August 18, 2001, Dr. Harron read Mr. Barrett's x-ray

_____

[69] Unfortunately, Mr. Connell's A-sheet was missing. Dr. Harron repeatedly was constrained in answering questions about his diagnoses because he kept no records for his litigation work. All of the materials he used and produced were sent to N&M. (Feb. 16, 2005 Trans. at 299, 318.) N&M and/or the Plaintiffs' lawyers involved only produced a handful of the A-sheets for the 6,350 Plaintiffs that Dr. Harron diagnosed in this MDL. (Feb. 16, 2005 Trans. at 300.)