and completed an ILO form, attached hereto as Exhibit 22.  Through some manner that Dr. Harron did not explain, this single ILO form became the basis of two separate diagnosing reports for Mr. Barrett.  One of the reports, attached as Exhibit 22, states that "I feel within a reasonable degree of medical certainty, Barry Barrett has asbestosis."  The other report, also attached as Exhibit 22, states that "I feel within a reasonable degree of medical certainty, Barry Barrett has silicosis."  Neither report references the other report or the other report's diagnosis.  Dr. Harron explained that the typist[70] would have seen the "S" primary opacity box checked and would have interpreted this as consistent with asbestosis.  (Feb. 16, 2005 Trans. at 292.)  This would have prompted the typist to produce the report diagnosing asbestosis.  (Feb. 16, 2005 Trans. at 294.)  Dr. Harron further explained that the typist would have seen the "P" secondary opacity box checked and interpreted that as consistent with silicosis, prompting the report diagnosing silicosis.  (Feb. 16, 2005 Trans. at 292-94.)  Dr. Harron testified that other diseases also could have been consistent with these opacities, but the typist selected asbestosis and silicosis, respectively.  (Feb. 16, 2005 Trans. at 293-94.)  This situation was not confined to the case of Mr. Barrett.  (Feb.

---

[70]  Based upon the initials at the bottom of the diagnosing reports, the typist was not Dr. Harron's long-time secretary or the former x-ray technician on his staff, but he supposed it was "translate[d]" by an unidentified member of "a stable of ... secretarial help [on the second floor of his office building] ... that is always looking for extra work."  (Feb. 16, 2005 Trans. at 289-90, 322.)

-85-

16, 2005 Trans. at 320-22 (detailing the identical situation with respect to Plaintiff James Curtis).)

Dr. Gary Friedman,[71] an occupational medicine specialist and professor at the University of Texas, testified about Dr. Harron's practice of allowing a secretary to transform the markings on the ILO form into a diagnosing report and then stamp his signature without review. Dr. Friedman said that this does not remotely resemble reasonable medical practice. (Feb. 18, 2005 Trans. at 249.) He continued: "I've been a B-reader. I've taught B-reading. I don't know of anything that implies that the B-reading system can be used by--interpreted by people other than physicians." (Feb. 18, 2005 Trans. at 249.) Later, Dr. Friedman called the practice "disgraceful"; Dr. Segarra called it "distressing". (Feb. 16, 2005 Trans. at 365; Feb. 18, 2005 Trans. at 265.)

Dr. Harron was involved in the diagnosis of approximately 6,350 Plaintiffs in this MDL (by performing B-reads and/or producing diagnosing reports), and he is listed as the diagnosing physician for approximately 2,600 Plaintiffs.[72] (Feb. 16, 2005

---

[71] Dr. Friedman was hired by the Defendants to testify at the Daubert hearings. However, it is worth noting that in the 23 years Dr. Friedman has consulted in medical/legal matters, 90-95 percent of his work has been for plaintiffs' lawyers. (Feb. 18, 2005 Trans. at 216-17.) Indeed, Dr. Friedman is currently employed in other cases by many of the Plaintiffs' lawyers in this MDL. (Feb. 18, 2005 Trans. at 216-17.)

[72] After Dr. Martindale withdrew his 3,617 diagnoses, Plaintiffs proposed to substitute each of Dr. Martindale's diagnoses with one from Dr. Harron. (Feb. 16, 2005 Trans. at 317.) Whether these were cases where Dr. Harron had already

Trans. at 300, 317.)   Of all the MDL Plaintiffs who submitted diagnoses, Dr. Harron performed approximately 78 percent of the B-reads.  (Defs.' Ray Harron Ex. 19.)

When the Defendants cross-referenced the documents produced in this MDL with the documents in the Manville Trust (a trust established for asbestos claims), they discovered instances where Dr. Harron performed a B-read for someone in connection with an asbestosis claim, and then later read the same person in connection with a silicosis claim in this MDL.   For example, in 1994, Dr. Harron completed an ILO form for Clarence Kimble in connection with asbestos litigation.  On that ILO form, attached as Exhibit 23, Dr. Harron found "S" and "T" opacities or scars on all zones of Mr. Kimble's lungs, consistent with asbestosis.[73]  (Feb. 16, 2005 Trans. at 333.)   These scars are permanent; according to Dr. Harron, people "with those fibers and scars in their lungs were going to their grave with them."  (Feb. 16, 2005 Trans. at 333-34.)

In 2002, Mr. Kimble was x-rayed again, this time in connection with the current silicosis litigation.  Dr. Harron again read Mr. Kimble's x-ray and completed an ILO form, attached as Exhibit 23. This time, Dr. Harron determined that Mr. Kimble's lungs had uniform "P" opacities or scars, consistent with silicosis.  As

_____

produced diagnosing reports which just had not been used, or whether Plaintiffs were proposing that Dr. Harron would perform the diagnoses anew, was not made clear.

[73]  As discussed _supra_, "S" and "T" opacities are linear or irregular opacities.  _See generally_ Exhibit 9, attached hereto.

-87-

discussed above, such opacities are rounded, and are unlikely to be confused with the "S" and "T" opacities that Dr. Harron previously reported in Mr. Kimble. When asked about Mr. Kimble's case, Dr. Harron ascribed it to "intra-reader variability."[74] (Feb. 16, 2005 Trans. at 334.)

When confronted with another example of a complete reversal on his part, this time in the case of Plaintiff Cora Lee Rodgers (whose 1995 asbestosis ILO form and 2002 silicosis ILO form are attached as Exhibit 24), Dr. Harron again invoked intra-reader variability, and also speculated that the x-ray film could have been shot lighter in the case of the silicosis screens (which apparently might have brought out the opacities in the upper lungs, where silicosis generally is present).[75] (Feb. 16, 2005 Trans. at 337-40.)

When presented with his own prior testimony that inter-reader variability (i.e., the variability between two different readers, rather than between the same reader) should be approaching zero, Dr. Harron agreed that his switch in the cases of Ms. Rodgers and Mr. Kimble is "about as wide[] [a] variance as you can get." (Feb. 16, 2005 Trans. at 343.) He then stated that the reversals are: "a

---

[74] As discussed <u>supra</u>, "intra-reader variability" is the phenomenon of the same reader reading the same film differently on different occasions. (Feb. 16, 2005 Trans. at 334.)

