Page 50

1    -- some of whom also face asbestos findings.

2            THE COURT:  I'm sorry.  And your name again, please,

3    sir?

4            MR. CANSLER:  My name is Jason Cansler.

5            THE COURT:  I'm sorry?

6            MR. CANSLER:  Jason Cansler, C-a-n-s-l-e-r.

7            THE COURT:  Cansler, thank you, sir.

8            Mr. Cansler, did you know that 12 of the 29 have

9    been previously diagnosed with asbestosis?

10           MR. CANSLER:  I can't speak specifically about that,

11   no, ma'am.

12           THE COURT:  Why?

13           MR. CANSLER:  Because I don't know if -- he's saying

14   that they currently are not being diagnosed with a mixed dust

15   pneumoconiosis.  I don't know what he's trying --

16           THE COURT:  Well, these are your clients.

17           MR. CANSLER:  Well, I'm trying to figure out what

18   he's suggesting to this Court.

19           THE COURT:  What he's telling me is that he has

20   information either from internal Defendant exhibits, their own

21   information in having defended silicosis -- asbestosis cases, or

22   from the John Manvel Trust, that 12 of your 29 have had previous

23   claims of asbestosis.

24           MR. CANSLER:  Okay.

25           THE COURT:  Is that what you're saying?

Page 51

1          MR. MULHOLLAND:  That's correct, your Honor.

2          THE COURT:  Is that on your Fact Sheets that they

3    have been previously diagnosed with asbestosis?

4          MR. CANSLER:  If that was, in fact, true, I would

5    recommend to this Court that it should be on those Fact Sheets.

6    We rely on their answers to those Fact Sheets, yes, ma'am.

7          THE COURT:  Have you represented anybody in

8    asbestosis claims, your firm?

9          MR. CANSLER:  Yes, ma'am.

10          THE COURT:  Did you represent any of these 29 in

11    your asbestosis claims?

12          MR. CANSLER:  I don't know the answer to that and

13    would hate to be wrong.

14          THE COURT:  Okay.  I'm going to give you 30 minutes

15    to come back and give that information from someone in your

16    office that knows.

17          MR. CANSLER:  Yes, ma'am.

18          Is there anything else before I?

19          MR. MULHOLLAND:  No, your Honor.

20          THE COURT:  Thank you.

21          MR. CANSLER:  Thank you.

22          THE COURT:  But we won't talk about McManus any more

23    until this gentleman returns.

24          MR. MULHOLLAND:  Now your Honor the other case that

25    I think is still impacted or likely to be impacted by our order

Page 52

1   25 motion, the Motion to Dismiss, is the Alexander case and the

2   real problem there comes in with this group of new medical

3   records, diagnoses --

4           THE COURT: Well, we'll get to that.

5           MR. MULHOLLAND: Excuse me?

6           THE COURT: We'll get to that in a minute.

7           MR. MULHOLLAND: Okay.

8           THE COURT: Mr. Laminack, are you ready with the --

9   have you looked at the three petitions?

10          MR. LAMINACK: We're still searching, your Honor.

11  We'll be ready before the hearing is over.

12          THE COURT: Do you want to just print them out for

13  him, Ms. Scotch?

14          CASE MANAGER: Yes, your Honor.

15          THE COURT: And what Mr. Laminack in Alexander you

16  just filed -- let's just take up the last of it. You just filed

17  the expert designations several months after the due date.

18          Did you know that?

19          MR. LAMINACK: I know that the due date fell during

20  a period in which you had stayed the proceedings.

21          THE COURT: No. I didn't stay the proceedings

22  during that time.

23          MR. LAMINACK: My understanding is your Honor stayed

24  -- issued a stay order in February and lifted it June 30th.

25          THE COURT: I think it was for certain matters and

Page 53

1   not designation of experts.

2           MR. LAMINACK: My understanding is --

3           THE COURT: I didn't -- I stayed discovery during

4   that time.

5           MR. LAMINACK: Yes, your Honor. You stayed all

6   discovery.

7           THE COURT: But not designation of experts. That's

8   something you would have known from the beginning, your experts.

9           MR. LAMINACK: Correct, your Honor.

10          THE COURT: So why --

11          MR. LAMINACK: We didn't designate them because my

12  understanding was that was part of the Master Discovery Order

13  and it was stayed by the Movants.

14          And so I wasn't about to do anything to violate your

15  order.

16          THE COURT: Okay. Well so when the stay was vacated

17  -- I don't agree with you about that, but let's say that you're

18  correct -- that your reading of that was correct. When the stay

19  was vacated -- Mr. Mulholland, end of the June?

20          MR. LAMINACK: June 30th.

21          MR. MULHOLLAND: June 30th.

22          THE COURT: June 30th.

23          MR. LAMINACK: Within six weeks, we listed all of

24  the experts we are going to use.

