US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 25

```
 1          But it's...
 2          MR. WYNER:  Ms. Simon, this is
 3     Richard Wyner from Goodwin Procter.  I
 4     represent the Center for Claims
 5     Resolution.
 6          And there is a confidentiality
 7     order that has been signed by the parties
 8     to this adversary proceeding and by the
 9     CCR.  And it has been submitted to the
10     judge.
11          I don't believe Travelers is a
12     signatory to that confidentiality
13     agreement; and are you prepared to abide
14     by the terms of that confidentiality
15     agreement with respect to this deposition?
16          MS. SIMON:  I just joined this
17     matter, working on this matter at the
18     firm.  And I'm not -- I'm not familiar
19     with the confidentiality agreement.
20          What I can do is find out --
21     or get a copy of it, find out whether we
22     are prepared to abide by it -- which I
23     would imagine it would just be not
24     disclosing the information publicly -- and
25     then obtain a transcript of the deposition
```

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 26

1    if we need it.

2            MR. WYNER:  Right.

3            You cannot stay on the call

4    without agreeing to the confidentiality

5    agreement's terms.

6            MS. SIMON:  I understand that.

7            MR. WYNER:  And so, does that

8    mean you're dropping off the call or

9    you're agreeing to the terms?

10           MS. SIMON:  I'll drop off the

11   call for now, because I'm not familiar

12   with the confidentiality agreement.

13           MR. WYNER:  Right.

14           I mean, I can tell you that

15   it, you know, is a basic confidentiality

16   agreement that would limit the use of the

17   information generated during this

18   deposition to the proceeding, and prohibit

19   the disclosure to anyone who is not,

20   essentially, a party to the case or

21   retained for purposes of the case.

22           But if you're more comfortable

23   with dropping off, obviously, that is your

24   choice.

25           MS. SIMON:  Actually, I guess

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 27

1    it does make sense to not -- to the terms

2    that you just said, to not disclose this

3    material publicly that would otherwise be

4    covered by the confidentiality agreement.

5        MR. WYNER:  Okay.  Right.

6        So I'm going to assume that

7    you've agreed to those terms, at least as

8    I have described them.

9        I will e-mail you a copy of

10   the confidentiality agreement after the

11   deposition today.

12       MS. SIMON:  Thank you.

13       MR. WYNER:  And you're at

14   Bingham?

15       MS. SIMON:  Yes.

16       MR. FRIEDMAN:  And what is

17   your phone number, please?

18       MS. SIMON:  (860) 240-2835.

19       MR. FRIEDMAN:  Could you read

20   back the last question, please -- and

21   answer.

22       (Whereupon, at this time the

23   referred-to portion of the record was read

24   by the reporter.)

25   BY MR. FRIEDMAN:

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 28

1      Q    Mr. Hanlon, if you recall, would
2    plaintiffs typically name a single member of the
3    CCR, or did they more often name multiple
4    members of the CCR in their complaints?
5      A    It varied case to case, but it was
6    not uncommon for more than one member to be sued
7    in a particular case.
8      Q    If multiple members of the CCR were
9    sued, but not all were named, did CCR assume
10    responsibility for the defense for only those
11    members that were named or did it, in settlement
12    negotiations, attempt to seek settlement on
13    behalf of all members of the CCR?
14          MR. FINCH:  Object to form.
15      A    Yeah, I think you asked two
16    different questions there; but let me try and
17    answer it.
18          The Center basically defended
19    the cases that were filed.  So if companies were
20    sued, they were defended by the Center.  If they
21    weren't sued, there was no need to defend them.
22          And it only entered
23    appearances on behalf of the companies -- or had
24    its counsel enter appearances on behalf of the
25    companies that were sued.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 29

1           With respect to settlement,
2     however, under the terms of the producer
3     agreement the Center did obtain, in every case
4     that it settled, a release of all of the Center
5     members, whether they were named as defendants
6     in the particular case or not.
7         Q    Do you know if CCR had a database
8     which tracked the number of times individual
9     member companies were named as defendants in
10    lawsuits?
11        A    Yes, certainly.
12        Q    So that would show whether some
13    defendants were named more frequently than other
14    defendants?
15        A    Yes.
16        Q    But the number of settlements for
17    all companies would be the same; is that
18    correct?
19            MR. FINCH:  Object to form.
20        A    If you are counting releases, yes.
21        Q    So when CCR settled cases on behalf
22    of all members -- when it arrived at a
23    settlement number, it would then allocate
24    liability shares among the individual members;
25    is that correct?

