US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 100

1    "extraordinary claims."
2           I'm aware of what
3    "extraordinary claims" are, generally, under
4    these kinds of agreements.
5           But again, I didn't have a
6    very active role in negotiating those terms of
7    these agreements.
8      Q    Is it correct that an extraordinary
9    claim would be one which was not subject to the
10   future claim values that were established in
11   these agreements?
12     A    Well, you could have extraordinary
13   claims with respect to both present claims and
14   future claims.
15     Q    Okay.
16     A    But generally, extraordinary claims
17   were exceptions to the negotiated averages.
18           And plaintiffs were always
19   pushing for as many exceptions or extraordinary
20   claims as they could negotiate with respect to
21   both pending claims and future claims.
22           And the Center was always
23   pushing back for as few exceptions or as few
24   extraordinary claims, recognizing that that was
25   one of the issues that they'd have to reach

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 101

1    agreement on.

2        Q    In this particular agreement, on

3    page -283 and -284, it says that -- "The number

4    of such Extraordinary Claims shall be limited to

5    2% of Future Claims each year."

6            Do you recall that being a

7    typical number in SSP agreements for the number

8    of future extraordinary claims?

9        A    I don't know that I'd use the term

10   "typical."

11           Generally, the numbers were

12   relatively small percentages or actually small

13   numbers of absolute claims.

14           As I said, the Center always

15   tried to keep that number, whether it was

16   expressed in terms of percentages or absolute

17   claims, as low as possible; and plaintiffs

18   always pushed back.

19       Q    Do you recall whether there were

20   some agreements in which only mesothelioma

21   claims could be extraordinary claims?

22       A    I don't recall specifically, but

23   that would not surprise me.

24       Q    Were mesothelioma claims

25   generally -- was there a wider range, I guess --

FINAL
CONFIDENTIAL

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 102

1     was there a wider range of -- were mesothelioma

2     claims considered to be the most -- were

3     mesothelioma claims considered to be the claims

4     of the highest value?

5         A    By who?

6         Q    By the CCR.

7         A    I don't know how to answer that.

8                I mean, certainly, other

9     things being equal, mesothelioma was considered

10    to be a more serious disease, in terms of an

11    asbestos-related claim, than lung cancer or

12    other cancers or non-malignants.

13               But you could have, you know,

14    extraordinary cases, where, under the

15    circumstances of the particular case, a

16    non-malignant claim could be a more expensive

17    claim to settle than a mesothelioma claim.

18               MR. FRIEDMAN:  I would ask you

19    to mark this as Exhibit 3.

20               This document is also

21    "Confidential," as designated by CCR.

22               (Whereupon, Hanlon Deposition

23    Exhibit No. 3 was marked for

24    identification.)

25    BY MR. FRIEDMAN:

FINAL                          JANE ROSE REPORTING
CONFIDENTIAL              1-800-825-3341   janerose@janerose.net

US District Court - Delaware    June 1, 2005
In Re Federal Mogul - Chapter 11    William Hanlon, Esquire

Page 103

1      Q    Mr. Hanlon, are you familiar with
2    this document?
3      A    I'm not sure.
4      Q    Okay.
5      A    I don't -- I don't know for sure
6    whether I've ever seen this particular document
7    or not.
8      Q    Was it typical to have a separate
9    agreement for future plaintiffs from present
10   plaintiffs?
11     A    I think the Center did it both ways.
12     Q    Do you know what the reasons were
13   for doing separate agreements were?
14     A    I think it was really a function of
15   the particular negotiation.
16          I don't know of any particular
17   reason.
18     Q    I ask you to turn to CCRFM000385.
19          Under Section 9, it says:
20          "Plaintiff Counsel have, for
21   many years, represented plaintiffs in connection
22   with their personal injury claims for
23   asbestos-related disease, and are highly
24   experienced in the asbestos litigation."
25          Was that a characteristic

FINAL    JANE ROSE REPORTING
CONFIDENTIAL    1-800-825-3341    janerose@janerose.net

US District Court - Delaware                          June 1, 2005
In Re Federal Mogul - Chapter 11              William Hanlon, Esquire

Page 104

1    you'd say was generally true of the plaintiffs'

2    counsel with whom the CCR entered the SSP

3    settlements?

