US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 125

1      Q    Was another factor that went into
2    the share allocation the types of
3    asbestos-containing products manufactured by
4    each CCR member?
5            Is that information that was
6    considered in setting the shares?
7      A    I don't think it was information
8    that was relevant to the initial shares.
9            Those were based on the
10   historic occupational averages.
11           So it was not directly based
12   on products -- only indirectly, to the extent
13   those products could have given rise to the
14   claims that eventually gave rise to the
15   settlements that became the pre-ACF settlements
16   that were factored into the equation for
17   purposes of setting the initial shares.
18           For purposes of adjusting the
19   shares, we would look at information regarding a
20   whole host of different pieces of information.
21           In particular cases, it could
22   be the nature of the products and the claims
23   with respect to those products.
24     Q    In setting the subsequent
25   allocations, would the CCR take into

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 126

1     consideration information about job sites where
2     particular products had been identified?
3          A    It could.
4          Q    Was job site information at all --
5     or work site information at all relevant to the
6     share-allocation process?
7          A    Yes.
8          Q    Could you describe how that
9     information was used in the share-allocation
10    process?
11         A    Well, it was used in many different
12    ways; but one principal way in which it was used
13    was in connection with special claims
14    categories, which were categories of claims that
15    were often based on the fact that all of the
16    claims arose out of a particular job site.
17             The claims would be carved out
18    of the traditional occupational grouping into
19    which they would otherwise fall.
20             And we would investigate the
21    evidence relating to the cases at that
22    particular job site, and come up with job
23    site-specific recommendations as to the relative
24    liability of the members for claims arising out
25    of that job site -- based in part on the

FINAL
CONFIDENTIAL

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 127

1    evidence as to product identification at that
2    particular job site.
3        Q    What other types of information, in
4    addition to types of asbestos-containing
5    products, places where the products were
6    distributed, job site, and occupation of the
7    plaintiff, did the CCR and Shea & Gardner take
8    into account in adjusting the allocation of
9    shares between and amongst the CCR members?
10        A    Well, in addition to all of the
11    different kinds of information that are
12    specifically identified in the CCR producer
13    agreement, we and the CCR members would look at
14    the relative strength or weakness of the product
15    identification case made against particular
16    members across the board -- by job site, by
17    plaintiff counsel, by type of claimants.
18            We would look at evidence with
19    respect to -- of the total number of claims
20    brought against a particular company, in a
21    particular state, in the particular job site, by
22    a particular plaintiff.
23            You know, what was the
24    strength of that product ID evidence or the
25    case, generally, across the board?

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 128

1          How many of those cases really
2     presented legitimate product identification, and
3     what was the view of the defense counsel or
4     liaison counsel or the members themselves as to
5     the relative strength of the case against the
6     members?
7          Which members did the
8     plaintiffs target?  Who were the plaintiffs that
9     the plaintiffs (sic) believed they had the
10    strongest case, and why?
11         So we didn't limit ourselves,
12    but we looked at what was actually happening in
13    the cases.
14         What was the strength of the
15    case, as perceived by the plaintiff and by our
16    own claim staff and defense lawyers, to come up
17    with our best informed judgment as to the
18    relative strength or weakness of the claim in a
19    particular place, against a particular member,
20    relative to the other members.
21    Q    Would you agree that the liability
22    share-allocation process was designed to
23    allocate as fairly as possible the overall costs
24    of the claims in proportion to each CCR
25    defendant's perceived share of its own

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3311    janerose@janerose.net

US District Court - Delaware                          June 1, 2005
In Re Federal Mogul - Chapter 11              William Hanlon, Esquire

Page 129

1    liability?
2          A    No; I don't think I can agree with
3    that.
4          Q    How would you describe what the
5    share-allocation process was designed to do?
6          A    I think it was designed to reflect
7    the process for adjusting shares to reflect
8    changes in the cases over time, identified
9    factors and trends that would reflect changes in
10   relative liability from the liability that faced
11   the members initially.
12              And it was a process that the
13   members agreed to.  And it left them with the
14   option of leaving the center if they, at some
15   point in time, became of the view that they
16   didn't want to remain a member of the Center for
17   any reason, including the reason that they were
18   dissatisfied or unhappy about a particular share
19   adjustment.
20              But the members needed a
21   process to share the costs of settlements and
22   the costs of defense, and this was a negotiated
23   agreement that they all agreed to.
24         Q    And in your role as special counsel,
25   was it your practice to try to allocate the

