# EXHIBIT S

1

<table>
<tr><td>1</td><td rowspan="2">

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
</td></tr>
</table>

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

2

3  In re: Federal Mogul Global, et al.,
          Debtors.

4

5  THE OFFICIAL COMMITTEE OF          Chapter 11
   ASBESTOS CLAIMANTS and ERIC D.     Jointly Administered
   GREEN, as the LEGAL               Bankruptcy
6  REPRESENTATIVE FOR FUTURE          No. 01-10578(RTL)
   ASBESTOS CLAIMANTS,
7                                     Case No. 05-00059(JHR)

8            Plaintiff,

9            -vs-

10 ASBESTOS PROPERTY DAMAGE
   COMMITTEE,

11           Defendant.

12

13    Mitchell H. Cohen United States Courthouse
      One John F. Gerry Plaza
14    Camden, New Jersey 08101
      JUNE 14, 2005

15

16 B E F O R E:    THE HONORABLE JOSEPH H. RODRIGUEZ
                   UNITED STATES DISTRICT JUDGE

17

18

19 A P P E A R A N C E S:

20 CAMPBELL & LEVINE, LLC
   BY: MARLA R. ESKIN, ESQUIRE
21      KATHLEEN J. CAMPBELL, ESQUIRE

22         -and-

23 CAPLIN & DRYSDALE, CHARTERED
   BY: ELIHU INSELBUCH, ESQUIRE
24
25         -and-



*United States District Court*
*Camden, New Jersey*

1

2

**A P P E A R A N C E S   C O N T I N U E D:**

3

YOUNG CONAWAY STARGATT & TAYLOR, LLP

4   BY:   JAMES L. PATTON, JR., ESQUIRE
          ROLIN BISSELL, ESQUIRE

5         MARIBETH L. MINELLA, ESQUIRE
          DANIELLE K. GRAHAM, ESQUIRE

6   ATTORNEYS FOR PLAINTIFFS LEGAL REPRESENTATIVE FOR
    FUTURE ASBESTOS CLAIMANTS

7

8

    FERRY, JOSEPH & PEARCE, P.A.

9   BY: THEODORE J. TACCONELLI, ESQUIRE
    LOCAL COUNSEL TO THE OFFICIAL COMMITTEE OF ASBESTOS PROPERTY

10  DAMAGE CLAIMANTS

11

    WEIL, GOTSHAL & MANGES LLP

12  BY: MICHAEL P. KESSLER, ESQUIRE
        ADAM P. STROCHAK, ESQUIRE

13      PETER M. FRIEDMAN, ESQUIRE
        KRISTIN KING BROWN, ESQUIRE

14  ATTORNEYS FOR THE DEFENDANT OFFICIAL COMMITTEE OF ASBESTOS
    PROPERTY DAMAGE CLAIMANTS

15

16

17

18

19

20

21

22

23

24                          Theodore M. Formaroli, CSR, CRR
                            Official Court Reporter
25                          New Jersey CSR # 433 10

*United States District Court*
*Camden, New Jersey*

3

1            W I T N E S S   I N D E X

2   WITNESS

3   PAUL J. HANLY, JR., ESQUIRE

4       Direct Examination          Page 45
5       Cross-Examination           Page 98
        Redirect Examination        Page 138
6

7   ANDREA CRICHTON, Q. C.

8       Direct Examination          Page 142
        Cross-Examination           Page 169
9

10  DR. LAURA STEWART WELCH, M.D.

11      Direct Examination          Page 182

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*
*Camden, New Jersey*

4



E X H I B I T S

| EXHIBIT | NUMBER | PAGE |
|---|---|---|
| PLAINTIFF EXHIBIT | P-19 | PAGE 46 |
| PLAINTIFF EXHIBIT | P-20 | PAGE 70 |
| PLAINTIFF EXHIBIT | P-52 | PAGE 70 |
| PLAINTIFF EXHIBIT | P-3 | PAGE 76 |
| PLAINTIFF EXHIBIT | P-7 | PAGE 87 |
| PLAINTIFF EXHIBIT | P-22 | PAGE 97 |
| DEFENDANT EXHIBIT | D-71 | PAGE 116 |
| PLAINTIFF EXHIBIT | P-18 | PAGE 143 |
| PLAINTIFF EXHIBITS | P-46 & 47 | PAGE 180 |
| DEFENDANT EXHIBITS | D-75 & 76 | PAGE 181 |
| PLAINTIFF EXHIBIT | P-23 | PAGE 193 |
| PLAINTIFF EXHIBIT | P-25 | PAGE 198 |
| PLAINTIFF EXHIBIT | P-26 | PAGE 199 |

1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25

*United States District Court*
*Camden, New Jersey*

5

1

2          THE COURT:  You may be, seated. Good morning. Are we

3    giving things away free today?

