1   clients were paid and the bankruptcy case was closed 20 years

2   earlier.  What the plan provides is that the trustee will

3   redistribute that cash back to the asbestos claimants.  So the

4   800 million dollars will funnel back to the asbestos

5   plaintiffs.  And, indeed, when they have only 2 billion

6   dollars in claims but your Honor previously estimated 10

7   billion, they will end up getting one half of their claim or 1

8   billion over 2 billion because that 800 million dollars will

9   get funded back to them, but we will only have made 10 cents

10  on our claim because of the estimate that was made back in

11  2005 by your Honor.  So that is why it is so vitally important

12  to us that we get the right or as best possible estimate

13  today.

14        Now, you might ask where are the other parties to this

15  action or to this proceeding?  Mr. Inselbuch said there are

16  other parties who are interested in the case but they're not

17  putting on any evidence.  Well, the general Unsecured

18  Creditors Committee supports an 11 billion dollar claim.  Why?

19  Well, generally, Unsecured Creditors Committee is made up

20  primarily of bondholders.  The bondholders in this case are a

21  separate class of unsecured creditors, they will get the other

22  50 percent of the equity in this case.  If you estimate the

23  claims at 10 billion dollars and we only get 10 cents on the

24  dollar, less cash will be paid out of the estate and the value

25  of their equity will increase, so will the value of the equity

*United States District Court*
*Camden, New Jersey*

1    that the plan gives to the asbestos plaintiffs.

2         If you estimate the claims at 2 billion dollars and

3    they have to therefore pay 50 cents on the dollar to my

4    clients, the value of their equity will go down.  So, of

5    course, the bondholders support a higher estimate that would

6    payout less in cash to my clients.  Mr. Carl Ichan, who is one

7    of the major players here, he will have a large amount of

8    equity in the case.  He supports the 10 billion dollar claim

9    for the same reason, the value of his equity will go up if

10   they pay less cash to my clients.  The value of his equity

11   will go down if they pay more cash to my clients.  The Equity

12   Committee supports the higher valuation because the plan

13   provides that they will be paid more warrants under the plan,

14   the value of the warrants will go up if the value of the

15   equity goes up.  And, once again, the value of the equity goes

16   up if they pay us less.  The value of the equity goes down or

17   doesn't go up as much if they pay us more.  This is why

18   everyone is siding with the asbestos claimants at a high

19   estimate of over 11 billion dollar.

20        It doesn't matter to the asbestos claimants, they're

21   going to divide the same billion dollars.  What matters is

22   that it determines how much cash will be paid out to other

23   unsecured creditors and how it will effect the value of this

24   equity, the equity of this company going forward.  That is why

25   so many parties who aren't even in the asbestos class are

1    supporting the high estimate.

2         And with that, your Honor, I would like to turn to my

3    colleague, Mr. Strochak, and have him go through what your

4    Honor will hear from the individual witnesses in this case.

5         Thank you.

6         THE COURT:  Thank you, Mr. Kessler.

7         MR. STROCHAK:  Good morning, your Honor.  Adam

8    Strochak from the of Weil, Gotshal & Manges for the Property

9    Damage Committee.

10        As Mr. Inselbuch previewed, the Court will hear

11   testimony from two estimation experts in this matter, the

12   Property Damage Committee's expert, Dr. Cantor, offers a base

13   case estimate of 2.5 billion dollars at present value and Dr.

14   Peterson, the expert for the Asbestos Claimants Committee,

15   offers his preferred estimate of 11.1 billion dollars at

16   present value or 21 billion dollars nominal value.

17        To put these estimates into perspective, your Honor,

18   consider that in its entire history, the evidence will show

19   that T&N paid about 835 million dollars to resolve about

20   250,000 United States personal injury claims.  Sometimes the

21   evidence not presented in court, your Honor, is as telling as

22   what is presented.  All the parties in this case, the debtors,

23   the Unsecured Creditors Committee, the Equity Committee, the

24   Futures Representative, the administrators in the UK, the UK

25   pension trustees, they all have their own estimation

*United States District Court*
*Camden, New Jersey*

1    consultants and all of them in one form or another have

2    evaluated and estimates.  The Court is only going to hear from

3    one on the asbestos claimants' side in this matter.  None of

4    these other experts are going to take the stand to defend the

5    estimate of 11.1 billion dollars, which is incorporated into

6    the plan of the reorganization that they are all supporting in

7    this matter.  And we think when the evidence is in, your

8    Honor, it's going to show that the estimate put forth by the

9    Property Damage Committee is one that is in a consistent range

10   of estimates, and the estimate proposed by Dr. Peterson for

11   the ACC is one that is an extreme outlier when all the

12   evidence is in.

