Hanly - Direct - Finch

1    law firm in the process by which the several shares of

2    liabilities were allocated among the various CCR members

3    during that time period?

4    A.   Yes, on a very regular basis.

5    Q.   And then what role did you have after Turner & Newall

6    left the CCR with respect to defending Turner & Newall in

7    asbestos personal injury claims?

8    A.   Well, Turner & Newall left the CCR in the very beginning

9    of 2001, I think January 2nd or thereabouts, and so becoming

10   again a stand alone defendant, which is to say a defendant not

11   part of any claims organization.  In a sense, we reverted to

12   the situation which we were in in 1981 through 1985, where we

13   were -- when I say we, I mean Turner & Newall and our team

14   were essentially out there on our own dealing with the cases

15   without the benefit of a large group of other companies to

16   share indemnify and expense costs.

17   Q.   We will get into that in much more detail later in your

18   examination, but could you -- over the course of your career,

19   I take it -- did you become familiar with the various types of

20   asbestos-containing products that Turner & Newall and its

21   U. K. subsidiaries manufactured and the types of operations

22   that gave rise to Turner & Newell's liability in the United

23   States?

24   A.   Yes, that was critical to being a competent defense

25   counsel, was to understand, as best one could, the history of

*United States District Court*
*Camden, New Jersey*

Hanly - Direct - Finch

1  Turner & Newall and its use of asbestos and its sales

2  distribution asbestos-containing products in the United

3  States.

4  Q.  And how did you gain that familiarity over the years with

5  Turner & Newell's asbestos products and operation?

6  A.  Well, by -- principally by spending a considerable amount

7  of time in the United Kingdom in Turner & Newell's document

8  repository.  In fact, I spent almost a year living there and

9  reviewing all of its historical documents, and many countless

10  days interviewing historical witnesses, in other words, folks

11  who had worked for the company in the nineteen thirties,

12  forties, fifties, sixties, etcetera, those were the principle

13  ways. And, of course, conversations with the first general

14  counsel to whom I reported who had been there for several

15  decades.  Those were the ways in which I became familiar with

16  the history of Turner & Newall.

17  Q.  What were the primary bases for liability for Turner &

18  Newall?

19  A.  Well, it's a little complex, I'll try to make it as

20  simple as I can. Turner & Newall was for many decades the

21  largest vertically integrated asbestos manufacturer in the

22  world, larger even than Johns-Manville, which, of course, was

23  the largest U.S. company. So as a consequence of having

24  involvement in every aspect of asbestos, from the mining of

25  the mineral, which is what asbestos is, all the way through

Hanly - Direct - Finch

1    the milling and the manufacturing process and the sale and

2    distribution and the installation process, there were several

3    different theories of liability put forth by the plaintiffs'

4    bar in the United States.  And I can summarize them briefly,

5    if you'd like.

6    Q.   Yes, if you could summarize those for us.

7    A.    Sure. Well, the first was Turner & Newall was a --

8    because it was an asbestos miner, it owned mining interests in

9    Canada and in southern Africa, it sold substantial quantities

10   of raw asbestos fiber to companies in the United States,

11   including Johns-Manville, which was its largest user of

12   asbestos fiber. Of course, Turner & Newall also used that

13   fiber in its own manufacture, but it was a fiber supplier.

14   Q.   So one basis of liability was for a fiber supplier on a

15   component part theory?

16   A.   Yes and no. Its liability was to, for example, workers in

17   the Manville, New Jersey Johns-Manville plant who were exposed

18   to that raw fiber, workers who off-loaded that fiber from the

19   Port of Philadelphia or Newark or New York, and also, as you

20   mentioned, it's liability also was to folks who were exposed

21   to the finished products of other companies, which products

22   had incorporated that raw fiber. So fiber supply was theory of

23   liability number one.

