———————Hanly - Direct - Finch———————

1  company ever sold any product there or if it did sell product

2  there, was it a major supplier of product.  Those kinds of

3  factors are what was looked at in making this assessment.

4  Q.  Would you agree that the allocation process was designed

5  to fairly allocate the several share of liability among the

6  CCR members?

7  A.  Yes, that was the -- the underlying purpose of the entire

8  arrangement was to have a fair sharing of the costs of each

9  and every asbestos personal injury complaint that was brought

10  against the CCR members.

11  Q.  And could you turn in your book to Exhibit 3, please.

12  A.  Yes.

13  Q.  Can you identify that document?

14  A.  This is the most up to date version of the CCR Producer

15  Agreement.  The agreement went through various iterations over

16  the years and I believe the '94 is the most current or most

17  recent version.

18       MR. FINCH:  Your Honor, at this juncture, I would

19  offer Plaintiffs' Exhibit 3, which is the CCR Producer

20  Agreement.

21       MR. FRIEDMAN:  No objection, your Honor.

22       THE COURT:  Plaintiff's 3 is in evidence.

23   (PLAINTIFF EXHIBIT 3 WAS RECEIVED IN EVIDENCE.)

24  BY MR. FINCH:

25  Q.  Mr. Hanly, we were talking about settlement payments and

*United States District Court*
*Camden, New Jersey*

77

─────Hanly - Direct - Finch─────

1  shares.  Just for the record, is it correct that what Turner &

2  Newall was paying when it paid claims was its own individual

3  several share of the liability, it wasn't paying the total

4  amount of the liability to a particular claimant?

5  A.   Yes, it was paying its own share, it wasn't paying the

6  share of Owens Corning or Armstrong or any of the other

7  defendants.

8  Q.   Could you describe for me why Turner & Newall -- first of

9  all, did you believe that being in the Center for Claims

10 Resolution provided advantages to Turner & Newall in

11 litigation with asbestos personal injury plaintiffs?

12 A.   Absolutely.

13 Q.   What were those advantages?

14 A.   Well, the first advantage was a cost savings, both in

15 terms of the indemnity payments, that is the settlement

16 payments, and in terms of the defense costs.  And by that I

17 mean, with respect to the settlement costs, the CCR was able

18 to effect, in our judgment, very favorable settlements as a

19 consequence of representing in the negotiations the interest

20 of 20 companies as opposed to one company, so there were, we

21 believed, very substantial discounts on the cost of resolving

22 the asbestos case.  By cost I mean the settlement payment.

23       Similarly, with respect to defense costs, like the

24 organization which preceded it, the CCR arrangement was to

25 have one group of law firms, I think there were 50 or so

*United States District Court*
*Camden, New Jersey*

Hanly - Direct - Finch

1   nationwide defending the interests of all 20 members and that

2   was a significant savings for all the members, including

3   Turner & Newall, which, but for such an arrangement, would

4   have had to go out on its own through my firm and engage

5   counsel in all the jurisdictions where it was sued, which it

6   ultimately had to do after the CCR effectively collapsed.

7        Thirdly, the CCR provided very significant cover to

8   Turner & Newall, which is to say Turner & Newall, as a

9   consequence of being a part of this arrangement, was not the

10  focus very often of particular plaintiffs in the way in which,

11  for example, Owens Corning became by being a stand-alone

12  defendant.  Turner & Newall was sort of like a boy in a big

13  cornfield and folks couldn't really see it very well because

14  of the height of the corn.  So that was the third benefit to

15  Turner & Newall of being in an organization such as the CCR.

16  Q.   Given these benefits, why did Turner & Newall leave the

17  CCR in early 2001?

18  A.   Well, the CCR effectively had collapsed by the beginning

19  of 2001.  While legally the organization, the corporation

20  continued to exist, de facto it didn't exist.  A number of its

21  members had filed for bankruptcy in the preceding 12 months, a

22  number of the remaining members, and there were only a handful

23  who by then were out negotiating their own deals with the

24  plaintiffs' Bar, notwithstanding that they were still part of

25  this organization.  And so really de facto it just ceased to

United States District Court
Camden, New Jersey

Hanly - Direct - Finch

1  exist and we were forced, Turner & Newall was forced back out

2  into the tort system on its own.

