—Hanly - Cross - Friedman—

1  A.  To the best of my knowledge, that's correct.

2  Q.  What's the basis of your knowledge about that?

3  A.  The basis from my knowledge about that is a conversation

4  I had with my partner about an hour ago.

5  Q.  Okay.  Do you recall was the Hoskins case a mesothelioma

6  case?

7  A.  Yes, sir.

8  Q.  And do you recall what the --

9  A.  Well, it was an alleged mesothelioma case.  I recall that

10  there were some issues as to whether, indeed, it was a

11  mesothelioma case because the man had out lived the usual

12  survival period after his diagnosis, but certainly it was an

13  alleged mesothelioma case.

14  Q.  And was the plaintiff awarded punitive damages in that

15  case?

16  A.  Yes, sir.

17  Q.  How much was the punitive damages award?

18  A.  I think it was about 7 million dollars of punitives and

19  maybe 2 million in compensatory.  I know the total award was

20  about 9 million.

21  Q.  And that verdict was in March of 2001, isn't that right?

22  A.  I will not dispute that it was sometime in the late

23  winter or early spring of 2001.

24  Q.  Did you settle mesothelioma cases on behalf of T&N after

25  the Hoskins verdict came down?

*United States District Court*
*Camden, New Jersey*

Hanly - Cross - Friedman

1  A.    I believe that we -- the answer to that must be certainly

2  yes, but I don't have any specific recollection of any

3  particular case settled after that point.

4  Q.    Did the punitive damages verdict in Hoskins affect the

5  pricing of those cases at all that you settled post-Hoskins?

6  A.    I don't believe so.

7  Q.    So you would have just been awarded -- so the company

8  would have been awarded 7 billion dollars in punitive damages

9  and that award didn't affect future prices?

10 A.    I think you misspoke.  You said billion, you meant

11 million.

12 Q.    Yes, 7 million.

13 A.    No, because the way it was evaluated, the cases, was

14 essentially looking at the compensatory element of the case

15 and that's how we priced them.

16 Q.    Mr. Hanly, the CCR was governed by a board of directors,

17 is that right?

18 A.    Yes, sir.

19 Q.    And you described before that there was a formula under

20 the Producer Agreement by which allocations of liability were

21 made to individual members of the CCR, is that right?

22 A.    Yes.

23 Q.    And three boards -- three CCR board seats were reserved

24 to CCR members who distributed the most amount of payments

25 under the Producer Agreement.  Isn't that right?

103

—Hanly - Cross - Friedman—

1  A.   That could be right, but I -- but I'm not recalling that

2  specific detail of the agreement.

3  Q.   Do you recall that Turner & Newall had a board seat on

4  the board of directors of CCR after 1991?

5  A.   Yes, sir, it did.

6  Q.   And it held its board seat until it departed the CCR,

7  isn't that right?

8  A.   That's correct.

9  Q.   Do you recall the basis for T&N being on the board of

10  CCR?

11  A.   I think it had to do with the size of its aggregated

12  share.  As I testified earlier, it had a different share per

13  occupational category.  But I believe, now that you mention

14  it, it did have to do with the size of its share.

15  Q.   It had one of the three largest aggregated shares among

16  CCR, isn't that right?

17  A.   I believe that to be the case.  Certainly in the second

18  half of the 1990's, sir, but I frankly don't recall prior to

19  say 1995 whether that was the case or not.

20  Q.   Do you recall if, in fact, it was in 1991 after Keene

21  departed the CCR, that CCR then actually assumed one of the

22  three largest shares of liability under the Producer

23  Agreement, does that sound like it's right?

24  A.   I frankly just don't recall that, sir.  It could be right

25  but I can't say that it is or it isn't.

Hanly - Cross - Friedman

1  Q.  Before, in your direct examination with Mr. Finch, you

2  referred to T&N as having been regarded in some respects as a

3  mini Manville, is that right?

4  A.  No, sir, I was referring to Keasbey & Mattison.

5  Q.  Keasbey & Mattison?

6  A.  Yes.

7  Q.  Okay.  Let me ask you for Keasby and Mattison cases.

8      Were those -- would cases that were brought against

9  Keasbey & Mattison count against T&N's overall share of cases

10  in CCR?

11  A.  I'm not sure I understand your question.  But, first of

12  all, Keasbey & Mattison was not sued because it didn't exist.

