IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | **Chapter 11** |
| **USG CORPORATION,** | : | |
| a Delaware corporation, et al., | : | **Jointly Administered** |
| | : | **Case No. 01-2094 (JKF)** |
| Debtors. | : | |
| | : | |
| | : | |
| _____ | : | |
| **USG CORPORATION, et al.,** | : | |
| | : | |
| Movant | : | |
| | : | |
| v. | : | |
| | : | **Civil Action No. 04-1559 (JFC)** |
| **OFFICIAL COMMITTEE OF** | : | **Civil Action No. 04-1560 (JFC)** |
| **ASBESTOS PERSONAL INJURY** | : | |
| **CLAIMANTS, et al.,** | : | **Hearing:    10/06/05 11:30 a.m.** |
| | : | |
| Respondents. | : | |

## DEBTORS' REPLY BRIEF IN SUPPORT OF MOTION FOR APPROVAL OF SAMPLING PLAN AND CLAIMANT QUESTIONNAIRE

COOLEY GODWARD LLP
Stephen C. Neal (CA 170085)
Scott D. Devereaux (CA 146050)
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306
Tel: (650) 843-5000

RICHARDS, LAYTON, & FINGER, P.A.
Daniel J. DeFranceschi (DE No. 2732)
Paul Heath (DE No. 3704)
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Tel: (302) 651-7700

JONES DAY
David G. Heiman (OH 0038271)
Brad B. Erens (IL 6206864)
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Tel: (216) 586-3939

Counsel for Debtors

## TABLE OF CONTENTS

PAGE

I.    INTRODUCTION...................................................................................1

II.   DISCUSSION......................................................................................3

    A.    This Court and Others Have Recognized the Propriety of
        Claimant Discovery...................................................................3

        1.    There is no "established method" for estimating
                claims exemplified by the Eagle Picher, Owens
                Corning, and Federal Mogul cases, and both past
                and recent estimations have taken a merits-based
                approach..................................................................4

        2.    Estimation of the aggregate value of personal
                injury claims does not violate due process...............5

    B.    The Relevance of the Sample Discovery to the
        Consideration of the Merits of Claims is Undeniable...............6

    C.    Debtors' Sampling Plan Is Sound, But Debtors Are
        Willing to Adjust It to Address Certain Criticisms..................8

        1.    Pursuant to the FCR's input, Debtors will sample
                an additional 1000 claimants whose occupations
                are unknown...........................................................8

        2.    Adding closed claims to Debtors' Sample would
                impose undue burdens on non-parties to this
                estimation and is not necessary...............................10

        3.    There is also no basis to omit older claims from
                Debtors' Sample...................................................10

        4.    The discrepancies between the number of
                pending claims in Debtors' and the FCR's
                databases arise, principally or entirely, from
                differences in what claims the parties treat as
                "pending."............................................................11

    D.    The ACC and FCR's Objections To Debtors'
        Questionnaire Lack Merit, But Debtors Have Agreed to
        Some Modifications.................................................................12

        1.    Completing Debtors' Questionnaire is not
                unduly burdensome for claimants.............................13

TABLE OF CONTENTS
(CONTINUED)

PAGE

2.   There is no substitute for claimants' relevant medical records and they are not unduly burdensome to produce ................................... 14

3.   Debtors have good bases for seeking social security numbers, past settlements, and information on alcohol and drug abuse. ....................... 15

4.   The time frames set forth in the August 12 Joint Filing are realistic and appropriate ............................... 16

III.   CONCLUSION ..................................................................................... 18

- ii -

# TABLE OF AUTHORITIES

PAGE

**CASES**

*Bittner v. Borne Chem. Co.*,
   691 F.2d 134 (3rd Cir. 1982)................................................................4

*Cimino v. Raymark, Industries Inc.*,
   151 F.3d 297 (5th Cir. 1998)..........................................................5, 6

*In re A.H. Robins Co.*,
   788 F.2d 994 (4th Cir. 1986).............................................................5

*In re G-I Holdings, Inc.*,
   323 B.R. 583 (Bankr. D.N.J. 2005)..................................................4

*In re W.R. Grace*,
   No. 01-1139 (Bankr. D. Del. Aug. 29, 2005)...................... *passim*

**STATUTES**

11 U.S.C. §§ 502(c), 524(g) (2005).....................................................5

Fed. R. Bankr. P. 3003(c)(3) (2005)..................................................14

Fed. R. Bankr. P. 7026-37 (2005)........................................................3