[75] Dr. Harron testified that he does not supervise the protocol for shooting the x-rays, so he does not know how any of the x-rays were shot. (Feb. 16, 2005 Trans. at 341.)

real problem and I'd like to see the film.  Whether I could explain it or not, I don't know."[76]  (Feb. 16, 2005 Trans. at 343.)

Just as the Defendants prepared to introduce a packet of eight more identical asbestosis/silicosis reversals by Dr. Harron, Dr. Harron stated to the Defendants' attorney, "if you're accusing me of fabricating these things, I think that's a serious charge." (Feb. 16, 2005 Trans. at 344.)  When the Court responded that the Defendants seemed to be making that accusation--and defense counsel agreed--Dr. Harron asked for representation.  (Feb. 16, 2005 Trans. at 344-45.)  The Court ended his testimony at that point in order to allow Dr. Harron to hire an attorney.  (Feb. 16, 2005 Trans. at 344-46.)  The eight additional sets of ILO forms showing the same reversals by Dr. Harron were admitted.  (Defs.' Ray Harron Exs. 11-18.)

Finally, the Defendants offered, and Plaintiffs have not disputed, a chart showing all of the Plaintiffs in this MDL who were read by Dr. Harron for silicosis, and who also have an asbestosis claim in the Manville Trust based upon a prior B-read by Dr. Harron.  This chart, attached as Exhibit 25, shows that after December 31, 2000 (when N&M changed its focus from asbestos to silica litigation), Dr. Harron found "P", "Q" and "R" opacities (consistent with silicosis) in 99.69% of the 6,350 B-reads he

_____

[76]  Unfortunately, since the x-rays had not been produced, the x-rays could not be examined.

-89-

performed for MDL Plaintiffs.[77] But prior to December 31, 2000 (when N&M was focused on asbestos litigation), Dr. Harron performed B-reads on 1,807 of the same MDL Plaintiffs for asbestos litigation, and he found some combination of only "S", "T" and/or "U" opacities (consistent with asbestosis but not silicosis) 99.11% of the time. In short, when Dr. Harron first examined 1,807 Plaintiffs' x-rays for asbestos litigation (virtually all done prior to 2000, when mass silica litigation was just a gleam in a lawyer's eye), he found them all to be consistent only with asbestosis and not with silicosis. But upon re-examining these 1,807 MDL Plaintiffs' x-rays for silica litigation, Dr. Harron found evidence of silicosis in every case.[78] This volume of reversals, according to Dr. Segarra (another Plaintiffs' expert) and Dr. Friedman, simply cannot be explained as intra-reader

---

[77] Most of Dr. Harron's "consistent with silicocis" B-reads (i.e., finding "P", "Q" or "R" as the primary and/or secondary opacity), contain a primary or secondary opacity reading which may also be consistent with asbestosis (i.e., an "S", "T" or "U" reading). However, none of his silicosis reports mention asbestosis.

[78] Most of Dr. Harron's "consistent with silicocis" B-reads (i.e., finding "P", "Q" or "R" as the primary and/or secondary opacity), contain a primary or secondary opacity reading which may also be consistent with asbestosis (i.e., an "S", "T" or "U" reading). Therefore, because it is possible that some of Dr. Harron's B-reads for this silicosis litigation may have been consistent with both silicosis and asbestosis, some of these B-reads may have not been complete reversals, or, "about as wide[] [a] variance as you can get" (Feb. 16, 2005 Trans. at 343), but they are nonetheless major reversals; this is because, in the words of Dr. Segarra, "you're crossing over on the ... small opacity from an irregular to a rounded one." (Feb. 17, 2005 Trans. at 13.) Moreover, none of his silicosis reports mention asbestosis.

variability.[79]  (Feb. 17, 2005 Trans. at 15; Feb. 18, 2005 Trans. at 298.)

As discussed above, Dr. Harron's testimony during the first day of the Daubert hearings abruptly ended when the Court granted his request for time to obtain counsel.  Although the parties said they expected to re-call Dr. Harron the following day, Dr. Harron, now represented by an attorney, did not re-take the witness stand.

**F.    Dr. Andrew Harron**

Dr. Andrew Harron is a radiologist and certified B-reader who diagnosed approximately 505 MDL Plaintiffs for N&M.  (Feb. 18, 2005 Trans. at 146-47, 163-64; A. Harron Ex. 35.)  He attended the N&M screenings and acted as the diagnosing doctor on the days when his father, Dr. Ray Harron, was unavailable.  (Feb. 18, 2005 Trans. at 147-48.)  Dr. Andrew Harron testified that his diagnosing process at the screenings was the same as his father's.  (Feb. 18, 2005 Trans. at 148-51.)  Like his father, he received his work and exposure history from N&M, then he took an abbreviated medical

---

[79]  Specifically, Dr. Segarra testified that acceptable intra-reader variability is having the same reader read the same film identically 75-80 percent of the time.  (Feb. 17, 2005 Trans. at 14.)  And "of the 20 to 25 percent that are different most of the changes should be minor.  You can have a couple that are totally different, that happens because medicine is not an exact science and people are human, but they shouldn't all be complete changes from irregular to rounded or rounded to irregular."  (Feb. 17, 2005 Trans. at 14.)  Meanwhile, Dr. Friedman testified that a 10 percent intra-reader variability rate can be expected.  (Feb. 18, 2005 Trans. at 298.)

history and he performed an abbreviated physical examination.
(Feb. 18, 2005 Trans. at 151.)

Dr. Andrew Harron also followed the same "transcription"
process employed by his father--whereby secretaries interpreted his
marks on the ILO form and drafted diagnosing reports and stamped
his signature. (Feb. 18, 2005 Trans. at 154-55.) Like his father,
he never saw or read any of the reports purportedly written and
signed by him. (Feb. 18, 2005 Trans. at 155-57.)