25          And I presume one of the things to be discussed

Exceptional Reporting Services, Inc.    361 949-2988

Page 54

1  today is the new Scheduling Order for the Alexander case.

2          THE COURT:  I don't think so.

3          MR. MULHOLLAND:  Your Honor, one of the truly

4  remarkable things about these new reports is they started -- the

5  dates on them go back to January of 2005 and the first time the

6  Defendants saw them was when they -- when the Alexander

7  plaintiffs responded to our Motion for Summary Judgment on

8  August 18th, 2005, and that motion had been filed in February.

9  So there are enormous timing problems throughout this process.

10          THE COURT:  I had -- and by the way, I had expert

11  discovery, which is why we had a February hearing of the

12  experts, the Dauberts and everything else.  We had all those

13  were designated.  The diagnosing physicians only were designated

14  per my Fact Sheet requirement.  That discovery was supposed to

15  be ongoing.  I never stayed those.

16          The experts were due in Alexander June the 1st, '05.

17  I never stayed Alexander's discovery.  I never stayed Alexander

18  at all.  And instead, even if you -- there was some misreading

19  of that, that order on the regular MDL cases was vacated end of

20  June and these experts were not designated until August the

21  12th.

22          MR. LAMINACK:  Correct, your Honor.

23          THE COURT:  So why were they late designated?

24          MR. LAMINACK:  They weren't late, your Honor.

25          I mean, you lifted your stay June 30th.  The stay

1   order makes no distinction.  It doesn't carve out Alexander at

2   all.  It simply states, "All the discovery proceedings."  Within

3   a very reasonable time after you lifted your stay, a lot of

4   deadlines had run during your stay.  And certainly within a

5   reasonable time after you lifted your stay and in light of all

6   of the rulings and pronouncements the Court had made, I think

7   less than six weeks is a very reasonable time to attempt to

8   comply and address the Court's concerns, concerning experts, all

9   that you've said and written.

10              It would be obviously derelict not to have done

11  that, and not to take into consideration everything you said and

12  all your rulings about experts, so we have been very careful in

13  what we've done with respect to experts.  And I think you'll

14  find that we've been very thorough and in the Motion to Dismiss

15  and the Motion for Summary Judgment that they addressed, I hope

16  to have an opportunity to discuss that with you and why we did

17  certain things.  I certainly think less than six weeks time

18  after you lifted the stay is reasonable time for designation.

19              THE COURT:  Why is that?  I assume you had them all

20  along?

21              MR. LAMINACK:  Not all of them.  We certainly had

22  some of them.  Some of them we had been working with.

23              MR. MULHOLLAND:  Your Honor, all but four are dated

24  before June 7, 2005 and they began receiving them January 11th,

25  2005.  And I can run down the dates on -- the dates and letters

Page 56

1    that need be, but the bulk of them were done by April 2005 and

2    again, the Defendants didn't see them until August 18th.

3            MR. LAMINACK:  That's correct.  Discovery was

4    stayed.

5            MR. MULHOLLAND:  What was not stayed, however, your

6    Honor, even if discovery were stayed, was our Motion for Summary

7    Judgment and this is only thing that they submitted in response

8    to our Motion for Summary Judgment.  It's been on file since

9    February -- February 25th.

10        (Pause)

11            THE COURT:  Well, I'm not sure that that's a good

12   explanation, Mr. Laminack.

13            MR. LAMINACK:  What's that, your Honor?

14        (Pause)

15            THE COURT:  Did you print them off?

16            THE CLERK:  Yes.  They are printing.

17            THE COURT:  Thank you.

18        (Pause)

19            I'm waiting for -- I think the whole matter will be

20   resolved when he looks at the petitions.  I'm going to dismiss

21   it for lack of jurisdiction anyway.

22            MR. LAMINACK:  Dismiss the whole case for lack of

23   jurisdiction?

24            THE COURT:  When you look at the petitions, I think

25   you'll realize that.  You've had over a year to identify -- to

Page 57

1   properly identify the Defendants with their citizenship.

2              MR. LAMINACK:  Well, first of all, your Honor --

3              THE COURT:  Their place of incorporation, and their

4   principal place of business, and for some reason, the Plaintiffs

5   have been unable to do that.

6              MR. LAMINACK:  First of all, I disagree with that,

7   your Honor.

8              Second, there's only one party moving.

9              THE COURT:  Pardon?

10             MR. LAMINACK:  There's only one party -- one

11  Defendant that's moved for dismissal, based on lack of

12  jurisdiction.