FINAL
CONFIDENTIAL

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11         William Hanlon, Esquire

Page 30

1        A    The Center didn't arrive at a
2    number.  It negotiated a settlement.
3        Q    Okay.  When it negotiated a
4    settlement, would it then allocate the total sum
5    of the settlement to its members pursuant to the
6    producer agreement?
7        A    Yes.
8        Q    Okay.  And you referred to before
9    that "Attachment A" to the producer agreement
10    described the allocation methodology?
11        A    Yes.
12        Q    And that's on page -22 of the
13    document I gave you; is that correct?
14        A    Of this particular version --
15    actually, it doesn't say page "22."  It says
16    page 1.
17        Q    I'm sorry.  Does yours not say at
18    the bottom "CCRFM-" --
19        A    Oh, "CCR-22" -- I'm sorry.
20            Yeah.
21        Q    Okay.  And that's the allocation
22    methodology that you were describing?
23        A    Yes.  As it says right at the
24    beginning of "Attachment A":
25            "All Liability Payments,

FINAL                    JANE ROSE REPORTING
CONFIDENTIAL        1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 31

1     Allocated Expenses, and Unallocated Expenses
2     shall be apportioned among Participating
3     Producers based on the individual Participating
4     Producer shares established as provided in this
5     Section..."
6             And then there was a Section A
7     that talked about the initial producer shares.
8             And then subsequently there's
9     a Section B, I believe, which describes the
10    process by which those initial shares were
11    subject to adjustment.
12        Q     So for the initial allocations under
13    Section A, those allocations were based on a
14    number of occupational groupings -- is that
15    correct? -- at least in part, on the
16    occupational grouping of claimants?
17        A     At least in part.
18        Q     And the other factors were the
19    historical costs per closed claim for members of
20    the CCR; is that correct?
21             MR. FINCH:  Object to form.
22        A     I'm not sure I can accept that
23    simple a --
24        Q     Well, can you describe for me the
25    method by which allocation in Section A was

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11        William Hanlon, Esquire

Page 32

1    reached for individual members of the CCR?
2                    MR. FINCH:  At what point in
3        time?
4                    MR. FRIEDMAN:  Well, it's my
5        understanding that Attachment A is as of
6        the date of 1991.
7    BY MR. FRIEDMAN:
8        Q     And Attachment B would deal with
9    adjustments to that -- to the initial numbers;
10   is that correct?
11       A     As I said in the beginning, the
12   producer agreement was amended from time to
13   time.
14                    You have handed me a version
15   that shows the producer agreement itself was
16   amended as of February 1, 1994.  But this
17   Attachment A was amended effective December 1,
18   1991.
19                    And there was a very
20   substantial amendment to Attachment A, effective
21   December 1, 1991, which effectively adjusted the
22   sharing formula from a generic sharing formula,
23   as it was then known, in which every member
24   basically had a share allocated to it in every
25   case, whether it was named as a defendant in the

FINAL                    JANE ROSE REPORTING
CONFIDENTIAL        1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 33

```
1    case or not -- to what became known as a "named
2    only" sharing formula, where in most situations
3    the sharing formula worked to allocate a share
4    to a company only in the cases in which it was
5    named, and not to companies that were not named
6    as defendants in the case.
7              So if you're asking me to
8    describe the way it worked under this 1991
9    Attachment A, it would be a different
10   explanation than if you were asking me to give
11   you the explanation with respect to Attachment A
12   as of 1988.
13       Q    So the 1991 version -- which is the
14   version you have in front of it -- you refer to
15   as having a "named only" provision; is that
16   correct?
17       A    It creates a "named only" sharing
18   arrangement for most cases.  That's what I said.
19       Q    Okay.  And "named only" means
20   that -- well, can you describe what "named only"
21   means?
22       A    As I said, under the "named only"
23   sharing arrangement, a company was only
24   allocated to share in the cases in which it was
25   named as a defendant and was not allocated to
```