4        A    Generally, the members of the

5    plaintiffs' bar with whom the Center was dealing

6    with in the late '90s had been in the business

7    for a long time, yes.

8        Q    Wouldn't you say they were, by and

9    large, pretty sophisticated counsel?

10       A    I don't see the word "sophisticated"

11   there.

12       Q    I'm not asking whether it appears in

13   there.  I'm asking for your assessment as -- in

14   your roles with CCR.

15            MR. FINCH:  Object to form.

16       A    It varied by plaintiff.

17            It depends on your definition

18   of "sophistication."

19       Q    In the fourth line from the bottom,

20   it says:

21            "Plaintiff Counsel believe

22   that virtually all of their clients will accept

23   their recommendations."

24            And if you want to read the

25   whole paragraph, that's fine -- to understand

FINAL                          JANE ROSE REPORTING
CONFIDENTIAL              1-800-825-3341   janerose@janerose.net

US District Court - Delaware

June 1, 2005

In Re Federal Mogul - Chapter 11

William Hanlon, Esquire

Page 105

1    what the "recommendations" refers to, obviously.

2        A    No.  I think I have a general

3    understanding.

4        Q    Okay.  Outside the context of this

5    particular agreement, did plaintiff counsel

6    represent to the CCR that they believed that

7    their clients would generally accept these

8    recommendations?

9        A    I believe, based on what I heard

10    reported by the CCR claim staff, that these

11    representations were made by the plaintiffs that

12    had entered into these agreements, yes.

13        Q    On page -382 in the paragraph above

14    4, "Payment of Claims..." -- well, I guess the

15    last paragraph of paragraph 3 -- it says:

16            In addition, in the event that

17    any current CCR member withdraws from the CCR or

18    has its membership in the CCR otherwise

19    terminated, plaintiff counsel and any such

20    departing CCR member company shall meet and

21    negotiate in good faith concerning a settlement

22    agreement with that company, governing future

23    claims that is consistent with this agreement.

24            Was that a provision that was

25    important to CCR members -- that if they

FINAL

JANE ROSE REPORTING

CONFIDENTIAL

1-800-825-3341    janerose@janerose.net

US District Court - Delaware                        June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 106

1    departed, they would still be able to retain

2    benefits of the SSP agreement -- some of the

3    benefits of the SSP agreements?

4            MR. FINCH:  Object to form.

5        A    I'm not sure what you mean by

6    "important" or which members.

7            It was something that was

8    negotiated for their benefit.

9            The extent to which it was

10   considered important varied member to member.  I

11   don't have a particular view as to how important

12   that was to any particular member.

13       Q    Do you remember if that was a

14   provision that was -- that that concept in that

15   provision was introduced by CCR and its members

16   or by the plaintiff counsel?

17       A    Oh, I suspect that that particular

18   provision was introduced by CCR, because it

19   provides some benefit to a departing CCR member.

20           And I don't think that

21   plaintiffs' counsel would have had any concern

22   about benefiting a member who left the CCR.

23       Q    Was this a provision that the

24   general plaintiffs resisted including and was

25   difficult to negotiate?

FINAL                           JANE ROSE REPORTING
CONFIDENTIAL              1-800-825-3341   janerose@janerose.net

US District Court - Delaware                          June 1, 2005
In Re Federal Mogul - Chapter 11                William Hanlon, Esquire

Page 107

1          MR. FINCH:  Objection; lack of
2      foundation.
3      A    I don't recall any reporting or
4      discussion about this being particularly
5      difficult to negotiate.
6               It doesn't look like it's much
7      of an additional commitment on the part of
8      plaintiffs' counsel.
9               So I'm not surprised that
10     that's my recollection of those reports, but I
11     don't have any specific recollection of a
12     particular instance where a negotiation with a
13     particular plaintiff was reported in my
14     presence.
15               I'm sure most of the
16     plaintiffs' bar would always be prepared to
17     negotiate something in good faith.
18          MR. FRIEDMAN:  Could I just
19      take five minutes to confer with Ms. King
20      -- Ms. Brown -- and we'll see if we have
21      additional questions?
22          THE WITNESS:  Sure.
23          MR. WYNER:  Sure.
24          (A recess was taken from 11:13
25          a.m. until 11:20 a.m.)