FINAL                          JANE ROSE REPORTING
CONFIDENTIAL              1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 130

1    shares as fairly as possible, taking into
2    account all the information that went into the
3    share-allocation process?
4        A    We did not allocate the shares.
5            We did monitor factors and
6    trends in the litigation; and where we became
7    confident that the existing shares for a
8    particular group of claims might not fairly
9    reflect the relative liability of the members
10   for those claims, we would take it upon
11   ourselves to make recommendations to the members
12   to adjust those shares to more fairly reflect
13   relative liability among the members.
14           And that was basically our
15   job, as we saw it.
16       Q    Turning to the producer agreement --
17   the producer agreement, page 2, states that --
18   "WHEREAS, Participating Producers believe it is
19   important to establish an organization that
20   will, on behalf of all Participating Producers,
21   resolve meritorious asbestos-related claims in a
22   fair and expeditious manner and, where
23   necessary, defend asbestos-related claims
24   efficiently and economically..."
25           Do you see that, Mr. Hanlon?

FINAL
CONFIDENTIAL

US District Court - Delaware                June 1, 2005
In Re Federal Mogul - Chapter 11           William Hanlon, Esquire

Page 131

1      A   I do.
2      Q   Would you agree that one of CCR's
3  principal goals was to "resolve meritorious
4  asbestos claims in a fair and expeditious manner
5  and, where necessary, defend asbestos-related
6  claims efficiently and economically"?
7      A   I believe that that was a stated
8  goal of the CCR.
9      Q   Do you believe that the CCR and its
10 members -- including you and your law firm, as
11 special counsel to the CCR -- attempted to meet
12 that goal?
13     A   Yes.
14     Q   Do you believe you were at all
15 successful in meeting that goal?
16     A   You know -- "at all successful"?
17         I mean, I don't know what you
18 mean by that.
19     Q   Well, did you accomplish that goal
20 in some significant manner?
21         MR. FRIEDMAN:  Object to form.
22     A   I think that that was a decision for
23 the members.
24         It was their claims, their
25 liability; and as I said before, they had the

FINAL                        JANE ROSE REPORTING
CONFIDENTIAL           1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 132

1       option at any point in time of withdrawing from
2       the Center on 60 days' notice.
3                   And I think for each company
4       the decision was whether they were better off
5       handling their litigation in the CCR or out of
6       the CCR on their own.
7                   And for the companies that
8       participated in the CCR for as long as they did
9       participate in the CCR, I think that they
10      thought that the CCR was handling those cases
11      for them in a way that was better for their
12      companies than if they were handling them on
13      their own.
14          Q    Do you know a man named "Paul
15      Hanly"?
16          A    Yes.
17          Q    Who is Mr. Hanly, and how do you
18      know him?
19          A    Mr. Hanly is a man of many talents.
20                  But among them, he is a lawyer
21      who practices in New York City.  And for a
22      significant period of time, he was the primary
23      U.S. counsel for Turner & Newall in the United
24      States asbestos litigation.
25          Q    Personal injury litigation?

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 133

1      A    And property damage as well.

2      Q    What role did Mr. Hanly have with

3    respect to the CCR?

4            How did you meet with him, how

5    did you interact with him?

6      A    Mr. Hanly was, as I said, the

7    national counsel for Turner & Newall,

8    Flexitallic, and Ferodo for -- at least for a

9    significant period of time.

10           I think I met him -- well, I

11   met him initially as counsel for a non-CCR

12   asbestos defendant sometime in the '80s, just in

13   connection with asbestos defense work.

14           And then we met again when his

15   firm really took over the primary role for

16   Turner & Newall in U.S. asbestos litigation

17   sometime, I think, in the early '90s.