4          Counsel, we're here on the record in the matter of In

5    re:  Federal-Mogul, which is a Delaware-designated case under

6    05-59. May we have the appearances for the record.

7          MR. INSELBUCH: Your Honor, Elihu Inselbuch from

8    Caplin and Drysdale, with my partner Nathan Finch,

9    representing the Asbestos Creditors Committee.

10         THE COURT: Good morning.

11         MR. KESSLER:  Good morning, your Honor. Michael

12   Kessler from Weil, Gotshal and Manges, with my colleagues Adam

13   Strochak and Peter Friedman representing the Property Damage

14   Committee.

15         MR. BISSELL:  Good morning, your Honor, Rolin Bissell

16   from Young, Conaway, Stargatt and Taylor representing the

17   Futures Representative, with me is my colleague Maribeth

18   Minella.

19         MS. GRAHAM: Good morning, your Honor, my name is

20   Danielle Graham, I'm with Caplin and Drysdale and I also

21   represent the asbestos claimants.

22         THE COURT:  Well, counsel, I think then we're ready

23   to proceed. Would it be your intention to make a brief opening

24   statement?

25         MR. INSELBUCH: It would be, your Honor.

*United States District Court*
*Camden, New Jersey*

1          THE COURT:  All right.

2          MR. INSELBUCH: Good morning. Once again, I'm Elihu

3    Inselbuch from Caplin and Drysdale and with Mr. Finch and with

4    Mr. Bissell, we'll be representing the proponents here, the

5    Asbestos Creditors Committee and the Futures Representatives.

6    The Property Damage Committee is present and participating.

7          I should mention just in passing that there are many,

8    many other parties to these proceedings who, although they are

9    well aware of this particular hearing, have chosen, for one

10   reason or another, not to appear. They include many of the

11   competing constituencies both in the United States and in the

12   United Kingdom, the Pension Creditors in England, the

13   Administrator in England, the Debtor, the Unsecured Creditors

14   Committee, the Secured Creditors and the Equity Committee in

15   this proceeding.  They're all on notice of these proceedings

16   and, for whatever reason they, are not participating.

17          Why are we here?  The mere fact that we have a

18   Futures Representative speaks loudly to the need to do an

19   estimation hearing. 502(c) of the Code says that we should

20   estimate, a Court should estimate claims where their

21   liquidation would unduly delay confirmation of a plan.  We

22   have pending 130,000 asbestos personal injury claims and

23   because of the insidious length of the period during which

24   claims manifest themselves for asbestos disease, it is

25   anticipated that there will be hundreds of thousands more

1  claims yet to come. Obviously, these claims cannot be

2  liquidated in any normal fashion, one by one, and the future

3  claims couldn't be liquidated at all because we wouldn't know

4  who they are. So for that reason, it's almost imperative that

5  we estimate for the purpose of plan confirmation purposes what

6  the size of these claims are as best we can so that we can

7  allocate the resources of these various debtors among the

8  various constituencies, which include other claimants than the

9  asbestos personal injury constituency.

10       There is no great mystery any longer about how we're

11  supposed to do this, a lot of courts have done it before.  And

12  basically Judge Fullam said recently in Owens-Corning that the

13  claims being valued here arise under state law and, hence,

14  state law determines their validity and value.  They are

15  valued as of the petition date.  And he said, and I quote,

16  "This necessarily means that the claims ought to be appraised

17  on the basis of what would have been a fair resolution of the

18  claims in the absence of bankruptcy."

19       So, we're looking at the asbestos personal injury

20  claims as of the petition date, the claims on hand as of that

21  time, what those claims would have been worth in the tort

22  system and the claims that will arise in the future.