13        To this day in their most recent SEC filings, the

14   debtors themselves report 1.4 billion dollars as the estimate,

15   albeit with more caveats about uncertainty.  There's no doubt

16   that this is a matter of considerable uncertainty.  As the

17   Court will hear from the deposition testimony of the debtors'

18   CFO, Mr. Lynch, he signed those SEC filings with the

19   understanding that the 1.4 billion dollars reported was at

20   least as probable as any other estimate that was out there,

21   including the 11.1 billion dollar estimate on which the plan

22   that the debtors are co-proponents of was based.

23        Your Honor, many of the facts in this matter are

24   undisputed.  There is no dispute that exposure to asbestos in

25   sufficient quantities can make people sick.  Indeed, it's a

1  little bit ironic that the debtors support an 11.1 billion

2  dollar estimate of personal injury claims under the plan while

3  the at the same time vigorously opposing the Property Damage

4  claimants' claims for the cost of encapsulating or removing

5  products to ensure that there's no further exposure to humans.

6  There's no dispute that occupational exposure to asbestos has

7  been reduced dramatically since the '50's, '60's, and '70's,

8  and, as a result, we are now well past the peak of incidents

9  levels for asbestos caused diseases.

10       There's no dispute, your Honor, that non-malignant

11  diseases, asbestosis and pleural disease, represent more than

12  90 percent of all claims and that a large portion of those, a

13  large portion of the people who assert those claims do not

14  suffer from objectively measurable physical impairment, that

15  is, if you give them a pulmonary function test, they're not

16  going to show up as being functionally impaired by the

17  disease.

18       There's no dispute that thousands of claims against

19  T&N, against Manville, against Owens Corning, against numerous

20  other defendants in asbestos litigation are based on what are

21  called B Reading.  And the term B Reading comes from the

22  certification that a doctor would get from the NIOSH

23  organization of the federal government to read x-rays for

24  occupational lung diseases.  There's no dispute that thousands

25  and thousands of those claims are based on B Readings from a

1   handful of selected doctors.  And some of the most prolific of

2   these doctors, the ones who have read the most X-rays for many

3   of these claims have been the subject of fraud allegations and

4   ongoing criminal investigation.  But even apart from any

5   fraudulent or criminal conduct, there is ample evidence of

6   massive over-reading of x-rays by these highly prolific

7   doctors and the Court will hear testimony about that.

8          We are going to offer testimony from Dr. Hans Weil in

9   the form of deposition and some prior testimony that he gave

10  in the Owens Corning case.  He was retained as our expert in

11  this case but due to an accident, he was unable to come to

12  trial to testify and we've been able to work out an

13  arrangement with the Asbestos Creditors Committee and the

14  Futures Representative to allow the use of deposition

15  testimony to assist the Court.

16         As Judge Fullam found less than three months ago in the

17  Owens Corning case, certain of the plaintiffs B Readers were

18  so biased that their readings were simply unreliable.  There

19  really can be no dispute, your Honor, that litigation tactics,

20  mass consolidation of cases, the tying of cases of less

21  serious injuries to ones to claimants with more serious

22  injuries for trial, abusive use of lenient venue rules and

23  plaintiff favorable jurisdiction like Texas, Mississippi, and

24  Illinois, and others, and the use of mass screened evidence of

25  alleged illness have all turned asbestos litigation into the

*United States District Court*
*Camden, New Jersey*

31

1  poster child for reform of the judicial system.  In papers

2  filed by the debtors in the bankruptcy court in this case in

3  2001, they noted that the massive number of claims from people

4  without meaningful workplace exposure, the aggregation of

5  claims, mass screenings all combined to distort the workings

6  of the tort system.  Judge Fullam found that the past results

7  of asbestos litigation had been skewed by these tactics and

8  those tactics can and should be avoided in the future in

9  coming to a reasonable estimate of the value of claims.