24   Q.   What were the other bases of liability for Turner &

25   Newall in addition to its liability as a fiber supplier?

*United States District Court*
*Camden, New Jersey*

—————————Hanly - Direct - Finch—————————

1  A.   The second basis of liability arose out of Turner &

2  Newell's ownership of a company based in Pennsylvania that was

3  called Keasbey & Mattison, that's with two Ts.   Keasby has

4  been described as sort is a mini Johns-Manville.   It was an

5  asbestos manufacturing company that was created in 1873, and

6  purchased by Turner & Newall in 1934. Turner & Newall owned it

7  from 1934 to 1962. And as a consequence of that ownership, the

8  plaintiffs alleged that if a plaintiff was exposed to the

9  products of Keasbey & Mattison, that Turner & Newall as the

10 owner of that company ought to have liability for that

11 exposure.

12       The principal initial theory was a kind of alter ego

13 or vicarious liability theory which is predicated on cases

14 that say if a corporation so dominates its subsidiary then the

15 subsidiary ceases to have its own independent existence that

16 the parent can be liable. So, in the early years of the

17 litigation, the claims were -- theory number two was:  Turner

18 & Newall, you are liable for the acts of Keasby because Keasby

19 was really just a division of yourself.

20 Q.   At some point did the plaintiffs' theories of liability

21 based on the exposure to the Keasbey & Mattison products

22 change?

23 A.   It did. What occurred just very briefly is we had some

24 success in the early years making motions for the nonliability

25 of Turner & Newall on this alter ego or veil-piercing theory

————Hanly - Direct - Finch————

1  and had some success here in New Jersey and Pennsylvania and

2  other places in the country. But what occurred over a few

3  years was plaintiff's bar as a consequence of discovery of

4  this repository of documents that I mentioned which existed in

5  England came to understand that, in fact, Turner & Newall had

6  been the fiber supplier to Keasbey & Mattison and, therefore,

7  the plaintiffs didn't need to run, if you will, the alter ego

8  theory, they could simply pursue Keasbey & Mattison claims on

9  the basis that the plaintiff was exposed to a Keasbey &

10  Mattison product, which product incorporated Turner & Newall

11  fiber. So that, the Keasby theory, what we call the Keasby

12  theory of liability sort of morphed, if I can use that term,

13  over the years and became a fiber supply theory.

14  Q.   So was it fair to say that after say 1988 or 1989 the

15  Turner & Newell's payments to resolve claims alleging exposure

16  to Keasbey & Mattison products were based on the exposure as a

17  fiber supplier as opposed to the alter ego?

18  A.   I think that's a fair generalization.  Of course, there

19  were some exceptions, but I think that's a fair

20  generalization.

21  Q.   What were the line of products that Keasbey & Mattison

22  was in?  Was it a full range of asbestos-containing products?

23  A.   Yes, Keasby, as I said, was -- not by me, but someone

24  historically dubbed Keasby a mini Manville, which is to say

25  that Keasby made every kind of insulation product.  It made

Hanly - Direct - Finch

1  asbestos textiles, it made asbestos cement pipe and asbestos

2  cement building materials, it had -- virtually any sort of

3  asbestos product that ever was manufactured, was manufactured

4  by Keasby.

5  Q.   Now you've told us about the liability as a raw fiber

6  supplier and the Keasbey & Mattison basis for liability. What

7  other bases for liability did Turner & Newall have in the

8  United States?

9  A.   Well, there were two others.  The first other, or the

10 third theory of liability, was liability for a Turner & Newall

11 product which was distributed to here in the United States,

12 and that product was call sprayed Limpet, L-I-M-P-E-T,

13 asbestos. This was spray-on fireproofing acoustical treatment

14 product.  Years ago, for example, a courtroom like this likely

15 would have had the ceiling sprayed with Limpet because it had

16 very good acoustical treatment properties. Limpet was

17 distributed throughout the United States from 1934 through

18 1974. It was an extremely dusty product, dusty in the

19 application process, with the highest percentage of asbestos

20 of any product ever sold in the United States. So it gave rise

21 to very significant liability claims, particularly

22 mesothelioma claims.

23 Q.   What was the type of asbestos that was incorporated in

24 Limpet and the Keasbey & Mattison products, did it contain

25 amosite asbestos, for example?