3  Q.  What did you observe in terms of the numbers of claims

4  filings against Turner & Newall after it left the CCR?

5  A.  They increased dramatically.

6  Q.  Can we refer to this time period between January of 2001

7  and the time Turner & Newall filed for bankruptcy as the time

8  when it was a stand-alone defendant?

9  A.  Yes.

10  Q.  What were the settlement requirements that Turner &

11  Newall would require plaintiffs to show before it would pay a

12  claim during the time that it was a stand-alone defendant?

13  A.  Same as the CCR and before that the ACF and before that

14  that Turner & Newall had required all along, which was some

15  evidence sufficient to survive a motion for summary judgment

16  of exposure to Turner & Newall product and evidence of an

17  asbestos-related disease or condition.

18  Q.  What factors did you and the CCR take into account in

19  negotiating settlement amounts with plaintiffs during the --

20  both during the CCR and the post-CCR time period?

21  A.  Many different factors.  The severity of the plaintiff's

22  disease.  The strength of the evidence of exposure to a Turner

23  & Newall product.  The particular jurisdiction in which the

24  case was pending.  Different jurisdictions historically had

25  returned very different jury verdicts.  The history of the

*United States District Court*
*Camden, New Jersey*

Hanly - Direct - Finch

1  appellate courts in that jurisdiction in remitting or

2  otherwise modifying jury verdicts.  The identity of the

3  plaintiff's counsel, because as in all things in the practice

4  of law, some lawyers are better at trying cases than others.

5  Those were the main factors.

6  Q.  Would the severity of the plaintiff's disease come into

7  play?

8  A.  That was my number one factor, yes.

9  Q.  What about the identity of the plaintiff's doctor who was

10  providing the diagnosis or the B Reading report, how, if at

11  all, was that taken into account in the settlement process?

12  A.  Well, of course, B Reader reports were not material in a

13  large number of cases, including mesothelioma cases, as you

14  know.  But, generally speaking, identity of the plaintiff's

15  doctor, expert witness or treating physician would play some

16  role.  There were several doctors who we were aware of who,

17  where the interpretation of X-rays was relevant, were known to

18  have over-read so it played a factor.  It was all a part of

19  the factors that we considered in pricing cases.

20  Q.  Would the ability of the plaintiff to get a trial date or

21  a delay on the trial calendar play a role in the settlement

22  negotiation process?

23  A.  Absolutely.

24  Q.  How would that affect settlement values?

25  A.  Well generally speaking, the earlier you settle a case,

Hanly - Direct - Finch

1  at least in asbestos litigation, the cheaper you can resolve

2  the case for because the plaintiff has not expended a

3  significant cost associated with working a case up for trial.

4  So, the sooner you settled, the better. If you waited until

5  the case was what we call trial listed on the docket of a

6  judge with a firm or semi firm trial date, that could

7  materially affect the value upwards.

8  Q.  Are you familiar with the concepts of mass consolidations

9  or mass groupings of cases together?

10  A.  Yes, that occurred.

11  Q.  What impact, if anything, did mass consolidation of cases

12  have on the average settlement value paid to plaintiffs to

13  resolve, in a mass consolidation case?

14  A.  Well, essentially while being faced with the prospect of

15  5000 cases all consolidated whether for discovery or trial

16  could seem quite daunting, in fact the economics were quite

17  good for Turner & Newall. Mass consolidations, generally

18  speaking, resulted in lower per case averages. So, once you

19  got over the rapid heart beat thinking that you had to defend

20  5000 cases in one proceeding, the economics actually worked to

21  the benefit of Turner & Newall.

22  Q.  What happened to the average mesothelioma settlement

23  value during the time period that Turner & Newall was a stand

24  alone defendant as compared to the prior years when it was

25  within the CCR?