13  Turner & Newall was sued and alleged to be liable for the acts

14  of Keasbey & Mattison.  If what you're trying to get at is

15  whether the Keasby cases were part of the CCR share

16  evaluation, the answer is yes.

17  Q.  Okay.  Thank you, Mr. Hanly.

18      So raw fiber cases -- again, T&N was also part of the

19  number of cases that were settled by CCR on its behalf, is

20  that right also?

21  A.  Yes.

22  Q.  So the CCR are an all in number for cases against T&N

23  irrespective of the nature of the liability?

24  A.  Irrespective of the theory of liability, that's correct.

25  Q.  So it was Keasbey & Mattison that was referred to

—————Hanly - Cross - Friedman—————

1    sometimes as a mini Manville, is that right?

2    A.    Yes.

3    Q.    The number of cases again T&N based on its affiliation

4    with Keasbey & Mattison has decreased over time, isn't that

5    right?

6    A.    That is true, yes.  I testified to that on direct.

7    Q.    And Manville was a company, that I think we can agree,

8    had a very substantial asbestos liability, isn't that right?

9    A.    I certainly would agree with that.

10   Q.    You said that Turner & Newall resolved between 200 and

11   300,000 asbestos cases between approximately 1976 and 2001.

12   A.    I believe that to be the case.

13   Q.    And would CCR settle cases when it was not named as a

14   defendant?

15   A.    No.

16   Q.    Okay.  So in that time roughly, T&N was named as a

17   defendant at a minimum between 200 and 300,000 times, isn't

18   that correct?

19   A.    Yes, that would have to be correct.

20   Q.    Would you say that virtually every major asbestos

21   plaintiff's firm named T&N at some -- as a defendant at some

22   point or another during that time frame?

23   A.    Yes.

24   Q.    Now, post-Georgine, the CCR entered into a strategic

25   settlement program.  I think Mr. Finch showed you some

Hanly - Cross - Friedman

1  exhibits that were SSP type agreements, is that right?

2  A.   Yes, sir.

3  Q.   And would you say that the CCR entered into SSP type

4  agreements with many of the leading plaintiff firms, asbestos

5  plaintiff law firms.

6  A.   Yes, I would.

7  Q.   Do you remember whether T&N's allocated share under the

8  Producer Agreement was ever adjusted while it was a member of

9  the CCR?

10 A.   Yes, it was, I believe, on several occasions.

11 Q.   And was that as a result of T&N seeking an adjustment or

12 was it because other defendants argued that T&N was not paying

13 its fair share?

14 A.   The latter.  I don't recall -- I don't recall T&N ever

15 petitioning for a share adjustment of its own.  But just to be

16 clear, sir, in addition, T&N's share would have changed, for

17 example, when Keene left the facility and when other

18 defendants departed in the late 1990's.

19 Q.   Between the time Keene left in the late 1990's, did a

20 number of companies leave the CRR?

21 A.   Yes, sir.

22 Q.   What companies were those?

23 A.   Well, let me be clear, certainly if we include the year

24 2000, then we have Armstrong leave, USG left at some point

25 around 2000, I believe.  Oh, GAF, of course, left in the late

Hanly - Cross - Friedman

1  '90's.

2  Q.   Do you recall what the occupational categories where T&N

3  had the most liability were under CCR, under the CCR sort of

4  schematic of occupations?

5  A.   I believe insulator, but I'm not -- I'm just not 100

6  percent certain.  I know that the percentages were not

7  dramatically different for T&N as across the different

8  categories and subcategories but I don't, I just frankly don't

9  recall.

10  Q.   Do you remember how high T&N's allocated share in any

11  individual category went?

12  A.   At any time?

13  Q.   Yes.

14  A.   Yes, it went quite high at the end, it was up in the 20s

15  or maybe even 30 percent in some category.

16  Q.   What about pre-2000?

17  A.   I think the highest it went was to somewhere in the teens

18  with respect to maybe one category or, you know, 10, 11, 12,

19  something.

20  Q.   And that was before some of the other larger members of

21  the CCR departed the CCR, right?

22  A.   Yes, that's correct.

23  Q.   Now, in the personal injury cases where you defended T&N,

24  there was often discovery against T&N, right?

25  A.   Well, there was discovery.  The extent of discovery

—————————————— Hanly - Cross - Friedman ——————————————

1   changed very dramatically, sir, depending on what decade or

2   particular year you would be talking about.

3   Q.  But plaintiffs sometimes sought discovery about the

4   products that T&N, the asbestos-containing process that T&N

5   manufactured, right?