Fed. R. Civ. P. 26-37 (2005)................................................................3

# I.    INTRODUCTION.

The ACC and FCR's oppositions to the Motion for Approval of Debtors' Sampling Plan and Claimant Questionnaire (the "Oppositions") begin by trying to resuscitate the previously briefed and previously rejected notion that the Court should forbid all claimant discovery.[1]  As the Court made clear on September 20, the day after the Oppositions were filed, "[i]f the Debtors wish to get information with respect to claimants, they're going to be entitled to do that... [T]here will be sampling because [Debtors are] entitled to get information about the claimants." (Sept. 20, 2005 Hr'g Tr. at 6:2-4, 7:17-18.)  The Court further explained:

> [I]f the debtor is going to proceed with an estimation theory, they're going to be allowed to get the evidence they feel is necessary to make their claim in this case.  I'm not going to cut them off at the pass, which is what [the ACC] want[s] to do.  [The ACC] want[s] me to look at the historical information.

(*Id.* at 34:15-21.)  This is consistent with the Delaware Bankruptcy Court's ruling in *In re W.R. Grace*, which approved a discovery questionnaire to be completed by each of the 118,000 personal injury claimants in that action.  *See In re W.R. Grace*, No. 01-1139 (Bankr. D. Del. Aug. 29, 2005), Case Management Order for the Estimation of Asbestos Personal Injury Liabilities, attached hereto as Exhibit A ("*Grace* CMO").

The Oppositions go on to criticize the utility of and methodology underlying Debtors' Sampling Plan and Questionnaire.  The ACC and FCR claim, again, that they cannot grasp how the information gathered by Debtors' Questionnaire is germane to the consideration of the merits of the claims in estimation.  As Debtors have repeatedly explained, claimant discovery will make it possible for the Court to assess the percentage of claims that have the characteristics of a valid

---

[1] The terms "Debtors", "the ACC" and "the FCR" will have the meanings given them in Debtors' April 26 Brief Regarding Request for Discovery in Advance of Hearing on Issues to be Considered in Estimation, D.I. 10. The terms "Debtors' Questionnaire" and "Debtors' Sampling Plan" will have the meanings given them in Debtors' August 19, 2005 Motion for Approval of Debtors' Sampling Plan and Claimant Questionnaire, D.I. 35 ("Debtors' Motion").  The term "Debtors' Sample" refers to the sample of claimants Debtors will draw under Debtors' Sampling Plan.

claim. For example, the Questionnaire will provide meaningful evidence regarding the percentage of claimants who have an asbestos-related disease and exposure to U.S. Gypsum's products sufficient to cause that disease. Similarly, it is now widely known that many asbestos plaintiffs' diagnoses are a product of unethical, if not fraudulent, conduct by certain plaintiffs' attorneys and prolific B-readers. The Questionnaire enables the Court to assess the percentage of claimants who rely on invalid diagnoses.

The FCR also argues that a sample of pending claims would not be representative of the characteristics of future claims. With one arguable exception, the FCR's claims concerning the insufficient parity between pending and future claims are unfounded. The FCR asserts that a sample of 1000 claimants whose occupations are known may not adequately represent the portion of claimants whose occupations are shown in the CCR database as "unknown." As Debtors have said before, they have no objection to taking steps to ensure that the sample will be as representative and useful as possible. Consequently, while Debtors dispute that the sampling of only claimants with a known occupation would introduce meaningful uncertainty, Debtors will accommodate the FCR's concern by sampling 1000 claimants with unknown occupations as well. This will further ensure that the sample tested is representative of both the pending and future claims.

The ACC and FCR next complain that a number of items in Debtors' Questionnaire seek detailed information that is time consuming to collect, that is sensitive, or that claimants do not have or cannot get. The claimants who will be sampled have all filed lawsuits against U.S. Gypsum (and dozens of other defendants) alleging that they have an asbestos-related disease, that they were exposed to U.S. Gypsum's products, and that this exposure caused their disease. It is not unduly burdensome to ask a fraction of these claimants to provide the basic information

on which they base their allegations, which is information that the claimants should have had when they filed their lawsuit or certainly should have by now. Further, if a claimant does not have information regarding whether he has an asbestos-related disease, where and when he was exposed to asbestos, to which products he was exposed, and for how long, then he does not have the evidence required to establish his claim and it should not be estimated to have significant value. Despite this, and despite the fact that Debtors' Questionnaire is largely based on a form already approved by Judge Fitzgerald for use in *Grace*, Debtors are willing to make, and have proposed, certain revisions to their Questionnaire to address the concerns of the ACC and FCR. These revisions are discussed below.