**G.  Dr. Ballard**

Dr. James Ballard, a radiologist and certified B-reader
practicing in Alabama, performed 1,444 B-reads on Plaintiffs in
this MDL, in conjunction with RTS screenings.[80]  (Feb. 18, 2005
Trans. at 15, 29-31; Ex. 4.)  He actually issued the diagnoses for
approximately 120 Plaintiffs.  (Feb. 18, 2005 Trans. at 17.)
However, he did not perform physical examinations, or take medical
or exposure histories, for any of the Plaintiffs.  (Feb. 18, 2005

---

[80]  Although Dr. Ballard was not licensed to practice
medicine in Mississippi, he traveled with RTS to Mississippi and
read x-rays in the course of screens.  (Feb. 18, 2005 Trans. at
37-38.)  The issue of whether Dr. Ballard's or RTS's activities
constituted the unauthorized practice of medicine for the purpose
of the State of Mississippi is not before this Court.  However,
upon remand, if Plaintiffs persist in basing their silicosis
claims on diagnoses founded on Dr. Ballard's B-reads, then this
issue may be relevant.  (See generally Feb. 18, 2005 Trans. at
37-43.)

Trans. at 31-32.)  Dr. Ballard charged RTS $45 per B-read, and $60 per B-read when he traveled.[81]  (Feb. 18, 2005 Trans. at 32.)

The Defendants asked Dr. Ballard about the case of Plaintiff Angelean Ball.  Dr. Ballard read the same chest x-ray of Ms. Ball on two separate occasions, once in the context of asbestos litigation and once in the context of silica litigation.  When he reviewed the x-ray for asbestos litigation, he found the presence of irregular "S" and "T" opacities in the lower lung zones, as well as extensive pleural thickening,[82] all consistent with asbestosis.  See ILO form and Report, attached as Exhibit 26.  When he reviewed the same x-ray for the present silica litigation, Dr. Ballard found rounded "P" and "Q" opacities in all zones and found no pleural thickening at all.  See ILO form and Report, attached as Exhibit 27.  When presented with this complete reversal, Dr. Ballard posited that "the films could be mixed up," meaning that he in reality was not reading the same film.  (Feb. 18, 2005 Trans. at 49-52.)  He further stated that "it would be difficult for [him] to stand by the diagnosis for either one right now."  (Feb. 18, 2005 Trans. at 49.)

---

[81]  Thus, for the B-reads Dr. Ballard performed for cases in this MDL, he was paid approximately $66,000.  He testified that in 2002 and 2001, he was paid approximately $1 million for performing B-reads in asbestos litigation.  (Feb. 18, 2005 Trans. at 33.)

[82]  Dr. Ballard found her pleural thickening to be the most extensive category on the ILO form--a category "3", meaning the pleural plaques were visible on more than half of the length of the chest.  (Feb. 18, 2005 Trans. at 45-46.)

The Defendants then presented twelve additional examples of Dr. Ballard making a similar complete asbestosis/silicosis reversal. (Ballard Exs. 21-44.) The Defendants also presented additional examples of complete asbestosis/silicosis reversals when Dr. Ballard read the film for the silica litigation and another B-reader (usually Dr. Harron) read the film in the asbestos litigation. (Ballard Exs. 45-54.)

Dr. Ballard testified that "either ... the testing service or the law firm" provided him with the work history for the clients. (Feb. 18, 2005 Trans. at 56.) This "work history" amounted to a simple statement from the lawyers or RTS that there "is exposure history that's consistent with asbestosis." (Feb. 18, 2005 Trans. at 56.) This meant to Dr. Ballard that the lawyers and/or RTS "want[ed] [Dr. Ballard] to look for asbestosis." (Feb. 18, 2005 Trans. at 56.) Dr. Ballard acknowledged that this "could sway" his reading. (Feb. 18, 2005 Trans. at 58.) Specifically, he explained:

> [I]f you've got somebody that you have history of exposure to asbestos, or if they say read for asbestosis, and you see S and T size opacities in the lower lung zone, then you would be more prone to see those. And if later you heard that they had silica exposure and you were reading for that, you would look closer for those P size opacities, because they, in the lower profusion, would be more difficult to see than the S/T's.

(Feb. 18, 2005 Trans. at 57.) Later, he again tried to explain:

> [T]hey might send me these films and say these are asbestos cases. And ... when I get the ... same film that might have been sent earlier for asbestosis, and

-94-

they say this individual has silicosis, or silica
exposure, then you might look in those upper lung zones
more carefully, because those small -- P size opacities
are much more difficult to see than the S/T size
opacities. And you have to specifically be looking for
them, particularly in the lower profusions....

(Feb. 18, 2005 Trans. at 64-65.)

Moreover, in viewing all of Dr. Ballard's 1,444 positive B-reads in this MDL, one would expect a fairly wide range of profusions between "1" (being the least severe) and "3" (being the most severe). As noted above, and as written on the ILO form, positive profusion findings are written from "1/0" (i.e., the B-reader believes it is a "1" but considered classifying it as a "0", meaning normal) to "3/+" or "3/4" (i.e., the B-reader believes it is a "3" and considered the profusion more severe than a normal "3"). In this MDL, Dr. Ballard classified 1,153 Plaintiffs, or 80% of his positive B-reads, as the least severe reading of "1/0". Additionally, Dr. Ballard classified 273 Plaintiffs, or 19% of his positive B-reads, as the next least severe reading of "1/1". Dr. Ballard classified only 1% of his positive B-reads as more severe than "1/1" (13 Plaintiffs were "1/2", 3 Plaintiffs were "2/2", 1 Plaintiff was "2/3", and no Plaintiffs were "3/2", "3/3" or "3/4").

Dr. Ballard's consistency is especially remarkable because it is in the area of profusion, which normally is the area where reader variability is most likely to occur (as opposed to in opacity sizes and shapes). (Feb. 18, 2005 Trans. at 137-38.) Dr.

-95-

Parker, the former administrator of NIOSH's B-reader program had
this to say on the subject of this consistency of profusion:

> What I find most stunning about the information I've seen
> in the last, yesterday afternoon and this morning, is the
> lack of reader variability, because the consistency with
> which these films are read as 1/0 defies all statistical
> logic and all medical and scientific evidence of what
> happens to the lung when it's exposed to workplace dust.
> What again is stunning to me is the lack of variability.
> This lack of variability suggests to me that readers are
> not being intellectually and scientifically honest in
> their classifications.