13             THE COURT:  I can sua sponte do this any time.

14             MR. LAMINACK:  I understand that, your Honor.

15             THE COURT:  At any time and you all have had more

16  than enough time.  I have given you so much leeway in this case

17  for improper pleadings, to fix them.  You fix them one time then

18  they go back to the improper pleading a second time.  And all

19  you were supposed to do was clarify about the one Defendant and

20  instead you muddied the water with all the Defendants again.

21             Any other Motions to Dismiss?

22             MR. MULHOLLAND:  Your Honor, we have additional

23  arguments about the Alexander documents, but we'll defer those

24  based on the Court's comments.

25             THE COURT:  Go ahead.  If you'd like to talk about

Page 58

1    them, you may.

2             MR. MULHOLLAND:  Well, the -- it's more of the same.

3    Of the -- and this gets nightmarish because there are

4    plaintiffs in the first petition that don't appear in the Second

5    Petition.  They reappear in the Third Petition.

6             THE COURT:  I know.  It's a mess.

7             MR. MULHOLLAND:  But suppose there are about 82 that

8    purport to have new diagnoses and I think that's right -- 60

9    percent of those are retreads.  They've also got asbestosis

10   claims.

11            Now in reference to our motion that we're talking

12   about the, the Order 25 Motion, those documents have not been

13   produced, and obviously it's critical to this claim for

14   silicosis that we have their prior asbestosis claims.  33 --

15            THE COURT:  Mr. Laminack, do you have those by the

16   way?

17            MR. LAMINACK:  Pardon me, your Honor?

18            THE COURT:  In the Alexander and Mr. Mulholland is

19   saying that -- how many -- what percentage of those?

20            MR. MULHOLLAND:  Sixty of 82, 73 percent.

21            THE COURT:  Sixty of 82 have also previously had

22   asbestosis claims; is that correct?

23            MR. LAMINACK:  I have no idea, your Honor.  I'm not

24   aware of this.  What I can say is, we never, never represented

25   an asbestos claimant and then turned around and retread it as a

Page 59

1    silicosis claimant.  We never, ever did that.

2            THE COURT:  But Mr. Mulholland is saying that

3    somebody else did.

4            MR. LAMINACK:  Now we have gone to --

5            THE COURT:  But that the 70-something percent of

6    these remaining Plaintiffs also have a claim for asbestosis.

7            MR. LAMINACK:  Okay.  We have gone to great lengths

8    to inquire of our clients whether or not they ever had an

9    asbestos claim.

10           THE COURT:  Do you have the names?

11           MR. MULHOLLAND:  Yes, your Honor.  I have a

12   spreadsheet that lists them all out.

13           THE COURT:  Let's do that.  Let's just read them in.

14           MR. MULHOLLAND:  And --

15           THE COURT:  This is what we did at the February

16   hearing.

17           MR. LAMINACK:  I understand that and when we got the

18   names at the February hearings, we wrote those clients letters.

19   We said, "Who is your lawyer?  Did you have an asbestos lawyer?"

20    When we got that information, we wrote the lawyers.  We said,

21   "Please provide that information.  We're under Court Order to

22   turn it over."

23           In some cases we got it.  In some cases we didn't

24   get it from the lawyers.

25           THE COURT:  And here we are -- here we are in

Page 60

1   August.  Okay.  Just -- you want to put it on the overhead

2   screen?

3           MR. LAMINACK:  So in short, we've given them

4   everything we have.

5           MR. MULHOLLAND:  Your Honor, as a suggestion and

6   I'll do obviously whatever you like, we'd be willing this

7   afternoon or tomorrow to provide him a list of the Plaintiffs

8   that have asbestos claims.  The lawyers that represent them --

9   the cases they were and so forth.

10          THE COURT:  Just put them on the overhead.  Let me

11  see them on the Elmo.

12          What information do you have?

13          Mr. Mulholland, has the Plaintiff's Attorney in

14  Alexander given you the information from the asbestosis claims?

15          MR. MULHOLLAND:  No.  We have three different --

16          THE COURT:  Any of them?

17          MR. MULHOLLAND:  I don't -- they identified the --

18  the Court may recall what we call the "O'Quinn 331" just as

19  Plaintiffs who also had asbestos claims, but we don't have any

20  of the underlying --

21          THE COURT:  The X-rays, the diagnoses?

22          MR. MULHOLLAND:  Correct.  We don't have that -- we

23  do not have that, your Honor.

24          MR. BARGER:  What are you trying to do?

25          MR. MULHOLLAND:  Focus.

Page 61

1              MR. MULHOLLAND:  Do that down here.

2              THE COURT:  Zoom in and push focus.  Zoom in all the

3     way.  We'll do it.  Ms. Scotch will do it.  This is very

4     difficult.