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3541   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 34

1    share in cases in which it was not named as a
2    defendant.
3        Q    Did CCR sometimes settle claims,
4    where -- before a plaintiff had actually named
5    any specific defendants, but rather had retained
6    law firms -- but not actually filed a complaint
7    yet?
8        A    Would you repeat that question.
9        Q    Did CCR settle claims sometimes,
10   where someone had not yet -- with plaintiffs who
11   had not yet initiated complaints, but had
12   retained attorneys?
13       A    Well, I think on occasion it did,
14   but -- but, rarely.
15       Q    Okay.  So in essence, all or almost
16   all of settlements were with plaintiffs who had
17   actually filed claims against at least one
18   member defendant?
19       A    Yes; in most cases that was
20   certainly the case.
21           There was a complaint on file,
22   and individual members were either named and/or
23   served as defendants in the case.
24       Q    So if a defendant was not -- an
25   individual member was not named as a defendant,

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 35

1    it would not make a contribution to a specific

2    settlement?

3        A    It would not be allocated a share by

4    the CCR of the settlement payment -- yes.

5        Q    Okay.  Were there other changes

6    between the 19- -- substantial changes between

7    the 1988 allocation formula and the 1991

8    allocation formula?

9        A    I do not believe there were any

10   changes to Attachment A between October 1988 and

11   December 1, 1991.

12       Q    Okay.  And what changes besides the

13   one you described before were there in the 1991

14   settlement -- I'm sorry, allocation

15   methodology -- from what had occurred previously

16   or had been set forth previously?

17       A    I think that was the fundamental

18   change that occurred.

19           I don't recall any other

20   particular changes occurring to Attachment A at

21   the time -- although, it's more than a decade

22   ago.  So I could be forgetting something.

23       Q    Can you describe the other -- the

24   components of an individual member's liability

25   share that the CCR used to allocate liability?

FINAL                          JANE ROSE REPORTING
CONFIDENTIAL             1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 36

1      A    I'm not sure I can.  I'm not sure
2    what you mean by the "components" of the share.
3      Q    Well, how did you determine how to
4    allocate to an individual CCR member what their
5    percentage of a particular settlement would be?
6      A    Well, I didn't do the allocation.
7      Q    Um-hum.  Okay.  How did CCR do that?
8      A    Pursuant to the -- Attachment A.
9      Q    Can you generally describe it for
10   me?
11     A    I can try.  But as you can see, it's
12   a pretty complicated document.
13          As I recall, basically what
14   Attachment A did was to provide that claims
15   would be classified according to occupational
16   categories.
17          And then those occupational
18   categories would be grouped into four basic
19   occupational groupings, which are listed on
20   page 2 of Attachment A as:  shipyard, insulator,
21   construction, and all others.
22          For each of those occupational
23   groupings, each of the CCR members would be
24   assigned an average cost per closed claim or
25   what became known as a "named only" occupational

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3541   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 37

1    average.
2       Q    Okay.
3       A    And those "named only" averages or
4    average cost per closed claim numbers were based
5    on historical settlements entered into by each
6    member before that member became a member of the
7    ACF.
8             But, those were averages that
9    were subject to adjustment through the share
10   adjustment process that is set out in Attachment
11   A.
12            But basically, in any
13   particular case, the "named only" share
14   allocation was based on each member's "named
15   only" average in that occupational category.
16            And in a particular case, the
17   shares were based on the simple math of taking
18   the "named only" averages for each of the
19   members named as a defendant in the settled
20   claim.
21            And for each member, their
22   share was their "named only" average over the
23   sum of the "named only" averages for all of the
24   members in the case.
25      Q    Section B of that document permits