FINAL
CONFIDENTIAL

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 108

1              MR. FINCH:  Mr. Friedman, you
2       pass the witness?
3              MR. FRIEDMAN:  Yes.
4       EXAMINATION BY COUNSEL FOR THE ASBESTOS
5              CLAIMANTS COMMITTEE
6       BY MR. FINCH:
7          Q    Mr. Hanlon, my name is Nate Finch
8       and I represent the Asbestos Claimants Committee
9       in the Federal Mogul bankruptcy proceedings.
10             Sticking for the moment with
11      Hanlon Deposition Exhibit No. 2, this is an
12      example of a Strategic Settlement Program
13      settlement agreement; correct?
14         A    I don't know what you mean by
15      "example."  It is one of the settlements
16      negotiated as part of the SSP program.
17         Q    As I read this agreement, before the
18      CCR will pay money to a claimant, the plaintiff
19      must submit evidence of exposure to the
20      asbestos-containing products of one or more CCR
21      members and evidence of an asbestos-related
22      disease.
23             Is that consistent with your
24      understanding of the settlement criteria in this
25      agreement?

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 109

1        A    That's consistent with my general
2    understanding of the SSP program.
3             I haven't looked at this
4    particular agreement; but, that was generally
5    true.
6        Q    Were those two requirements --
7    namely, evidence of exposure to the
8    asbestos-containing products of one or more CCR
9    members and evidence of an asbestos-related
10   disease -- requirements in virtually all
11   settlement agreements with asbestos personal
12   injury plaintiffs, between the CCR member
13   companies and the plaintiffs?
14       A    Yes, I believe so.
15       Q    Can you explain for me why those two
16   requirements were the basis for the settlements?
17       A    Well, I guess -- I think it's pretty
18   obvious:
19            The center wouldn't be under
20   any need to settle a claim if there wasn't a
21   basis for product identification against its
22   members.
23            It would be able to defend the
24   claim successfully on the basis of lack of
25   product ID.

FINAL                        JANE ROSE REPORTING
CONFIDENTIAL           1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 110

1          And similarly, what it was

2    attempting to do with these settlements was to

3    enter into settlements that would compensate

4    individuals for asbestos-related injury; and it

5    was trying to get some evidence of that injury

6    as a condition of the settlement.

7          It was not intending to

8    compensate people who were not injured by

9    asbestos.

10    Q    Were those criteria, broadly

11    speaking, designed to track the standards a

12    plaintiff would have to meet in order to get

13    past a motion to dismiss or a motion for summary

14    judgment?

15    A    No; I don't think I'd phrase it like

16    that.

17    Q    How would you phrase it?

18    A    I think they were entered into

19    against the litigation landscape, but they were

20    not designed to track anything.

21          They were negotiations that

22    took place in the tort system, subject to what

23    the tort system would do if the case were not

24    settled.

25    Q    Okay.  So they were designed to

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 111

1    track how the law would treat the claims if they
2    were not settled?
3         A    Again, I wouldn't buy your language
4    "track."
5         Q    They were designed to "reflect"?
6         A    No.  They were negotiated in the
7    context of the tort system -- based on the
8    realities of the tort system, the particular
9    jurisdiction, the particular plaintiffs'
10   counsel, the particular claimants.
11            But they weren't meant to
12   "track" or "reflect" anything.
13        Q    The settlement amounts set forth in
14   Exhibit 2, on page -272 --
15        A    The ones that are redacted out.
16        Q    Yes.
17            -- those were the settlement
18   amounts that were paid to the plaintiffs
19   pursuant to this agreement that would resolve
20   the plaintiffs' claim against all the CCR
21   members; correct?
22        A    Again, I don't know -- I mean, that
23   was generally true of the SSP agreements.  I
24   don't know about this particular agreement.
25            But generally, the Center

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 112

1     always settled a case on behalf of its

2     then-existing members.