18           He was a trusted advisor and

19   counsel to Mr. Baines in connection with

20   Mr. Baines' service on the CCR's board of

21   directors, and we worked cooperatively with

22   Mr. Hanly and his colleagues and his firm on a

23   whole host of matters.

24     Q    Would Mr. Hanly from time to time

25   appear at the CCR board meetings?

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware                          June 1, 2005
In Re Federal Mogul - Chapter 11                William Hanlon, Esquire

Page 134

1        A    For a period of time, he attended
2    regularly.
3        Q    And would Mr. Hanly from time to
4    time be provided with the settlement agreements
5    that CCR entered into on behalf of Turner &
6    Newall, among others, with asbestos plaintiffs?
7        A    I certainly believe he had access to
8    those agreements.  I do not know the extent to
9    which he actually exercised that access.
10       Q    So you know he had access, you just
11   don't know the extent to which he exercised that
12   access; is that correct?
13       A    That's correct.
14       Q    Did Mr. Hanly ever appear in court
15   on behalf of Turner & Newall in personal injury
16   litigation, during the time it was a CCR member?
17       A    I don't know for sure.
18            It would be unusual for him to
19   do that, and I would be surprised if he did so
20   with respect to the personal injury litigation.
21            I know he actively defended
22   Turner & Newall in property damage litigation
23   during that time; but as I explained earlier,
24   the CCR had the exclusive authority to act on
25   behalf of members, including the authority to

FINAL                         JANE ROSE REPORTING
CONFIDENTIAL              1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 135

1    retain counsel to represent the members in the
2    litigation.
3             And it would be unusual for a
4    member's own lawyer to appear on behalf of a
5    member, except with respect to punitive damages
6    issues in a particular piece of litigation.
7        Q    Do you know if Mr. Hanly took over
8    principal responsibility for representing Turner
9    & Newall after it left the CCR?
10       A    I believe he did.
11       Q    Do you know if he was involved in
12   negotiating some or any asbestos personal injury
13   claims with plaintiffs during the time that
14   Turner & Newall was a CCR member?
15       A    I believe that Mr. Hanly would have
16   been consulted by CCR claim staff.
17           But I suspect in most
18   instances, he would not have actually been
19   negotiating on behalf of T&N.  He would simply
20   have been consulting with the CCR representative
21   who would have been responsible for negotiating
22   settlements.
23       Q    Was it the regular practice of Mike
24   Rooney and other members of the claim staff who
25   worked for him to consult on a periodic basis

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 136

1       with Mr. Hanly or other national counsel for CCR
2       member defendants about the claims they were
3       settling on their behalf?
4            A    I'm not sure I can speak to the
5       regular practice.
6                    I'm simply aware that there
7       was regular consultation; but the extent of that
8       consultation and the parameters on it, I don't
9       really know.
10           Q    Do you believe, based on your
11      interactions with Mr. Hanly, that he became
12      sufficiently familiar with the CCR and its
13      operations to have an understanding as to how it
14      operated and settled claims on behalf of its
15      members?
16           A    Yes.
17           Q    Let's talk for a minute about
18      Georgine.  There was a fair amount of discussion
19      of it when you were being interrogated by
20      Mr. Friedman, but I don't know that we had ever
21      defined it for purposes of this deposition.
22                    What was the Georgine class
23      action settlement?
24           A    It was a settlement that was
25      negotiated by the CCR on behalf of its members

FINAL                    JANE ROSE REPORTING
CONFIDENTIAL          1-800-825-3341   janerose@janerose.net

US District Court - Delaware                         June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 137

1    with the then leaders of the plaintiffs steering
2    committee in the asbestos MDL pending before
3    Judge Wiener, which purported to settle all
4    future claims brought on behalf of a class of
5    plaintiffs who had been exposed at any time to
6    any asbestos-related products of the CCR
7    members -- but who, as of the time of the
8    settlement, had not yet manifested any injury as
9    a result of that exposure.
10          It was crafted as an opt-out
11   settlement, class settlement -- subject to court
12   approval.
13          And as I had mentioned
14   earlier, it was basically agreed to at the same
15   time that a complaint was filed in the Eastern
16   District of Pennsylvania for purposes of
17   adjudicating, ultimately, the fairness of that
18   settlement and its applicability to the defined
19   class.
20       Q    And after the Supreme Court
21   ultimately affirmed the Third Circuit's reversal
22   of the district court decision approving the
23   class action settlement, what, if any,
24   phenomenon did you observe with respect to
25   claims filing levels against CCR members post