23       Because Federal-Mogul is the parent of a very large

24  English subsidiary Turner & Newall and because Turner & Newall

25  itself was a tort-feasor and is responsible for many, many

1    hundreds of thousands of the claims that are pending here, we

2    have a cross border need we have a cross border issue and the

3    need to understand how these very same claims against turn and

4    newly would be valued in the United Kingdom or in England in

5    particular. Because there are constituents in England that

6    have claims against Turner & Newall that are not in the United

7    States and because we have a paralegal administration in

8    England the court in England will ultimately have to decide

9    how you allocate the Turner & Newall assets that are in

10   England as among the various constituencies.

11        With that in mind, although this Court in the United

12   States can't bind the English Court anymore than the English

13   Court could bind this Court, it is our belief that if we have

14   a proper foundation in what the English law is so that we

15   understand how the English Court would go about estimating

16   these very same claims, we can ensure here that we produce a

17   record of what all the facts are that would be necessary both

18   for this Court and for that Court to do the estimation so

19   there would be no need to do this more than once.

20        Having said that, how do we go about doing

21   estimation?  When you estimate anything, what you would do as

22   a matter of logic, you would compare the thing you have no

23   value for to something that you know the value of that looks a

24   lot like it. And in our case, we have that in the settlement

25   history over 25 years that Turner & Newall went through and

1    resolved 250,000 odd claims, whether in trial, in settlement

2    across the table.  What that settlement history shows is how

3    in the tort system willing plaintiffs and a willing defendant

4    resolved their controversies in a fair environment over a long

5    period.  And that history provides us with the best evidence

6    that we think we can present to this Court as to what the

7    claims that are not yet liquidated would be worth.

8            Of course, when you look at that history, it's not

9    simple, its complex, it has many factors in it, there are

10   moving parts to it, and as of the moment we draw the curtain

11   at the petition date, it had trends moving things in various

12   different directions.  And the experts have to take account

13   for those moving pieces and those moving trends as they do

14   their estimation because when you look forward to estimate

15   claims, you have to make reasonable assumptions about what

16   would occur had there not be a bankruptcy for Turner & Newall.

17           Now, we're going to put evidence on from people who

18   actually were involved in this settlement process, involved in

19   this litigation process.  And, of course, as we are all aware,

20   there has been a fair amount of publicity about asbestos and a

21   fair amount of criticism has been made about asbestos largely

22   by people who were not involved in the tort system who have

23   said things like you can't use the tort system to measure

24   things because the tort system is broken, the asbestos cases

25   weren't resolved fairly.  And we read that in the newspapers,

*United States District Court*
*Camden, New Jersey*

1  we hear that trumpeted in the halls of the Congress.  But what

2  we ask the Court to do is to listen to the evidence from the

3  people who actually participated in the process, who I assure

4  you will explain that Turner & Newall was able to resolve its

5  claims in what it regarded as most favorable an environment as

6  it could develop given the evidence that existed against it.

7          Our evidence will come through a series of witnesses.

8  Our first witness on our direct case, we may have some short

9  rebuttal thereafter, but our direct case, our first witness

10  will be Paul Hanly. Mr. Hanly, who is a lawyer and an

11  experienced trial lawyer by training and experience, was the

12  principal lawyer in the tort system for Turner & Newall since

13  some time in the nineteen-eighties. And he will be able to

14  describe to the Court the entire history of Turner & Newell's

15  tort system affairs in the United States from the time he took

16  on the role back in the nineteen-eighties until the time

17  Turner & Newall went into Chapter 11 with Federal-Mogul.

18          He will describe the many ways and methodologies that

19  Turner & Newall adopted, its joinder in the Asbestos Claims

20  Facility, its joinder in the CCR, the attempt to resolve

21  matters through the Georgine settlement, the class action that

22  ultimately was reversed by the Third Circuit and the Supreme

23  Court, the post-Georgine environment, the post CCR environment

24  that existed briefly before the Chapter 11 proceeding was

25  filed. He will describe to you how all of the various factors

*United States District Court*
*Camden, New Jersey*

1  that people have mentioned that are wrong with the tort

2  system, the biased B Readers, the consolidations, the punitive

3  damages, all of these issues; how these issues did, in fact,

4  play a role in Turner & Newell's resolution history or did not

5  play a role in that history. So that we hope he will assure

6  the Court that the record that exists for Turner & Newall is a

7  fair one and a complete one on which an estimation can be

8  made.

9       We will next present his counterpart in England,

10  Andrea Crichton, who had the effectively the same role as he

11  did except with respect to the case being brought against

12  Turner & Newall in England.  She will describe what the nature

13  of the claims were that were resolved there, how that process

14  worked and what the results were and how that data also is in

15  this data base on which our estimates and our experts are

16  opining.