10         There's no dispute that the tide is now turning with

11  significant reforms adopted by legislatures and courts in

12  critical states like Ohio, Texas, Florida, Georgia,

13  Mississippi, and others.  Indeed, some of the most substantial

14  changes have come in just a few months since Judge Fullam's

15  ruling demonstrating the quickening face of reform.

16         Your Honor, with that backdrop, I would like to comment

17  a little bit on the estimate that the Property Damage

18  Committed will put forth.  Our estimate, Dr. Cantor's base

19  case of 2.5 billion dollars is not an aggressive one, your

20  Honor.  We have not tried and do not and will not present the

21  Court with the lowest possible estimate.  Dr. Cantor's

22  estimate is based on the actual experience of this company as

23  reflected by more than a quarter of a million resolved claims

24  in the past.  The law of the Owens Corning case and others say

25  that you look at claim values as of the petition date.

*United States District Court*
*Camden, New Jersey*

1    Notwithstanding that, Dr. Cantor's base case estimate actually

2    includes increasing claims value to mesothelioma, that is, the

3    Court will hear that she looked at the historical data, she

4    saw increasing values in the past and projected increasing

5    values out into the future as a conservative step.

6         Dr. Cantor makes no deduction or adjustment in her

7    estimate for the reforms, the legal reforms that we've now

8    seen in numerous states that there can be no doubt will

9    significantly change the legal landscape for asbestos claims

10   in the future.  She makes no deductions for the punitive

11   component of settlement values.  She makes no deduction for

12   the historic payment of unimpaired non-malignant claims that

13   in all likelihood were supported by nothing more than a single

14   x-ray reading taken as part of the mass screening and

15   interpreted by many of the same doctors who have developed a

16   notorious reputation for over-reading x-rays, no deduction for

17   that.  She makes no adjustment to historical dismissal rates,

18   which surely would go up if T&N took a harder look at many of

19   these issues in the hypothetical future that we're talking

20   about.  She assumes no reduction in the ratio of non-malignant

21   claims to malignant claims even though recent data show

22   dramatic reductions in this ratio.  And, finally, she uses a

23   risk free discount rate to reduce the value of future claims

24   to present value even though a much higher discount rate

25   certainly could be justified under a variety of theories.  So,

33

1    your Honor, her estimate, the evidence will show, is a

2    conservative one, a reasonable one, and is well-grounded in

3    the history of this company.

4         Let me comment just for a few minutes on Mr. Peterson's

5    11.1 billion dollar estimate.  And if I could ask for slide

6    No. 7.

7         Dr. Peterson didn't start at 11.1 billion dollars.  In

8    October of 2002, he estimated T&N's liability for U.S. claims

9    at 6.6 billion.  He revised that estimate downward in February

10   2004 when he came up with 5.7 billion.  Only once a deal had

11   been struck on this plan of reorganization incorporating many

12   of the incentives that my colleague Mr. Kessler described to

13   the Court, and it became clear that the estimate really is

14   only going to effect the recovery of other unsecured creditors

15   in this case, like the Property Damage claimants, only after

16   all that did the estimate double to 11 billion dollars.  And

17   then, finally, your Honor, in April of this year, Dr.

18   Peterson, the evidence will show, did another sensitivity

19   analysis where he actually did rely on the historical claim

20   values and the result of his own sensitivity is 3.6 billion

21   dollars.  And as we're going to show the Court, that

22   sensitivity analysis that he performed illustrates exactly why

23   Dr. Cantor's estimate is squarely in the range of reasonable

24   estimates in this case.

25        Claim values here are critical, your Honor.  And if we

1   could turn to Page 6 of the slides.  The evidence is going to

2   show, your Honor, that the claimed values that Dr. Peterson

3   uses in his estimate far exceed anything that comes out of

4   T&N's actual claims history.  So, for example, on the

5   left-hand side where the claims database shows that T&N

6   actually paid an average of about $102,000 to mesothelioma

7   claimants in 2001, Dr. Peterson's estimate doubles it and

8   assigns to claimants $200,000 in that category.  Where lung

9   cancer claimants actually got on average of about $13,000 in

10  2001, Dr. Peterson assigns $33,000 in value to those claims.

11  Other cancer claims resolved for about $4,000 in 2001 more

12  than tripled in Dr. Peterson's estimate to $14,750.  And

13  probably the most significant difference is with respect to to

14  the non-malignant disease claims.