*United States District Court*
*Camden, New Jersey*

—————————————— Hanly - Direct - Finch ——————————————

1    A.   Well, the Limpet product containing amosite or another

2    type of asbestos that's called chrysolite, those are the blue

3    and the brown varieties. The Limpet products never contain the

4    chrysotile product. The Keasby products, while there were some

5    chrysotile products, the vast majority of the insulation

6    products were again this amosite product which was widely

7    used, for example, by the United States Government, to which

8    Keasby was a significant supplier.

9    Q.   What were the other bases for potential liability for

10   Turner & Newall in the United States?

11   A.   Well, the last theory of liability was a kind of concert

12   of action or conspiracy theory of liability. This related to

13   the facts that Turner & Newall had been at the forefront of

14   the development of knowledge concerning the hazards of

15   asbestos going back actually to the teens, the 19 teens, and

16   it also had very close, very close connections and business

17   relationship with Johns-Manville. And there are many, many

18   communications between the two companies and, of course,

19   Johns-Manville, it's well known, was also a company that had

20   very early knowledge of the hazards but never during the

21   relevant years placed any warnings on its products. So, it was

22   a conspiracy or concert of action theory of liability.

23   Q.   Did Turner & Newall ever pay a claim, pay a settlement to

24   a claimant based on a conspiracy theory allegation?

25   A.   No, we didn't.

58

————Hanly - Direct - Finch————

1  Q.  So, you would never pay those type of claims where there

2  were some allegation that were made?

3  A.  They were allegations that were made.  They could not be

4  paid, in our judgment as counsel, because theoretically we

5  would then have to pay for every Manville claim.

6  Q.  Now, was there, in addition to a conspiracy basis for

7  allegations at least, was there also ever a joint venture

8  agreement between Turner & Newall and Johns-Manville?

9  A.  Yes. There was actually a company formed in the 19 teens

10  that was called Turner Manville, Ltd., and this company was

11  created to form a joint venture for the distribution of

12  asbestos-containing products in the United States and in

13  England.

14  Q.  What impact, if any, on Turner & Newall liability would

15  this joint venture have if the plaintiffs began asserting

16  claims on that basis?

17  A.  Well, the problem from a defense lawyer point of view was

18  that this company called Turner Manville, although it's name

19  changed, it continued to exist, and I believe it exists today.

20  And so as a consequence of that, this was more, simply more

21  corroboration, if you will, for the plaintiffs' theory of

22  liability, which what was espoused to me by many plaintiffs'

23  lawyers in many courtrooms all around the country, that Turner

24  & Newall effectively was Manville.

25  Q.  Did Turner & Newall in the United States -- let me back

—————————— Hanly - Direct - Finch ——————————

1  up.  Turner & Newall had numerous United Kingdom subsidiaries

2  that were involved with either the mining or united and sale

3  of asbestos-containing products, is that correct?

4  A.   That's correct.

5  Q.   And those finished products would be sold to the United

6  States as well as the raw fiber sold to the U.S.?

7  A.   That's correct.

8  Q.   Did Turner & Newall, when were you defending Turner &

9  Newall over the 20 years history in the United States, ever

10 try to allocate the liability payment for particular claims

11 between and amongst the United Kingdom subsidiaries?

12 A.   No, it did not.

13 Q.   And could you explain to the Court why Turner & Newall

14 didn't try to allocate liability for claims to particular

15 subs, U. K. subs?

16 A.   Yes. Essentially, as I came to understand it over the

17 years, the relationship between the subsidiaries in the United

18 Kingdom and the parent company in the United Kingdom was

19 legally actually an agency relationship whereby there were

20 documents which had been created which provided that the

21 subsidiaries acted as agents of Turner & Newall, Ltd. or

22 Turner & Newall PLC, the parent company. This was just a fact

23 that was inescapable.  And as a consequence of that, it was

24 the position of Turner & Newall in the United States

25 litigation that effectively Turner & Newall as a defendant

Hanly - Direct - Finch

1  included all of the United Kingdom subsidiaries as if those

2  subsidiaries were mere divisions of the company, such as the

3  Chevrolet Division of General Motors.

4  Q.   Did Turner & Newall ever file affidavits in court saying

5  that it was appearing on behalf of itself and all of its

6  United Kingdom subsidiaries?

7  A.   Yes. There was a standard affidavit that was filed in

8  connection with every Rule 12 or its equivalent motion

9  executed, sworn to bite general counsel, that defined Turner &

10  Newall, Ltd. or Turner & Newall PLC, it changed over the

11  years, as the parent for all of the United Kingdom

12  subsidiaries.