Hanly - Direct - Finch

1    A.   It rose very dramatically from -- I don't recall exactly

2    what it was, I think it was around $80,000 to 130 odd thousand

3    dollars, so it was some 75 percent increase, something,

4    something along those lines, in a one-year period.

5    Q.   What about the lung cancer values, what happened to those

6    during the time period Turner & Newall was a stand alone

7    defendant?

8    A.   Lung cancer, frankly I don't recall.

9    Q.   But the database would show that information?

10   A.   Oh, absolutely.

11   Q.   Just briefly on databases, did you and your firm keep

12   track of basic information about asbestos personal injury

13   claims filed against Turner & Newall in some kind of

14   electronic format?

15   A.   Yes, we did.

16   Q.   And did the CCR also do that?

17   A.   They did.

18   Q.   Were those databases used to form the basis of reports to

19   Turner & Newell's general counsel and the chief solicitor in

20   the U.S. and to upper management?

21   A.   Yes.

22   Q.   What was Turner & Newell's strategy with respect to the

23   nonmalignant claims that it was facing after it left the CCR

24   and became a standalone defendant again?

25   A.   Well, again, throughout the history of Turner & Newell's

*United States District Court*
*Camden, New Jersey*

83

Hanly - Direct - Finch

1  involvement in asbestos litigation, it's basic strategy as

2  across all cases was the same, to resolve the cases as cheaply

3  as possible. So, we tried in that relatively short period of

4  time to resolve the nonmalignancy claims, and resolved some,

5  but we really had our hands full dealing with the mesothelioma

6  cases, which for reasons that I guess ought to be obvious are

7  much more serious cases; that we basically tried to

8  back-burner the nonmalignant cases and we did so knowing,

9  knowing with certainty that had we not filed for bankruptcy,

10  that those cases would have to be dealt with by resolution or

11  by trial sooner or later.

12  Q.  Did you believe that the settlement values that were you

13  able to achieve in nonmalignant cases were sustainable absent

14  bankruptcy?

15  A.  No, they were not sustainable.

16  Q.  You believed they would go up?

17  A.  Yes.

18  Q.  And is that a function of being able to get the cases to

19  the trial calendar and other reasons?

20  A.  Yes. In many jurisdictions, in most jurisdictions, in

21  fact, those claims were capable of surviving summary judgment

22  and going to a jury for a jury to decide if there was

23  liability and, if so, the extent of damages.

24  Q.  During the two years prior to Turner & Newall filing for

25  bankruptcy protection, it was receiving claims at a rate in

*United States District Court*
*Camden, New Jersey*

————————Hanly - Direct - Finch————————

1  excess of 50,000 a year. Did the number of claims, the volume

2  of claims preclude Turner & Newall from defending the cases

3  against it or evaluating the strong cases versus the weak

4  cases, in your view?

5  A.   No, we continued to defend the cases as we had defended

6  the case throughout. The volume really had very little impact

7  on our ability to defend ourselves or to deal with the cases.

8  Q.   Would your answer be the same with respect to the post

9  Georgine -CCR period?  Did the volume preclude Turner &

10  Newell's ability to defend itself?

11  A.   No, I believe we did a good job of defending Turner &

12  Newall throughout the entire history of asbestos litigation in

13  the United States.

14  Q.   Let's turn to a few of those defenses. Did Turner &

15  Newall require in lung cancer cases that the plaintiff prove

16  that he also had an underlying diagnosis of asbestosis before

17  Turner & Newall would pay a settlement?

18  A.   No.

19  Q.   And why not?

20  A.   Because there is a body of medical literature out there

21  that suggests that a person can suffer a lung cancer, an

22  asbestos caused lung cancer even where that person doesn't

23  have this underlying condition that's called asbestosis. There

24  were medical articles in peer viewed publications which so

25  concluded and there were formidable medical experts who would

*United States District Court*
*Camden, New Jersey*

85

——Hanly - Direct - Finch——

1  take the stand and so testify.

2  Q.  Are you familiar with the concept of pulmonary function

3  tests?