6   A.  Yes, they always sought discovery.  The extent to which

7   discovery was engaged in varied over time because there were

8   times when T&N settled a whole bunch of cases and so the

9   plaintiffs discontinued the discovery, that's all that it

10   went.

11   Q.  There were also times it didn't and discovery proceeded?

12   A.  Oh, sure.

13   Q.  And plaintiffs sought documents about where T&N products

14   were distributed, isn't that right?

15   A.  That's correct.

16   Q.  And that would include work sites and other kinds of

17   locations where product was distributed?

18   A.  Yes, sir.

19   Q.  And if cases went to trial, plaintiff lawyers would use

20   those documents to prove up their cases, is that right,

21   against T&N?

22   A.  Yes.

23   Q.  Did you say T&N started trial between 25 and 40 times

24   when you were counsel or was that verdicts?

25   A.  No, the question I was asked was how many trials I had

—————————————————————————— Hanly - Cross - Friedman ——————————————————————————

1    started up, at least I understood it to be asking me how many

2    trials I personally had started up, and my testimony was 25 to

3    40.  But there were other counsel who used -- who would be

4    added to that number, which is to say T&N probably started up

5    trials in 100 to 200 cases over the course of those years.

6    Q.   And when T&N went to trial in those 100 to 200 cases, the

7    plaintiff sought to, maximize the damages they could recover

8    against T&N?

9    A.   As they did against every other defendant, yes, sir.

10   Q.   And plaintiffs at least sought punitive damages against

11   every -- sought punitive damages against T&N, is that right?

12   A.   Certainly I would say that in the vast majority of cases,

13   except for cases brought in the limited number of

14   jurisdictions that prohibited punitive damages in asbestos

15   cases, that punitive damages were sought in the complaint.

16   But its quite a separate issue as to the extent to which

17   punitive damages were pursued as the case unfolded.

18   Q.   Were they frequently pursued as cases unfolded?

19   A.   Certainly they were pursued in the cases that started up

20   trials, but the number of trials that went to verdict, the

21   number of times that T&N went to verdict in trials over the

22   course of the 25 years you could count on two hands.

23   Q.   Cases that settled on the eve of trial and after trial

24   had started but prior to a verdict --

25   A.   Yes.

Hanly - Cross - Friedman

1   Q.   -- were more costly for T&N, isn't that right?

2   A.   Sure, that's true of any defendant in asbestos.

3   Q.   Mr. Hanly, as a general matter, T&N tried to resolve

4   non-malignant claims when it could prior to trial, is that

5   right?

6   A.   Yes.

7   Q.   Tried to resolve them for the lowest cost possible?

8   A.   Yes, sir.

9   Q.   And that was a strategy while you were representing it,

10  isn't that right?

11  A.   Throughout the time, yes, sir.

12  Q.   And is that a strategy you intended on continuing after

13  2000 when it was a stand-alone defendant?

14  A.   Yes, sir.

15  Q.   So you -- Mr. Hanly, you and Mr. Finch discussed certain

16  documents indicating T&N's management knew about health issues

17  associated with asbestos as far back as the 1940's, correct,

18  even further back, the 1920's?

19  A.   Yes, sir.

20  Q.   When did plaintiffs first seek those documents in

21  discovery?

22  A.   Well, again, I'm trying to answer your questions very

23  precisely.  They sought them presumably in the first discovery

24  set that was served in 1977.  Documents were produced in the

25  United States over the years, but the first full scale review

Hanly - Cross - Friedman

1   of the entire repository took place in December of 1985.

2   Q.   And who conducted that full scale review?

3   A.   Lawyers from the firm that's now known as Motley Rice.

4   Q.   So they were given access to all documents in the T&N

5   repository?

6   A.   Well, they were given access to all documents in the T&N

7   repository save, of course, for privileged documents that were

8   in the T&N repository at that time.  I'm not trying to dance

9   with you, sir, it's just a little more complicated than that.

10  The repository changed, got added to over the years.

11  Q.   Do you recall approximately how many documents were

12  available in 1985?

13  A.   Yes, in 1985 there were probably a million documents,

14  something like that.  That number grew substantially over the

15  ensuing decade.

16  Q.   And did plaintiffs continue to ask for those documents?

17  A.   Well, they asked for them, sir, but they didn't follow up

18  very often, which is to say they asked for them, we said fine,

19  you can come and visit Manchester, England and review them in

20  the place they're maintained.  But very few people, very new

21  plaintiff's counsel actually spent the money and the time to

22  do so.