The Court has stated and restated its intention to consider all the competing evidence in estimation and not to limit itself to the evidence that the ACC and FCR consider relevant. Sample claimant discovery is a necessary and appropriate part of this process, and Debtors' Questionnaire is an efficient means of gathering this discovery. At this point, all that remains for the Court to decide is what the precise contours of the claimant discovery should be. In light of the Court's clear instructions on September 20, Debtors hope that the parties will be able to resolve many of their remaining disputes before the October 6 hearing. But to the extent they cannot, Debtors urge the Court to reject the ACC and FCR's recycled arguments and to allow Debtors to proceed with the discovery they need to present all the relevant evidence in estimation.

## II.    DISCUSSION.

### A.    This Court and Others Have Recognized the Propriety of Claimant Discovery.

Debtors are entitled to take discovery in the estimation under both the Bankruptcy and Civil Rules of Procedure. *See* Fed. R. Bankr. P. 7026-37 (2005); Fed. R. Civ. P. 26-37

(2005). The discovery sought by Debtors' Questionnaire is plainly relevant to estimating the number and value of potentially valid claims and is narrowly tailored to minimize the burden on claimants.

In light of the Court's statements at both the June 13 and the September 20 hearings, Debtors understand that the Court has resolved to allow claimant discovery and will not respond in detail to the ACC and FCR's attempts to resurrect previously rejected arguments as to why any form of claimant discovery would be improper and irrelevant. (*See* ACC's Opp'n at 10-19; FCR's Opp'n at 8-10.) Nonetheless, Debtors respond, if only summarily, to certain misstatements that the ACC and FCR have made.

    1.    **There is no "established method" for estimating claims exemplified by the *Eagle Picher*, *Owens Corning*, and *Federal Mogul* cases, and both past and recent estimations have taken a merits-based approach.**

While the Oppositions discuss the *Eagle Pitcher*, *Owens Corning*, and *Federal Mogul* estimations in depth, they tellingly omit any mention of, much less any attempt to distinguish or discredit, the numerous cases adopting a more merits-based approach that Debtors have previously cited. *See, e.g.*, *Grace* CMO (approving a discovery questionnaire to be answered by each of W.R. Grace's approximately 118,000 personal injury claimants); *In re G-I Holdings, Inc.*, 323 B.R. 583, 626 (Bankr. D.N.J. 2005); *see also* Debtors' May 26 Response to Joint Discovery Brief at 8-9, D.I. 16 (discussing *In re Armstrong World Industries, Inc.*, *In re Babcock & Wilcox Co.*, and *In re A.H. Robins Company, Inc.*).

There is no "established approach" to estimation that militates against permitting claimant discovery or considering the merits of claims. Rather, this Court has the power to use whatever method it deems best suited to estimating Debtors' liability under the circumstances. *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135 (3rd Cir. 1982). While Debtors do not assert that settlement history has no relevance to this estimation, the method best suited to weighing the

value of pending and future claims is to assess the relevant medical and historical bona fides of a representative sample of pending claims and to extrapolate the findings to the overall claimant pool.

### 2. Estimation of the aggregate value of personal injury claims does not violate due process.

There also is no due process problem with permitting discovery of a sample of claimants or considering the merits of claims in estimation. Debtors, like the ACC, seek only to have the Court estimate the total amount of Debtors' liabilities for the purpose of establishing a 524(g) trust. Estimation in these circumstances is required by the Bankruptcy Code. *See* 11 U.S.C. §§ 502(c), 524(g) (2005). Precedent also establishes that an estimation should precede jury trials of the underlying claims. *See, e.g., In re A.H. Robins Co.*, 788 F.2d 994, 1012 (4th Cir. 1986) (noting that "the authorities . . . are all unanimous. The estimations of the potential and pending claims by the bankruptcy courts should precede any trials of the claims.")

The only difference between the parties' estimation proposals is the method of calculating the amount needed to fund the trust. Neither approach to estimation liquidates individual claims. In both approaches, the claimants' right to a jury trial is preserved in that unhappy claimants are entitled to sue the trust. If the ACC/FCR's estimation methodology comports with due process, then so does Debtors'.