(Feb. 18, 2005 Trans. at 81-82.)  Dr. Parker elaborated:

> If I have a population in which there's general agreement
> that they have silicosis, I would be stunned to find
> almost all of the readings to be 1/0.  I would expect
> there to be a range of distributions of profusion.  The
> system would not expect a reader to be that consistent.
> In fact, that very consistency suggests that people are
> not being intellectually and scientifically honest.

(Feb. 18, 2005 Trans. at 83-84.)

## H.  Dr. Levy

Dr. Barry Levy diagnosed approximately 1,389 Plaintiffs in
this MDL.[83]  (Defs.' Resp. PTO 27, MDL 03-1553 Docket Entry 1826,
Ex. C.2.)   In making these diagnoses, Dr. Levy exhibited an
extraordinary amount of faith: he did not take the occupational or

---

[83]  For the past 18 years, Dr. Levy has not been a treating
physician, but instead earns his income through consulting in
litigation on behalf of plaintiffs.  (Feb. 16, 2005 Trans. at 37,
41-42, 52.)  His standard billing rate is $600 per hour, and he
has the option of charging $900 per hour for weekend and after-
hours work.  (Feb. 16, 2005 Trans. at 42-43.)  For example,
excluding his travel time, Dr. Levy billed approximately $34,000
simply to prepare for his testimony at the Daubert hearings.
(Feb. 16, 2005 Trans. at 49-51.)

medical histories of any of the Plaintiffs; he did not perform the B-reads on any of the Plaintiffs; he did not perform the physical examination of any of the Plaintiffs; and he did not speak to any of the Plaintiffs or their primary care physicians. (Feb. 16, 2005 Trans. at 24, 69, 72, 111.)   Instead, he relied on other physicians' B-reads (primarily Dr. Ballard)[84] and on the work of other "physicians" whom he believed followed "the protocol that I developed for the history and physical." (Feb. 16, 2005 Trans. at 24.) He testified that "the protocol I set up for other physicians to do physicals in this case" should take "[a]bout an hour and a half." (Feb. 16, 2005 Trans. at 72.)   Later, Dr. Levy amended this answer by stating that "some of this conceivably could have been done by a nurse or assistant asking some of the history questions in advance, but I would guess the total professional time would be in the range of about an hour, maybe an hour and [a] half." (Feb. 16, 2005 Trans. at 76.)

Despite establishing this protocol, Dr. Levy testified that he does not know if the protocol was followed.   Indeed, all of Dr. Levy's work in diagnosing the Plaintiffs occurred in his office in

---

[84]   Dr. Levy is not a B-reader and did not see any of the Plaintiffs' x-rays. (Feb. 16, 2005 Trans. at 38, 71.) Of Dr. Levy's approximately 1,389 diagnoses, Dr. Ballard performed the B-read on 950 and Dr. Allen Oaks (whose testimony is discussed infra) performed the B-read on 145, and numerous other physicians performed the remainder of B-reads. (Feb. 16, 2005 Trans. at 176.)

Massachusetts--without seeing or examining any Plaintiff.[85]  (Feb.
16, 2005 Trans. at 56.)  Dr. Levy testified: "I don't know anything
about the screening that the plaintiffs had.  I recognize that
people had the B-readings and so forth.  I'm not familiar with what
actually took place."  (Feb. 16, 2005 Trans. at 148.)

Dr. Levy testified that for the "vast majority" of Plaintiffs
"[he] did a preliminary report and then a supplemental report."
(Feb. 16, 2005 Trans. at 23.)  This supplemental report was done
after the history and physical were performed.  (Feb. 16, 2005
Trans. at 25.)  In these cases (as in virtually all of the rest),
there is no evidence that any of the Plaintiff's histories were
taken by a physician or other medically-trained individual, as
supposed by Dr. Levy's protocol.

Moreover, the claimed thoroughness of Dr. Levy's evaluations
is belied by the speed at which he worked.  All told, Dr. Levy
performed 1,239 diagnostic evaluations in 72 hours.  (Feb. 16, 2005
Trans. at 68.)  On average, Dr. Levy devoted less than four minutes
to each of his diagnostic evaluations in this litigation.[86]  (Feb.

---

[85]  As was the case with Dr. Ballard, the Court need not
delve into the issue of whether Dr. Levy's diagnosing of
Plaintiffs who were examined in Mississippi, Texas and Alabama
constitutes the unlicensed practice of medicine in those states.
It is worth noting that Dr. Levy has considered the issue, and
his "conclusion was that I was not practicing medicine, that I
was providing diagnostic information in the context of
medical/legal consultation."  (Feb. 16, 2005 Trans. at 56-57.)

[86]  Dr. Levy testified that excluding the 379 people who did
not have a sufficient exposure to silica (and therefore could be
evaluated quickly), he spent an average of about five minutes on

-98-

16, 2005 Trans. at 68.)  Of this time, he spent approximately one minute per report reviewing the report for accuracy.  (Feb. 16, 2005 Trans. at 84-85.)  The brevity of his mass diagnoses is in stark contrast to Dr. Levy's work in the single-plaintiff state-court case of McBride v. Clark Sand Company, when Dr. Levy devoted 17.6 hours and his assistant spent 46 hours diagnosing the plaintiff with silicosis.  (Feb. 16, 2005 Trans. at 70-71.)

An example of a report prepared by Dr. Levy is attached as Exhibit 28.[87]  The report concerns Plaintiff Samuel Fontaine, who apparently claimed he "was exposed to free crystalline silica from 1967 to 1995 as a teacher who worked around sandblasting for Rosedale Elementary Jr. High in Rosedale, Mississippi."  As indicated above, Dr. Levy did not speak to the Plaintiff or supervise the taking of the exposure history, but merely trusted that whomever took the history was a physician who followed his "protocol."  This protocol included an explicit instruction that anyone who "worked around sandblasting," as Mr. Fontaine purportedly did for 27 years while teaching elementary school, must have "worked in the immediate proximity of sandblasting."  (Feb. 16, 2005 Trans. at 94.)