5          (Laughter)

6              MR. KRUTZ:  Sit down, Barger.

7              MR. BARGER:  I failed again.

8          (Pause)

9              MR. MULHOLLAND:  Your Honor, on the left column is

10    the name, and Column A and B is the last and first name of the

11    Plaintiff.  Column C is the social security number.  Over to the

12    right, beginning at Column K, L, M, and N are information based

13    on either our firm's internal records or the JM Trust, which we

14    were able to determine, the case the Plaintiffs were in, their

15    lawyers historically.  You know, this is the information that we

16    have about the asbestos claims.

17             THE COURT:  Mr. Laminack, these are your clients.

18    This information you had in February and here we are in August.

19             MR. LAMINACK:  Correct.  It's information I provided

20    them --

21             THE COURT:  And do you have the X-rays from the

22    asbestosis claims?  Do you have the medical reports from the

23    asbestosis claims?

24             These are your clients.  They were supposed to have

25    identified on their original Fact Sheet, all of these diagnoses,

Page 62

1  but apparently failed to do so.

2          Now what you have here is 70-some-odd percent of

3  your clients that have had both a diagnosis, according to you,

4  of silicosis and asbestosis, which when I heard all the experts

5  in February, not a single expert had ever seen a combination of

6  those two.  Only Plaintiff's lawyers have seen them.

7          Not a single physician that testified here had ever

8  seen -- they didn't rule out that it wasn't possible, but none

9  of them had ever seen a case of asbestosis and silicosis

10  combined.

11          And so the sanctions that were given originally for

12  this may continue.  Those documents should be provided by your

13  clients.  I assume that your experts that you've identified are

14  going to explain why some 70 percent of your clients have both

15  silicosis and asbestosis and how that could possibly have

16  occurred, and I just need to give you fair warning about this

17  because this stretches credibility.

18          MR. LAMINACK:  Your Honor, I understand and I don't

19  like it, either.  I want the Court to know that.  I have

20  listened very carefully to everything you've said.

21          THE COURT:  I appreciate that.

22          MR. LAMINACK:  And I've heard your concerns.  And --

23          THE COURT:  But those were February concerns and --

24          MR. LAMINACK:  I totally understand.  And you bet my

25  experts are going to explain that.  I think the explanation on a

Page 63

1   lot of the cases is the asbestosis diagnosis is wrong.

2           THE COURT:  Well, that would be a shame, wouldn't

3   it, that your clients made fraudulent claims in asbestosis and

4   now those same people who made fraudulent claims are trying to

5   make another pneumoconiosis claim here.  It -- that impacts

6   their credulity tremendously.

7           I wonder, also, for each of the Plaintiff's lawyers

8   that have these cases, if they have informed their clients once

9   you acquired this diagnosis for your clients that they now have

10  to forever have the diagnosis of a terminal disease, that

11  they're obligated to tell their life insurance carriers.  If

12  they acquire new life insurance, if they change health insurance

13  providers, that they have this disease.

14          Do you think that they know this, Mr. Laminack?

15          MR. LAMINACK:  Your Honor, that's a very good point.

16   I agree totally with what you're saying.

17          THE COURT:  Would you mind standing in front of a

18  microphone?  I beg your pardon, Mr. Laminack.  There's one on

19  each of the tables -- actually most of the tables, and there's

20  some overhead mikes that don't work because I had to disconnect

21  them to do these, but...

22          MR. LAMINACK:  I understand and I agree with what

23  the Court has said.  Obviously I don't want to go into what I

24  talked to my clients about --

25          THE COURT:  I understand.

Page 64

1      MR. LAMINACK:  --- other than to say we have been

2  very candid with our clients about these issues and the

3  repercussions.

4      And your Honor, I've got enough to do.  I don't want

5  to represent people that don't have legitimate cases.  I don't

6  want to do that.  That's not my purpose in being here.  All I

7  know is at this point 87 of these Alexander plaintiffs have

8  good, solid Daubert-proof diagnoses of silicosis.  They've got

9  it.

10      THE COURT:  And 70-some-odd percent of those also

11  had apparently solid Daubert-proof asbestosis diagnoses.

12      Did you print off the document for him?

13      MR. LAMINACK:  I doubt that.

14      THE COURT:  Pardon?

15      MR. LAMINACK:  I doubt that's true.

16      THE COURT:  About the asbestosis?

17      MR. LAMINACK:  Yes.

18      THE COURT:  And Mr. Laminack, you can speak on

19  behalf of your clients about that?

20      MR. LAMINACK:  As I say, your Honor, I doubt that.  I

21  doubt the numbers, and I doubt the diagnosis.

22      THE COURT:  You doubt that they had claims or you

23  doubt that they actually had asbestosis?