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 38

1    the future adjustment for participating producer
2    shares; is that correct?
3         A    Yes.
4         Q    Were some adjustments made when
5    additional members joined the CCR after December
6    of 1991?
7         A    I don't believe any additional
8    members joined the CCR after December 1, 1991.
9         Q    Okay.  So Section B's intent and
10   purpose was to provide for the possibility of
11   adjustments made among and between different
12   members of the -- among the existing members of
13   the CCR; is that correct?
14        A    I'm not sure what you mean by
15   "among" the members.
16              It provided a process by which
17   the members, themselves, could adjust the shares
18   that were initially agreed to in Attachment A.
19   And it set out that process.
20              And basically, it called for a
21   recommendation by us, as special counsel, which
22   was a nonbinding recommendation with respect to
23   adjustments that were made -- adjustment
24   recommendations that could be made by us, as
25   special counsel, or by individual members.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 39

1    And then there was a voting
2    procedure, which is set out here.
3    And I don't recall it
4    specifically. But basically, it required, as
5    set forth in B(2)(a), that an adjustment, to
6    become effective, required an affirmative vote
7    of producers representing at least 50 percent of
8    the combined dollar contributions by all
9    producers to the Center for all purposes during
10   the preceding calendar year, and at least 40
11   percent of the number of producers per capita.
12   Q    Were there frequently adjustments
13   over the course of the life of the CCR?
14   A    There were a significant number.
15   I don't know about
16   "frequently" -- but, you know, something, I
17   think -- I think we had 40, 50 different share
18   recommendations that were voted on over the life
19   of the Center, or something like that.
20   Q    Do you recall whether there were
21   adjustments to T&N's share under Section B?
22   A    I'm sure there were.
23   I mean, in some cases what
24   were adjusted were the "named only" occupational
25   averages.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 40

1           And any adjustment in any
2    member's average would affect the averages -- I
3    mean, the settlement averages of all the
4    members.
5           So, you know, it was a zero
6    sum gain.
7           You had to get 100 percent
8    shares.  So if you increased one or decreased
9    one, it had some impact on the rest of the
10   members.
11      Q    What would the basis be for making
12   adjustments to the claim?
13      A    Well, the basic standard was that
14   adjustments should only be made to achieve a
15   sharing arrangement that would more fairly
16   reflect the relative liability of the members in
17   the claim subject to that particular share.
18           So our standard, both in
19   making recommendations for share adjustments or
20   in opining on recommendations that were made by
21   other members, was whether the proposed shares
22   would more fairly reflect relative liability
23   than the existing shares for the liability
24   subject to those shares.
25      Q    Did CCR use -- well, was the data

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net

US District Court - Delaware                          June 1, 2005
In Re Federal Mogul - Chapter 11              William Hanlon, Esquire

Page 41

1    CCR collected used to determine -- used to
2    assist in the determination of whether liability
3    shares were accurately being reflected by the
4    allocation shares?
5             MR. FINCH:  Object to form.
6        A    Yes.  I believe the data the Center
7    collected was used to assist in the
8    share-adjustment process.
9        Q    The data collection is -- it looks
10   like it's laid out on page 15 of this agreement,
11   starting on page 15, Subsection (b).
12            And so --
13       A    Page 15 of Attachment A, yes.
14       Q    Yes.  CCRFM -36.
15            So the CCR collected data, all
16   of the type of data in Section (c); is that
17   correct?
18            I'm sorry, Section (b).
19       A    I haven't looked at it in a while;
20   but it certainly did track the filing date of
21   the claim; the occupational category of the
22   claim, based on the occupation of the person
23   whose exposure gave rise to the claim; the
24   disease category; dates of exposure.
25            I don't believe the database

FINAL                              JANE ROSE REPORTING
CONFIDENTIAL                 1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 42

1    necessarily tracked the circumstances of

2    exposure, but the Center did have information

3    with respect to the circumstances of exposure.

4             It certainly tracked who was

5    named as a defendant or a third-party defendant.