3         Q    Right.

4             And it wouldn't tell the

5     plaintiff lawyers, who were negotiating the

6     claims, how much each CCR member contributed to

7     the overall aggregate settlement amount in the

8     agreement, would it?

9         A    No, it would not.

10        Q    Okay.  So for example, if the

11    mesothelioma amount here was $500,000, the CCR

12    would never tell the plaintiff lawyers, "Well,

13    of that $500,000, Turner & Newall's share of

14    that was 20 percent" -- or anything like that,

15    would it?

16        A    Not in the negotiation process.

17            In the short-payment

18    litigation, as claims were shortened, the Center

19    did routinely advise plaintiffs' counsel and

20    plaintiffs of the share of the company who was

21    not paying its share.

22            The Center did routinely

23    advise plaintiffs' counsel and their claimants

24    of the share of the company that was not paying

25    its share.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 113

1          Q     And the short-payment litigation
2     occurred after February 2001; is that correct?
3          A     No.  My recollection -- but I'd be
4     happy to take some counsel from my counsel --
5     was that it began after GAF membership was
6     terminated in the Center, effective January of
7     2000.
8                So I think the short-payment
9     litigation began --
10         Q     Early in 2000?
11         A     -- something in, like, March 2000,
12    yes.
13         Q     But as part of negotiating the
14    values of the cases, the plaintiffs certainly
15    wouldn't be told what the liability share was
16    for each CCR member?
17         A     No, they couldn't be, because the
18    shares of the members depended, in part, on the
19    occupation of the claimant; and that information
20    would not be known, systematically, until those
21    claims were actually processed and qualified.
22         Q     Okay.
23         A     So, you couldn't determine the
24    shares in advance.
25         Q     Turning to page 14 of Exhibit 2,

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 114

1    Mr. Friedman took you through the

2    provision where it states that -- "...Plaintiff

3    Counsel agree to negotiate in good faith with

4    the CCR and its then member companies..."

5          Do you see that?

6    A    Um-hum -- yes.

7    Q    Is it correct that what the

8    plaintiff lawyers obligated themselves to do was

9    to negotiate with the remaining CCR members and

10   any current member that left the CCR on

11   compensation amounts for future claims -- but

12   they did not agree to any particular amounts for

13   the companies that left the CCR, did they?

14   A    I think I basically agree with what

15   you're saying, yes.

16   Q    So for example, if the overall

17   settlement average for all the CCR members at

18   the time Exhibit Hanlon 2 was entered into was

19   for $500,000 for mesothelioma, the plaintiff

20   lawyers didn't obligate themselves to any

21   particular amount to recommend in settlement

22   negotiations with Turner & Newall if Turner &

23   Newall subsequently left the CCR, did they?

24   A    No.

25   Q    "No," they didn't obligate

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 115

1    themselves to do that?

2        A    "No," they did not obligate

3    themselves to do that.

4        Q    I take it that you have not compared

5    the average settlement amounts for Turner &

6    Newall post CCR to what they're paying within

7    the CCR, have you?

8        A    I don't know that I've ever seen

9    information for Federal Mogul entity settlements

10   after they left the CCR.

11       Q    Okay.  During the time that the CCR

12   was handling claims on behalf of its members,

13   who was the person that was principally

14   responsible for negotiating the exposure and

15   medical criteria in the settlement agreements?

16       A    I think that varied from agreement

17   to agreement.

18            You know, there was a director

19   of claims; and there was also a chief operating

20   officer and a CEO.

21            And everything took

22   direction -- everyone took direction,

23   ultimately, from the board of directors.