FINAL                          JANE ROSE REPORTING
CONFIDENTIAL          1-800-825-3541   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 138

1    summer of 1997?
2        A    I don't recall observing any
3    phenomenon.
4        Q    Did you observe an increasing number
5    of claims being filed against CCR members during
6    the '97-'98 time frame, as compared to the years
7    when the Georgine injunction was in effect?
8            MR. WYNER:  Asked and
9        answered.
10           We've been over this.
11       A    Certainly, once the injunction was
12   lifted, because the claims were no longer
13   subject to an injunction, we received, at the
14   CCR, many more claims than we had been receiving
15   during the injunction period -- for the reasons
16   I had explained.
17       Q    Did you come to a view -- strike
18   that.
19           Did the higher claim filing
20   levels post Georgine tail off in any significant
21   degree between, say, 1997 and the year 2000?
22           MR. FRIEDMAN:  Object to form.
23       A    Not that I recall, no.
24       Q    I'm going to quote you something
25   that you told me a couple of years ago about the

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 139

1    share-allocation system.
2           MR. WYNER:  What are you
3    quoting from?
4           MR. FINCH:  I'm quoting from a
5    deposition taken in the Armstrong --
6           MR. WYNER:  Was that
7    deposition subject to a protective order?
8           MR. FINCH:  It is, which is
9    why I'm not going to produce the
10   deposition or use it for purposes --
11          MR. WYNER:  No; I think you're
12   using it.
13          You're quoting from it?
14   BY MR. FINCH:
15   Q    Well, let me ask it this way:
16          Would you agree, Mr. Hanlon,
17   with the statement that -- referring to the
18   share allocation process:
19          Over time we would make -- my
20   law firm would make recommendations to the
21   members, based on discussions with them, to
22   adjust the historical averages that gave rise to
23   those shares.
24          And I think by 1995, the
25   occupational matrix, if you will -- the

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net

Page 140

1    occupational averages that were used to generate

2    the shares were no longer substantially tied to

3    the historical settlement averages, but were

4    based on judgments about the relative

5    liabilities of each of the members for

6    particular types of cases in the tort system

7    that the Center members had faced from the

8    inception of the litigation to that point in

9    time.

10           But basically, it reflected

11   the members' decision to share on a relevant

12   basis, based on their perceived relative

13   liabilities for different occupations.

14           MR. WYNER:  I'm going to

15       object.  That sounds like a quote from the

16       deposition transcript, which I believe was

17       done pursuant to a protective order which

18       provided that the materials could only be

19       used for purposes of that case.

20           And if it has, in fact, now

21       been used for purposes of this case, the

22       CCR reserves the right to seek appropriate

23       sanctions under that protective order.

24   BY MR. FINCH:

25       Q    Let me see if I can ask the question

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 141

1    in a different way, without using the deposition
2    from the prior case.
3             Would you agree with me that
4    the liability-sharing formula that the CCR
5    members agreed to was the subject of much
6    analysis and discussion between and among the
7    CCR members and with your law firm?
8        A    Yes.
9        Q    Did Turner & Newall, prior to the
10   time it exited the CCR, ever complain that its
11   liability share was too high?
12       A    Yes.
13            Every member complained that
14   its liability share was too high at some point
15   in time.
16       Q    And every member, I take it, had an
17   incentive to have its liability share determined
18   to be as low as possible; correct?
19       A    Other things being equal, I think
20   that is correct, yes.
21       Q    Would you agree with me that one of
22   the goals for the CCR was to manage the asbestos
23   litigation in as efficient and cost-effective a
24   way as possible for its members?
25            MR. WYNER:  Asked and