17       You will have testimony also by deposition transcript

18  from Bill Hanlon.  Mr. Hanlon is a lawyer and he and his firm

19  were counsel for the CCR.  That was a group of, I don't know

20  if your Honor is familiar with the CCR, it was a collection of

21  defendants that they put together among themselves in an

22  effort to minimize their costs, get some group bargaining

23  power and resolve cases that way against plaintiffs and

24  Mr. Hanlon will describe how, as will Mr. Hanly, how that

25  process worked, how it served to reduce the expenses of the

1  group as a whole, and how it made every attempt to allocate

2  the costs of the exercise and the costs of the settlements

3  fairly among the various members, reflecting their fair share

4  of the liability.

5        In all of these cases, what these records show is not

6  the absolute tort system joint liability for claims, but

7  rather the settlement share that in each case Turner & Newall

8  paid, whether in the United States or in England.

9        After Mr. Hanly, Ms. Crichton and Mr. Hanlon's

10  testimony, and as I said, Mr. Hanlon will be deposition

11  transcript that's been designated -- and we are assuming that

12  your Honor will not want us to sit here and read it to you,

13  but I assume you will just want us to give it to you marked.

14  After that, we will present Dr. Laura Welch.  She's a well

15  known occupational and internal medicine doctor and teacher.

16  She will describe for the Court what the nature of the various

17  asbestos related diseases are, how they are diagnosed, that

18  many of the issues that are raised are irrelevant to the

19  diagnosis of asbestos disease, and she will talk a bit about

20  this well blown-up issue of the so-called unimpaired claims,

21  which you'll hear a great deal about in the testimony.

22        After Dr. Welch, well present Barbara Dohmann, who is

23  a well known, at least in England, Queens Counsel, experienced

24  in issues of choice of law, commercial choice of law, tort

25  choice of law.  And she will describe for the Court what in

13

1   her opinion will be the applicable English law that will apply

2   to these claims, if and when they are again disputed, if they

3   are disputed in England. And she will explain what the

4   underlying facts are that the English Court will look to in

5   determining those issues so that we can, as I said before,

6   ensure that we have those facts in the record here.

7        At that point, we will present Dr. Mark Peterson,

8   he's an experienced and well known expert in this field, and

9   he will present his estimation of the asbestos liabilities,

10  present and future, facing Turner & Newall. I don't intend to

11  spend a great deal of time describing his methodology, I'll

12  leave that for him to do when he testifies, but basically he

13  has to do two things. He has to come to a conclusion about

14  what the value of the claims was as of the petition date and

15  what trends might exist in those values as of the petition

16  date so that he can take that value in dollars or in pounds,

17  as the case may be, for the U.S. or English claims and apply

18  that to the existing claims.  He then has to estimate the

19  projection of future claims that will arise, apply those

20  values again to those future claims with whatever changes he

21  might see occurring in the values, and then, of course,

22  discount back to present value as of the petition date this

23  sum of the future claims. He will present two estimates, one

24  based upon his preferred view that as of the petition date,

25  the claims in the United States, the propensity to sue Turner

1    & Newall in the United States was increasing and continuing to

2    increase.

3          And his second, and less favorite estimation, will be

4    based upon assuming there will be no increase in propensity to

5    sue.  Propensity to sue is, of course, a way of saying that in

6    no circumstance does everybody that has a right to file a

7    claim bring one.

8          What we can do, as Dr. Peterson will explain, is he can

9    project for you, based upon epidemiological formulas that have

10   proven remarkably valid for over 20 years, what the curve of

11   incidents will be of mesothelioma over the next 30 years.  And

12   we're about at the top of the curve and it's beginning to

13   decrease.  Now, within the that curve, that's everybody that

14   dies from mesothelioma.  Not everyone that dies from

15   mesothelioma will sue and not everyone that sues will sue

16   Turner & Newall, because to sue Turner & Newall, the

17   mesothelioma has to be in some part at least caused by

18   exposure to some product for which Turner & Newall has

19   responsibility.

20         Now, what he will demonstrate to the Court is that if

21   the incidents curve is up here, what was going on in the tort

22   system was more and more people were, indeed, bringing

23   lawsuits against Turner & Newall, the propensity to sue was

24   increasing, still, of course, below the total.  And the

25   question then becomes how does that curve then marry the

1   decreasing incidents curve?  And you'll hear from Dr.