15         Now, it's a little bit hard, as the evidence will show

16  later on, because Dr. Peterson puts all the non-malignants in

17  one category, Dr. Cantor divides them into asbestos and

18  pleural disease categories, but it's still very clear the

19  differences on non-malignant diseases.  Where they were

20  getting about $1,500 or so actually in 2001, Dr. Peterson

21  assigns them all, including the large percentage of unimpaired

22  non-malignant claims that's within that group, $7,000 each for

23  every year of this 40 year cost.  The vast majority -- the

24  difference between the Cantor and Peterson estimates is

25  settlement averages, as well as to Dr. Peterson's preferred

35

1    increasing model of claiming rates, a model, I would note,

2    your Honor, that the Court in Owens Corning rejected.

3        If we could go to Page 8, please.  The bar on the left,

4    your Honor, is Dr. Cantor's estimate of 2.5 billion.  The bar

5    on the right is Dr. Peterson's estimate of 11.1 billion.  And

6    the center bar is the sensitivity analysis that Dr. Peterson

7    did that came up with 3.6 billion dollars.  And what we've

8    done, your Honor, is color code the bars to illustrate where

9    the substantial difference is.  And the evidence is going to

10   show, your Honor, that the substantial difference between the

11   11.1 estimate and Dr. Cantor's 2.5 is attributable to the use

12   of what have been called trust distribution procedure values

13   in Dr. Peterson's estimate and his model of increasing

14   filings, that accounts for 87.2 percent of the difference.  As

15   the evidence is going to show in this matter, the remaining

16   difference, the 12.8 percent represented by the yellow bar, is

17   a variety of different differences between Dr. Cantor's

18   estimate and Dr. Peterson's, including the use of

19   epidemiological models that vary slightly, that change the

20   shape of the curves a little bit of the incidents of disease

21   going forward, and an analysis, which I'm sure the Court will

22   hear quite a bit about, that compares claims in file year

23   versus death year, the use of a two-year window for

24   calculating historical averages that Dr. Cantor, excuse me,

25   that Dr. Peterson uses as opposed to a four-year window that

1   Dr. Cantor uses, the change in the discount rate and a modest

2   change in the inflation rate that is used, all those

3   differences make up only 12.8 percent of the gap.

4       The 3.6 billion dollar sensitivity, the evidence shows,

5   your Honor, is that when Dr. Peterson actually assumes that

6   history is the best measure, as Mr. Inselbuch noted in his

7   opening statement, when we do look to the history as the best

8   measure, we come up with 3.6, a number very close to the

9   reasonable range of estimates that have been offered by Dr.

10  Cantor and others.

11      So how does Dr. Peterson justify the substantial

12  increases in claim values and claiming rates that he

13  forecasts?  The number one factor that he identifies in his

14  report, and as the evidence, as the Court will hear in

15  testimony, is the publication by Jeffrey Tweedale of what I

16  call a muckraking book in the year 2000.  We will show the

17  Court that the corporate conduct documents discussed in Mr.

18  Tweedale's book had been out there for years, they had been

19  made available to plaintiffs' lawyers for years, and that the

20  plaintiffs' lawyers had every incentive to exploit those

21  doctors and maximize the value of their clients' claims.

22  There's nothing new here and there's certainly nothing worth

23  the billions and billions of dollars that Dr. Peterson adds to

24  his estimate on account of that information.

25      As the Court hears the testimony, we would ask you your

*United States District Court*
*Camden, New Jersey*

1   Honor to keep in mind the fundamental differences in the

2   forecast.  And if I could just turn to Page 9 of the slides,

3   this chart, your Honor, the vertical line on the left-hand

4   side of the chart represents the petition date, the green line

5   escalating rapidly prior to the petition date on the left

6   represents claim filings, and the purple line below represents

7   closed compensated claims, that's historical data taken from

8   the database that reflects what was actually going on, actual

9   claim filings, actual claims closed and compensated.  The

10  lines on the right-hand side depict the estimates, the upper

11  line, the red line on top is Dr. Peterson's estimate of future

12  claims, and the blue line down beneath it is Dr. Cantor's

13  estimate of future claims.