13  Q.   So that affidavit plus Turner & Newell's own role with

14  its subsidiaries effectively precluded trying to draw a

15  defense between Turner, the parent, and the subsidiaries for

16  the U. K. subsidiaries; is that correct?

17  A.   It did effectively preclude that.

18  Q.   Just briefly I want to touch on two of these agency

19  companies and ask you about them. One of them is Ferodo U. K.

20  What type of products did that company make?

21  A.   Yes. Ferodo U. K. made asbestos-containing friction

22  materials, which is to say it made materials such as

23  automobile brakes and linings and clutch facings and

24  industrial related braking, with an A, materials used in

25  railroad cars, for example, to stop the trains. So it made

*United States District Court*
*Camden, New Jersey*

Hanly - Direct - Finch

1   friction products.

2   Q.   Was that company ever sued in its individual capacity in

3   the United States?

4   A.   Yes, it was.

5   Q.   About what percentage of the claims would name that

6   company as a defendant?

7   A.   A rather small percentage. It would be very hard to say

8   with any certainty, but I would say five percent or less.

9   Q.   Greater than one percent, less than five percent, in that

10  range?

11  A.   I think that that's probably about right.

12  Q.   Are you familiar with a company called TBA Industrial

13  Products, Ltd.?

14  A.   Yes.

15  Q.   What?

16  A.   TBA -- sorry.

17  Q.   Excuse me, I interrupted you.  Go on.

18  A.   TBA was one of the founding companies of Turner & Newall,

19  its original name was Turner Brothers Asbestos, the Turner

20  family and the Newall family formed Turner & Newall in 1920.

21  And TBA, as we called it, was a manufacturer of

22  asbestos-containing textiles which were used in insulation

23  trades in the United States and all around the world. And TBA

24  had a sales agent located in Michigan for many, many years who

25  sold the products of TBA here in the United States.

Hanly - Direct - Finch

1   Q.   Was TBA ever named in its individual capacity in the

2   United States asbestos personal injury claims?

3   A.   Very often.

4   Q.   What percentage of the time would plaintiffs name TBA as

5   a basis for their claims against Turner & Newall?

6   A.   Again, I've never done a statistical survey of this, but

7   I would say in excess of 75 percent.

8   Q.   What about Keasbey & Mattison, claims alleging exposure

9   to Keasbey & Mattison products, what percentage of the

10  settlements that Turner & Newall made were based on some kind

11  of Keasby exposure?

12  A.   Well, that varied over time.

13  Q.   Let's say in the last five years before Turner & Newall

14  went into bankruptcy?

15  A.   In the last five years I would say that somewhere on the

16  order of 75 percent.  In the early days, the percentage was

17  much higher.

18  Q.   Okay.  At this point I would like to turn your attention

19  to the various litigation strategies that Turner & Newall

20  tried and utilized in defending itself at various points in

21  time.

22         MR. FINCH: If your Honor wants to take a morning

23  recess, this might be a good time to do it.  If not, I can

24  continue forward.

25         THE COURT:  Why don't we take very brief recess.  How

*United States District Court*
*Camden, New Jersey*

Hanly - Direct - Finch

1    long do you feel a reasonable recess would be?

2            MR. FINCH: Five, ten minutes.

3            THE COURT:  Ten minutes?  Why don't we take -- it's

4    now 11:15 by this clock, we'll take a ten-minute recess.

5            MR. FINCH: Thank you, your Honor.

6            (Short recess).