4  A.  Sure.

5  Q.  Can you describe just briefly what a pulmonary function

6  test shows?

7  A.  There are different kinds, but the basic pulmonary

8  function test involves breathing into a tube and a computer

9  records, by reference to some standardized values, how you're

10 doing, whether your lungs are working at the level of a

11 25-year-old or 75-year-old.

12 Q.  Was a particular threshold score on a pulmonary function

13 test something that Turner & Newall would require before it

14 would settle a nonmalignant asbestos claim?

15 A.  Never.

16 Q.  And why not?

17 A.  Because pulmonary function tests to my knowledge have

18 never been required by any judge of any court anywhere in the

19 country to enable a plaintiff to get to a jury on the issue of

20 whether their lungs have been damaged by exposure to asbestos.

21 Q.  Was going to trial in an asbestos personal injury case

22 something that Turner & Newall tried to avoid?

23 A.  Yes.

24 Q.  Could you explain to the court why.

25 A.  Yes. First of all, these are very serious cases

*United States District Court*
*Camden, New Jersey*

Hanly - Direct - Finch

1  medically, often the plaintiff was dead or dying from an

2  asbestos-related disease. If we concluded that there was

3  evidence of exposure to a Turner & Newall product sufficient

4  to survive summary judgment, it was our belief that the claim

5  was indefensible.  And the reason for that is that the

6  criterion of liability is did the defendant place warnings on

7  its product of the hazards of asbestos.  And with respect to

8  Turner & Newall, the answer to that question uniformly across

9  all cases was no.

10  Q.  And as part of the element of the cause of action did the

11  plaintiff typically have to show that the asbestos defendant

12  knew or should have known that its asbestos fiber or asbestos

13  product was dangerous?

14  A.  Of course.

15  Q.  And did Turner & Newall have documents that made it

16  fairly easy for plaintiffs to establish liability in that

17  regard?

18  A.  Many.

19  Q.  Could you turn in your book to Plaintiffs' Exhibit 7.

20  A.  Yes.

21  Q.  What is Plaintiffs' Exhibit 7?

22  A.  This is an internal Turner & Newall document dating from

23  1930 and it is a series of excerpts or extracts from minutes

24  of the board of directors of Turner & Newall, LTD. and these

25  extracts, these were not extracted by counsel, these were

*United States District Court*
*Camden, New Jersey*

———————Hanly - Direct - Finch———————

1  extracts pulled together back in 1930 by Turner & Newall and

2  all of the extracts relate to the disease asbestosis and

3  Turner & Newell's clear knowledge of that disease and its

4  causes.

5  Q.  And the cause of asbestosis is exposure to asbestos?

6  A.  By definition.

7        MR. FINCH: Your Honor, we would offer Plaintiffs'

8  Exhibit 7.

9        MR. FRIEDMAN: No objection, your Honor.

10        THE COURT:  P-7 is in evidence.

11  (PLAINTIFF EXHIBIT P-7 WAS RECEIVED IN EVIDENCE).

12  BY MR. FINCH:

13  Q.  Did you ever have occasion to compare Turner & Newell's

14  cost of resolving cases through trials compared to its

15  settlement averages during the time you were its defense

16  counsel?

17  A.  Sure.

18  Q.  And what was the comparison?

19  A.  Trials were a disaster.

20  Q.  The trial verdicts were much, much higher than the

21  average settlement payment?

22  A.  Much, much higher.

23  Q.  Are you familiar, is that a reason why Turner & Newall

24  would seek to avoid trial?

25  A.  Of course.

88

Hanly - Direct - Finch

1   Q.   Were you familiar with the results for other asbestos

2   defendants who adopted a more aggressive strategy and would

3   try cases more often?

4   A.   Very familiar.

5   Q.   What happened to those defendants?   And let me break this

6   up.   Can you give me some examples?

7   A.   Sure.   Johns-Manville is the number one example. It took

8   a very aggressive posture in the nineteen-seventies and as a

9   consequence filed for bankruptcy in August of 1982.