23  Q.   Mr. Hanly, would you consider Mr. Motley to be a very

24  sophisticated plaintiffs lawyer?

25  A.   One of the most sophisticated.

United States District Court
Camden, New Jersey

Hanly - Cross - Friedman

1  Q.  Now, you defended T&N in an asbestos property damage

2  lawsuit by Chase Manhattan Bank, isn't that right?

3  A.  Yes, sir.

4  Q.  And that was litigated in federal court in the Southern

5  District of New York?

6  A.  Yes, sir.

7  Q.  And Chase obtained a large number of, if not all of the

8  documents that we've just been discussing, isn't that right?

9  A.  Yes, by the time Chase was engaged in full scale

10  discovery, the repository, to the best of my knowledge, was

11  complete, which is to say we had gathered the relevant

12  documents from all the different locations and Chase had

13  access to the entirety of the repository and microfilmed all,

14  virtually all of it.

15  Q.  So they made a computerized database I think, is that

16  right?

17  A.  Well, I don't think that that's correct, sir.  This was

18  the period around '92, '93, they microfilmed everything.  And

19  so there were microfilm or microfiche copies of these

20  documents, but I never knew whether they were computerized in

21  some fashion or not.

22  Q.  Do you know if Chase brought copies of the microfiches

23  back to the United States?

24  A.  I do know that they did.

25  Q.  And there was an attorney at Chase who essentially made

United States District Court
Camden, New Jersey

Hanly - Cross - Friedman

1  it his business to try to disseminate those documents as

2  widely as possible, isn't that right?

3  A.   Yes.

4  Q.   And he shared them with a lot of plaintiff's attorneys,

5  didn't he?

6  A.   Well, I know that Mr. O'Connor, who was the attorney at

7  Chase, certainly held himself out to have these documents and

8  make them available.  I don't know to what extent plaintiffs

9  lawyers purchased them, if they were required to purchase the

10  copies, I just don't know.  I know that Mr. O'Connor certainly

11  held himself out as having documents which he was willing to

12  share with plaintiffs bar.

13  Q.   Do you recall if an attorney named Steve Kazan obtained a

14  copy of those documents?

15  A.   Mr. Kazan and his firm obtained many of those documents.

16  Mr. Kazan sent one of his partners separately to Manchester

17  and she spent quite a long time there looking at documents.

18  So Mr. Kazan certainly had access to the documents that Chase

19  had.

20  Q.   And that was as early as 1993, isn't that right?

21  A.   Yeah, I think that's about right.

22  Q.   And would you also consider Mr. Kazan to be the most

23  sophisticated plaintiff's attorneys around?

24  A.   Mr. Kazan is an excellent asbestos plaintiff's attorney,

25  that's correct.

————Hanly - Cross - Friedman————

1   Q.   Who achieves extraordinary results for his clients in

2   many cases?

3   A.   He does indeed.

4   Q.   Do you remember in 1993 there was an article in <u>Mother</u>

5   <u>Jones</u> magazine about the Chase depository documents?

6   A.   I didn't recall that until I saw your exhibit list and

7   then I recalled it, yes.

8   Q.   Do you recall another article about those documents in a

9   magazine called the Journal of Business and Economic History?

10  A.   Yes, David Jeremy's article.

11  Q.   That was published in 1995, right?

12  A.   About that time, yes, sir.

13  Q.   The Chase case went to trial, isn't that right?

14  A.   Yes, sir.

15  Q.   And Chase used many of those documents against T&N in

16  open court, is that correct?

17  A.   Yes, sir.

18  Q.   And with you as counsel, T&N won that case, is that

19  right?

20  A.   We were fortunate, yes, sir.

21  Q.   I would like to ask you to look at Exhibit 71 in your

22  binder, and if you'll turn to the second page in that binder.

23  A.   The second page of 71, sir?

24  Q.   Yes.  This was an article in the American Lawyer about

25  the Chase case, isn't that right?

—Hanly - Cross - Friedman—

1    A.    That's correct.

2    Q.    And that's you on Page 3, is that right?

3    A.    That's a younger me, yes, sir.

4    Q.    And if you look on PD 00710004 --

5    A.    Yes, sir.

6    Q.    -- in the first paragraph, do you recall that in this

7    article that the author actually quoted Arthur Liman, who is

8    counsel in that case, quoting from specific documents --

9    A.    Sure.

10    Q.    -- from T&N?

11    A.    Sure.

12    Q.    And if you look to PD 00710006, do you recall also that

13    certainly Chase Manhattan intended to arm the English

14    plaintiff's bar with these documents, isn't that right?