Because none of the cases cited in the Oppositions involved 502(c) estimation, they do not show that Debtors' approach to estimation would violate due process. *Cimino v. Raymark, Industries Inc*, 151 F.3d 297 (5th Cir. 1998), for example, was not an estimation proceeding. The Court in *Cimino* considered the appropriateness of a trial plan that would allow plaintiffs to extrapolate the results of bellwether trials to resolve issues of liability and to fix damages in

thousands of other cases. *Id* at 303. The Court noted that due process provides the right to a jury trial in proceedings to determine liability and fix damages, and rejected the trial plan on those grounds. *Id* at 319. Here, by contrast, the sample will not be used to fix damages or determine liability. It will instead be used to provide the Court with a tool to weigh the strength or weakness of the overall universe of pending and future claims to estimate how much money should be set aside for such claims. No individual claimant is deprived of his or her rights by this process.

**B.    The Relevance of the Sample Discovery to the Consideration of the Merits of Claims is Undeniable.**

In addition to repeating these general indictments of the concept of claimant discovery, the ACC and FCR again plead ignorance as to how the discovery might be used in estimation. They argue that because such discovery would only be relevant to the litigation of individual cases, it has no probative value here and must be denied.

Debtors again set forth below how the Questionnaire will be used to address the five issues of claim validity Debtors will present in estimation. While Debtors' experts' testimony is still being developed and there are likely to be additional uses to which the claimant discovery can be put, the summaries below describe the primary uses Debtors currently envision for the claimant discovery.

- **No Reliable Proof of Injury / Impairment:** The bulk of claims in the CCR database are for non-malignant asbestos disease. Debtors will present expert testimony on the medically-accepted criteria for physical impairment and use the results from the Questionnaire to analyze what percentage of the sample claimants do not meet this criteria. Debtors will also use the results of the Questionnaire to determine what percentage of claims depend upon B-reads from the cadre of B-readers who have recently been implicated in misconduct and misdiagnoses of asbestos and silica-related illnesses. Using this information, the Court can determine what percentage of the sample claimants, and by extrapolation all pending and future claimants, have fraudulent claims or have no evidence of a compensable injury.

6

- **De Minimis Exposures:** Debtors' industrial hygiene and construction practices experts will use the occupational and exposure histories obtained from the Questionnaire, to estimate the cumulative exposure of each sample claimant to U.S. Gypsum's asbestos-containing products. Debtors' medical experts will testify as to the level of exposure required to cause each of the diseases at issue in the estimation. From this evidence, the Court will be able to determine what percentage of claimants have zero or insignificantly slight exposure to U.S. Gypsum's products. Debtors will also use the Questionnaire to identify instances where the level of a claimant's exposure to another manufacturer's asbestos-containing products is so great as to render his exposure to U.S. Gypsum's products comparatively meaningless.

- **The Chrysotile Defense to Mesothelioma Claims:** Debtors' percipient witnesses and experts will establish that Debtors' products contained no meaningful levels of any type of asbestos other than chrysotile asbestos. Debtors' experts will also establish that chrysotile either has not been shown to cause mesothelioma or does so only at massive doses. Debtors will then use the occupational and exposure histories from the Questionnaire (as described above) to estimate what percentage of the sample mesothelioma claimants have zero or insignificant exposure (in terms of mesothelioma causation) to U.S. Gypsum's products.

- **Lung Cancer without Asbestosis:** Debtors' experts will demonstrate that there is a scientific consensus that lung cancer in the absence of asbestosis is not asbestos related. Debtors will then use the information from the Questionnaire to establish what percentage of lung cancer claimants also have reliable evidence of asbestosis.

- **Other Cancers:** Debtors' experts will testify that there is no evidence that asbestos causes cancers other than lung cancer and mesothelioma. Debtors will then use the Questionnaire to determine from what types of "other cancers" (*e.g.*, laryngeal, liver, brain, etc.) the sample claimants suffer. This information would be needed, in the event that the Court accepts that some other cancers can be caused by asbestos, but not others. Debtors will also use the Questionnaire to check the bona fides of the diagnoses of the sample other cancer claims.

After these determinations as to the validity of the sample claims are made, Debtors expert statistician will predict, taking into account the appropriate margins of error, what percentage of the total claimant population, in each disease category, has and does not have the characteristics of a valid claim.[2]

---

[2] Given that Debtors' medical and scientific experts will determine whether each of the 2000 sampled claims has the characteristics of a valid claim, and will provide those results to Debtors' expert statistician, there will

C.    **Debtors' Sampling Plan Is Sound, But Debtors Are Willing to Adjust It to Address Certain Criticisms.**

As detailed below, the FCR's criticisms of Debtors' Sampling Plan are, for the most part, groundless and premature. Moreover, their position is wholly inconsistent with the approach to estimation they themselves advocate. The ACC and FCR's approach to estimation also necessitates using evidence about a sample of claims (in their case, the recently closed claims) to predict the value of future claims. Indeed, their estimation specifically contemplates that the Court will make adjustments to the estimation based upon predicted changes in the complexion of the claimants in the future. The FCR cannot claim that such projections and adjustments are possible and appropriate in their estimation, but unworkable in Debtors'.