---

his diagnostic evaluations.  (Feb. 16, 2005 Trans. at 67-69.)  By comparison, Dr. Segarra and Dr. Friedman each testified that they spend in excess of an hour to diagnose a patient with silicosis. (Feb. 16, 2005 Trans. at 366; Feb. 18, 2005 Trans. at 253.)

[87]  The information contained in Exhibit 28 represents all of the information Dr. Levy had when he made his diagnosis. (Feb. 16, 2005 Trans. at 111.)

Dr. Levy testified that in the case of Mr. Fontaine, he was able to satisfy the third diagnostic criteria for silicosis (i.e., the absence of any good reason to believe that the radiologic findings are due to some other disease) because:

> [t]here's no indication on the reading of the B-reading which is shown here or in the -- there was no plural thickenings, no plural plaques. The B-reader, Dr. Ballard, didn't indicate anything about asbestosis. There's no indication of asbestosis exposure or coal dust or beryllium, for that matter. I excluded those to any reasonable probability; that is, it satisfied the criterion of the absence of any information to conclude that it was a different dust disease of the lung.

(Feb. 16, 2005 Trans. at 101; see also Feb. 16, 2005 Trans. at 111 (emphasizing the "B-reading that did not show any evidence of Asbestosis disease").) Unfortunately, Dr. Levy testified prior to Dr. Ballard, and thus could not respond to Dr. Ballard's testimony that he ignored evidence of asbestosis when he was asked to read x-rays for silica litigation. Indeed, Dr. Levy was not aware that any of the Plaintiffs he diagnosed, including the 950 which were based on Dr. Ballard's B-reads, had ever also been diagnosed with asbestosis. (Feb. 16, 2005 Trans. at 180.)

In the case of Mr. Fontaine, Dr. Levy testified that he excluded other diseases which might have produced Mr. Fontaine's radiographic findings by looking to statistics about the geographic distribution of different diseases:

> The next category is infectious diseases and the ones to consider there are Miliary Tuberculosis, as well as fungal diseases, such as histoplasmosis and coccidioidomycosis. It turns out that coccidioidomycosis

-100-

in this country is a disease primarily in California and
Arizona....  And there's just a handful in the most
recent year from CDC of 2002 in which they reported 3900
cases nationwide, 3800 of those were from California and
Arizona with a scattering of cases elsewhere.  No cases
were reported from Mississippi....  If he was seen by his
treating      physician--and      I'm      not      a      treating
physician--that      physician      might      have      reported
[coccidioidomycosis] ... to the public health authorities
in    the    State    where    the    person    is    resident....
Tuberculosis, Histaplasmosis are unlikely.  I considered
those diagnoses.  Tuberculosis, for example, occurs at
the rate of five per 100,000; Mississippi, only one to
three   percent   of   Tuberculosis   cases   are   Malarial
Tuberculosis.... [As for the rate of occurrence of
Histaplasmosis in the Mississippi Delta,] I don't [know]
the exact number.   I know it's a part of the country
where    Histaplasmosis    does,    indeed,    occur.      So,
Histaplasmosis is a possibility but again, weighing the
likelihood of; is Silicosis more likely in a person with
20   plus   years   exposure   --   at   least,   intermittent
sandblasting without evidence of respiratory protection
who has a positive B reading versus the possibility of
undiagnosed Histaplasmosis; I think -- and it was my
judgment in this case -- that Silicosis is a much more
likely probability.

(Feb. 16, 2005 Trans. at 101-05.)

Dr. Levy may be correct that it is customary medical practice
to exclude certain diseases and conditions based on official
statistics about the geographic distribution of a disease.
However, as alluded to by the nationwide silicosis statistics set
out supra, the same principle virtually mandates the conclusion
that the vast majority of silicosis diagnoses in this MDL are
erroneous.

One obvious problem with these diagnoses (which certainly is
not confined to, or even best exemplified by, Dr. Levy's diagnoses)
is repeatedly referenced in Dr. Levy's academic writings on the

-101-

diagnosis of silicosis.  Dr. Levy has written that "the proper
diagnosis of silicosis ... depends critically on a comprehensive
and appropriate patient history that adequately explores the
relation of the disease to the occupation." (Feb. 16, 2005 Trans.
at 129-30.)[88]  Dr. Levy has also written a series of examples of
physicians who misdiagnosed "a work-related illness caused by a
hazardous substance" despite "a reasonable and considerable

_____

[88] According to Dr. Levy's writings:
    The occupational history has five key parts: (A)
    description of all the patient's pertinent jobs, both
    past and present; (B) a review of exposures based by
    the patient in these jobs; (C) information on the
    timing of symptoms in relation to work; (D) data on
    similar problems among coal workers; and (E)
    information on non-work factors such as smoking and
    hobbies that may cause or contribute to disease or
    injury.
(Feb. 16, 2005 Trans. at 134-35.)  Dr. Levy has also explained
that in taking an occupational history, "[t]he number of hours
per day and days per year [of exposure to silica] is an important
piece of information." (Feb. 16, 2005 Trans. at 144.)
    Moreover, an occupational history is important not only to
determine the exposure of an individual to silica, but also to
attempt to determine the dose.  "Exposure" means to be in close
proximity or contact with a hazardous substance, whereas "dose"
means the amount of that hazardous substance--in this case,
silica--that gets into the body. (Feb. 16, 2005 Trans. at 146.)
If a worker is exposed to silica, but does not get any silica
into his or her body, then it is not a hazardous situation.
(Feb. 16, 2005 Trans. at 146.)  Hence, questions about dosage are
also important.  As Dr. Levy has written:
    Equally pertinent, when asking about exposures ..., the
    physician should ask questions such as:  Does the
    ventilation system always work adequately?  Is it
    usually turned off, especially in the winter?  Do
    workers follow instructions when performing certain
    work tasks or when using personal protective equipment?
    Some physicians might be surprised at how aware workers
    are of such matters.
(Feb. 16, 2005 Trans. at 145-46.)

evaluation and diagnosis." (Feb. 16, 2005 Trans. at 131-32.)  Dr.
Levy's text continues:

> The facts fit together and resulted in a coherent story
> leading each physician to recommend a specific
> therapeutic and preventive regimen.  In each of these
> cases, however, the physician made an incorrect diagnosis
> because of a common oversight; failure to take an
> occupational history.