24      MR. LAMINACK:  Both.

25      THE COURT:  Okay.  Here are your -- we've printed

Page 65

1   off the three petitions that we're talking about, Mr. Laminack.

2   And one more. There's one more coming, sorry. You can take

3   that, too.

4           MR. LAMINACK: And I'm not -- I'm not taking a

5   cavalier attitude, your Honor, but that's not a problem.

6           THE COURT: Well, I don't hear that.

7           MR. LAMINACK: I know that's a problem.

8           THE COURT: And I appreciate that, Mr. Laminack, but

9   I --

10          MR. LAMINACK: And you can bet I don't want to be

11  here.

12          THE COURT: This is your Court, Mr. Laminack.

13          MR. LAMINACK: In this type of setting.

14          THE COURT: You're welcome here any time and your

15  clients.

16          MR. LAMINACK: Well, I hope this is my courtroom,

17  too, just like it is for the Defendants.

18          THE COURT: It is your courtroom, Mr. Laminack.

19          MR. LAMINACK: And I hope it belongs to my clients,

20  too.

21          THE COURT: It's not my courtroom. It belongs to

22  all of you.

23          Here's the third petition. And if you read them in

24  order, you'll see the problems.

25          MR. LAMINACK: I will do that right now, your Honor.

1      THE COURT:  Thank you, sir.

2      So I will excuse you and we'll go back then to

3  McManus.  I see the attorney is back -- is in.

4      If you could change gears, Mr. Mulholland?

5      MR. CANSLER:  They're working on it right now, your

6  Honor.  They're supposed to call me back in ten minutes.  I just

7  didn't want to miss what was going on in here.

8      THE COURT:  All right.  I assume you don't have a

9  cell phone on.

10     MR. CANSLER:  Not in this big room, no, ma'am.

11     THE COURT:  Thank you very much.

12     MR. MULHOLLAND:  Your Honor, both with respect to

13  the McManus case and with respect to the information that's on

14  this chart as to Alexander, these matches to prior asbestos

15  claims were made by social security number and not name, so I'm

16  fairly confident, but not positive that it is.

17     THE COURT:  Let's not talk about Alexander while Mr.

18  O'Quinn -- I mean, Mr. Laminack is not here.

19     (Pause)

20     Does that conclude then your presentation under

21  Roman Numeral II Discovery Motions to Dismiss?

22     MR. MULHOLLAND:  Except for some additional

23  information about Alexander.

24     THE COURT:  Okay.  We'll then I'll come back to

25  that.

Page 67

1          Now B, Motion to Compel Screening Companies'

2    Compliance with Order Number 25.

3          MR. ARGENTO:  Good morning, your Honor.

4          My name is John Argento and I filed this motion on

5    behalf of my clients and certain other Defendants.  Your Honor

6    issued Order Number 25, which I'm sure you're familiar with,

7    that required the disclosure and filing with the depository of

8    certain information dealing with names of the screening

9    companies that screened each of the Plaintiffs, medical records

10   that dealt with any Plaintiffs that were in this MDL, other

11   medical records and information from either other treating

12   physicians or diagnosing doctors.

13          Your Honor, what we did before we presented this and

14   prepared this motion, we went to the depository and got an index

15   of everything that was filed by either a party or on behalf of a

16   Plaintiff by a law firm that represented them in this

17   litigation.  What we were able to determine, your Honor, is that

18   there are four firms that filed absolutely nothing in response

19   to Order Number 25 that we can determine.

20          Now there is one possibility, your Honor, and it

21   does get confusing sometimes.  Some of the firms work together

22   on cases or they're affiliated with respect to certain clients,

23   so if one firm filed something that satisfied the requirement

24   for another law firm, I'm not here and able to determine that. I

25   need to hear from the Plaintiffs' firms about that and you need

Page 68

1    to hear about that.

2            But your Honor those four firms are Brent Coon and

3    Associates --

4            THE COURT:  Are who?

5            MR. ARGENTO:  Brent Coon and Associates, your Honor.

6    Ingraham and Associates, Mr. Hooper's firm, and the Shannon Law

7    Firm, which I think may have been corrected or rendered moot

8    today because I think they only have the Cole case and that case

9    was dismissed, if I'm not --

10           THE COURT:  Okay.  So that's -- we're talking three

11   law firms?

12           MR. ARGENTO:  Yes, your Honor.  And then there are

13   other -- there are other law firms, your Honor, that we were

14   able to determine that they are in partial compliance, but

15   there's great amounts of information that are missing that

16   caused them to not be in compliance with Order Number 25.

17           And I can get into the details by law firm, if you'd

18   like me to, but perhaps as a suggestion, we could talk about the

19   three law firms first that as far as our research has indicated

20   have not filed anything in compliance with Order Number 25.