6             It certainly tracked

7    plaintiffs' counsel; disposition date; type of

8    disposition; if there was a judgment, which

9    producers were held liable; the amounts paid or

10   owed by the Center's liability payments; and

11   additional other types of information.

12            So, yes, basically that's

13   correct.

14       Q    What kind of other information, if

15   you recall, would be collected?

16       A    Well, there was no particular

17   limitation on the sort of information that could

18   be deemed relevant.

19            It had to do with the evidence

20   that gave rise to the claims of liability.

21            And in basic terms, our focus

22   was on the strength of the product

23   identification as to each particular member and

24   the nature of the claim against each particular

25   member.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 43

1           In addition to the information
2     that was provided in the complaint and through
3     discovery in the case, we would from time to
4     time, as special counsel, meet with and
5     interview the liaison counsel that were actually
6     defending the claim and the Center claims
7     analysts who were responsible for negotiating
8     settlements on behalf of the members, to -- and
9     the individual members themselves -- to get
10    their views on the strength or weakness of
11    particular claims against each member, based on
12    occupation, based on product identification,
13    based on any other factor that was relevant to
14    the case.
15         Q    Was the potential for plaintiffs to
16    recover punitive damages against a particular
17    defendant part of the strength of a case?
18         A    I don't think so.
19              I mean, we focused on the
20    product identification issues and the causation
21    issues.
22              We did not give any particular
23    weight to punitive damages in our share of
24    adjustment recommendations.
25         Q    Were punitive damages an issue that

FINAL
CONFIDENTIAL

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11           William Hanlon, Esquire

Page 44

1    mostly individual counsel would deal with for a
2    specific member?
3        A    I'm not sure I understand the
4    question.
5        Q    Well, I'll strike the question.
6    I'll move on to a different section.
7            And this information that was
8    collected was reported after the individual
9    members on a monthly basis; is that correct?
10       A    Not all of the information I was
11   discussing, no.
12       Q    But most of the data gathered under
13   Section B would be reported after the members?
14           MR. FINCH:  Object to form.
15       Mischaracterized what he said.
16       A    The Center routinely reported
17   certain claims information to the members.
18           I don't know what particular
19   information you're referring to.  We'd have to
20   go through it bit by bit.
21           And I don't recall whether it
22   was reported monthly or quarterly or on some
23   other basis.
24           But certainly -- you know,
25   certain kinds of claims data were routinely

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 45

1    reported to the members.
2         Q    Did that include number of claims
3    against specific defendants -- let's say, on a
4    monthly basis?
5         A    My recollection is that -- I don't
6    know whether it was monthly or not -- but my
7    recollection is that the members certainly did
8    receive information about the number of new
9    claims that were reported as to each member.
10             But I do not believe that the
11   Center routinely provided to the membership
12   information about the individual number of
13   claims asserted against another member.
14             My recollection is that,
15   generally, each member was told the total number
16   of claims that it was named in and, I think,
17   what percentage that was of the total number of
18   claims brought against all members.
19        Q    Well, do you know what kind of
20   information about other members was provided to
21   each member individually in order for them to
22   determine whether or not an allocation share of
23   the specific member was appropriate or not?
24        A    Yes, I have some knowledge of it.
25        Q    Can you tell me what knowledge that

FINAL                          JANE ROSE REPORTING
CONFIDENTIAL              1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 46

1    would have been?

2         A    Well, it varied over time.

3              In the early years, each

4    member's share was treated by each of the

5    members as confidential.

6              I think that was a holdover

7    from the Asbestos Claims Facility days, where

8    the shares were considered confidential.

9              But over time as members began

10   to appreciate the share-adjustment process and

11   realized that it was a zero sum gain, there was

12   focus on the facts with respect to other

13   members, in order that the members could make a

14   judgment as to the adjustment process, because

15   they couldn't really make that on a "before"

16   basis without having some information about the

17   case.

18             In the early adjustments, the

19   adjustments tended to focus on discrete groups

20   of claims that were broken out into what were

21   called in the producer agreement "special claim

22   categories."