24            I think the person most

25   responsible for supervising the settlements that

US District Court - Delaware                      June 1, 2005
In Re Federal Mogul - Chapter 11            William Hanlon, Esquire

Page 116

1    took place were with Michael Rooney for the bulk
2    of that time.
3            But Michael Rooney resigned
4    from the Center at some point in the early
5    2000s. So after he left, it would have probably
6    been Dan Myer — so, different people at
7    different points in time.
8            And some of these issues were
9    also delegated down to individual claims
10   analysts for particular negotiations.
11       Q    Turning to Appendix C of Exhibit 2,
12   page -296 of the settlement agreement --
13       A    Yes.
14       Q    -- paragraph 2(a)(1) recites that a
15   plaintiff can prove exposure by demonstrating
16   his presence at an "agreed-upon jobsite during
17   an agreed-upon exposure period."
18            What was an "agreed-upon
19   jobsite" and an "agreed-upon exposure period"?
20       A    Well, generally, these were, in
21   particular cases, job sites and exposure periods
22   under which the CCR would agree with the
23   plaintiffs' counsel that one or more of the CCR
24   members had products that were in use at that
25   job site at that time.

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 117

1              So that if the claimant
2      established that he worked at that job site
3      during that period of time, the CCR would not
4      contest that there was sufficient evidence of
5      product identification to justify compensation
6      under the settlement.
7         Q    Then it goes on to say that the
8      plaintiff can demonstrate exposure to the
9      asbestos-containing product at one or more
10     members of CCR by providing an affidavit or
11     deposition testimony or coworker affidavits.
12             Do you see that?
13        A    I do see it, yes.
14        Q    Is that type of evidence frequently
15     accepted by the CCR as proof of exposure?
16             MR. FRIEDMAN:  Object to form.
17        A    Yes, I believe it was.
18        Q    And then it lists other evidence
19     acceptable to the CCR to demonstrate exposure to
20     one or more CCR members' asbestos-containing
21     products or to establish exposure at a site
22     where one or more CCR members'
23     asbestos-containing products were regularly
24     used.
25             What type of other evidence

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 118

1     was acceptable to the CCR to demonstrate product
2     ID?
3         A     I don't have anything particular in
4     mind.  I'm sure there are a number of
5     possibilities.
6               One that occurs to me, just
7     looking at this, could be live testimony in a
8     court case, for example; but I think this is
9     really a catchall to -- to --
10        Q     Could it include things like
11    interrogatory answers or answers to request for
12    submissions from prior cases?
13        A     I suppose it could.  I don't know
14    for sure, but I suppose it could.
15        Q     Could it include things like
16    invoices, showing asbestos-containing products
17    shipped to a particular place?
18        A     Potentially, it could.
19        Q     Could it include testimony from
20    other lawsuits involving CCR members, prior
21    testimony?
22              MR. FRIEDMAN:  Objection to
23    form.
24        A     Potentially, I suppose it could.
25        Q     The next page, -297 --

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware                     June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 119

1                    Or actually, I have a
2        question:
3                    Were the product
4        identification and exposure criteria set forth
5        in this particular agreement similar in nature
6        to the product identification and exposure
7        criteria set forth in other CCR group settlement
8        agreements?
9            A    I suspect so, but I haven't compared
10       them recently.
11           Q    Turning to page -297, it states:
12                   "A Plaintiff will be deemed to
13       have satisfied these product exposure
14       requirements if he or she establishes, by
15       affidavit or comparably reliable evidence, that
16       he or she had regular occupational exposure for
17       a period of at least one year (three months in
18       mesothelioma cases) during a period when
19       products supplied by one or more CCR members
20       were used at that work site."
21                   Why was there a requirement of
22       showing regular occupational exposure for a
23       period of at least one year, for everything
24       other than mesothelioma cases?
25           A    I think it was a negotiated term to

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 120

1     reflect sufficient occupational exposure to meet

2     a certain level of reasonable causation.

3          Q     And why was the period of time for

4     mesothelioma lower than for other

5     asbestos-related diseases?

6          A     I think the epidemiological evidence

7     over which litigation occurs suggests that the

8     amount of exposure to establish causation for

9     mesothelioma is less than it is for the other

10    diseases that are subject to the settlement.

11         Q     In the next paragraph, it states

12    that -- "In addition, Plaintiff Counsel must, in

13    good faith, attempt to submit evidence

14    concerning Plaintiff's exposure to every CCR

15    member's asbestos-containing products to which

16    Plaintiff claims exposure, or to which other

17    evidence available to Plaintiffs' Counsel

18    indicates Plaintiff was exposed."