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 142

1    answered.
2         You just read the provision of
3    the producer agreement.
4         MR. FINCH:  It's a different
5    question.
6         MR. WYNER:  I don't agree.
7         That's asked and answered.
8    A    I believe that was a stated goal of
9    the CCR and a goal of its members on the claim
10   staff, yes.
11   Q    Let's talk about Judge Wiener's
12   administrative orders.
13        Am I correct in understanding
14   that Judge Wiener is a judge -- a federal judge
15   in the Eastern District of Pennsylvania;
16   correct?
17   A    Yes.
18   Q    And he is a judge to whom all
19   asbestos personal injury cases that are in the
20   federal system are transferred, for purposes of
21   pretrial proceedings and discovery and case
22   management; correct?
23   A    Basically, yes.
24   Q    And you referred in your testimony,
25   under questioning from Mr. Friedman, to some

FINAL
CONFIDENTIAL

US District Court - Delaware                          June 1, 2005
In Re Federal Mogul - Chapter 11                William Hanlon, Esquire

Page 143

1    administrative orders that Judge Wiener had

2    entered which had the effect of doing certain

3    things to asbestos claims; is that correct?

4              MR. FRIEDMAN:  Object to form.

5         A    I'm not sure I buy that language.

6         Q    Okay.  You referred to certain

7    administrative orders entered by Judge Wiener;

8    correct?

9         A    I think I referred to certain case

10   management orders.

11        Q    Is it correct that the case

12   management orders did not determine as a matter

13   of law that unimpaired non-malignant claimants

14   did not have valid claims -- but instead

15   prioritized the cases that were pending, such

16   that only the claims of the more serious

17   diseases would be remanded back to the local

18   federal courts for trial?

19        A    You know, I think those agreements

20   speak for themselves.

21              I haven't looked at them in a

22   long time --

23              MR. WYNER:  The "orders," you

24   mean?

25              THE WITNESS:  I mean the

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware                                    June 1, 2005
In Re Federal Mogul - Chapter 11                          William Hanlon, Esquire

Page 144

1      orders.

2                  What did I say?

3                  MR. WYNER:  "Agreements."

4                  THE WITNESS:  I'm sorry.  I

5      meant the orders.

6          A    -- I haven't looked at them in a

7      long time.

8                  My recollection is consistent

9      with -- with the thrust of your statement, which

10     is that they did not attempt to define

11     "unimpaired" as opposed to "impaired," but they

12     did prioritize the cases in a way that resulted

13     in only the more serious cases, or cases that

14     were deemed by the defendants to be impaired,

15     would be subject to remand.

16                 But it has been some time

17     since I've looked at those orders.

18         Q    Turning to the subject of certain

19     doctors -- to your knowledge, did the CCR claims

20     analyst who settled the claims on behalf of the

21     CCR take into consideration the identity of the

22     plaintiff's doctor in some cases, in assessing

23     the plaintiff's claim?

24         A    In some cases?  Certainly, yes.

25         Q    Were there CCR settlement agreements

FINAL                              JANE ROSE REPORTING
CONFIDENTIAL                   1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 145

1    that would refuse to accept medical diagnoses

2    from certain doctors?

3            MR. WYNER:  Asked and

4        answered.

5        A    I think that misstates what an

6    agreement does.

7            An agreement doesn't "refuse."

8    An agreement is an agreement, and there were

9    certain agreements that provided that the

10   reports of certain doctors would not qualify for

11   compensation.

12       Q    Do you know if Mike Rooney and

13   others on the claims handling staff would take

14   into account the identity of the plaintiff

15   doctors in the values they would agree to pay

16   non-malignant cases?

17       A    I believe that from time to time, I

18   believe that certain diagnoses by certain

19   doctors were not worth very much, and they would

20   so argue, and that that would be one of the

21   factors argued that would be argued about in

22   negotiating appropriate compensation.

23       Q    And that would be one of the factors

24   that would be reflected in the settlement

25   amounts; correct?