2   Peterson, he believes that there was, as of the petition date,

3   a continuing increase in the propensity to sue that would

4   exist.  And based upon that calibration, his estimate of the

5   U.S. claims present value as of the petition date against

6   Turner & Newall would be 11 billion.   The English claims,

7   looking at the same data, he did not believe they were

8   increasing in propensity to sue in England as of that time and

9   his estimate of the English claims is 400 million dollars, so

10  that the total estimate based on this calibration is 11.4

11  billion dollars.  His no increasing model, which he believes

12  is likely to be less accurate and probably, as he will say,

13  another projection that proved to be too low, because every

14  time a projection has been made, historically in asbestos

15  cases they've proven to be too low, would be that the U.S.

16  claims would be 8.2 billion dollars, the English claims would

17  remain at 400 million dollars, so that the total would be 8.6

18  billion dollars.  And that will be the end of our direct case.

19       As far as we know, there is no serious evidentiary

20  contradiction to what Mr. Hanley, Ms. Crichton, and Mr.

21  Hanlon are going to say.  But there's, of course, a major

22  dispute with the property damage constituency of how you take

23  the same database and how you estimate from it what the

24  liabilities are present and future.

25       They will present Dr. Robin Cantor, I will save for

1    closing and for cross-examination what we might have to say on

2    the specific issues that deal with Dr. Cantor, but we would

3    point out in passing that she's never done this before.  She

4    uses a method that was never adopted anywhere before.  And

5    basically by predicting a future claim starting with 40

6    percent fewer and the year after the petition was filed then

7    were filed the year before, and using values that were some 55

8    percent lower than what had been being paid the year before

9    the petition was filed, she comes to -- she takes what is

10   basically the same 8.2 billion dollar figure and brings it

11   down to something like 2 billion dollars.  We don't believe

12   that there's any merit to that approach and we will, of

13   course, direct that towards the evidence and in whatever

14   rebuttal we have

15       That's, I believe, what the case will be and how we

16   will present it.

17       Thank you for your attention

18       THE COURT:  Thank you.

19       MR. KESSLER:  May I proceed, your Honor?

20       THE COURT:  Yes, you may.

21       MR. KESSLER:  Good morning, again.  Michael Kessler

22   from Weil, Gotshal & Manges.  And I would like to divide the

23   Property Damage Committee's opening argument between myself

24   and my colleague Mr. Adam Strochak.

25       You will hear at the outset of my argument what may

1  sound like a lot of agreement with Mr. Inselbuch.  I assure

2  you as we get along, you'll hear about the disagreements as

3  well.

4        Your Honor --

5        THE COURT:  I guess that's why we're here.

6        MR. KESSLER:  Your Honor, I ask that we not lose

7  sight of the fact that this is a bankruptcy case.  We are here

8  to estimate the aggregate allowed amount of the asbestos

9  claims in a bankruptcy and pursuant to Section 502(c) of the

10 Bankruptcy Code.  Section 502(c) requires mandates that the

11 allowed amount of contingent or unliquidated claims be

12 estimated by the court when a traditional full blown trial to

13 determine the allowed amount would unduly delay the

14 administration of the estate.  Now, the allowance or the

15 allowed amount of claims is the bankruptcy term for the full

16 amount or 100 percent of the creditor's claim in the

17 bankruptcy.  So by way of example, if a creditor in the

18 bankruptcy had a note owing by the debtor for $100, his

19 allowed claim there in bankruptcy would be $100.