14      Dr. Cantor takes her signals from the closed

15  compensated claims.  As she will testify, your Honor, and

16  explain to the Court, the closed compensated claims represent

17  the best measure of history because they represent mutual

18  resolution, plaintiffs and the defendant T&N coming together,

19  agreeing which claims would be resolved with payments and what

20  those payments would be. Dr. Peterson, in contrast, takes his

21  signals from filings. What he is modeling, your Honor, is he

22  is modeling the conduct of the plaintiffs and the plaintiffs'

23  bar in these cases. So, he looks at sharply increasing filings

24  and says things will go on at this extraordinarily high level

25  from here on in, ignoring the claims that actually got

38

1  compensated.

2      Your Honor, we think the evidence is going to show

3  that by taking his signal from the green line that what

4  Peterson, Dr. Peterson actually is doing is he's standing on a

5  bubble, and what has happened is that the bubble has burst.

6  When you look at what we have called colloquially the

7  historical future, and the reason we call it's the historical

8  future is for purposes of the estimates, in this case the

9  future begins on the petition date back in the year 2001.  So

10 we have several years of experience now that tells us what the

11 future actually looks like. And when you look at what has

12 actually happened, it does not reflect what Dr. Peterson was

13 projecting would happen. He was standing on a bubble and the

14 bubble has burst.

15     Dr. Cantor looks down from that peak of claims on the

16 green line and tests a series of hypotheses, your Honor,

17 through extensive analysis, including analysis of events that

18 have happened and conditions that have developed in the years

19 since the petition date. And as the Court will hear, she finds

20 no evidence to support the level of claiming activity and the

21 level of the estimate that Dr. Peterson has offered in this

22 matter.

23     Your Honor, we think when the evidence is in, it will

24 show that $2.5 billion is a reasonable, conservative estimate

25 of the amount of U.S. personal injury claims against T&N.

*United States District Court*
*Camden, New Jersey*

39

1          I do want to comment on one more matter we have not

2    offered, your Honor, an estimate of the value of the United

3    Kingdom claims.  That is a relatively small piece of this pie,

4    so to speak. While we don't necessarily agree with Dr.

5    Peterson's estimate of $400 million U.S. for those claims, and

6    indeed the evidence will show that there are other estimates

7    out there that offer lower numbers, we came to the conclusion

8    that spending a lot of this estate's money and taking a lot of

9    the Court's resources to litigate a dispute that would only

10   have an incremental impact, very small incremental impact on

11   the recovery of property damage claimants, was not the

12   appropriate thing to do, so we have chosen not to offer a

13   separate estimate of the value of the U. K. claims. Even when

14   you compare the $400 million amount that Dr. Peterson offers

15   with the 2.8 billion -- excuse me, the $2.5 billion estimate

16   of Dr. Cantor, it's a relatively small fraction and does not

17   make a dramatic change in recoveries and that's the reason why

18   we offer no separate estimate of those claims.

19          Thank you, your Honor.

20          THE COURT: Let me just ask one question. If there

21   will be no serious challenge as to the value of the claims

22   from England, wouldn't this Court still have to reason why the

23   projected figure is reasonable in order for it to have some

24   binding effect in England?

25          MR. STROCHAK:  Your Honor, I am probably not terribly

*United States District Court*
*Camden, New Jersey*

40

1  well qualified to comment on what would and would not have a

2  binding effect --

3      THE COURT:  Well, not binding, influential.  Other

4  than say well, this was conceded in the United States, here's

5  the figure.  Would that have any influence in an English

6  Court?

7      MR. STROCHAK:  I certainly think it would, your

8  Honor.  I think that obviously the Court has a separate duty

9  to come up with an estimate that it believes is defensible and

10  supportable. Yes, and I think your Honor is going to hear

11  testimony from the Asbestos Claimants Committee on the issue

12  of what exactly is the appropriate measure of damages in the

13  U. K.  That's an issue that we don't really have a strong view

14  on, your Honor.

15      I think the point here is that we think that the

16  amount is sufficiently small and the Court will do its duty.

17  We will present to the Court the opposing estimates that are

18  out there on the U. K. claims that other parties have done and

19  the Court can make its own assessment as to whether it thinks

20  400 is reasonable or not reasonable.

21      THE COURT:  All right.

22      MR. INSELBUCH: May I have minute in rebuttal, your

23  Honor?

24      MR. BISSELL:  Actually --

25      THE COURT:  Wait a minute, we have --

*United States District Court*
*Camden, New Jersey*

1          MR. BISSELL:  Just a few remarks, if you don't mind.

2          Your Honor, Rolin Bissell from Young Conaway again

3     for the Futures Representative.  This will be very brief.