7            DEPUTY CLERK:  All rise.

8            THE COURT:  You may be seated.

9    BY MR. FINCH:

10   Q.   Mr. Hanly, before we launch into the description of the

11   various strategies that Turner & Newall used in defending

12   itself at various points in time, I just want to get on the

13   record the elements of the cause of action for the claims that

14   plaintiffs asserted against Turner & Newall.

15           Is it fair to say that the vast majority of the

16   asbestos personal injury claims against Turner & Newall,

17   asserted claims based on Turner & Newell's failure of the duty

18   to warn of the dangers caused by its asbestos-containing

19   products?

20           MR. FRIEDMAN:  Objection on the basis he's leading

21   the witness.

22   BY MR. FINCH:

23   Q.   Can you describe the basic elements of the cause of

24   action against Turner & Newall?

25   A.   The basic elements of the cause of action against Turner

*United States District Court*
*Camden, New Jersey*

Hanly - Direct - Finch

1  & Newall throughout the entire history of the asbestos

2  litigation was failure to warn based on either strict products

3  liability on a failure to warn basis and/or negligence claims.

4  I'm not aware of any other theory that was ever advanced.

5  Q.   And what did a plaintiff have to proof to establish a

6  liability on the part of Turner & Newall under a failure to

7  warn theory?

8  A.   That Turner & Newall failed to warn that plaintiff was

9  exposed to an asbestos-containing material sold by Turner &

10 Newall and that the plaintiff suffered some asbestos-related

11 condition.

12 Q.   Turning your attention to the pre-ACF time period, early

13 80's to '85, can you, please, describe how Turner & Newall

14 dealt with the asbestos personal injury claims that were

15 facing it?

16 A.   Yes.  From the first days that I was a member of the team

17 of lawyers defending Turner & Newall, I was informed that the

18 basic strategy was to resolve as many cases by settlement as

19 possible consistent with the cash flow needs of the company.

20 And where that was not possible, to mount the defenses that a

21 typical defense lawyer would mount in an asbestos products

22 liability case.

23 Q.   Did that dramatically change after Turner & Newall

24 entered the Asbestos Claims Facility?

25 A.   No, it was always the strategy of the company to resolve

Hanly - Direct - Finch

1   as many cases as it could on a yearly basis consistent with

2   the cash flow of the company.

3   Q.   Was its goal to resolve the cases at the cheapest price

4   possible?

5   A.   Of course.

6   Q.   How did the Asbestos Claims Facility members go about

7   defending the claims against them?

8   A.   Through a joint defense effort whereby the organization

9   itself, the Asbestos Claims Facility, appointed some 50 to 75

10  law firms around the country who were supposed to be

11  representing all of the members of the Asbestos Claims

12  Facility in each case, which was the idea was to effect a huge

13  cost savings over the pre-ACF days where you would enter a

14  courtroom anywhere in the country and there would be anywhere

15  from 75 to 100 lawyers representing some 50 to 60 companies,

16  so the idea was to have one lawyer for all 35 members and to

17  effect savings in that fashion on the defense side.   Then

18  there was a similar concept on the indemnity side.

19  Q.   And after the ACF folded in 1988, what was the approach

20  to resolving the claims that Turner & Newall used when it was

21  within the Center of Claims Resolution up to 1993?

22  A.   The same approach.   The Center for Claims Resolution was

23  similar to the ACF, although it had a much more aggressive

24  approach to settlement, it wanted to settle more cases rather

25  than fewer cases.   And so Turner & Newall was pleased with

—————Hanly - Direct - Finch—————

1   that organization because it was Turner & Newell's desire to

2   resolve as many cases as cheaply as possible on an annual

3   basis consistent with the cash flow of the company.

4   Q.   We will get into more detail about the way in which the

5   several share and liability payments were allocated between

6   Turner & Newall and other members of the CCR.

7        But did anything happen in 1993 that impacted on Turner

8   & Newell's asbestos litigation, in January of 1993?