10  Owens-Corning Fiberglass is another major asbestos defendant,

11  which beginning in 1995 engaged in a scorched earth

12  try-every-case strategy.   As a consequence of that, that

13  company is also in bankruptcy. Eagle Pitcher Corporation is

14  another example of a company which in the nineteen-eighties

15  tried a similar tact and that company swiftly ended up in

16  bankruptcy. There are no examples of any company ever having

17  adopted an aggressive trial strategy in asbestos litigation

18  where that company did not end up in Chapter 11.

19  Q.   Turning for a minute to one of the defenses that asbestos

20  defendants sometimes try, are you familiar with a defense

21  called the chrysotile defense?

22  A.   Sure.

23  Q.   Could you describe for the Court what that is?

24  A.   Sure. Your Honor, there is basically three kinds of

25  asbestos that has been used commercially and one kind is

Hanly - Direct - Finch

1  called chrysotile.  It's called white asbestos because it's

2  white in color. The other two kinds are the brown asbestos

3  that I mentioned, and the blue asbestos.

4       The chrysotile defense, your Honor, is a defense that

5  says that if the plaintiff only worked around white asbestos,

6  chrysotile asbestos, the plaintiff's mesothelioma cannot have

7  been caused by that exposure. And the defense is essentially a

8  scientific-based defense that says the nature of the

9  chrysotile fiber, the chemical constituents are such as to

10  disable that substance from causing that disease called

11  mesothelioma. So this was a medical defense, scientific

12  defense mounted by a number of companies but only by those

13  companies who only used that white asbestos in its products.

14  And so this was a trial defense that was used over many years

15  in asbestos litigation.

16  Q.  Was this a defense that was very often available to

17  Turner & Newall?

18  A.  No, it was -- it was not available to Turner & Newall

19  except in some very, very limited types of cases. It was not

20  available to Turner & Newall because Turner & Newell's -- the

21  principal source of Turner & Newell's liability lay with its

22  sales of the brown and the blue asbestos-containing products.

23  Q.  Are you familiar with the names of some of the defendants

24  who asserted the chrysotile defense in practically every case?

25  A.  Sure. Union Carbide, USG, or United States Gypsum

—————Hanly - Direct - Finch—————

1    Company, Armstrong World Industries.  There are others. I take

2    that back.  Armstrong, Armstrong not so often as the others.

3    Q.    And Union Carbide and USG's chrysotile defense was based

4    on the fact they made some chrysotile asbestos?

5    A.    USG didn't, but Union Carbide did.

6    Q.    Union Carbide. What were the categories of compensatory

7    damages that were available to asbestos personal injury

8    plaintiffs in a trial against Turner & Newall in the United

9    States?

10   A.    Well, the categories would be the same that would exist

11   in any kind of tort case, whether it was a car wreck case or

12   an asbestos case, so that would include so-called special or

13   economic damages such as medical expenses and lost wages and,

14   in the case of a decedent, funeral expenses and the like. And

15   then, of course, the general category of general damages such

16   as pain and suffering and loss of consortium and those sorts

17   of damages that are available in cases I dare say that are

18   tried in this court house every day.

19   Q.    Would it include the cost of past and future medical

20   care, for example?

21   A.    Sure, that would be part of the economic damages.

22   Q.    On the concept of pain and suffering and general damages,

23   what, if any, methods did judges both at the trial court level

24   and the appellate court level have to exert some control over

25   the magnitude of pain and suffering damages awarded in an

Hanly - Direct - Finch

1   individual asbestos personal injury case?

2   A.   Well, in most courts in most jurisdictions there is the

3   remedy of remitter, or remitting the damages, and asbestos

4   personal injury damage awards were remitted, in my experience,

5   in cases from New York to Pennsylvania to Texas to Florida.

6   Q.   And would remitter be something that could happen either

7   at the trial court level or on appeal?

8   A.   Sure.

9   Q.   And what were the -- my memory of tort law is if the

10  judgment or jury verdict shocks the conscience, the appellate

11  court could order a remitter, is that basically the way it

12  worked?