15    A.    Yes, sir, and I believe that they did.

16    Q.    And also, if you look in the second to last full

17    paragraph, do you recall that a British member of Parliament

18    sought to put the T&N documents in the House of Commons

19    library?

20    A.    Yes, do remember that.

21    Q.    Did that occur?

22    A.    I think it did.

23    Q.    Is that a public file?

24    A.    Yes, I think so.

25            MR. FRIEDMAN:  Your Honor, I would move Property

Hanly - Cross - Friedman

1  Damage Committee 71 into evidence.

2          MR. FINCH:  No objection, your Honor.

3          THE COURT:  71 is in evidence.

4          MR. FINCH:  Is this defendant's Exhibit 71?

5          MR. FRIEDMAN:  Yes, defendant's.  Thank you, Mr.

6  Finch.

7          (DEFENDANT EXHIBIT 71 WAS RECEIVED IN EVIDENCE.)

8  BY MR. FRIEDMAN:

9  Q.   Mr. Hanly, before 1996, did T&N have very much insurance

10 to cover its asbestos liabilities?

11 A.   Well, at one time it had insurance but by then it had run

12 out.

13 Q.   And in 1996, T&N purchased an insurance policy to cover

14 at least a portion of its asbestos liability, correct?

15 A.   Correct.

16 Q.   And was that known as the Hercules policy?

17 A.   Yes, it was.

18 Q.   Do you recall how much coverage that provided T&N?

19 A.   Yes, approximately, I recall that there was a

20 self-insured retention of, I want to say 500 million pounds

21 above which sat coverage of 696 million pounds, I believe.

22 Q.   Do you happen to remember how much in terms of dollar

23 coverage that provided at the time?

24 A.   Yes, the exchange rate was fixed in the contract of

25 insurance at, I think $1.65.

United States District Court
Camden, New Jersey

Hanly - Cross - Friedman

1  Q.  I don't have my calculator, so it provided T&N with

2  roughly --

3  A.  About 900 million dollars, something like that.

4  Q.  Okay.  And you were aware that plaintiff's lawyers knew

5  about the existence of the Hercules policy, isn't that right?

6  A.  Oh, sure.

7  Q.  Was it a pretty widely known fact that Turner & Newall

8  had purchased roughly 900 million dollars in insurance

9  coverage?

10  A.  Yeah.  Sure.  Because, as you know, sir, in any case you

11  are entitled to insurance coverage information and that was

12  sought and produced.

13  Q.  Did the existence of that policy make T&N an attractive

14  target to plaintiff's lawyers?

15  A.  Well, it certainly would have made it an attractive

16  target if T&N had been standing alone.  But, of course, these

17  were the CCR years and I can't entirely agree with you that

18  T&N became a target as a consequence of that coverage because

19  the plaintiff's lawyers were negotiating with CCR and T&N was

20  not pulled out and focused on at that point in time.

21  Q.  Mr. Hanly, while you represented T&N, it had an annual

22  budget for dealing with asbestos personal injury claims,

23  right?

24  A.  Yes, sir.

25  Q.  And that included both defense costs and indemnity

—————— Hanly - Cross - Friedman ——————

1  payments, is that right?

2  A.   Yes, it was a budget that the company hoped to meet.  But

3  as with all budgets, it wasn't always met.

4  Q.   But it was part of your responsibility to manage

5  resolution of claims in a way that attempted to meet the

6  annual budget, is that right?

7  A.   Yes, sir.

8  Q.   And the company advised you how much each year it wanted

9  to spend?

10  A.   Generally, yes.

11  Q.   And you did your best to try to meet that?

12  A.   I did the best I could.

13  Q.   I would like to ask you some questions about T&N's

14  product and the products that it imported into the United

15  States.

16  A.   Yes, sir.

17  Q.   Would you agree with the statement that T&N did not

18  extensively market its products in the United States?

19  A.   You know, that's a hard question -- that's a hard

20  question to answer because it's so general.  T&N did not

21  extensively market certain of its products at all in the

22  United States, but with respect to others, it did market some

23  of those products extensively, such as raw fiber.