1.    **Pursuant to the FCR's input, Debtors will sample an additional 1000 claimants whose occupations are unknown.**

On September 20, the Court invited Debtors to increase the number of sampled claimants as necessary. The Court stated:

> If the debtor wants to do more than 1,000 questionnaires, they can do more than 1,000 questionnaires, unless it becomes so unduly burdensome.
>
> . . .
>
> If you want to go with 1,000, if there's 5,000, I can't judge the number. Although I would say when you're looking at 150,000 potential claimants, to pick 1,000 doesn't strike this Court as unreasonable when you understand that there has to be some level of sampling that will take place.

(Sept. 20, 2005 Hr'g Tr. at 6:17-19, 7:12-16.) Debtors' Sampling Plan called for 500 claims, stratified by disease type, to be randomly drawn from construction-industry claimants and 500 to be drawn from non-construction claimants. As the FCR notes, a portion of the present

---

be no need for Debtors' statistician to make projections across multiple characteristics or multiple categories of claimants. For example, Debtors' statistician will not be projecting what portion of sampled lung cancer claimants have either inadequate exposure or no asbestosis. That analysis will be performed individually for each claimant by Debtors' other experts. For this reason, Dr. Florence's warning that making projections about one characteristic in combination with another will raise the margins of error, (*see* Declaration of B. Thomas Florence in Opposition to Debtors' Motion for Approval of Sampling Plan and Claimant Questionnaire ¶ 16), is not applicable here.

claimants' occupational industries are shown as "unknown" in the CCR database. (FCR Opp'n at 13-14.) The FCR argues that drawing a sample only from those claimants with a known industry might introduce some bias into the data and decrease the representativeness of the sample to pending and future claims. (*Id.*) The FCR offers no evidence to demonstrate that the omission of unknown occupational claimants from Debtors' Sample would improperly skew the statistical inferences Debtors intend to develop. Nonetheless, in an abundance of caution and to address the FCR's concerns, Debtors now propose to revise their Sampling Plan.

Debtors will sample an additional 1000 claimants with unknown occupations. These claimants will be stratified by disease type in the same manner as the original 1000 claimants (*i.e.*, one-fifth of the sample will be drawn from each of the disease categories: mesothelioma, lung cancer, other cancer, non-malignant, and unknown). After this sample is drawn and these claims are analyzed, they can be reassigned to the construction and non-construction groups into which the original 1000 sample claimants are divided. The additional sample will have the added benefits of driving down margins of uncertainty in the extrapolation, since larger sample sizes always lower the uncertainty of projections to the whole population. (*See* Fienberg Declaration accompanying Debtors' Motion ¶ 17, D.I. 36 ("Fienberg Decl.").) It will also enable the parties to perform certain additional analyses, described below, that the FCR asserts may be necessary, while maintaining relatively small error bounds.[3]

As Debtors have previously stated, they are ready and willing to meet with the ACC and FCR, or their experts, to discuss further amendments to the Sampling Plan that will alleviate concerns that the sample will be unrepresentative or any other concerns the parties may have.

---

[3] The FCR also takes issue with Debtors' proposal to assign a claimant to the construction group if his secondary occupation is in construction, arguing that there is no "objective means" to determine secondary occupation from the CCR database. There are any number of objective methods one might use to determine secondary occupation, such as the occupation with the second longest duration. In any case, this is an issue that can certainly be resolved at a later time and provides no basis for rejecting sampling altogether.

### 2.   Adding closed claims to Debtors' Sample would impose undue burdens on non-parties to this estimation and is not necessary.

The FCR also argues that Debtors' Sample will be unrepresentative because it includes only open claims, when a sample of both open and closed claims might be more representative of the future claims. Including both open and closed claims in Debtors' Sample is both highly impractical and unnecessary.

Gathering a sample of Questionnaires from the closed claimants would be very difficult. Plaintiffs whose claims against Debtors have been resolved are not part of this bankruptcy, and this Court has no jurisdiction over them. Consequently, discovery of these claimants could only take place by way of subpoenas issued to hundreds or thousands of individuals throughout the country. Even if the subpoenas could be enforced, the information returned on closed claims is likely to be much less accurate and complete than for pending claims, because claimants with closed claims have no independent requirement or incentive to gather or organize complete and correct information.