(Feb. 16, 2005 Trans. at 132.)[89]

In virtually all of the cases presented to the Court,[90] the
occupational history, to the extent one was taken at all, falls far
below the standards set by Dr. Levy's writings.  None of the
histories Dr. Levy relied upon were taken by a physician or other
medically-trained individual--instead, they were taken by the law
firms or screening companies.  The histories fail to include any
information about dosage, or the length and intensity of exposure
to silica.  For example, it would be natural to inquire with Mr.
Fontaine the precise circumstances under which he was exposed to
airborne crystalline silica for 27 years while working in an
elementary school, and, for example, with what frequency and
duration "blast equipment" was used in the "immediate proximity" of

---

[89]  In response to these and other quotations from his
writings about the importance of taking a history, Dr. Levy
responded that "[i]t is impossible to obtain a detailed
occupational history on every patient seen." (Feb. 16, 2005
Trans. at 130.)  While that statement may be true, that does not
mean it is reasonable medical practice to not even <u>attempt</u> to
take a detailed history from a patient who is available and
willing to give one.

[90]  One notable exception is Roosevelt Sykes, the Plaintiff
diagnosed by Dr. Segarra.

his classroom. (Ex. 28 at 5, attached.) As another example, it might be natural to inquire with Plaintiff Robert Hart how, at the age of fifteen, he was self-employed, "hanging & finishing sheetrock" and using jack hammers and sanders. (Levy Ex. 6 at 9.) Or a physician might ask Plaintiff Sammie Williams how, and on how many days, he was exposed to crystalline silica while working for 30 years as a piano repairman. (Levy Ex. 7 at 5.)

When questioned about three specific cases, Dr. Levy withdrew his diagnoses for each of the cases. In the case of Plaintiff James Hyatt, Dr. Ballard had read the x-ray as consistent with asbestosis and mixed dust disease (finding "S" and "T" opacities in the lower lungs with pleural abnormalities), yet Dr. Levy diagnosed silicosis, erroneously calling the opacities "rounded." (Feb. 16, 2005 Trans. at 188; Dr. Levy's report is attached as Exhibit 29.) When presented with a 2001 report prepared by Dr. Segarra diagnosing Mr. Hyatt with asbestosis (attached as Exhibit 30), Dr. Levy withdrew his diagnosis. (Feb. 16, 2005 Trans. at 199-200.) Likewise, Dr. Levy withdrew his diagnosis of Plaintiff Donny Weaver when he realized he relied upon an erroneous report by the B-reader, Dr. Oaks, which listed the B-read as an "S/P" ("P" being consistent with silicosis), when it was in fact an "S/S". (Feb. 16, 2005 Trans. at 199; Levy Ex. 13.) Dr. Levy also withdrew his diagnosis of Plaintiff Zettie Shields, which was based on a Dr. Ballard B-read consistent with silicosis, when he was presented with another B-read by Dr. Ballard of the same x-ray, this time

-104-

consistent with asbestosis. (Feb. 16, 2005 Trans. at 200-02; Levy Exs. 14 & 17.)   For the same reason (i.e., a Dr. Ballard asbestosis/silicosis reversal), Dr. Levy withdrew his diagnoses of Plaintiffs Effie Coleman and Monroe Lenoir. (Feb. 16, 2005 Trans. at 204-05; Levy Exs. 15 & 18-19.)

In summary, the following is clear: the reliability of Dr. Levy's diagnoses are dependant upon the reliability of the B-readers (primarily Dr. Ballard); Dr. Levy worked at a break-neck pace which apparently led to some errors; and his exposure and medical histories were not taken by medically-trained people and were below the standard set by his writings and his "protocol." Finally, it is clear that Dr. Levy had an agenda: diagnose silicosis and nothing else.  For instance, the following exchange occurred regarding Plaintiff Sammie Orr, whom Dr. Levy diagnosed with silicosis and nothing else:

> DR. LEVY:  Here's a gentleman like many other people who have both silicosis and asbestosis. ...
> Q:  If he had both, why didn't you diagnose him with both?
> DR. LEVY:   My job was not to make diagnoses of asbestosis.
> ....
> Q: Okay.
> THE COURT: [Your] job is not to make diagnosis of anything other than silicosis.
> DR. LEVY:  Well, yes.

(Feb. 16, 2005 Trans. at 213.)

It is clear that Dr. Levy saw his role with respect to these cases as beginning and ending with litigation.  In one of his

published articles, Dr. Levy advises a diagnosing physician to inform appropriate entities of the diagnosis for the good of other workers and of society:

> If a work-related illness is diagnosed, the physician can play a critical role in developing and implementing preventative measures such as educating or advising the patient, reporting the case with the patient's permission to the employer and/or the union if one exists, contacting an appropriate governmental agency if the situation dictates the need, instituting substitutions for or measures to engineer out of work place hazard and conducting further research on the problem.

(Feb. 16, 2005 Trans. at 221.)  Dr. Levy made this recommendation to physicians who diagnose a <u>single</u> work-related illness.  In this MDL, Dr. Levy diagnosed <u>1,389</u> cases of silicosis.  (Defs.' Resp. PTO 27, MDL 03-1553 Docket Entry 1826, Ex. C.2.)  Yet despite the fact that Dr. Levy has provided consulting services to NIOSH, OSHA, the CDC, the Environmental Protection Agency, and the World Health Organization--and therefore would know the proper people to call if he felt it was appropriate--he chose to notify no one but the lawyers who paid his bills:

> DR. LEVY:   My duty in this context was to assess [whether] people had silicosis and report that information to the attorneys. ...
> Q:  You have not called any agencies, Mississippi State Department of Health, OSHA in Mississippi, the Mississippi -- University of Mississippi Medical School, you've not made contact with any of those people to let them know that you have diagnosed 1200-some-odd cases of silicosis?
> DR. LEVY:  That's correct.

(Feb. 16, 2005 Trans. at 222.)