21           THE COURT:  Is the Brent Law Firm here?  Brent Coon

22   and Associates?

23           MR. CANSLER:  That's me again, your Honor.  That's

24   my firm.

25           THE COURT:  And can you tell me, do you have any

Page 69

1  documents in response to Order Number 25?

2          The problem with that is that I know that I said all

3  orders apply to all new cases, but I had a date of February

4  25th, 2005 that everybody had to file.  I don't think their law

5  firm was even -- had a case here.

6          MR. ARGENTO:  That's possible, your Honor.  That's

7  possible in light of --

8          THE COURT:  So these, I think, that all they've got

9  are some new cases?

10          MR. CANSLER:  We're one of the new cases, your

11  Honor, and I've got a letter here when we were filing and trying

12  to file with the Court.  We were having difficulty because we

13  could not get a style.  I talked to Ms. Scotch here, your Honor,

14  and of course, your clerk.

15          Where we were having difficulty actually filing it

16  and did not want to be out of compliance with any of the orders.

17          THE COURT:  Okay.  Well, you don't make any

18  agreements with my case manager.  You're agreements either are

19  in court or made with other parties when you can file them, but

20  sending a letter to Ms. Scotch saying this is to confirm my

21  understanding of your conversations with my paralegal, doesn't

22  do a thing.

23          MR. CANSLER:  Yes, ma'am.  Well, I -- yes, ma'am.

24          THE COURT:  And she's not obligated to respond at

25  your bottom line that says, "If this is not correct, please

Page 70

1    notify either myself or my staff." That isn't how we do

2    business here. It's not sent out to all the other parties.

3              MR. CANSLER: I had spoke to --

4              THE COURT: Would you give that back to him, please?

5    What did you tell him about that?

6              MR. CANSLER: -- a member of Forman Perry Watkins

7    Reese and Tardy about this and told them that we were having

8    some problems and that was the extensive instructions.

9              THE COURT: What problems were you having?

10             MR. CANSLER: I couldn't -- they would not give me a

11   cause number to file the discovery into the repository, as I

12   understood it. I could have filed it, but they didn't -- it

13   didn't -- I didn't have a number.

14             THE COURT: Who was supposed to give you that? What

15   was your understanding about that?

16             MR. CANSLER: My understand was, and if I could read

17   my letter, I think it --

18             THE COURT: No. I don't care what your letter to my

19   case manager.

20             What was your understanding about how you were

21   supposed to file? Did you call the Liaison Plaintiff's Counsel?

22             MR. CANSLER: Mr. Watts? Yes, ma'am.

23             THE COURT: And what did he tell you?

24             MR. CANSLER: I don't recall him ever getting back

25   in touch with me, to be honest with you.

Page 71

1    MR. ARGENTO:  Your Honor, to follow up on your point

2  about when this firm may have been involved --

3    THE COURT:  Your cause number -- what case are you

4  talking to -- talking about for cause number, McManus?

5    MR. CANSLER:  Yes, ma'am.

6    MR. ARGENTO:  Your Honor, there were Fact Sheets

7  filed in that case as far back as May 5th.

8    THE COURT:  I have a Southern District Cause Number

9  205-121 and you filed documents in that cause number.

10    MR. CANSLER:  And my understanding was we were

11  supposed to stop.

12    Your Honor, let me call Ms. Coleman once again and

13  find out for --

14    THE COURT:  What are you doing here if you don't

15  know anything about this?  This is very unfortunate.

16    MR. CANSLER:  I was just trying to help out a lawyer

17  colleague of mine --

18    THE COURT:  I understand that, but --

19    MR. CANSLER:  -- who cannot fly because of her --

20    THE COURT:  -- you need to -- do you have a Federal

21  license?

22    MR. CANSLER:  Yes, ma'am.

23    THE COURT:  Have you read the Federal Rules on what

24  you're supposed to do to appear for lead counsel and what your

25  level of -- do you have the authority to bind your client today?

Page 72

1    MR. CANSLER:  Yes, ma'am.

2    THE COURT:  To what?

3    MR. CANSLER:  It just depends on what you -- I need

4  to.  I would have full authority, I would say.

5    THE COURT:  You're supposed to be familiar with the

6  case and you're, as you said, clearly not so why don't you go

7  back and check with your firm and see what it is you can do?

8    MR. CANSLER:  And what information specifically does

9  the Court request or is asking me --

10    THE COURT:  I wanted to know why you've not filed

11  the documents in response to Order Number 25.  It can't be

12  because you didn't have a cause number, because you've been

13  filing documents in this cause number in McManus, 2-05-121,

14  since the case was transferred.