23             And with respect to those

24   special claim categories, we would carve them

25   out of the traditional occupational grouping

FINAL
CONFIDENTIAL

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 47

1    that they would otherwise be placed into.
2              And they would be subject to
3    an ad hoc or a special sharing arrangement just
4    for those claims.
5              And with respect to those
6    claims, we would often share with the members a
7    great deal of information with respect to the
8    facts pertaining to those particular claims.
9              Generally, they arose out of a
10   particular job site or were brought by a
11   particular plaintiff or were filed in a
12   particular region of the country.
13             And we would share all kinds
14   of information with respect to the strength or
15   weaknesses of those claims against each of the
16   members that were named in those claims.
17             And over time, that process
18   continued.
19             And I worry about simplifying
20   the process by trying to shorthand it into a few
21   sentences.
22             But, from time to time there
23   were adjustments to the occupational averages
24   for shipyard, insulator, all other, or the
25   construction categories.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware                          June 1, 2005
In Re Federal Mogul - Chapter 11              William Hanlon, Esquire

Page 48

1           And that would involve a much
2    more global assessment of the relative strength
3    and weakness of the claims against a member, as
4    compared to the other members in each of those
5    occupational groupings.
6           And information with respect
7    to the strength or weakness of claims in those
8    particular categories were shared by us with the
9    members as part of the share-adjustment process.
10          And they all -- the members
11   were also free to seek information from the
12   claim staff or liaison counsel or from the other
13   members, with respect to those matters.
14      Q    On page -39, CCR Bates stamp -39 --
15   it looks like page 18 of Attachment A -- it
16   lists -- under Section 4 there begins a list of
17   factors about -- that would help, I guess --
18   help the CCR staff identify whether there might
19   be a basis for adjustments to particular
20   members' shares.
21          Is that a fair
22   characterization of what that section is
23   intended to do?
24      A    No, I don't think so.
25          First of all, the staff had no

FINAL                          JANE ROSE REPORTING
CONFIDENTIAL          1-800-825-3341   janerose@janerose.net

US District Court - Delaware                          June 1, 2005
In Re Federal Mogul - Chapter 11              William Hanlon, Esquire

Page 49

1    role in adjusting or setting the producer
2    shares.
3         Q    Did they make recommendations?
4         A    No.  The adjustment recommendations
5    generally came from individual members
6    themselves or from Shea & Gardner as special
7    counsel.
8         Q    Okay.
9         A    The staff's job was to defend and
10   settle the claims.
11             But as established by the
12   producer agreement, they did not take any role
13   in the share-adjustment process, apart from
14   providing information to the members or to
15   special counsel.
16             As it says there, the Center
17   and special counsel would monitor the reports
18   and information obtained to identify any factors
19   or trends that tended to suggest that the
20   existing shares may not fairly reflect the
21   relative responsibility of producers for
22   settlement payments or defense costs.
23             The factors that are then
24   listed were among the factors that were looked
25   at, but they were only the listed factors.  They

FINAL                          JANE ROSE REPORTING
CONFIDENTIAL          1-800-825-3341    janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 50

1    did not limit the factors.

2                    And we were free, as special

3    counsel, and the members were free as members,

4    to look at any other factors that they thought

5    were relevant to the question of whether the

6    existing shares did or did not fairly reflect

7    the relative responsibility of the members, or

8    whether they should be adjusted to more fairly

9    reflect the relative responsibility of the

10    members for a particular group of claims, either

11    for a particular occupational grouping or for a

12    particular special claim category.

13        Q    In Section (g) on page 19, it

14    discusses that:  "Disposition or other data

15    indicating for a particular category of

16    claims..." -- and then there is language that

17    the relative responsibility among participating

18    producers is significantly different from what

19    is indicated by the participating producer

20    share?

21        A    Yeah.

22        Q    Would that be based on the kind of

23    information you were talking about, that -- a

24    determination that might, in fact, be the

25    case -- that there was a -- the relative

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net