19              Why was that a requirement in

20    this settlement agreement?

21         A     Generally, this information was

22    relevant to the CCR for purposes of share

23    allocation.

24              MR. FINCH:  Okay.  Well, let's

25         talk about the share-allocation process.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 121

1          Let's mark this as the next

2     document.

3               (Whereupon, Hanlon Deposition

4     Exhibit No. 4 was marked for

5     identification.)

6     BY MR. FINCH:

7        Q    Mr. Hanlon, do you recognize Hanlon

8     Deposition Exhibit 4?

9        A    Yes.

10       Q    What is it?

11       A    I believe it is a document that was

12    prepared in response to information requests,

13    that was related to this deposition.

14       Q    Just going through the columns:

15    "All CCR Claim Count" -- does that refer to the

16    number of claims filed against all CCR members

17    in a given period of time?

18       A    Well, we're starting with a

19    population of billed claims.

20               For those billed claims, the

21    claims are broken down by the settlement month,

22    the month in which the CCR settled them.

23               And the total claim count is

24    the total number of claims that were settled by

25    the CCR on behalf of all the CCR members, yes.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 122

1       Q     Okay.  So the billed claims would be
2   the number of claims that CCR paid money to a
3   plaintiff; is that right?
4       A     Not necessarily.
5             By billed claims it means
6   billed to the CCR member.  So these are the
7   claims that the Center billed to its members.
8       Q     Okay.  And so, for example, in the
9   eighth month of 1998, CCR billed to all of its
10  members 24,551 claims.
11            And of that amount, Turner &
12  Newall paid a share of 9,637 of them?
13            Am I reading that information
14  correctly?
15      A     No.
16      Q     Okay.  Can you explain how this
17  works?
18      A     I think you said that the Center
19  billed 24,000 claims in that month; and that's
20  not what this reflects.
21            This reflects all billed
22  claims by the month in which they were settled.
23            So, the total population of
24  claims that were billed -- 24,551 of them were
25  settled in that eighth month of 1998.

FINAL
CONFIDENTIAL

US District Court - Delaware                         June 1, 2005
In Re Federal Mogul - Chapter 11               William Hanlon, Esquire

Page 123

1        Q    Okay.  With that amendment and that
2    understanding, let me reask my question.
3            So in August of 1998, the CCR
4    settled 24,551 claims, which were ultimately
5    billed to some CCR member; is that correct?
6        A    That's correct.
7        Q    And of the 24,500 claims that were
8    settled in August of 1998, Turner & Newall paid
9    a portion of the settlement in 9,637 of them; is
10   that correct?
11       A    They were billed.
12           At some point T&N stopped
13   paying their bills.
14           I suspect they paid all of
15   this bill; but what this reflects is "billed,"
16   not "paid."
17       Q    Okay.  They were allocated an
18   obligation to pay 9,600 out of the 24,500 that
19   were settled.
20           Whether they ultimately paid
21   it or not, you don't know.  At least they were
22   billed for that amount?
23       A    That's what this document reflects,
24   yes.
25       Q    Okay.  And obviously, all of the

FINAL                          JANE ROSE REPORTING
CONFIDENTIAL              1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 124

1    claims settled during the 1998 to 2000 time

2    period were when CCR was operating under the

3    "named only" share allocation system; is that

4    correct?

5        A    Yes; although even under the "named

6    only" share allocation system there were -- and

7    it's a very small number, but there were

8    occasional claims that were still settled under

9    shares that were not strictly "named only."

10        Q    Okay.  Is it fair to say that one of

11    the primary duties of your law firm, in its role

12    as special counsel to the CCR, was to assist and

13    make -- or assist and evaluate the

14    recommendations relating to the share

15    allocation?

16        A    Yes.

17        Q    In setting the share allocation

18    between and amongst the CCR members, I believe

19    you testified that one factor that went into

20    that allocation was the occupation of the

21    asbestos plaintiff; correct?

22        A    Yes.

23        Q    Was another factor the historical

24    settlement experience for the CCR members?

25        A    Yes.  I believe I testified to that.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net