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 146

1        A    From time to time, I suspect that's
2    correct, yes.
3        Q    Why didn't the CCR require in every
4    agreement that the plaintiffs submit evidence of
5    exposure to every CCR defendant who was named in
6    the lawsuit for purposes of entering into a
7    settlement?
8              MR. WYNER:  But don't reveal
9        privileged communications.
10       A    I don't understand the question.
11       Q    Okay.
12       A    Try it again.
13       Q    I walked you through the settlement
14   agreement, Hanlon 2 --
15       A    Right.
16       Q    -- which said that in order for
17   there to be a settlement, the plaintiff had to
18   demonstrate exposure to the asbestos-containing
19   products of one or more members of the CCR;
20   correct?
21       A    That's correct.
22       Q    Okay.  And then it also had a
23   provision that said that the plaintiff must, in
24   good faith, attempt to submit evidence
25   concerning plaintiff's exposure to every CCR

FINAL                        JANE ROSE REPORTING
CONFIDENTIAL          1-800-825-3341   janerose@janerose.net

US District Court - Delaware                              June 1, 2005
In Re Federal Mogul - Chapter 11                  William Hanlon, Esquire

Page 147

1    member's asbestos-containing products to which
2    the plaintiff claims exposure.
3         A    Right.
4         Q    That was an add-on.
5              That requirement that they
6    submit evidence of exposure to every CCR named
7    defendant's products, as I understand it, was
8    not a requirement in every single settlement
9    agreement; is that correct?
10             MR. FRIEDMAN:  Object to the
11        form.
12        A    I think that's probably correct.
13        Q    Okay.  If you can answer the
14   question without revealing privileged
15   communications, why did the CCR not require
16   exposure to every CCR named defendant's products
17   in every settlement agreement?
18             MR. FRIEDMAN:  Object to the
19        form.
20        A    I don't know what you mean by
21   "require."
22             That's what I'm -- I'm --
23        Q    Require --
24        A    You're suggesting, I think, that
25   that's a requirement for compensation.

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341   janerose@janerose.net

US District Court - Delaware
In Re Federal Mogul - Chapter 11

June 1, 2005
William Hanlon, Esquire

Page 148

```
 1              But even in the agreement that
 2    you referred to, the requirement that they
 3    provide what information they have didn't
 4    require them to establish that they did have
 5    product identification against every member.
 6              So I'm not sure I
 7    understand --
 8        Q    Let me ask it this way...
 9        A    -- your question.
10        Q    Why didn't, for purposes of
11    compensation, CCR require that the plaintiff
12    establish product identification against every
13    named CCR defendant?
14        A    Because it would never have gotten a
15    plaintiff lawyer to agree to that term.
16        Q    Were the CCR claims handlers, like
17    Mike Rooney, attempting to settle the cases that
18    they were negotiating for the lowest total price
19    possible?
20        A    Particularly with respect to
21    inventory settlements, any settlement decision
22    by the CCR involved a whole range of strategic
23    considerations.
24              But other things being equal,
25    in most cases, the cost of settlement was a
```

FINAL
CONFIDENTIAL

JANE ROSE REPORTING
1-800-825-3341    janerose@janerose.net

US District Court - Delaware                    June 1, 2005
In Re Federal Mogul - Chapter 11          William Hanlon, Esquire

Page 149

```
 1    primary consideration.
 2              And the Center was always
 3    trying to negotiate the best deal it could for
 4    its members -- which would include, generally,
 5    trying to get the lowest price possible.
 6              And one of the factors that
 7    they would take into account in trying to
 8    negotiate the best price possible would be the
 9    strength and product identification, member by
10    member, across all the members named in the
11    case.
12              And if they had an argument
13    that the identification was stronger as to some
14    than as to others and that there was no product
15    identification as to some, that would certainly
16    be a factor that they would use to negotiate the
17    best price possible.
18       Q    Did you ever come to a view, one way
19    or another, whether the CCR was able to obtain
20    negotiating advantages in its dealings with
21    plaintiffs' lawyers, based on the fact that the
22    plaintiffs' lawyer could settle cases against 20
23    defendants at once -- which settlement
24    advantages would not necessarily be available if
25    the defendant was dealing with the plaintiffs on
```

FINAL                          JANE ROSE REPORTING
CONFIDENTIAL              1-800-825-3344   janerose@janerose.net