20       It's important that we distinguish this allowed amount

21 from the distribution amount.  The distribution amount is the

22 amount that will be paid in the bankruptcy case on the allowed

23 claim.  So if the bankruptcy case, for example, provided that

24 unsecured creditors will be paid 10 percent on their claim,

25 the distribution amount would be 10 percent, and that

18

1   hypothetical creditor who I just described who has an allowed
2   claim of $100 would be paid $10 as the distribution amount.
3        Now, this is significant because you, your Honor, are
4   being asked to determine, to estimate just the allowed amount,
5   the aggregate allowed amount of the asbestos claims in their
6   total.  You're not being asked to estimate, and you will not
7   be asked to estimate, the distribution amount on these claims.
8   The distribution amount will be determined at a later date
9   after the bankruptcy is over in a trust that will be set up
10  under the bankruptcy and will never come before this Court.
11       Now, the case law provides that an estimation under
12  Section 502(c), the bankruptcy court, in this case the
13  district court, has a wide degree of discretion in deciding
14  how to estimate.  In a variety of cases dealing with different
15  types of claims to be estimated, courts have estimated based
16  on the pleadings, courts have estimated in other cases based
17  on oral argument of counsel, courts have estimated on
18  declarations of witnesses, submission of depositions and mini
19  trials.  We don't have any disagreement in this case about how
20  the estimation should be conducted, the procedure for the
21  estimate.  Indeed, your Honor adopted the procedure that was
22  proposed by all parties and has been used in asbestos cases
23  throughout this country for many years.  The point, and the
24  key point, is that you're being asked to estimate just the
25  aggregate amount, the total amount of the allowed claims.

*United States District Court*
*Camden, New Jersey*

1    You're not being asked to estimate the allowed amount of any

2    individual claim and you're certainly not being asked to

3    estimate the distribution amount of any individual claim, how

4    much any individual asbestos claimant will ever receive out of

5    this bankruptcy.

6         Now, notwithstanding our agreement on the procedure and

7    what it is we're estimating, the parties disagree widely on

8    the components that should be used by the Court to come up

9    with the estimation.  We disagree on a number of other

10   substantive issues, and my colleague Adam Strochak will focus

11   in his piece of the opening argument on those disagreements.

12   I would like to focus on why it's so important, so significant

13   that the non-asbestos unsecured creditors receive as

14   accurately as possible a reasonable estimate of the aggregate

15   amount of asbestos claims.

16        The Court may ask and wonder why do we care how much

17   the asbestos claims get?  Why do the non-asbestos creditors

18   care if you estimate the asbestos claims to be 10 billion

19   dollars or 2 billion dollars?  Well, I want to emphasize, and

20   I'm going to go through this entire analysis, the debtors have

21   taken no position in this estimation.  The debtors have not

22   said that they prefer 10 billion dollars, 5 billion dollars or

23   2 billion dollar.  They are a co-proponent of the plan but

24   they are taking no position.  Why?  There's little in this

25   fight for the debtors because the debtors are insolvent and

1    all the equity will go to the creditors under the plan.  The

2    debtors are ambivalent if one creditor gets more or less than

3    another, they totally don't care.  They just want to get out

4    of bankruptcy and have the equity distributed to the new

5    shareholders and reorganized into a new company .

6         Now, your Honor, if I may, I would like to put up on

7    the screen a couple of demonstrative exhibits.

8         The plan of reorganization in this case provides that

9    the asbestos claims will be paid pursuant to a Bankruptcy Code

10   Section 524(g) trust.  Section 524(g) of the Bankruptcy Code

11   requires that in order for that section to apply, the asbestos

12   claims received into the trust at least 50.1 percent of the

13   equity of the reorganized company, that's a requirement of

14   that section of the trust.  And that section of the trust is

15   particularly necessary in asbestos claims because it provides

16   the injunction against suits in the future by the future

17   plaintiffs.

18        In the plan proposed by the plan proponents in this

19   case, 50.1 percent, for simplification purposes let me just

20   refer to it as 50 percent, of the equity of the reorganized

21   debtor will be transferred into this trust.  Now, for purposes

22   of my discussion or my argument, let's just assume that the 50

23   percent of the equity that will be transferred to this trust

24   is worth 1 billion dollars.  That's actually not far from the

25   appraised value that they describe in their disclosure

1   statement.

2       Now, let's assume that the Court estimates the allowed

3   amount of all asbestos claims present and future at 10 billion

4   dollars, close to the 11.4 billion that they're asking.   In

5   this hypothetical example, the trust will receive 1 billion

6   dollars in equity and it will have against it an estimated

7   aggregate amount of claims of 10 billion dollars.   In a

8   perfect world, and if asbestos claims are later proved to the

9   trustee of that trust to aggregate claim by claim and add up

10  to exactly 10 billion dollars, everyone will get 10 cents on

11  the dollar or 1/10 of their claim as the distribution amount.

12  They will have 1 billion in equity, they'll have 10 billion in

13  claims, they'll each get a distribution amount out of the

14  trust of 1/10 or 10 percent.

15      Now, if the Court estimates instead the aggregate

16  amount of asbestos claims at 2 billion, what then happens?

17  The trust still gets 1 billion dollars of equity.   The

18  asbestos claims have now been estimated at 2 billion dollars.