4          In the Property Damages' opening remarks they asked

5     you to consider the evidence not presented and in particular

6     they asked you to draw an inference about what the Futures

7     Representative, my client, believes because they are not

8     presenting a separate estimation expert. We are presenting,

9     along with the ACC, Dr. Peterson.  No inference should be

10    drawn by the fact that we're not providing a duplicate expert.

11    We've worked very hard with the ACC to streamline these

12    proceedings, we'll be sharing the witnesses, we will not be

13    presenting a whole different set of witnesses.  We don't stand

14    together on everything, but we're standing together on this

15    one.

16          Also, I would ask you to not take the approach the

17    Property Damage Committee recommended. I hope that you do not

18    consider the evidence not presented, I hope you consider the

19    evidence that is presented. And if at the end of this hearing

20    there is no evidence from witnesses, from documents but only

21    lawyers' argument and newspaper reports and other things that

22    are not evidence supporting things about people's motives

23    about how tort reform is going to work in the future, I hope

24    that you will just consider the evidence and not the argument.

25          Thank you, your Honor.

42

1    MR. INSELBUCH: Briefly, your Honor.  I would

2  certainly second what Mr. Bissell said.  As I said in my

3  opening remarks, there has always been a lot of noise made

4  about how the tort system values are inappropriate, wrong, the

5  tort system is broken, but you only hear it from this lectern,

6  you will not hear it from the witness box, and I implore the

7  Court to listen to what the witnesses tell the Court.

8        Naturally, any estimate is riven with a potential for

9  error and if the estimate is too high, that's bad for

10  somebody; if the estimate is too low, it's bad for somebody.

11  We are here to do the best we can and for this Court to do the

12  best it can to come up with what the Court thinks is the right

13  answer. And it does matter to the asbestos constituencies,

14  just as it matters to everyone else who will share in the

15  equity of this company when it comes out in reorganization

16  because, after all, whatever is paid to other constituencies

17  is not part of the equity of the remaining company.

18        Finally, your Honor, two points. Everyone likes to

19  look at the SEC filings that these companies filed before they

20  went into Chapter 11 and say my goodness, they only had 1.4

21  billion dollars in there estimate in fair SEC filings for

22  their asbestos liabilities and those filings demonstrated that

23  they were solvent companies. Well, if they were solvent and if

24  the estimation of 1.4 billion dollars were correct, we

25  wouldn't be here today. The reason we're here today is that

1   estimate was woefully wrong and that's why ultimately their

2   house of cards collapsed and they had to file in Chapter 11.

3        Now, Mr. Strochak has talked about estimates that Dr.

4   Peterson did in 2002 and 2004. First, they were not done

5   after -- they were not done before the deal was struck, the

6   deal, the so-called deal, the 50-50 split of the equity was

7   done long before any of these estimates were made because the

8   precision of the estimate didn't matter in how we calculated

9   those liabilities. And the whole point of negotiating a

10  settlement early in a reorganization was the hope that we

11  could have confirmation soon and get this company back out.

12  That didn't work out so well, but the deal was struck before.

13       Dr. Peterson did not change his estimates to

14  accommodate a deal. In fact, when he made his estimates in

15  2002, they came with a cover sheet that said these estimates

16  are based upon values that were derived from when Turner &

17  Newall was in the CCR.  The CCR has folded, these values are

18  much too low, but you've asked me to do this calculation for

19  you and I've done it. In 2004 he said now let's look at what

20  the real numbers are, and that's when we got the higher

21  valuation.

22       Mr. Strochak talks about punitive damages.  There are

23  no punitive damages in the data base that this estimate is

24  made from. There was only one verdict against Turner & Newall

25  in their entire history for punitive damages and it happened

*United States District Court*
*Camden, New Jersey*

44

1   in 2001 and it is not in the data base that the experts worked

2   from.

3          Judge Fullam did not reject Dr. Peterson's increasing

4   estimate in a way that would be in any way applicable here.

5   There were special facts in the Owens-Corning case that had to

6   do with the Owens-Corning settlement process that gave rise to

7   a separate set of numbers and a separate continuum of numbers.