9   A.   Yes, in January of 1993, there was filed in the Eastern

10  District of Pennsylvania a purported settlement class action

11  under Rule 23 of the Federal Rules of Civil Procedure.   The

12  defendants were all the members of the CCR, the Center for

13  Claims Resolution, including Turner & Newall, and the

14  plaintiff was a representative asbestos claimant.   And the

15  concept was to create a settlement class action whereby from

16  that point forward all asbestos personal injury claims to be

17  brought in the United States against those 20 odd defendants

18  would be processed through the settlement vehicle.   It was in

19  the view of Turner & Newall, and I believe all the other

20  members, that this was a, potentially a great concept whereby

21  the claims of the victims would be resolved and the companies

22  could continue to do business and resolve the claims at annual

23  cash levels that in the judgment of the companies at that time

24  they were able to meet.

25  Q.   Can we refer to this as the Georgine settlement?

67

Hanly - Direct - Finch

1    A.    Yes, that's what it's commonly called.

2    Q.    What was the fate of the appeal of the Georgine

3    settlement in the court system?

4    A.    A group of folks who didn't like the settlement appealed

5    the class certification to the Court of Appeals of the Third

6    Circuit and an Opinion by Judge Becker reversed the class

7    action certification, vacated it, I believe.  And that then

8    went to the United States Supreme Court, which affirmed Judge

9    Becker's Opinion.

10    Q.    During the -- and did the Supreme Court affirm that in

11    the summer of 1997, is that right?

12    A.    That's correct.

13    Q.    During the time when Georgine was pending in the

14    appellate process, what, if any impact, was there on the new

15    claim filings against Turner & Newall?

16    A.    There weren't any, because as part of the class action

17    proceeding in the District Court Eastern District of

18    Pennsylvania, the district judge had entered an injunction.

19    And that injunction remained in effect from approximately 1993

20    until late in the summer of 1997 when the Supreme Court

21    directed that the injunction be vacated.

22    Q.    And what impact did you observe on the numbers of new

23    claim filings against Turner & Newall after the Georgine

24    injunction was vacated in the summer of '97?

25    A.    They became overwhelming in number.  There was a huge, we

---Hanly - Direct - Finch---

1  called it the surge or the backlog that had been pent up, if

2  you will, in the offices of plaintiff counsel around the

3  country, tens of thousands of claims that they were precluded

4  from bringing because of the injunction.  And when the Supreme

5  Court directed that the injunction be vacated, those claims

6  came like a torrent against all the, all 20 of the CCR

7  members, including Turner & Newall.

8  Q.  I want to focus on the post-Georgine time period when

9  Turner & Newall was still a member of the CCR.

10 A.  Post-'97.

11 Q.  Post-'97 up until the time Turner & Newall exited the CCR

12 in early 2001.

13      What were the basic evidentiary settlement requirements

14 that Turner & Newall would require before it would settle an

15 asbestos personal injury claim?

16 A.  Again, quite simply some evidence of exposure to a Turner

17 & Newall product proffered by the plaintiff and evidence of an

18 asbestos-related disease or condition.

19 Q.  And we will get to the way the CCR worked.

20      But how would -- would the CCR pay a settlement if the

21 plaintiff proved exposure to one or more CCR members'

22 products?

23 A.  Yes, the CCR had a rather complex governing agreement.

24 But to strip it to its essence, the deal was that if you were

25 a member of the CCR and the plaintiff presented evidence of

──────Hanly - Direct - Finch──────

1   exposure to one CCR members' products, the other members who

2   had been named in that plaintiff's complaint had to contribute

3   to that settlement notwithstanding that the plaintiff had not

4   proffered any evidence of exposure to the products of those

5   other defendants.   It was essentially a contractual

6   arrangement that was made.

7   Q.   Why did Turner & Newall stay in a contractual arrangement

8   such as this?

9   A.   Because it was the judgment of Turner & Newall, based on

10   a variety of factors, including the judgment of the members of

11   my team, that the cost savings and the protection that the CCR

12   offered was far greater than was available if Turner & Newall

13   became what I called earlier a stand-alone defendant, in other

14   words, a defendant out in the tort system without the benefit

15   of cost sharing arrangements for indemnity and legal expense.