13  A.   That's basically the standard that was used in asbestos

14  personal injury cases. The analysis usually was by reference

15  to other asbestos-related injury claims, the values of those

16  claims usually in that jurisdiction would be the basis on

17  which the trial or appellate court would decide whether and to

18  what extent a damage award might be remitted.

19  Q.   Just a moment back on the chrysotile defense.  Was that

20  something that was often successful by the defendants who

21  asserted it?

22  A.   Very rarely successful. It's a very complicated

23  scientific defense that's beyond the acumen of most trial

24  lawyers, not to mention jurors.

25  Q.   And there is disputed medical evidence on the point, I

Hanly - Direct - Finch

1   take it?

2   A.   There is.

3   Q.   Did Turner & Newall ever suffer a judgment for punitive

4   damages in an asbestos personal injury case?

5   A.   Just once.

6   Q.   And when was that?

7   A.   It was in the late winter of 2001.

8   Q.   And do you know when that judgment was paid, if at all?

9   A.   It was bonded and paid recently, I think in the last

10  year.

11  Q.   Do you know if that judgment is in any way referenced in

12  the databases that your firm compiled?

13  A.   I believe it's not.

14  Q.   Did the settlement amount that Turner & Newall was paying

15  to resolve asbestos personal injury claims contain a dollar

16  component allocable to punitive damages in your view?

17  A.   No, never.

18  Q.   Can you explain why not?

19  A.   We didn't price cases on the basis of punitive damage

20  exposure, we priced cases -- priced case meaning, your Honor,

21  analyzing what the case should settle for -- based on the

22  strength of the product exposure evidence, the competence of

23  the plaintiff's lawyer and, most importantly, or equally

24  importantly the significance or severity of the

25  asbestos-related disease.

——————————Hanly - Direct - Finch——————————

1   Q.   Did you come to a view by the end of 2001 when Turner &

2   Newall filed for bankruptcy as to the extent of its overall

3   liability for asbestos personal injury claims as a stand alone

4   defendant as compared to when it was in the CCR?

5   A.   Yes, it was our view that the liability would be greatly

6   enhanced if Turner & Newall continued as a stand alone

7   defendant.

8   Q.   What factors led you to come to this view?

9   A.   20 years experience of observing what was happening to

10  members of the Asbestos Claims Facility and the CCR versus

11  what was happening to folks who were stand alone defendants.

12  The CCR members survived for a very long time and all the

13  others, including the examples I gave you ten or 12 questions

14  ago, ended up in bankruptcy a whole lot earlier.

15  Q.   Did the fact that Turner & Newall mesothelioma settlement

16  averages were increasing rapidly play a role in your view?

17  A.   Sure.

18  Q.   There was reference in the opening statement to something

19  called the Tweedale book on opening statement from the

20  Property Damage Committee. Do you know what that is?

21  A.   Sure.  It's a book written by a professor of industrial

22  history from the University of Manchester in England

23  concerning the Turner & Newall documents, more specifically

24  it's a history of Turner & Newell's awareness of the hazards

25  of asbestos over many decades and its response, or some would

94

──────────Hanly - Direct - Finch──────────

1   say lack of response to that knowledge.

2   Q.   Did you bring this book to the attention of anyone in say

3   December of 2002?

4        Let me withdraw the question. What impact did the

5   publication of the Tweedale book have on Turner & Newall

6   potential asbestos liability in your view?

7   A.   It had very material impact. And the reason for that is

8   that while the underlying documents which are referenced and

9   described in the book had been in principle available for some

10  six years before the publication of the book, they were --

11  they were available as part of a huge 8 million document

12  repository in Manchester, England. They were not condensed

13  into a kind of comic book form that's easily accessible, which

14  is the Tweedale book, which runs to about 200 pages and

15  summarizes hundreds of thousands of documents in a very

16  succinct fashion that is easy for a trial lawyer or even a

17  neophyte trial lawyer to pick up and use.

18  Q.   Is this a copy of that book?

19  A.   It is.

20       MR. FINCH: Your Honor, I'm not going to offer this as

21  an exhibit, but this was the book that was referenced.