24  Q.   If the debtors made the representation in the disclosure

25  statement that T&N did not extensively market its products in

Hanly - Cross - Friedman

1  this country, would that be inaccurate?

2  A.   No, it's not inaccurate, it's, I think, a little over

3  general is my belief.

4  Q.   Now, you were talking about raw fiber.

5  A.   Yes, sir.

6  Q.   Raw fiber suits were less frequent than suits claiming

7  exposure to Limpet, is that right?

8  A.   That's probably correct, yeah.

9  Q.   And less frequent than suits over purported exposure to

10  Keasbey & Mattison products against T&N, is that right?

11  A.   There were fewer raw fiber based suits than there were

12  Keasbey & Mattison suits.

13  Q.   Okay.   T&N had an asbestos fiber brokerage subsidiary,

14  meaning TAF, is that right?

15  A.   Yes, sir.

16  Q.   And the majority of the asbestos fiber that TAF brokered

17  was bought by T&N's own UK companies, isn't that right?

18  A.   Yes, that's correct.

19  Q.   And then those companies used the fibers they bought from

20  TAF in their own products, isn't that right?

21  A.   Yes, sir.

22  Q.   A portion of the fiber claims was brought by longshoreman

23  unloading ships carrying fiber from Africa, is that right?

24  A.   Yes, sir.

25  Q.   Were those cases generally handled in federal court under

*United States District Court*
*Camden, New Jersey*

Hanly - Cross - Friedman

1  the Longshoreman and Harbor Worker's Compensation Act?

2  A.    Some of them were, but not all of them.

3  Q.    Did T&N generally prefer to be in federal court over

4  state court?

5  A.    It depended.  It really depended, sir.  There were some

6  jurisdictions where it didn't make any difference whatsoever.

7  Q.    Well, would you agree that it preferred to be in federal

8  court after the federal MDL was established by Judge Wiener

9  presiding over pretrial discovery?

10  A.    Well, sure, I would agree that it would have that

11  preference.  But there were very few cases that actually got

12  MDL as to which Turner & Newall was a defendant.

13  Q.    Now, TAF brokered a minuscule amount of the raw fibers

14  sold in America, didn't it?

15  A.    Sure.  Sure.  If you're talking about all fiber, every

16  manufacturer in the United States, that would be a very small

17  percentage.

18  Q.    In fact, over a 45 year period ending in 1976, TAF

19  brokered only about 40, 50 thousand total tons of raw fiber,

20  is that right?

21  A.    That number sounds about right.  I don't know whether I

22  could agree with your only, the use of your term only, but I

23  think the number, the tonage was about what you say.

24  Q.    Actually 400,000 tons.  It would be closer to 400,000

25  tons?

*United States District Court*
*Camden, New Jersey*

Hanly - Cross - Friedman

1  A.   That's about right.

2  Q.   And do you recall if from the 1950's to early 1970's

3  nearly a million tons of asbestos fiber were used annually in

4  the United States?

5  A.   I know the number was around that magnitude.  I used to

6  have an interest in that.

7  Q.   So would you agree with the statement in the debtors

8  disclosure statement that TAF brokered only a tiny fraction of

9  all asbestos fiber that reached the United States?

10  A.   Sure, I think -- I think that that percentage was very,

11  very small.

12  Q.   Now, you said the jurisdiction in which a claim was

13  pending would sometimes make a difference as to settlement,

14  the amount of settlement, is that right?

15  A.   Yes, sir.

16  Q.   Was Texas a particularly bad jurisdiction for defendants?

17  A.   From time to time, yes, sir.

18  Q.   And was Mississippi a particularly bad jurisdiction for

19  defendants?

20  A.   Certainly it was in the late 1990's.  Prior to that

21  point, it was a sleeper jurisdiction.

22  Q.   Did you actually see more cases go to Mississippi as the

23  jurisdiction got more and more difficult from a defense

24  perspective?

25  A.   For a period of time between 1998 and about 2000 that

*United States District Court*
*Camden, New Jersey*

Hanly - Cross - Friedman

1   would be true, yes.

2   Q.   And that was after the Cosey case was decided isn't that

3   right?

4   A.   Yes, sir.

5   Q.   In the Cosey case there was a substantial punitive

6   damages award to non-malignant -- to plaintiffs claiming

7   non-malignant injuries, isn't that right?