Sampling closed claims also is not necessary because, to the extent that the FCR can demonstrate a quantifiable difference in the characteristics of closed claims, they are free to argue that such differences should be taken into account during the estimation. As stated above, under either estimation protocol, the Court will need to consider evidence on the likely characteristics of the future claims and decide what adjustments from the estimation of the present claims are necessary.

### 3.   There is also no basis to omit older claims from Debtors' Sample.

The FCR also argues that certain of the open claims from which Debtors will sample are "stale," or too old to be representative of future claims. The FCR's belief that these claims will possess different characteristics than the more recently filed open claims is

highly speculative, and Debtors doubt that it is correct. Given that less than 20% of the open claims fall into this allegedly "stale" group and that any differences in the characteristics of these claims will be, at most, minor, the overall impact of these claims on the estimation is likely to be imperceptible.

In any event, speculation on this issue is unnecessary. These "stale" claims clearly must be sampled, along with more recent claims, for the purpose of assessing their strength. But, as Debtors now propose to sample 2000 claimants, approximately 1600 of which will have been filed within the last three years, the FCR can, in its own analysis, exclude these allegedly stale claims from the sample for the purpose of estimating the future claims, while retaining more than adequate predictive power. The Court will then be able to see whether excluding these claims makes any difference and can decide which sample it believes is more representative of the future claims. Thus, even if the Court accepts that these claims should not be used to predict the characteristics of future claims, there is no reason to conclude that Debtors' Sampling Plan is flawed.

> **4.      The discrepancies between the number of pending claims in Debtors' and the FCR's databases arise, principally or entirely, from differences in what claims the parties treat as "pending."**

The FCR's Opposition notes the number of pending claims in Debtors' and the FCR's databases appear to be different (approximately 150,000 vs. approximately 180,000) and query whether the parties are working with the same database. Both Debtors and the FCR are working with databases supplied by the Center for Claims Resolution. Debtors' initial analysis suggests that the discrepancy in the number of pending claims arises from a difference in the parties' definitions of "pending." The CCR database divides unresolved claims into the following three basic categories: "Open," "SBND," and "Inactive". Debtors consider the pending claims (those they intend to sample) to be only the "Open" claims. As Exhibit B to the

RLF1-3028322-1

Florence Declaration makes explicit, in calculating its numbers, the FCR also treats the "SBND" or "Settled But Not Documented" claims as "pending." The FCR's inclusion of SBND claims accounts for most, if not all, of the differences in the parties' numbers.[4]

**D.    The ACC and FCR's Objections To Debtors' Questionnaire Lack Merit, But Debtors Have Agreed to Some Modifications.**

As Debtors' noted in their moving papers, their proposed Questionnaire is based substantially on the form approved by Judge Fitzgerald for use in *Grace*. *See* W.R. Grace Asbestos Personal Injury Questionnaire ("*Grace* Questionnaire") following the *Grace* CMO attached as Exhibit A. Ignoring this fact altogether, the ACC and FCR raise a host of objections to Debtors' Questionnaire. The ACC claims, for example, that compliance with the Questionnaire is unduly burdensome because certain items request information that is too detailed and the associated document request is overbroad. They also argue that certain information (such as social security information and information related to alcohol/drug abuse) is too sensitive to provide. The ACC and FCR also claim that the time frames for collecting and analyzing the claimant discovery are unreasonably short. The ACC and FCR's objections can be grouped into certain general categories, discussed below. While Debtors believe they are fully justified in requiring claimants to respond to the Questionnaire in the form originally proposed, they are, in the interest of compromise, willing to limit the Questionnaire in certain significant particulars and have so indicated below.

---

[4] Based on the numbers in the FCR Opposition, it appears that some small discrepancies may remain even after adjusting for the SBND claims, but Debtors cannot make this determination without further information on the origin of the numbers in the FCR's Opposition. Debtors and the FCR should confer to sort out this potential confusion, if necessary, at a later time.

RLF1-2928322-1

1.    **Completing Debtors' Questionnaire is not unduly burdensome for claimants.**

The ACC argues that numerous items in Debtors' Questionnaire are too detailed for claimants to answer. (*See e.g.,* ACC Opp'n at 22-25 and 30-31, arguing that it is unduly burdensome to require claimants to supply detailed information regarding past occupations, past residences, exposures to U.S. Gypsum's and other manufacturers' products, and medical history.) These objections have no proper basis.