-106-

Two of Plaintiffs' other diagnosing doctors, Dr. Segarra and Dr. Coulter, testified that they would not employ the methodology employed by Dr. Levy in these cases. (Feb. 16, 2005 Trans. at 365; Feb. 17, 2005 Trans. at 64.) Dr. Friedman testified most cogently about Dr. Levy's diagnoses:

> Dr. Levy made his diagnoses in about three-and-a-half minutes, never talked to a patient, never looked at an x-ray, never ... talked to a treating physician, [and] may have only looked at a few medical records in cases that he linked. And in 72 hours, reviewed something in the range of 1200 cases, and [in] 800 ... diagnosed life-threatening illness. ... Dr. Levy ... relied on the product identification part of the work history. I don't even think it was a full work history. I mean, ... it came nowhere near meeting what his own methodology was that he spelled out. And I have both the Third and Fourth Edition of his textbooks. And in no way does it relate to that methodology.

(Feb. 18, 2005 Trans. at 250-51.)

## I.  Dr. Coulter

Dr. Todd Coulter, a general internist practicing in Mississippi, diagnosed 237 MDL Plaintiffs with silicosis. (Feb. 17, 2005 Trans. at 30, 67-68.) Dr. Coulter diagnosed these Plaintiffs as part of a contract with a screening company called Occupational Diagnostics. (Feb. 17, 2005 Trans. at 53-54.) As noted above, this company is run from a Century 21 realty office, even sharing its phone number with the real estate business. (Feb. 17, 2005 Trans. at 80-81.) On weekends, the company parked its trailer in the parking lots of restaurants and hotels. (Feb. 17,

2005 Trans. at 54, 73.)  The trailer had a portable x-ray machine
and a "physician's suite."  (Feb. 17, 2005 Trans. at 55.)

Dr. Coulter became involved in the mass screens after being
recruited by the owner/operator of Occupational Diagnostics.  Dr.
Coulter described the recruitment process as follows:

> So [the owner of the screening company] made an
> appointment with me and talked to me about would I be
> willing to do some occupational reports for him.  Or more
> importantly, would I be willing to evaluate some
> patients?  And he explained the scope of it as that
> "Well, we're going to be taking chest x-rays and we're
> going to be looking for silicosis or something like that
> or whatever it was and you'll need to evaluate the
> patients."
> And I said to him, "Well, let me spend some time
> researching and reviewing this and then I'll decide if
> that's something I can do."  So I looked up something in
> the textbook of Internal Medicine on silicosis and found
> some basic information and said, well, it doesn't seem
> like it would be that difficult and that's why I
> consented.

(Feb. 17, 2005 Trans. at 72.)

All told, during eleven days of screenings, Dr. Coulter saw
approximately 600 people, approximately half of whom he diagnosed
with silicosis.[91]  (Feb. 17, 2005 Trans. at 75.)  By contrast, after
ten years of operating his own high-volume clinic,[92] Dr. Coulter has
diagnosed approximately six people with silicosis.  (Feb. 17, 2005
Trans. at 69.)  Dr. Coulter testified that he spent up to 15

---

[91]  Some of the people Dr. Coulter diagnosed are not
Plaintiffs in this MDL, but are plaintiffs in cases pending in
state court.

[92]  He currently averages 40-45 patients a day in his
clinic.  (Feb. 17, 2005 Trans. at 69.)

-108-

minutes with each of the clients--although it is difficult to believe this was common, since given the volume of people he saw (between 50 and 60 a day), he would have had to work 15-hour days with no breaks.  (Feb. 17, 2005 Trans. at 98.)

Dr. Coulter testified that he took thorough histories from the Plaintiffs, although thorough histories are not reflected on his reports.  (An example of one of Dr. Coulter's reports is attached as Exhibit 31.)  He stated that the exposure histories and occupational histories were written on forms provided by, and then returned to, the screening company.[93]  (Feb. 17, 2005 Trans. at 104-08.)  Although Dr. Coulter is not a B-reader, he testified that he reads x-rays as a part of his normal practice and he does not feel that he needs to use an ILO form to render a diagnosis.  (Feb. 17, 2005 Trans. at 34, 55.)

Dr. Coulter does not consider the Plaintiffs his patients.  (Feb. 17, 2005 Trans. at 53, 105.)  As with all of the other doctors, he diagnosed Plaintiffs "to a reasonable degree of medical certainty," which is a term he would not use for diagnoses in his practice, but instead is a term he uses for litigation.  (Feb. 17, 2005 Trans. at 91.)  He testified as follows:

A: When I utilize the term 'reasonable degree of medical certainty,' that reflects for me and only for me -- at the moment in time based upon the information that I

---

[93]  These purportedly thorough histories have never been produced, despite the Court's admonition to Plaintiffs' counsel that if Plaintiffs wished to rely on those histories, they needed to be produced.  (Feb. 17, 2005 Trans. at 107-09, 117-19.)

> have, this is what I come up with. ... Not excluding and
> not considering other potential limitations or
> conditions.
> COURT: Why? Why wouldn't you be?
> A: Perhaps -- and again, I think your Honor is correct.
> That is an example where I am trying to think as a lawyer
> instead of ... consistently thinking as a doctor.
> COURT: Well, if you were thinking as a doctor, what
> would you be doing with this [report]? With this
> information?
> A: I would confirm the diagnosis of silicosis.
> COURT: How would you be able to do that?
> A: Chest x-ray findings and certainly the exposure
> history. And then considering alterative and ruling out
> competing other diagnoses.

(Feb. 17, 2005 Trans. at 92.)

Dr. Coulter's testimony contained a number of examples of how he relaxed his standards for the screening "clients" when compared to his clinic "patients". In contrast to his practice at his clinic, while at the screenings, Dr. Coulter did not supervise the selection of the x-ray equipment, the selection of the x-ray operators, the setting up and operation of the equipment, or the amount of radiation to which the Plaintiffs were exposed. (Feb. 17, 2005 Trans. at 87-88, 125.)

Moreover, after working with the screening company for "a couple of months," Dr. Coulter sought out advice from two pulmonologists to give him a "tutorial" on how to read x-rays. (Feb. 17, 2005 Trans. at 100-01.) Notably, he only sought out this training when he was confronted with two patients from his clinic whom he suspected had silicosis. (Feb. 17, 2005 Trans. at 102-03.)