15    MR. CANSLER:  In my last conversation with Ms.

16  Coleman, her representations to me, your Honor, was that

17  everything that we had in our possession, custody, and control

18  had been turned over to the Court.  If there's things out

19  there --

20    THE COURT:  I don't take discovery.  It goes into a

21  document depository.

22    MR. CANSLER:  And that's what I --

23    THE COURT:  Can you find out what documents you have

24  filed in response to Order Number 25?

25    MR. CANSLER:  Yes, ma'am.

Page 73

1       THE COURT:  Do you have X-rays of your clients?

2       MR. CANSLER:  Those have been filed, it's my

3   understanding.

4       MR. ARGENTO:  Your Honor, that's not what the

5   deposit log from the depository says.  The depository log

6   indicates that on May 5th, they filed some Fact Sheets and

7   that's the only filing they have for his law firm.  And I got

8   this from --

9       THE COURT:  Find out where the X-rays are, where the

10  expert reports are, where the diagnosing physician reports are.

11      MR. CANSLER:  Yes, ma'am.

12      THE COURT:  Did any of these have asbestosis claims?

13      MR. ARGENTO:  Your Honor, these are part of the

14  McManus, so yes.  We've already had that discussion this

15  morning.

16      THE COURT:  Oh, McManus, they've had asbestosis

17  claims also?

18      MR. ARGENTO:  I believe so, your Honor.

19      THE COURT:  You need to find out where those

20  documents are that have to do with the asbestosis claims, and

21  report back.

22      MR. CANSLER:  Yes, ma'am.  Sorry for the

23  inconvenience.

24      THE COURT:  Thank you, sir.

25      MR. ARGENTO:  Your Honor, the next firm is the

Exceptional Reporting Services, Inc.      361 949-2988

Page 74

1   Ingraham firm and according to the deposit log from the

2   depository --

3           THE COURT:  Is anyone here from Ingraham?

4           MR. ARGENTO:  Cheri is not sure if they have any

5   active cases.

6           THE COURT:  Cases left?

7           MR. ARGENTO:  And your Honor, when we sent out the

8   motion, we sent it out a week or ten days in the advance with

9   the hope that some of these firms would call us.  No one called

10  us from the Ingraham firm.

11          THE COURT:  Okay.

12          MR. ARGENTO:  So if they do not have any active

13  cases, we'll withdraw them.

14          THE COURT:  And what have you got, Mr. Hooper?

15          MR. HOOPER:  Your Honor, my reading of Order 25 was

16  about the screening companies only.  As I've advised the Court

17  several times and the defendants, we didn't use screening

18  companies.  We had a discussion with the Court during the

19  February hearing about on the day the order was entered that we

20  had used a company when we couldn't use land-based X-rays --

21  like a facility that had land-based X-rays that we used a

22  company called "Inner Visions," to do the X-rays.  And during

23  the discussion with the Court, it's my understanding that we had

24  to produce those records.  We have produced Inner Visions

25  records to the Defendant.

Page 75

1    My reading of 25 was about the screening companies

2  and we didn't use screening companies.  If the Court would like

3  for me to file an Affidavit that Inner Visions has complied with

4  producing all of their records, I'll be happy to do that or if

5  the Court needs something from Inner Visions, we'd be happy to

6  do that.

7    THE COURT:  Okay.  That's not what I ordered in

8  Order 25, that you should file on the date that I specified, "A

9  list of all screening companies, medical testing companies, and

10  other entities or persons who supplied any Plaintiff's B-Read

11  and/or diagnosis of silica-related diseases to any Plaintiff's

12  Counsel in this MDL."

13    And of course, the list should include the name,

14  addresses, and phone number of each screening company, but did

15  not apply just to screening companies.

16    Now these are third-party people.  If you don't --

17  if you tell me you didn't' check with them, but if you don't

18  have any control over the, that's another thing all together.

19  But if these are going to be produced in any way to substantiate

20  any of these claims are --

21    MR. HOOPER:  Your Honor, to the extent that it -- if

22  we're talking about doctors like Dr. Ballard, who did the B-

23  Reads, or Dr. Levy, who did the medical report.  If it

24  encompasses those, Dr. Ballard and Dr. Levy have produced all of

25  their records, also.  My understanding is Dr. Levy didn't

Page 76

1  produce a handful, and I don't know the number of files of

2  people that were incomplete that he had not diagnosed.  So if

3  we're talking about those doctors, which I didn't read it, and I

4  asked the Court about the scope of it.

5          THE COURT:  Wait a minute.  What are you missing

6  that you want from Mr. Hooper's clients?

7          MR. ARGENTO:  Well, your Honor, we're just asking

8  for what you ordered and that any physician that made a

9  diagnosis should supply through Plaintiff's Counsel an affidavit

10 saying they've supplied everything and we don't have affidavits

11 from anyone who diagnosed any of Mr. Hooper's clients.