19  If all the claims are then later proved to the trust and

20  aggregate exactly as the Court estimated, 2 billion dollars,

21  each of the asbestos claimants will get 50 percent on their

22  claim, 1 billion of equity over 2 billion in claims.   Now

23  they're still getting to whack up the same billion dollars of

24  equity, it's just optics at this point as to whether they're

25  getting 10 cents on the dollar or 50 cents on the dollar,

22

1  they're still getting 1 billion dollars divided up among all

2  of them.

3       Why is it important in this case we get the right

4  estimates, they're still going to get the same 1 billion

5  dollars whether you determine 1 billion or 10 billion?  If you

6  can put up chart No. 4, please.  The reason is that the plan

7  provides, as you see up here in Section 1.1.147, the

8  Distribution Ratio 1, all that legalese means, what we have on

9  the right-hand side, the equal side, the value of the equity

10 to be deposited in the asbestos trust.  By my example, 1

11 billion dollars divided by the aggregate estimated asbestos

12 claimants, by my example 10 billion dollars, would be 1/10 or

13 2 billion dollars would be one half, that's the ratio that

14 will be paid to all other creditors, to other unsecured

15 creditors in this case because the Bankruptcy Code says that

16 creditors who are of equal parity in a bankruptcy must receive

17 the same value on their claims.  The Bankruptcy Code doesn't

18 say that they have to get the same script, they don't have to

19 get the same payment, but they have to get approximately the

20 same value.

21      There's certain exceptions to that rule, but the

22 exceptions aren't important here.  So what they said in their

23 plan is that asbestos will get 1 billion dollars of equity,

24 you divide that by the estimated amount of their claims and

25 that same ratio will be given to the other, to other unsecured

1  creditors in the case.  So if you estimate the aggregated

2  estimated asbestos claimants at 10 billion dollars, my

3  clients, the Property Damage plaintiffs who are not in the

4  trust, and other unsecured creditors, will get 10 cents on the

5  dollar or 1/10 of their claim as the distribution amount.  If

6  you estimate the asbestos claims at 2 billion dollars, we will

7  get 50 cents or 50 percent of our claim.  They will get the

8  same -- they will get the same 1 billion dollars to divide up

9  among themselves.

10      So that's the first reason why it's so important to us

11 that your Honor come up with as reasonable and practicable as

12 possible the right estimation amount.

13      Now, my explanation of the second reason why the

14 correct estimate is so vitally important really exposes the

15 cunning of this plan.  Key point here is the asbestos trust,

16 once funded, will distribute all of its value to the asbestos

17 plaintiffs present and future.  There's no provision in the

18 trust to give anything back if your Honor over-estimates.

19      So how does that impact us?  Let's go back to my simple

20 example again.  If you estimate the aggregate amount of

21 asbestos claims at 10 billion dollars, they have 1 billion in

22 equity, they divide by 10 billion dollars, they get 10 percent

23 return on their claims.  As I mentioned earlier, in the

24 perfect world over the next 20 or 30 years, if they all come

25 in and prove their claims up to the trustee and it's aggregate

1  10 billion dollars, your Honor did the perfect job, and they

2  all get 10 cents on their claim and we get 10 cents on their

3  claim.

4      But what happens if your Honor makes a mistake, what

5  happens if you estimate 10 billion dollars but, in fact, over

6  the next 20 or 30 years only 2 billion dollars is proved up to

7  the trustee of the trust?  Well, first thing that happens is

8  that when your Honor estimates 10 billion dollars, the ratio

9  is 1 over 10 and the plan provides that on the effective date

10 of the plan, 1/10 or 10 percent in cash will be paid to our

11 class and certain other unsecured creditors.  The trust will

12 get the 1 billion dollars and over time the asbestos claimants

13 will prove up their claims to the trustee in the class.  Under

14 my hypothetical, if your Honor made a mistake and there's not

15 10 billion in claims but they only prove up 2 billion in the

16 trust, the trustee of the trust will have been paying out 10

17 cents on the dollar because your Honor estimated 10 billion at

18 the beginning and at the end of of time 10 cents on the dollar

19 with only 2 billion dollars proved up will only provide for

20 200 million of the 1 billion dollars in the trust to be paid

21 out to asbestos claimants, there's 800 million dollars left

22 over.

23     What happens to it?  It doesn't come back to the

24 bankruptcy estate because the bankruptcy estate was closed 20

25 years before.  It doesn't come back to my clients because my