8   Judge Fullam respectfully disagreed with Dr. Peterson, that's

9   Judge Fullum's prerogative as the Court, but whatever he's

10  decided in Owens-Corning is not precedent on this point for

11  anything that happened here because the facts are all

12  different.

13         Once again, I would implore you, as did Mr. Bissell,

14  we will stand or fall by what the witnesses say and we will

15  hope that the Court will reject simply the arguments of the

16  lawyers. Thank you.

17         THE COURT:  Counsel, before we start, you're rising

18  in your seat, before we start with testimony, let me make this

19  clear, that it would be my intention to decide this case the

20  same way I would instruct a jury to decide it, that it's to be

21  based on the evidenced and solely on the evidence presented in

22  court. I'm fully aware of the emotional debates that take

23  place nationally with respect to the tort system and I know

24  that on each side they're infected with political motivation

25  and I don't intend to get caught up on either side of the

———————————Hanly - Direct - Finch———————————

1   motivation. Whatever we do, I would hope that it will be based

2   strictly on the evidence presented before me here in court.

3           MR. INSELBUCH: Thank you. You wish us to proceed,

4   your Honor?

5           THE COURT:  Yes, you may.

6           MR. INSELBUCH: I would ask my college Mr. Finch to

7   call our first witness.

8           MR. FINCH: Your Honor, the Plaintiffs call Paul

9   Hanly.

10  (PAUL J. HANLY, JR., HAVING BEEN DULY SWORN, TESTIFIED AS

11  FOLLOWS:)

12          THE COURT:  You may be seated.

13          THE WITNESS: Thank you, your Honor.

14          MR. FINCH: Nathan Finch for the Asbestos Claimants

15  Committee.

16  (DIRECT EXAMINATION OF MR. HANLY BY MR. FINCH:)

17  Q.  Mr. Hanly, could you briefly describe your educational

18  background?

19  A.  Yes. I have an ungraduate degree from Cornell University,

20  a masters degree from Cambridge University and a law degree

21  from Georgetown University Law Center.

22  Q.  What year did you take your law degree?

23  A.  1979.

24  Q.  Can you give us a brief rundown of your employment

25  history beginning with the first job that you took following

—————Hanly - Direct - Finch—————

1 law school and continuing to the present?

2 A.   Yes. Immediately following law school, I had the good

3 fortune of serving as law clerk to a judge of this court, the

4 District of New Jersey.  Following that, I went to New York

5 and became an associate in a law firm in Manhattan.  And

6 commencing in 1981, I came to begin the representation of

7 Turner & Newall in the asbestos personal injury and property

8 damage litigation.

9 Q.   I have placed a book in front of you which contains some

10 of our trial exhibits in this case. Could you turn to

11 Plaintiffs' Exhibit 19 in your binder, Mr. Hanly.

12 A.   Yes, I have that.

13 Q.   Is that an accurate copy of your resume?

14 A.   Yes.

15        MR. FINCH: Your Honor, we would offer at this time

16 Plaintiffs' Exhibit 19.

17        MR. FRIEDMAN:  No objection, your Honor.

18        THE COURT:  Plaintiffs' Exhibit 19 is now in

19 evidence.

20 (PLAINTIFF EXHIBIT P-19 WAS RECEIVED IN EVIDENCE).

21 BY MR. FINCH:

22 Q.   Mr. Hanly, is it fair to say that for the vast majority

23 of your career you were the primary national coordinating

24 outside defense counsel for Turner & Newall with respect to

25 asbestos personal injury and property damage liabilities?

—————Hanly - Direct - Finch—————

1    A.   Yes.

2    Q.   Could you describe what that entailed, what were your job

3    duties, what did you do?  In some detail, could you explain

4    what your role was and how it changed over time?

5    A.   Sure. Well, Turner & Newall had first been sued in the

6    United States asbestos litigation in August of 1977.  By the

7    fall of 1981 when I first became a lawyer working for Turner &

8    Newall, it was a defendant in probably a thousand cases or so.

9    And I was initially part of a team which continued over the

10   next 20 years to defend Turner & Newall as the national trial

11   and coordinating counsel.