16   Q.   Could you turn in your book to Exhibit 20, Plaintiffs'

17   Exhibit 20?

18   A.   Yes.

19   Q.   And can you identify that document?

20   A.   Yes, this is a fairly standard form agreement that the

21   CCR would use to settle any particular asbestos personal

22   injury case.   They varied somewhat because they had to vary

23   consonant with the requirements of state law in different

24   jurisdictions, but this is the basic form of a CCR settlement

25   agreement on behalf of the members of CCR.

*United States District Court*
*Camden, New Jersey*

Hanly - Direct - Finch

1  Q.   What diseases would, asbestos-related diseases would

2  Turner & Newall pay compensation to?

3  A.   What categories of disease?

4  Q.   Yes, what categories of disease.

5  A.   Well, malignant mesothelioma, asbestos-related lung

6  cancer, asbestosis, pleural thickening, some other

7  occasionally pleural plaque claims, other cancers that as to

8  which there was medical literature suggesting a causal

9  connection between asbestos exposure, and those cancers such

10  as colon cancer, esophageal cancer, and other cancers.

11       MR. FINCH:  Your Honor, at this time I would offer

12  Plaintiffs' Exhibit 20.

13       MR. FRIEDMAN:  No objection, your Honor.

14       THE COURT:  Plaintiff's 20 is now in evidence.

15   (PLAINTIFF EXHIBITS 20 WAS RECEIVED IN EVIDENCE.)

16  BY MR. FINCH:

17  Q.   And, Mr. Hanly, could you turn to Plaintiffs' Exhibit 52

18  and tell me whether or not that is another example of a CCR

19  settlement agreement from the time period during which Turner

20  & Newall was a CCR member?

21  A.   Yes, it is.

22       MR. FINCH:  Your Honor, I would offer Exhibit 52.

23       MR. FRIEDMAN:  No objection, your Honor.

24       THE COURT:  52 is in evidence.

25   (PLAINTIFF EXHIBITS 52 WAS RECEIVED IN EVIDENCE.)

———————Hanly - Direct - Finch———————

1   BY MR. FINCH:

2   Q.   And could you turn to Page 296 of Exhibit 52?

3   A.   Yes.

4   Q.   Does Paragraph 2A set forth the exposure requirements

5   that a plaintiff would have to show before CCR would pay a

6   settlement?   It continues over onto the next page.

7   A.   Yes, this is essentially Appendix C, Pages 296 to 297

8   effectively set forth the criteria that the CCR used across

9   all cases, not just this particular group, cases that's

10  reflected in Exhibit 52.

11  Q.   Turning your attention to the concept of product

12  identification or exposure to asbestos defendants' products,

13  how would plaintiffs -- could you describe for me the various

14  ways by which plaintiffs would prove product identification

15  and exposure against Turner & Newall or another asbestos

16  defendants?

17  A.   Effectively there were four ways.   First would be the

18  testimony of the plaintiff himself that he worked in the

19  Brooklyn Navy Shipyard in such and such years and during that

20  time, he was exposed to Keasbey & Mattison/Turner & Newall

21  products.

22      Alternatively, or in addition, there might be testimony

23  of a co-worker.   In other words, if the plaintiff were either

24  deceased or in his testimony just couldn't recall what

25  products he was exposed to, the fellow who or fellows who

—————————————Hanly - Direct - Finch—————————————

1  worked alongside him might well testify, and often did

2  testify, that they worked during the same years as plaintiff

3  Jones, let's call him, and that on a daily, weekly, monthly,

4  whatever basis, we worked with the products of Turner &

5  Newall.

6        Thirdly, even in the absence of those two forms of

7  testamentary evidence, there was -- there could be documentary

8  evidence and the documentary evidence would either come from

9  Turner & Newell's files, for example, documents showing the

10  sale of asbestos-containing products at a particular time to a

11  particular company or particular job site, so that would be

12  the third way.

13        And then the fourth way would be, even in the absence

14  of the first three bases or evidentiary bases, there often

15  were records, documents of the job site itself.  The Bethlehem

16  Steel facility, for example, often had documents dating back

17  decades that indicated when and to what extent it was

18  purchasing asbestos-containing products and had the names of

19  the manufacturers.