22  BY MR. FINCH:

23  Q.   Would you agree that Turner & Newall only settled case

24  with asbestos personal injury plaintiffs where it believed

25  that the plaintiff a realistic ability to survive summary

*United States District Court*
*Camden, New Jersey*

95

—————— Hanly – Direct – Finch ——————

1  judgment such as that the trial of the case would present a

2  legal and economic risk to the company?

3  A.   Sure.

4  Q.   Did Turner & Newall follow settlement trial and

5  strategies designed to minimize its liability during the

6  entire course of its time in the tort system?

7  A.   Absolutely.  Turner & Newall was a publicly traded

8  company, it had responsibilities to its shareholders, and one

9  of its responsibilities was to minimize the outflow of cash.

10  Q.   Do you believe that you and Turner & Newall were

11  successful in minimizing its liability to the greatest extent

12  possible?

13  A.   I believe that we were.

14  Q.   Could you turn in your book to Plaintiffs' Exhibit 22?

15  A.   Yes, I have that.

16  Q.   Do you recognize this document, Mr. Hanly?

17  A.   Yes, I do.

18  Q.   How do you recognize it?

19  A.   Well, this is basically a narrative that I wrote along

20  with help from you to provide to the English counsel, the

21  English barrister, concerning the history of Turner & Newell's

22  liability exposure in asbestos personal injury litigation.

23  Q.   Are the statements in Plaintiffs' Exhibit 22 accurate in

24  your view?

25  A.   I, I certainly hope so.

*United States District Court*
*Camden, New Jersey*

──────Hanly - Direct - Finch──────

1        MR. FINCH: Your Honor, we offer Plaintiffs'

2   Exhibit 22.

3        MR. FRIEDMAN:  Your Honor, I object to hearsay and

4   Mr. Hanly has already given his testimony on the matters

5   contained in this exhibit.

6        MR. FINCH: Your Honor, I'm not offering it

7   necessarily for the truth, I'm offering it to show that it was

8   a foundation of something that Ms. Dohmann relied on in coming

9   to her opinions in this case in addition to his trial

10  testimony.  Her report was due before, obviously, the trial

11  and her report has been submitted in various places and I just

12  want to lay the foundation for that.

13        THE COURT:  On that basis?

14        MR. FRIEDMAN:  Your Honor, I think that could be

15  authenticated by Ms. Dohmann herself rather than this witness.

16        THE COURT:  She would only testified that she relied

17  on it.

18        MR. FINCH: He wrote it.

19        THE COURT:  And the foundation would come from this

20  witness that he prepared it.

21        MR. FRIEDMAN:  Yes, your Honor, but as to whether she

22  relied on it, it would be more proper for her to testify about

23  it as for admission as to whether it was relied on by a

24  witness in this case.

25        MR. FINCH: I'm laying the foundation that he wrote it

───────────── Hanly - Direct - Finch ─────────────

1   and that it exists and then she can testify that she relied on

2   it. I think it's admissible, your Honor.

3           THE COURT:  No, I think certainly it would be

4   admissible.  The weight of the information that's on here

5   certainly would depend on whether or not she relied upon it,

6   to the extent that it's reliable, as to her use, which,

7   incidentally experts, can rely on documents that might even

8   contain hearsay.

9           So, Exhibit 22 is in evidence.

10  (PLAINTIFF EXHIBIT P-22 WAS RECEIVED IN EVIDENCE).

11          MR. FINCH: Your Honor, if I just may have a brief

12  moment to consult with my learned counsel here, I may be done.

13          Your Honor, just to make sure that my notes are

14  consistent with the record, plaintiffs have offered Exhibit 3,

15  7, 19, 20, 22 and 52 into evidence during this direct

16  examination.

17          THE COURT:  Yes.

18  BY MR. FINCH:

19  Q.  Mr. Hanly, one final question. You testified that the

20  mesothelioma settlement average went from $80,000 in the years

21  prior to Turner & Newall becoming a stand alone defendant to

22  around $130,000 as a stand alone defendant, why, in your view,

23  was this increase in value?