8   A.   No, sir, there were no punitive damages awarded in the

9   Cosey case, the case was settled on the compensatory.

10  Q.   Was it settled for the full value of the compensatory

11  award?

12  A.   Yes, sir.

13  Q.   Did you represent one of the defendants in the Cosey

14  case?

15  A.   Yes, sir.

16  Q.   Were you concerned that the jury would come back with

17  punitive damages?

18  A.   No, because I was out on a directed verdict.

19  Q.   Okay.  So there was no opportunity for the jury to issue

20  punitive damages against the defendants in that case?

21  A.   Not with respect to the defendants I represented, which

22  was Turner & Newall and one of its subsidiaries.

23  Q.   Hadn't Turner & Newall -- Turner & Newall had been

24  dismissed because of lack of product identification?

25  A.   Yes, sir.

Hanly - Cross - Friedman

1   Q.   Were there other Federal Mogul companies that had been

2   dismissed?

3   A.   Yes, there was one, and it got dismissed on a directed

4   verdict, which is equivalent of a Rule 50 judgment as a matter

5   of law, it wasn't called that.

6   Q.   Do you know if other defendants were concerned about

7   punitive damages being awarded?

8           MR. FINCH:  Objection, your Honor.  Calls for

9   speculation.

10          THE COURT:  Only to the extent that he might have had

11  some direct information.  But just to speculate, I'll sustain

12  the objection.

13  BY MR. FRIEDMAN:

14  Q.   To the extent you were involved in CCR meetings where you

15  had direct knowledge of that.

16  A.   Certainly the issues of punitive damages was discussed

17  among counsel who spent that month or so in Jefferson County,

18  Mississippi.

19  Q.   Would you agree that after Cosey, there were a lot more

20  cases filed in Mississippi?

21  A.   Oh, yeah.

22  Q.   In October 2001, you were a partner in the law firm of

23  Coblence & Warner, is that correct?

24  A.   Yes, sir.

25  Q.   I would like you to take a look at Exhibit, Exhibit No.

*United States District Court*
*Camden, New Jersey*

Hanly - Cross - Friedman

1  10, please, in the binder.

2  A.   Okay.

3  Q.   And this is the debtors' informational brief submitted to

4  the bankruptcy court in this case, is that correct?

5  A.   Yes, it looks to be that.

6  Q.   And if you look at the last page of that exhibit --

7  A.   Yes.

8  Q.   -- on the right-hand side up on the screen, that's --

9  A.   That's my name.

10  Q.   That's your name.  So did you participate in the

11  drafting?

12  A.   Yes, I did.

13  Q.   And were you aware of its contents when it was submitted?

14  A.   Sure.

15  Q.   The factual assertions in it were true when they were

16  made, weren't they?

17  A.   Certainly to the extent that I participated in their

18  drafting, yes.

19  Q.   The debtors weren't trying to mislead the Court when they

20  submitted this brief, were they?

21  A.   Certainly not, to my knowledge.  I would have been very

22  surprised and objected if they had.

23  Q.   You're familiar with the term unimpaired claimant, isn't

24  that right?

25  A.   Yes, sir.

*United States District Court*
*Camden, New Jersey*

Hanly - Cross - Friedman

1   Q.   Was it a problem for T&N when a claimant with

2   mesothelioma or cancer joined his or her claim with the claim

3   of a person who was unimpaired?

4   A.   That was a problem that was certainly discussed at the

5   CCR level.  Whether it ever was a particular problem for T&N

6   in any particular case, I frankly just don't recall, sir.

7   Q.   Well, do you agree that unimpaired claimants benefited

8   because of sympathy by association with claimants who are

9   actually sick?

10  A.   That certainly is a dynamic that could well happen at the

11  trial of a case.  Sure.  If you had a person who was dying of

12  mesothelioma joined with a plaintiff who was not exhibiting

13  any signs of distress, certainly that presents a dynamic at a

14  jury trial that most defense lawyers would try to avoid.

15  Q.   If you'd look the pages Bates No. 00100020.

16  A.   2-0 did you say?

17  Q.   Yes, 2-0 at the end.

18  A.   Is that the one with the footnotes.

19  Q.   The four footnotes.

20  A.   Yes, I have it.

21  Q.   Okay.  And in the fourth sentence, do you agree with the

22  statement in this brief that aggregation makes it more likely

23  the defendant will be found liable and result in significantly

24  higher damage awards?

25  A.   That comes from Castano, doesn't it?

*United States District Court*
*Camden, New Jersey*