It is not unduly burdensome to ask questions to determine whether the claimants have been diagnosed with an asbestos-related disease, what exposure they have or may have had to asbestos-containing products, and what records they have that support (or contradict) their assertions.[5] Courts in other estimations, including *Grace*, have ordered that discovery of this general kind be taken *of every* claimant. (*See e.g., Grace* CMO and *Grace* Questionnaire; Debtors' May 26 Response to Joint Discovery Brief at 8-9, D.I. 16 (discussing *In re Babcock & Wilcox Co.* and *In re A.H. Robins Company, Inc.*); *see also* Equity Committee's Sept. 19 Response at 11.) Given the substantial similarity between Debtors' Questionnaire and the *Grace* Questionnaire, which will be served on approximately 118,000 claimants in that action, the ACC and FCR's claims of undue burden are patently insupportable. Every argument made as to the burden of the claimant discovery here would have been 60 times more compelling in *Grace*, where the number of claimants from whom discovery is sought is approximately 60 times as large. Again, the *Grace* decision is directly on point, and its glaring absence from the Oppositions' discussion of the alleged burden of Debtors' Questionnaire belies the ACC and

---

[5] The smattering of cases cited by the ACC regarding the "substantial factor" test are not relevant. The ACC is free to take the now thoroughly discredited view that one fiber can significantly contribute to disease -- even though all Americans are exposed to millions of fibers in the ambient air each year -- during the estimation. Debtors, however, will present scientific evidence that *de minimis* exposures to asbestos fibers are medically meaningless

RLF1-2928322-1

FCR's arguments.

The recent ruling in *Grace* is particularly relevant on questions of burden, because it is likely that a substantial percentage of Debtors' present claimants are also claimants in *Grace*. In light of the considerable overlap between the information those claimants have already been ordered to collect and produce in *Grace* (including work histories, medical records, deposition transcripts, prior settlement results, etc.), the ACC and FCR can hardly argue that it will be burdensome to produce the same information here. Indeed, for those claimants who are also responding to the *Grace* Questionnaire, responding to Debtors' Questionnaire may be nearly effortless.

Additionally, as the Equity Committees' September 19 brief notes, Debtors would be entitled to demand a bar date and prima facie proof of a valid claim from every claimant in this action. Fed. R. Bankr. P. 3003(c)(3) (2005); Equity Committee's Sept. 19 Response at 8-10. Debtors' proposed approach, which requires just over one percent of claimants to compile only the basic facts and documents supporting their claim and allows nearly 99% of claimants to do nothing, is far less burdensome than this legally guaranteed alternative.

While Debtors are confident of their entitlement to all the information sought in the Questionnaire, in a good faith effort to address the ACC's stated concerns, Debtors have carefully reconsidered each item of information requested. After such review, Debtors are willing to revise the Questionnaire to omit Part 8, which requests detailed information on claimants' residential history. Other changes Debtors will voluntarily make to the Questionnaire are described below.

2. **There is no substitute for claimants' relevant medical records and they are not unduly burdensome to produce.**

The ACC's Opposition contains one paragraph arguing that Debtors

should be denied the right to collect any documents from the sample claimants. (ACC Opp'n at 34.)    This argument makes no sense in this context. First, much of the medical evidence Debtors will need to, and are entitled to, examine will be *entirely documentary*. Debtors cannot, for example, examine the appearance of the alleged opacities in the claimants' chest x-rays by reading a claim form. Neither can Debtors be forced to rely on a claimant's representation that he was diagnosed with an asbestos-related condition, if the actual medical report and x-ray are available.

Second, a simple document request is not, as the ACC argues, unduly burdensome. It is a garden variety form of discovery employed in virtually every civil action that occurs anywhere in the country. In fact, the estimation in *Grace* requires all claimants to provide the medical, and other, documentation supporting their claims. (*See Grace* Questionnaire; *see also* the discussion of *In re A.H. Robins* in Debtors' May 26 Response to Joint Discovery Brief at 9 (noting that medical records were gathered from 6,000 claimants in that action).) Moreover, given that claimants will have to collect and review many of the relevant documents, including medical records, in order to accurately complete the Questionnaire, the additional burden of producing those documents is not material.

Despite Debtors' clear entitlement to this discovery, Debtors are willing, in the interest of compromise, to omit their request for medical records for mesothelioma claimants, and to require only a statement of diagnosis from a physician. This compromise will lessen significantly the burden of collection and production that would otherwise rest on the claimants.