-110-

Finally, according to Dr. Coulter, in the context of his clinic:

> [N]o one leaves without at least a tentative diagnosis.... [W]hat people crave in the active practice of medicine, ... they crave the -- you know what we don't want is we don't want to say, 'Gosh, I spent this time with the doctor and I don't know what's going on.' People want feedback. They want communication. I think that's what's important. That's what I do.

(Feb. 17, 2005 Trans. at 49.) By contrast, in the context of his work in the mass screenings for this litigation, he testified that unless he was specifically asked by the client, "I was not going to give people the diagnosis." (Feb. 17, 2005 Trans. at 128.) But, "[i]f patients asked, I said: it looks like, it may be Silicosis. It looks like Silicosis. But, your lawyers will be in contact with you or whoever sent them to the testing center." (Feb. 17, 2005 Trans. at 128.) However, when it came time to dictate the diagnosing letter to the lawyers, Dr. Coulter expressed a certainty he apparently could not muster when looking the patient in the eye. (See Exhibit 31, attached.)

Perhaps most disconcerting about Dr. Coulter's diagnoses is that every one of his 237 reports for Plaintiffs in this MDL contain the identical sentence: "There is increased preponderance [sic] of interstitial lung tracings in lower lobes bilaterally."[94] (See, e.g., Exhibit 31, attached.) (Not only does every report contain this sentence, but every report contains the identical

---

[94] Dr. Coulter is not a B-reader, and did not complete an ILO form for any of the Plaintiffs.

misspelling of the word, "prepondurance.")    As Dr. Coulter
conceded, "interstitial lung tracings in lower lobes" is
characteristic of <u>asbestosis</u> rather than silicosis. (Feb. 17, 2005
Trans. at 134.) Also, in every one of Dr. Coulter's reports, two
other sentences always appeared: "On closer examination of the
bilateral lobar markings, there are multiple enhanced lucent
circular opacities. These are disparate, and are prominent in both
PA and lateral films." (<u>See, e.g.</u>, Exhibit 31, attached.)

In addition, 221 out of Dr. Coulter's 237 reports mention a
physical examination. (Dr. Coulter testified that the remaining 16
reports are "incomplete in that there is no documentation of the
physical exam, but the physical exam was performed. I performed
the physical exam on all of the patients." (Feb. 17, 2005 Trans.
at 96.))   In every one of the 221 reports, this sentence appears:
"The physical examination is hallmarked by audible but coarse
rhonci with minimum to moderate rales on auscultation."[95]    (<u>See,
e.g.</u>, Exhibit 31, attached.) However, Dr. Coulter could not point
to any medical text or article where it states that it is common
for silicotics to have rales or rhonci. (Feb. 17, 2005 Trans. at
138.)

--------

[95]  According to Dr. Coulter, in laymen's terms, this means
that "[t]he lungs sounded rather junky." (Feb. 17, 2005 Trans.
at 136.)  More specifically, "[r]honchi are sounds that resemble
snoring.  They are produced when air movement through the large
airways is obstructed or turbulent." <u>See</u>
www.nlm.nih.gov/medlineplus/ ency/article/003323.htm.  By
contrast, "[r]ales (crackles or crepitations) are small clicking,
bubbling, or rattling sounds in the lung.  They are believed to
occur when air opens closed alveoli (air spaces)." <u>Id.</u>

Finally, at this point, it is hardly surprising that even prior to searching through the records at the Manville Trust, out of Dr. Coulter's 237 silicosis diagnoses, at least 150 of these individuals had previously been diagnosed with asbestosis.  (Feb. 17, 2005 Trans. at 148.)

**J.    Dr. Oaks**

Dr. W. Allen Oaks, a radiologist and NIOSH-certified B-reader practicing part-time in Mobile, Alabama, performed B-reads on 447 Plaintiffs and diagnosed approximately 200 Plaintiffs.  (Feb. 17, 2005 Trans. at 162-65, 175, 220; Oaks Ex. 4.)  Despite the fact that Dr. Oaks issued 200 diagnoses, he declined to label himself as an "expert in the area of diagnosing silicosis," instead preferring only to say he was "an expert in reading x-rays."  (Feb. 17, 2005 Trans. at 190.)

When reading x-rays, Dr. Oaks testified if the screening company told him to read for silicosis, that is the only disease he would mention in the report, even if he felt the x-ray was also consistent with asbestosis.  (Feb. 17, 2005 Trans. at 235, 246.)  Likewise, if the screening company told him to look for asbestosis, that is all he would report.  (Feb. 17, 2005 Trans. at 235, 246.)

For his diagnosing work, N&M gave Dr. Oaks an x-ray and an exposure history and instructed him, "on the basis of the exposure history and the B-reading, render an opinion as to whether or not

these clients -- these patients had silicosis."[96]  (Feb. 17, 2005 Trans. at 168, 190-91.)  He was not aware of who took the exposure history or their qualifications, other than that it was provided to him by N&M.  The "history" Dr. Oaks relied upon consisted of a bare statement that the person was exposed to silica.  The "history" said nothing about the duration of the exposure, the intensity of the exposure, the nature of the exposure or whether the individual was protected (such as by wearing a mask) during that exposure. (Feb. 17, 2005 Trans. at 251.)  However, Dr. Oaks testified that "[i]t's my assumption that the doctor who does the history and physical has questioned this patient and then has summarized it [with] this statement [i.e., that the client has been exposed to silica]."  (Feb. 17, 2005 Trans. at 254.)  He further testified that his "diagnosis of silicosis is based on the assumption that there's an exposure history that meets the basic criteria."  (Feb. 17, 2005 Trans. at 256-57.)

Dr. Oaks testified that he would expect "some spread" of profusion levels among the 447 Plaintiffs whom he either diagnosed or identified as having x-rays consistent with silicosis.  (Feb. 17, 2005 Trans. at 220.)  He also testified that among a large group of people with silicosis, one would expect the disease to have progressed further (i.e., have a greater profusion) among the older people.  (Feb. 17, 2005 Trans. at 220.)  Moreover, Dr. Oaks

_____

[96]  As was the case with most of the other diagnosing doctors, Dr. Oaks did not consider the Plaintiffs his patients. (Feb. 17, 2005 Trans. at 186-87.)