12         MR. HOOPER:  If that's the scope of the order, I'm

13 sorry because I -- I'm sorry.  We'll get that affidavit.

14         THE COURT:  All right.  How long do you need to do

15 that?

16         MR. HOOPER:  May I have two weeks?

17         THE COURT:  That's fine.  Thank you.

18         MR. ARGENTO:  Your Honor, that takes care of that

19 group of firms and then there are other firms, your Honor, the

20 first one being Campbell Cherry where our investigation has

21 disclosed that they have provided no list of screening companies

22 or other medical testing companies as was required, and while

23 they did file an affidavit from M&N, they have not filed

24 affidavits from Drs. Martindale, Hilbun, Cooper, Ray Herron, and

25 perhaps other doctors.

Exceptional Reporting Services, Inc.     361 949-2988

Page 77

1          THE COURT:  I think their testimony would suffice.

2          MR. ARGENTO:  Good.  But we would like --

3          THE COURT:  That was all under oath.

4          MR. ARGENTO:  Your Honor, we weren't sure exactly

5  how much detail they got into, whether they were asked about all

6  their records and whether or not they still retained anything,

7  so that's the only reason we brought it up.

8          THE COURT:  I think that all those people did say

9  they didn't have any records.  They didn't have any records at

10  all.

11          MR. BARGER:  Yes.

12          THE COURT:  If I recall correctly.

13          MR. BARGER:  That's a correct assessment.

14          MR. ARGENTO:  Your Honor, we'd still like a list of

15  all the screening companies and other medical providers, because

16  again there's no way for us to know if we're missing anybody

17  unless we have that list and it's provided.

18          THE COURT:  All right.  Campbell Cherry?

19          MS. SNAPKA:  Your Honor, I believe those cases were

20  remanded.  I don't believe we have any more.

21          THE COURT:  I don't think I have any more Campbell

22  Cherry cases in front of me.

23          MS. SNAPKA:  Yes.  I believe that's correct, your

24  Honor.

25          MR. ARGENTO:  Your Honor, the other firm would be

Exceptional Reporting Services, Inc.    361 949-2988

Page 78

1   the Alwyn Luckey (phonetic) firm.  Again, no list of screening

2   companies.

3              THE COURT:  The what company?

4              MR. ARGENTO:  Alwyn Luckey, that law firm.

5              THE COURT:  Anyone here from that company -- from

6   that firm?

7              MR. MULLINS:  I'm here for the law settlement.  Our

8   people were here live and while were here they produced

9   everything we had.  I don't know what they suggest we --

10             THE COURT:  Why not just make a -- if you make a

11  representation that that's all there is, there isn't any more.

12             MR. MULLINS:  That's all there is, and I think these

13  were referenced again were May cases, which this Court -- we've

14  given everything we have.

15             THE COURT:  Okay.

16             MR. ARGENTO:  Your Honor, there was a letter from

17  Mr. Mullins indicating that he had attempted to contact Quality

18  Testing Services, that they were out of business, that some of

19  their records had been destroyed in a hurricane and that the

20  owner, Mr. Childers, had been away on vacation for a week and

21  that he was going to continue to try to speak with him and get

22  compliance with the Court's order.  That was a letter dated in

23  February.

24             THE COURT:  I don't have any of his cases.

25             Do I have any of his cases?  Is he part of the 17?

Page 79

1          MR. MULLINS:  No, your Honor.

2          MR. ARGENTO:  I think they're remanded.

3          THE COURT:  Do you answer anyway?  Do you know

4    anything about that company?

5          MR. MULLINS:  It's my understanding those records

6    were destroyed in Hurricane Ida.  I think he was actually might

7    have had one or two of the actual cases that we represented.  We

8    had never been successful in getting those back.  He's an

9    independent party.  He's out of business.  He does something

10   else now.  I've talked to his wife multiple times and we've

11   tried to get them to us.  She said she thought they were all

12   destroyed.  They've never been given to us.

13         MR. ARGENTO:  Your Honor, the last one is the Porter

14   and Maluth (phonetic) Firm and the Foxworth and Casano

15   (phonetic), who I believe filed cases jointly.  There were 19

16   providers that we were able to determine from review of the

17   records that we did not have affidavits from, none of whom were

18   experts that testified here at your Daubert hearing.

19         And your Honor, interestingly enough, ten out of the

20   19 called us in response to the motion and all ten of them told

21   us that they had never heard of Order Number 25.  They had never

22   been contacted by anybody from the law firm to comply and that

23   in every instance we referred them to Attorney Porter and said,

24   "You need to talk with him."

25         MS. SNAPKA:  Your Honor, I believe all those cases

Exceptional Reporting Services, Inc.      361 949-2988