12          Because Turner & Newall was not a United States

13   company but rather an English company, and although it was

14   ably represented by its general counsel, or the equivalent of

15   general counsel, it had a different title, unlike an American

16   asbestos defendant, its in-house lawyers were not terribly

17   familiar or experienced with the U.S. litigation system. As a

18   consequence, as national trial and coordinating counsel, my

19   firm and I, and the members of our team, were engaged in the

20   full panoply of duties that both an American general counsel

21   would have in the defense of a litigation such as asbestos and

22   the more mundane day-to-day duties that a trial lawyer or a

23   team of trial lawyers would have.

24          So, beginning with the service of a complaint, our

25   team would, in consultation with the general counsel of the

*United States District Court*
*Camden, New Jersey*

Hanly - Direct - Finch

1  company, decide which law firm nationally should handle the

2  case, which particular lawyer should handle the case. We

3  determined -- we made decisions as to whether the case should

4  be answered or moved against with respect to the equivalent of

5  Rule 12 motions. We were responsible for all strategy

6  decisions throughout the discovery process, including which

7  witnesses would be proffered, which documents would be

8  produced, how responses to requests for the production would

9  be handled.  And with respect to all motion practice, all

10 briefs and memoranda of law were prepared either at my firm or

11 under my firm's supervision.

12         And then if the case -- in the early days, we were

13 also responsible for negotiating all of the settlements and if

14 the case were to proceed to trial, members of our team would

15 either try the case or choose the local counsel in whatever

16 jurisdiction was involved to try the case and would be at

17 trial with counsel.

18 Q.  Let me stop you right there. How many asbestos personal

19 injury cases did you personally try or start the trial for

20 Turner & Newall?

21 A.  Over the course of 20 years, I probably started and tried

22 between 25 and 40 cases.

23 Q.  And how many case resolutions through settlement or

24 judgment did you oversee over you're 20-year career as

25 asbestos counsel for Turner & Newall?

Hanly - Direct - Finch

1  A.   200 to 300,000.

2  Q.   Could you describe for me the process by which you would

3  interact with first the Asbestos Claims Facility and then

4  later the Center for Claims Resolution on behalf of Turner &

5  Newall?

6  A.   Sure. In June of 1985, a consortium of insurance,

7  liability insurance companies and 35 asbestos manufacturers

8  came together and formed what was called of the Asbestos

9  Claims Facility. This was essentially a joint claims handling

10  claims defense organization. It had a board of directors and

11  had as its members a number of large liability insurance

12  carriers and defendants.

13       The Asbestos Claims Facility itself engaged counsel

14  around the United States to deal with the underlying cases

15  when cases could not be resolved early on. However, very few

16  of those very competent and able lawyers around the country

17  had any experience defending Turner & Newall historically and

18  as a consequence our firm and the members of my team continued

19  to participate on a daily basis in all of the activities which

20  I described to you four or five questions ago. So that

21  continued through the years of the Asbestos Claims Facility.

22       That organization died an untimely death in the fall

23  of 1988 and a new organization rose from those ashes that was

24  called the Center for Claims Resolution, or the CCR. And

25  again, it had a similar sort of structure, but again because

*United States District Court*
*Camden, New Jersey*

50

—————————— Hanly - Direct - Finch ——————————

1    the counsel who were reporting to the CCR had no considerable

2    experience with Turner & Newall, my team continued again in

3    the role that I described for you a few minutes ago.

4    Q.   And just for the record, what is the Center for Claims

5    Resolution?

6    A.   The Center for Claims Resolution was again like the

7    Asbestos Claims Facility, an organization, without the

8    insurance companies, but an organization of some 20 asbestos

9    defendants who wanted to continue what was the initial purpose

10   of the Asbestos Claims Facility, which was to come together to

11   reduce costs and to try to find a way to resolve asbestos

12   claims on the most economical terms possible.

13   Q.   And then subsequent to Turner & Newall, did -- at some

14   point in time did Turner & Newall, when it was in the CCR, did

15   you attend CCR board meetings?

16   A.   Yes, I did. From approximately the beginning of 1996

17   until the end -- until the time when Turner & Newall left the

18   CCR in early 2001, I and my law partner attended virtually

19   every CCR board meeting.

20   Q.   Did you also interact with the staff of the CCR who were

21   engaged in settlement negotiations with individual Plaintiff

22   law firms to approve various settlements over that time

23   period?

24   A.   Yes, on a daily basis.

25   Q.   Did you interact with Bill Hanlon and the members of his

*United States District Court*
*Camden, New Jersey*