20        So in one or more of those four basic ways, there may

21  have been other ways but they wouldn't have been material, the

22  plaintiff could proof exposure to a Turner & Newall or any

23  other product.

24  Q.  Are you aware of the concept of agreed upon job sites

25  where products were used in CCR settlement agreements?

--------Hanly - Direct - Finch--------

1  A.   Vaguely.

2  Q.   What was that?

3  A.   I think that was a job site -- I think it was a job site

4  in which the plaintiffs and the CCR agreed that the products

5  of some particular company had been used there during some

6  particular time frame so that that issue need not have been

7  litigated.

8  Q.   Could you describe for me the process by which CCR

9  allocated the individual settlement shares between and amongst

10 its member if the CCR were to, say, settle a case or group of

11 cases of asbestos personal injury plaintiffs?

12 A.   Yes.  Again, this was a very complicated formula that I

13 would be hard pressed to recite with any precision.  But the

14 essence of the arrangement was that each defendant member of

15 the CCR was assigned a percentage share in each of several

16 categories of asbestos cases.  So, for example, Turner &

17 Newall would have a share of, let's say, 5 percent of every

18 shipyard work case and then it might have 10 percent of every

19 asbestos plant worker case and it might have 2 percent of

20 every construction worker case.  And so the way in which it

21 worked -- and every other member had similar shares which

22 differed by occupational category.

23      So the way -- in its simplest terms, the way that it

24 worked was that if a case was settled for $100,000, the

25 settlement was allocated or divided up by first determining

—————————Hanly - Direct - Finch—————————

1   what kind of case was it, was it a plant worker case, a

2   shipyard case, whatever.  And once that determination was

3   made, in effect the CCR would simply look at the schedule of

4   shares of the companies who had been named in that particular

5   case and decide a percentage of the $100,000 to each of those

6   companies based on the percentage that that company had

7   previously been assigned in that category.

8   Q.   The only companies who attributed to settlement would be

9   the ones named in the plaintiff's complaint under the CCR as

10  it operated in the late '90s?

11  A.   That's correct.  The only companies that would pay in my

12  hypothetical example of a $100,000 settlement would be those

13  companies as to which that plaintiff had put their claims in

14  the caption of the complaint.

15  Q.   And was there a process by which the CCR members could

16  adjust the shares over time and it did that -- let me stop

17  there.

18  A.   Yes.  Again, this was all a contract based arrangement in

19  the CCR agreement that the members all had to sign to become

20  part of the CCR.  It provided -- had a very detailed and

21  complicated formula arrangement whereby any company that felt

22  it was paying too much in any category of case, in other

23  words, any company that thought that its percentage was too

24  high, could effectively petition the CCR to have a, what was

25  called a share review and that would be performed.  And the

Hanly - Direct - Finch

1   board would ultimately make a decision as to whether the

2   petition of the petitioning company, which invariably sought

3   to have the share lowered, not highered, would be decided.

4   Q.   And what information -- was this something that Mr. Bill

5   Hanlon and his law firm, Shay & Gardener, would be involved in

6   the share allocation adjustment process?

7   A.   Yes, they were.   The CCR law firm -- they were the law

8   firm for the CCR for many purposes, one of which was this

9   dealing with the petitions of any company that felt it was

10  paying too much and wanted to have basically a second look at

11  the fairness of its particular share.

12  Q.   And in making these share allocations, did Shay &

13  Gardener and the CCR members have information about the types

14  of asbestos-containing products each of the members made and

15  where those products were sold and the job sites from which

16  claims arose?

17  A.   Yes, the process by which a petition would get evaluated,

18  a petition to have your share lowered would include a detailed

19  review of the historical -- of the history of that particular

20  company, what kinds of product containing asbestos did it

21  make, where did it sell those products, how were they used,

22  and so on, because the ultimate question was is my share fair

23  in this particular category, let's call it the construction

24  worker category.   And in order to make that fairness

25  determination, the CCR had to look at whether that particular