24  A.  Because Turner & Newall had exited the CCR and was out in

25  the tort system on its own.

*United States District Court*
*Camden, New Jersey*

Hanly - Cross - Friedman

1      MR. FINCH: Your Honor, at this time I pass the

2  witness.

3      THE COURT:  It's now 12:30 and I think we're close

4  enough to it to recess for lunch.  On Tuesdays we have our

5  judges' meeting, it doesn't last for more than an hour, so I

6  anticipate being back here at 1:30. Now, you are going to be

7  testing our lunch facilities, I don't know what arrangements

8  have been made.  So try to get back here as close to 1:30 as

9  possible.

10      MR. FINCH: Thank you, your Honor.

11      (Recess).

12      (Open Court.)

13      DEPUTY CLERK:  All rise.

14      THE COURT:  You may be seated.

15      MR. FRIEDMAN:  Good afternoon, your Honor.  My name

16  is Peter Friedman from the firm of Weil, Gotshal & Manges on

17  behalf of the Property Damage Committee.

18      With your permission, I would like to approach you and

19  the witness with a cross-examination exhibit binder.

20      THE COURT:  Yes, you may.

21  (CROSS-EXAMINATION OF PETER J. HANLY, JR., BY MR. FRIEDMAN:)

22  Q.  Good afternoon Mr. Hanly.

23  A.  Good afternoon, Mr. Friedman.

24  Q.  We met for the first time this morning, right?

25  A.  That's correct.

99

Hanly - Cross - Friedman

1  Q.  And the Property Damage Committee didn't take your

2  deposition in this case, did we?

3  A.  No, you didn't.

4  Q.  But you did meet with my colleague Mr. Strochak for an

5  interview?

6  A.  Yes.

7  Q.  You told him some things about Turner & Newell's asbestos

8  history, is that right?

9  A.  Correct.

10  Q.  And those were true when you told him those things?

11  A.  Yes, sir.

12  Q.  Mr. Hanly, were you ever consulted by Federal Mogul's

13  auditors pre-petition regarding what the company's future

14  reported asbestos -- what T&N's future reported asbestos

15  liability was?

16  A.  When you say auditors, do you mean outside auditors or

17  in-house auditors.

18  Q.  I mean auditors who would have been operating in

19  connection with a 10-K filing, either outside or inside.

20  A.  I believe I certainly had communications with Mr. Lynch,

21  who was the CFO.  I don't recall specifically anyone else in

22  connection with any of the financial statements.

23  Q.  And your conversations with Mr. Lynch in connection with

24  the debtors were going to report T&N's future asbestos

25  liability?

*United States District Court*
*Camden, New Jersey*

———Hanly - Cross - Friedman———

1   A.   Well, certainly they would have been with respect to

2   T&N's asbestos liability.  If your question is with respect to

3   specific numbers, the answer to that would be no.

4   Q.   So you were not consulted in connection with the number

5   that the debtors put in their 10-Ks regarding their

6   anticipation of pending and future asbestos liability?

7   A.   Not with respect to the specific number, no.  I mean, it

8   likely would have come up, sir, but our role was never to

9   opine about specific gross aggregate numbers with respect to

10  asbestos liability.

11  Q.   Are you aware of what the debtors have reported in their

12  10-Ks as to T&N's pending and future asbestos liability?

13  A.   I am.  I believe it's about 1.4, 1.5 billion dollars,

14  maybe 1.6.

15  Q.   Have you ever advised the company that that's misleading

16  to have in their 10-Ks?

17  A.   I have not.

18  Q.   Before you mentioned the Hoskins case, I believe, as a

19  case in which punitive damages were awarded against Turner &

20  Newall, is that right?

21  A.   I didn't mention Hoskins, but that is the case.

22  Q.   Was that the case you were referring to?

23  A.   Yes, it was.

24  Q.   And you said the Hoskins case wasn't in the T&N database,

25  to the best of your knowledge?

*United States District Court*
*Camden, New Jersey*