### 3. Debtors have good bases for seeking social security numbers, past settlements, and information on alcohol and drug abuse.

The ACC protests that claimants should not be required to provide their social security numbers, past settlement information, or information concerning past alcohol and

drug abuse, claiming that this information is "personal" and sensitive, and that seeking it is "punitive." (ACC Opp'n at 33.) Debtors have good reasons to request this information, and there are easy mechanisms to guard against unauthorized further disclosure. Nonetheless, Debtors are willing to drop their requests regarding alcohol and drug use.

Debtors have requested social security information to enable them to verify and confirm claimants' employment history with the Social Security Administration. Employment history relates to exposure, a fundamental issue of claim validity. To the extent the ACC has genuine concerns about privacy and confidentiality of claimants' Social Security numbers, Debtors are prepared to enter into confidentiality agreements with all vendors who will have access to those numbers.

Debtors must have information about the settlement amounts claimants have previously received for their injuries to avoid bestowing a windfall on claimants to the detriment of all other stakeholders. The ACC protests that this information is potentially subject to a confidentiality agreement or protective order. Judge Fitzgerald, however, ordered claimants to collect and produce this information in *Grace*. To the extent necessary, claimants can give the appropriate notices of disclosure in advance of production, thereby affording interested parties a chance to object, and can produce this information subject to a protective order to ensure that no subsequent disclosure occurs.

4.    **The time frames set forth in the August 12 Joint Filing are realistic and appropriate.**

The ACC and FCR complain that they will require more than thirty-five days to complete the Questionnaires, and that they will need six to eight months, at least, to evaluate the claimant discovery after collection. (*See* FCR Opp'n at 18-20.) Regarding how long claimants will need to complete Debtors' Questionnaire and provide the responsive

documents, since much of the information sought in the Questionnaires would have to have been gathered by the claimants' lawyers before they would have had a sufficient basis to file suit against U.S. Gypsum, Debtors do not agree that several months are required to respond to the Questionnaire fully. Work histories, litigation histories, and basic medical documentation should be readily accessible to claimants. Additionally, the FCR's argument that claimant discovery will place an impossible burden on those plaintiffs' law firms that may have to complete numerous Questionnaires is contradicted by the *Grace* order, which requires all the questionnaires served in that action to be returned in 4 months. (*Grace* CMO at 2-3.) If the plaintiffs' bar can respond to 118,000 *Grace* Questionnaires in four months, it can surely respond to 2,000 in thirty-five days.[6]

As to time to analyze the information obtained, Debtors are willing to consider reasonable alternative proposals by the ACC and FCR. However, given that all the objective information will be provided in a searchable database, which can be queried to analyze any information it contains, Debtors do not agree that a period substantially longer than the period they have proposed will be necessary. Once again, the FCR's position that six to eight months is required to analyze 2,000 claims is at loggerheads with the *Grace* Case Management Order, under which it is incumbent upon the parties to analyze 60 times as many claims and produce expert reports in just over a year. (*Grace* CMO at 3-4.)

Debtors' Questionnaire seeks only the basic information necessary to assess the validity of the sample claims. Contrary to the ACC's claim that the discovery sought is "totally divorced from state law standards," the exposure, occupation, and litigation history Debtors' request is a fraction of what these claimants would have to produce if their claims were litigated in the tort

---

[6] Again, some of Debtors' 2000 claimants will likely also be part of Grace's 118,000, and will have collected this information already.

system. (*See* Debtors' Motion at 9-11.)

## III.    CONCLUSION

For these reasons, Debtors respectfully urge the Court to approve their Sampling Plan and

Questionnaire, in the form initially proposed, but modified as specified in this brief, and to order

that claimant discovery commence as soon as is practicable.

Dated:  September 28, 2005

RICHARDS, LAYTON, & FINGER, P.A.

*[signature]*

Daniel J. DeFranceschi (DE No. 2732)
Paul N. Heath (DE No. 3704)
One Rodney Square, P.O. Box 551
Wilmington, Delaware 19899
Tel: (302) 651-7700

COOLEY GODWARD LLP
Stephen C. Neal (CA 170085)
Scott D. Devereaux (CA 146050)
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306
Tel: (650) 843-5000

JONES DAY
David G. Heiman (OH 0038271)
Brad B. Erens (IL 6206864)
North Point - 901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Tel: (216) 586-3939

966474 v1/SF

18